## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| In Re SUNRISE SENIOR LIVING, INC.   ) | **Civil Action No. 07-00143** |
| Derivative Litigation                       ) | |
| _____) | **CONSOLIDATED SHAREHOLDER** |
| ) | **DERIVATIVE COMPLAINT** |
| This Document Relates To:               ) | |
| ) | **JURY TRIAL DEMANDED** |
| ALL ACTIONS                            ) | |
| _____ ) | |

Plaintiffs, by the undersigned attorneys, submit this Consolidated Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.      This is a shareholders' derivative action brought for the benefit of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of Directors (the "Board"), and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations, and other violations of law.

2.      From 1997 through 2005, a majority of Sunrise directors and top officers colluded to devise two separate mechanisms that manipulated the accounting treatment of the Company's joint venture real estate operations and stock option granting practices.

3.      For at least seven years, Sunrise directors and top officers improperly accounted for joint venture real estate developments in which the Company had a minority stake (typically 20%) and gave preferential distributions and financial guarantees to the Company's majority partners and financiers.  Under applicable accounting rules, if Sunrise structured its joint ventures with preferential guarantees and distributions to its partners, Sunrise, as the managing

1

entity in the joint venture, was required to absorb 100% of the early period or start-up losses of the new facilities, rather than just its 20% share, and was allowed to recoup those early period losses only when the joint venture's facility was operating successfully and profitably and/or was sold. Additionally, Sunrise could not record profits on sales of facilities if it provided financial guarantees in connection with the sale. Accounting for its joint venture operations or real estate sales in the manners described above – which was required by Generally Accepted Accounting Principles ("GAAP") and principles of fair presentation – would heavily penalize Sunrise's reported financial results, depriving it of real estate sales profits, while requiring it to recognize millions of dollars of current period losses from the joint venture operations. This would prevent it from showing the kind of strong profitable growth that was indispensable for the success of its business plan and necessary to allow its insiders to personally profit from large annual bonuses and to push its stock price to the high levels they desired so they could sell off their Sunrise stock at inflated – and very profitable – prices.

4.     Thus, to achieve the ends they desired, defendants cheated and pursued an improper course of business that misled Sunrise's investors. Instead of following the required accounting rules and principles, Sunrise's top officers and directors, including the members of its Audit Committee, knowingly caused or allowed Sunrise to report inflated profits from at least 1999-2005 and, by the Company's own admission, report over **$100 million** in improperly accounted for profits and conceal significant joint venture losses, which enabled Sunrise insiders to pocket large and unjustified cash bonuses and to personally profit by insider trading to take advantage of the artificially inflated price of Sunrise's common stock.

5.     Additionally, for at least five years, a majority of Sunrise directors, together with its top officers, engaged in a secret scheme to grant undisclosed, in-the-money stock options to

2

themselves and others by backdating stock option grants to coincide with historically low closing prices of Sunrise's common stock, thus manufacturing artificially low option exercise prices. In fact, in a striking pattern over four consecutive years – 1997-2000 – Sunrise's Board purportedly granted options when Sunrise stock was trading at or near its yearly low price. Moreover, eleven out of thirteen option grants dated from May 1997 through November 2001 were backdated,[1] eight of which were granted to some, if not all, of Sunrise's five most highly compensated executives. Furthermore, at least two additional option grants during this period were granted in direct violation of the Company's shareholder-approved stock option plans.

6.     Plaintiffs have also conducted a statistical analysis identical in methodology to that of the Merrill Lynch analysis that has been recently advocated by the Delaware Court of Chancery and a number of federal district courts as indicative of a pattern of backdating.[2] The result of plaintiffs' statistical analysis indicates that over the period from 1997 through 2001 the average annualized return for stock option grants to Sunrise executives based on a twenty-day trading window following the date of grant was 148%. This is more than seven times the average annualized investor return of 20% over the same period. The difference of over 120% is strong evidence of backdating.

7.     By engaging in both of these unlawful schemes, the Individual Defendants (defined herein) were able to conceal that Sunrise was not recording material compensation

---

[1] Automatic grants to directors on or near the date of the annual stockholders' meeting or pursuant to their appointment/election as directors are excluded from this pattern, as are option grants that were later exchanged pursuant to Sunrise's stock option re-pricing plan implemented by the Stock Option Committee on September 14, 1998, because no discretion as to the timing of the grant was possible.

[2] The statistical analysis involved examines the twenty-day return of each stock option grant listed in the Company's proxy statement for each year of the relevant period. The twenty-day returns for all the grants made during each individual fiscal year were averaged and then annualized to represent what the twenty-day return would correspond to for an entire year. The average annualized returns for each year during the relevant period were then averaged and compared to the average of an investor's annual return for each year over the relevant period.

expenses and was materially overstating the Company's net income and earnings for at least 1997 to 2006. From 1997 to 2006, the Individual Defendants collectively realized over $174 million in illicit proceeds through the sale of Sunrise stock based on their knowledge of material non-public information regarding the Company's schemes. By contrast, Sunrise has suffered, and will continue to suffer, significant financial and non-monetary damages and injuries.

8.      The Individual Defendants' illegal accounting manipulation schemes not only lined the pockets of the recipients of the backdated options and other inside sellers of stock, and caused Sunrise to issue materially false financial statements, but also undermined the key purpose of stock option-based executive compensation: to provide incentive to improve the Company's performance and increase the Company's stock price and market capitalization. By manipulating options such that they carried an exercise price lower than the trading price of the stock on the date of grant, Sunrise insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition.

9.      Sunrise shareholders first filed derivative lawsuits concerning the Company's stock option granting practices against certain of the Company's officers and directors in August and September 2006 in the Circuit Court of Fairfax County, Virginia. Sunrise's Board subsequently appointed undisclosed persons to a special independent committee "to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants."

10.      In gross breach of their fiduciary duties as officers and/or directors of Sunrise, the Individual Defendants colluded with one another to:

        a      improperly account for real estate joint venture profits, losses and
               sales, in violation of GAAP;

4

b        improperly backdate dozens of grants of Sunrise stock options to Sunrise executives and directors, in violation of the Company's shareholder-approved stock option plans;

c        improperly record and account for the backdated stock options, in violation of GAAP;

d        improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

e        produce and disseminate to Sunrise shareholders and the market false financial statements and other Securities and Exchange Commission ("SEC") filings that improperly recorded and accounted for the Company's real estate joint ventures and backdated option grants and concealed the improper accounting of real estate joint ventures and backdating of stock options.

11.     As a result of the Individual Defendants' egregious misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

14.     Lead plaintiffs Broxton Contributory Retirement System, Catherine Molner and Robert Anderson are, and were at all relevant times, shareholders of nominal defendant Sunrise.

15.     Nominal defendant Sunrise is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102.  According to its public filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

### Director Defendants

16.     Defendants, husband and wife, Paul J. Klaassen ("Klaassen") and Teresa M. Klaassen ("Teresa Klaassen" and collectively, "the Klaassens") co-founded Sunrise and have served as directors of the Company since 1981.  Klaassen has also served as Chairman of the Board and Chief Executive Officer of the Company since 1991.  Teresa Klaassen has served as Chief Cultural Officer of the Company since 2001, and previously served as Secretary from 1981 to 2005 and as Executive Vice President from 1981 to November 2003.  Because of the Klaassens' positions, they knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith.  Klaassen received at least 700,000 backdated stock options.[3]  Moreover, the Klaassens, together, sold 1,462,106 of their personally held shares

---

[3] Calculations of stock options granted to defendants are adjusted for the Company's 2-for-1 stock split effective October 4, 2005.

of Sunrise common stock for $56,363,094.63 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company. Furthermore, Sunrise paid Klaassen the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|---|
| Klaassen | 2005 | $473,890 | $454,925 | $1,181,952 | - | $225,324 |
| | 2004 | $463,742 | - | - | - | $234,545 |
| | 2003 | $420,910 | $146,865 | $58,751 | - | $150,884 |
| | 2002 | $373,414 | $400,000 | - | - | $54,680 |
| | 2001 | $300,000 | $412,500 | - | - | - |
| | 2000 | $242,000 | $37,500 | - | 350,000 | $350,000 |
| | 1999 | $200,000 | $75,000 | - | - | - |
| | 1998 | $200,000 | - | - | - | - |
| | 1997 | $200,000 | - | - | - | $942 |

17.    Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of Sunrise since 1995, and as a member of the Audit Committee of the Board ("Audit Committee") since 1996, chairing the Audit Committee since 2001. Aprahamian also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in 1996. Aprahamian also served as a consultant to the Company beginning in May 1997. Because of Aprahamian's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Aprahamian received at least 222,000 backdated

7

stock options.  Moreover, Aprahamian sold 215,200 of his personally held shares of Sunrise common stock for $8,848,497.20 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company.

18.     Defendant Craig R. Callen ("Callen") has served as a director of Sunrise since 1999.  Callen served as a member of the Audit Committee in 1999 and since 2004, and as a member of the Stock Option Committee from 1999 to August 23, 2002, when the Stock Option Committee merged with the Compensation Committee of the Board ("Compensation Committee").  Because of Callen's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith.  Callen received at least 36,000 backdated stock options.  Moreover, Callen sold 10,000 of his personally held shares of Sunrise common stock for $521,093.00 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company.

19.     Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995 and as a member of the Audit Committee since 1996.  Donohue served as a member of the Stock Option Committee from 1996 to August 23, 2002, serving as chairman for part of his tenure.  Because of Donohue's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real

estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Donohue received at least 52,000 backdated stock options. Moreover, Donohue sold 134,378 of his personally held shares of Sunrise common stock for $3,732,527.28 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company.

20.     Defendant J. Douglas Holladay ("Holladay") has served as a director of Sunrise since 2000, and as a member of the Audit Committee in 2000. Because of Holladay's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Holladay received at least 24,000 backdated stock options. Moreover Holladay sold 39,000 of his personally held shares of Sunrise common stock for $1,873,125.00 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company.

21.     Defendant William G. Little ("Little") has served as a director of Sunrise since 2004. Because of Little's position, he knew, consciously disregarded, was reckless and grossly

negligent in not knowing or should have known about the improper joint venture and real estate accounting, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith.

22.    Defendant David G. Bradley ("Bradley") served as a director of Sunrise from August 1997 to 2005, as a member of the Stock Option Committee from 1997 to August 23, 2002, and as a member of the Audit Committee from 2001 to 2003. Because of Bradley's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Bradley received at least 14,000 backdated stock options.

23.    Defendant Peter A. Klisares ("Klisares") served as a director of Sunrise from 2000 to 2004. Because of Klisares' position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Klisares sold 28,664 of his personally held shares of Sunrise common stock for $999,177.05 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real

10

estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company.

24.     Defendant Scott F. Meadow ("Meadow") served as a director of Sunrise form January 1995 to August 1995 and from February 1996 to November 1999.  Meadow also served as a member of the Stock Option Committee from 1996 to 1999.  Because of Meadow's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith.

25.     Defendant Robert R. Slager ("Slager") served as a director from 1999 to 2001. Because of Slager's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith.  Slager received at least 10,000 backdated stock options.

26.     Collectively, defendants Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue, Holladay, Little, Bradley, Klisares, Meadow and Slager are referred to herein as the "Director Defendants."

**Officer Defendants**

27.     Defendant Thomas B. Newell ("Newell") has served as the Company's President

11

since April 2000, as Executive Vice President from May 1996 to April 2000, as President of Sunrise Development, Inc., the Company's development subsidiary, and as General Counsel from January 1996 to April 2000. Because of Newell's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Newell received at least 900,000 backdated stock options. Moreover, Newell sold 733,886 of his personally held shares of Sunrise common stock for $26,230,945.70 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company. Furthermore, Sunrise paid Newell the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|
| Newell | 2005 | $396,498 | $309,344 | $96,000 | 100,000 |
| | 2004 | $360,688 | $446,000 | - | - |
| | 2003 | $339,769 | $87,500 | - | - |
| | 2002 | $289,897 | $225,000 | $3,268,530 | - |
| | 2001 | $252,465 | $131,000 | - | 70,000 |
| | 2000 | $215,600 | $37,500 | - | 85,000 |
| | 1999 | $175,000 | $75,000 | - | 65,000 |
| | 1998 | $175,000 | - | - | 400,000 |
| | 1997 | $175,000 | - | - | 100,000 |

28. Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003. Previously Tomasso served as Executive Vice

President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994. Because of Tomasso's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Tomasso received at least 730,000 backdated stock options. Moreover, Tomasso sold 472,335 of her personally held shares of Sunrise common stock for $17,265,701.75 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company. Furthermore, Sunrise paid Tomasso the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|------------------------|-------------------------------|
| Tomasso | 2005 | $348,138 | $204,716 | $626,598 | 100,000 |
| | 2004 | $309,162 | $160,000 | - | - |
| | 2003 | $283,812 | $80,000 | $974,825 | - |
| | 2002 | $221,012 | $112,500 | - | 60,000 |
| | 2001 | $207,423 | $105,000 | - | 30,000 |
| | 2000 | $197,000 | $37,500 | - | 70,000 |
| | 1999 | $165,000 | $50,000 | - | 65,000 |
| | 1998 | $165,000 | - | - | 430,000 |

29.    Defendant John F. Gaul ("Gaul") has served as the Company's General Counsel since October 2002 and as Secretary since May 2005. Previously, Gaul served as Senior Vice

President from October 2002 to November 2003. Because of Gaul's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and reports and other information provided to him in connection therewith. Gaul sold 26,503 of his personally held shares of Sunrise common stock for $1,090,491.08 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company. Furthermore, Sunrise paid Gaul the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|---|
| Gaul | 2004 | $206,108 | $194,667 | - | - |
| | 2003 | $194,808 | $33,333 | $389,944 | - |
| | 2002 | $38,365 | $32,500 | - | 50,000 |

30.     Defendant Bradley B. Rush ("Rush") has served as Sunrise's Chief Financial Officer ("CFO") since August 2005. Previously, Rush served as Chief Investment Officer from January 2005 to August 2005, Managing Director and Senior Vice President, Capital Group (a division of Sunrise) from September 2004 to January 2005 and Executive Vice President of the Company's properties division from July 2003 to September 2004. Because of Rush's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to

internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and reports and other information provided to him in connection therewith. Rush sold 6,937 of his personally held shares of Sunrise common stock for $432,143.87 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company. Sunrise paid Rush the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|---|
| Rush | 2005 | $286,711 | $177,421 | $1,658,927 | 80,000 |

31.     Defendant Carl Adams ("Adams") has served as Senior Vice President and Treasurer since December 2005. Previously, Adams served as Senior Vice President of Sunrise Capital Group from November 2004 to December 2005, and as Sunrise Chief Accounting Officer from May 2000 to November 2004. Because of Adams' positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Adams received at least 5,000 backdated stock options. Moreover, Adams sold 17,481 of his personally held shares of Sunrise common stock for $590,106.75 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant

backdating practices engaged in by the Company.

32.      Defendant David W. Faeder ("Faeder") served as the Company's, and its predecessor entities, Executive Vice President and Chief Financial Officer from 1993 to 1997. Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant to the Company from April 2000 to March 2004.  Because of Faeder's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith.  Faeder received at least 850,000 backdated stock options.  Moreover, Faeder sold 749,727 of his personally held shares of Sunrise common stock for $22,118,963.33 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company.  Furthermore, Sunrise paid Faeder the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------------|------------------------|
| Faeder    | 1999        | $175,000 | $75,000 | 65,000 | - |
|           | 1998        | $175,000 | - | 400,000 | - |
|           | 1997        | $175,000 | - | 100,000 | $838 |

33.      Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003,

and as Chief Financial Officer from April 2000 to 2005. Because of Hulse's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Hulse received at least 257,776 backdated stock options. Moreover, Hulse sold 239,897 of his personally held shares of Sunrise common stock for $9,304,495.07 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company. Furthermore, Sunrise paid Hulse the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|---|
| Hulse | 2004 | $257,635 | $212,333 | - | - |
| | 2003 | $235,933 | $41,667 | $487,413 | - |
| | 2002 | $181,809 | $92,500 | $34,485 | 40,000 |
| | 2001 | $170,939 | $86,500 | - | 25,000 |
| | 2000 | $157,000 | $30,000 | - | 32,222 |
| | 1999 | $105,000 | $30,000 | - | 50,000 |

34.    Defendant Timothy S. Smick ("Smick") served as Chief Operating Officer of the Company from February 1996 to January 1998, as Executive Vice President of the Company from May 1996 to January 1998, and as a director of the Company from October 1996 to March 1998. Because of Smick's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Sunrise insiders were improperly

backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Smick received at least 300,000 backdated stock options. Moreover, Smick sold 60,417 of his personally held shares of Sunrise common stock for $2,125,947.25 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company. Furthermore, Sunrise paid Smick the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|---|
| Smick | 1997 | $175,000 | - | 150,000 |

35.    Defendant Brian C. Swinton ("Swinton") served as the Company's Executive Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc. from September 2000 to December 2002. Because of Swinton's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Swinton received at least 550,000 backdated

18

stock options. Moreover, Swinton sold 461,307 of his personally held shares of Sunrise common stock for $14,493,371.22 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and undisclosed stock option grant backdating practices engaged in by the Company. Furthermore, Sunrise paid Swinton the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------------|
| Swinton | 2001 | $207,423 | $27,500 | 30,000 |
|  | 2000 | $197,000 | - | 60,000 |
|  | 1999 | $165,000 | $50,000 | 40,000 |
|  | 1998 | $165,000 | - | 200,000 |
|  | 1997 | $165,000 | - | 75,000 |

36.     Defendant Christian B. A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May 1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004. Because of Slavin's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and reports and other information provided in connection therewith. Slavin received at least 850,000 backdated stock options. Moreover, Slavin sold 278,546 of his personally held shares of Sunrise common stock for $8,990,534.92 while in possession of material, non-public information concerning the improper accounting practices related to Sunrise's real estate joint ventures and the illegal and

undisclosed stock option grant backdating practices engaged in by the Company. Furthermore, Sunrise paid Slavin the following compensation during the relevant period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|---|
| Slavin | 2003 | $283,812 | $80,000 | $974,825 | - |
| | 2002 | $221,012 | $112,500 | - | 60,000 |
| | 2001 | $207,423 | $105,000 | - | 60,000 |
| | 2000 | $197,000 | $37,500 | - | 145,000 |
| | 1999 | $111,000 | - | - | 220,000 |

37.     Collectively, defendants Newell, Tomasso, Gaul, Rush, Adams, Faeder, Hulse, Smick, Swinton and Slavin are referred to herein as the "Officer Defendants."

38.     Collectively, defendants Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue, Holladay, Little, Bradley, Klisares, Slager, Newell, Tomasso, Rush, Adams, Faeder, Hulse, Swinton and Slavin are referred to herein as the "Accounting Defendants."

39.     Collectively, the Director Defendants and Officer Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

40.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not for self-aggrandizement. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty

to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

41.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

d.    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

e.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

43.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's

financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

> (1)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (2)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> > (a)     transactions are executed in accordance with management's general or specific authorization;
> >
> > (b)     transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

44.     Sunrise's Audit Committee Charter provides that the Audit Committee shall, among other things:

> a.     meet to review and discuss the company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including reviewing the company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"
>
> b.     review major issues regarding accounting principles and financial statement presentations, and major issues as to the adequacy of the company's internal controls and any special audit steps adopted in light of material control deficiencies;
>
> c.     review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of financial statements;
>
> d.     determine whether to recommend to the board of directors that the annual audited financial statements be included in the company's annual report on Form 10-K; and

22

e. prepare the audit committee report required by the rules of the SEC to be included in the company's annual proxy statement.

## FACTUAL ALLEGATIONS

### The Individual Defendants' Improper Accounting of the Company's Real Estate Joint Ventures

45. For years, but specifically from 2005 to 2006, the Accounting Defendants forced the Company to make material misrepresentations regarding the overall performance of the Company and specifically the performance of Sunrise's real estate joint ventures in relationship to the Company's overall performance.

46. On August 4, 2005, the Accounting Defendants knowingly caused or allowed Sunrise to report its second quarter of fiscal year 2005 results via a press release that referred to "growth in equity in earnings on investments in unconsolidated senior living properties."  The press release stated in part:

> "We are extremely pleased with the results we are reporting today," said Paul Klaassen, Sunrise Senior Living chairman and CEO."  We are benefiting from our typical growth drivers which include revenue growth in our operating portfolio of management properties, additional community openings and new construction . . . ."

> \* \* \*

> "At the end of the quarter, we had minority equity interests in 132 communities held in joint ventures, with a balance sheet investment book value of over $108 million," said Thomas Newell, president, Sunrise Senior Living. "*Since a substantial majority of our new development activity, and most of our acquisitions, are being conducted through joint ventures, we expect our minority equity investments to continue to grow.  We participate in the earnings of the joint venture communities based on our percentage ownership and we also expect to continue to receive incentives as these ventures exceed performance thresholds.  As a result, we expect to see substantial growth in our income from earnings and returns on equity investments going forward*."

47. On the same day, defendants held a telephone conference call for analysts to

discuss the Company's business and financial results.  During the call, the following occurred:

> **[P. Klaassen – CEO:]** [We] had an excellent second quarter.  Virtually every segment performed at or above expected levels.  As a result we had a significant increase in core earnings which we define as total earnings excluding income from property sales and acquisitions transition expenses.

*  *  *

> We have now met or exceeded expectations every quarter for the past six years and we continued that unbroken streak in the second quarter as ***we significantly exceeded the high end of our guidance range* …. *In hindsight, our forecast was probably a bit conservative as we outperformed in occupancy growth, management and professional services fees, earnings from joint ventures and lower interest costs.***

*  *  *

> **[Question:]** [O]ne of the things that drove numbers for the quarter I guess was little unexpected from my part was the equity in earnings line and I understand some of that were incentive fees related to sale. And I was wondering - if we can get a little more color on exactly the transaction for the quarter, and also if you can give us any help on thinking about projecting that on a go forward basis, additional sales and incentive fees that we might see?

> **[P. Klaassen:]** The transaction in the quarter I'm not going to break down too much -- we negotiate these things every day and I do not want to hurt ourselves in those negotiations by giving too much information on it. … We try to make the best deal that we can. You can see the growth that occurred in that line item that gives you an idea sort of about the range. But for competitive reasons, I do not want to get too detailed.  … [A]ll I can say is those investments are long-term. We are very happy with the structure which rewards Sunrise for upside end results and we think those are good investments, the $108 million now $130 million was spent wisely. And we think over the long-term, they'll pay off.

48.     On September 13, 2005, officers of Sunrise met with Davenport Equity Research ("Davenport").  On September 14, 2005, Davenport reported the results of that meeting to the market, repeating what Sunrise's officers had told them.  Davenport's September 14, 2005 report stated:

> •     **Reiterate Buy rating following meetings with management**.  We are comfortable with our forecast for 15% earnings growth for the next several years.  We believe our investment thesis remains sound, while the

24

company continues to execute its **growth strategies under its new management services orientation**.

\* \* \*

• **Management services business model generates stable revenue and reduces the company's risk profile**.  The sale of most consolidated facilities and subsequent increase in management contracts has made SRZ's revenue stream more predictable with upside potential from performance bonuses and the minority interest usually retained.  In addition, capital, construction, and fill-ups risks are now shared with the development partners.

49.    On November 8, 2005, the Accounting Defendants knowingly caused or allowed the Company to issue a press release entitled "Sunrise Reports Third-Quarter 2005 Results and Re-Affirms Full Year 2005 Earnings Guidance."  Specifically, the press release stated:

Sunrise Senior Living, Inc. today reported third-quarter 2005 earnings per share of $0.24 (diluted) compared to $0.21 (diluted) per share in the third quarter of 2004.  **The 14 percent increase in third-quarter, year-over-year earnings per share reflects ... growth in equity in earnings and return on investments in unconsolidated senior living properties**.

\* \* \*

**Sunrise's income from equity in earnings and return on investments in unconsolidated senior living properties increased to $7.8 million in the third quarter of 2005 from $2.1 million in the prior year period primarily as a result of a transaction in which a venture partner sold its equity portion of 13 senior living communities**.  Through this transaction, Sunrise's ownership interest in the venture increased to 25 percent from 20 percent and Sunrise received performance incentive distributions under the terms of the venture agreement. Sunrise venture agreements typically include provisions rewarding Sunrise through various performance incentives.  Sunrise continues to manage these 13 senior living communities under long-term management contracts.

"**We continue to benefit from** our management services business model and **our minority equity investments in unconsolidated properties**," said Thomas Newell, president, Sunrise Senior Living.  "At the end of the third quarter, we had minority equity investments in 152 communities in unconsolidated ventures with a balance sheet investment book value of $128 million.  We strive to create value for our investment partners through operational excellence and when we succeed we also generate substantial returns for Sunrise through our percentage ownership in these communities and the incentives triggered when these ventures exceed

25

performance thresholds. We have set a long-term target to earn a 15 percent annual return on our investments in unconsolidated senior living properties."

50.    On November 8, 2005, certain Officer Defendants held a conference call for

analysts to discuss its business and finances. During the call, the following occurred:

[P. Klaassen, CEO:] Our income statement, balance sheet, and cash flow are all in excellent shape and ready to support a very strong '06 outlook. Our growth drivers are producing consistent with our expectations and as a result we are able to report earnings per share excluding acquisition transition and hurricane related expenses of $0.26 a share in Q3 after adjusting for our recent two for one stock split .... *As anticipated, we also continued to benefit from growth in our equity and earnings line. Our 152 joint venture communities are making substantial contributions to our growth through our percentage ownership in these communities*. … We target a 15% annual return on our $128 million investment in these unconsolidated senior living properties. And we expect to continue to benefit from our percentage ownership in these joint venture communities for many years to come.

* * *

[Question:]  I wanted to actually just ask a little bit about equity and earnings and guidance. The equity and earnings bounces around a little bit because you're selling properties. You have got various things coming in. I guess I wanted to see if we could get some additional guidance on that beyond what you provided and also just clarify maybe what your own assumptions are say in '05, '06 numbers for that?

[Newell – President:] We have given a target long-term of 15% earnings on the 128 million we've invested. That's through 152 properties and joint ventures and it is lumpy as you said because included in that line will be startup losses from homes and development ventures as they open. As they ramp up then, we begin to share in the earnings and cash from those joint ventures. And as performance hurdles are met, we began to share disproportionately which is what you saw in this quarter and in the last quarter as investor partners received distributions in excess of the hurdles we begin to generate substantial returns. Our assumptions internally are that over time from those investments we will hit a 15% IRR. We model out all 152 communities over a long period of time and calculate that in our guidance. It's very difficult to predict out more than one or two quarters. We have a sense of what's coming, we do our best in giving guidance what we are very confident of these are very good investments in communities that are performing very well. For the long run for Sunrise, we will generate a great return on that.

51.    On March 7, 2006, the Accounting Defendants knowingly caused or allowed the

26

Company to issue a press release entitled "Sunrise Reports Fourth-Quarter 2005 Results, Reaffirms Full-Year 2006 Earnings Guidance and Expects 15 to 20 Percent Full-Year 2007 EPS Growth."  The press release stated in part:

> Sunrise Senior Living, Inc. today reported fourth-quarter 2005 earnings of $1.01 per share (diluted) compared to $0.28 (diluted) per share in the fourth quarter of 2004.  For the full year 2005, Sunrise reported earnings per share of $1.67 (diluted) compared to earnings per share of $1.12 (diluted) in 2004.

> *    *    *

> "The fourth quarter and year closed strongly, as we expected, and positions us for a very good 2006 during which we will be celebrating our 25th anniversary," said Paul Klaassen, Sunrise Senior Living's chairman and CEO.

> *    *    *

> "We are extremely excited about the opportunities that lie ahead for our business," said Thomas Newell, president of Sunrise Senior Living.  "*As we move forward, we expect to continue to benefit from our expanded development program and our management services business model.  In 2006, we anticipate a record number of community openings and substantial returns from our minority investments in joint venture partnerships.  In addition, the strength of our balance sheet is expected to provide significant flexibility as we enter into the next phase of our growth strategy.*"

> *    *    *

> Sunrise's 2006 earnings per share is expected to be driven ... by further growth in earnings generated by Sunrise's equity investments in unconsolidated ventures.

> *    *    *

> Sunrise expects earnings generated by its equity investments in unconsolidated ventures to continue to play a significant role in its ability to grow overall EPS for the next several years.

52.    On the same day, certain Officer Defendants held a conference call for analysts to discuss Sunrise business and finances.  During the call, the following occurred:

[P. Klaassen – CEO:] The fourth quarter closed out strongly as we expected and ended a busy and successful year for Sunrise. All four of our growth engines, are firing on all cylinders. As you may know, those four growth engines are: 1, growth from new construction, 2, growth from new management contract acquisition: 3, internal growth from existing operations, and 4, growth generated by our balance sheet. …

*   *   *

Our success in 2005 was the result of many factors ....

*   *   *

*Regarding equity in earnings, excluding the 3.6 million one-time write-down of our original investment in the At-Home venture, we would have reported equity in earnings of unconsolidated senior-living communities of approximately 3.8 million in Q4, and, I guess that would be $16.8 million for the year. We expect an additional 15 % growth in this business segment in 2006.* Our ownership percentage in these 156 unconsolidated joint-venture communities in which we have invested $138 million should therefore generate about 19 million in pretax income this year. *These minority ownership positions align our interests with our capital partners, and allows us to participate in community performance upside, without the negative impact of increased debt levels or additional amortization and depreciation expenses*.

53.    In March 2006, the Accounting Defendants knowingly caused or allowed Sunrise to issue its 2005 Annual Report to Shareholders.  The 2005 Annual Report contained a letter signed by Klaassen and Newell that stated:

**2005 Results**  Overall, we are very pleased with our performance in 2005.

*   *   *

**Joint Venture Partners**      Strong industry demographics, operational excellence, and our strong financial condition continue to accelerate interest among our impressive group of joint venture partners.  At the end of 2005, 156 of our communities were held in joint ventures, and *nearly all of our new development and acquisitions are conducted through joint ventures*.  Through our percentage ownership in these communities and the incentives we receive for exceeding performance thresholds, *these partnerships contributed significantly to our growth in 2005*.  In addition, these joint venture partnerships reduce our corporate risk profile *since we share capital and construction risk with our partners*.

28

54.    Elsewhere, the 2005 Annual Report stated:

***Equity in Earnings and Return on Investment in Unconsolidated Senior Living Communities***

Equity in earnings and return on investment in unconsolidated senior living communities represents our allocation of the results of operations and returns on our investment from the distributions of proceeds from transactions with our unconsolidated ventures.

**2005 Compared to 2004**

Equity in earnings and return on investment in unconsolidated senior living communities was $13.2 million in 2005 compared to $9.4 million in 2004, an increase of $3.8 million, or 41%, which was primarily comprised of:

- $8.8 million return on our investment pursuant to the terms of a venture agreement;

- a decrease of $4.9 million from our portion of start-up losses associated with two international development ventures. In 2005, these two ventures opened four communities which incurred losses in 2005;

- $2.9 million return on our investment whereby an unconsolidated venture sold two senior living communities to Sunrise REIT;

- $3.0 million return on our investment whereby an unconsolidated venture sold its three senior living communities and distributed the proceeds to its members. We recognized the $3.0 million of cash received in excess of our investment;

- a decrease of $3.6 million from the write-down of our interest in Sunrise at Home; and

- a decrease of $2.5 million from the results of operations from other unconsolidated ventures, including our portion of start-up losses from development ventures.

**2004 Compared to 2003**

Equity in earnings and return on investment in unconsolidated senior living communities was $9.4 million in 2004 compared to $5.3 million in 2003, an increase of $4.1 million, or 76%, which primarily resulted from improved operations and additional incentive fees.

55.    The 2005 Annual Report also contained a section stating:

**Management's Report on Internal Control over Financial Reporting**

29

Management of Sunrise Senior Living, Inc. (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting and for the assessment of the effectiveness of internal control over financial reporting. As defined by the Securities and Exchange Commission, internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the consolidated financial statements in accordance with U.S. generally accepted accounting principles.

The Company's internal control over financial reporting is supported by written policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the Company's transactions and dispositions of the Company's assets; [and] (2) *provide reasonable assurance that transactions are recorded as necessary to permit preparation of the consolidated financial statements in accordance with generally accepted accounting principles* . . . .

\* \* \*

In connection with the preparation of the Company's annual consolidated financial statements, management has undertaken an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO Framework). *Management's assessment included an evaluation of the design of the Company's internal control over financial reporting and testing of the operational effectiveness of those controls.*

*Based on this assessment, management has concluded that as of December 31, 2005, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.*

56.    Note 2 to Sunrise's 2005 financial statements represented:

*Investments in Unconsolidated Senior Living Communities*

Sunrise holds an interest in ventures established to develop or acquire and own senior living communities. When these ventures are considered to be variable interest entities ("VIEs") in accordance with FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary. When Sunrise has determined it is not the primary beneficiary or, for non-VIEs when it determines that it owns a non-controlling interest (because other partners or members control

or participate in the management decisions of these ventures), ***the investments are accounted for under the equity method***.

*The equity method investments are recorded at cost* and subsequently are adjusted for equity in net income (losses) and distributions. Sunrise determines its share of the investees' earnings or losses based on the distributions of cash flow from a hypothetical liquidation of the investee's assets and liabilities. The equity earnings are adjusted for the impact on the investee's reported earnings, if any, for the basis differences between Sunrise's carrying value of the equity investments and the investee's underlying assets. Sunrise recognizes profits on sales of services to these ventures to the extent of the ventures' outside ownership interest.

*Sunrise owned interests in 187 unconsolidated senior living communities (31 of which are under development) through ownership interests in 30 unconsolidated ventures at December 31, 2005 that are accounted for under the equity method and one unconsolidated venture accounted for under the cost method.* Those ventures are generally limited liability companies and partnerships. Sunrise's interest in those ventures generally range from five to 25%. Sunrise has one community in which it owns less than 10%, 147 communities in which it owns between 10% and 20%, and 20 communities in which it owns between 10% and 30%, and 19 communities in which it owns more than 30%.

### Variable Interest Entities

At December 31, 2005, Sunrise had an interest in 11 ventures that are considered VIEs. Sunrise is the primary beneficiary and, therefore, consolidates eight of these VIEs. Seven of these consolidated VIEs are development communities in which Sunrise has a majority of the voting interest and is developing for Sunrise REIT (see Note 4). At December 31, 2005, included in Sunrise's consolidated balance sheet were $56.1 million of development costs and $50.7 million of debt, including $6.6 million of third-party construction debt secured by the development communities and $44.1 million of borrowings from Sunrise REIT guaranteed by Sunrise. The only recourse to Sunrise with respect to these seven VGFIEs is under borrowings from Sunrise REIT.

57.    Despite the multitude of representations by the Accounting Defendants regarding Sunrise's robust performance, in reality the Accounting Defendants were knowingly concealing material information and improper accounting techniques to the Company's investors as follows:

- Sunrise's 2003, 2004 and 2005 and prior year financial results, including its net income, EPS, profit and shareholders' equity, were all materially overstated due to improper accounting for minority interests in joint ventures and real estate sales

31

and contrivances and manipulations in the administration of Sunrise's stock options, including backdating, and failing to properly record or account for the actual amount and tax consequences of the compensation expense of its executives.

- Sunrise's excellent financial and operating results reported, at times relevant hereto, were not due to the skill and business acumen of its top executives and directors, their successful management of its business or the outstanding performance of its business units, as represented. In fact, a significant part was due to manipulation of Sunrise's financial statements by improperly avoiding recognizing losses on minority interests in joint ventures, improper recognition of gains on real estate sales and not properly accounting for and understating the true compensation expense of its executive and management team.

- The Individual Defendants were manipulating the Company's stock option plan so as to enrich themselves by backdating the stock options they were granted to set the options at a much lower exercise price – one well below the market price or fair value of the stock when the option was actually granted – or by granting them before the release of positive corporate news that would boost the stock, thus giving them an instant, riskless profit, while exposing the Company to the risk of regulatory investigations, tax penalties and even criminal proceedings.

- Sunrise's internal financial and accounting controls were materially deficient and ineffective in providing the necessary and required degrees of assurance that Sunrise's financial results and reports were fairly and accurately presented and free from fraud.

32

58.     The Accounting Defendants' improper accounting manipulations and contrivances had an enormous impact on Sunrise's publicly issued financial statements.  For instance, in a joint venture in which Sunrise had a 20% interest and its partner an 80% interest, where the venture suffered $1 million in losses during its start-up and early operations phase, GAAP required Sunrise to recognize and report 100% of these losses, or $1 million.  However, by manipulating the Company's accounting and acting as if the joint venture did not have a distribution preference, defendants caused Sunrise to recognize and report losses of only $200,000.  This tricky manipulation, when combined with Sunrise's manipulated real estate accounting to improperly recognize profits on sales where Sunrise provided guarantees, overstated Sunrise's reported profits by at least $100 million from 1999 through 2005.

### Backdating of Stock Option Grants to the Individual Defendants

59.     According to the Company's annual proxy statements, from June 5, 1996 to August 23, 2002, the Stock Option Committee "ha[d] the power and authority to take all actions and make all determinations under the Company's stock option plans, including the grant of options thereunder."   On August 23, 2002, the Stock Option Committee merged with the Compensation Committee, and thereafter the Compensation Committee was responsible for administering the Company's stock option plans and determining the grants awarded under the stock option plans.

60.     Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1996 Directors' Stock Option Plan ("1996 Director Plan"), the 1997 Stock Option Plan, the 1998 Stock Option Plan, the 1999 Stock Option Plan, the 2000 Stock Option Plan, and the 2001 Stock Option Plan (collectively, the "Plans"), "[t]he Option Price shall be not less than the greater of par value or 100 percent of the fair market value of a share of Stock on the date on

which the Option is granted," where fair market value is defined as "the closing price of the Stock on such exchange or system or in such market … on the trading date immediately before the Option is granted …."

61.    Additionally, each of the Plans specifically provides that "[t]he date of grant of an Option under this Plan shall be the date as of which the Board approves the grant."

62.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

63.    Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation; and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

64.    From 1997 to 2001, the Stock Option Committee, which consisted of defendants Callen, Donohue, Bradley and Meadow, with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25 and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the

market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated options.

65.    The members of the Board who were not on the Stock Option Committee had actual knowledge of the backdating and knew that it violated the terms of the Plans, ABP 25 and Section 162(m).  All of the members of the Board knew that the publicly reported grant dates and statements that the Company followed APB 25 and granted options with exercise prices equal to the fair market value of Sunrise stock on the date of grant were false because the grants were in fact backdated.  The entire Board knowingly and deliberately approved the backdating scheme with knowledge of its consequences, e.g., its effects on Sunrise's financial statements.

## 1997 Backdated Option Grants

66.    Purportedly on May 2, 1997, the Stock Option Committee, which consisted of defendants Donohue and Meadow, granted 525,000 stock options to five of the Individual Defendants, including four of the five most highly compensated executives as disclosed in the Company's proxy statement.  These stock options were backdated to the **second lowest price of Sunrise stock for the entire year**, as demonstrated below:[4]

_____

[4] All graphs in the Complaint use adjusted exercise prices and adjusted closing prices.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price[5] | Adjusted Number of Options |
|---|---|---|---|---|---|
| 05/02/97 | Faeder | $24.38 | 100,000 | $12.19 | 200,000 |
| | Smick | $24.38 | 150,000 | $12.19 | 300,000 |
| | Newell | $24.38 | 100,000 | $12.19 | 200,000 |
| | Swinton | $24.38 | 75,000 | $12.19 | 150,000 |
| | Aprahamian | $24.38 | 100,000 | $12.19 | 200,000 |

67.     Purportedly on August 28, 1997, the Stock Option Committee, which consisted of defendants Donohue, Meadow and Bradley, granted Tomasso 30,000 stock options.[6]  These stock options were backdated to the **second lowest price of Sunrise stock for the fiscal**

---

[5] All tables in this complaint depict adjusted exercise prices and adjusted numbers of options to account for the Company's 2-for-1 stock split effective October 4, 2005.

[6] These options were later re-priced pursuant to a re-pricing program authorized and implemented by the Stock Option Committee.  The re-pricing program allowed Sunrise officers to trade in options with an exercise price of more than $29.00 in exchange for an equal number of options at an exercise price of $25.00, which was the closing price of Sunrise stock on September 14, 1998.

**quarter**, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 08/28/97 | Tomasso | $30.75 | 30,000 | $15.38 | 60,000 |

68.     Purportedly on November 4, 1997, the Stock Option Committee, which consisted of defendants Donohue, Meadow and Bradley, granted Hulse 25,000 stock options.[7]  These stock options were backdated to one of the lowest prices of Sunrise Stock for the fiscal quarter, as demonstrated below:

---

[7] Id.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/04/97 | Hulse | $36.63 | 25,000 | $18.31 | 50,000 |

### 1998 Backdated Option Grants

69.    Purportedly on September 14, 1998, the Stock Option Committee, which consisted of defendants Donohue, Meadow and Bradley, granted a total of 755,000 stock options to five of the Individual Defendants, including four of the five most highly compensated executives as disclosed in the Company's proxy statement. These grants, pursuant to a re-pricing plan to give the Individual Defendants additional profits, were backdated to one of the lowest prices of Sunrise stock for the fiscal year. Additionally, all the underwater options[8] that were re-priced in favor of the Individual Defendants were profitable again by the end of the year, as

---

[8]    "Underwater options" is a term used for options whose exercise price is above the current market stock price, and as such would be useless to exercise because the grantee would have to pay more to obtain the stock than the price at which the grantee could sell the stock.

demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/14/98 | Faeder | $25.00 | 200,000 | $12.50 | 400,000 |
| | Newell | $25.00 | 200,000 | $12.50 | 400,000 |
| | Swinton | $25.00 | 100,000 | $12.50 | 200,000 |
| | Tomasso | $25.00 | 230,000 | $12.50 | 460,000 |
| | Hulse | $25.00 | 25,000 | $12.50 | 50,000 |

70.    Purportedly on October 8, 1998, Donohue, a member of both the Stock Option Committee and the Audit Committee at the time, was granted 10,000 stock options. These options were backdated to the **lowest price of Sunrise stock for the fiscal quarter**, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 10/08/98 | Donohue | $30.81 | 10,000 | $15.41 | 20,000 |

71.    Purportedly on December 10, 1998, the Stock Option Committee, which consisted of defendants Donohue, Meadow and Bradley, granted Hulse 21,666 stock options.  These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock, as demonstrated below:

40



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 12/10/98 | Hulse | $41.19 | 21,666 | $20.59 | 43,332 |

### 1999 Backdated Option Grants

72.     Purportedly on March 5, 1999, the Stock Option Committee, which consisted of defendants Donohue, Meadow and Bradley, granted Hulse and Slavin a total of at least 165,000 stock options.[9]  However, Slavin **did not even begin his employment with the Company until May 1999**, according to the Company's 2003 proxy statement.  These options were backdated to one of the lowest prices of Sunrise stock for the fiscal quarter, as demonstrated below:

---

[9] Where the total number of options is unknown, *i.e.* where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 03/05/99 | Hulse | $37.63 | 15,000 | $18.81 | 30,000 |
| | Slavin | $37.63 | At Least 150,000 | $18.81 | At Least 300,000 |

73.    Purportedly on November 8, 1999, the Stock Option Committee, which consisted of Donohue, Bradley and Callen, granted a total of 350,000 stock options to seven of the Individual Defendants, including four of the five most highly compensated executives as disclosed in the Company's proxy statement.  Callen, one of the recipients of these options, was on the Stock Option Committee and the Audit Committee on the date of grant.  These options were backdated to one of the lowest prices of Sunrise stock for the fiscal year, as demonstrated below:

42



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/08/99 | Faeder | $12.75 | 65,000 | $6.38 | 130,000 |
| | Newell | $12.75 | 65,000 | $6.38 | 130,000 |
| | Swinton | $12.75 | 40,000 | $6.38 | 80,000 |
| | Tomasso | $12.75 | 65,000 | $6.38 | 130,000 |
| | Hulse | $12.75 | 35,000 | $6.38 | 70,000 |
| | Slavin | $12.75 | 70,000 | $6.38 | 140,000 |
| | Callen | $12.75 | 10,000 | $6.38 | 20,000 |

## 2000 Backdated Option Grants

74.    Purportedly on February 25, 2000 and March 28, 2000, the Compensation

Committee, which consisted of defendants Donohue, Bradley and Callen, granted a total of over

420,000 options to eleven of the Individual Defendants, including four of the five most highly

compensated executives as disclosed in the Company's proxy statement.  Furthermore, Donohue

Bradley and Callen, three of the recipients of the February 25, 2000 options, comprised the entire

Stock Option Committee on the date of grant, and Aprahamian, Donohue, and Callen, all

43

recipients of the February 25, 2000 options, comprised the entire Audit Committee on the date of grant. These options were backdated to two of the lowest prices of Sunrise stock for the fiscal year, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 02/25/00 | Newell | $12.38 | 60,000 | $6.19 | 120,000 |
| | Slavin | $12.38 | 55,000 | $6.19 | 110,000 |
| | Swinton | $12.38 | 45,000 | $6.19 | 90,000 |
| | Tomasso | $12.38 | 55,000 | $6.19 | 110,000 |
| | Faeder | $12.38 | 60,000 | $6.19 | 120,000 |
| | Hulse | $12.38 | 7,222 | $6.19 | 14,444 |
| | Donohue | $12.38 | 16,000 | $6.19 | 32,000 |
| | Aprahamian | $12.38 | 11,000 | $6.19 | 22,000 |
| | Slager | $12.38 | 5,000 | $6.19 | 10,000 |
| | Bradley | $12.38 | 7,000 | $6.19 | 14,000 |
| | Callen | $12.38 | 8,000 | $6.19 | 16,000 |
| 03/28/00 | Newell | $12.44 | 25,000 | $6.22 | 50,000 |
| | Slavin | $12.44 | 15,000 | $6.22 | 30,000 |
| | Swinton | $12.44 | 15,000 | $6.22 | 30,000 |
| | Tomasso | $12.44 | 15,000 | $6.22 | 30,000 |
| | Hulse | $12.44 | 25,000 | $6.22 | 50,000 |

44

75.    Purportedly on May 22, 2000, the Stock Option Committee, which consisted of Donohue, Bradley and Callen, granted Adams and Holladay a total of at least 14,500 stock options.  These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 05/22/00 | | | | | |
| | Adams | $15.56 | At least 2,500 | $7.78 | At least 5,000 |
| | Holladay | $15.56 | At Least 12,000 | $7.78 | At Least 24,000 |

76.    Purportedly on September 11, 2000, Co-founder, Chairman of the Board, and CEO Klaassen was granted 350,000 stock options.  The Company's proxy statement indicates that this was pursuant to a new employment agreement entered into with Klaassen in September

45

of 2000, which conveniently granted stock options to him when Sunrise stock was **at the lowest price of the month of September** and near the lowest price of the fiscal quarter, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/11/00 | Klaassen | $17.00 | 350,000 | $8.50 | 700,000 |

77.     Purportedly on November 24, 2000, the Stock Option Committee, which consisted of defendants Donohue, Bradley and Callen, granted 75,000 options to Slavin. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/24/00 | Slavin | $26.31 | 75,000 | $13.16 | 150,000 |

## 2001 Backdated Option Grants

78.     Purportedly on November 12, 2001, the Stock Option Committee, which consisted of defendants Donohue, Bradley and Callen, granted 60,000 stock options to Slavin. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise Stock as demonstrated below:

47



11/12/01: Options granted at 11/09/01 stock price of $13.48

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/12/01 | Slavin | $26.96 | 60,000 | $13.48 | 120,000 |

79.    Each and every one of the aforementioned stock option grants were dated just before a significant increase in Sunrise stock price and/or at or near Sunrise's lowest closing price of the pertinent fiscal quarter or year.  The reason for the extraordinary patterns set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, at the behest of the Individual Defendants, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and deliberately backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the Individual Defendants.  This improper backdating, which violated the terms of the Company's stock option

48

plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options and improperly reduced the amounts the Individual Defendants had to pay the Company upon exercise of the options.

### Ultra Vires Stock Option Grants

80.    As discussed above, pursuant to all of the Plans, stock options granted by Sunrise must be granted at least at fair market value and require a one-day look back to the preceding day's closing price to determine what that fair market value is.

81.    However, two stock option grants by Sunrise during the relevant period violated one or both of these provisions in direct contradiction of the shareholder-approved stock option plans, and therefore are ultra vires and void.  Defendants Faeder, Newell, Swinton, Tomasso, Hulse, Adams, Donohue, Bradley and Callen were the recipients of these ultra vires options, and are hereinafter referred to at the "Ultra Vires Option Recipient Defendants."

82.    Purportedly on March 3, 1998, the Stock Option Committee, which consisted of defendants Donohue, Meadow and Bradley, granted 600,000 stock options to four of the five most highly compensated executives as disclosed in the Company's proxy statement.  The exercise price of these options was $43.50, according the Sunrise's 1999 proxy statement, but the closing price on March 2, 1998 was $43.63.  These options were granted at a price below fair market value in violation of the shareholder-approved stock option plans.

83.    The following chart indicates the recipients of these stock options and the stock options' adjusted value:

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 03/03/98 | Faeder | $43.50 | 200,000 | $26.75 | 400,000 |
|  | Newell | $43.50 | 200,000 | $26.75 | 400,000 |

49

| | Swinton | $43.50 | 100,000 | $26.75 | 200,000 |
| | Tomasso | $43.50 | 100,000 | $26.75 | 200,000 |

84.     Despite the fact that these options were later re-priced pursuant to the Company's re-pricing plan enacted on September 14, 1998, the new options granted to the Ultra Vires Option Recipient Defendants listed above were exchanged for ultra vires options granted at an exercise price below fair market value.

85.     The second ultra vires option grant was purportedly dated May 11, 2001, the date of the Company's annual shareholders' meeting. The Stock Option Committee, which consisted of defendants Donohue, Bradley and Callen, granted 240,000 stock options to themselves and six executives on this date that violated the Plans' definition of fair market value. As noted above, the Plans defined fair market value as the closing price of the Company's stock on the trading day immediately preceding the date of grant, hereinafter referred to as a one day look-back provision. However the options granted on May 11, 2001 were granted at the closing price of the Company's stock on the date of grant. This grant date was **the only time in the entire history of Sunrise's stock option grants that a one day look-back was not used** to determine the exercise price of the options and substantially favored the recipients of stock options on that date. If the one day look-back provision had been applied the exercise price of options would have been $20.97, instead of the $20.00 exercise price at which the stock options were granted. Furthermore, the options were granted at one of the lowest prices of Sunrise Stock for the fiscal year, as demonstrated below:



| Purported Grant Date | Defendant | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 05/11/01 | Faeder | $20.00 | 50,000 | $10.00 | 100,000 |
| | Newell | $20.00 | 70,000 | $10.00 | 140,000 |
| | Swinton | $20.00 | 30,000 | $10.00 | 60,000 |
| | Tomasso | $20.00 | 30,000 | $10.00 | 60,000 |
| | Hulse | $20.00 | 25,000 | $10.00 | 50,000 |
| | Adams | $20.00 | At least 15,000 | $10.00 | At least 30,000 |
| | Donohue | $20.00 | 12,000 | $10.00 | 24,000 |
| | Bradley | $20.00 | 7,000 | $10.00 | 14,000 |
| | Callen | $20.00 | 10,000 | $10.00 | 20,000 |

86.     Both of the aforementioned stock option grants to the Ultra Vires Option Recipient Defendants were granted in violation of the shareholder-approved stock option plans, and therefore are ultra vires and void.

### The Individual Defendants' Improper Stock Repurchase

87.     Between 2000 and 2005, at times when defendants were improperly accounting for the Company's real estate joint ventures and illegally backdating their options, the Board

51

directed Sunrise to repurchase over $202.1 million of its own stock. Specifically, Sunrise repurchased over 13.5 million of its shares from 2000 to 2005.

88.    During these repurchases, Sunrise's stock was artificially inflated because its published financial results did not properly account for the Individual Defendants improper treatment of the Company's real estate joint ventures and illegally backdated stock options. Further, the stock repurchases served to further inflate Sunrise's stock price and, thus, defendants' illegal stock option backdating profits.

### The Individual Defendants' Failure to Hold the Company's Required Annual Meeting of Shareholders

89.    The Individual Defendants have continued to conceal the extent of the Company's accounting improprieties and keep the Company's shareholders in the dark by failing to hold an annual shareholders meeting since May 16, 2006. Pursuant to Del. Gen. Corp. Law § 211(c), "[i]f there be a failure to hold the annual meeting or to take action by written consent to elect directors in lieu of an annual meeting for a period of 30 days after the date designated for the annual meeting, or if no date has been designated, for a period of 13 months after the latest to occur of the organization of the corporation, its last annual meeting or the last action by written consent to elect directors in lieu of an annual meeting, the Court of Chancery may summarily order a meeting to be held upon the application of any stockholder or director." As of June 16, 2007, the Company has failed to hold an annual meeting within the statutorily required 13 month period following the Company's last annual meeting of shareholders and is a violation of Delaware law.

**The Individual Defendants' Dissemination of False Financial Statements**

90.     The Individual Defendants prepared, approved and/or signed Sunrise's annual and quarterly SEC reports during the relevant period.  The Individual Defendants knowingly and deliberately caused the Company to disseminate materially false and misleading statements in the periodic filings that the Individual Defendants prepared, approved, and/or signed.

91.     The Individual Defendants' improper accounting of real estate joint ventures and option backdating schemes caused each of Sunrise's Forms 10-K and Forms 10-Q for the relevant period to materially understate Sunrise's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Individual Defendants failed to properly account for profits realized and losses sustained in the real estate joint ventures per the proper GAAP methods and expense the in-the-money portion of Sunrise's stock option grants during the period as required by APB 25.

92.     As a result of the improper accounting of the Company's real estate joint ventures and backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants:

   a.   violated GAAP, as set forth in AICPA Statement of Position ("SOP) 78-9, Accounting for Investments in Real Estate Ventures, by not eliminating inter-company profits until realized;

   b.   violated GAAP, as set forth in FASB Interpretation ("FIN") No. 46R, addressing consolidation of companies of variable interest entities, by not consolidating entities in which it lacked controlling financial interest;

   c.   violated GAAP, as set forth in FASB Statements of Financial Accounting Standards ("SFAS") No. 66, Accounting for Sales of Real Estate, by providing guarantees on the return of investment of its joint venture partners and the transfer of assets as a sale;

   d.   violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair

53

market value of the price of Sunrise stock on the date of grant;

e.   violated APB 25 by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

f.   violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

g.   produced and disseminated to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expense and overstated net income.

93.   The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

a.   Form 10-K for the fiscal year ended December 31, 1997, filed with the SEC on March 31, 1998 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Bradley and Donohue;

b.   Form 10-K for the fiscal year ended December 31, 1998, filed with the SEC on March 31, 1999 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Bradley and Donohue;

c.   Form 10-K for the fiscal year ended December 31, 1999, filed with the SEC on March 30, 2000 and signed by defendants Klaassen, Faeder, Slavin, Hulse, Aprahamian, Callen, Bradley, Slager and Donohue;

d.   Form 10-K for the fiscal year ended December 31, 2000, filed with the SEC on March 30, 2001 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Callen, Adams, Bradley, Holladay and Donohue;

e.   Form 10-K for the fiscal year ended December 31, 2001, filed with the SEC on March 29, 2002 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Callen, Adams, Bradley, Holladay and Donohue;

f.   Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 27, 2003 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Adams, Callen, Bradley, Holladay and Donohue;

g.      Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 12, 2004 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, Adams, Callen, Bradley, Holladay and Donohue;

h.      Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on March 16, 2005 and signed by defendants Klaassen, Hulse, Aprahamian, Callen, Bradley, Holladay and Donohue; and

i.      Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 16, 2006 and signed by defendants Klaassen, Aprahamian, Callen, Holladay and Donohue.

94.     Specifically, in the Company's annual report on Form 10-K for 2005, the Company represented that it had complied with FIN No. 46R:

### *Investments in Unconsolidated Senior Living Communities*

Sunrise holds an interest in ventures established to develop or acquire and own senior living communities.  When these ventures are considered to be variable interest entities ("VIES") in accordance with FASB Interpretation No. 46, Consolidation of Variable Interest Entities ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary.  When Sunrise has determined it is not the primary beneficiary or, for non-VIE's when and it [sic] determines that it owns a non-controlling interest (because other partners or members control or participate in the management decisions of these ventures), the investments are accounted for under the equity method.

95.     Also, in the Company's annual report on Form 10-K for 2005, the Company stated that "[w]e generally have ownership interests in these unconsolidated ventures ranging from five to 25%.  We will manage these communities pursuant to long-term management contracts."    However, in 2005, Sunrise reported $13.2 million in equity earnings from unconsolidated ventures.  Yet those ventures' total income was $19.2 million.  It is incongruous that Sunrise could recognize 69% of the income from ventures when it generally owned between five and twenty-five percent.  Thus Sunrise inflated its earnings through improper accounting for these unconsolidated ventures.  Moreover, the financial guarantees Sunrise provided to its joint venture partners prohibited the Company from recognizing the sales of real estate immediately.

96.    Additionally, in the Company's annual reports on Form 10-K for fiscal years 1996 to 2003, the Individual Defendants caused Sunrise to falsely state that "the Company has elected to follow Accounting Principles Board Opinion No. 25, 'Accounting for Stock Issued to Employees' ('APB 25'), and related interpretations, in accounting for its employee and director stock option and stock incentive plans.  Under APB 25, if the exercise price of the Company's stock options is not less than the market price of the underlying stock on the date of grant, no compensation expense is recognized."  Such statements were materially false and misleading in each of these years because Sunrise had granted stock options at prices that were below fair market value on the date of the grant and failed to account for the in-the-money options as required by APB 25.

97.    As alleged previously, APB 25 required the Individual Defendants to record compensation expense for options that were in-the-money on the date of grant.  However, they did not do so, thereby materially understating Sunrise's compensation expense and materially overstating Sunrise's net income or materially understating its net loss.  These statements were designed to conceal, and did in fact conceal, the fact that the Individual Defendants were engaged in a continuous and systematic scheme of backdating stock option grants to Sunrise insiders in violation of state and federal laws.

98.    Furthermore, Sunrise's materially false and misleading financial statements for fiscal years 1998 to 2002 were included in its Forms 10-K filed for subsequent fiscal years.  For this reason, and to the extent they included financials from earlier periods, Sunrise's annual reports on Form 10-K for fiscal years 2003 to 2005 were also materially false and misleading.  By participating in these accounting schemes, and by reviewing and/or signing these subsequent annual reports, the Individual Defendants knew, or were reckless in not knowing, that the

56

financial statements in these later filings were materially false and misleading.

99.     Moreover, defendants Klaassen, Hulse and Rush filed false Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification"), certifying that each Annual Report of Sunrise on Form 10-Ks "fully complies with the requirements of section 13(a) and 15(d) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." Defendants Klaassen and Hulse signed the following Certifications for years 2003 through 2005, whereas defendants Klaassen and Rush signed the Certification in 2006:

     a.    for the Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 27, 2003

     b.    for the Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 12, 2004;

     c.    for the Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on March 16, 2005; and

     d.    for the Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 16, 2006.

**The Individual Defendants' Concealment of Their Misconduct**

100.     The Individual Defendants caused Sunrise to send shareholders proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period. The Individual Defendants prepared and/or reviewed each proxy statement between 1999 and 2006. Moreover, they knew, or were deliberately reckless in not knowing, that the proxies were materially false and misleading.

101.     The Sunrise proxy statements that were sent to shareholders by the Individual Defendants annually in connection with annual shareholders' meeting concerned the election of

directors, the approval and adoption of a new Sunrise stock option plan, and ratification of the selection of Sunrise's independent auditor. Each proxy statement sent to shareholders during this period contained materially false and misleading disclosures or omitted information about Sunrise's stock option practices, as detailed above.

102.    From 1998 to 2002, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant," as follows:

a.    Sunrise's proxy statement filed with the SEC on April 3, 1998 falsely reported that options granted to Faeder, Smick, Newell, and Swinton were granted on May 2, 1997, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

b.    Sunrise's proxy statement filed with the SEC on April 6, 1999 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on September 14, 1998, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

c.    Sunrise's proxy statement filed with the SEC on April 14, 2000 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on November 8, 1999, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

d.    Sunrise's proxy statement filed with the SEC on March 29, 2001 falsely reported that options granted to Klaasen were granted on September 11, 2000, that options granted to Newell, Slavin, Swinton, and Tomasso were granted on February 25, 2000 and March 28, 2000, and that options granted to Slavin were granted on November 24, 2000, and falsely stated

that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

   e.   Sunrise's proxy statement filed with the SEC on April 5, 2002 falsely reported that options granted to Newell, Swinton, Tomasso, and Hulse were granted on May 11, 2001 and that options granted to Slavin were granted on November 12, 2001, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

   103.   Moreover, in the Compensation Committee Reports included in the Company's proxy statements filed from 1998 to 2002, the Company falsely stated that "[t]he full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price," when in fact the backdated stock options and ultra vires stock options provided the Individual Defendants with immediate profits regardless of the Company's stock performance.

   104.   Furthermore, from 2003 to 2006, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Forms 4 that falsely reported the dates of stock option grants to the Individual Defendants, as follows:

   a.   Swinton's Form 4 filed with the SEC on May 21, 2003 falsely reported that options granted to Swinton had been granted on March 28, 2000;

   b.   Faeder's Form 4 filed with the SEC on July 16, 2003 falsely reported that options granted to Faeder had been granted on November 8, 1999;

   c.   Faeder's Form 4 filed with the SEC on August 21, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

   d.   Faeder's Form 4 filed with the SEC on August 22, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

   e.   Newell's Form 4 filed with the SEC on August 25, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

f.      Faeder's Form 4 filed with the SEC on September 2, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

g.      Hulse's Form 4 filed with the SEC on September 5, 2003 falsely reported that options granted to Faeder had been granted on February 25, 2000 and March 28, 2000;

h.      Newell's Form 4 filed with the SEC on September 23, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

i.      Faeder's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Faeder had been granted on May 2, 1997;

j.      Swinton's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Swinton had been granted on February 25, 2000;

k.      Swinton's Form 4 filed with the SEC on October 14, 2003 falsely reported that options granted to Swinton had been granted on November 8, 1999;

l.      Swinton's two Forms 4 filed with the SEC on October 21, 2003 falsely reported that options granted to Swinton had been granted on May 11, 2001;

m.      Newell's Form 4 filed with the SEC on October 23, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

n.      Swinton's Form 4 filed with the SEC on October 29, 2003 falsely reported that options granted to Swinton had been granted on May 11, 2001;

o.      Tomasso's Form 4 filed with the SEC on October 30, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999;

p.      Tomasso's Form 4 filed with the SEC on October 31, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999 and March 28, 2000;

q.      Swinton's Form 4 filed with the SEC on November 6, 2003 falsely reported that options granted to Swinton had been granted on May 2, 1997;

r.      Slavin's Form 4 filed with the SEC on November 7, 2003 falsely reported that options granted to Slavin had been granted on February 25, 2000;

s.      Tomasso's Form 4 filed with the SEC on November 7, 2003 falsely reported that options granted to Tomasso had been granted on February 25, 2000;

t.      Hulse's Form 4 filed with the SEC on November 12, 2003 falsely reported that options granted to Hulse had been granted on May 11, 2001;

u.      Slavin's Form 4 filed with the SEC on November 12, 2003 falsely reported that options granted to Slavin had been granted on November 8, 1999, February 25, 2000, March 28, 2000, November 24, 2000, and November 12, 2001;

v.      Faeder's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Faeder had been granted on November 8, 1999;

w.      Hulse's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Hulse had been granted on November 8, 1999;

x.      Swinton's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Swinton had been granted on November 8, 1999;

y.      Tomasso's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999;

z.      Slavin's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Slavin had been granted on November 8, 1999;

aa.     Newell's Form 4 filed with the SEC on November 26, 2003 falsely reported that options granted to Newell had been granted on March 28, 2000;

bb.     Slavin's Form 4 filed with the SEC on December 5, 2003 falsely reported that options granted to Slavin had been granted on November 24, 2000 and November 12, 2001;

cc.     Tomasso's Form 4 filed with the SEC on December 22, 2003 falsely reported that options granted to Tomasso had been granted on May 11, 2001;

dd.     Newell's Form 4 filed with the SEC on December 23, 2003 falsely

reported that options granted to Newell had been granted on November 8, 1999 and March 28, 2000;

ee.    Newell's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ff.    Newell's Form 4 filed with the SEC on February 25, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

gg.    Hulse's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Hulse had been granted on February 25, 2000;

hh.    Tomasso's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Tomasso had been granted on February 25, 2000;

ii.    Faeder's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Faeder had been granted on February 25, 2000;

jj.    Slavin's Form 4 filed with the SEC on March 4, 2004 falsely reported that options granted to Slavin had been granted on February 25, 2000;

kk.    Slavin's Form 4 filed with the SEC on March 5, 2004 falsely reported that options granted to Slavin had been granted on February 25, 2000;

ll.    Swinton's Form 4 filed with the SEC on March 9, 2004 falsely reported that options granted to Swinton had been granted on February 25, 2000;

mm.    Newell's Form 4 filed with the SEC on March 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

nn.    Hulse's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Hulse had been granted on March 28, 2000;

oo.    Tomasso's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Tomasso had been granted on March 28, 2000;

pp.    Slavin's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Slavin had been granted on March 28, 2000;

qq.    Newell's Form 4 filed with the SEC on April 23, 2004 falsely reported that options granted to Newell had been granted on February 25, 2000;

rr.    Newell's Form 4 filed with the SEC on May 24, 2004 falsely reported that options granted to Newell had been granted on February 25, 2000;

ss.　　Hulse's Form 4 filed with the SEC on May 26, 2004 falsely reported that options granted to Hulse had been granted on May 11, 2001;

tt.　　Newell's Form 4 filed with the SEC on June 23, 2004 falsely reported that options granted to Newell had been granted on March 28, 2000;

uu.　　Newell's Form 4 filed with the SEC on July 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999 and March 28, 2000;

vv.　　Newell's Form 4 filed with the SEC on August 24, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ww.　　Newell's Form 4 filed with the SEC on September 24, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

xx.　　Newell's Form 4 filed with the SEC on October 25, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

yy.　　Newell's Form 4 filed with the SEC on November 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

zz.　　Tomasso's Form 4 filed with the SEC on December 16, 2004 falsely reported that options granted to Tomasso had been granted on May 11, 2001;

aaa.　　Newell's Form 4 filed with the SEC on December 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

bbb.　　Newell's Form 4 filed with the SEC on January 25, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ccc.　　Newell's Form 4 filed with the SEC on February 24, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ddd.　　Newell's Form 4 filed with the SEC on March 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

eee.　　Newell's Form 4 filed with the SEC on April 26, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

fff.    Hulse's Form 4 filed with the SEC on May 12, 2005 falsely reported that options granted to Hulse had been granted on May 2, 1997;

ggg.    Newell's Form 4 filed with the SEC on May 24, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

hhh.    Aprahamian's Form 4 filed with the SEC on May 24, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

iii.    Aprahamian's Form 4 filed with the SEC on May 26, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

jjj.    Aprahamian's Form 4 filed with the SEC on May 31, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

kkk.    Newell's Form 4 filed with the SEC on June 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

lll.    Newell's Form 4 filed with the SEC on July 25, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

mmm.    Newell's Form 4 filed with the SEC on August 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

nnn.    Newell's Form 4 filed with the SEC on September 26, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ooo.    Donohue's Form 4 filed with the SEC on November 22, 2005 falsely reported that options granted to Donohuel had been granted on February 25, 2000;

ppp.    Aprahamian's Form 4 filed with the SEC on April 20, 2006 falsely reported that options granted to Aprahamian had been granted on May 2, 1997.

105.    The Individual Defendants have never disclosed the true grant dates of the stock options described herein.

**Backdating and other Accounting Improprieties Revealed at Sunrise**

106.    On May 8, 2006, Sunrise's value was as high as $39.30 per share.  On May 9,

64

2006, the Company was forced to suddenly reveal that it was "rescheduling its first quarter 2006 earnings release to allow additional time for further review of the accounting treatment applied to its investments in unconsolidated senior living communities, and to complete the review of its Form 10-Q for the first quarter ended March 31, 2006."  On May 10, 2006, Sunrise was forced to reveal that the accounting treatment review was focused on the allocation of profits and losses for a "limited number" of Sunrise's joint ventures where Sunrise was a minority partner and the capital partner received a preference, either on the return of its capital over Sunrise's capital in the event of a refinancing or sale of the venture's properties, or cash flow from operations.  On May 11, 2006, Sunrise disclosed "it has decided to use a different methodology to allocate profits and losses in its joint ventures."

107.    During a May 11, 2006 conference call, the following occurred:

**[P. Klaassen – CEO:]** During the final preparation of our first-quarter Form 10-Q, an issue arose that required additional time for review by our team and our outside accountants to ensure the integrity and the accuracy of our financial statements.  The issue that necessitated this additional review has to do with the accounting treatment applied to certain of our investments in unconsolidated senior living communities.  Specifically, this accounting treatment review is focused on the allocation of profits and losses for those joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties.

Now, approximately 15% of Sunrise's communities are held by joint ventures that would fall into this category.  Throughout the year, and in connection with our quarterly filings, we conduct a review of our various accounting policies, including the methodology we use to allocate profits and losses in our joint ventures where our capital partner is entitled to a preferential return.  In connection with this review, our accounting team determined and then brought to the attention of our auditors that there is a more preferable method under generally accepted accounting principles for allocating such profits and losses among the partners of these ventures and for determining the timing of such allocations during the lifecycle of the ventures, from startup losses to stabilized cash flow to refinancing or sale of the property.

*Now, as a result, we are now in the process of assessing the implications of adopting this alternate methodology and whether adjustments are necessary to prior period financial statements*.  In order to have time to effectively complete this review, we will not be filing our Form 10-Q with the Securities and Exchange Commission today.  Instead, we will take the time it takes to carefully review and finalize this matter. ... [W]e do not expect the outcome of this review to adversely affect our previously furnished earnings guidance for 2006 or 2007, due to the limited number of current joint ventures affected and because of the various stages of those ventures.

\* \* \*

*[W]e will completely avoid this accounting issue in the future by no longer providing preferential return on capital in any future ventures.  We were able to do this now because of the successful track record that we have established for these ventures*.

\* \* \*

The general effect of using this different methodology – known, I am told, as the hypothetical liquidation at book value method – *is to shift more of any losses to Sunrise in the early days of any venture where the capital partner has a preference for return of capital*. ...

Perhaps a simplified example will help illustrate this rather technical and complicated issue.  Assuming a one-property development venture built a $20 million Sunrise community, if the venture obtains 75% or $15 million of construction debt, the partners would contribute $5 million of equity.  If it is a typical 80/20 partnership, *our share of the equity would be 1 million* and our capital partner would contribute 4 million.  In our now typical model, where there is no capital return preference to our partner, all losses and profits *would be allocated 80/20* ....

Now, if this partnership were to experience 1 million of initial losses ... Sunrise would initially recognize *20% or $200,000 of the $1 million of losses* ... for a total of *$1 million profit from the venture*. ...

Now, if the same venture had included a capital return preference ... Sunrise would be allocated 100% or all million dollars of the initial losses ....

\* \* \*

**Derrick Dagnan, Analyst – Avondale Partners:**  Is the new accounting method or the new treatment under GAAP – is that a new option to you, or has that been available to you for a number of years and you just recently found it?

**[Rush – CFO:]**  It has been available for a number of years.  And again, with the scrutiny that Paul and Tom mentioned earlier, it came into consideration late in 2005.  And when we took a look at it, we thought we should look deeper.

108.    On June 15, 2006, *MarketWatch* reported that:

Sunrise Senior Living, Inc. had one quarter and two years' worth of per-share earnings estimates cut by Stifel Nicolaus on Thursday .... Preliminary first-quarter results provided by the company, coupled with the buyout of 10 management contracts by Five Start Quality Care Inc., prompted Stifel Nicolaus to take its full-year 2006 outlook to $1.15 from $1.18 a share.  The firm also reduced its full-year 2007 per-share forecast to $1.32 from $1.36, and lowered its first-quarter forecast to 21 cents from 23 cents.

109.    After this occurred, Sunrise's value dropped to $27.89 per share on June 15, 2006 and to as low as $26.29 on June 20, 2006, three trading days later.  On June 15, 2006, Stifel Nicolaus reported:

• 	SRZ shares declined 5.3% yesterday, with most of the damage coming late in the day on a couple of large block trades.

• 	Shares are down 26.3% from their 4/4/06 high due to general market conditions. Sunrise's delay in reporting 1Q06 results as a result of an accounting issue concerning its development joint ventures and yesterday's block sales

110.    By late July 2006, Sunrise value fell to as low as $25.08 per share as rumors circulated of a massive financial restatement by Sunrise.  On July 27, 2006, Stifel Nicolaus reported:

**Announced July 31, 2006 Date for Releasing 1Q06 Earnings Rapidly Approaching**

• 	SRZ shares are down 31.5% since the company delayed 1Q06 earnings due to an accounting question about recognition of earnings on some of its joint venture investments.

• 	In a 6/30/06 press release announcing an acquisition, Sunrise said it "expects to complete its accounting review **prior to July 31, 2006.**"

• 	We believe the release of Sunrise's much delayed 1Q06 results will be a catalyst for the stock to rebound.

67

- With three business days to go, Sunrise has not scheduled an earnings release and it is our sense that the company may or may not meet its expected timetable for completing its accounting review.

111.    On July 31, 2006, Sunrise was forced to announce a huge, multi-year financial restatement. Sunrise's press release stated in part:

[T]he Company will **restate** its financial statements for the years ended December 31, 2003, 2004 and 2005 primarily to adjust the accounting treatment related to ventures that contain partner preferences and the timing of sale accounting and recognition of income from prior sales of real estate. The cumulative impact of the restatement is expected to reduce net income for all periods impacted, including the years 1999 through 2005, by an estimated $60 million to $110 million. ... Sunrise is unable at this time to provide the precise impacts of the restatement since its review of these issues has not yet concluded. ... The Company noted that its previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and its unaudited quarterly financial statements during these years **should no longer be relied upon**.

112.    In its July 31, 2006 announcement, Sunrise was forced to admit it had been **improperly accounting for its joint venture investments and operations and for certain real estate sales**, and that it would no longer engage in real estate sales with guarantees and other ongoing financial commitments. On July 31, 2006, Sunrise stock fell to as low as $24.40 per share. In November 2006, Sunrise disclosed its accounting review was still not completed and that, subject to completion of its auditor's review and clearing comments from the SEC, Sunrise expected to file its restated 2005 Form 10-K before year-end, which would be followed by the filing of Sunrise's Forms 10-Q for the first three quarters of 2006, and to be current in its filings with the SEC, it would file its 2006 Form 10-K on or before March 1, 2007. Sunrise indicated that the cumulative impact of the restatement was anticipated to reduce net income for all periods impacted, including 1999 through 2005, by approximately $100 million. Approximately 50% of this amount related to the periods from 1999 through 2002.

113.    A November 26, 2006 *New York Times* article by Gretchen Morgenson, stated in part:

Shareholders of Sunrise Senior Living, a provider of residential communities and services for the elderly, have seen their holdings decline 17 percent since last spring. Problematic bookkeeping kept the company from filing three quarterly financial statements on time, forced it to restate earnings for 2003 through 2005, drew Securities and Exchange Commission inquiries about its accounting and led it to warn that its internal controls were probably inadequate.

All of that resulted in a $342 million hit to the market value of the company, based in McLean, VA. But a raft of insiders escaped some of that damage. Three of the company's directors and its two founders sold $32 million worth of Sunrise stock in the six months leading up to the May 9 announcement that it was changing it accounting practices and delaying its financial filing.

Reviewing stock sales over the six months before the announcement is relevant because, during a conference call with investors in May, Sunrise officials said that "late in 2005" they had begun contemplating the accounting shift that later clobbered Sunrise shares.

* * *

Selling during the period were Paul J. Klaassen, the founder and chief executive; Theresa M. Klaassen, his wife and Sunrise's chief cultural officer; Ronald V. Aprahamian, a consultant and investor who is chairman of Sunrise's audit committee; Thomas J. Donohue, a Sunrise director who is chairman of the United States Chamber of Commerce; and J. Douglas Holladay, a founder of a private equity firm and a director.

* * *

The biggest sellers of Sunrise stock were the Klaassens, who generated $21.4 million in sales of 600,000 shares from December 2005 to April 4, 2006. The sales began last Dec. 19, around the time the company first contemplated the accounting review that resulted in the restatements. They were part of a series of planned sales put in place in December by the executives.

An especially timely stock sale by Mr. and Mrs. Klaassen came a week before the company announced it was delaying its financial filings. On May 1 and 2, they sold 100,000 shares at an average price of $36.91. The day of the announcement, the price fell to $32.35. On Friday, the stock closed at $32.50

Reached last Wednesday at a vacation home in Florida, Mrs. Klaassen, who is also a director, declined to comment. The Klaassens continue to hold a

69

large stake in Sunrise – 5.2 million shares, or approximately 10 percent of the stock outstanding. Although they entered into a derivatives contract relating to a forward sale of 750,000 shares last year, the 600,000-share sales are their first outright disposal of Sunrise stock since the company went public in 1996.

* * *

Another apparently well-timed sale took place last April 18, exactly three weeks before the company announced its filing delay, when Mr. Aprahamian, chairman of the company's audit committee, sold 20,000 shares at $37.85 each, generating $757,040. Mr. Aprahamian declined to comment when reached last Wednesday at his home in Virginia. He said he had not seen the shareholder letter, addressed to Sunrise directors and hand-delivered to the company last Monday. He declined to provide a fax number or e-mail address where a reporter could send a copy.

Mr. Donohue, the Chamber of Commerce chairman, has been a Sunrise director since 1995 and heads its compensation committee. He is also a member of its audit committee. On Nov. 21, 2005, he sold shares worth $3.4 million, according to regulatory filings. Mr. Klaassen is on both the Chamber of Commerce's board and that of its research arm, the National Chamber Foundation.

114.    Then on December 11, 2006, Sunrise announced an SEC investigation of the

Company and the appointment of a special committee whose bifurcated purpose was to review

insider sales of Sunrise stock and the Company's historical practices relating to stock option

grants:

Sunrise Senior Living, Inc. (NYSE: SRZ) today announced that its Board of Directors has appointed a special independent committee to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants. The Board's decision followed receipt of a letter from a union shareholder that was simultaneously sent to news outlets, which resulted in media coverage and a subsequent request by the Securities and Exchange Commission (SEC) for information about matters raised in the media reports. The special committee has retained independent outside legal counsel to assist in its review.

Sunrise is committed to sound corporate governance and transparency and the Board has determined that a comprehensive review by a special committee and independent counsel is the most appropriate way to address these matters in a timely manner.

70

The review by the special committee will be conducted in parallel with the Company's ongoing efforts to complete the previously announced restatement of its financial statements. In view of these ongoing efforts and the special committee review, the Company now anticipates that its restated 2005 Form 10-K will be delayed beyond year-end, but still expects to be current in all of its filings with the SEC by March 1, 2007.

115.    On January 15, 2007, the Company indicated that Sunrise would not be current in all of its filings with the SEC by March 1, 2007 as previously announced in the December 11, 2006 press release.  The Company stated, "Sunrise believes that it is close – weeks, not months – to submitting its recast 2005 financial information to the SEC for its review . . . ."

116.    However, on February 27, 2007, a month and a half later, Sunrise continued to maintain that it was "close" to completing its restatement, but admitted that the accounting improprieties perpetrated by the Company would result in a restatement that "reduce[d] net income for all periods impacted, included 1999 through 2005, by approximately **$98 to $107 million**."

117.    On March 2, 2007, Sunrise announced that it had extended the mandate of the Special Committee beyond reviewing certain insider sales and the Company's historical stock option grant practices to include a "review of facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the pending restatement of the Company's financial statements."

118.    Moreover, documents related to the investigation of the improper transactions may not even be available, as defendant Rush was suspended as CFO for failing to comply with the Company's document retention policies.  Specifically, Sunrise stated in an April 25, 2007 press release:

On April 23, 2007, Bradley B. Rush, the chief financial officer of Sunrise Senior Living, Inc. (the "Company"), was suspended with pay.  The action was taken by

the Board following a briefing to the independent directors by independent legal counsel retained by the special independent committee of the Board. As previously disclosed, the special independent committee is reviewing recent insider sales of the Company's stock, the Company's historical practices related to stock option grants and the facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the previously announced pending restatement of the Company's financial statements (the "Special Committee Investigation"). **The Board concluded that actions taken by Mr. Rush were not consistent with the document retention directives issued by the Company.** Mr. Rush has served as the chief financial officer of the Company since August 2005.

119.    One week later, on May 2, 2007, Sunrise terminated defendant Rush for cause related to his failure to comply with the document retention policies instituted by the Company.

120.    On May 29, 2007, Sunrise announced that the SEC has commenced a formal investigation of the Company's insider stock sales, historical stock option granting practices and other accounting practices.

### Individual Defendants' Insider Selling

121.    From 1997 to 2006, certain of the Individual Defendants, while in possession of materially adverse non-public information regarding the backdating and ultra vires granting of stock options and the false financial statements resulting therefrom, sold more than $174 million in Sunrise stock, a significant portion of which was obtained through the exercise of improperly backdated stock options, as demonstrated below:

| Defendant | Dates of Sales | Shares Sold | Proceeds |
|---|---|---|---|
| Adams | 09/03/03 to 06/07/04 | 17,841 | $590,106.75 |
| Aprahamian | 07/02/01 to 04/18/06 | 215,200 | $8,848,497.20 |
| Callen | 05/26/05 | 10,000 | $521,093.00 |
| Donohue | 01/29/04 to 11/21/05 | 134,378 | $3,732,527.28 |
| Faeder | 03/09/98 to 02/25/04 | 749,727 | $22,118,963.33 |
| Gaul | 06/02/04 to 04/20/06 | 26,503 | $1,090,491.08 |
| Holladay | 05/12/05 to 03/21/06 | 39,000 | $1,873,125.00 |

| Hulse | 03/10/98 to 08/12/05 | 239,897 | $9,304,495.07 |
| Klaassen[10] | 12/17/97 to 05/02/06 | 1,462,106 | $56,363,094.63 |
| Klisares | 11/25/03 to 05/07/04 | 28,664 | $999,177.05 |
| Newell | 03/09/98 to 04/24/06 | 733,886 | $26,230,945.70 |
| Rush | 09/08/05 to 09/12/05 | 6,937 | $432,143.87 |
| Slavin | 12/29/00 to 05/17/04 | 278,546 | $8,990,534.92 |
| Smick | 03/26/98 to 06/30/98 | 60,417 | $2,125,947.25 |
| Swinton | 12/01/97 to 03/05/04 | 461,307 | $14,493,371.22 |
| Tomasso | 03/09/98 to 02/02/05 | 472,335 | $17,265,701.75 |
| **TOTAL** | | **4,936,744** | **$174,980,215.10** |

122.    Defendants Adams, Aprahamian, Callen, Donohue, Faeder, Gaul, Holladay, Hulse, Klaassen, Teresa Klaassen, Klisares, Newell, Rush, Slavin, Smick, Swinton and Tomasso, are hereinafter referred to at the "Insider Selling Defendants."

## SUNRISE'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES AND REGULATIONS

123.    As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Sunrise to violate GAAP, SEC regulations and IRS rules and regulations.

124.    Sunrise's financial results for 1997 through 2006 were included in reports filed with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Sunrise's financial results were presented in a fair manner and in accordance with GAAP.

125.    The Individual Defendants' representations were false and misleading as to the financial information reported, because such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in

---

[10] This includes proceeds of sales by Paul Klaassen and his wife Teresa Klaassen as they filed Forms 4 jointly reporting their transactions starting in May of 2002.

violation of GAAP and SEC rules.

126.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

**Violations of GAAP**

127.    During the relevant period, the Individual Defendants caused the Company to understate its compensation expenses by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

128.    Under well-settled accounting principles in effect throughout the relevant period, Sunrise did not need to record an expense for options granted to employees at the current market price ("at the money").   The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in the money").   In order to provide Sunrise executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Individual Defendants systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date.

129.    Throughout the relevant period, Sunrise accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees."  Under APB No. 25, employers were required to record as an expense on their financial statements the

"intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at-the-money or out-of-the-money on the measurement date need not be expensed. Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

## Sunrise's GAAP Violations Were Material

130. Sunrise's false and misleading relevant period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality. SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality. Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." It also stresses that materiality requires qualitative, as well as quantitative, considerations. For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

131. SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

\*      \*      \*

whether the misstatement masks a change in earnings or other trends

whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

\*      \*      \*

75

whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

132.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

133.    Sunrise's misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

### Sunrise's Financial Statements Violated Fundamental Concepts of GAAP

134.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

135.    Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information that, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

### Sunrise's Financial Statements Violated SEC Regulations

136.    During the relevant period, the Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

137.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary

compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ." Item 402(c)(2)(iv).

138. The Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date that the Stock Option Committee approved the grant.

## Sunrise's Violations of IRS Rules and Regulations

139. During the relevant period, the Individual Defendants further caused Sunrise to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated, exposing Sunrise to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

140. The Individual Defendants caused the Company to violate Section 162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based." In order for compensation to be performance-based, the Stock Option Committee must have set pre-established and objective performance goals. The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are

78

issued at an exercise price that is no less than the fair market value of the stock on the date of the grant. Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

141. Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

142. The Individual Defendants caused Sunrise to violate Section 162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As a result, all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

143. The Individual Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Sunrise's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

144. ISOs are a form of equity compensation that may be provided to a company's employees. ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as

they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential treatment as they are subject to income tax and FICA withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

145. By improperly treating its backdated options as ISOs, the Individual Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its options by its executives and employees in violation of IRS rules and regulations.

146. The chart below illustrates Sunrise's false and misleading fiscal year financial results which materially understated its compensation expenses and thus overstated its earnings:

| Fiscal Year Ended | Reported Net Income (Loss) In Thousands | Reported Diluted Earnings (Loss) Per Share |
|---|---|---|
| December 31, 1997 | $4,001 | $0.20 |
| December 31, 1998 | $22,312 | $1.16 |
| December 31, 1999 | $20,213 | $0.94 |
| December 31, 2000 | $24,278 | $1.10 |
| December 31, 2001 | $49,101 | $1.04 |
| December 31, 2002 | $54,661 | $1.12 |
| December 31, 2003 | $62,178 | $1.32 |
| December 31, 2004 | $50,687 | $1.12 |
| December 31, 2005 | $79,742 | $1.67 |

147. Meanwhile, the Individual Defendants were causing the Company to grant them hundreds of thousands of backdated Sunrise stock options. The Company's executives and

directors received a significant number of backdated Sunrise stock options as compensation during the relevant period.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

148.    In a misguided effort to attract and retain employees in a competitive environment, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme.  The Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.  Specifically, the Individual Defendants breached their fiduciary duties by:

      a      colluding with each other to improperly account for Sunrise's real estate joint venture start-up losses and real estate sale gains;

      b      colluding with each other to backdate stock option grants;

      c      colluding with each other to violate GAAP and Section 162(m);

      d      colluding with each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

      e      colluding with each other to file false proxy statements, false financial statements, and False Form 4's in order to conceal the improper backdating of stock options.

149.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

150.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to

incur, loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grants, costs and expenses incurred in connection with the Company's internal investigation and restatement of historical financial statements, and the SEC investigation of the Company.

151.    As alleged herein, certain of the Individual Defendants have exercised hundreds of thousands of backdated Sunrise stock options at improperly low prices and have then sold the shares for substantial profits. Consequently, these defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

152.    On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted former SEC Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants? For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

153.    On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of knowingly betting on a race that's already been run."

154.    On July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to

efficient markets]. . . . It is securities fraud if you falsify books and records.  It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles.  There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

155.    On September 6, 2006, MarketWatch, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a ***black-and-white example of securities fraud***," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

156.    Shortly thereafter, on September 6, 2006, the United States Senate Committee on Finance held a hearing on "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits." At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive.  It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

157.    Further, at the Senate Finance Committee Hearing, SEC Chairman Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws." The Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

158.    In his statement before the Senate Finance Committee, Deputy Attorney General Paul J. McNulty described the practice of stock option backdating "as a brazen abuse of corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "for some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

159.    In addition to the foregoing, a recent academic study revealed that outside directors of companies were also benefiting from backdating and were recipients of manipulated stock option grants, as detailed in the following *Wall Street Journal* article published on December 18, 2006:

>      A new academic study suggests that many outside directors received manipulated stock-option grants, a finding that may help explain why the practice of options backdating wasn't stopped by the boards of some companies.
>
>      The statistical study, which names no individuals or firms, estimates that 1,400 outside directors at 460 companies received questionable option grants, suggesting the widespread practice extended well beyond the executive suite.

The study is notable because it suggests that outside, or independent, directors -- who are supposed to play a special role safeguarding against cozy board relationships with management -- may have been co-opted in options backdating by receiving manipulated grants themselves. The New York Stock Exchange requires that a majority of board seats, and all compensation- and audit-committee members, be independent . . . .

The evidence "contributes to understanding the possible factors that led to or enabled manipulation to occur," states the unpublished study, which was conducted by professors at Harvard and Cornell universities and the French business school Insead . . . .

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

160.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

161.    Plaintiffs are owners of Sunrise common stock and were owners of Sunrise common stock at all times relevant hereto.

162.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

163.    As a result of the facts set forth herein, plaintiffs have not made any demand on the Sunrise Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

164.    At the time this action was commenced the Board consisted of seven directors: defendants Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue, Holladay and Little.  The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

    a       Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue, Holladay and Little, because they violated Delaware law by failing to schedule, provide notice of, or hold an annual meeting for 2007.

85

These defendants' violation of Delaware law was not the result of good faith business judgment, but rather was the result of their failure to exercise good faith business judgment and/or their failure to inform themselves to a degree reasonably necessary under the circumstances;

b     Klaassen, Aprahamian, Callen, Donohue, and Holladay, because as recipients of the backdated stock option grants, they are directly interested in the improperly backdated stock option grants complained of herein;

c     Klaassen, because as Chief Executive Officer of the Company, Klaassen stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by defendants Aprahamian, Callen, and Donohue, who are the current members of the Compensation Committee;

d     Teresa Klaassen, because as Chief Cultural Officer of the Company, Teresa Klaassen stands to earn hundreds of thousands of dollars in annual salary, bonuses and other compensation, all of which must be approved by defendants Aprahamian, Callen, and Donohue, who are the current members of the Compensation Committee;

e     Aprahamian, Callen, and Donohue, because as members of the Stock Option Committee, they knowingly and deliberately backdated stock option grants, as alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein.  Moreover, by colluding with the recipients of backdated and ultra vires stock options, as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the recipients of backdated and ultra vires stock options;

f     Aprahamian, Callen, Donohue, and Holladay, because as members of the Audit Committee, they knowingly and deliberately participated in and approved the filing of false financial statements and other false SEC filings as alleged herein and knowingly and deliberately participated in and approved the Company's violations of GAAP and Section 162(m) as alleged herein, and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein.  Moreover, by colluding with the other Director Defendants and Officer Defendants to improperly account for the Company's real estate joint ventures they have demonstrated they are unable or unwilling to act independently of

86

the recipients of backdated and ultra vires stock options, as alleged herein, Aprahamian, Callen, Donohue, and Holladay have demonstrated that they are unable or unwilling to act independently of the recipients of backdated and ultra vires stock options;

g    Klaassen, Teresa Klaassen, Aprahamian, Callen, Donohue and Holladay, because they participated in illegal insider selling while in possession of material, non-public information regarding the improper accounting of real estate joint ventures and backdated and ultra vires stock options, and as such are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein.

h    The Klaassens, because as husband and wife, and co-founders of the Company, they have a close familial and business relationship that prevents them from acting independently of each other;

i    Klaassen, Donohue, and Little, because they share a long-standing personal and professional relationship, specifically as fellow members on the Board of Directors of the U.S. Chamber of Commerce, of which Donohue is the CEO and President, and as fellow members on the Board of Directors of the National Chamber Foundation, of which Donohue is the President and Little is the Chairman of the Board of Directors;

j    Klaassen, Teresa Klaassen, and Donohue, because they share a long standing personal and professional relationship, in addition to what is described above, Klaassen and Teresa Klaassen lived with Donohue for a period of time, and Donohue also invested in the Klaassen's first home;

k    Klaassen, because he shares a personal and professional relationship with defendant Swinton, specifically as they are both "Fellows and Instructors in Executive Education" at the University of Maryland, Baltimore County (UMBC), Erickson School of Aging Studies; and

l    Callen, because he and his employers Donaldson, Lufkin & Jenrette Securities Corporation, Credit Suisse First Boston, and Aetna, have done business with Sunrise Senior Living during virtually his entire tenure on the board.

165.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

166.    The Board's decision to authorize the repurchase of over $202.1 million of Sunrise's shares from 2000 to 2005 was not the product of valid business judgment.  Defendants Klaasseen, Aprhamian, Donohue and Callen, who engaged in illegal backdating, were self dealing because they were improperly benefiting from an appreciation of their backdated option grants.  Defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Holladay and Callen, were also engaging in self dealing because they were improperly benefiting from the sales of their personally held shares while in possession of material non-public information concerning the improper accounting.  The stock repurchases facilitated their illegal insider selling proceeds. The remaining defendants who approved the repurchases were grossly negligent because they approved repurchases during periods in which the illegally backdated options were vesting, thus facilitating an increase in the other defendants' illegal backdating profits.  Because the decision to approve the repurchases was not the product of valid business judgment, defendants Klaassen, Teresa Klaassen, Aprahamian, Donohue, Holladay, Callen and Little, who approved the repurchases, are interested.  Thus, demand is futile.

167.    Additionally, as represented in Sunrise's proxy statements, the stated purposes of granting stock options is to attract and retain skilled executive personnel and align their interests with those of the stockholders, specifically the Compensation Committee reports state "[s]tock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains."  However, by granting Sunrise stock options with backdated exercise prices, the Individual Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of

Sunrise's performance.  In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders and the Company.

168.    The Individual Defendants could have achieved the stated purpose of attracting and retaining executives by granting those employees additional stock options under their incentive plans, or by granting stock options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants.  Instead, the Director Defendants backdated stock option grants in violation of the Plans and improperly reported these grants in their financial disclosures to improve their bottom line.

169.    The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected Sunrise to potentially massive liability.  The SEC has initiated an investigation into Sunrise's stock option granting practices.  Sunrise will also likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against the Individual Defendants for
### Violations of §10(b) and Rule 10b-5 of the Securities and Exchange Act

170.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

171.    Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud and deceit upon the Company.

172.    The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

173.    The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.

174.    The Company relied upon the Individual Defendants' fraud in granting the recipients of backdated and ultra vires stock options to purchase shares of the Company's common stock, as alleged herein.

175.    As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

### COUNT II

### Against the Individual Defendants for<br>Violations of §14(a) of the Securities Exchange Act

176.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

90

177.    Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14-A-9.

178.    The proxy statements described herein violated §14(a) and Rule 14-A-9 because they omitted material facts, including the fact that the Individual Defendants were causing Sunrise to engage in an option backdating scheme, a fact which the Individual Defendants were aware of and participated in from at least 1997.

179.    In the exercise of reasonable care, the Individual Defendants should have known that the proxy statements were materially false and misleading.

180.    The misrepresentations and omissions in the proxy statements were material.  The proxy statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

181.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### Against Klaassen, Faeder, Slavin, Hulse and the Director Defendants for Violations of §20(a) of the Securities Exchange Act

182.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

183.    Klaassen, Faeder, Slavin, Hulse and the Director Defendants, by virtue of their positions with Sunrise and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Sunrise within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause Sunrise to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Against the Individual Defendants for Accounting

184.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

185.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

186.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

187.    The Individual Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants.

188.    As a result of the Individual Defendants' misconduct, Sunrise has been damaged financially and is entitled to a recovery as a result thereof.

189.    Plaintiffs demand an accounting be made of all stock option grants made to any of the Individual Defendants, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the stock options were exercised, as well as the disposition of any proceeds received by any of the Individual Defendants via sale or other exercise of the grants.

## COUNT V

### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

190.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

191.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

192.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

193.    In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

194.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to and did, unduly benefit the Individual Defendants at the expense of the Company.

195.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT VI

### Against the Individual Defendants for Unjust Enrichment

196.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above though fully set forth herein.

197.    The recipients of backdated stock options were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

198.    To remedy the unjust enrichment of the recipients of backdated stock options, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT VII

### Against the Individual Defendants for Rescission

94

199.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

200.    As a result of the acts alleged herein, the stock option contracts between the recipients of backdated stock options and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control.  Further, the backdated Sunrise stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

201.    All contracts that provide for stock option grants to the recipients of backdated stock options and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executor contracts cancelled and declared void.

## COUNT VIII

### Against the Ultra Vires Option Recipient Defendants for Unjust Enrichment

202.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

203.    The Ultra Vires Option Recipient Defendants were unjustly enriched by their receipt and retention of ultra vires stock option grants and the proceeds they received through exercising ultra vires stock options, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

204.    To remedy the Ultra Vires Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the ultra vires stock options they

received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT IX

### Against the Ultra Vires Option Recipient Defendants for Rescission

205.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

206.    As a result of the acts alleged herein, the stock option contracts between the Ultra Vires Option Recipient Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' breaches of fiduciary duties.  Further, the ultra vires stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

207.    All contracts that provide for stock option grants to the Ultra Vires Option Recipient Defendants and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT X

### Against the Director Defendants for Violation of Delaware Law

208.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

209.    Pursuant to Delaware law, Sunrise is required to hold an annual meeting of shareholders at least once every 13 months.

210. Sunrise's last annual meeting was held on May 16, 2006, more than 13 months ago.

211. In violation of Delaware law, the Director Defendants failed to schedule, provide notice of, or hold an annual meeting for 2007.

212. To remedy the Director Defendants' foregoing violation of Delaware law, the Court should issue an Order requiring the Director Defendants within ten (10) days to: (i) schedule an annual meeting of Sunrise's shareholders to be held no later than thirty (30) days from the date of the Order; and (ii) provide to Sunrise's shareholders notice of the annual meeting in accordance with Sunrise's by-laws.

<u>COUNT XI</u>

<u>Against the Insider Selling Defendants for</u>
<u>Insider Selling and Misappropriation of Information</u>

213. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

214. At the time of the stock sales as set forth herein, the Insider Selling Defendants knew the information described above, and sold Sunrise common stock based on such information.

215. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Sunrise common stock.

216. At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated because of the undisclosed stock option grants

and other related compensation expenses. The Insider Selling Defendants also knew that the Company's revenues were materially overstated because of the undisclosed accounting manipulations. The Insider Selling Defendants' sales of Sunrise common stock while in possession and control of this material, adverse and non-public information was a breach of their fiduciary duties of loyalty and good faith.

217. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

WHEREFORE, Plaintiffs demand judgment as follows:

A. Issuing an Order requiring the Director Defendants within ten (10) days to: (i) schedule an annual meeting of Sunrise's shareholders to be held no later than thirty (30) days from the date of the Order; and (ii) provide to Sunrise's shareholders notice of the annual meeting in accordance with Sunrise's by-laws;

B. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C. Ordering the Individual Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

D. Ordering the Ultra Vires Option Recipient Defendants to disgorge to the Company all of the ultra vires stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized, and imposing a constructive trust thereover;

E. Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

F. Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury.

Dated: June 29, 2007                    Respectfully submitted,

DAVIS, COWELL & BOWE, LLP

___/s/ Mark Hanna_____
George R. Murphy (DC Bar 75200)
Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
1701 K Street NW, Suite 210
Washington, DC 20006
Tel. (202) 223-2620
Fax: (202) 223-8651
*Liaison Counsel*

SCHIFFRIN BARROWAY TOPAZ
& KESSLER, LLP
Eric L. Zagar
Eric Lechtzin
J. Daniel Albert
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

SAXENA WHITE P.A.
Maya Saxena
Joseph E. White III
2424 North Federal Highway, Suite 257
Boca Raton, FL  33431
Telephone:  (561) 394-3399
Facsimile:  (561) 394-3382

ROBBINS, UMEDA, & FINK LLP
Brian J. Robbins
Felipe J. Arroyo
Ashley R. Palmer

99

610 West Ash Street, Suite 1800
San Diego, CA  92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991

*Co-Lead Counsels for Plaintiffs*

<u>VERIFICATION</u>

I, Robert Anderson, have read the Sunrise Senior Living, Inc. Consolidated Shareholder Derivative Complaint and know the contents thereof. The Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _June 20, 2007_

_____
ROBERT ANDERSON

## VERIFICATION

I, Cathrine Molner , hereby verify that I have authorized the filing of the attached Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.   I declare under penalty of perjury that the foregoing is true and correct.

DATE: __6/25/07__

**CATHERINE MOLNER**

## SUNRISE SENIOR LIVING INCORPORATED VERIFICATION

I, Harold Hanna, Executive Director of the Brockton Contributory Retirement

System, hereby verify under the penalty of perjury that I am familiar with the allegations

in the Consolidated Shareholder Derivative Complaint, and that I have authorized the

filing of the Complaint, and that the foregoing is true and correct to the best of my

knowledge, information and belief.

Date: 6/27/07

Harold Hanna

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 29th day of June, 2007, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. I further certify that on the same date I mailed the foregoing document to counsel of record on the attached Service List.

_____/s/ Mark Hanna_____
Mark Hanna

**SERVICE LIST**

| | |
|---|---|
| John C. Millian<br>Jill S. Henderson<br>Matthew R. Estabrook<br>**GIBSON DUNN & CRUTCHER, LLP**<br>1050 Connecticut Ave., NW<br>Washington, DC 20036<br>Tel: (202) 955-8500<br>Fax: (202) 467-0539<br><br>*Attorneys for Defendants Carl Adams,*<br>*Ronald V. Aprahamian, Craig R. Callen,*<br>*Thomas J. Donohue, David W. Faeder,*<br>*John F. Gaul, J. Douglas Holladay, Larry*<br>*E. Hulse, Paul L. Klaassen, Teresa*<br>*Klaasen, Pete A. Klisares, William G.*<br>*Little, Scott F. Meadow, Thomas B. Newell,*<br>*Robert R. Slager, Christian B.A. Slavin,*<br>*Timothy S. Smick, Brian C. Swinton,*<br>*Tiffany L. Tomasso* | Philip A. Sechler<br>Vidya Atre Mirmira<br>**WILLIAMS & CONNOLLY, LLP**<br>725 12th Street, NW<br>Washington, DC 20005<br>Tel: (202) 434-5000<br>Fax: (202) 434-5029<br><br>*Attorneys for Defendant David G. Bradley* |