**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| In Re SUNRISE SENIOR LIVING, INC. | ) | |
| Derivative Litigation | ) | Civil Action No. 1:07CV00143 |
| _____ | ) | Judge Reggie B. Walton |
| | ) | |
| This Document Relates To: | ) | |
| | ) | |
| ALL ACTIONS | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**THE MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY**
**BY NOMINAL DEFENDANT SUNRISE SENIOR LIVING, INC.**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

ARGUMENT .......................................................................................................................7

     I.      Governing Law, Demand Futility Pleading Requirements, and
            Judicial Notice ...................................................................................................9

          A.      Delaware Law Governs the Demand Analysis ...........................................9

          B.      Plaintiffs Must Plead Particularized Facts Establishing that
                a Majority of Sunrise's Current Directors Are "Interested"
                with Respect to Each Claim....................................................................10

          C.      On a Motion to Dismiss, the Court May Take Judicial
                Notice of Facts Outside the Four-Corners of the Complaint....................15

     II.     Demand Is Required with Respect to Claims Based on Grant Dates
            Challenged in Von Guggenberg, and Cannot Be Relitigated Here .......................15

     III.   Plaintiffs Fail to Plead Particularized Facts Establishing that
            Demand Was Futile for Counts I–VII.................................................................18

          A.      Plaintiffs' Conclusory Allegations Do Not Support An
                Inference that Backdating Occurred .........................................................18

          B.      Plaintiffs Fail to Establish That a Majority of the Current
                Directors Are Interested Based on the Alleged Backdating .....................26

          C.      Plaintiffs Other Allegations Fail to Establish that Any
                Current Director Is Interested or Otherwise Beholden to An
                Interested Current Director ......................................................................27

          D.      Plaintiffs Fail to Establish that a Majority of Current
                Directors Are Interested With Respect to Counts I–VII............................33

     IV.   Plaintiffs Fail to Plead Particularized Facts Establishing that
            Demand Was Futile for Counts VIII and IX.......................................................33

     V.     Plaintiffs Fail to Plead Particularized Facts Establishing that
             Demand Was Futile for Count XI........................................................................34

VI.    In the Alternative, and At a Minimum, the Court Should Stay this
        Suit Until the Class Action Claims Are Resolved ................................................36

CONCLUSION...........................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

Air Line Pilots Ass'n v. Miller, 523 U.S. 866 (1998)...................................................... 36

Angstadt v. Atlantic Mutual Ins. Co., 457 S.E.2d 86 (Va. 1995) .................................. 16

Aronson v. Lewis, 473 A.2d 805 (Del. 1984)...................................................... passim

Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 833 A.2d 961 (Del. Ch. 2003) ................................................................................................................... 14

Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040 (Del. 2004) ......................................................................................................... …13, 14, 28, 32

Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150 (Del. Ch. 2005) ................................. 12

Blasband v. Rales, 971 F.2d 1034 (3d Cir. 1992).................................................... 13, 28

Breault v. Folino, 2002 WL 31974381 (C.D. Cal. 2002) ....................................... 37, 39

Brudno v. Wise, 2003 WL 1874750 (Del. Ch. 2003) .................................................. 38

Columbia Plaza Corp. v. Sec. Nat'l Bank, 525 F.2d 620 (D.C. Cir. 1975) ................................. 37

Cramer v. Gen. Tel. & Elec. Corp., 582 F.2d 259 (3d Cir. 1978) ................................. 16

Dellinger v. Mitchell, 442 F.2d 782 (D.C. Cir. 1971) .................................................. 36

Desimone v. Barrows, 924 A.2d 908 (Del. Ch. 2007)........................................... 20, 25

Fairview Hosp. v. Leavitt, 2007 WL 1521233 (D.D.C. 2007) ..................................... 38

Gaubert v. Federal Home Loan Bank Bd., 863 F.2d 59 (D.C. Cir. 1988) ..................................... 10

Grobow v. Perot, 526 A.2d 914 (Del. Ch. 1987) ........................................................ 29

Grobow v. Perot, 539 A.2d 180 (Del. 1988)......................................................... 13, 29

Guttman v. Huang, 823 A.2d 492, 500 (Del. Ch. 2003)........................................ passim

Halpert Enterprises, Inc. v. Harrison, 362 F. Supp. 2d 426 (S.D.N.Y. 2005) .............................. 10

Henik ex rel. LaBranche & Co., Inc. v. LaBranche, 433 F. Supp. 2d 372 (S.D.N.Y. 2006)........ 16

Highland Legacy Ltd. v. Singer, Civ A. No. 06-01566, 2006 WL 741939 (Del. Ch. 2006). 14, 28

Hisler v. Gallaudet Univ., 344 F. Supp. 2d 29 (D.D.C. 2004)...................................... 36

In re CNET Networks, Inc., 483 F. Supp. 2d 947 (N.D. Cal. 2007).........................................13, 19

In re Computer Sciences Corp. Derivative Litig., 2007 WL 1321715 (C.D. Cal. 2007) .............30

In re E.F. Hutton Banking Practices Litig., 634 F. Supp. 265 (S.D.N.Y. 1986)...........................39

In re J.P. Morgan Chase & Co. Shareholder Litig., 906 A.2d 808 (Del Ch. 2005).......................12

In re Linear Tech. Corp., 2006 WL 3533024 (N.D. Cal. 2006) .....................................................25

In re Openwave Sys. Inc. Shareholder Derivative Litig., 2007 WL 1456039 (N.D. Cal. 2007)..19

In re Oracle Corp. Derivative Litig., 808 A.2d 1206 (Del. Ch. 2002)...........................................35

In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970 (9th Cir. 1999).....................................13, 28

In re Walt Disney Co. Derivative Litigation, 731 A.2d 342 (Del. Ch. 1998)...............................32

In re Xcel Energy, Inc., 222 F.R.D. 603 (D. Minn. 2004)............................................................30

In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165 (D.D.C. 2007) ...................15

In re Zoran Corp. Derivative Litigation, 2007 WL 1650948, at *13 (N.D. Cal. 2007).........19, 23

Kamen v. Kemper Fin. Serv., 500 U.S. 90 (1991)....................................................................9, 10

Massey v. Merrill Lynch & Co., Inc., 464 F.3d 642 (7th Cir. 2006)............................................37

McCall v. Scott, 239 F.3d 808 (6th Cir. 2001) ............................................................................12

Official Committee of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins, 2004
   WL 1949290 (Del Ch. 2004) ..................................................................................................30

Orman v. Cullman, 794 A.2d 5 (Del. Ch. 2002).............................................................14, 28, 31

Prince v. Bensinger, 244 A.2d 89 (Del. Ch. 1968) ......................................................................30

Rales v. Blasband, 634 A.2d 927 (Del. 1993) ..............................................................................11

Rattner v. Bidzos, 2003 WL 22284323 (Del. Ch. 2003) ..............................................................35

Reiter v. Universal Marion Corp., 173 F. Supp. 13 (D.D.C 1959)..............................................37

Reiter v. Universal Marion Corp., 299 F.2d 449 (D.C. Cir. 1962).........................................16, 37

Ryan v. Gifford, 918 A.2d 341 (Del Ch. 2007) ...........................................................................12

West Coast Mgmt. & Capital, LLC v. Carrier Access Corp., 914 A.2d 636 (Del. Ch. 2006)......16

Yaw v. Talley, Civ. A. No. 12882, 1994 WL 89019 (Del. Ch. 1994).........................................14

**State Cases**

Del. Code Ann. tit 8, § 141 ...................................................................................... 7, 30

**Federal Statutes**

Del. Ch. Ct. R. 23.1.................................................................................................. 7, 10

Del. R. Evid. 201(b).................................................................................................. 21, 22

Fed. R. Evid. 201 ............................................................................................... 15, 21, 22

Va. Sup. Ct. R. 1:6 (West 2007) ................................................................................... 16

**State Statutes**

Ward, Jr., Rodman, et al., <u>Folk on the Delaware General Corporation Law</u>, § 327.4.2.2 (5th ed. 2006) ............................................................................................................. 14

### INTRODUCTION

The Consolidated Shareholder Derivative Complaint (the "Complaint" or the "Derivative Suit") filed by plaintiffs Brockton Contributory Retirement System ("Brockton") and Catherine Molner and Robert Anderson (collectively, "Plaintiffs") asserts derivative claims challenging stock options grants issued by nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") and subsequent insider stock trading and corporate accounting. 1/ The Complaint consolidates the third, fourth and fifth – in a series of six – derivative suits alleging such claims.  Neither the Plaintiffs in this suit nor the plaintiffs in the other derivative suits made any presuit demand on Sunrise's Board of Directors (the "Board").

The Complaint, as in the other derivative suits, does not allege direct evidence of stock option backdating or the other allegedly improper conduct.  There are no corporate disclosures, admissions, documents, statements, nor facts alleged that, if true, would establish that options were backdated or other improper conduct occurred.  Rather, the alleged factual basis for the claims in the instant suit, as in the other derivative suits, is entirely circumstantial.

Specifically, the only alleged factual basis for Plaintiffs' conclusory claims of backdating is that, with respect to a select few of the numerous options granted by Sunrise, the Company's stock price fell before or rose after the date of those particular grants.  From the movement of the stock price alone, Plaintiffs would have the Court infer that there was intentional backdating, and that all the current directors are somehow compromised and unable to consider a presuit demand.

---

1/      The three suits were captioned:  Brockton Contributory Retirement System v. Klaassen, et al., Case No. 1:07CV00143, filed Jan. 19, 2007 ("Brockton"); Molner v. Klaassen, et al., Case No. 1:07CV00227, filed Jan. 31, 2007 ("Molner II"); Anderson v. Paul K. Klaassen, et al., Case No. 1:07CV00286, filed Feb. 5, 2007 ("Anderson").

The other improper conduct identified in the Complaint is that certain current and former officers and directors allegedly approved or at least were aware of certain purported accounting irregularities, and that they sold stock with knowledge of the purported backdating and/or these accounting issues.  However, none of Plaintiffs' conclusory assertions is supported by any particularized factual allegations.  Under Federal Rule of Civil Procedure 23.1 and the applicable Delaware law, conclusory assertions cannot establish demand futility.

Thus, the entire Complaint rises and falls with Plaintiffs' circumstantial allegations of backdating.  As courts have held, however, allegations based on fluctuations in a company's stock price before and after a handful of cherry-picked option grants (all of which were granted more than six years ago, and some more than 10 years ago) cannot support an inference of backdating, much less meet the stringent pleading requirements applicable here.  Conclusory claims of backdating based solely on stock price movement fail as a matter of law in the face of legitimate, judicially-noticeable explanations for the grant dates at issue.  Properly looking past Plaintiffs' broad-brush and conclusory assertions, the Complaint simply lacks the particularized factual allegations necessary to establish that a majority of Sunrise's current directors received backdated options or are otherwise "interested" with respect to each of the claims alleged.

In addition, one of the earlier filed derivative suits alleging backdating and related improper conduct at Sunrise has already been dismissed by the Virginia state courts for failure to make the presuit demand required by the applicable Delaware law.  Thus, not only do the Plaintiffs here fail to allege particularized facts explaining why no demand was made, they assert demand futility based on claims for which it has already been determined that presuit demand is required.  Plaintiffs are precluded from re-litigating the issue of demand futility for such claims.

Thus, demand was neither futile nor otherwise excused, and Plaintiffs' claims should be dismissed.

Finally, even assuming arguendo that (a) Plaintiffs have alleged particularized facts justifying their failure to make demand, and (b) they are not precluded from re-litigating demand futility, this case should be stayed while the Company defends itself in the consolidated securities class action case pending before this Court (the "Class Action"). 2/ Many of the same claims are raised in both cases. Sunrise should not be placed in the position of having to defend itself from these claims in the Class Action, while simultaneously having to pursue those same claims against its current and former officers and directors in this Derivative Suit.

Once the Class Action is resolved, and with the clarity and focus provided by the rulings in that case, determinations can be made whether any viable derivative claims remain and whether it is in the Company's interest to pursue them. Staying the Derivative Suit is thus in the Company's best interest, and would allow for the fair, efficient and orderly resolution of both direct and derivative claims, thereby promoting justice and preserving the resources of the Court, the Company and the individual defendants.

For these reasons, the Court should dismiss the Derivative Suit or, in the alternative, exercise its discretion to stay the instant suit pending resolution of the Class Action.

## **FACTUAL BACKGROUND**

Nominal defendant Sunrise is a Delaware corporation with its corporate headquarters in McLean, Virginia. Compl. ¶ 15. Sunrise operates senior living communities

---

2/    These two cases are captioned:  United Food & Commercial Workers Union Local 880-Retail Food Employers Joint Pension Fund, et al. v. Sunrise Senior Living, Inc., et al., Case No. 1:07CV00102, filed Jan. 16, 2007 ("United Food"), see complaint, Ex. 1 hereto; First New York Securities, L.L.C. v. Sunrise Senior Living, Inc., et al., Case No. 1:07CV00294, filed Feb. 8, 2007 ("First New York"), see complaint, Ex. 2 hereto.

throughout the United States, Canada, the United Kingdom, and Germany.  Id.  Sunrise was founded by named defendants Paul Klaassen and Teresa Klaassen.  Id. at ¶ 16.  The other named defendants are current or former members of Sunrise's board of directors and/or current or former officers of the Company.  Id. at ¶¶ 17-36.  At the time the Derivative Suit was filed, Sunrise had seven directors:  Ronald Aprahamian, Craig Callen, Thomas Donohue, J. Douglas Holladay, Paul Klaassen, Teresa Klaassen and William Little (the "Current Directors").  Id. at ¶ 164.  Little is not named as a defendant in the Complaint. 3/

The first assertion of any claim of stock option backdating or other improper conduct relating to or arising from Sunrise option grants was made in a derivative suit filed by Schiffrin & Barroway, LLP ("Schiffrin & Barroway") – Co-Lead Counsel for the Plaintiffs in this suit – in the Virginia Circuit Court for Fairfax County on August 11, 2006, captioned Von Guggenberg v. Klaassen, et al., Case No. CL-2006-10174 ("Von Guggenberg").  See Von Guggenberg complaint, Ex. 3 hereto.  Sunrise moved to dismiss the Von Guggenberg suit for failure to make demand and on statute of limitations grounds.

On September 6, 2006, before the Circuit Court ruled on Sunrise's motions, Schiffrin & Barroway filed another derivative suit in the same Virginia Circuit Court asserting similar claims of backdating and other improper conduct relating to or arising from option grants. Molner  v. Klaassen, et al., Case No. CL-2006-11244 ("Molner I").  See Molner I complaint, Ex. 4 hereto.  On September 15, 2006, the Virginia Circuit court granted Sunrise's motions to dismiss the Von Guggenberg suit for failure to make demand, and on statute of limitations grounds.  See September 15, 2006 Final Order, Ex. 5 hereto.  Von Guggenberg filed a petition

---

3/      Sunrise appointed an eighth director, Stephen D. Harlan, effective June 20, 2007, after the Brockton, Molner II and Anderson suits were filed, but before the Complaint was filed.  See June 21, 2007 Press Release, Ex. 6 hereto.  Harlan is not named as a defendant in the Complaint.

for appeal to the Supreme Court of Virginia.  After briefing and argument to a three-justice writ panel, Von Guggenberg's petition for appeal was denied on April 27, 2007, thus concluding that suit.  <u>See</u> April 27, 2007 Order, Ex. 7 hereto.

On December 11, 2006, in response to a letter from a union shareholder that was simultaneously sent to news outlets, Sunrise's Board appointed an independent special committee (assisted by independent counsel and accountants) to review the Company's historic practices related to stock option grants and insider sales of Sunrise stock.  Compl. at ¶¶ 114.  The review by the special committee is being conducted in parallel with the Company's ongoing efforts to complete a restatement of its financial disclosures.  <u>Id.</u> at ¶¶ 106-117.  The special committee's investigation is ongoing at this time.  <u>Id.</u> at ¶ 117.

On December 22, 2006, the Virginia Circuit Court stayed <u>Molner I</u> pending resolution of the appeal in <u>Von Guggenberg</u>.  Molner subsequently filed an uncontested notice of non-suit (permitted by right under Virginia law), and re-filed her complaint in this Court, as described further below.

In January and early-February 2007, just weeks after Sunrise had disclosed the appointment of the special committee, five complaints were filed in this Court against the Company and its current and former officers and directors:  the two securities class actions now consolidated into the Class Action, and the three derivative suits now consolidated into the Derivative Suit.

A sixth derivative suit was filed on March 6, 2007, in Delaware Chancery Court, captioned <u>Young, et al. v. Klaassen, et al.</u>, C.A. No. 2770-N ("<u>Young</u>").  The <u>Young</u> complaint is virtually identical to the previously-dismissed <u>Molner I</u> complaint and asserts state law claims based on the same allegedly backdated stock options first challenged in <u>Von Guggenberg</u>.  <u>See</u>

<u>Young</u> Compl., Ex. 8 hereto.  Sunrise filed a motion seeking dismissal of the Delaware suit on grounds that it was precluded by <u>Von Guggenberg</u> and for failure to make the required demand on Sunrise's Board.  In the alternative, Sunrise requested a stay of the action in favor of the earlier-filed class actions and derivative suits pending in this Court.  In response to that motion, Plaintiffs agreed to either (a) file a joint stipulation staying the suit, or (b) file an amended complaint, on or before September 17, 2007.  <u>See</u> July 31, 2007 Joint Stipulation Amending Scheduling Order, Ex. 9 hereto.

   The three derivative suits filed in this Court were consolidated into the Derivative Suit on May 9, 2007, and captioned <u>In re Sunrise Senior Living, Inc. Derivative Litig.</u>, Case No. 07-00143.  <u>See</u> May 9, 2007 Stipulation and Order Consolidating Cases for All Purposes and Appointing a Leadership Structure (the "May 9, 2007 Order") Ex. 10 hereto.  The Plaintiffs filed their Consolidated Shareholder Derivative Complaint on June 29, 2007.  Counts I-IX and XI, the 10 counts at issue in this Motion, <u>4/</u> arise from the alleged grant, receipt, and/or concealment of improperly dated stock options.  Compl. ¶¶ 174, 178, 183, 186, 192, 197, 200, 203, 206, 216. Nine of the 16 option grants Plaintiffs challenge in this suit were also challenged in <u>Von Guggenberg</u>.  The Complaint also alleges improper accounting practices relating to joint ventures, <u>see</u> Compl. ¶¶ 45-58, but Plaintiffs' claims rely principally on the stock option grant allegations.  Id. ¶¶ 170-201; 213-17.

   The two class actions filed in this Court were consolidated into the Class Action on July 31, 2007, pursuant to a stipulation filed on June 8, 2007, and captioned <u>In re Sunrise</u>

---

<u>4/</u>  The remaining count in the Complaint, Count X (Violation of Delaware Law), seeks to compel the Company to hold an annual meeting.  Count X is the subject of Plaintiffs' partial motion for summary judgment and should be dismissed for the reasons set forth in Sunrise's opposition and surreply filed in response thereto.  <u>See</u> Def's Mem. in Opp'n to Pl. Mot. for Partial S.J. [Docket No. 31]; Surreply in Response to Lead Pl. Reply Br. in Support of Their Mot. for Partial S.J. [Docket No. 34].

Senior Living, Inc. Securities Litigation, Case No. 07-00102. See Stipulation and Order re:
Appointment of Lead Plaintiffs, Approval of Counsel, Consolidation of Related Cases and
Further Organization of the Case, Ex. 11 hereto. The class action plaintiffs will file their
consolidated amended complaint shortly after Sunrise files current and restated financial
statements. Id. The Class Action claims arise from the same underlying alleged conduct as the
Derivative Suit – allegedly improper option grants and purported accounting irregularities, and
subsequent alleged insider stock sales. See United Food Compl. ¶¶ 3-9; First New York Compl.
¶¶ 3-8. The Class Action Plaintiffs allege they were directly injured because they purchased
Sunrise shares at a price purportedly inflated by the Company's failure to properly account for
the alleged options backdating. See United Food Compl. ¶¶ 8-10, 96; First New York Compl.
¶ 50, 122-27.

## ARGUMENT

As a Delaware corporation, Sunrise is managed by its Board. See Del. Code Ann.
tit. 8, § 141. By filing suit, the Plaintiffs seek to displace the Board's statutory responsibility to
manage the business and affairs of the Company, and thereby make decisions, assert claims, and
control litigation on its behalf. Under Federal Rule of Civil Procedure 23.1 ("Federal Rule
23.1"), Plaintiffs' standing to bring a derivative suit is determined by Delaware substantive law.
The applicable Delaware law requires, among other things, that Plaintiffs either (i) make a
presuit demand on the Board to take appropriate action to address the Plaintiffs' concerns, or
(ii) allege particularized facts sufficient to explain why the required demand was not made.
Aronson v. Lewis, 473 A.2d 805, 808 (Del. 1984); see Del. Ch. Ct. R. 23.1. Plaintiffs failed to
satisfy either of these requirements, and thus lack standing to maintain the instant suit.

All of Plaintiffs' claims at issue on this Motion (Counts I–IX and XI) arise from,
and thus depend on, the allegations that Sunrise improperly granted stock options on 16 different

dates.  With respect to claims arising from the options granted on nine of the 16 dates, the

Virginia courts already have held in <u>Von Guggenberg</u> that demand was required.  That ruling

should not be re-litigated here.

        In addition, Counts I-VII are based on the alleged backdating of options granted

on 14 different dates.  The option grants on five of those 14 dates were tied to specific corporate

events taking place on the same day, thus erasing any circumstantial inference of backdating.

For the options granted on four of the other nine grant dates, there are simply no indicia of

backdating, circumstantial or otherwise. <u>5</u>/  With respect to the remaining five grant dates,

Plaintiffs fail to establish that a majority of the Current Directors benefited from the granted

options.  Furthermore, Plaintiffs fail to plead particularized facts relating to other allegedly

improper conduct that might establish that one or more Current Directors is interested or

beholden to another interested Director, and thus demand was neither futile nor otherwise

excused.  As a result, Plaintiffs lack standing to pursue Counts I–VII.

        Counts VIII and IX are based on the alleged <u>ultra vires</u> granting of options.  Yet,

Plaintiffs fail to establish that <u>any</u> Current Director received such options, or is otherwise

interested, and thus demand was neither futile nor otherwise excused with respect to those claims.

As a result, Plaintiffs lack standing to pursue counts VIII and IX.

        Plaintiffs' "insider trading" claim (Count XI) alleges that several individual

defendants traded Sunrise stock while in possession of material, non-public information relating

to the allegedly improper option grants and/or purported accounting irregularities.  Plaintiffs fail

to plead particularized facts establishing that any of the Current Directors engaged in any insider

---

<u>5</u>/      Indeed, when all of the option grants made to Sunrise directors and officers during the
relevant period are considered, no "extraordinary pattern" of backdating is evident.

trading or are otherwise interested.  Thus, demand was neither futile nor otherwise excused, and the Plaintiffs lack standing to pursue Count XI.

Last, even if the Court does not dismiss the Complaint for failure to make the required demand, it should enter a stay in favor of the Class Actions now pending in this Court. If the Class Action and the Derivative Suit proceed together, Sunrise will be forced to try to defend itself in the Class Action by disproving claims of options backdating, while at the same time pursuing claims against its current and former officers and directors for the same alleged conduct in the Derivative Suit. 6/  Staying the Derivative Suit in favor of the Class Action is thus in the Company's best interest, and would allow for the fair, efficient and orderly resolution of both direct and derivative claims, thereby promoting justice and preserving the resources of the Court, the Company and the individual defendants.

## I.    Governing Law, Demand Futility Pleading Requirements, and Judicial Notice

### A.    Delaware Law Governs the Demand Analysis

A derivative suit "permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'" 7/  Kamen v. Kemper Fin. Serv., 500 U.S. 90, 95 (1991) (citation omitted).  Thus, a shareholder seeking to assert a claim on behalf of a corporation must first exhaust intracorporate remedies by making a demand on the corporation's board of directors to obtain the action desired.  See id. at 102 n.7.  Demand may be excused only where a shareholder is able to show that demand is futile.  Id. at 102.

---

6/      Of course, any misconduct by Sunrise's directors and senior officers would be imputed to Sunrise and form the basis for the Company's liability in the Class Action.  Thus, the Plaintiffs in this action, who are purporting to act *for* Sunrise's benefit, in fact could not be acting in a more adversarial manner toward the Company.

7/      Concerned about the potential for abuse of this remedy, "equity courts established as a precondition for the suit that the shareholder demonstrate that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." Kamen, 500 U.S. at 95-96.

Federal Rule 23.1 requires a derivative plaintiff "to allege with particularity" why demand would be futile. 8/  The rule "filter[s] unfounded claims[ ]" by excusing demand "only if the complaining stockholder, in his complaint, makes well pleaded allegations that demand on the corporation is futile."  Halpert Enterprises, Inc. v. Harrison, 362 F. Supp. 2d 426, 429 (S.D.N.Y. 2005) (citation omitted).  Importantly, this mandate to plead with particularity "requires substantially more" than mere notice pleading.  Gaubert v. Federal Home Loan Bank Bd., 863 F.2d 59, 68 (D.C. Cir. 1988).

The "demand requirement" of Federal Rule 23.1 relates to the "adequacy of the shareholder representative's pleadings," but the federal rule itself does not require demand. Kamen, 500 U.S. at 96.  Thus, while federal courts hearing shareholder derivative claims apply the federal procedural requirement of particularized factual pleading, they apply state substantive law to determine whether demand was required and, if so, whether the facts alleged demonstrate demand would is futile and thus can be excused.  Id.  Because Sunrise is a Delaware corporation, Delaware law governs the demand analysis in this case.

### B. Plaintiffs Must Plead Particularized Facts Establishing that a Majority of Sunrise's Current Directors Are "Interested" with Respect to Each Claim

Delaware law requires presuit demand.  Aronson, 473 A.2d at 808; see Del. Ch. Ct. R. 23.1.  Delaware courts have developed two tests to determine whether a derivative plaintiff has alleged particularized facts sufficient to explain why presuit demand was not made.

---

8/    The purpose of Federal Rule 23.1 is to "affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right."  Kamen, 500 U.S. at 95 (citation omitted).

1.    **Aronson and Rales Illustrate the Two Different Tests That May Be Applied to Determine Demand Futility**

The first test applies to derivative claims arising from <u>affirmative</u> actions taken or expressly approved by a corporation's board of directors.  <u>Aronson</u>, 473 A.2d at 808, 814 (where a claim arises from an affirmative business decision by the board of directors, a plaintiff must allege with particularity sufficient facts to create a reasonable doubt that:  (a) a majority of the directors are disinterested and independent; or (b) the challenged transaction was the product of a valid exercise of business judgment).

The second test applies where the derivative claims do not arise from an affirmative action or decision of the board itself.  <u>Rales v. Blasband</u>, 634 A.2d 927, 933-934 (Del. 1993).  For such claims, presuit demand will be deemed to be futile only if the plaintiff alleges with particularity sufficient facts to create a reasonable doubt that a majority of the directors could have exercised independent and disinterested judgment in response to a demand.  <u>Id.</u> ("Where there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application.") (citation omitted).

2.    **Based on the Allegations in the Complaint, <u>Rales</u> Applies to All of Plaintiffs' Claims**

The <u>Rales</u> test applies to <u>all</u> of Plaintiffs' claims, because Plaintiffs' claims do not arise from affirmative actions or express approvals of Sunrise's current Board.  Underlying all of Plaintiffs' claims are allegations of improper stock option grants (allegedly backdated or <u>ultra vires</u>) and/or trading of Sunrise stock by individual Defendants while in possession of material,

non-public information. 9/  Plaintiffs acknowledge that the challenged options were granted by

one of the Board's committees authorized to approve and issue stock options, not by the Board

as a whole.  Compl. ¶ 64. 10/  Similarly, Plaintiffs' allegations of "insider trading" do not

involve any decision made by the current Board, but rather involve alleged decisions by

individual defendants acting for themselves.  See McCall v. Scott, 239 F.3d 808, 817 n.8 (6th Cir.

2001) (applying the Rales test where complaint alleged insider trading); Guttman v. Huang, 823

A.2d 492, 499-500 (Del. Ch. 2003) (same).

       Under the Rales test, a director is deemed to be "interested" (and, thus, lacks

disinterestedness and independence) if he derives a direct personal benefit from a challenged

transaction in the sense of self-dealing.  In re J.P. Morgan Chase & Co. Shareholder Litig., 906

A.2d 808, 821 (Del Ch. 2005) (citation omitted).  A director also may be deemed to be interested

if he faces a "substantial likelihood" of personal liability, thereby compromising his ability to

consider a presuit demand.  Guttman, 823 A.2d at, 501 (citation omitted).  A director may be

deemed to lack "independence" from other interested directors if he is dominated by them, or

derives his main source of income from the corporation.  Benihana of Tokyo, Inc. v. Benihana,

Inc., 891 A.2d 150, 174-76 (Del. Ch. 2005).

---

9/     See Comp. ¶¶ 174 (claim under Securities and Exchange Act Sec. 10(b)/Rule 10b-5
arises from option grants); 178-189 (claim under Securities and Exchange Act Sec. 14(a) arises
from option grants); 182 (claim under Securities and Exchange Act Sec. 20(a) arises from option
grants); 186-87 (claim for rescission arises from option grants); 186 (claim for accounting arises
from option grants); 192 (claim for breach of fiduciary duty arises from option grants); 197
(claim for unjust enrichment arises from option grants); 200 (claim for rescission arises from
option grants); 203 (claim for unjust enrichment arises from option grants); 206 (claim for
rescission arises from option grants; 214 (claim for "insider selling and misappropriation of
information" arises from sales by individual defendants).

10/    Only two of the Current Directors served on the Compensation Committee/Stock Option
Committee (the "Compensation Committee") during the time period when the challenged option
grants were made.  See Compl. at ¶ 64.  Thus, the actions of the Compensation Committee/Stock
Options Committee cannot be imputed to the full board, and Rales is the proper test to determine
demand futility.  See Ryan v. Gifford, 918 A.2d 341, 353 (Del. Ch. 2007).

A trial court need not blindly accept as true all allegations, nor must it draw inferences from them in a plaintiff's favor unless they are <u>reasonable</u> inferences.  <u>Grobow v. Perot</u>, 539 A.2d 180, 187 (Del. 1988); <u>In re CNET Networks, Inc.</u>, 483 F. Supp. 2d 947, 954 (N.D. Cal. 2007).  Moreover, a "key principle" under Delaware law is that "directors are entitled to a presumption that they were faithful to their fiduciary duties."  <u>Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart</u>, 845 A.2d 1040, 1048-49 (Del. 2004).  The burden is on the plaintiff in a derivative action to overcome that presumption by pleading particularized facts.  <u>Id.</u>

Thus, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors."  <u>Aronson</u>, 473 A.2d at 815; <u>see also</u> <u>Blasband v. Rales</u>, 971 F.2d 1034, 1049 (3d Cir. 1992) (applying Delaware law) ("plaintiff may not bootstrap allegations of futility merely by pleading that the directors participated in the challenged transaction.").  Demand futility does not mean that any "approval of a challenged transaction automatically connotes 'hostile interest' and 'guilty participation' by directors," because such a rule would leave "the clear mandate of Chancery Rule 23.1 devoid of its purpose and substance."  <u>Aronson</u>, 473 A.2d at 814.

General allegations that a director breached fiduciary duties are "insufficient to demonstrate that the [director] engaged in conduct that resulted in a substantial risk of personal liability."  <u>In re Silicon Graphics Inc. Sec. Litig.</u>, 183 F.3d 970, 990 (9th Cir. 1999) (applying Delaware law).  Generalized and conclusory allegations of director approvals have been soundly rejected by Delaware courts as insufficient to excuse demand.  <u>See, e.g.</u>, <u>Guttman</u>, 823 A.2d at 503 (demand not excused where plaintiff's complaint lacked "well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company, the

information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities").

Likewise, Delaware courts have consistently held that directors are not deemed to lose their independence merely because they move in the same social circles or hold seats on the same corporate boards.  Beam ex rel. Martha Stewart Living, 845 A.2d at 1051-52; see also Orman v. Cullman, 794 A.2d 5, 27 (Del. Ch. 2002)  ("the naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence"); Highland Legacy Ltd. v. Singer, Civ A. No. 06-01566, 2006 WL 741939, at *6 (Del. Ch. Mar. 17, 2006) (unpublished) (conclusory allegations that directors are dominated because they serve together on the boards of unaffiliated companies is not enough to overcome the presumption of a director's independence).

Finally, Plaintiffs must plead with particularity facts sufficient to explain why demand was not made with respect to each separate claim pled in the Complaint.  Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) ("[d]emand futility analysis is conducted on a claim-by-claim basis") (citation omitted), aff'd, 845 A.2d 1040; Yaw v. Talley, Civ. A. No. 12882, 1994 WL 89019, *9 (Del. Ch. Mar. 2, 1994) (unpublished) (same); see also Ward, Jr., Rodman, et al., Folk on the Delaware General Corporation Law, § 327.4.2.2 (5th ed. 2006).

Applying these standards, Plaintiffs fail to plead particularized facts establishing that a majority of Sunrise's Current Directors were interested with respect to any of the claims alleged in the Complaint, and demand was thus not futile or otherwise excused.

C.    **On a Motion to Dismiss, the Court May Take Judicial Notice of Facts Outside the Four-Corners of the Complaint**

On a motion to dismiss, the Court may consider "facts stated on the face of the complaint, in documents appended to the complaint or incorporated into the complaint by reference, and [ ] matters of which judicial notice may be taken."   In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165, 174 (D.D.C. 2007) (citations omitted).  The Court may take judicial notice of a fact which is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  In a securities action, the Court may take judicial notice of documents that are required to be filed, and actually have been filed, with the SEC.  XM Satellite Radio, 479 F. Supp. 2d at 174.

II.    **Demand Is Required with Respect to Claims Based on Grant Dates Challenged in Von Guggenberg, and Cannot Be Relitigated Here**

Initially, Plaintiffs claims should be dismissed for failure to make demand to the extent that they are based on option grants previously challenged in Von Guggenberg.  The Virginia courts held that demand was required with respect to claims based on all nine of the option grants challenged in that case.  The specific grant dates are: May 2, 1997; September 14, 1998; November 8, 1999; February 25, 2000; March 28, 2000; September 11, 2000; November 24, 2000; May 11, 2001; and November 12, 2001.  The instant Complaint challenges 16 option dates, including all nine of the grants previously challenged in Von Guggenberg.  Compare Von Guggenberg Compl. ¶¶ 26-29 and 43 (alleging a "striking pattern" between 1997 and 2001 suggesting that options had been backdated), with Compl. ¶¶ 66, 69, 73, 74, 76-78, 85.  It already has been determined on the merits that demand was required with respect to claims based on

these nine option grants.  As a result, Plaintiffs should be precluded from re-litigating demand

futility in the Derivative Suit with respect to claims based on those same grants.

The doctrine of collateral estoppel/issue preclusion embraces general principles of

comity, requiring federal courts to give the same preclusive effect to a judgment from a foreign

state as would a court sitting in that foreign state.  <u>Reiter v. Universal Marion Corp.</u>, 299 F.2d

449, 452 (D.C. Cir. 1962).  Under Virginia law, collateral estoppel/issue preclusion shall apply

where, as here: (1) the parties to the prior and subsequent proceedings (or their privies) are the

same; (2) the issue sought to be re-litigated was actually litigated in the prior action; (3) the issue

was essential to the judgment in the prior proceeding; (4) the prior proceeding resulted in a

judgment that is valid, final, and adverse to the party against whom the collateral estoppel/issue

preclusion is sought to be applied; and (5) there is "mutuality" in the sense that the litigant who

has invoked collateral estoppel/issue preclusion in the later litigation would have been bound had

the litigation of the issue in the prior proceeding reached the opposite result.  <u>Angstadt v.</u>

<u>Atlantic Mutual Ins. Co.</u>, 457 S.E.2d 86, 87 (Va. 1995). <u>11</u>/

All of these factors are present in the instant suit.  First, the real parties in interest

in <u>Von Guggenberg</u> and the Derivative Suit are the same. <u>12</u>/  Second, the issue of whether

---

<u>11</u>/      <u>See also</u> Va. Sup. Ct. R. 1:6(a) (West 2007) (eff. July 1, 2006) ("A party whose claim for
relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by
a final judgment, <u>shall</u> <u>be</u> <u>forever</u> <u>barred</u> from prosecuting any second or subsequent civil action
against the same opposing party or parties on any claim or cause of action that arises from that
same conduct, transaction or occurrence....") (emphasis added).

<u>12</u>/      Although different shareholders brought the two suits, the actual plaintiff on whose
behalf the claims were brought is the identical corporation – Sunrise.  <u>See</u> <u>West Coast Mgmt. &</u>
<u>Capital, LLC v. Carrier Access Corp.</u>, 914 A.2d 636, 643 n.22 (Del. Ch. 2006) ("a prior suit by
another plaintiff with similar allegations of demand futility may bar a second plaintiff from filing
the same suit"); <u>Cramer v. Gen. Tel. & Elec. Corp.</u>, 582 F.2d 259, 267 (3d Cir. 1978), <u>cert.</u>
<u>denied</u>, 439 U.S. 1129 (1979) (previous shareholder derivative suit precluded subsequent
derivative suit by different plaintiff asserting the same claim); <u>Henik ex rel. LaBranche & Co.,</u>
<u>Inc. v. LaBranche</u>, 433 F. Supp. 2d 372, 380 (S.D.N.Y. 2006) (same).  In addition, four Current

---

demand on Sunrise's Board would have been futile with regard to these allegedly backdated options was litigated in <u>Von Guggenberg</u> and comprise the majority of the option grants challenged in the instant suit. Third, the <u>Von Guggenberg</u> court's determination that demand would not have been futile with regard to these options was <u>the</u> essential issue in its decision to sustain Sunrise's demurrer. <u>See</u> September 15, 2006 Order, Ex. 5. Fourth, the court's ruling on Sunrise's demurrer was a valid and final judgment on the merits. Finally, Virginia's mutuality requirement is satisfied because the defendants in <u>Von Guggenberg</u> would have been bound had the court reached the opposite result.

Plaintiffs (who are represented by the same counsel who filed <u>Von Guggenberg</u>) should not be permitted to make an end-run around the demand requirement simply by challenging a few additional option grants in a subsequent suit, particularly where, as explained below, there are no facts alleged in the Complaint from which an inference of backdating can be drawn with respect to those other grants. Otherwise, Sunrise risks being subjected to an endless stream of suits by other shareholder plaintiffs filing complaints based on these same option grants that include a few additional grants in an attempt to avoid prior decisions on the merits regarding the demand requirement. For these reasons, Counts I–IX (alleging stock option backdating or <u>ultra</u> <u>vires</u> grants) and Count XI (alleging insider trading based on knowledge of improper option grants) should be dismissed for failure to make demand, because these claims are based principally on option grants previously challenged in <u>Von Guggenberg</u>, where it was determined that demand was required.

---

Directors (Aprahamian, Callen, Donohue and Klaassen – a majority of the Board) were among the individuals named as defendants in both suits.

III.    **Plaintiffs Fail to Plead Particularized Facts Establishing that Demand Was Futile for Counts I–VII**

        Plaintiffs' claims in Counts I–VII arise either directly or indirectly from the alleged grant and/or receipt of purportedly backdated stock options on 14 different dates. 13/ Compl. ¶¶ 170-201.  Yet, Plaintiffs have failed to plead particularized facts sufficient to establish a reasonable inference that any backdating occurred.  As a result, none of the Current Directors is interested for purposes of demand based on an alleged benefit from the purported backdating.  In addition, Plaintiffs have failed to plead particularized facts sufficient to establish that any Current Directors are interested based on other allegedly improper conduct, or are otherwise beholden to another interested Current Director.  For these reasons, Plaintiffs have failed to establish that a majority of the Current Directors is interested and, thus, Counts I–VII should be dismissed.

    A.    **Plaintiffs' Conclusory Allegations Do Not Support An Inference that Backdating Occurred**

        Plaintiffs' conclusory allegations are insufficient to establish an inference of backdating for several reasons.  First, five of the challenged option grants were made on dates tied to corporate events at Sunrise and, thus, no inference of backdating can be drawn.  Second, four other challenged option grants were not favorable to the recipients and, thus, cannot support a reasonable inference of backdating either.  Third, setting aside these nine option grants, the five remaining challenged option grants do not support an inference of backdating when viewed, as

---

13/      Counts I (Violations of § 10(b) and Rule 10b-5 of the Securities and Exchange Act), IV (Accounting), V (Breach of Fiduciary Duty and/or Aiding and Abetting), VI (Unjust Enrichment), and VII (Rescission), all are expressly based on the alleged granting and/or receipt of backdated options on 14 different dates.  Compl. ¶¶ 170-175, 184-201.  Similarly, Count II (Violations of § 14(a) of the Securities Exchange Act) is based on false and misleading proxy statements arising from the alleged backdating.  Compl. ¶¶ 176-181.  Count III (Violations of § 20(a) of the Securities Exchange Act), while cryptically pled, arises from the "illegal conduct and practices complained of" in the Complaint, all of which allegedly arises from or relates back to the purported backdating.  Compl. ¶¶ 182-183.

they must be, in the context of <u>all</u> options granted to directors and/or officers during the relevant time period (which include five other grant dates not mentioned in the Complaint). When these 19 different option grants (including the five omitted from the Complaint) are examined, it is evident that at least 14 of them, or 74% of the total, refute Plaintiffs' suggestion of backdating. In this context, Plaintiffs' central thesis – that some "extraordinary pattern" of intentional backdating should be inferred – is not merely unreasonable, it is disingenuous.

1.      **Five Grant Dates Are Tied to Corporate Events and Thus Cannot Support a Reasonable Inference of Backdating**

Because Plaintiffs did no presuit investigation of their own, their backdating-related claims are purely circumstantial and, thus, depend entirely on the Court <u>inferring</u> that backdating occurred based on the performance of Sunrise stock during time periods surrounding the challenged grant dates. <u>14</u>/ When a plaintiff relies solely "on the numbers" to allege backdating, as Plaintiffs do here, no inference of backdating can be drawn when a grant date is tied to a related corporate event. <u>See, e.g.</u>, <u>In re CNET Networks, Inc.</u>, 483 F. Supp. 2d at 960 ("[m]ere reliance on the numbers is not sufficient when plaintiffs are confronted with a legitimate, judicially-noticeable explanation for the grant date"); <u>In re Zoran Corp. Derivative Litigation</u>, Civ. A. No. 06-05503, 2007 WL 1650948, at *13 (N.D. Cal. Jun. 5, 2007) (slip copy) (no inference of backdating where options grant occurred in connection with company's annual shareholders meeting or in connection with a director's joining the board); <u>Desimone v. Barrows</u>,

---

14/      Plaintiffs claim to have conducted "a statistical analysis identical in methodology to that of the Merrill Lynch analysis" cited in several other cases. Compl. ¶ 6. Yet, after making this claim in the introduction of their complaint, Plaintiffs provide no details of their "analysis." The Court cannot assume that the Plaintiffs' "analysis" is legitimate when Plaintiffs have offered no details as to the methodology behind it. Moreover, because Plaintiffs did not include all options grant dates during the relevant time period, their analysis is methodologically flawed and, thus, useless for purposes of establishing a "pattern" of backdating. <u>In re Openwave Sys. Inc. Shareholder Derivative Litig.</u>, Civ. A. No. 06-03468, 2007 WL 1456039, *5 (N.D. Cal. May 17, 2007).

924 A.2d 908, 948 (Del. Ch. 2007) (plaintiff failed to sufficiently plead backdating where the

option grants occurred on the occurrence of a specific corporate event).  Five of the 14 allegedly

backdated option grants coincided with corporate events at Sunrise.

### (a)  September 14, 1998

Plaintiffs allege that options issued on September 14, 1998 must have been

backdated "to one of the lowest prices of Sunrise stock for the fiscal year."  Compl. ¶ 69.

Plaintiffs' allegation of backdating is belied by their own pleading.  As Plaintiffs acknowledge,

on September 14, 1998, previously granted options were "repriced."  Compl. p.3, n.1.  Although

termed a "repricing," options originally priced in excess of $29.00 ($14.50 split-adjusted) were

cancelled and regranted at $25.00 ($12.50 split-adjusted), the closing price of Sunrise shares on

September 14, 1998.  This was fully disclosed in Sunrise's SEC filings.  See Sunrise 10-Q filed

Nov. 10, 1998, p. 8, Ex. 12 hereto; proxy statement filed Apr. 6, 1999, p. 10, Ex. 13 hereto.

Given these facts, there is no basis to infer that these options were backdated.

### (b)  November 8, 1999

Plaintiffs allege that options granted to Callen on November 8, 1999, must have

been backdated "to one of the lowest prices of Sunrise stock for the fiscal year."  Compl. ¶ 73.

Plaintiffs acknowledge, however, that Callen became a director in 1999.  Id. at ¶ 18.  The 1996

Directors' Stock Option plan provides that each director "shall be granted an Initial Option, as of

the date of the Director's Commencement of Service."  See 1996 Directors' Stock Option Plan at

¶ 7 (a complete copy of which was attached to Sunrise's 10-K, filed with the SEC on March 31,

1998 and March 31, 1999), Exs. 14 and 15 hereto. Other than those granted on November 8,

1999, no other options were granted to Callen in 1999.  Sunrise proxy statement filed Apr. 14,

2000, p. 8, ex. 16 hereto.  The only inference to be drawn is that these stock options were granted

in conjunction with Callen's commencement of service as a director. [15]/ Indeed, Plaintiffs stated that options granted to directors pursuant to their appointment/election as directors would not be included in their "pattern" because these grants were not discretionary.  Compl. p.3, n.1.

  **(c)  February 25, 2000**

  Plaintiffs allege that options granted on February 25, 2000, must have been backdated because their exercise price was among "the lowest stock prices…for the 2000 fiscal year."  Compl. ¶ 74.  Sunrise's public filings reveal that these options were granted on the same date on which the Company's 2000 Stock Option Plan was approved. [16]/  See Apr. 14, 2000 Proxy Statement at 20, Ex. 16.  The grant of options on this date was tied to an event at the Company and was not the result of discretionary selection.  Thus, there is no basis to infer that these options were backdated.

  **(d)  May 22, 2000**

  Plaintiffs allege that options granted to Holladay on May 22, 2000, must have been backdated "to a point just prior to a precipitous rise in the price of Sunrise stock."  Compl. ¶ 75.  Yet, Plaintiffs acknowledge that Holladay became a director in 2000, id. at ¶ 20, and SEC filings confirm that Holladay did not receive any other options during 2000.  Because they did no presuit investigation of their own, Plaintiffs do not (and cannot) allege that these options were not issued in connection with the commencement of Holladay's service as a director pursuant to Sunrise's customary practices.  The only inference to be drawn is that these stock options were

---

[15]/  In fact, Callen's service as a director did commence on November 8, 1999.  This fact is subject to judicial notice, because it is clearly capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b); see also Del. R. Evid. 201(b).

[16]/  The Board also approved senior executive severance plans on this same date, further demonstrating that the Board, and its committees, were conducting business on February 25, 2000.  See Apr. 14, 2000 Proxy Statement at 16, Ex. 16.

granted in conjunction with Holladay's commencement of service as a director. 17/  More importantly, this grant was disclosed in a Form 4 filed with the SEC on May 25, 2000, the next business day after the grant date.  See May 25, 2000 Form 3, Ex. 17 hereto.  Given this disclosure, the last possible date that these options could have been granted is May 25, 2000.  Thus, the allegation of backdating is preposterous.

### (e)    September 11, 2000

Plaintiffs allege that options granted to Paul Klaassen on September 11, 2000 must have been backdated because they were "conveniently granted…when Sunrise stock was at the lowest price of the month of September and near the lowest price of the final quarter." Compl. ¶ 76.  There was nothing "convenient" about the granting of these options.  Rather, they were granted pursuant to an employment agreement entered into by Paul Klaassen and Sunrise on September 12, 2000.  See Employment Agreement at Sec. 3(c) (a complete copy of which was attached to Sunrise's 10-Q, filed with the SEC on November 13, 2000), Ex. 18 hereto.  That agreement specifically provides that Klaassen was "awarded an incentive stock option grant on September 11, 2000."  Id.  The grant date was thus tied to an event at the Company, and was not the result of discretionary selection.  As a result, there is no basis to infer that these options were backdated.

### 2.    Four Challenged Grant Dates Cannot Support Any Inference of Backdating Based on Sunrise's Stock Performance

Similarly, there is no basis to infer backdating from at least four other challenged grant dates, in light of Sunrise's stock performance during the relevant period.  When a court is

---

17/      In fact, Holladay's service as a director commenced on May 19, 2000, the Friday preceding the Monday, May 22, 2000 grant date.  Holladay's commencement of service is a fact subject to judicial notice, because it is clearly capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b); see also Del. R. Evid. 201(b).

asked to draw an inference of backdating from "the numbers" alone, those numbers must, in fact, support such an inference – conclusory allegations of backdating do not suffice.  See In re Zoran, 2007 WL 1650948, at *12-13 (no inference of backdating where options grant was not favorable to recipient).  Four of the allegedly backdated grant dates are merely conclusory allegations devoid of any support by the actual numbers on which Plaintiffs' purport to rely.

### (a)   November 4, 1997

Plaintiffs allege that options granted on November 4, 1997 must have been backdated "to one of the lowest prices of the quarter."  Compl. ¶ 68.  The numbers themselves do not support any inference of backdating.  The options issued on this date were priced at $18.31.  There were 63 trading days in the quarter.  The exercise price of $18.31 was actually the 21st lowest price of the quarter – hardly "one of the lowest."  Indeed, Sunrise shares were priced lower on nearly 33% of the trading days in the quarter.  Thus, there is no basis to infer that these options were backdated.

### (b)   March 28, 2000

Plaintiffs allege that options issued on March 28, 2000 must have been backdated because they were granted at one of "the lowest prices of Sunrise stock for the fiscal year."  Compl. ¶ 74.  Plaintiffs plot these options on a 12-month chart for Sunrise shares, attempting to highlight the fact that the grant was made before a dramatic increase in the price of the stock in late April 2000.  See id.  However, Plaintiffs ignore the fact that these options were disclosed in SEC filings on April 10, 2000.  Ex. 19 hereto.  Any change in price after that date is irrelevant because the options could not possibly have been granted after they were disclosed.  At most, the options could have been backdated 13 days (from April 10 back to March 28) during which time the stock price ranged from $6.22 to $6.97.  Indeed, under Plaintiffs' analysis, options granted on any date between January 1 and the middle of April 2000 (a period covering more than the entire

first quarter of that year) would have been granted at "one of the lowest prices for the fiscal

year." Thus, there is no basis to infer that these options were backdated.

### (c)    November 24, 2000

Plaintiffs allege that options issued on November 24, 2000 must have been

backdated because they were granted "just prior to a precipitous rise in the price of Sunrise

stock." Compl. ¶ 77. In the 20 trading days following this grant, Sunrise shares actually <u>declined</u>

in value by 11%. Moreover, there were 21 trading days in the month, and these options were

granted at the 11th <u>highest</u> price for the month. Thus, there is no basis to infer that these options

were backdated.

### (d)    November 12, 2001

Plaintiffs allege options issued on November 12, 2001 must have been backdated

because they were granted "just prior to a precipitous rise in the price of Sunrise stock." Compl.

¶ 78. Plaintiffs' own graph belies their contention that any "precipitous rise" followed these

options. <u>See Id.</u> There is nothing unusual about the performance of Sunrise shares following this

grant. As indicated by Plaintiffs' own chart, <u>see</u> Compl. ¶ 78, the performance of Sunrise shares

following this grant reflects nothing but the ordinary, day-to-day fluctuations of the market.

Thus, there is no basis to infer that these options were backdated.

### 3.    No "Extraordinary Pattern" of Backdating Can Be Inferred From the Five Remaining Challenged Option Grants

The five remaining grant dates alleged to have been backdated (May 2, 1997;

August 28, 1997; October 8, 1998; December 10, 1998; and March 5, 1999) cannot be

considered in a vacuum. When viewed in context, the allegations relating to these grants are

insufficient to establish a reasonable inference of backdating with respect to any of the

challenged option grants, much less the "extraordinary pattern" alleged in the Complaint.

When a series of stock options are granted over time, it is expected that some will subsequently appear to have been "favorable," some will appear to have been "neutral," and still others will appear to have been "unfavorable" due to natural fluctuations in the price of the stock. An inference of backdating cannot be drawn from a purported "pattern" that is based <u>only</u> on option grants that appear to have been favorably timed with the benefit of hindsight.  Thus, in <u>Desimone</u>, the court found that the plaintiff had not pled demand futility adequately, and expressed skepticism that an inference of backdating could be drawn solely by examining a limited number of favorable stock option grants without a statistical analysis of all of the Company's option grants.  2007 WL 1670255, at *23 n.114. <u>18</u>/

If there were a scheme to backdate stock options, as Plaintiffs allege, this scheme would be evidenced by an unusually high ratio of favorable grants among <u>all</u> option grants to directors and officers.  No such pattern exists.  Plaintiffs have alleged in their Complaint that 14 option grants were backdated.  Of those 14 grants, as discussed above, five were tied to corporate events (September 14, 1998; November 8, 1999; February 25, 2000; May 22, 2000; and September 11, 2000) and Sunrise's stock price during the relevant periods does not support any inference of backdating for another four (November 4, 1997; March 28, 2000; November 24, 2000; and November 12, 2001).  In addition to the 14 option grants challenged in the Complaint, SEC filings show that options were granted to Sunrise officers and/or directors on five other dates during the relevant period (April 28, 1997; January 19, 1998; April 27, 1998; April 26,

---

<u>18</u>/    <u>See also</u> <u>In re Linear Tech. Corp.</u>, Civ. A. No. 06-03290, 2006 WL 3533024, at *3 (N.D. Cal. Dec. 7, 2006) (slip copy) (rejecting assertion of "striking pattern" of backdating where plaintiffs pled no facts concerning how often and at what times options were granted in past).

1999; and January 9, 2001). 19/  Plaintiffs do not challenge options granted on any of these dates, presumably because the "numbers" are either neutral or unfavorable.

Thus, even assuming, _arguendo_, that the five remaining option grants challenged in the Complaint could be classified as "favorable," there is no basis to assert an "extraordinary pattern" based on only five out of 19 grants.

### B.  Plaintiffs Fail to Establish That a Majority of the Current Directors Are Interested Based on the Alleged Backdating

As illustrated in Table 1, below, none of the Current Directors alleged to have received options on one or more of the challenged option grants is interested for purposes of demand futility.  Plaintiffs failed to plead particularized facts upon which a reasonable inference of backdating can be drawn with respect to any of those grants.  In addition, Plaintiffs are precluded from asserting demand futility with respect to grant dates for which the Virginia courts have already held that demand was required in Von Guggenberg.

---

19/      See Form 5 filed by Aprahamian Feb. 5, 1998 (disclosing Apr. 28, 1997 options grant), Ex. 20 hereto; Form 3 filed by Tomasso Mar. 4, 1998 (disclosing Jan. 19, 1998 options grant), Ex. 21 hereto; Form 5 filed by Aprahamian Feb. 15, 2000 (disclosing Apr. 27, 1998 and April 26, 1999 options grants), Ex. 22 hereto; Form 4 filed by Aprahamian Jul. 9, 2001 (disclosing Jan. 9, 2001 options grant), Ex. 23 hereto.

**Table 1**

| Grant Date | Current Director Recipient(s) | Reason(s) Demand is Required |
|---|---|---|
| 05/02/1997 | Aprahamian | • No reasonable inference of backdating<br>• Precluded by <u>Von Guggenberg</u> |
| 10/08/1998 | Donohue | • No reasonable inference of backdating |
| 11/08/1999 | Callen | • Grant date tied to corporate event<br>• Precluded by <u>Von Guggenberg</u> |
| 02/25/2000 | Aprahamian, Callen, Donohue | • Grant date tied to corporate event<br>• Precluded by <u>Von Guggenberg</u> |
| 05/22/2000 | Holladay | • Grant date tied to corporate event |
| 09/11/2000 | P. Klaassen | • Grant date tied to corporate event<br>• Precluded by <u>Von Guggenberg</u> |

Even assuming, <u>arguendo</u>, that (1) an inference of backdating can be drawn with respect to grant dates that (a) are not tied to a corporate event and (b) appear "favorable" when considered in isolation, <u>and</u> (2) that Plaintiffs are not precluded from asserting demand futility with respect to grant dates for which the Virginia courts have already held that demand is required, <u>at most</u> two Current Directors are alleged to have received such options:  Aprahamian (May 2, 1997) and Donohue (October 8, 1998).  [20]/ Compl. ¶¶ 66, 67, 70, 71, 72.  As a result, at least five Current Directors (Callen, Holladay, Paul Klaassen, Teresa Klaassen and Little) are disinterested and could consider a demand on Counts I–VII.

C.    **Plaintiffs Other Allegations Fail to Establish that Any Current Director Is Interested or Otherwise Beholden to An Interested Current Director**

Plaintiffs make numerous sweeping and conclusory allegations in an attempt to establish that other Current Directors are interested or otherwise beholden to an interested

---

[20]/    Both of these grants, however, have been matters of public record for years.  Aprahamian filed a Form 5 disclosure with the SEC on February 5, 1998, nearly nine years before Brockton filed suit.  <u>See</u> Ex. 20 hereto.  Donohue filed a Form 5 on October 8, 1998, nearly eight years before Brockton filed suit.  <u>See</u> Ex. 24 hereto.

Current Director. Compl. ¶¶ 164-169. These allegations fall into three categories: allegedly improper approvals; allegedly disqualifying business relationships; and allegedly disqualifying personal relationships.

As discussed above, however, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." Aronson, 473 A.2d at 815; see also Blasband, 971 F.2d at 1049 (applying Delaware law) ("plaintiff may not bootstrap allegations of futility merely by pleading that the directors participated in the challenged transaction."). Plaintiffs' general allegations that one or more of the Current Directors breached fiduciary duties are "insufficient to demonstrate that the [director] engaged in conduct that resulted in a substantial risk of personal liability." In re Silicon Graphics, 183 F.3d at 990 (applying Delaware law). So, too, are Plaintiffs' conclusory allegations that one or more of the Current Directors approved an option grant or other challenged transaction or event. See, e.g., Guttman, 823 A.2d at 503 (demand not excused where plaintiff's complaint lacked "well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company, the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities").

Likewise, Delaware courts have consistently held that directors are not deemed to lose their independence merely because they move in the same social circles or hold seats on the same corporate boards. Beam ex rel. Martha Stewart Living, 845 A.2d at 1051-52; see also Orman, 794 A.2d at 27 (Del. Ch. 2002) ("the naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence"); Highland Legacy, 2006 WL 741939, at *6 (conclusory allegations that directors are dominated because they serve

together on the boards of unaffiliated companies is not enough to overcome the presumption of a director's independence).

As a result, none of Plaintiffs' sweeping demand futility allegations is sufficient to establish that one or more of the Current Directors is interested, or is otherwise beholden to another interested Current Director, such that a majority of Current Directors is interested with respect to any of Plaintiff's claims.

1.    **Plaintiffs Fail to Establish that Aprahamian, Callen or Donohue Face A Substantial Threat of Liability From Service on the Compensation Committee**

Specifically, Plaintiffs' sweeping allegations that Aprahamian, Callen and Donohue are interested because of their service on the Compensation Committee are insufficient to render them interested.  Plaintiffs have not pled facts establishing that any of these Current Directors approved a particular grant date at issue.  Indeed, Callen did not join the compensation committee until 1999, and thus could not have approved any of the challenged options issued prior to that time.   Such conclusory allegations of generalized director approvals are insufficient to excuse demand.  See Guttman, 823 A.2d at 503; Grobow v. Perot, 526 A.2d 914, 924 (Del. Ch. 1987) aff'd 539 A.2d 180 (demand not excused based on mere allegations that the directors "approved, participated, or acquiesced in a challenged transaction").

2.    **Plaintiffs Fail to Establish that Aprahamian, Callen, Donohue or Holladay Face a Substantial Threat of Liability From Service on the Audit Committee**

Similarly, Plaintiffs allege that Aprahamian, Callen, Donohue and Holladay are interested because they face a substantial threat of liability due to their service on the Audit Committee.  Compl. ¶¶ 164(f).  In particular, Plaintiffs assert in a purely conclusory fashion that these Current Directors "knowingly and deliberately participated in and approved the filing of false financial statements and other S.E.C. filings" and "knowingly and deliberately participated

in and approved" purported accounting violations. <u>Id.</u> Here as well, Plaintiffs' conclusory allegations are insufficient to excuse demand. 21/ <u>See</u> <u>Guttman</u>, 823 A.2d at 503; <u>In re Computer Sciences Corp. Derivative Litig.</u>, Civ. A. No. 06-05288, 2007 WL 1321715, at *9 (C.D. Cal. Mar. 26, 2007) (unpublished) (plaintiffs must plead "specific allegations of facts concerning the likely or actual time, place and manner of specific communications related to the wrongful backdating as well as facts supporting the alleged knowledge of the Audit Committee Defendants of the backdating").

    **3.**    **Plaintiffs Fail to Establish that Callen's Employment Renders Him Incapable of Exercising Independent Judgment**

Plaintiffs vaguely allege that Callen's ability to exercise independent judgment is affected by his employment with Donaldson, Lufkin, & Jenrette; Credit Suisse First Boston; and Aetna. Compl. ¶ 164(l). Plaintiffs' provide no details about Callen's alleged employment with these companies or their relationship with Sunrise, other than to state that the companies "have done business" with Sunrise. Id. These allegations are insufficient to establish that Callen is incapable of independent judgment. <u>See, e.g.</u>, <u>Official Committee of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins</u>, Civ. A. No. 20228, 2004 WL 1949290, at *11 (Del Ch. Aug. 24, 2004) (unpublished) (no inference of control where complaint did not specify the

---

21/    Without specific factual allegations as to how, why, and when these Current Directors would have become aware of the alleged issuance of backdated options, the Court cannot infer that members of the Audit Committee knowingly approved any false financial statements. <u>See, e.g.</u>, <u>In re Computer Sciences Corp.</u>, 2007 WL 1321715, at *9; <u>In re Xcel Energy, Inc.</u>, 222 F.R.D. 603, 607 (D. Minn. 2004) (looking to Delaware law for guidance and holding that generalized statements that Audit Committee members "knew or should have known" of false statements did "not constitute facts pleaded with particularity"). Indeed, Plaintiffs themselves concede that the Audit Committee relied on management and an independent auditor in carrying out its duties. Compl. ¶ 44(a)-(d). Under Delaware law, a director cannot be held liable for accounting errors when he has relied in good faith on books of account and reports made by corporate officials or independent certified public accountants. <u>Prince v. Bensinger</u>, 244 A.2d 89, 94 (Del. Ch. 1968); Del. Code Ann. tit 8, § 141(e).

amount of money the challenged director's law firm received from the corporation because court could not determine whether those fees constituted such a large part of the firm's income so as to be material to either the firm or the director).

### 4. Plaintiffs Fail to Establish that Paul Klaassen and Teresa Klaassen Are Beholden to the Compensation Committee

Plaintiffs claim that Paul Klaassen and Teresa Klaassen are not independent because they are beholden to the current members of the Compensation Committee (Aprahamian, Callen, and Donohue).  Compl. ¶¶ 164(c) and (d).  Under Delaware law, a director may be considered beholden to an entity only when that entity, directly or indirectly, has the unilateral power to decide whether the director "continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively."  Orman, 794 A.2d at 25 n.50 (emphasis added).

Plaintiffs assert that the Klaassens "stand[ ] to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by" the Compensation Committee.  Compl. ¶ 164 (c)-(d).  This assertion, however, ignores the overriding reality that the Klaassens own in excess of 6,000,000 shares of Sunrise stock (see Schedule 13G filed by P. and T. Klaassen, Feb. 14, 2007, Ex. 25 hereto) worth more than $200 million.  It defies common sense to suggest that the "hundreds of thousands of dollars" of compensation referred to in the Complaint would cause the Klaassens to elevate the wishes of one or more members of the Compensation Committee over the welfare of their enormous stake in the Company or their fiduciary duties to their shareholders, with whom their interests are clearly aligned.  See, e.g., In re Walt Disney Co. Derivative Litigation, 731 A.2d 342, 356 (Del.

Ch. 1998), <u>rev'd on other grounds sub nom.</u>, <u>Brehm v. Eisner</u>, 746 A.2d 244 (Del. 2000). (where

a director owns substantial stake in the corporation, the "only reasonable inference [the court can

draw] is that he is an economically rational individual whose priority is to protect the value of

his" investment, "not someone who would intentionally risk his own and his family's interests in

order to placate" another director).

> **5.    Plaintiffs Fail to Establish that Paul Klaassen, Teresa Klaassen, and Little Are Beholden to Donohue**

Finally, Plaintiffs allege that Paul Klaassen, Teresa Klaassen, and Little are

beholden to Donohue based on alleged personal and business relationships.  Compl. ¶¶ 164(i)

and (j).  Specifically, Plaintiffs assert that Paul Klaasen and Little "share a long-standing

personal and professional relationship" based on their mutual service on the Board of Directors

of the U.S. Chamber of Commerce (of which Donohue is the President and Chief Executive

Officer), and as fellow members of the U.S. Chamber Foundation (of which Donohue is

President and Little is Chairman).  Compl. ¶ 164(i).  Additionally, Plaintiffs assert the Paul

Klaassen and Teresa Klaassen share a "long-standing personal and professional relationship"

with Donohue.  Compl. ¶ 164(j).  These allegations are insufficient to create an inference that

Paul Klaassen, Teresa Klaassen, or Little is beholden to Donohue.

To create a reasonable doubt about Paul Klaassen's and Little's independence,

Plaintiffs were required to plead facts that would support a reasonable inference that, because of

the nature of a relationship, Paul Klaassen and Little would be more willing to risk their own

reputations than risk their relationship with Donohue.  <u>Beam ex rel. Martha Steward Living</u>, 845

A.2d at 1052.  Plaintiffs' conclusory allegations about mutual service on boards of the U.S.

Chamber of Commerce are insufficient to overcome the presumption that Klaasen and Little are

independent from Donohue.  Likewise, Plaintiffs' allegations about the personal relationship

between Paul and Teresa Klaasen and Donohue are similarly insufficient to overcome the presumption of independence. 22/ See, e.g., Benihana, 891 A.2d at 178-79 (40-year friendship between directors not enough to establish lack of independence from each other).

> **D.     Plaintiffs Fail to Establish that a Majority of Current Directors Are Interested With Respect to Counts I–VII**

The conclusion with respect to the demand requirement is the same for all of Plaintiffs' Counts I–VII.  As explained above, Plaintiffs have failed to plead particularized facts establishing that any option grants were backdated, much less that any Current Director is interested with respect to consideration of a demand on these claims.  Even assuming arguendo that an inference of backdating can be drawn with respect to options granted to Aprahamian and Donohue, Plaintiffs fail to allege particularized facts establishing that any other Current Directors are interested or otherwise beholden to Aprahamian or Donohue.  Thus, Plaintiffs have failed to establish that a majority of the Current Directors is interested with respect to Counts I–VII, and those claims should be dismissed.

**IV.     Plaintiffs Fail to Plead Particularized Facts Establishing that Demand Was Futile for Counts VIII and IX**

Demand was required with respect to Plaintiffs' Counts VIII and IX.  Counts VIII (Unjust Enrichment) and IX (Rescission) both arise from the alleged granting and/or receipt of purportedly ultra vires stock options granted on March 3, 1998, and May 11, 2001.  Compl. at ¶¶ 82-83, 85, 202-07.  Initially, the options granted on May 11, 2001, were previously challenged

---

22/     Plaintiffs allegations fall far short of the detailed factual pleading required to overcome the Klaassens' presumption of independence.  For example, Plaintiffs assert that Paul and Teresa Klaassen "lived with Donohue for a period of time" (see Compl. ¶ 164(j)), and that Donohue "invested" in the Klaassen's first home (id.), but allege no particularized facts about the timing or circumstances of these events.  These broad allegations cannot create an inference that the Klaassens' relationship with Donohue is such that they are beholden to him, especially when considered in light of the Klaassens' substantial personal wealth.

in <u>Von Guggenberg</u>.  Demand is thus required with respect to these claims, at least to the extent they are based on that option grant.

In any event, of the Current Directors, Plaintiffs allege only that <u>ultra</u> <u>vires</u> options were received by Callen and Donohue on May 11, 2001.  <u>Id.</u> at ¶¶ 80-85.  These allegations, however, are wholly without factual basis.  No options were issued to Callen or Donohue on that date.  As the April 5, 2002 Proxy Statement cited in the Complaint (<u>see</u> Compl. ¶ 102(e)) states, as well as Form 4s filed with the SEC by both Callen and Donohue (<u>see</u> Proxy Statement, Ex. 26 hereto, and Form 4s, Ex. 27 hereto), the only options granted to these directors in 2001 were those granted on January 9, 2001 (not challenged in the Complaint). 23/  Plaintiffs cannot claim that Callen or Donohue are interested based on the alleged receipt of options that were not, in fact, granted.

Moreover, as explained with respect to the alleged backdating, Plaintiffs' generalized allegations that certain Current Directors approved or knew of the purportedly <u>ultra</u> <u>vires</u> options cannot render any Current Director interested and, as a result, the alleged relationships among various Current Directors is irrelevant here as well.  Thus, Plaintiffs have failed to establish that a majority of the Current Directors is interested with respect to Counts VIII and IX, and those claims should be dismissed.

**V.    Plaintiffs Fail to Plead Particularized Facts Establishing that Demand Was Futile for Count XI**

Plaintiffs' Count XI (Insider Selling and Misappropriation of Information) is based on the alleged sale of Sunrise stock with the knowledge of purportedly improper option

---

23/      The Form 4s stated that Callen received 10,000 options and Donohue received 12,000 on the actual grant date of January 9, 2001, and these amounts correspond precisely with the total number of options listed in the Proxy Statement for that year.  <u>See</u> Proxy Statement, Ex. 26, and Form 4s, Ex. 27.

grants and accounting practices. 24/  Compl. ¶¶ 213-217.  Plaintiffs allege that six of the Current

Directors – Aprahamian, Callen, Donohue, Holladay, Paul Klaassen, and Teresa Klaasen – sold

Sunrise shares while in possession of material, non-public information regarding the alleged

stock options backdating and/or purported accounting irregularities.  Id. ¶¶ 16-20, 121, 216. 25/

Initially, Plaintiffs are precluded from alleging demand futility with respect to this claim,

because it is based on the challenged options already litigated in Von Guggenberg.  In any event,

Plaintiffs' allegations are insufficient to excuse demand because they fail to establish that a

majority of the Current Directors participated in any improper insider trading or are otherwise

incapable of considering demand on this claim.

      Delaware law "makes the same policy judgment as federal law does with regard

to claims of insider trading, which is that insider trading claims depend importantly on proof that

the selling defendants acted with scienter."  Guttman, 823 A.2d at 505.  In order to excuse

demand on an insider trading claim under Delaware law, Plaintiffs must plead specific facts

creating an inference that "each sale by each individual defendant was entered into and

completed on the basis of, and because of, adverse material non-public information."  Rattner v.

Bidzos, Civ. A. No. 03-19700, 2003 WL 22284323, at *11 (Del. Ch. Sept. 30, 2003)

(unpublished) (emphasis added); see also Guttman, 823 A.2d at 503-04.  Conclusory allegations

that a director "had reason to know that the company's financial statements were misstated" are

not sufficient.  Guttman, 823 A.2d at 503.  Rather, Plaintiffs must provide "well-pled,

particularized allegations of fact detailing the precise roles that these directors played at the

---

24/    There is no cause of action under Delaware law for "insider selling and misappropriation of information."  Such claims are typically brought as claims for breach of fiduciary duty.  See, e.g., In re Oracle Corp. Derivative Litig., 808 A.2d 1206, 1208 (Del. Ch. 2002).

25/    Plaintiffs use the term "Insider Selling Defendants" in Count XI but fail to define that term anywhere in their complaint.

company, the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities." Id.

Other than some paragraphs excerpted from a newspaper article that vaguely describe a few transactions, see Compl. ¶ 113, Plaintiffs provide no specific details of the trades underlying their insider trading claims. Instead, Plaintiffs provide a chart that lists only the total sales of Sunrise shares by various Defendants over an eleven-year period. See Compl. ¶ 121. Thus, Plaintiffs' allegations are insufficient to create an inference that any Current Director is incapable of considering demand on Count XI, and the claim should be dismissed.

## VI.    In the Alternative, and At a Minimum, the Court Should Stay this Suit Until the Class Action Claims Are Resolved

Even if the Court does not dismiss the Derivative Suit for failure to make the required demand, it should nevertheless stay this suit in favor of the earlier-filed securities class action claims pending before the Court in the recently consolidated Class Action.

The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 879 n. 6 (1998). Thus, a trial court may find it is efficient for its own docket, and the fairest course for the parties, to enter a stay of an action before it, pending resolution of independent proceedings that bear upon the case. Hisler v. Gallaudet Univ., 344 F. Supp. 2d 29, 35 (D.D.C. 2004). The party moving for a stay must show that it will suffer hardship or inequity in being required to go forward, and the decision whether to grant a stay is "an exercise of judgment" in which the Court must "weigh competing interests" of itself, counsel, and the litigants involved. Dellinger v. Mitchell, 442 F.2d 782, 786 (D.C. Cir. 1971) (citations omitted).

Because a derivative suit is brought by a shareholder on the corporation's behalf, the beneficial plaintiff in such a suit is the corporation itself. Reiter v. Universal Marion Corp., 173 F. Supp. 13, 15 (D.D.C 1959), aff'd, 299 F.2d 449. Thus, a trial court may stay a derivative suit if it determines that it is not in the corporation's best interests for the suit to go forward. See, e.g., Breault v. Folino, Civ. A. No. 01-00826, 2002 WL 31974381, at *1-2 (C.D. Cal. Mar. 15, 2002); cf. Massey v. Merrill Lynch & Co., Inc., 464 F.3d 642, 647 (7th Cir. 2006) (recognizing that the derivative plaintiff and the corporation "may have different interests and goals in litigation, and [the shareholder plaintiff] could act in ways that harm the corporation, even if unintentionally"). In this case, the interests of judicial economy and the interests of the beneficial plaintiff – Sunrise – clearly favor a stay of the Derivative Suit in favor of the Class Action.

Sound judicial administration counsels against the "wasteful expenditure of energy and money" implicated by litigation the same issues in separate proceedings. Columbia Plaza Corp. v. Sec. Nat'l Bank, 525 F.2d 620, 626 (D.C. Cir. 1975). Although one action is brought directly and the other derivatively, the claims asserted by the Plaintiffs in the Derivative Suit and the Class Action arise from virtually identical factual predicates – allegedly improper stock option grants and purported financial misstatements arising from those grants. 26/ Accordingly, the outcome of many of the claims asserted in the Class Action and the Derivative Suit will turn on the determination of the same factual and legal issues.

---

26/    Derivative Plaintiffs' claims in Counts I-VII arise directly from allegedly backdated options granted between May 2, 1997 and Nov. 12, 2001; Derivative Plaintiffs' claim in Count XI arises from alleged "insider trading" by certain Defendants while in possession of knowledge about the backdating and purported accounting irregularities. Compl. ¶¶ 45-58; 170-201; 213-217. Class Actions Plaintiffs' claims are based on the same alleged misconduct. See United Food Compl. ¶¶ 3-9; First New York Compl. ¶¶ 3-8.

For example, a finding in the Class Action that no backdating occurred at Sunrise would conclusively resolve at least seven of the 10 claims made in the Complaint. It would be a waste of the Court's time and resources for such potentially dispositive issues to be litigated in separate proceedings. See Fairview Hosp. v. Leavitt, Civ. A. No. 05-1065, 2007 WL 1521233, at *2-3 (D.D.C. May 22, 2007) (unpublished) (citations omitted) ("[g]iven the indistinguishable nature of the legal issues and defenses raised [in the simultaneous proceeding] and the case at hand, efficiency requires that this case be stayed"); Brudno v. Wise, Civ. A. No. 03-19953, 2003 WL 1874750, at *1 (Del. Ch. Apr. 1, 2003) (staying derivative suit based on the same misconduct alleged in class action against corporate defendant because if corporation successfully defended against the class action, at least some of the derivative claims would not survive). 27/ Sunrise's interests will be best served if these issues are litigated directly in the Class Action rather than derivatively in the shareholders' suit. 28/

Because the issues in both suits are so similar, the prosecution of the Derivative Suit will inevitably conflict with Sunrise's ability to defend itself in the Class Action. For example, a finding in this suit of intentional wrongdoing by Sunrise directors or senior officers, and any preclusive effect such findings would be given in the Class Action, could be imputed to Sunrise and form the basis for its own liability in the Class Action. Thus, the very action that Plaintiffs bring purportedly to benefit Sunrise would have just the opposite effect. See also In re

---

27/    Although the derivative suit in Brudno sought to hold the directors of El Paso Corporation liable for any damages or costs that resulted from the federal securities action, the success of the derivative complaint hinged on the truthfulness of the same allegations of misconduct that was the basis for the federal securities class action case. Brudno, 2003 WL 1874750, at *3-4. The principles in Brudno, therefore, are just as applicable to the case at hand. It should also be noted that the district judge who was assigned the federal securities class action claim and a federal derivative claim against El Paso stayed the federal derivative claim pending the securities class action. Id.

28/    Given the nature of derivative suits, the protection of the defendant corporation's interests are especially important.

E.F. Hutton Banking Practices Litig., 634 F. Supp. 265, 270 (S.D.N.Y. 1986) (recognizing that directors whom plaintiffs wished to sue derivatively would be important witnesses for the corporation in pending direct litigation, and that the derivative suit might "undercut their veracity and general effectiveness as witnesses" on the corporation's behalf); Breault, 2002 WL 31974381, at *2 (staying derivative action because named defendants would likely be witnesses for the corporation in pending direct action).

Moreover, by consuming valuable financial and management resources at a time when those resources are needed to defend itself in the Class Action, allowing the Derivative Suit to proceed now will harm Sunrise's ability to protect the Company, as a result, the interests of its shareholders.  See Breault, 2002 WL 31974381, at *2 (staying derivative action because it would divert corporation's resources from defense of direct action).

Finally, because a derivative suit is brought by a shareholder on behalf of the corporation and for the corporation's (not the shareholders') benefit, the Plaintiffs' interests here should be equivalent to Sunrise's best interests.  Plaintiffs cannot claim any prejudice in light of the benefits to Sunrise likely to flow from a stay of the Derivative Suit.  Thus, for all these reasons a stay is appropriate.

## CONCLUSION

For these reasons, the Court should dismiss the Derivative Suit or, in the alternative, stay this suit in until the Class Action has been resolved.

Respectfully Submitted,

Dated: August 27, 2007                    HOGAN & HARTSON, LLP

/s/      George H. Mernick, III
George H. Mernick, III (DC Bar 294256)
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone:   (202) 637-5726
Facsimile:   (202) 637-5910

N. Thomas Connally (DC Bar 448355)
Jon M. Talotta (DC Bar 473626)
8300 Greensboro Drive, Suite 1100
McLean, Virginia  22102
Telephone:   (703) 610-6100
Facsimile:   (703) 610-6200

*Attorneys for Nominal Defendant*
*Sunrise Senior Living, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the forgoing, MEMORANDUM OF POINTS AND

AUTHORITIES IN SUPPORT OF THE MOTION TO DISMISS OR, IN THE ALTERNATIVE,

TO STAY BY NOMINAL DEFENDANT SUNRISE SENIOR LIVING, INC., was served this

27th day of August, 2007, in accordance with the Court's CM/ECF Guidelines.  In addition, the

forgoing was served this 27th day of August, 2007, via first-class mail, postage prepaid, on:

>           Maya Saxena
>           Joseph White
>           SAXENA WHITE, P.A.
>           2424 North Federal Highway, Suite 257
>           Boca Raton, FL  33431
>
>           Brian J. Robbins
>           Felipe J. Arroyo
>           Ashley R. Palmer
>           ROBBINS, UMEDA, & FINK, LLP
>           610 West Ash Street, Suite 1800
>           San Diego, CA  92101
>
>           *Co-Lead Counsel for Plaintiffs*

>           /s/      Jon M. Talotta
>           Jon M. Talotta
>           jmtalotta@hhlaw.com

# EXHIBIT  1

**FILED**

JAN 1 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 880 – RETAIL FOOD EMPLOYERS JOINT PENSION FUND<br>2828 Euclid Avenue<br>Cleveland, OH 44155<br><br>and<br><br>UNITED FOOD AND COMMERCIAL WORKERS UNION-EMPLOYER PENSION FUND<br>2828 Euclid Avenue<br>Cleveland, OH 44155,<br><br>Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br> vs.<br><br>SUNRISE SENIOR LIVING, INC.<br>7902 Westpark Drive<br>McLean, VA 22102<br><br>   and | Civil No.<br><br><u>CLASS ACTION</u><br><br>*JURY ACTION* (stamp)<br><br>CASE NUMBER  1:07CV00102<br><br>JUDGE: Reggie B. Walton<br><br>DECK TYPE: General Civil<br><br>DATE STAMP: 01/16/2007<br><br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

[Caption continued on following page.]

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

PAUL J. KLAASSEN                           )
9050 Falls Run Road                        )
McLean, VA  22102                          )
                                           )
    and                )
                                           )
THOMAS B. NEWELL                           )
9119 Mill Pond Valley Drive                )
McLean, VA  22102                          )
                                           )
    and                )
                                           )
BRADLEY B. RUSH                            )
371 Church Street, NE                      )
Vienna, VA  22180                          )
                                           )
    and                )
                                           )
RONALD V. APRAHAMIAN                       )
9311 Cornwell Farm Road                    )
Great Falls, VA  22066                     )
                                           )
    and                )
                                           )
J. DOUGLAS HOLLADAY                        )
3333 North Glebe Road                      )
Arlington, VA  22207                       )
                                           )
    and                )
                                           )
THOMAS J. DONOHUE                          )
8008 Coach Street                          )
Potomac, MD  20854                         )
                                           )
    and                )
                                           )
WILLIAM G. LITTLE                          )
950 North Michigan Avenue, Apt. 2902       )
Chicago, IL  60611                         )
                                           )
_____)

[Caption continued on following page.]

and                                      )
                                         )
TERESA M. KLAASSEN                       )
9050 Falls Run Road                      )
McLean, VA  22102                        )
                                         )
and                                      )
                                         )
CRAIG R. CALLEN                          )
75 Walcott Avenue                        )
Jamestown, RI  02835                     )
                                         )
and                                      )
                                         )
J. BARRON ANSCHUTZ                       )
304 Summer Way                           )
Rockville, MD  20850,                    )
                                         )
                    Defendants.          )
                                         )

Shareholders of Sunrise Senior Living . . . have seen their holdings decline 17 percent since last spring. Problematic bookkeeping kept the company from filing three quarterly financial statements on time, forced it to restate earnings for 2003 through 2005, drew Securities and Exchange Commission inquiries about its accounting and led it to warn that its internal controls were probably inadequate.

All of that resulted in a $342 million hit to the market value of the company . . . . But a raft of insiders escaped some of that damage. Three of the company's directors and its two founders sold $32 million worth of Sunrise stock in the six months leading up to the May 9 announcement that it was changing it accounting practices and delaying its financial filing.

\*    \*    \*

Selling during the period were Paul J. Klaassen, the founder and chief executive; . . . Ronald V. Aprahamian, . . . chairman of Sunrise's audit committee; Thomas J. Donohue, a Sunrise director who is chairman of the United States Chamber of Commerce; and J. Douglas Holladay . . . a director.

\*    \*    \*

The biggest sellers of Sunrise stock were the Klaassens, who generated $21.4 million in sales of 600,000 shares from December 2005 to April 4, 2006. The sales began last Dec. 19, around the time the company first contemplated the accounting review that resulted in the restatements. . . .

An especially timely stock sale by Mr. and Mrs. Klaassen came a week before the company announced it was delaying its financial filings. On May 1 and 2, they sold 100,000 shares at an average price of $36.91. The day of the announcement, the price fell to $32.35.

\*    \*    \*

Another apparently well-timed sale took place last April 18, exactly three weeks before the company announced its filing delay, when Mr. Aprahamian, chairman of the company's audit committee, sold 20,000 shares at $37.85 each, generating $757,040. . . .

Mr. Donohue . . . has been a Sunrise director since 1995 and heads its compensation committee. He is also a member of its audit committee. On Nov. 21, 2005, he sold shares worth $3.4 million, according to regulatory filings.

Gretchen Morgenson, *Shedding Light on Sales at Sunrise*, N.Y. Times, 11/26/06.

- 1 -

## INTRODUCTION AND OVERVIEW

1.      This is a securities class action on behalf of all persons who purchased or

otherwise acquired the publicly traded securities of Sunrise Senior Living, Inc. ("Sunrise" or

the "Company") between 8/4/05 and 6/15/06 (the "Class Period"), including those who

owned Sunrise common stock from 2000 through 2006 at the time Sunrise's 2000-2006

Proxy Statements were circulated to shareholders to solicit their votes on various matters.

The defendants are Sunrise, certain of its officers and all of its directors. The action asserts

violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Sunrise provides residential and other services to retirees and elderly persons

through facilities it develops and constructs and then manages, often through joint ventures.

Sunrise makes profits from these activities and also by selling real estate, often to its joint

ventures.  For the last several years, Sunrise has been pursuing a vigorous expansion

program.  However, because Sunrise's access to the capital necessary to fund this expansion

program was limited, it has been forced to pursue various strategies, including utilizing joint

venture arrangements (normally 20% owned by Sunrise and 80% owned by other investors),

to raise the capital needed to fund its expansion program.

3.      For Sunrise's expansion program to succeed and for its top executives and

other insiders to obtain the types of personal economic gains they wanted to obtain from the

enterprise, it was critical that Sunrise appear to be achieving strong profits even during this

expansionary – and capital intensive – phase of its business.  However, Sunrise learned early

on that because its business model was not yet proven and its facilities normally suffered

losses during their start-up phase and period of early operations, frequently it could not

- 2 -

attract joint venture partners to participate in ventures to construct new residential facilities

unless it gave to those partners preferential returns from the joint venture. These entities, the

joint venture partner(s), were to receive guarantees of preferential distributions from the

operations of the joint ventures or upon the sale of the facility. Sunrise also discovered early

on that to sell certain of its real estate or facilities it was necessary to provide financial

guarantees to the entity financing the sale.

      4.       This created a problem for Sunrise. It could not obtain the capital it needed

through the joint venture arrangements or sell real estate assets or completed facilities

without providing these preferential distribution and guarantee arrangements. However,

under applicable accounting rules, if Sunrise structured its joint ventures with preferential

guarantees and distributions to its partners, Sunrise, as the managing entity in the joint

venture, was required to *absorb 100% of the early period or start-up losses of the new

facilities*, rather than just its 20% share, and was allowed to recoup those early period losses

only later on when the joint venture's facility was operating successfully and profitably

and/or was sold. And Sunrise could not record profits on sales of facilities if it provided

financial guarantees in connection with the sale. Accounting for its joint venture operations

or real estate sales in this manner – which was required by Generally Accepting Accounting

Principles ("GAAP") and principles of fair presentation – would heavily penalize Sunrise's

reported financial results, depriving it of real estate sales profits, while requiring it to

recognize millions and millions of dollars of current period losses from the joint venture

operations. This would prevent it from showing the kind of strong profitable growth which

was indispensable for the success of its business plan and necessary to allow its insiders to

personally profit from large annual bonuses and to push its stock price to the high levels they desired so they could sell off their Sunrise stock at inflated – and very profitable – prices.

5.       Thus, to achieve the ends they desired, Sunrise and the other defendants cheated, pursuing a scheme to defraud and a course of business that operated as a fraud or deceit on purchasers of Sunrise's publicly traded securities.  Instead of following the required accounting rules and principles, Sunrise's top managers and directors, including the members of its Audit Committee, falsified Sunrise's reported profits from at least 1999-2005, falsely reporting over $100 million in profits and concealing significant joint venture losses, which falsification enabled Sunrise insiders to pocket large and unjustified cash bonuses and to personally profit by insider trading to take advantage of the artificially inflated price of Sunrise's common stock.

6.       Beginning on 5/9/06, a series of revelations caused the scheme to unravel and the truth about Sunrise's prior false representations and its accounting irregularities to enter the market.  Sunrise first disclosed a "delay" in reporting its 1stQ 06 results to allow a "review" of its financial statements, making it appear that Sunrise was "changing" accounting methods to adopt a more preferable method, which might or might not impact its prior financial reports.  However, under pressure from the SEC – which questioned Sunrise's accounting and the accuracy of these statements – on 7/31/06, Sunrise revealed it would be forced to *restate*[1] its financial statements going back several years – at least to 1999 – because

---

[1]       Under GAAP, a restatement of prior period financial statements is an admission of the falsity of those financial statements when issued.

- 4 -

its prior accounting was false and its prior financial statements could no longer be relied upon, and it would discontinue doing business with joint ventures with preferential returns and engaging in real estate sales with guarantees. Sunrise also admitted it could not file current period financial statements for the 1stQ, 2ndQ and 3rdQ of 2006 and that when it restated its financial results, at least $100 million of previously reported profits from its joint ventures and real estate sales would be eliminated – and that, contrary to prior representations, Sunrise had serious weaknesses in its internal controls. As these revelations unfolded, Sunrise's stock fell from $39.62 on 5/8/06 to as low as $24.40 on 7/31/06.

7.     Sunrise's fraudulent accounting manipulations and contrivances had an enormous impact on Sunrise's publicly issued financial statements. For instance, in a joint venture in which Sunrise had a 20% interest and its partner an 80% interest, where the venture suffered $1 million in losses during its start-up and early operations phase, GAAP required Sunrise to recognize and report 100% of these losses, or $1 million. However, by falsifying its accounting and acting as if the joint venture did not have a distribution preference, Sunrise recognized and reported losses of only $200,000. This tricky falsification over 1999-2005, when combined with Sunrise's phony real estate accounting to improperly recognize profits on sales where Sunrise provided guarantees, overstated Sunrise's reported profits by at least $100 million!

8.     This case also concerns defendants' manipulation of Sunrise's stock option program, including grants to enrich themselves in a secret and inherently deceptive manner, which manipulation also caused the Company's financial statements to be false and misleading. A stock option allows the corporate officer to purchase the specified number of

- 5 -

shares of company stock at a specified price – referred to as the "exercise price" or "strike price" – for a specified period of time. Stock options are granted by public companies as compensation for executives – supposedly to create incentives for them to boost long-term corporate performance and profitability by good, honest management efforts. When the executive exercises the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's market price at the time the option is exercised. The exercise price of stock options are the market price on the date of grant – *so if the stock goes up over time, the executive makes a profit*. If the system is abused by "backdating," which refers to picking an option-grant date earlier than the actual date the option was granted – a date when the stock price was lower than the actual grant date – or by "spring-loading," *i.e.*, granting the stock option just before the company is going to issue positive news which will push the stock price up, the executive gets an instant, guaranteed and riskless profit. The company is also hurt, as the "spread" between the true grant exercise price and the market price is required by law to be treated as compensation expense, which reduces profits. In addition, the backdating causes the corporate stock option plan to lose its tax protection and results in the corporation's internal non-public information being misappropriated by the executives for their personal profit. Shareholders and share purchasers are also hurt, as reported corporate profits are improperly inflated, as is the trading price of the stock (at least until the truth comes out), their ownership interest in the corporation is unfairly diluted and, since they voted to approve the stock option plan and elect the directors who proposed the plan and oversee its implementation and administration, their corporate suffrage rights are violated.

9.     In violation of the Company's own stated policies and applicable laws, defendants engaged in or permitted "backdating" and "spring-loading" in the issuance of executive stock options for many years. All the Company's stock option plans required stock options to have an exercise price equal to the fair market value of stock on the date of the grant, and defendants regularly represented that stock options covered by the stock option plans were not granted at less than 100% of fair market value on the date of grant, but this was not true. *Often the grants were made and were backdated to when Sunrise stock was lower in price or were granted just prior to the release of positive corporate news and a likely increase in the market price of the Company's stock, thus positioning the executives to achieve an instant, riskless profit.*

10.     During the Class Period, defendants issued materially false and misleading statements regarding the Company's business, its stock option plans, its compensation practices and its financial results, while employing contrivances and manipulative acts in connection with Sunrise's stock option programs and financial statements. As a result of defendants' false statements, contrivances and manipulative acts, Sunrise's common stock traded at artificially inflated prices during the Class Period, reaching a high of $39.68 per share on 3/29/06, as Sunrise reported outstanding financial results. In addition, Sunrise's stock option plans were approved and its directors were elected and re-elected by shareholder votes made pursuant to false and misleading proxy statements, thus perpetuating the directors' and their allies' hold on their positions of power, prestige and profit at Sunrise. The individual defendants took advantage of these falsified financial results, the artificial inflation of Sunrise's stock and the manipulation of its stock option plans by selling shares of

- 7 -

their Sunrise stock for illegal insider trading proceeds of over $34 million – ill-gotten gains

that were enhanced due to the improper "backdating" and "spring-loading" of their options to

purchase Sunrise stock – while Sunrise's top officers pocketed millions more in unjustified

bonus payments enhanced in part by Sunrise's falsified profits.

11.     Sunrise's top insiders personally profited from their illegal behavior in several

ways.  First of all, top executives received large cash bonuses which were based in

significant part on Sunrise's purported profitably which was falsified.  In addition, in order to

maximize their personal profit from their illegal conduct, these top insiders secured the

approval of Sunrise's shareholders of executive compensation programs, which not only

authorized or ratified these types of performance bonuses, but also of a stock option plan

which supposedly was to be administered by a committee of independent directors (the

Compensation/Stock Option Committee) who would honestly run the stock option program,

granting options that were exercisable only at the closing price of Sunrise stock on the date

that the option was actually granted.  However, these stockholder approvals were obtained in

violation of the Exchange Act's proxy provisions and rules – including by way of false and

misleading proxy statements that did not disclose the ongoing accounting fraud, which was

inflating Sunrise's reported profits, and the bonuses being granted the executives, or that the

top insiders at Sunrise were manipulating Sunrise's stock option plans to backdate stock

options or grant "spring-loaded" stock options to themselves and their allies so as to give the

options exercise prices significantly lower than the actual closing prices of the stock options

on the dates they were actually granted or to grant options at low prices before the release of

- 8 -

corporate news, which was likely to boost the stock price, a deception which not only assured the insiders of profits, but maximized their ill-gotten gains from the scheme.

12.    During late 2005, as Sunrise insiders learned that it would be impossible to continue the accounting fraud much longer,[2] and in early 2006,[3] as widespread revelations of a stock option backdating scandal began to sweep corporate America, the top insiders at Sunrise took advantage of the artificial inflation in Sunrise's shares to bail out of the stock, unloading almost a million shares of the stock at artificially inflated prices, obtaining almost $35 million of insider trading proceeds for themselves – a deceit some of them furthered by implementing so-called 10b5-1 executive stock sale plans, putting those stock plans in place, knowing that they were already pursuing a scheme to defraud and falsifying Sunrise's reported financial results, and establishing plan terms that did not comply with regulatory requirements, but hoping that implementing their sales through the 10b5-1 plans would give them protection from the legal liability they knew they would otherwise face for such insider trading.  The chart below shows the Sunrise executives' insider selling:

---

[2]    Sunrise's CFO has admitted that Sunrise began to consider the problem with Sunrise's accounting for its joint ventures and had considered changing its accounting "late in 2005."

[3]    In early 2006, a number of incidents involving stock option "backdating" and "spring-loading" by public companies surfaced, including Securities and Exchange Commission ("SEC") investigations, executive resignations and financial restatements. On 3/18/06, *The Wall Street Journal* published an article raising questions about whether several public companies had been manipulating stock option grants to enrich executives by backdating these grants to lower prices or granting options to executives ahead of the release of positive corporate news.



**Sunrise Senior Living, Inc.**
All Defendants - Class Period Insider Sales Quarterly Dollar Volume
August 2004 to June 2006

13.      Sunrise's press releases, SEC filings and analyst conference calls during the Class Period were false and misleading. The true facts, which were known by the defendants but concealed from the investing public during the Class Period were:

(a)      Sunrise's 2003, 2004 and 2005 and prior year financial results, including its net income, EPS and shareholders' equity, were all materially overstated due to improper accounting for minority interests in joint ventures and real estate sales and contrivances and manipulations in the administration of Sunrise's stock options, including "backdating" and "spring-loading," and failing to properly record or account for the actual amount, and tax consequences, of the compensation expense of its executives.

- 10 -

(b)     Sunrise's excellent financial and operating results reported during the Class Period were not due to the skill and business acumen of its top executives, their successful management of its business or the outstanding performance of its business units, as represented.  In fact, a significant part was due to falsification of Sunrise's financial statements by improperly avoiding recognizing losses on minority interests in joint ventures, improper recognition of gains on real estate sales and not properly accounting for (and thus understating) the true compensation expense of its executive and management team.

(c)     Sunrise's top executives were manipulating the Company's stock option plans so as to enrich themselves by "backdating" or "spring-loading" the stock options they were granted to set the options at a much lower exercise price – one well below the market price or fair value of the stock when the option was actually granted – or by granting them before the release of positive corporate news that would boost the stock, thus giving them an instant, riskless profit, while exposing the Company to the risk of regulatory investigations, tax penalties, and even criminal proceedings.

(d)     Sunrise's internal financial and accounting controls were materially deficient and not effective in providing the necessary and required degrees of assurance that Sunrise's financial results and reports were fairly and accurately presented and free from fraud.

14.     The failure to disclose the setting of the exercise prices to achieve maximum benefit for Sunrise's directors and executives caused the 2000-2006 Proxy Statements and 2005 Form 10-K and 2005 Forms 10-Q issued by the Company to be materially misleading

- 11 -

in violation of the proxy rules and the Exchange Act. Among the false statements made

during the Class Period and in the 2000-2006 Proxy Statements were:

- Sunrise's joint venture operations, properly accounted for under the equity accounting methodology, had been producing substantial profits for Sunrise.

- The Company's internal financial, accounting and disclosure controls were adequately designed and functioning in a manner so as to prevent fraud or manipulation.

- Sunrise's financial reports and statements fairly presented its financial condition and results in accordance GAAP.

- Sunrise's stock option plans would help assure the Company's future success by offering to top executives incentives to put forth maximum effort for the success of the Company's business.

- Sunrise's stock option plans assured favorable tax treatment of stock-based awards and ensured stock-option compensation was tax deductible for the Company, and stock options could not and would not be granted at less than 100% of fair market value (*i.e.*, stock market closing price) on the date of grant.

- Sunrise's stock option plans were administered by a committee of all independent directors.

- The Compensation Committee was authorized only to grant options in accordance with the terms of the plan, including limiting option exercise prices to not less than 100% of fair market value of the stock on the date of grant.

- The value of the Company's stock option grants was tied to the Company's future performance and the full value of option grants would be obtained only over time as the stock price appreciated.

- Specified officers of Sunrise had been granted options to buy specified numbers of shares of Sunrise stock at specified prices, *i.e.*, fair market value on the date the options were granted.

- Because of the way Sunrise's stock option plans were structured and administered and because the Company grants stock options at an exercise price not less "than the fair market value of the Company's common stock on the date of grant," Sunrise did not have to recognize compensation expense in connection with its grant, or any subsequent exercise, of stock options.

- 12 -

15.     As a result of defendants' false statements, Sunrise's stock traded at artificially inflated levels during the Class Period, massive stock option plans for executives were approved and all of the current Sunrise directors were elected or re-elected, perpetuating their control of Sunrise.  The improper falsification of Sunrise's financial statements, the "backdating" and "spring-loading" of Sunrise's top insiders' stock options and the artificial inflation of Sunrise's stock allowed Sunrise's top insiders to reap millions of dollars via illegal insider trading of their Sunrise stock, while the falsification of the Company's financial statements contributed to huge bonuses for them based in part on Sunrise's inflated profits.  However, the public purchasers and owners of Sunrise's stock were damaged.  The ownership of Sunrise by public stockholders was improperly diluted as Sunrise executives and directors got millions of stock options they were not entitled to or got more shares at lower option prices than they were entitled to, and Class members were damaged as they purchased Sunrise stock at artificially inflated prices and then the Company's stock declined in price as the truth entered the market.  The chart below shows these events:

# Sunrise Senior Living
## April 30, 2004 - July 28, 2006

P. Klaassen
Chairman and
CEO

Donahue
Audit Committee/
Chair Compensation
Committee

Aprahamian
Chair Audit
Committee/
Compensation
Committee

Rush
CFO

Newell
President

Holladay
Director

| Insider | Shares Sold | Proceeds | % of Stock Actually Owned and Sold |
|---|---|---|---|
| Ronald V. Aprahamian Ch. AuditCom/Comp. Com | 20,000 | $757,000 | 90.9% |
| Thomas J. Donohue Chair Comp. Com/Audit Com. | 102,666 | $3,392,085 | 71.2% |
| James D. Holladay Dir. | 36,000 | $1,259,000 | 100.0% |
| Paul J./Teresa M. Klaassen CB/CEO | 600,000 | $21,426,000 | 10.4% |
| Thomas B. Newell Pres. | 216,000 | $7,399,080 | 46.0% |
| Bradley B. Rush CFO | 13,874 | $432,144 | 29.2% |
| J. Barron Anschutz CAA | 5,926 | $194,767 | 100.0% |
| Totals: | 994,466 | $34,860,075 | |

**Dollars Per Share** (y-axis: 15, 20, 25, 30, 35, 40)

x-axis: 04/30/2004, 07/22/2004, 10/11/2004, 12/30/2004, 03/22/2005, 06/10/2005, 08/30/2005, 11/17/2005, 02/09/2006, 05/02/2006, 07/21/2006

4/04 2004 Proxy Statement. Board reelected. Stock options granted only at market price; full value realized over time with price appreciation.

4/05 2005 Proxy Statement Board reelected. Stock options granted only at market price; full value realized over time with price appreciation.

3/05 2004 10K

8/3/05 $26.55

8/05-10/05 Insiders sell 103,874 shares for $3.27 million.

11/05-12/05 Insiders sell 265,666 shares for $9 million.

1/06-2/06 Insiders sell 248,928 shares for $8.64 million.

3/06-5/2/06 Insiders sell 376,000 shares for $13.91 million.

5/8/06 $39.62

5/9/06 $30.35

6/15/06 $27.89

3/7/06 4th Q 05 & 05 results. $1.01 EPS 4th Q; $1.67 EPS - 05. Excluding one time write off, equity earnings of $16.8 million in 05. Expect 15% growth in 06. 3/06 05 Annual Report/10K. EPS 01 - $1.04; 02 - $1.12; 03 - $1.32; 04 - $1.12; 05 - $1.67. Internal accounting and disclosure controls functioning and adequate. SEC filings accurate. Financial statements fairly presented. No undisclosed fraud exists. Options granted with exercise price equal to fair value on date of grant.

11/8/05 3rd Q 05 results. EPS $.24. Results reflect growth in equity in earnings. Growth in equity earnings grew to $7.8 million in 3rd Q 05 vs. $2.1 million in 3rd Q 04. Continue to benefit from equity investments. 11/9/05 3rd Q 05 10Q filed. Internal accounting and disclosure controls functioning and adequate. SEC filings accurate. Financial statements fairly presented. No undisclosed fraud exists. Options granted with exercise price equal to fair value on date of grant.

9/13/05 Meeting w/ analyst. Sunrise forecasts 15% EPS growth for next several years.

8/4/05 2nd Q 05 EPS $.46. $.08 better than expected due to $2.1 million more in JV equity earnings. Equity investment income expected to grow.
8/9/05 2nd Q 10Q filed. Internal accounting and disclosure controls functioning and adequate. SEC filings accurate. Financial statements fairly presented. No undisclosed fraud exists. Options granted with exercise price equal to fair value on date of grant.

4/06 2006 Proxy Statement. Board reelected. Stock options granted only at market price; full value realized over time with price appreciation.

5/8-11/06 Delays 1st Q 06 results. Investigating JV equity accounting. Will change JV equity accounting method to preferable method. No more joint ventures of this kind. Review will not materially affect 07 results.

Later Events
• Prior financial statements should not be relied upon.
• Will restate 03, 04 and 05 results.
• 99-05 net income reduced by $110 million.
• Unable to file 1st Q, 2nd Q, 3rd Q 10-Qs or issue current financial statements.
• Material weakness in internal controls exist.
• Prior accounting errors involve both JV equity accounting and sales of real estate.
• No more JV with preferential terms; no more real estate sales with guarantees.
• Stock option backdating inquiry begins.

**Class Period**
8/4/05 - 6/15/06

Copyright © 2007 by William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP. William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to the writing/publication.

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under §§10(b), 14(a), 20(a) and 20A of the

Exchange Act, 15 U.S.C. §§78j(b), 78n(a), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R.

§240.10b-5, promulgated thereunder. In connection with the acts, conduct and other wrongs

complained of herein, defendants, directly or indirectly, used the means and instrumentalities

of interstate commerce, the United States mail and the facilities of a national securities

market.

17.    Jurisdiction exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and

28 U.S.C. §1331.

18.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C.

§78aa, and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation

and dissemination of materially false and misleading information, occurred in substantial

part in this District. Sunrise filed false and misleading SEC filings in this District. Sunrise

has four communities in operation or under development in Washington, D.C. Further, the

Individual Defendants conduct business in this District.

## PARTIES

19.    (a)    Plaintiff United Food and Commercial Workers Union Local 880 –

Retail Food Employers Joint Pension Fund is a Taft-Hartley pension plan that invests and

administers the retirement savings of UFCW members. As set forth in the Certification

attached hereto, this plaintiff purchased Sunrise publicly traded securities during the Class

Period, including its purchases on the open market, and remains an owner of over 24,300

shares of Sunrise common stock. This plaintiff has owned Sunrise stock continually since

3/05 to the current date. As a result, this plaintiff has suffered economic loss and damages and had its position as a Sunrise shareholder unfairly and improperly diluted.

(b)    Plaintiff United Food and Commercial Workers Union-Employer Pension Fund is a Taft-Hartley pension plan that invests and administers the retirement savings of UFCW members. As set forth in the Certification attached hereto, this plaintiff purchased Sunrise publicly traded securities during the Class Period, including its purchases on the open market, and remains an owner of over 14,800 shares of Sunrise common stock. This plaintiff has owned Sunrise stock continually since 3/05 to the current date. As a result, this plaintiff has suffered economic loss and damages and had its position as a Sunrise shareholder unfairly and improperly diluted.

20.    Defendant Sunrise is a public company. Sunrise offers senior living services, including independent living, assisted living, care for individuals with Alzheimer's, as well as nursing and rehabilitative care. Sunrise operates communities in the United States, Canada, Germany and the United Kingdom.

21.    Defendant Paul J. Klaassen ("P. Klaassen") was at all relevant times CEO and Chairman of Sunrise. During the Class Period, he reaped illegal insider selling proceeds of $21,426,000 by selling 600,000 shares of his Sunrise stock, 10.4% of the stock he owned and could sell. Defendant P. Klaassen signed or was associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K. Defendant P. Klaassen's (combined with his wife Teresa M. Klaassen's) insider selling is shown as follows:

- 16 -



**Sunrise Senior Living, Inc.**
Paul J. Klaassen/Teresa M. Klaassen - Class Period Insider Sales Quarterly Dollar Volume
August 2004 to June 2006

22.    Defendant Bradley B. Rush ("Rush") was at all relevant times Chief Financial

Officer ("CFO") of Sunrise.  During the Class Period, Rush reaped illegal insider selling

proceeds of $432,144 by selling 13,874 shares of his Sunrise stock, 29.2% of the stock he

owned and could sell.  Defendant Rush signed or was associated with the 2005 Form 10-K

and 2005 Forms 10-Q.  Defendant Rush's insider selling is shown as follows:



**Sunrise Senior Living, Inc.**
**Bradley B. Rush - Class Period Insider Sales Quarterly Dollar Volume**
**August 2004 to June 2006**

23.    Defendant Thomas B. Newell ("Newell") was at all relevant times President of

Sunrise. During the Class Period, he reaped illegal insider selling proceeds of $7,399,080 by

selling 216,000 shares of his Sunrise stock, 46% of the stock he owned and could sell.

Defendant Newell's insider selling is shown as follows:



**Sunrise Senior Living, Inc.**
**Thomas B. Newell - Class Period Insider Sales Quarterly Dollar Volume**
**August 2004 to June 2006**

24.    Defendant J. Douglas Holladay ("Holladay") was at all relevant times a director of Sunrise. During the Class Period, he reaped illegal insider selling proceeds of $1,259,000 by selling 36,000 shares of his Sunrise stock, 100% of the stock he owned and could sell. Defendant Holladay signed or was associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K. Defendant Holladay's insider selling is shown as follows:

- 19 -



**Sunrise Senior Living, Inc.**
**J. Douglas Holladay - Class Period Insider Sales Quarterly Dollar Volume**
**August 2004 to June 2006**

25.     Defendant Thomas J. Donohue ("Donohue") was at all relevant times a director of Sunrise and Chairman of the Compensation Committee and on the Audit Committee.     During the Class Period, he reaped illegal insider selling proceeds of $3,392,085 by selling 102,666 shares of his Sunrise stock, 71.2% of the shares he owned and could sell.     Defendant Donohue signed or was associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K. Defendant Donohue's insider selling is shown as follows:



**Sunrise Senior Living, Inc.**
**Thomas J. Donohue - Class Period Insider Sales Quarterly Dollar Volume**
**August 2004 to June 2006**

26.     Defendant Ronald V. Aprahamian ("Aprahamian") was at all relevant times a

director of Sunrise and Chairman of the Sunrise Audit Committee. During the Class Period,

he reaped illegal insider selling proceeds of $757,000 by selling 20,000 shares of his Sunrise

stock, 90.9% of the shares he owned and could sell. Defendant Aprahamian signed or was

associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K.

Defendant Aprahamian's insider selling is shown as follows:

- 21 -



**Sunrise Senior Living, Inc.**
**Ronald V. Aprahamian - Class Period Insider Sales Quarterly Dollar Volume**
**August 2004 to June 2006**

| Class Period Insider Sales | 90.9% |
| Class Period Shares Sold | 20,000 |
| Class Period Proceeds | $757,000 |

Class Period: 8/4/05 - 6/15/06

27.    Defendant J. Barron Anschutz ("Anschutz") was at relevant times Chief

Accounting Officer ("CAO") of Sunrise. During the Class Period, he reaped illegal insider

selling proceeds of $194,767 by selling 5,926 shares of his Sunrise stock, 100% of the stock

he owned and could sell. Defendant Anschutz signed or was associated with the 2004-2005

Forms 10-K and the 2005 Form 10-Qs. Defendant Anschutz's insider selling is shown as

follows:



**Sunrise Senior Living, Inc.**
**J. Barron Anschutz - Class Period Insider Sales Quarterly Dollar Volume**
**August 2004 to June 2006**

28.    Defendant William G. Little ("Little") was at all relevant times a director of Sunrise. Defendant Little signed or was associated with the 2005-2006 Proxy Statements and signed the 2004-2005 Forms 10-K.

29.    Defendant Teresa M. Klaassen ("T. Klaassen"), wife of P. Klaassen, was at all relevant times a director of Sunrise. During the Class Period, she reaped illegal insider selling proceeds of $21,426,000 by selling 600,000 shares of her Sunrise stock, 10.4% of the stock she owned and could sell. Defendant T. Klaassen signed or was associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K. Defendant T. Klaassen's (combined with defendant P. Klaassen's) insider selling is shown as follows:

- 23 -





**Sunrise Senior Living, Inc.**
Paul J. Klaassen/Teresa M. Klaassen - Class Period Insider Sales Quarterly Dollar Volume
August 2004 to June 2006

30.    Defendant Craig R. Callen ("Callen") was at all relevant times a director of

Sunrise and on its Audit and Compensation Committees. Defendant Callen signed or was

associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K.

31.    According to Sunrise's 2006 Proxy, the Sunrise Board had the following

committees:

| Director | Audit Committee | Compensation Committee | Executive Committee |
|---|---|---|---|
| Ronald V. Aprahamian | X* | X | |
| Craig R. Callen | X | X | |
| Thomas J. Donohue | X | X* | X |
| J. Douglas Holladay | | | X |
| Paul J. Klaassen | | | X* |

* Chairman.

- 24 -

32.    The defendants who were directors of Sunrise are referred to herein as the

"Director Defendants." The defendants who were officers of Sunrise are referred to herein

as the "Officer Defendants." The defendants who sold stock during the Class Period and are

referred to herein as the "Insider Selling Defendants." Collectively, the Officer and Director

Defendants are referred to herein as the "Individual Defendants."

**Defendants' Duties**

33.    Each officer and director of Sunrise owed Sunrise shareholders the duty to

exercise care and diligence in the management and administration of the affairs of the

Company.

34.    By reason of their positions as officers and directors of Sunrise and because of

their ability to control the business and corporate affairs of the Company, the defendants

owed Sunrise shareholders an obligation of candor. As officers and/or directors of a publicly

held company, the defendants had a duty to promptly disseminate accurate and truthful

information with respect to the Company's operations, finances and compensation practices.

35.    Because of their positions of control and authority as directors or officers of

Sunrise, each of the defendants was able to and did, directly and indirectly, control the

wrongful acts complained of herein.    These acts include: (i) agreement to and/or

acquiescence in the improper stock option practices; (ii) causing Sunrise to disseminate false

Proxy Statements for 2000-2006, which Proxy Statements failed to disclose defendants'

improper option activities and failed to disclose that executives were able to "backdate" or

"spring load" their stock option grants via oral notification in order to lower the exercise

price of the stock options they received, or pick the grant date of their option grants so as to

benefit from the upcoming release of positive corporate news which would likely boost the stock price; (iii) causing Sunrise to file false SEC filings, including Sunrise's 2003, 2004 and 2005 Annual Reports, its 2003-2005 Forms 10-Q, its 2000-2006 Proxy Statements, all in violation of the U.S. securities laws. Because of their positions with Sunrise, each of the defendants had access to adverse non-public information and was required to disclose these facts promptly and accurately to Sunrise shareholders and the financial markets but failed to do so.

36.    To discharge their duties, the directors of Sunrise were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the business and financial affairs of Sunrise. By virtue of such duties, the officers and directors of Sunrise were required, among other things, to:

(a)    manage, conduct, supervise and direct the business affairs of Sunrise in accordance with applicable federal law, government rules and regulations, and the charter and bylaws of Sunrise, including its stock option plans;

(b)    not permit any officer, director or employee of Sunrise to engage in self-dealing, insider trading or stock manipulation;

(c)    not permit any officer, director or employee of Sunrise to violate applicable laws, rules and regulations;

(d)    remain informed as to the status of Sunrise's operations, including its practices in relation to its executive compensation practices, financial statement preparation and internal financial, accounting and disclosure controls, and upon receipt of notice or information of imprudent, improper or unsound practices, to make inquiry in connection

- 26 -

therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the federal securities laws and their duty of candor to the Company's shareholders;

(e)     establish and maintain systematic and accurate records and reports of the business and affairs of Sunrise and procedures for the reporting to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     maintain and implement an adequate, functioning system of internal legal, financial, disclosure and accounting controls, such that Sunrise's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and in accordance with applicable laws;

(g)     exercise control and supervision over the public statements to the securities markets and trading in Sunrise stock by the officers and employees of Sunrise; and

(h)     supervise the preparation and filing of any financial reports or other information required by law from Sunrise and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Sunrise and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

37.     The defendants, as corporate officers and/or directors, were obligated to comply with applicable laws and to disclose the truth about Sunrise. Each of the defendants participated in the issuance and/or review of the false and/or misleading statements, including the false SEC filings and reports issued to Sunrise shareholders.

- 27 -

38.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Sunrise's Proxy Statements, quarterly reports, press releases, SEC filings, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports, Proxy Statements, SEC filings, registration statements and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

39.    The defendants named in the §10(b) claim are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Sunrise. These defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Sunrise's publicly traded securities was a success, as it: (i) deceived the investing public regarding Sunrise's prospects and business; (ii) artificially inflated the prices of Sunrise securities; (iii) allowed defendants to sell some $34 million worth of their Sunrise stock at inflated prices; and (iv) caused plaintiff and other members of the Class to purchase Sunrise publicly traded securities at inflated prices and suffer damages when the securities later declined as the truth entered the market.

## FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

40.    On 8/4/05, Sunrise reported its 2ndQ 05 results via a press release which referred to "***growth in equity in earnings on investments in unconsolidated senior living properties***." The press release stated in part:

"We are extremely pleased with the results we are reporting today," said Paul Klaassen, Sunrise Senior Living chairman and CEO." We are benefiting from our typical growth drivers which include revenue growth in our operating portfolio of management properties, additional community openings and new construction . . . ."

\*      \*      \*

"At the end of the quarter, we had minority equity interests in 132 communities held in joint ventures, with a balance sheet investment book value of over $108 million," said Thomas Newell, president, Sunrise Senior Living. "*Since a substantial majority of our new development activity, and most of our acquisitions, are being conducted through joint ventures, we expect our minority equity investments to continue to grow. We participate in the earnings of the joint venture communities based on our percentage ownership and we also expect to continue to receive incentives as these ventures exceed performance thresholds. As a result, we expect to see substantial growth in our income from earnings and returns on equity investments going forward.*"

41.    On 8/4/05, Sunrise held a telephone conference call for analysts to discuss its business and its financial results. During the call, the following occurred:

[**P. Klaassen – CEO:**] We had an excellent second quarter. Virtually every segment performed at or above expected levels. As a result we have a significant increase in core earnings which were defined as total earnings excluding income from property sales and acquisitions transition expenses. . . . We have now met or exceeded our expectations every quarter for the past six years and we continue that unbroken streak in the second quarter. *We significantly exceeded the high end of our guidance range. In hindsight our forecast is probably a bit conservative as we outperformed . . . earnings from joint ventures* . . . .

\*      \*      \*

[**Question:**] One of the things that drove number for the quarter I guess was unexpected on my part, was the equity in earnings line. I understand that some of those were incentive fees related to sale. I was wondering if you can give color exactly on the transaction but quarter? And if you can give us any help on thinking about projecting that on a go forward basis, additional sales and incentive fees that we might see?

[**P. Klaassen:**] The transaction on the quarter I will not break down too much. We negotiate these things every day and night to not want to hurt

- 29 -

ourselves and those negotiations by giv[ing] too much information on it. We try to make the best deal that we can, you could see the growth that occurred in that line item, it gives to the idea of the range. For competitive reasons I do not want to get too detailed. . . . All I can say is that those investments are long-term. We're happy with the structure. We think those are good investments. The money was spent wisely and we think over the long-term they will pay off.

42.      Analysts that followed Sunrise reacted favorably to this 2ndQ 05 report.

(a)      On 8/4/05, Legg Mason reported:

- Yesterday, Sunrise reported 2Q05 EPS adjusted for unusual items of $0.46, $0.08 above our estimate and consensus. . . .

- While operating fundamentals appeared solid, the entire earnings upside came from $2.1 million more in *equity earnings on joint venture investments that we had not expected, primarily because a JV sold two communities and Sunrise received additional equity earnings related to the sale*.

\*      \*      \*

**2Q05 Results**

. . . Reported results were $0.08 above the high end of company guidance and our estimate. The company attributed the beat to . . . higher-than-expected earnings from Sunrise's minority equity investments in joint ventures . . . . From our perspective . . . the upside came entirely from an asset sale driven increase in equity earnings.

(b)      On 8/4/05, Davenport Equity Research reported:

- **Q2 2005 EPS of $0.46 is well ahead of our $0.38 estimate.** *Most of the $0.08 upside from our estimate is a result of higher than expected equity in unconsolidated facilities, which increased 76.2% year-over year to $3.7 million* (versus our $750,000 forecast). . . . .

- **Equity investment income is expected to grow**. With most new development activity and acquisitions conducted through joint ventures, income from equity investments is expected to grow.

- 30 -

(c)    On 8/5/05, Jefferies & Co. reported:

While the owned and managed portfolios posted solid improvement during the quarter, *the quarter's upside was primarily driven by a significant increase in equity income relating to improved operations in the Joint Venture (JV) portfolio* . . . .

\*    \*    \*

With the recent capacity additions, expected pre-opening income from construction starts, and the improvement in equity earnings from JV properties, we view the company's more favorable outlook for 2005 and 2006 as achievable. . . .

**Overview of Second Quarter 2005 Results**

**Second quarter operating EPS of $0.46 versus $0.34 in 2Q04, were $0.09 above consensus and our estimate**.  While the owned and managed portfolios posted solid improvement during the quarter, *the quarter's upside was primarily driven by a significant increase in equity income, relating to improved operations in the Joint Venture (JV) portfolio* . . . .

43.    On 8/9/05, Sunrise filed its 2ndQ 05 10-Q Report with the SEC.  It was signed by Rush as CFO and Anschutz as CAO.  It contained the Sarbanes-Oxley certification as pleaded at ¶62.  It also reported the following:

|  | Three months ended 6/30, | | Six months ended 6/30, | |
|---|---|---|---|---|
|  | **2005** | **2004** | **2005** | **2004** |
| Income from operations | $12,358 | $22,184 | $22,966 | $43,307 |
|  | \*    \*    \* | | | |
| Equity in earnings and return on investment in nconsolidated senior living properties | $3,696 | $2,072 | $5,220 | $3,740 |
|  | \*    \*    \* | | | |
| Net income | $10,338 | $15,132 | $18,350 | $29,063 |
|  | \*    \*    \* | | | |
| [EPS] data: | | | | |
|  | \*    \*    \* | | | |
| Diluted net income per common share | $.46 | $.66 | $.82 | $1.26 |

- 31 -

It also reported stockholders' equity of $550,702,000.

44.    The 2ndQ 05 10-Q also stated:

**Stock-Based Compensation**

Stock options are granted for a fixed number of shares to employees *with an exercise price equal to the fair value of the shares at the date of grant.* Sunrise accounts for stock-based compensation using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"), and accordingly, *does not recognize compensation expense for stock option grants.* . . .

\*    \*    \*

**Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Sunrise's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). *Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at June 30, 2005.* In connection with the evaluation by management, including our Chief Executive Officer and Chief Financial Officer, no changes in Sunrise's internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the quarter ended June 30, 2005 were identified that have materially affected or are reasonably likely to materially affect Sunrise's internal control over financial reporting.

45.    On 9/13/05, officers of Sunrise met with Davenport Equity Research. On 9/14/05, Davenport reported the results of that meeting to the market, repeating what Sunrise's officers had told them. Davenport's 9/14/05 report stated:

- **Reiterate Buy rating following meetings with management.** We are comfortable with our forecast for 15% earnings growth for the next several years. We believe our investment thesis remains sound, while the company continues to execute its *growth strategies under its new management services orientation.*

\*    \*    \*

- 32 -

- **Management services business model generates stable revenue and reduces the company's risk profile.** The sale of most consolidated facilities and subsequent increase in management contracts has made SRZ's revenue stream more predictable with upside potential from performance bonuses and the minority interest usually retained. In addition, capital, construction, and fill-ups risks are now shared with the development partners.

46.    In 10/05 Sunrise stock was split 2-for-1.

47.    On 11/8/05, the Company issued a press release entitled "Sunrise Reports Third-Quarter 2005 Results." The press release stated in part:

> Sunrise Senior Living, Inc. today reported third-quarter 2005 earnings per share of $0.24 (diluted) compared to $0.21 (diluted) per share in the third quarter of 2004. *The 14 percent increase in third-quarter, year-over-year earnings per share reflects . . . growth in equity in earnings and return on investments in unconsolidated senior living properties*.
>
> *    *    *
>
> *Sunrise's income from equity in earnings and return on investments in unconsolidated senior living properties increased to $7.8 million in the third quarter of 2005 from $2.1 million in the prior year period primarily as a result of a transaction in which a venture partner sold its equity portion of 13 senior living communities*. Through this transaction, Sunrise's ownership interest in the venture increased to 25 percent from 20 percent and Sunrise received performance incentive distributions under the terms of the venture agreement. Sunrise venture agreements typically include provisions rewarding Sunrise through various performance incentives. Sunrise continues to manage these 13 senior living communities under long-term management contracts.
>
> *"We continue to benefit from* our management services business model and *our minority equity investments in unconsolidated properties*," said Thomas Newell, president, Sunrise Senior Living. "At the end of the third quarter, we had minority equity investments in 152 communities in unconsolidated ventures with a balance sheet investment book value of $128 million. We strive to create value for our investment partners through operational excellence and when we succeed we also generate substantial returns for Sunrise through our percentage ownership in these communities and the incentives triggered when these ventures exceed performance thresholds. We have set a long-term target to earn a 15 percent annual return on our investments in unconsolidated senior living properties."

- 33 -

48.    On 11/8/05, Sunrise held a conference call for analysts to discuss its business and finances. During the call, the following occurred:

> **[P. Klaassen, CEO:]** Our income statement, balance sheet and cash flow are all in excellent shape and ready to support a very strong '06 outlook. Our growth drivers are producing consistent with our expectations and as a result we are able to report earnings per share excluding acquisition transition and hurricane related expenses of $0.26 a share in 2003 after our two for one stock split . . . . *As anticipated, we also continued to benefit from growth in our equity and earnings line.* Our 152 joint venture communities are making substantial contributions to our growth through our percentage ownership in these communities. . . . We target a 15% annual return on our $128 million investment in these unconsolidated senior living properties. And we expect to continue to benefit from our percentage ownership in these joint venture communities for many years to come.
>
> *        *        *
>
> **[Question:]** I want to ask a little bit about equity and earnings and guidance. The equity and earnings bounces around a little bit because you're selling properties. You have various things coming in. I wanted to see if we could get additional guidance on that beyond what you provided and clarify maybe what your own assumptions are say in '05, '06 numbers for that.
>
> **[Newell – President:]** . . . We have given a target long-term of 15% earnings on the $128 million we invested. That's through 152 properties and joint ventures and it is lumpy as you said because included in that line will be start of – startup losses from homes in development ventures as they open. As they ramp up then, we begin to share in the earnings and cash from those joints ventures. As performance hurdles are met, we begin to share disproportionately which is what you saw in this quarter and last quarter as investor partners received distributions in excess of the hurdles we generate substantial returns. Our assumptions internally that over time from those investments we will hit a 15% irr. We model out all 152 communities over a long period of time and calculate that in our guidance. It's very difficult to predict out more than one or two quarters. We have a sense of what's coming and we do our best and giving guidance what we are very confident of these are very good investments and communities that are performing very well. For the long run for Sunrise, we will generate a great return on that.

49.    On 11/9/05, Jefferies & Co. reported:

**Portfolio Development Activities**

. . . A major component of the company's development strategy is to make equity investments (usually 20%) with development JV partners. During the quarter, Sunrise opened four communities, assumed management of another three properties, and acquired an interest in and management of 18 communities as part of The Fountains acquisition (18 properties, resident capacity of 4,500, and $165 million of annualized revenue). In addition, the company terminated two management contracts in 3Q05. During the quarter, Sunrise started construction on five new properties (four in the U.S. and one in Canada) for a total of 39 communities under construction, with a combined capacity of 4,600 residents. The company expects 16 additional construction starts by the end of 2005. Of the 39 properties currently under construction, 26 are expected to open in the next four quarters. Of the 26 openings, three will be wholly owned by third parties, 20 are JVs, and three will be wholly owned by Sunrise. The 26 openings over the next year include: three JV properties and one third-party owned property in 4Q05; eight JV owned properties, and one third-party owned property in 1Q06; one wholly owned property; eight JV owned properties, and one third-party owned property in 2Q06; and two wholly owned properties and one JV property in 3Q06. Higher development and pre-opening management fees for facility openings (offset by corresponding pre-opening expenses) are expected to significantly contribute to earnings for the foreseeable future and can cause some earnings volatility as was experienced this quarter.

50.    On 11/9/05, Sunrise filed its 3rdQ 05 10-Q. It was signed by Rush/CFO and

Anschutz/CAO. It reported:

| | Three months ended 9/30, | | Nine months ended 9/30, | |
|---|---|---|---|---|
| | **2005** | **2004** | **2005** | **2004** |
| Income from operations | $9,395 | $11,821 | $32,361 | $55,130 |
| * | * | * | | |
| Equity in earnings and return on investment in nconsolidated senior living properties | $7,801 | $2,095 | $13,021 | $5,834 |
| * | * | * | | |
| Net income EPS data: | $11,049 | $8,912 | $29,379 | $37,975 |
| * | * | * | | |
| Diluted net income per common share | $.24 | $.21 | $.66 | $84 |

The 3rdQ 05 10-Q also reported stockholders' equity of $572,283,000.

51.    The 3rdQ 05 10-Q also stated:

**Stock-Based Compensation**

Stock options are granted to employees for a fixed number of shares *with an exercise price equal to the fair value of the shares at the date of grant*. Sunrise accounts for stock-based compensation using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"), *and accordingly, does not recognize compensation expense for stock option grants*.

\*    \*    \*

**Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Sunrise's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). *Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at September 30, 2005*. In connection with the evaluation by management, including our Chief Executive Officer and Chief Financial Officer, no changes in Sunrise's internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the quarter ended September 30, 2005 were identified that have materially affected or are reasonably likely to materially affect Sunrise's internal control over financial reporting.

52.    The 3rdQ 10-Q also stated:

Certification of Chief Executive Officer and Chief Financial Officer
Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002
(18 U.S.C. Section 1350)

The undersigned, the Chief Executive Officer and the Chief Financial Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

(a)    the Quarterly Report on Form 10-Q of the Company for the period Ended September 30, 2005 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

- 36 -

> (b)    *information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.*

53.    On 3/7/06, the Company issued a press release entitled "Sunrise Reports Fourth-Quarter 2005 Results." The press release stated in part:

> Sunrise Senior Living, Inc., today reported fourth-quarter 2005 earnings of $1.01 per share (diluted) compared to $0.28 (diluted) per share in the fourth quarter of 2004. For the full year 2005, Sunrise reported earnings per share of $1.67 (diluted) compared to earnings per share of $1.12 (diluted) in 2004. . . .
>
> "The fourth quarter and year closed strongly, as we expected, and positions us for a very good 2006 during which we will be celebrating our 25th anniversary," said Paul Klaassen, Sunrise Senior Living's chairman and CEO.
>
> *        *        *
>
> "We are extremely excited about the opportunities that lie ahead for our business," said Thomas Newell, president of Sunrise Senior Living. "As we move forward, we expect to continue to benefit from our expanded development program and our management services business model. In 2006, we anticipate a record number of community openings and substantial returns from our minority investments in joint venture partnerships. In addition, the strength of our balance sheet is expected to provide significant flexibility as we enter into the next phase of our growth strategy."
>
> *        *        *
>
> Sunrise's 2006 earnings per share is expected to be driven . . . by further growth in earnings generated by Sunrise's equity investments in unconsolidated ventures.

54.    On 3/7/06, Sunrise held a conference call for analysts to discuss its business and finances. During the call, the following occurred:

> **[P. Klaassen – CEO:]** The fourth quarter closed out strongly as we expected and ended a busy and successful year for Sunrise. All four of our growth engines are firing on all cylinders. As you may know, those four growth engines are:  1, growth from new construction; 2, growth from new management contract; 3, internal growth from existing operations; 4, growth generated by our balance sheet. . . . Our success in 2005 was the result of many factors . . . . ***Regarding equity in earnings, excluding the $3.6 million***

- 37 -

*one-time write-down of our original investment in that at-home venture, we would have reported equity in earnings ofun [sic] – of approximately $3.8 million in Q4, and, I guess that would be $16.8 million for the year. We expect an additional 15 percent growth in this business segment in 2006.* Our ownership percentage in these 156 unconsolidated joint venture communities in which we have invested $138 million should therefore generate about $19 million in pretax income this year.  These minority ownership positions align our interests with our capital partners, and allows you to participate in community performance upside, without the negative impact of increased debt levels or additional amortization and depreciate quags [sic] expenses. . . .

55.     In 3/06, Sunrise issued its 2005 Annual Report to Shareholders.  It contained the following financial statements:

FINANCIAL HIGHLIGHTS
(dollars in thousands)

| YEAR ENDED DECEMBER 31, | **2005** | **2004** | **2003** |
|---|---|---|---|
| Operating revenues | $1,819,479 | $1,446,471 | $1,096,260 |
| Net income | $79,742 | $50,687 | $62,178 |
| | * * * | | |
| Total assets | $1,328,276 | $1,105,756 | $1,009,798 |
| | * * * | | |
| Stockholders' equity | $632,677 | $523,518 | $490,276 |

(Footnotes omitted.)

56.     Sunrise's 2005 financial statements at Note 13 stated:

13.     Stockholders' Equity

Stock Option Plan

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors . . . . *Under the terms of the plans, the option exercise price and vesting provisions of the options are fixed when the option is granted. . . . The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.*

- 38 -

> *. . . Under the terms of the Directors' Plan, the option exercise price was not less than the fair market value of a share of common stock on the date the option was granted.*

Sunrise's 2005 10-K contained an identical representation.

57.     The 2005 Annual Report contained a letter signed by Klaassen and Newell which stated:

> **2005 Results**   Overall, we are very pleased with our performance in 2005.

*   *   *

> **Joint Venture Partners**   Strong industry demographics, operational excellence, and our strong financial condition continue to accelerate interest among our impressive group of joint venture partners. At the end of 2005, 156 of our communities were held in joint ventures, and ***nearly all of our new development and acquisitions are conducted through joint ventures***. Through our percentage ownership in these communities and the incentives we receive for exceeding performance thresholds, ***these partnerships contributed significantly to our growth in 2005***. In addition, these joint venture partnerships reduce our corporate risk profile ***since we share capital and construction risk with our partners***.

58.     Elsewhere, the 2005 Annual Report stated:

**Equity in Earnings and Return on Investment in Unconsolidated Senior Living Communities**

> Equity in earnings and return on investment in unconsolidated senior living communities represents our allocation of the results of operations and returns on our investment from the distributions of proceeds from transactions with our unconsolidated ventures.

**2005 Compared to 2004**

> Equity in earnings and return on investment in unconsolidated senior living  communities was $13.2 million in 2005 compared to $9.4 million in 2004, an increase of $3.8 million, or 41%, which was primarily comprised of:

> • $8.8 million return on our investment pursuant to the terms of a venture agreement;

- 39 -

- a decrease of $4.9 million from our portion of start-up losses associated with two international development ventures. In 2005, these two ventures opened four communities which incurred losses in 2005;

- $2.9 million return on our investment whereby an unconsolidated venture sold two senior living communities to Sunrise REIT;

- $3.0 million return on our investment whereby an unconsolidated venture sold its three senior living communities and distributed the proceeds to its members. We recognized the $3.0 million of cash received in excess of our investment;

- a decrease of $3.6 million from the write-down of our interest in Sunrise at Home; and

- a decrease of $2.5 million from the results of operations from other unconsolidated ventures, including our portion of start-up losses from development ventures.

**2004 Compared to 2003**

Equity in earnings and return on investment in unconsolidated senior living communities was $9.4 million in 2004 compared to $5.3 million in 2003, an increase of $4.1 million, or 76%, which primarily resulted from improved operations and additional incentive fees.

59.    The 2005 Annual Report contained a section stating:

**Management's Report on Internal Control over Financial Reporting**

Management of Sunrise Senior Living, Inc. (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting and for the assessment of the effectiveness of internal control over financial reporting. As defined by the Securities and Exchange Commission, internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the consolidated financial statements in accordance with U.S. generally accepted accounting principles.

The Company's internal control over financial reporting is supported by written policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the Company's transactions and dispositions of the Company's assets; [and] (2) *provide*

*reasonable assurance that transactions are recorded as necessary to permit preparation of the consolidated financial statements in accordance with generally accepted accounting principles* . . . .

\*     \*     \*

In connection with the preparation of the Company's annual consolidated financial statements, management has undertaken an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO Framework). *Management's assessment included an evaluation of the design of the Company's internal control over financial reporting and testing of the operational effectiveness of those controls.*

*Based on this assessment, management has concluded that as of December 31, 2005, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.*

\*     \*     \*

Paul J. Klaassen Chief Executive Officer

Bradley B. Rush Chief Financial Officer

60.    Note 2 to Sunrise's 2005 financial statements represented:

**Investments in Unconsolidated Senior Living Communities**

Sunrise holds an interest in ventures established to develop or acquire and own senior living communities. When these ventures are considered to be variable interest entities ("VIEs") in accordance with FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary. When Sunrise has determined it is not the primary beneficiary or, for non-VIEs when it determines that it owns a non-controlling interest (because other partners or members control or participate in the management decisions of these ventures), *the investments are accounted for under the equity method.*

*The equity method investments are recorded at cost* and subsequently are adjusted for equity in net income (losses) and distributions. Sunrise determines its share of the investees' earnings or losses based on the distributions of cash flow from a hypothetical liquidation of the investee's

- 41 -

assets and liabilities. The equity earnings are adjusted for the impact on the investee's reported earnings, if any, for the basis differences between Sunrise's carrying value of the equity investments and the investee's underlying assets. Sunrise recognizes profits on sales of services to these ventures to the extent of the ventures' outside ownership interest.

*Sunrise owned interests in 187 unconsolidated senior living communities (31 of which are under development) through ownership interests in 30 unconsolidated ventures at December 31, 2005 that are accounted for under the equity method and one unconsolidated venture accounted for under the cost method.* Those ventures are generally limited liability companies and partnerships. Sunrise's interest in those ventures generally range from five to 25%. Sunrise has one community in which it owns less than 10%, 147 communities in which it owns between 10% and 20%, and 20 communities in which it owns between 10% and 30%, and 19 communities in which it owns more than 30%.

\* \* \*

**Variable Interest Entities**

At December 31, 2005, Sunrise had an interest in 11 ventures that are considered VIEs. Sunrise is the primary beneficiary and, therefore, consolidates eight of these VIEs. Seven of these consolidated VIEs are development communities in which Sunrise has a majority of the voting interest and is developing for Sunrise REIT (see Note 4). At December 31, 2005, included in Sunrise's consolidated balance sheet were $56.1 million of development costs and $50.7 million of debt, including $6.6 million of third-party construction debt secured by the development communities and $44.1 million of borrowings from Sunrise REIT guaranteed by Sunrise. The only recourse to Sunrise with respect to these seven VGFIEs is under borrowings from Sunrise REIT.

61.    On 3/16/06, the Company filed its Form 10-K for the fiscal year ended 12/31/05, which included its previously reported 2003-2005 financial results and statements. The 10-K also included certifications, signed by Klaassen and Rush, which stated the following:

1.    I have reviewed this annual report on Form 10-K of Sunrise Senior Living, Inc.;

- 42 -

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \*

## CERTIFICATION OF [CEO] AND [CFO]
## PURSUANT TO SECTION 906
## OF THE SARBANES-OXLEY ACT OF 2002 (18 U.S.C. SECTION 1350)

The undersigned, the Chief Executive Officer and the Chief Financial Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

(a)    the Annual Report on Form 10-K of the Company for the Period Ended December 31, 2005 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(b)    *information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.*

62.    Sunrise's 1stQ 05 10-Q, 2ndQ 05 10-Q and 3rdQ 05 10-Q contained the following Sarbanes-Oxley certifications, signed by P. Klaassen and Rush:

I, [Paul J. Klaassen/Bradley B. Rush], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Sunrise Senior Living, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*     *     *

- 45 -

Date: [_____]                     [Paul J. Klaassen
                                   Chief Executive Officer

                                   Bradley B. Bush
                                   Chief Financial Officer]

                    *        *        *

## CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
## AND CHIEF FINANCIAL OFFICER PURSUANT
## TO SECTION 906 OF THE SARBANES-OXLEY
## ACT OF 2002 (18 U.S.C. SECTION 1350)

The undersigned, the Chief Executive Officer and the Chief Financial Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

(a)    the Quarterly Report on Form 10-Q of the Company for the Period Ended [_____] filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(b)    information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

                                   /s/ Paul J. Klaassen
                                   Paul J. Klaassen
                                   Chief Executive Officer
                                   Date: [____]

                                   /s/ Bradley B. Rush
                                   Bradley B. Rush
                                   Chief Financial Officer
                                   Date: [____]

63.    Identical certificates covering Sunrise's financial statements were contained in

Sunrise's 2003, 2004 and 2005 10-Ks filed 3/04, 3/05 and 3/16/06, signed by P. Klaassen.

Rush signed the 2005 Form 10-K.

- 46 -

64.    Sunrise's 2005 financial statements at Note 13 stated:

13. Stockholders' Equity

Stock Option Plans

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. . . . *Under the terms of the plans, the option exercise price and vesting provisions of the options are fixed when the option is granted. . . . [T]he option exercise price was not less than the fair market value of a share of common stock on the date the option was granted. . . .*

Sunrise's 2005 10-K contained an identical representation.

65.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period were:

(a)    Sunrise's 2003, 2004 and 2005 and prior year financial results, including its net income, EPS, profit and shareholders' equity, were all materially overstated due to improper accounting for minority interests in joint ventures and real estate sales and contrivances and manipulations in the administration of Sunrise's stock options, including "backdating" and "spring-loading," and failing to properly record or account for the actual amount, and tax consequences, of the compensation expense of its executives.

(b)    Sunrise's excellent financial and operating results reported during the Class Period were not due to the skill and business acumen of its top executives, their successful management of its business or the outstanding performance of its business units, as represented.  In fact, a significant part was due to falsification of Sunrise's financial statements by improperly avoiding recognizing losses on minority interests in joint ventures, improper recognition of gains on real estate sales and not properly accounting for (and thus understating) the true compensation expense of its executive and management team.

- 47 -

(c)     Sunrise's top executives were manipulating the Company's stock option plan so as to enrich themselves by "backdating" or "spring-loading" the stock options they were granted to set the options at a much lower exercise price – one well below the market price or fair value of the stock when the option was actually granted – or by granting them before the release of positive corporate news that would boost the stock, thus giving them an instant, riskless profit, while exposing the Company to the risk of regulatory investigations, tax penalties, and even criminal proceedings.

(d)     Sunrise's internal financial and accounting controls were materially deficient and not effective in providing the necessary and required degrees of assurance that Sunrise's financial results and reports were fairly and accurately presented and free from fraud.

66.     On 5/8/06, Sunrise's stock traded as high as $39.62 and closed at $39.30 per share. On 5/9/06, the Company suddenly revealed it was "rescheduling its first quarter 2006 earnings release to allow additional time for further review of the accounting treatment applied to its investments in unconsolidated senior living communities, and to complete the review of its Form 10-Q for the first quarter ended March 31, 2006." On 5/10/06, Sunrise revealed the accounting treatment review was focused on the allocation of profits and losses for a "limited number" of Sunrise's joint ventures where Sunrise was a minority partner and the capital partner received a preference, either on the return of its capital over Sunrise's capital in the event of a refinancing or sale of the venture's properties, or cash flow from operations. On 5/11/06, Sunrise said "*it has decided to use a different methodology to allocate profits and losses in its joint ventures.*" On 5/9/06, Sunrise's stock fell to as low as

$30.35 per share on huge volume of 4.4 million shares, but by 5/11/06 traded as high as $36 before closing at $33.64 per share.

67.    During a 5/11/06 conference call, the following occurred:

**[P. Klaassen – CEO:]**  During the final preparation of our first-quarter Form 10-Q, an issue arose that required additional time for review by our team and our outside accountants to ensure the integrity and the accuracy of our financial statements.  The issue that necessitated this additional review has to do with the accounting treatment applied to certain of our investments in unconsolidated senior living communities.   Specifically, this accounting treatment review is focused on the allocation of profits and losses for those joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties.

Now, approximately 15% of Sunrise's communities are held by joint ventures that would fall into this category.  Throughout the year, and in connection with our quarterly filings, we conduct a review of our various accounting policies, including the methodology we use to allocate profits and losses in our joint ventures where our capital partner is entitled to a preferential return.  In connection with this review, our accounting team determined and then brought to the attention of our auditors that there is a more preferable method under generally accepted accounting principles for allocating such profits and losses among the partners of these ventures and for determining the timing of such allocations during the lifecycle of the ventures, from startup losses to stabilized cash flow to refinancing or sale of the property.

***Now, as a result, we are now in the process of assessing the implications of adopting this alternate methodology and whether adjustments are necessary to prior period financial statements***.  In order to have time to effectively complete this review, we will not be filing our Form 10-Q with the Securities and Exchange Commission today.  Instead, we will take the time it takes to carefully review and finalize this matter. . . . [W]e do not expect the outcome of this review to adversely affect our previously furnished earnings guidance for 2006 or 2007, due to the limited number of current joint ventures affected and because of the various stages of those ventures.

*        *        *

***[W]e will completely avoid this accounting issue in the future by no longer providing preferential return on capital in any future ventures.  We were***

- 49 -

*able to do this now because of the successful track record that we have established for these ventures*.

\* \* \*

The general effect of using this different methodology – known, I am told, as the hypothetical liquidation at book value method – *is to shift more of any losses to Sunrise in the early days of any venture where the capital partner has a preference for return of capital*. . . .

Perhaps a simplified example will help illustrate this rather technical and complicated issue. Assuming a one-property development venture built a $20 million Sunrise community, it the venture obtains 75% or $15 million of construction debt, the partners would contribute $5 million of equity. If it is a typical 80/20 partnership, *our share of the equity would be 1 million* and our capital partner would contribute 4 million. In our now typical model, where there is no capital return preference to our partner, all losses and profits *would be allocated 80/20* . . . .

Now, if this partnership were to experience 1 million of initial losses . . . Sunrise would initially recognize *20% or $200,000 of the $1 million of losses* . . . for a total of *$1 million profit from the venture*. . . .

Now, if the same venture had included a capital return preference . . . Sunrise would be allocated 100% or all million dollars of the initial losses . . . .

\* \* \*

**Derrick Dagnan, Analyst – Avondale Partners:**  Is the new accounting method or the new treatment under GAAP – is that a new option to you, or has that been available to you for a number of years and you just recently found it?

**[Rush – CFO:]**  It has been available for a number of years. And again, with the scrutiny that Paul and Tom mentioned earlier, *it came into consideration late in 2005. And when we took a look at it, we thought we should look deeper*.

68.    On 6/15/06, *MarketWatch* reported that:

Sunrise Senior Living, Inc. had one quarter and two years' worth of per-share earnings estimates cut by Stifel Nicolaus on Thursday . . . . Preliminary first-quarter results provided by the company, coupled with the buyout of 10 management contracts by Five Start Quality Care Inc., prompted Stifel Nicolaus to take its full-year 2006 outlook to $1.15 from $1.18 a share. The

- 50 -

firm also reduced its full-year 2007 per-share forecast to $1.32 from $1.36, and lowered its first-quarter forecast to 21 cents from 23 cents.

After this occurred, Sunrise's stock dropped to $27.89 per share on 6/15/06 and to as low as $26.29 on 6/20/06, three trading days later. On 6/15/06, Stifel Nicolaus reported:

- SRZ shares declined 5.3% yesterday, with most of the damage coming late in the day on a couple of large block trades.

- Shares are down 26.3% from their 4/4/06 high due to general market conditions. Sunrise's delay in reporting 1Q06 results as a result of an accounting issue concerning its development joint ventures and yesterday's block sales.

69.    By late 7/06, Sunrise stock fell to as low as $25.08 per share as rumors circulated of a massive financial restatement by Sunrise. On 7/27/06, Stifel Nicolaus reported:

**Announced July 31, 2006 Date for Releasing 1Q06 Earnings Rapidly Approaching**

- SRZ shares are down 31.5% since the company delayed 1Q06 earnings due to an accounting question about recognition of earnings on some of its joint venture investments.

- In a 6/30/06 press release announcing an acquisition, Sunrise said it "expects to complete its accounting review prior to July 31, 2006."

- We believe the release of Sunrise's much delayed 1Q06 results will be a catalyst for the stock to rebound.

- With three business days to go, Sunrise has not scheduled an earnings release and it is our sense that the company may or may not meet its expected timetable for completing its accounting review.

70.    On 7/31/06, Sunrise *announced a huge, multi-year financial restatement*.

Sunrise's press release stated in part:

[T]he Company will *restate* its financial statements for the years ended December 31, 2003, 2004 and 2005 primarily to adjust the accounting treatment related to ventures that contain partner preferences and the timing of

- 51 -

sale accounting and recognition of income from prior sales of real estate. *The cumulative impact of the restatement is expected to reduce net income for all periods impacted, including the years 1999 through 2005, by an estimated $60 million to $110 million. . . . Sunrise is unable at this time to provide the precise impacts of the restatement since its review of these issues has not yet concluded.* . . . The Company noted that its previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and its unaudited quarterly financial statements during these years *should no longer be relied upon*.

71.    In its 7/31/06 announcement, Sunrise admitted it had been *improperly accounting for its joint venture investments and operations and for certain real estate sales*, and that it would no longer engage in real estate sales with guarantees and other ongoing financial commitments. On 7/31/06, Sunrise stock fell to as low as $24.40 per share. In 11/06, Sunrise disclosed its accounting review *was still not completed* and that, subject to completion of its auditor's review and clearing comments from the SEC, Sunrise expected to file its restated 2005 Form 10-K before year-end, which would be followed by the filing of Sunrise's Forms 10-Q for the first three quarters of 2006, and to be current in its filings with the SEC, it would file its 2006 Form 10-K on or before 3/1/07. *Sunrise indicated that the cumulative impact of the restatement was anticipated to reduce net income for all periods impacted, including 1999 through 2005, by approximately $100 million. Approximately 50% of this amount related to the periods from 1999 through 2002.*

72.    An 11/26/06 *New York Times* article by Gretchen Morgenson stated in part:

Shareholders of Sunrise Senior Living, a provider of residential communities and services for the elderly, have seen their holdings decline 17 percent since last spring. Problematic bookkeeping kept the company from filing three quarterly financial statements on time, forced it to restate earnings for 2003 through 2005, drew Securities and Exchange Commission inquiries about its accounting and led it to warn that its internal controls were probably inadequate.

- 52 -

All of that resulted in a $342 million hit to the market value of the company, based in McLean, VA. But a raft of insiders escaped some of that damage. Three of the company's directors and its two founders sold $32 million worth of Sunrise stock in the six months leading up to the May 9 announcement that it was changing it accounting practices and delaying its financial filing.

Reviewing stock sales over the six months before the announcement is relevant because, during a conference call with investors in May, Sunrise officials said that "late in 2005" they had begun contemplating the accounting shift that later clobbered Sunrise shares.

\*      \*      \*

Selling during the period were Paul J. Klaassen, the founder and chief executive; Theresa M. Klaassen, his wife and Sunrise's chief cultural officer; Ronald V. Aprahamian, a consultant and investor who is chairman of Sunrise's audit committee; Thomas J. Donohue, a Sunrise director who is chairman of the United States Chamber of Commerce; and J. Douglas Holladay, a founder of a private equity firm and a director.

\*      \*      \*

The biggest sellers of Sunrise stock were the Klaassens, who generated $21.4 million in sales of 600,000 shares from December 2005 to April 4, 2006. The sales began last Dec. 19, around the time the company first contemplated the accounting review that resulted in the restatements. They were part of a series of planned sales put in place in December by the executives.

An especially timely stock sale by Mr. and Mrs. Klaassen came a week before the company announced it was delaying its financial filings. On May 1 and 2, they sold 100,000 shares at an average price of $36.91. The day of the announcement, the price fell to $32.35. On Friday, the stock closed at $32.50

Reached last Wednesday at a vacation home in Florida, Mrs. Klaassen, who is also a director, declined to comment. The Klaassens continue to hold a large stake in Sunrise – 5.2 million shares, or approximately 10 percent of the stock outstanding. Although they entered into a derivatives contract relating to a forward sale of 750,000 shares last year, the 600,000-share sales are their first outright disposal of Sunrise stock since the company went public in 1996.

\*      \*      \*

Another apparently well-times sale took place last April 18, exactly three weeks before the company announced its filing delay, when Mr. Aprahamian, chairman of the company's audit committee, sold 20,000 shares

at $37.85 each, generating $757,040. Mr. Aprahamian declined to comment when reached last Wednesday at his home in Virginia. He said he had not seen the shareholder letter, addressed to Sunrise directors and hand-delivered to the company last Monday. He declined to provide a fax number or e-mail address where a reporter could send a copy.

Mr. Donohue, the Chamber of Commerce chairman, has been a Sunrise director since 1995 and heads its compensation committee. He is also a member of its audit committee. On Nov. 21, 2005, he sold shares worth $3.4 million, according to regulatory filings. Mr. Klaassen is on both the Chamber of Commerce's board and that of its research arm, the National Chamber Foundation.

73. After shareholder complaints that Sunrise "backdated" or "spring-loaded" stock option grants and a demand that the grants be investigated, in 12/06, Sunrise announced an internal investigation of its stock option grant process over the past several years.

## SUNRISE'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

74. In order to inflate the price of Sunrise's securities, defendants caused the Company to falsely report its results for 2003 through 2005 through improper accounting for investments in unconsolidated senior living communities. As a result of its improper accounting, Sunrise prematurely recognized income involving many of its joint ventures. The Company also falsified its financials by not accounting for backdated options given to certain executives.

75. The 2003 through 2005 results were included in press releases disseminated to the public and Forms 10-Q and 10-K filed with the SEC.

76. Sunrise has now admitted that it will restate to change the accounting treatment applied to its investments in unconsolidated senior living communities because its prior accounting was in error. Sunrise also commenced a probe of its stock option practices.

77.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

**Improper Accounting for Unconsolidated
Senior Living Centers**

78.    GAAP, as set forth in AICPA Statement of Position ("SOP") 78-9, *Accounting for Investments in Real Estate Ventures*, states that, under the equity method, inter-company profits should be eliminated until realized.  SOP 78-9.21.  Companies are also required to carefully consider substance over form in recognizing profits.  SOP 78-9.25.

79.    Also, GAAP, as set forth in FASB Interpretation ("FIN") No. 46R, addresses consolidation by companies of variable interest entities.  An entity must be consolidated if total investment at risk is not sufficient, or if the equity holders lack controlling financial interest or if voting rights are not proportional to obligations.  FIN 46R, ¶5.

80.    In its 2005 Form 10-K, the Company represented that it had complied with these standards:

Investments in Unconsolidated Senior Living Communities

Sunrise holds an interest in ventures established to develop or acquire and own senior living communities. When these ventures are considered to be variable interest entities ("VIES") in accordance with FASB Interpretation No. 46, Consolidation of Variable Interest Entities ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary. When Sunrise has determined it is not the primary beneficiary or, for non-VIE's when and it [sic] determines that it owns a non-controlling interest (because other partners or members control or participate in the management decisions of these ventures), the investments are accounted for under the equity method.

81.    GAAP, as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 66, *Accounting for Sales of Real Estate*, states that a seller's continuing involvement without the transfer of risks and rewards, such as guarantees of the return of investment, will prevent treating the transfer of the asset as a sale. *See* SFAS No. 66, ¶¶25-29.

82.    Sunrise has now admitted that certain of its partners in ventures received preference on their return of capital, such that it had not been complying with applicable accounting rules.    Sunrise was providing guarantees and commitments including construction completion, operating cash flow deficit guarantees and debt guarantees. As such, sales of real estate should not have been recognized immediately. Sunrise was able to inflate its earnings through its misaccounting for unconsolidated ventures. In 2005, Sunrise reported $13.2 million in equity earnings from unconsolidated ventures. Yet those ventures' total income was $19.2 million. It is incongruous that Sunrise could recognize 69% of the income from the ventures when it presumably owns less than 50% of the ventures. In fact, Sunrise reported that it had much less than 50% ownership interest. In the 2005 Form 10-K it stated:

- 56 -

We generally have ownership interests in these unconsolidated ventures ranging from five to 25%. We will manage these communities pursuant to long-term management contracts.

83.     Sunrise will restate its results from 2003 through 2005 and prior years. Sunrise has recently estimated the input of its pending restatement:

The cumulative impact of the restatement is currently expected to reduce net income for all periods impacted, including 1999 through 2005, by an estimated $65 million to $100 million.

84.     Significantly, Sunrise has now mentioned the accounting standard at issue involves SOP 78-9, a standard in effect for more than 27 years. This long-standing accounting pronouncement, which controlled a significant aspect of Sunrise's financial reporting, was something with which the Individual Defendants would have been familiar.

85.     As a result of Sunrise's improper accounting practices, it will restate at least its 2003-2005 financial statements. The fact that Sunrise will restate its financial statements is an admission that:

(a)     the financial results originally issued during the Class Period and its public statements regarding those results were materially false and misleading;

(b)     the financial statements reported prior to and during the Class Period were incorrect based on information available to defendants at the time the results were originally reported; and

(c)     the financial statements can no longer be relied upon as being accurate.

86.     The SEC has reiterated its position regarding statements:

[T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia, to prove the falsity and*

- 57 -

*materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter . . . .*

*In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *In Limine* to Exclude Evidence of the Restatement and Restatement Report at 2 (S.D. Fla. Feb. 22, 2002).

87.     The fact that Sunrise will restate its past financial statements and that it has indicated that such financial statements should no longer be relied upon is an admission that the financial statements originally issued were false and that the overstatement of net income was material.  Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Sunrise was to correct for material errors in its previously issued financial statements.  *See* APB No. 20, ¶¶7-13.  Moreover, SFAS No. 154, ¶25, *Accounting Changes and Error Corrections*, states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements." Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements.  Sunrise's restatement is due to an error.  Thus, the restatement is an admission by Sunrise that its previously issued financial results and its public statements regarding those results were false.

**Improper Accounting for Stock Options**

88.     Sunrise violated GAAP by failing to properly report compensation expense and understated its tax liabilities by misdating the option grants.

- 58 -

89.     GAAP, as set forth in APB No. 25, *Accounting for Stock Issued to Employees* –

the standard for accounting for employee stock options in effect until 1995 – required that

any difference between the market price on the measurement date and the exercise price be

accorded as compensation expense.  APB No. 25, ¶10, stated in part:

> Compensation for services that a corporation receives as consideration for
> stock issued through employee stock option, purchase, and award plans should
> be measured by the quoted market price of the stock at the measurement date
> less the amount, if any, that the employee is required to pay.
>
> *     *     *
>
> Thus a corporation recognizes compensation cost for stock issued
> through compensatory plans unless the employee pays an amount that is at
> least equal to the quoted market price of the stock at the measurement date.

90.     In 1995, SFAS No. 123, *Accounting for Stock-Based Compensation*, became

effective.  The new standard set forth "fair value" as the method for accounting for stock-

based compensation plans.  This method was deemed preferable to APB No. 25.  However,

companies were permitted to continue to use APB No. 25 but with added disclosure

requirements.  SFAS No. 123, ¶11, stated in part:

> This Statement provides a choice of accounting methods for transactions with
> employees that are within the scope of Opinion 25. Paragraphs 16-44 of this
> Statement describe a method of accounting based on the fair value, rather than
> the ***intrinsic value***, of an employee stock option or a similar equity instrument.
> The Board encourages entities to adopt the fair value based method of
> accounting, which is preferable to the Opinion 25 method for purposes of
> justifying a change in accounting principle under APB Opinion No. 20,
> *Accounting Changes*. However, an entity may continue to apply Opinion 25
> in accounting for its stock-based employee compensation arrangements. An
> entity that does so shall disclose pro forma net income and, if presented,
> earnings per share, determined as if the fair value based method had been
> applied in measuring compensation cost (paragraph 45).

(Emphasis in original, footnote omitted.)

91.    In 12/04, SFAS No. 123 was revised.  The new standard, SFAS No. 123R, required recognition of the cost of options (as per the fair value method) in the financial statements:

> 10.    An entity shall account for the compensation cost from share-based payment transactions with employees in accordance with the fair-value-based method set forth in paragraphs 11-63 of this Statement.

92.    Each of these standards required a company include in its calculation the fair market value of the stock on the measurement or grant date.  For a publicly traded company like Sunrise, the fair market value of the stock was the trading price of the stock on the grant date.  So long as the exercise price of the stock was the same as the quoted market price, there was no compensation cost recorded on the grant date under APB No. 25 (the standard which companies were permitted to continue to follow under SFAS No. 123) as long as they included disclosures about the pro forma impact of using the fair value method of measurement under SFAS No. 123.  However, granting options with exercise prices equal to market price on the date of grants was critical to the accounting under any of the standards.

93.    Indeed, this is what Sunrise represented that it did.  For example, the 2006 Proxy Statement makes reference to the 1991 Non-Incentive Plan and represents that: "The option exercise price will not be less than the greater of par value or the fair market value of a share of Sunrise common stock on the date of grant." This was not true at least as to years 1999-2002, when certain of the defendants' grants had exercise prices not at fair market value on the date of grant.

94.    Sunrise represented the following about its compliance with stock option accounting rules in its 2005 Form 10-K:

- 60 -

Stock options are granted for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. Sunrise accounts for stock based compensation using the intrinsic value method in accordance with Account Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), and accordingly, does not recognize compensation expense for stock option grants.

95.     A nearly identical disclosure was included in the Company's 2004 Form 10-K.

96.     In reality, Sunrise's financial statements and related disclosures were materially false and misleading because Sunrise was violating a fundamental principle for the manner in which it accounted for stock options under all the various stock option accounting standards: it was granting options with exercise prices at less than market value. In fact, it was backdating options to dates when the price was lower than the market price on the day the options were actually granted. Note the fortuitous dates Sunrise selected for its options to many of its top officers (adjusted for stock splits):



**Sunrise Senior Living**

**January 2, 1997 - December 31, 1997**

1997 Options Grants
Faeder        200,000 shares
Smick         300,000 shares
Newell        200,000 shares
Swinton       150,000 shares



**Sunrise Senior Living**

**January 2, 1998 - December 31, 1998**



**Sunrise Senior Living**

**January 4, 1999 - December 31, 1999**



**Sunrise Senior Living**

**January 3, 2000 - December 29, 2000**



**Sunrise Senior Living**

**January 2, 2001 - December 31, 2001**

97.    Sunrise has now announced a probe into its stock option practices.

## Sunrise's GAAP Violations and Restatement Were Material

98.    Sunrise's false and misleading Class Period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality.[4] SEC SAB Topic 1M, *Materiality*, summarizes GAAP definitions of materiality.   Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality

---

[4]    Staff Accounting Bulletin ("SAB") Topic 1M, *Materiality*, represents the codification of certain Staff Accounting Bulletins, including SAB No. 99, *Materiality*, as of May 9, 2003. SAB No. 99 was effective August 12, 1999.

requires qualitative, as well as quantitative, considerations. For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

99.     SAB Topic 1M further states:

> Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
> *       *       *
>
> •       whether the misstatement masks a change in earnings or other trends
>
> •       whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
>
> *       *       *
>
> •       whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability . . . .

100.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

101.    Sunrise's misstatements, by their own admissions, satisfy these criteria and, thus, were material from both a quantitative and qualitative perspective.

102.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

- 67 -

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as

well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

103.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEFENDANTS' CERTIFIED FALSE AND MISLEADING FINANCIAL RESULTS

104.    In Sunrise's 1stQ 05 10-Q, 2ndQ 05 10-Q and 3rdQ 05 10-Q, the following Sarbanes-Oxley certifications appeared, signed by P. Klaassen and Rush:

I, [Paul J. Klaassen/Bradley B. Rush], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Sunrise Senior Living, Inc.;

- 69 -

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*     *     *

Date: [_____]

[Paul J. Klaassen
Chief Executive Officer

Bradley B. Bush
Chief Financial Officer]

*     *     *

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002 (18 U.S.C. SECTION 1350)

The undersigned, the Chief Executive Officer and the Chief Financial Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

(a)     the Quarterly Report on Form 10-Q of the Company for the Period Ended [_____] filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(b)     information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Paul J. Klaassen
Paul J. Klaassen
Chief Executive Officer
Date: [_____]

/s/ Bradley B. Rush
Bradley B. Rush
Chief Financial Officer
Date: [_____]

105.    Identical certificates covering Sunrise's financial statements were contained in Sunrise's 2003, 2004 and 2005 10-Ks filed 3/04, 3/05 and 3/16/06, signed by P. Klaassen. Rush signed the 2005 Form 10-K.

- 71 -

106.    Defendants P. Klaassen and Rush knowingly certified false and misleading

financial statements.  Defendants P. Klaassen and Rush certified the following financial

statements during the Class Period:

### SCHEDULE OF CERTIFIED FINANCIAL STATEMENTS

| Financial Statement Filed | Filing Period | Filing Date | Signed/Certified by | |
|---|---|---|---|---|
| | | | CEO | CFO |
| Form 10-Q | 06/30/05 | 08/09/05 | P. Klaassen | Rush |
| Form 10-Q | 09/30/05 | 11/09/05 | P. Klaassen | Rush |
| Form 10-K | 12/31/05 | 03/16/06 | P. Klaassen | Rush |

107.    These financial statements were not in accordance with GAAP and SEC rules.

Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and SEC Rules 13a-

14(a) and 15d-14(a) of the Exchange Act requires defendants P. Klaassen, as CEO, and

Rush, as CFO, to certify to the SEC and investors both the fairness of the financial

information in each quarterly and annual report.  Defendants P. Klaassen and Rush were

required to certify that the financial statements and other financial information included in

the reports were fairly presented in all material respects.  Defendants P. Klaassen and Rush

also stated that the reports did not contain any untrue statement of material fact or omit to

state a material fact.  In addition, defendants P. Klaassen and Rush stated that Sunrise has

established and maintained disclosure controls and procedures sufficient to ensure that the

financial and non-financial information required to be disclosed in SEC reports was

recorded, processed, summarized and reported within the specified time periods.

108.    Defendants P. Klaassen and Rush knowingly certified misleading and

inaccurate financial statements that were not in accordance with GAAP and SEC rules.  In

accordance with §906 of Sarbanes-Oxley and 18 U.S.C. §1350, defendants P. Klaassen and

Rush were required to certify each periodic report that includes financial statements.  Their

signed certifications falsely stated that: (i) the report fully complied with the requirements of
§13(a) or §15(d) of the Exchange Act; and (ii) the information contained in the report fairly
presented, in all material respects, the financial condition and results of operations of
Sunrise.

109.    On the dates noted in the Schedule of Certified Financial Statements above,
defendants P. Klaassen and Rush signed and filed with the SEC certifications under SEC
Rules 13a-14(a)/15d-14(a) of the Exchange Act and §906 of Sarbanes-Oxley attesting to the
accuracy and truthfulness of the corresponding Forms 10-K and 10-Q for Sunrise.  At the
time P. Klaassen and Rush signed these certifications, they knew or recklessly disregarded
that they were false for the reasons alleged herein.

## SUNRISE FAILED TO MAKE REQUIRED DISCLOSURES

110.    The SEC requires that, as to annual financial statements filed with the SEC,
registrants include a management's discussion and analysis section which provides
information with respect to the results of operations and "also shall provide such other
information that the registrant believes to be necessary to an understanding of its financial
condition, changes in financial condition and results of operations." *See* Regulation S-K, 17
C.F.R. §229.303(a).  Regulation S-K states that, as to annual results, the management's
discussion and analysis section shall:

> (3)    Results of operations. (i) Describe any unusual or infrequent
> events or transactions or any significant economic changes that materially
> affected the amount of reported income from continuing operations and, in
> each case, indicate the extent to which income was so affected.  In addition,
> describe any other significant components of revenues or expenses that, in the
> registrant's judgment, should be described in order to understand the
> registrant's results of operations.

(ii)    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. §229.303(a)(3)(i)-(ii).

111.    The SEC also requires that interim period financial statements filed with the SEC include a management's discussion and analysis of the financial condition and results of operations so as to enable the reader to assess material changes in financial condition and results of operations. Regulation S-K, 17 C.F.R. §229.303(b) states that: "The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item [as set forth above], except that the impact of inflation and changing prices on operations for interim periods need not be addressed."

112.    During the Class Period, Sunrise failed to truthfully disclose its accounting policies and practices related to income from investments and related to improper stock option grants in prior years.

113.    Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements. *See* FASB Statement of Concepts ("FASCON") No. 1, ¶7. For this reason, in addition to Sunrise's failure to make the required disclosures in its financial statements and in its SEC filings, Sunrise also shirked its duty to make such disclosures in its conference calls, its press releases, its quarterly financial reports and its Annual Reports.

## SUNRISE LACKED ADEQUATE INTERNAL CONTROLS

114.    Defendants were able to scheme Sunrise shareholders and inflate Sunrise stock prices through accounting improprieties which results in materially misstated financial statements by means of circumventing and failing to establish and maintain adequate internal accounting control over financial reporting relating to real estate sales, investments and stock options.

115.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must:

> (A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> *      *      *
>
> (ii)    transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP] . . . .

15 U.S.C. §78m(b)(2)(A)-(B).

116.    These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets. *SEC v. World-Wide Coin Inv.*, 567 F. Supp. 724, 746 (N.D. Ga. 1983).

117.    Defendants caused Sunrise to violate §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its accounting for stock options. Sunrise's inaccurate and false records were not isolated or unique instances because they were

improperly maintained for multiple reporting periods. Accordingly, Sunrise violated §13(b)(2)(A) of the Exchange Act.

118.    In addition, defendants caused Sunrise to violate §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Sunrise failed to ensure that proper review and checks were in place to ensure that it was recording and properly reporting accounting investments and for stock options. In fact, despite knowing the Company's true dismal state and lack of adequate controls, defendants regularly issued quarterly financial statements throughout the Class Period, without ever disclosing the deficiencies in Sunrise's internal accounting controls and falsely asserted that its financial statements complied with GAAP.

119.    Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements. *See* FASCON No. 1, ¶7. For this reason, in addition to Sunrise's failure to make the required disclosures in its financial statements and in its SEC filings, Sunrise also shirked its duty to make such disclosures in its conference calls, its press releases and its Annual Reports.

120.    As defendants allowed and were responsible for initiating a gross lack of internal controls over financial reporting, defendants were able to scheme Sunrise shareholders and inflate stock prices through accounting improprieties which resulted in materially misstated publicly filed financial statements.

## LOSS CAUSATION/ECONOMIC LOSS

121.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Sunrise's stock price and operated as a fraud or deceit on Class Period purchasers of Sunrise stock by misrepresenting the Company's financial results, business success and future business prospects. Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the Company's accounting and falsifying the Company's financial statements.  Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Sunrise stock fell precipitously as the prior artificial inflation came out of Sunrise's stock price.  As a result of their purchases of Sunrise stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

122.    By misrepresenting Sunrise's financial statements and its future earnings, the defendants presented a misleading picture of Sunrise's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Sunrise's business was not as healthy as represented, Sunrise falsely overstated its net income.

123.    These claims of profitability caused and maintained the artificial inflation in Sunrise's stock price throughout the Class Period and until the truth was revealed to the market.

124.    Defendants' false and misleading statements had the intended effect and caused Sunrise stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $39.49 per share.

125.   On 5/9/06, Sunrise revealed that it needed to reschedule its 1stQ 06 earnings release and needed additional time to complete a review of its Form 10-Q for its 1stQ 06. As investors and the market became aware that Sunrise's prior financial statements had been falsified, the prior artificial inflation came out of Sunrise's stock price, damaging investors.

126.   As a direct result of defendants' admissions and the public revelations regarding the truth about Sunrise's misstatements and its actual prospects going forward, Sunrise's stock price plummeted from $39.30 on 5/8/06 to $28.50 per share by 6/16/06, a drop of $10.80 per share, and fell to as low as $24.40 when the restatement of Sunrise's earnings was revealed on 7/31/06. This drop removed some of the inflation from Sunrise's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.   In sum, as the truth about defendants' fraud and Sunrise's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of at least $10.80 per share.

127.   The decline in Sunrise's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Sunrise's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

## DEFENDANTS' INSIDER TRADING

128.    While Sunrise's stock price was artificially inflated by defendants' false statements, the Insider Selling Defendants personally profited from their wrongful conduct and scheme by selling $34.8 million worth of their individual Sunrise holdings based on inside information.

| Insider | Date | Shares Sold | Price | Proceeds | % of Stock Actually Owned and Sold |
|---|---|---|---|---|---|
| J. Barron Anschutz | 21-Nov-05 | 3,000 | $33.00 | $99,000 | |
| | 21-Nov-05 | 2,000 | $33.04 | $66,080 | |
| | 3-Jan-06 | 826 | $32.06 | $26,482 | |
| | 3-Jan-06 | 100 | $32.05 | $3,205 | |
| | | 5,926 | | $194,767 | 100.0% |
| Ronald V. Aprahamian | 18-Apr-06 | 20,000 | $37.85 | $757,000 | 90.9% |
| Thomas J. Donohue | 21-Nov-05 | 32,000 | $33.04 | $1,057,280 | |
| | 21-Nov-05 | 30,000 | $33.04 | $991,200 | |
| | 21-Nov-05 | 24,000 | $33.04 | $792,960 | |
| | 21-Nov-05 | 10,000 | $33.04 | $330,400 | |
| | 21-Nov-05 | 6,666 | $33.04 | $220,245 | |
| | | 102,666 | | $3,392,085 | 71.2% |
| J. Douglas Holladay | 23-Sep-05 | 10,000 | $32.00 | $320,000 | |
| | 3-Oct-05 | 8,000 | $33.50 | $268,000 | |
| | 7-Nov-05 | 2,300 | $35.00 | $80,500 | |
| | 6-Dec-05 | 1,700 | $35.00 | $59,500 | |
| | 12-Dec-05 | 6,000 | $36.50 | $219,000 | |
| | 21-Mar-06 | 8,000 | $39.00 | $312,000 | |
| | | 36,000 | | $1,259,000 | 100.0% |
| Paul J. Klaassen/ | 19-Dec-05 | 50,000 | $34.78 | $1,739,000 | |
| Teresa M. Klaassen | 20-Dec-05 | 50,000 | $34.58 | $1,729,000 | |
| | 3-Jan-06 | 50,000 | $32.11 | $1,605,500 | |
| | 4-Jan-06 | 50,000 | $34.39 | $1,719,500 | |
| | 1-Feb-06 | 50,000 | $36.27 | $1,813,500 | |
| | 2-Feb-06 | 50,000 | $36.14 | $1,807,000 | |
| | 1-Mar-06 | 50,000 | $34.76 | $1,738,000 | |
| | 2-Mar-06 | 50,000 | $34.36 | $1,718,000 | |
| | 3-Apr-06 | 50,000 | $38.82 | $1,941,000 | |

- 79 -

|  | | | | | |
|---|---|---|---|---|---|
|  | 4-Apr-06 | 50,000 | $38.50 | $1,925,000 | |
|  | 1-May-06 | 50,000 | $37.04 | $1,852,000 | |
|  | 2-May-06 | 50,000 | $36.77 | $1,838,500 | |
|  | | 600,000 | | $21,426,000 | 10.4% |
|  | | | | | |
| Thomas B. Newell | 22-Aug-05 | 24,000 | $30.05 | $721,200 | |
|  | 22-Sep-05 | 13,272 | $31.51 | $418,134 | |
|  | 22-Sep-05 | 10,728 | $31.51 | $337,986 | |
|  | 24-Oct-05 | 24,000 | $32.52 | $780,480 | |
|  | 22-Nov-05 | 24,000 | $33.68 | $808,320 | |
|  | 22-Dec-05 | 24,000 | $34.66 | $831,840 | |
|  | 23-Jan-06 | 24,000 | $35.29 | $846,960 | |
|  | 22-Feb-06 | 24,000 | $34.20 | $820,800 | |
|  | 22-Mar-06 | 24,000 | $38.27 | $918,480 | |
|  | 24-Apr-06 | 24,000 | $38.12 | $914,880 | |
|  | | 216,000 | | $7,399,080 | 46.0% |
|  | | | | | |
| Bradley B. Rush | 8-Sep-05 | 1,374 | $29.76 | $40,883 | |
|  | 12-Sep-05 | 6,000 | $31.30 | $187,770 | |
|  | 12-Sep-05 | 4,000 | $31.30 | $125,200 | |
|  | 12-Sep-05 | 2,300 | $31.32 | $72,025 | |
|  | 12-Sep-05 | 200 | $31.33 | $6,266 | |
|  | | 13,874 | | $432,144 | 29.2% |
|  | | | | | |
|  | Totals: | 994,466 | | $34,860,075 | |

129.    To the extent any of the insider stock sales were pursuant to Rule 10b5-1 plans, those plans do not protect those sales from legal liability or from raising an inference of scienter because either (i) when the plan was put in place the defendants had knowledge of the ongoing fraudulent conduct and/or (ii) the plan allowed the defendants discretion as to how stock sales under the plan would occur.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

130.    At all relevant times, the market for Sunrise's securities on the New York Stock Exchange was an efficient market for the following reasons, among others:

(a)    Sunrise's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Sunrise filed periodic public reports with the SEC and the NYSE;

(c)    Sunrise regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Sunrise was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

131.    As a result of the foregoing, the market for Sunrise's securities efficiently digested current information regarding Sunrise from all publicly available sources and reflected such information in the prices of Sunrise's securities. Under these circumstances, all purchasers of Sunrise's securities during the Class Period suffered similar injury through their purchase of Sunrise securities at artificially inflated prices and a presumption of reliance applies.

## APPLICABILITY OF THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE

132.    Plaintiffs are also entitled to the *Affiliated Ute* presumption of reliance because defendants' fraudulent scheme primarily involved a failure to disclose and/or concealment of the material facts, which information plaintiffs would have wanted to have known and which

would have caused investors to not have purchased shares of Sunrise at the prices they traded at during the Class Period.

## NO SAFE HARBOR

133.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sunrise who knew that those statements were false when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

134.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the publicly traded securities of Sunrise during the Class Period and who were damaged thereby (the "Class"), including those who held common shares of Sunrise's stock at the time its 2000-2006 Proxy Statements were circulated to stockholders to solicit their votes on various matters.  Excluded from the Class are defendants, the officers and

- 82 -

directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

135.    The members of the Class are so numerous that joinder of all members is impracticable. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

136.    Throughout the Class Period, Sunrise's common stock was actively traded on the NYSE, in an active and efficient market. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sunrise or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

137.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

138.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

139.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether defendants acted with negligence or with scienter;

(c)    whether statements made by defendants to the investing public during the Class Period and in the 2000-2006 Proxy Statements misrepresented or failed to disclose material facts about the business and operations of Sunrise;

(d)    whether the prices of Sunrise common stock and other publicly traded securities were artificially inflated during the Class Period;

(e)    whether the ownership share of public stockholders in Sunrise stock was improperly diluted as a result of Sunrise's stock option grants;

(f)    whether equitable remedies are available to remedy defendants' allegedly negligent, improper and/or fraudulent conduct, and to what extent these equitable remedies should be applied and how they should be fashioned;

(g)    to what extent the members of the Class have sustained economic loss and/or damages and the proper measure of damages;

(h)    whether the Insider Selling Defendants should be required to disgorge their trading profits to contemporaneous purchasers of Sunrise stock; and

(i)    how to define contemporaneous purchasers for purposes of the Exchange Act.

140.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small,

the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against Defendants Sunrise, Anschutz, Aprahamian, Donohue,
### Holladay, P. Klaassen, T. Klaassen, Newell and Rush

141.    Plaintiffs incorporate ¶¶1-140 by reference.

142.    The defendants named herein are liable for: (i) making false statements; (ii) failing to disclose adverse facts known to them about Sunrise; or (iii) participating in, permitting or causing contrivances and manipulative acts regarding Sunrise's stock option plans and its financial statements. Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of Sunrise stock, as it: (i) deceived the investing public regarding Sunrise's business, compensation practices and finances; (ii) artificially inflated the prices of Sunrise's publicly traded securities; (iii) allowed Sunrise executives, including those named as defendants herein, to obtain undeserved and/or illegal options at low option exercise prices, and inflated bonuses which were directly tied to the reported performance of Sunrise; (iv) allowed Sunrise executives to insider trade by getting options based on non-public information and allowed the Insider Selling Defendants to sell millions of dollars worth of their own Sunrise stock at artificially inflated prices; and (v) caused plaintiffs and other members of the Class to purchase Sunrise securities at inflated prices, and suffer economic loss and damage, and also to unlawfully and improperly dilute their holdings in Sunrise.

- 85 -

143.    During the Class Period, these defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144.    During the Class Period, each of the defendants named in this Claim occupied a position at Sunrise and was privy to non-public information concerning the Company. Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose these facts. Notwithstanding their duty to refrain from selling Sunrise stock while in possession of material, adverse, non-public information concerning the Company, the Insider Selling Defendants sold millions of shares of Sunrise stock at inflated prices, improperly personally profiting and benefiting from their wrongful course of conduct and false and misleading statements.

145.    While Sunrise's top insiders and directors were issuing favorable, yet false and misleading, statements about Sunrise, the Insider Selling Defendants sold shares of their Sunrise stock for more than $34 million to personally profit from the artificial inflation in Sunrise's stock price. Notwithstanding their access to material non-public information and their duty to disclose same before acquiring or selling Sunrise stock, certain of the defendants obtained option grants at artificially low prices or knew positive corporate news was coming which would boost the stock price and they also sold significant amounts of their Sunrise stock at artificially inflated prices and at highly suspicious times. This insider selling by the Insider Selling Defendants was highly unusual, both in its timing and in its

- 86 -

amount and occurred when these defendants knew Sunrise's publicly reported financial results were overstated and of their illicit stock option contrivances and manipulations.

146.    Public investors who purchased Sunrise stock at prices inflated by the false representations and omissions have suffered millions in damages. Sunrise's insiders who knew the truth fared much better. Also, before the truth was revealed and Sunrise's stock price collapsed, these defendants sold their shares of Sunrise common stock on the open market.

147.    These defendants pursued a scheme and course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing insiders to manipulate its stock option plan and was misrepresenting its financial results; (ii) maintain defendants' executive and directorial positions at Sunrise and the profits, power and prestige which defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Sunrise, regarding defendants' compensation practices and Sunrise's financial performance. Each of the defendants was a direct, necessary and substantial participant in the scheme, common enterprise and/or common course of conduct complained of herein.

148.    The purpose and effect of defendants' scheme and common course of conduct was, among other things, to disguise defendants' violations of law, abuse of control and unjust enrichment, to conceal adverse information concerning the Company's operations and financial condition, and to artificially inflate the price of Sunrise common stock so they could dispose of millions of dollars of their own Sunrise stock, and enhance their executive

and directorial positions and receive the substantial compensation they obtained as a result thereof.

149.    In taking such actions to substantially engage in the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

150.    Defendants named in this Complaint acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

151.    These defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business alleged herein because they were senior officials of Sunrise and issued statements and press releases on behalf of the Company, and had the opportunity to commit the fraud alleged herein.

152.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Sunrise publicly traded securities during the Class Period.

153.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sunrise publicly traded securities.    Plaintiffs and the Class would not have purchased Sunrise publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and/or failure to disclose material facts.

154.    By misrepresenting the Company's financial statements, failing to inform the market of the improper and manipulative options backdating scheme and the resulting impact it was having on the Company's financial results and profits, and making other false statements, these defendants presented a misleading picture of Sunrise's business, compensation practices, financial results and prospects.    This caused and maintained artificial inflation in the trading prices of Sunrise's securities throughout the Class Period and until the truth came out.

155.    Defendants' false and misleading statements had the intended effect and caused Sunrise stock to trade at artificially inflated levels throughout the Class Period.    As the truth about the extent and severity of Sunrise's prior overstatement of income and the extent of the harm to its reputation and credibility in the market was disclosed and became apparent to the market, Sunrise's common stock price plummeted as the prior artificial inflation came out of the Company's stock price, falling from its Class Period high.    All or a

significant portion of the decrease in Sunrise's stock price was due to the disclosure, revelation and/or leakage of information inconsistent with defendants' prior financial disclosures and Company releases. This drop removed the inflation from Sunrise's stock price, causing real economic loss and damage to investors who had purchased the stock during the Class Period.

156.   As a result of their purchases of Sunrise securities during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

157.   As investors and the market became aware that Sunrise's prior financial results had been falsified and that Sunrise's actual financial results, which had long been obfuscated by defendants' manipulative conduct, scheme to inflate its stock price and false statements regarding Sunrise's financial results, the prior artificial inflation came out of Sunrise's stock price, damaging investors.

158.   As a direct result of defendants' admissions and the public revelations regarding the truth about Sunrise's improper options backdating practices, false financial results and its actual earnings prospects going forward, the price of Sunrise shares plummeted, causing damage to plaintiffs and the Class. This decline in response to these revelations removed the inflation from the price of Sunrise's shares, causing real economic loss to investors who had purchased Sunrise shares during the Class Period.

159.   The timing and magnitude of Sunrise's stock price declines negate any inference that the losses suffered by plaintiffs and other Class members were caused by changed market

conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

160.    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Sunrise publicly traded securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violation of §20A of the Exchange Act
### Against the Insider Selling Defendants

161.    Plaintiffs incorporate by reference ¶¶1-160.

162.    The defendants named in this Claim for Relief are the defendants that sold Sunrise stock during the Class Period.

163.    Certain plaintiffs purchased Sunrise stock contemporaneously with sales of Sunrise stock by certain of the defendants named in this Claim.

164.    By virtue of their positions as senior insiders of Sunrise, the defendants named in this Claim were in possession of material, non-public information about Sunrise at the time of their collective sales of more than $34 million of their own Sunrise stock to plaintiffs and members of the Class at artificially inflated prices.

165.    By virtue of their participation in the scheme to defraud investors described herein, and/or their sales of stock while in possession of material, non-public information about the adverse information detailed herein, these defendants violated the Exchange Act and applicable rules and regulations thereunder.

166.    Plaintiffs and all other members of the Class who purchased shares of Sunrise stock contemporaneously with the sales of Sunrise stock by the Insider Selling Defendants:

(i) have suffered substantial damages in that they paid artificially inflated prices for Sunrise

stock as a result of the violations of §§10(b) and 20(a) and Rule 10b-5 herein described; and

(ii) would not have purchased Sunrise stock at the prices they paid, or at all, if they had been

aware that the market prices had been artificially inflated by defendants' false and

misleading statements.

### THIRD CLAIM FOR RELIEF

#### For Violation of §14(a) of the Exchange Act Against
#### the Director Defendants

167.   Plaintiffs incorporate by reference and reallege each and every allegation set

forth above, as though fully set forth herein, except allegations of fraud or intent which are

not necessary to assert this Claim for Relief.

168.   In 4/00, Sunrise circulated its 2000 Proxy Statement to shareholders.  As a

result, Donohue and David W. Faeder were elected as directors.  The 4/00 Proxy also stated:

**STOCK OPTIONS**

Stock options are considered an effective long-term incentive because
gains are linked to increases in the stock value, which in turn provides
stockholder gains. Stock options are granted by the stock option committee at
an exercise price equal to the market price of the common stock at the date of
the grant. . . . . The full benefit of the options is realized upon appreciation of
the stock price in future periods, thus providing an incentive to create value to
Sunrise's stockholders through appreciation of the stock price.

169.   In 3/01, Sunrise circulated its 2001 Proxy Statement to its shareholders.  As a

result, P. Klaassen, Callen and Peter A. Klisares were elected as directors.  The 2001 Proxy

stated:

Audit Committee. The members of the audit committee are Messrs.
Aprahamian, Donohue and Holladay, all of whom are independent directors.
The audit committee makes recommendations concerning the engagement of
Sunrise's independent auditors, reviews the results and scope of the annual

audit and other services provided by Sunrise's independent auditors and reviews the adequacy of Sunrise's internal accounting controls. . . .

Compensation Committee. The members of the compensation committee are Messrs. Aprahamian, Callen and Donohue. The compensation committee makes recommendations to the full board of directors concerning salary and bonus compensation and benefits for the five most highly compensated executive officers of Sunrise. . . .

Stock Option Committee. The members of the stock option committee are Messrs. Bradley, Callen and Donohue. The stock option committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

170. The 2001 Proxy stated:

COMPENSATION OF EXECUTIVE OFFICERS

The compensation policies of Sunrise are designed to enable Sunrise to attract, motivate and retain experienced and qualified executives. Sunrise seeks to provide competitive compensation. Sunrise's policy has been to provide a significant component of an executive officer's compensation through the grant of stock options. Sunrise believes that grants of stock options to executives, as well as to employees generally, help align the interests of these persons with the interests of Company's stockholders.

The following describes in more specific terms the elements of compensation of executive officers for 2000:

*      *      *

BONUSES

In 2000, bonuses were used to reward and compensate some employees for achieving certain goals set by Sunrise's management. Sunrise may use cash incentives from time to time to help motivate the attainment of management objectives.

STOCK OPTIONS

Stock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. ***Stock options are granted by the stock option committee at an exercise price equal to the market price of the common stock at the date of the grant.***

171.    In 4/02, Sunrise circulated its 2002 Proxy Statement to its shareholders. As a result, Aprahamian, David G. Bradley and T. Klaassen were elected as directors. The 2002 Proxy stated:

> Executive Committee.  The members of the executive committee are Messrs. Klaassen and Faeder and Ms. Klaassen. The executive committee has been delegated all of the powers of the board of directors, when the board of directors is not in session, to the extent permitted under the Delaware General Corporation Law. Mr. Klaassen chairs the committee. . . .

> Audit Committee.  The members of the audit committee are Messrs. Aprahamian, Donohue and Bradley, all of whom are independent directors. Mr. Aprahamian chairs the committee. The duties and responsibilities of the audit committee are set forth in the written audit committee charter adopted by the board of directors. Among other duties and responsibilities, the audit committee makes recommendations to the full board concerning the engagement of Sunrise's independent auditors, reviews the results and scope of the annual audit and other services provided by Sunrise's independent auditors and reviews the adequacy of Sunrise's internal accounting controls. . . .

> Compensation Committee.   The members of the compensation committee are Messrs. Aprahamian, Callen and Donohue. Mr. Donohue chairs the committee. The compensation committee makes recommendations to the full board of directors concerning salary and bonus compensation and benefits for the five most highly compensated executive officers of Sunrise. . . .

> Stock Option Committee. The members of the stock option committee are Messrs. Bradley, Callen and Donohue. Mr. Donohue chairs the committee. The stock option committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

*        *        *

OPTION REPRICING TABLE

As required by SEC rules, the following table sets forth information with respect to all repricings of options held by any executive officer since Sunrise became a public company in June 1996.

- 94 -

## TEN-YEAR OPTIONS REPRICING

| NAME | DATE | SHARES OF COMMON UNDERLYING OPTIONS REPRICED (#) | MARKET PRICE OF STOCK AT TIME OF REPRICING ($) | EXERCISE PRICE AT TIME OF REPRICING ($/SH) | NEW EXERCISE PRICE ($/SH) | LENGTH OF ORIGINAL OPTION TERM REMAINING AT TIME OF REPRICING |
|------|------|------|------|------|------|------|
| Christopher B.A. Slavin | 11/24/00 | 75,000 | $26.3125 | $37.625 | $26.3125 | 100 months |
| David W. Faeder | 9/14/98 | 200,000 | $24.1875 | $43.50 | $25.00 | 113 months |
| Thomas B. Newell | 9/14/98 | 200,000 | $24.1875 | $43.50 | $25.00 | 113 months |
| Tiffany Tomasso | 9/14/98 | 100,000 | $24.1875 | $43.50 | $25.00 | 113 months |
| | 9/14/98 | 100,000 | $24.1875 | $43.50 | $25.00 | 113 months |
| | 9/14/98 | 30,000 | $24.1875 | $30.75 | $25.00 | 106 months |
| Brian C. Swinton | 9/14/98 | 100,000 | $24.1875 | $43.50 | $25.00 | 113 months |

\*    \*    \*

## REPORT ON EXECUTIVE COMPENSATION

The board of directors and its compensation and stock option committees have prepared the following report on Sunrise's policies with respect to the compensation of executive officers for 2001.

\*    \*    \*

## COMPENSATION OF EXECUTIVE OFFICERS

The compensation policies of Sunrise are designed to enable Sunrise to attract, motivate and retain experienced and qualified executives. Sunrise seeks to provide competitive compensation. Sunrise's policy has been to provide a significant component of an executive officer's compensation through the grant of stock options. ***Sunrise believes that grants of stock options to executives, as well as to employees generally, help align the interests of these persons with the interests of Company's stockholders.***

The following describes in more specific terms the elements of compensation of executive officers for 2001:

\*    \*    \*

## BONUSES

In 2001, bonuses were used to reward and compensate some employees for achieving certain goals set by Sunrise's management. Sunrise may use cash incentives from time to time to help motivate the attainment of management objectives.

- 95 -

172.    In 4/03, Sunrise circulated its 2003 Proxy Statement to shareholders by which

Donohue, Faeder and Holladay were elected as directors.  It also stated:

> Executive Committee. The members of the executive committee are Messrs. Klaassen and Faeder and Ms. Klaassen. The executive committee has been delegated all of the powers of the board of directors, when the board of directors is not in session, to the extent permitted under the Delaware General Corporation Law. Mr. Klaassen chairs the committee. . . .

> Audit Committee. The members of the audit committee are Messrs. Aprahamian, Donohue and Bradley, all of whom are independent directors. Mr. Aprahamian chairs the committee. The duties and responsibilities of the audit committee are set forth in the written audit committee charter adopted by the board of directors. Among other duties and responsibilities, the audit committee makes recommendations to the full board concerning the engagement of Sunrise's independent auditors, reviews the results and scope of the annual audit and other services provided by Sunrise's independent auditors and reviews the adequacy of Sunrise's internal accounting controls. . . .

> Compensation Committee. On August 23, 2002, the board of directors reconstituted the then existing compensation and stock option committees into one committee designated *as the compensation committee*. Prior to its reconstitution, the members of the compensation committee were Messrs. *Aprahamian*, *Callen* and *Donohue* and the members of the stock option committee were Messrs. *Bradley*, *Callen* and *Donohue. Mr. Donohue chaired both committees*. The former compensation committee met once in 2002. The former stock option committee met twice in 2002. The members of the reconstituted compensation committee are Messrs. *Aprahamian, Bradley and Donohue. Mr. Donohue is the chairman of the reconstituted compensation committee*. Among other duties and responsibilities, the compensation committee is responsible for reviewing and approving annual base salary and bonus amounts, any long-term incentive compensation, any employment agreements, severance agreements, change in control and similar agreements and any perquisites for executive officers. The compensation committee is also responsible for reviewing and approving special or supplemental benefits for the Chief Executive Officer and the other executive officers and for administering and implementing Sunrise's compensation plans and equity-based plans in which directors, the Chief Executive Officer, other executive officers and other employees of Sunrise and its subsidiaries may be participants.

*        *        *

## Compensation of Executive Officers

The compensation policies of Sunrise are designed to enable Sunrise to attract, motivate and retain experienced and qualified executives. Sunrise seeks to provide competitive compensation. Sunrise's policy has been to provide a significant component of an executive officer's compensation through the grant of stock options. In 2002, Sunrise also added grants of restricted stock as an incentive to key executives. Sunrise believes that grants of stock options and restricted stock to executives, and grants of stock options to employees generally, help align the interests of these persons with the interests of Sunrise's stockholders.

The following describes in more specific terms the elements ·of compensation of executive officers for 2002:

\*      \*      \*

### Bonuses

In 2002, bonuses were used to reward and compensate some employees for achieving certain goals set by Sunrise's management. Sunrise may use cash incentives from time to time to help motivate the attainment of management objectives.

### Stock Options

Stock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options were granted by the stock option committee, and are now granted by the compensation committee, at an exercise price equal to the market price of the common stock at the date of the grant. . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

173.    The 2003 Proxy also stated:

## REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the financial statements and the reporting process, including the systems of internal controls. In fulfilling its oversight responsibilities, the audit committee reviewed the audited financial statements in the Annual Report on Form 10-K for the year ended December 31, 2002 with management, including a discussion of the quality, not just the acceptability, of the accounting

principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements.

The audit committee has reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the quality, not just the acceptability, of Sunrise's accounting principles and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from management and Sunrise, including the matters in the written disclosure required by the Independent Standards Board and considered the compatibility of nonaudit services with the auditors' independence.

The audit committee discussed with Sunrise's independent auditors the overall scope and plans for their respective audits. The audit committee meets with the independent auditors, with and without management present, to discuss the results of their examinations, their evaluations of the Sunrise's internal controls, and the overall quality of Sunrise's financial reporting. The audit committee held four meetings during fiscal year 2002.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2002 for filing with the Securities and Exchange Commission.

> Respectfully Submitted,
>
> Ronald V. Aprahamian, Chairman
> Thomas J. Donohue
> David G. Bradley

174.    In 4/04, Sunrise circulated its 2004 Proxy Statement to shareholders. It sought and secured the election of Callen and P. Klaassen to the board. The 2004 Proxy also stated:

> Sunrise has the following standing committees of its board of directors:
>
> Executive Committee. The executive committee was reconstituted in May 2003 and the members of the executive committee are Messrs. Klaassen, Donohue and Holladay. The executive committee has been delegated all of the powers of the board of directors, when the board of directors is not in session
> . . . .

- 98 -

Audit Committee. The members of the audit committee are Messrs. Aprahamian, Donohue and Bradley, all of whom are independent, as defined in the NYSE listing standards and applicable SEC rules. Mr. Aprahamian chairs the committee.

*     *     *

The audit committee charter requires that all members of the audit committee be financially literate.

The duties and responsibilities of the audit committee are set forth in the audit committee charter and include, among other duties and responsibilities, making recommendations to the full board concerning the engagement of Sunrise's independent auditors, reviewing the results and scope of the annual audit and other services provided by Sunrise's independent auditors and reviewing and monitoring Sunrise's system of internal accounting controls. A report of the audit committee is included in this annual proxy statement. . . .

Compensation Committee. The members of the compensation committee are Messrs. Donohue, Aprahamian and Bradley, all of whom are independent, as defined in the NYSE listing standards. Mr. Donohue is the chairman of the compensation committee. . . .

The duties and responsibilities of the compensation committee are set forth in the compensation committee charter and include, among other duties and responsibilities, reviewing and approving annual base salary and bonus amounts, any long-term incentive compensation, any employment agreements, severance agreements, change in control and similar agreements and any perquisites for executive officers. The compensation committee is also responsible for reviewing and approving special or supplemental benefits for the chief executive officer and the other executive officers and for administering and implementing Sunrise's incentive compensation plans and equity-based plans in which directors, the chief executive officer, other executive officers and other employees of Sunrise and its subsidiaries may be participants.

175.   Elsewhere the 2004 Proxy stated:

**Compensation of Executive Officers**

Sunrise's compensation policies are designed to enable the company to attract, motivate and retain experienced and qualified executives. The committee's key objective with respect to the compensation of executive officers is to build a strong relationship between the creation of stockholder value and executive compensation, providing incentives to achieve both short

- 99 -

and long-term goals, and providing an overall level of remuneration which is competitive and reflective of performance. With this objective in mind, the compensation committee has designed the company's executive compensation program to (1) be competitive with the compensation policies of other companies of comparable size and complexity; (2) provide significant incentives directly linked to increases in specified measures of stockholder value; and (3) reward superior performance as measured by financial and non-financial factors.

The company's executive compensation program consists of cash payments in the form of salary and annual bonus for performance during the current year and stock-based incentive compensation for performance over the long term. . . .

The following describes in more specific terms the elements of compensation of executive officers for 2003:

*       *       *

### Bonuses

Bonuses are used to reward and compensate the chief executive officer and other executive officers for achieving certain goals set by the compensation committee and to reward superior performance. . . .

### Stock-Based Incentive Compensation

The compensation committee considers stock options to be an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the compensation committee, at an exercise price equal to the market price of the common stock at the date of the grant. . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

176.    The 2004 Proxy also stated:

### REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the company's financial statements and reporting process, including its systems of internal controls. In fulfilling its oversight responsibilities, the audit

committee has reviewed and discussed with management the audited financial statements in Sunrise's Annual Report on Form 10-K for the year ended December 31, 2003.

The audit committee has also reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the acceptability of the audited financial statements and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from Sunrise and its management, including the matters in the written disclosure received by the audit committee as required by the Independence Standards Board, and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2003 for filing with the Securities and Exchange Commission.

Respectfully Submitted,

Ronald V. Aprahamian, Chairman
Thomas J. Donohue
David G. Bradley

177.    In 4/05, Sunrise circulated its 2005 Proxy Statement. It sought and secured the election of Aprahamian and T. Klaassen as directors. It also identified the following board committees:

| Director | Audit Committee | Compensation Committee | Nominating and Corporate Governance Committee | Executive Committee |
|---|---|---|---|---|
| Ronald V. Aprahamian | X* | X | X | |
| Craig R. Callen | X | X | | |
| Thomas J. Donohue | X | X* | X | X |
| J. Douglas Holladay | | | X* | X |
| Paul J. Klaassen | | | | X* |

* Chairman.

178.    The 2005 Proxy also stated:

Audit Committee.

The audit committee assists the board of directors in its oversight of our financial statements, our compliance with legal and regulatory requirements, our independent auditor's qualifications and independence and the performance of our internal audit function and internal auditor. Among its responsibilities, the audit committee is directly responsible for the appointment, compensation and oversight of the work of the independent auditor.

Pursuant to the audit committee's charter, all members of the audit committee must meet the independence requirements of the NYSE and the rules of the SEC. Each member of the audit committee must also be financially literate as determined under NYSE rules. The board of directors has determined that each member of the audit committee is independent within the meaning of the requirements of the NYSE's listing standards and the rules of the SEC and is financially literate. At least one member of the audit committee also must have accounting or financial management expertise as determined under NYSE rules.

\*        \*        \*

Compensation Committee.

The duties and responsibilities of the compensation committee are set forth in the compensation committee charter and include, among other duties and responsibilities, reviewing and approving annual base salary and bonus amounts, any long-term incentive compensation, any employment agreements, severance agreements, change in control and similar agreements and any perquisites for executive officers. The compensation committee is also responsible for reviewing and approving special or supplemental benefits for the chief executive officer and the other executive officers and for administering and implementing Sunrise's incentive compensation plans and equity-based plans that are subject to board of directors approval in which directors, the chief executive officer, other executive officers and other employees of Sunrise and its subsidiaries may be participants.

The board of directors has determined that each member of the compensation committee is independent under the rules of the NYSE.

179.    Elsewhere the 2005 Proxy stated:

- 102 -

## REPORT ON EXECUTIVE COMPENSATION

The compensation committee has prepared the following report on Sunrise's policies with respect to the compensation of executive officers for 2004.

The compensation committee has been delegated the authority to discharge the board of director's responsibilities relating to compensation for the chief executive officer and other executive officers. The compensation committee's responsibilities include the annual review and approval of base salaries, bonus amounts, long-term incentive compensation, any employment, severance, and change in control agreements (including any amendments, supplements or waivers to these agreements), perquisites, and special or supplemental benefits for the chief executive officer and other executive officers.

The compensation committee has also been delegated the authority to administer and implement Sunrise's incentive compensation plans and equity-based plans that are subject to board of directors approval, including approving option grants and restricted stock or other awards to the chief executive officer, other executive officers and Sunrise employees.

### Compensation of Executive Officers

Sunrise's compensation policies are designed to enable the company to attract, motivate and retain experienced and qualified executives. The committee's key objective with respect to the compensation of executive officers is to build a strong relationship between the creation of stockholder value and executive compensation, providing incentives to achieve both short and long-term goals, and providing an overall level of remuneration which is competitive and reflective of performance. With this objective in mind, the compensation committee has designed the company's executive compensation program to (1) be competitive with the compensation policies of other companies of comparable size and complexity; (2) provide significant incentives directly linked to increases in specified measures of stockholder value; and (3) reward superior performance as measured by financial and non-financial factors.

The company's executive compensation program consists of cash payments in the form of salary and annual bonus for performance during the current year and stock-based incentive compensation for performance over the long term. . .

In setting each of the elements of compensation, the committee considers the total value of the annual compensation for each executive and all

- 103 -

executives as a group. The following describes in more specific terms the elements of compensation of executive officers for 2004:

\*       \*       \*

### Bonuses

Bonuses are typically used to reward and compensate the chief executive officer and other executive officers for achieving certain goals set by the compensation committee and to reward superior performance. For 2004, such goals, which were substantially achieved by the chief executive officer and the other executive officers, included quantitative and qualitative objectives relating to, among other things, the company's earnings, expense control, development pace, growth in revenue under management and team member development. . . .

\*       \*       \*

### Stock-Based Incentive Compensation

The compensation committee considers restricted stock and restricted stock units to be an effective long-term incentive for individuals as it provides them with an opportunity to acquire or increase their proprietary interest in the company and encourages key individuals to continue to serve the company long-term. The full benefit of the restricted stock or restricted stock unit grant is realized upon the appreciation of Sunrise's stock price, providing an incentive for key employees to create value for Sunrise's stockholders through their service to Sunrise. The compensation committee believes that restricted stock and restricted stock units have and will continue to be helpful in attracting and retaining skilled executive personnel.

The compensation committee also considers stock options to be an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the compensation committee at an exercise price equal to the market price of the common stock at the date of the grant. . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

180.    Elsewhere the 2005 Proxy stated:

### REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility

for the company's financial statements and reporting process, including its systems of internal controls. In fulfilling its oversight responsibilities, the audit committee has reviewed and discussed with management the audited financial statements in Sunrise's Annual Report on Form 10-K for the year ended December 31, 2004.

The audit committee has also reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the acceptability of the audited financial statements and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from Sunrise and its management, including the matters in the written disclosure received by the audit committee as required by the Independence Standards Board, and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2004 for filing with the Securities and Exchange Commission.

Respectfully Submitted,

Ronald V. Aprahamian, Chairman
Thomas J. Donohue
Craig R. Callen

181.    In 4/06, Sunrise circulated its 2006 Proxy Statement to shareholders.   It supported and secured the election of Donohue, Holladay and Little as directors.

182.    According to the 2006 Proxy, the Sunrise Board had the following committees:

| Director | Audit Committee | Compensation Committee | Nominating and Corporate Governance Committee | Executive Committee |
|---|---|---|---|---|
| Ronald V. Aprahamian | X* | X | | |
| Craig R. Callen | X | X | | |
| Thomas J. Donohue | X | X* | X | X |
| J. Douglas Holladay | | | X* | X |
| Paul J. Klaassen | | | | X* |
| William G. Little | | | X | |

* Chairman.

183.    Elsewhere the 2006 Proxy stated:

## REPORT ON EXECUTIVE COMPENSATION

The compensation committee has prepared the following report on Sunrise's policies with respect to the compensation of executive officers for 2005.

The compensation committee has been delegated the authority to discharge the board of director's responsibilities relating to compensation for the chief executive officer and other executive officers. The compensation committee's responsibilities include the annual review and approval of base salaries, bonus amounts, long-term incentive compensation, any employment, severance, and change in control agreements (including any amendments, supplements or waivers to these agreements), perquisites, and special or supplemental benefits for the chief executive officer and other executive officers.

The compensation committee has also been delegated the authority to administer and implement Sunrise's incentive compensation plans and equity-based plans that are subject to board of directors approval, including approving option grants and restricted stock or other awards to the chief executive officer, other executive officers and Sunrise employees.

**Compensation of Executive Officers**

Sunrise's compensation policies are designed to enable the company to attract, motivate and retain experienced and qualified executives. The committee's key objective with respect to the compensation of executive officers is to build a strong relationship between the creation of stockholder value and executive compensation, providing incentives to achieve both short and long-term goals, and providing an overall level of remuneration which is competitive and reflective of performance. With this objective in mind, the compensation committee has designed the company's executive compensation program to (1) be competitive with the compensation policies of other companies of comparable size and complexity; (2) provide significant incentives directly linked to increases in specified measures of stockholder value; and (3) reward superior performance as measured by financial and non-financial factors.

The company's executive compensation program consists of cash payments in the form of salary and annual bonus for performance during the current year and stock-based incentive compensation for performance over the long term. . . .

- 106 -

. . . The following describes in more specific terms the elements of compensation of executive officers for 2005:

\*   \*   \*

### Bonuses

Bonuses are typically used to reward and compensate the chief executive officer and other executive officers for achieving certain goals set by the compensation committee and to reward superior performance. For 2005, such goals, which were substantially achieved by the chief executive officer and the other executive officers, included quantitative and qualitative objectives relating to, among other things, the company's earnings, expense control, development pace, growth in revenue under management and team member development. In the first quarter of 2006, all of the executive officers were awarded cash bonuses in connection with the achievement of the goals for 2005 set by the compensation committee and other relevant criteria determined by the compensation committee.

### Stock-Based Incentive Compensation

\*   \*   \*

The compensation committee also considers stock options to be an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. **Stock options are granted by the compensation committee** at an exercise price equal to the market price of the common stock at the date of the grant. . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value for Sunrise's stockholders through appreciation of the stock price.

184.    Elsewhere the 2006 Proxy provided:

### REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the company's financial statements and reporting process, including its systems of internal controls. In fulfilling its oversight responsibilities, the audit committee has reviewed and discussed with management the audited financial statements in Sunrise's Annual Report on Form 10-K for the year ended December 31, 2005.

The audit committee has also reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those

audited financial statements with generally accepted accounting principles, their judgments as to the acceptability of the audited financial statements and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from Sunrise and its management, including the matters in the written disclosure received by the audit committee as required by the Independence Standards Board, and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2005 for filing with the Securities and Exchange Commission.

Respectfully Submitted,

Ronald V. Aprahamian, Chairman
Thomas J. Donohue
Craig R. Callen

185.    Sunrise's 2000, 2001, 2002 and 2003 Proxy Statements each sought and attained approval of Sunrise stockholders for its 2000-2003 Stock Option Plans. In this regard it stated:

- The board of directors had adopted the subject stock option plan, subject to approval of stockholders at the appropriate (next) annual meeting.

- The principal provisions of each stock option plan was summarized.

- The option exercise prices of options granted under the stock option plan were to be fixed by the stock option compensation committee when the options were granted. However, the per share option exercise price could not be less than the fair market value of Sunrise common stock on the date of grant.

- The purchase price of each share of stock subject to any option granted under the plans was to be fixed by the board and stated in each option agreement. "The Option Price shall be not less than 100 percent of the fair market value of a share of Stock on the date on which the Option is granted (as determined in good faith by the Board)."

- In the event that the stock is publicly traded in an established securities market, "in determining the fair market value of the Stock, the Board shall use the closing price of the Stock on such exchange in such market (the highest

such closing price if there is more than one such exchange or market) on the trading date immediately before the Option is granted."

186.    The statements in Sunrise's Proxy Statements and other SEC filings that stock options may not be granted at less than 100% of fair market value on the dates granted and that the plan was important to the Company because it was structured to ensure that the stock option compensation was tax deductible for the Company were false. The way the plan was actually run, top executives could pick the grant dates for their options – picking a date before the actual grant date to take advantage of a lower price ("backdating") or picking a date just before they knew the Company was about to release positive news which would boost the stock price ("spring-loading"). Thus, options were granted at less than fair market value on the date of the grant or by executives to themselves based on non-public corporate information. As a result, the stock option program exposed Sunrise to large tax liabilities and unrecorded and unreported employee compensation expense that caused its financial statements to be false.

187.    The statement that executives were awarded options at an exercise price which was the fair market value of the stock on the grant date was also false and misleading, as it failed to disclose that award dates were picked to coincide with a low stock price by way of "backdating" or "spring-loading." Furthermore, this statement was materially false and misleading because it failed to disclose that top insiders had authority to pick the grant date, i.e., exercise price of their options in violation of the stock option plans.

188.    The statements were also materially misleading because they failed to disclose that the options were priced at or near the lowest price possible. When an option is priced at an artificially low price, by "backdating" or "spring-loading," those granted options receive

windfall compensation even if performance goals are not met. They were also misleading because the executives' interests are not aligned with shareholders, as options granted with artificially low exercise prices by design are not contingent upon the long-term performance of the Company.

189.   The statements in the Proxy Statements were materially false and misleading because when the Company allowed the top officers to manipulate the exercise price for options, it did not align their interests with the shareholders at all. Nor did it provide them with an incentive to act in the *long-term* best interest of the Company. When options are granted at artificially low prices or just before good corporate news is announced, the Company does not need long-term success for the option holder to prosper. Indeed, they stood to make hundreds of millions if the stock price simply returned to the price it was at before the price decline or moved up as expected on good news they knew was coming, which they took full advantage of.

190.   The statements were also materially false and misleading to the extent that they did not disclose that option grants were backdated or spring-loaded. Furthermore, these statements were false and misleading because the Company failed to disclose that the top officers were permitted to manipulate the option grant process and had picked grant dates that were best for them and hurt the other shareholders.

191.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material

fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9(a).

192.    The Proxy Statements violated § 14(a) and Rule 14a-9 because they omitted material facts, including the fact that defendants were causing Sunrise to engage in an option backdating scheme, a fact which defendants were aware of and participated in from at least 1997.

193.    In the exercise of reasonable care, the Director Defendants should have known that the Proxy Statements were materially false and misleading.

194.    The misrepresentations and omissions in the Proxy Statements were material to plaintiffs in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of defendants' unlawful stock option manipulation scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies, including approval or ratification of the stock option plans.

195.    Sunrise shareholders were damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## FOURTH CLAIM FOR RELIEF

### For Violation of §20(a) of the Exchange Act Against
### Defendants P. Klaassen, T. Klaassen and Sunrise

196.    Plaintiffs incorporate ¶¶1-195 by reference.

197.    Defendants P. Klaassen and T. Klaassen acted as controlling persons of Sunrise within the meaning of §20(a) of the Exchange Act. By reason of their positions with the

Company, and their ownership of Sunrise stock, P. Klaassen and T. Klaassen had the power and authority to cause Sunrise to engage in the wrongful conduct complained of herein. Sunrise controlled all of its officers. By reason of such conduct, the defendants named herein are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding compensatory and punitive money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure defendants do not participate therein or benefit thereby;

C.      Awarding preliminary and permanent injunctive relief in favor of plaintiffs and the Class against defendants and all persons acting under, in concert with, or for them, including an accounting for and the imposition of a constructive trust and/or an asset freeze on defendants' ill-gotten gains;

D.      Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

E.      Ordering an accounting to force a complete accounting of all the stock options granted to Sunrise executives, the disposition and/or exercise of those options, and proceeds and profits obtained;

- 112 -

F.     Ordering the disgorgement of all stock option proceeds and/or profits obtained by Sunrise executives relating to all options issued pursuant to the polluted stock-option plans and which were improperly backdated;

G.     Ordering that all outstanding unexercised stock options held by defendants be cancelled or rescinded;

H.     Voiding all existing stock option plans, including all options, vested or unvested, which were issued pursuant to such plans;

I.     Ordering the implementation of an increased disclosure mechanism for the transparency of Sunrise's stock option practices, including semi-annual or annual disclosure of all options granted and exercised detailing the grant and exercise prices, dates, etc.;

J.     Ordering that the defendants personally bear their own legal fees in defending any and all claims arising out of these matters, whether asserted by stockholders or the government, and not be indemnified by the corporation or any insurance;

K.     Awarding plaintiffs reasonable costs and attorneys' fees; and

L.     Awarding such equitable, injunctive and/or other relief as the Court may deem just and proper.

# JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: January 16, 2007

CUNEO GILBERT & LaDUCA, LLP
JONATHAN W. CUNEO(DC Bar # 939389)
PAMELA GILBERT (DC Bar # 418207)


_____
JONATHAN W. CUNEO

507 C Street, N.E.
Washington, DC 20002
Telephone: 202/789-3960
202/789-0489 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
MATTHEW P. SIBEN
THOMAS G. WILHELM


_____
WILLIAM S. LERACH

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
NANCY M. JUDA (DC Bar # 445487)
1100 Connecticut Avenue, NW, Suite 730
Washington, DC 20036
Telephone: 202/822-0600
202/828-8528 (fax)

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Avenue, NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

SCHWARZWALD & McNAIR LLP
EBEN O. McNAIR IV
616 Penton Media Building
1300 East Ninth Street
Cleveland, OH  44114-1503
Telephone:  216/566-1600
216/566-1814 (fax)

Counsel for Plaintiffs

S:\CptDraft\Securities\cpt Sunrise Senior.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 880 –

RETAIL FOOD EMPLOYERS JOINT PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the
direction of plaintiff's counsel or in order to participate in this private action or any
other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in
the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a
class in an action filed under the federal securities laws except as detailed below
during the three years prior to the date of this Certification:

*UFCW Local 880 – Retail Food v. Newmont Mining Corp., et al.,* No. 05-CV-1046-MSK-BNB
(D. Colo.)
*Charatz v. Avaya, Inc., et al.,* No. 3:05-cv-02319-MLC-TJB (D.N.J.)
*In re Cooper Companies, Inc. Sec. Litig.,* No. SACV-06-00169-CJC(RNBx) (C.D. Cal.)

07 0102 **FILED**

JAN 1 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

6.    The Plaintiff will not accept any payment for serving as a representative
party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

SUNRISE SENIOR LIVING

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _127th_ day of _December_, 2006.

By: _Robert W. Gransog_

Its:  Trustee, United Food and Commercial
      Workers Union Local 880 - Retail
      Food Employers Joint Pension Fund

- 2 -

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 09/16/2005 | 400 | $31.48 |
| 09/19/2005 | 1,000 | $31.64 |
| 09/20/2005 | 800 | $31.45 |
| 09/22/2005 | 800 | $31.46 |
| 09/26/2005 | 400 | $31.98 |
| 09/27/2005 | 800 | $31.99 |
| 09/28/2005 | 400 | $31.97 |
| 10/03/2005 | 400 | $33.79 |
| 10/06/2005 | 1,900 | $31.91 |
| 11/03/2005 | 2,700 | $34.67 |
| 12/08/2005 | 1,100 | $35.05 |

*Opening position of 13,600 shares.

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

UNITED FOOD AND COMMERCIAL WORKERS UNION–EMPLOYER PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Charatz v. Avaya, Inc., et al.*, No. 3:05-cv-02319-MLC-TJB (D.N.J.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

SUNRISE SENIOR LIVING

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this *12TH* day of *December*, 2006.

By: *Robert W. Scammozy*

Its: Trustee, United Food and Commercial Workers Union-Employer Pension Fund

- 2 -

SUNRISE SENIOR LIVING

## SCHEDULE A

### SECURITIES TRANSACTIONS

#### Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
| --- | --- | --- |
| 09/16/2005 | 200 | $31.51 |
| 09/19/2005 | 600 | $31.67 |
| 09/20/2005 | 600 | $31.47 |
| 09/22/2005 | 400 | $31.49 |
| 09/26/2005 | 200 | $32.00 |
| 09/27/2005 | 600 | $32.01 |
| 09/28/2005 | 200 | $32.00 |
| 10/03/2005 | 400 | $33.82 |
| 10/06/2005 | 1,400 | $31.96 |
| 12/08/2005 | 800 | $35.10 |

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I.(a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United Food and Commercial Workers Union 880 - Retail Food Employers Joint Pension Fund & United Food and Commercial Workers Union-Employer Pension Fund, et al. | Sunrise Senior Living, Inc., et al. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Cleveland, OH
(EXCEPT IN U.S. PLAINTIFF CASES)  88888

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Fairfax Va
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Jonathan W. Cuneo, Esquire
Cuneo Gilbert & LaDuca, LLP
507 C Street, NE
Wash., DC 20002

ATTORNEYS

CASE NUMBER   1:07CV00102

JUDGE: Reggie B. Walton

DECK TYPE: General Civil

DATE STAMP: 01/16/2007

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF
FOR PLAINTIFF AND ONE

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| □ 410 Antitrust | □ 310 Airplane<br>□ 315 Airplane Product Liability<br>□ 320 Assault, Libel & Slander<br>□ 330 Federal Employers Liability<br>□ 340 Marine<br>□ 345 Marine Product Liability<br>□ 350 Motor Vehicle<br>□ 355 Motor Vehicle Product Liability<br>□ 360 Other Personal Injury<br>□ 362 Medical Malpractice<br>□ 365 Product Liability<br>□ 368 Asbestos Product Liability | □ 151 Medicare Act<br><br>**Social Security:**<br>□ 861 HIA ((1395ff)<br>□ 862 Black Lung (923)<br>□ 863 DIWC/DIWW (405(g)<br>□ 864 SSID Title XVI<br>□ 865 RSI (405(g)<br>**Other Statutes**<br>□ 891 Agricultural Acts<br>□ 892 Economic Stabilization Act<br>□ 893 Environmental Matters<br>□ 894 Energy Allocation Act<br>□ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ◉ E. General Civil (Other)     OR | ○ F. Pro Se General Civil |
|---|---|

| **Real Property**<br>□ 210 Land Condemnation<br>□ 220 Foreclosure<br>□ 230 Rent, Lease & Ejectment<br>□ 240 Torts to Land<br>□ 245 Tort Product Liability<br>□ 290 All Other Real Property<br><br>**Personal Property**<br>□ 370 Other Fraud<br>□ 371 Truth in Lending<br>□ 380 Other Personal Property Damage<br>□ 385 Property Damage Product Liability | **Bankruptcy**<br>□ 422 Appeal 28 USC 158<br>□ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>□ 535 Death Penalty<br>□ 540 Mandamus & Other<br>□ 550 Civil Rights<br>□ 555 Prison Condition<br><br>**Property Rights**<br>□ 820 Copyrights<br>□ 830 Patent<br>□ 840 Trademark<br><br>**Federal Tax Suits**<br>□ 870 Taxes (US plaintiff or defendant<br>□ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>□ 610 Agriculture<br>□ 620 Other Food &Drug<br>□ 625 Drug Related Seizure of Property 21 USC 881<br>□ 630 Liquor Laws<br>□ 640 RR & Truck<br>□ 650 Airline Regs<br>□ 660 Occupational Safety/Health<br>□ 690 Other<br><br>**Other Statutes**<br>□ 400 State Reapportionment<br>□ 430 Banks & Banking<br>□ 450 Commerce/ICC Rates/etc.<br>□ 460 Deportation | □ 470 Racketeer Influenced & Corrupt Organizations<br>□ 480 Consumer Credit<br>□ 490 Cable/Satellite TV<br>□ 810 Selective Service<br>☒ 850 Securities/Commodities/ Exchange<br>□ 875 Customer Challenge 12 USC 3410<br>□ 900 Appeal of fee determination under equal access to Justice<br>□ 950 Constitutionality of State Statutes<br>□ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)**<br><br>*(If pro se, select this deck)* | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions (if Privacy Act)**<br><br>*(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

○ 1 **Original Proceeding**    ○ 2 **Removed from State Court**    ○ 3 **Remanded from Appellate Court**    ○ 4 **Reinstated or Reopened**    ○ 5 **Transferred from another district (specify)**    ○ 6 **Multi district Litigation**    ○ 7 **Appeal to District Court from Mag. Judge**

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
Alleged Violations of the Federal Securities Laws  15 USC § 1350

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23 | **DEMAND $** above $100,000  Check YES only if demanded in complaint **JURY DEMAND:** YES ☒  NO ☐ |
|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐  /NO ☒    If yes, please complete related case form.

DATE  1/16/2007    SIGNATURE OF ATTORNEY OF RECORD  *Johnson W. Cur*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT  2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | X | |
| FIRST NEW YORK SECURITIES, L.L.C., 850 Third Avenue, New York, New York 10022, Individually and On Behalf of All Others Similarly Situated, | : : : : : | **Civil Action No.** <br><br> **CLASS ACTION** |
| Plaintiff, | : : | **JURY TRIAL DEMANDED** |
| vs. | : : : | |
| SUNRISE SENIOR LIVING, INC., PAUL J. KLAASSEN, THOMAS B. NEWELL, BRADLEY B. RUSH, RONALD V. APRAHAMIAN, J. DOUGLAS HOLLADAY, THOMAS J. DONOHUE, WILLIAM G. LITTLE, TERESA M. KLAASSEN, CRAIG R. CALLEN and J. BARRON ANSCHUTZ, | : : : : : : : : | |
| Defendants. | : X | |

# CLASS ACTION COMPLAINT FOR
# VIOLATIONS OF THE FEDERAL SECURITIES LAW

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ................................................................. 1

II.     JURISDICTION AND VENUE ............................................................... 4

III.    PARTIES ................................................................................................ 4

        A.      Plaintiff ..................................................................................... 4

        B.      Defendants ................................................................................ 5

        C.      Control Person Liability ........................................................... 8

        D.      Group Pleading ......................................................................... 9

        E.      Duties of Individual Defendants .............................................. 10

IV.     CLASS ACTION ALLEGATIONS ........................................................ 11

V.      FRAUD ON THE MARKET PRESUMPTION .................................... 13

VI.     THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE ............... 14

VII.    BACKGROUND AND FACTS .............................................................. 15

VIII.   DEFENDANTS' MATERIALLY FASLE AND MISLEADING
        STATEMENTS AND OMMISSIONS DURING THE CLASS PERIOD ...................... 17

IX.     THE TRUTH BEGINS TO EMERGE .................................................. 40

X.      POST CLASS PERIOD DEVELOPMENTS ........................................ 43

XI.     CAUSATION ALLEGATIONS ............................................................ 47

XII.    SCIENTER ALLEGATIONS ................................................................ 48

XIII.   SUNRISE'S GAAP VIOLATIONS ...................................................... 51

        A.      Sunrise Prematurely Recognized Income from Its Unconsolidated
                Senior Living Centers ............................................................... 53

        B.      Sunrise Improperly Accounted For Sales of Real Estate To Its
                Joint Venture Partners and Third Party Investors ..................... 54

        C.      Sunrise Improperly Accounted For Back-dated Stock Options ............ 55

D.      Defendants' Internal Control Violations..................................................... 58

COUNT I:  Violations of § 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder Against All Defendants................................... 59

COUNT II:  Violations of § 20(a) Of The Securities Exchange Act Of 1934
Against The Individual Defendants .............................................................. 61

COUNT III:  Violations Of § 20A Of The Securities Exchange Act Of 1934
Against The Section 20A Defendants............................................................ 62

COUNT IV:  For Violation of § 14(a) of the Exchange Act
Against the Director Defendants................................................................. 64

JURY DEMAND ...................................................................................... 66

1.      Plaintiff, First New York Securities, L.L.C. ("First New York" or "Plaintiff"), by its undersigned attorneys, for its Class Action Complaint (the "Complaint"), makes the following allegations against Defendants based upon an investigation conducted by and under the supervision of counsel for Plaintiff, which has included, among other things, review and analyses of: the public filings of Sunrise Senior Living, Inc. ("Sunrise" or the "Company"), including filings with the Securities and Exchange Commission ("SEC"); press releases issued by Defendants; news articles and analysts' reports concerning Defendants; and transcripts from conference calls Defendants held with analysts.

## I.      SUMMARY OF THE ACTION

2.      Plaintiff brings this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all similarly situated persons or entities (collectively, the "Class") who purchased Sunrise common stock from August 4, 2005 through and including June 15, 2006 (the "Class Period") and persons who owned Sunrise common stock at the time Sunrise's 2000 through 2006 Proxy Statements were circulated to shareholders in solicitation of their votes on various issues, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

3.      Prior to and throughout the Class Period, Sunrise engaged in a course of business which operated as a fraud and deceit on purchasers of the Company's securities. In particular, during the relevant period Sunrise issued a series of materially false and misleading statements and omitted material facts from its public disclosures concerning its financial performance and condition, falsely representing to investors that its equity in earnings in unconsolidated senior living properties were growing due to the Company's joint ventures. As investors would ultimately learn, however, Sunrise's statements were materially false and misleading because,

among other reasons, the Company failed to disclose that: (i) Sunrise was understating losses

from its minority interests in joint ventures in which Sunrise's partners received preferential

distributions; (ii) the Company was improperly accounting for gains on real estate sales in which

it provided guarantees and commitments to venture partners and third parties; and (iii) its

financial results were overstated due to option back-dating. Sunrise's false and misleading

statements caused the Company's common shares to trade at artificially inflated levels during the

Class Period, reaching as high as $39.49 per share on March 29, 2006.

4.    Over the past several years, Sunrise pursued an aggressive expansion program. In

order for the program to succeed, the Company had to at least appear to be consistently

achieving strong profits. The majority of Sunrise's new development activity and most of its

acquisitions were conducted through joint ventures in which Sunrise held a minority interest.

However, in order to attract joint venture partners, the Company had to offer those partners

preferential distributions and guarantees from the joint ventures because the senior living

facilities regularly suffered significant start-up losses and the Company had not yet established a

successful track record. Under applicable accounting rules, if Sunrise structured its joint

ventures with preferential distributions to partners, the Company was required to recognize

100% of the initial losses of the new facilities, rather than simply its minority share. In addition,

the applicable accounting principles required Sunrise to defer some or all of the income from the

sales of facilities if it provided financial guarantees in connection with those sales.

5.    Sunrise began to disclose its accounting problems on May 9, 2006, when it

announced that it was rescheduling its 2006 earnings release to allow additional time for review

of the accounting treatment applied to the Company's investments in unconsolidated senior

living communities. The next day, May 10, 2006, Sunrise further disclosed that its internal

review was focused on the allocation of profits and losses for a limited number of joint ventures where Sunrise was a minority partner and the capital partner received a preference. Thereafter, on May 11, 2006, Sunrise announced that as a result of its review, the Company decided to use a different methodology to allocate profits and losses in its joint ventures. Following the disclosure of the accounting review, the price of Sunrise common shares declined from $39.30 per share on May 8, 2006, to $32.35 per share on May 9, 2006, and continued to decline throughout the remaining Class Period, erasing over $300 million in shareholder value.

6.      As a result of Sunrise's accounting problems described above, the Company announced it would have to restate its financial results for periods as far back as 1999 through 2005. The estimated $100 million restatement will require the Company to record additional losses in prior periods for the joint ventures with preferential distributions and to defer and/or not achieve income from the sale of real estate with guarantees or commitments.

7.      The Company's false and misleading statements concerning its earnings and growth and the resulting artificial inflation of Sunrise common shares allowed Sunrise executives to personally profit through substantial insider selling. In the aggregate, Sunrise executives sold approximately 990,576 shares of Sunrise common stock for an illegal profit of more than $37 million.

8.      In addition, as a result of its improper accounting practices, Sunrise is currently the subject of multiple ongoing investigations by the SEC. In this regard, on August 8, 2006, Sunrise announced that the SEC had requested information regarding the method used for determining Sunrise's share of equity in earnings and losses and its interpretation of certain accounting principles. Thereafter, on December 11, 2006, Sunrise announced that the SEC had

requested information regarding the Company's stock option grant practices and the insider trading of its executives.

## II.    JURISDICTION AND VENUE

9.    This action arises under Sections 10(b), 20(a), 20A and 14(a) of the Exchange Act, as amended, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), 78(t)-1(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.    Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the dissemination of materially false and misleading statements in connection with the sale of a security, occurred in substantial part in this district. Sunrise filed false and misleading SEC filings in this district and has four communities in operation or under development in Washington, D.C. Furthermore, the Individual Defendants conduct business in this district.

12.    In connection with the acts alleged in this Complaint, Sunrise, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, internet communications and the facilities of the New York Stock Exchange ("NYSE") market.

## III.    PARTIES

### A.    Plaintiff

13.    Plaintiff, First New York, as set forth in the accompanying certification, incorporated by reference herein, purchased Sunrise common stock at artificially inflated prices during the Class Period and has been damaged thereby.

**B.    Defendants**

14.    Defendant Sunrise, founded in 1981 by Paul and Teresa Klaassen, is a public company incorporated under the laws of Delaware, maintaining its principal executive offices at 7902 Westpark Dr., McLean, VA 22102. Sunrise common stock is actively traded on the NYSE under the symbol SRZ. The Company describes itself as "one of the nation's premier providers of senior living services" that "currently operates more than 420 senior living communities in 37 states, the District of Columbia, Canada, the United Kingdom and Germany."

15.    Defendant Paul J. Klaassen ("P. Klaassen"), was at all relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Chairman"). P. Klaassen made materially false and misleading public statements during the Class Period in Company press releases, conference calls with analysts and in Sunrise's public filings with the SEC. During the Class Period, P. Klaassen sold approximately 600,000 shares of Sunrise common stock for proceeds of approximately $21,421,000, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by P. Klaassen.

16.    Defendant Bradley B. Rush ("Rush") was, at all relevant times, the Company's Chief Financial Officer ("CFO"). Defendant Rush also made materially false and misleading public statements during the Class Period in the Company's public filings with the SEC. During the Class Period, Defendant Rush sold approximately 6,937 shares of Sunrise common stock for proceeds of approximately $432,144, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Rush.

5

17.    Defendant Thomas B. Newell ("Newell") was, at all relevant times, the Company's President. Defendant Newell also made materially false and misleading public statements during the Class Period in Company press releases, conference calls with analysts and in Sunrise public filings with the SEC. During the Class Period, Defendant Newell sold approximately 192,000 shares of Sunrise common stock for proceeds of approximately $7,399,080, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Newell.

18.    Defendant J. Douglas Holladay ("Holladay") was, at all relevant times, a director on the Company's Board of Directors ("BOD"). Defendant Holladay also made public statements during the Class Period in Sunrise's public filings with the SEC. During the Class Period, Defendant Holladay sold approximately 27,000 shares of Sunrise common stock for proceeds of approximately $1,259,000, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Holladay.

19.    Defendant Thomas J. Donohue ("Donohue") was, at all relevant times, a director on the Company's BOD, Chairman of the Compensation Committee and a member of the Audit Committee. Defendant Donohue also made public statements during the Class Period in the Company's public filings with the SEC. During the Class Period, Defendant Donahue sold approximately 102,666 shares of Sunrise common stock for proceeds of approximately $3,392,085, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Donahue.

20.     Defendant Ronald V. Aprahamian ("Aprahamian") was, at all relevant times, a director on the Company's BOD and Chairman of the Audit Committee.  Defendant Aprahamian also made public statements during the Class Period in the Company's public filings with the SEC.  During the Class Period, Defendant Aprahamian sold approximately 20,000 shares of Sunrise common stock for proceeds of approximately $757,000, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Aprahamian.

21.     Defendant J. Barron Anschutz ("Anschutz") was, at all relevant times, the Company's Chief Accounting Officer ("CAO").  Defendant Anschutz also made public statements during the Class Period in Sunrise's public filings with the SEC.  During the Class Period, Defendant Anschutz sold approximately 5,000 shares of Sunrise common stock for proceeds of approximately $194,767, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Anschutz.

22.     Defendant William G. Little ("Little") was, at all relevant times, a director on the Company's BOD.  Defendant Little also made public statements during the Class Period in the Company's public filings with the SEC.

23.     Defendant Teresa M. Klaassen ("T. Klaassen") was, at all relevant times, a director on the Company's BOD.  Defendant T. Klaassen also made public statements during the Class Period in Sunrise's public filings with the SEC.  During the Class Period, T. Klaassen sold approximately 600,000 shares of Sunrise common stock for proceeds of approximately $21,421,000, while privy to material, non-public information, which had not been disclosed to

7

the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by T. Klaassen.

24.     Defendant Craig R. Callen ("Callen") was, at all relevant times, a director on the Company's BOD and a member of the Audit and Compensation Committees.  Defendant Callen also made public statements during the Class Period in the Company's public filings with the SEC.

25.     Defendants P. Klaassen, Rush, Newell, Holladay, Donohue, Aprahamian, Anschutz, Little, T. Klaassen and Callen are referred to collectively herein as the "Individual Defendants."

26.     Defendants P. Klaasen, Rush, Newell, Holladay, Donohue, Aprahamian, Anschutz and T. Klaassen are referred to collectively herein as the "Section 20A Defendants."

27.     The Defendants who were directors of Sunrise are referred to herein as the "Director Defendants."

**C.     Control Person Liability**

28.     During the Class Period, the Individual Defendants, as senior executive officers and directors of Sunrise, were privy to confidential and proprietary information concerning Sunrise and its business, operations, performance and prospects, including its compliance with applicable federal, state and local laws and regulations.  Because of their high-level positions with Sunrise, the Individual Defendants had regular access to non-public information about its business, operations, performance and prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and the Company's BOD, and committees thereof, and reports and other information provided to them in connection therewith.

29.    Because of their possession of the information described above, the Individual Defendants knew, or recklessly disregarded that the Company's earnings were inflated as a result of its improper accounting for its minority interests in joint ventures, real estate sales and stock options.  Accordingly, Defendants knew, or recklessly disregarded that the statements complained of herein were materially false and misleading when made.

30.    Each of the Defendants is liable as a direct participant and primary violator with respect to the wrongdoing complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and directors, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly and indirectly, control the conduct of Sunrise's business.

31.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the content of the various SEC filings, press releases and other public statements made by the Company during the Class Period.  By reason of their respective high-level management and Board positions, the Individual Defendants had the ability and opportunity to review copies of Sunrise's SEC filings, reports and press releases alleged herein to be materially misleading, prior to, or shortly after their issuance, and to prevent their issuance or cause them to be corrected.

**D.    Group Pleading**

32.    The Individual Defendants are liable for the materially false and misleading statements pleaded herein that were issued by or in the name of the Company, as those statements were each "group-published" information, the result of the collective actions of the

Individual Defendants, each of whom was intimately involved in the day-to-day operations of Sunrise. It is appropriate to treat the Individual Defendants as a group and to presume that the public filings, press releases and other public statements complained of herein, are the product of the collective actions of the narrowly defined group of Individual Defendants. The Individual Defendants, by virtue of their high-level positions within Sunrise, directly and actively participated in the management and day-to-day operations of the Company, and were privy to confidential non-public information concerning the business and operations of Sunrise. In addition, the Individual Defendants were involved in drafting, reviewing and/or disseminating the materially false and misleading statements issued by Sunrise and approved or ratified those statements, and, therefore, adopted them as their own.

## E.    Duties of Individual Defendants

33.    Each of the Individual Defendants had the duty to make full, candid and timely disclosures of all material facts relating to the business, operations, performance and prospects of Sunrise. Among other things, Defendants were required to:

- conduct and supervise the business of Sunrise in accordance with all applicable laws and regulations;

- supervise the preparation of the Company's SEC filings and approve any reports concerning the financial reporting and results of Sunrise;

- ensure that Sunrise established and followed adequate internal controls; and

- refrain from obtaining personal benefit, at the expense of the public purchasers of Sunrise common stock, by misusing proprietary non-public information.

34.    As senior officers and controlling persons of a publicly-held Company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information

with respect to the Company's performance, operations, business, and prospects, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

35.     As a result of Defendants' failure to fulfill the foregoing obligations, Sunrise's common stock was artificially inflated during the Class Period. In response to the emergence of the truth, Sunrise's common stock fell precipitously. As a direct and proximate result of Defendants' wrongdoing, Plaintiff and other Class members were damaged.

## IV.     CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of persons who purchased Sunrise common stock during the Class Period (or their successors in interest). Excluded from the Class are the Defendants named herein, members of the immediate families of the Defendants, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of any such excluded person.

37.     The Class is so numerous that joinder of all members is impracticable. During the Class Period, there were more than 50 million shares of Sunrise common stock issued and outstanding. Sunrise shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of geographically dispersed Class members. Record owners and Class members can be identified from records maintained by Sunrise or its

transfer agent and can be notified of the pendency of this action by mail and publication, using forms of notice similar to those customarily used in securities class actions.

38. Plaintiff's claims are typical of the members of the Class, because Plaintiff and all of the Class members sustained damages arising from the same wrongful conduct complained of herein.

39. Plaintiff will fairly and adequately protect the interests of the members of the Class, and Plaintiff has no interests which are contrary to, or in conflict with, the interests of the Class members that they seek to represent. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to ensure such protection, and intends to prosecute this action vigorously.

40. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that, Defendants have acted on grounds generally applicable to the entire Class. The questions of law and fact common to the Class include:

- whether Defendants' acts violated the federal securities laws as alleged herein;

- whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

- whether Defendants participated in and pursued the common course of conduct complained of herein;

- whether Defendants acted with scienter in omitting and/or misrepresenting material facts;

- whether the price of Sunrise common stock was artificially inflated during the Class Period as a result of the material misrepresentations and omissions complained of herein;

- whether Defendants P. Klaasen, Rush, Newell, Holladay, Donohue, Aprahamian, Anschutz, Little, T. Klaassen and Callen were controlling persons as alleged herein; and

- whether members of the Class have sustained damages and, if so, the proper measure of such damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually seek redress for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.    FRAUD ON THE MARKET PRESUMPTION

42.    At all relevant times, the market for Sunrise common stock was an efficient market for the following reasons, among others:

(a)    Sunrise's common stock was listed and actively traded on the NYSE, a highly efficient national market, with more than 50 million shares issued and outstanding and public trading float of 44.33 million shares;

(b)    As a registered and regulated issuer of securities, Sunrise filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint;

(c)    Sunrise regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services; and

(d)    Sunrise was followed by several different securities analysts employed by

major brokerage firms, including Avondale Partners LLC, Citigroup, Inc., Davenport &

Company LLC, Friedman, Billings Ramsey Group, Inc., Jefferies & Co., Inc., Lehman

Brothers, Inc., Stifel Nicolaus & Company, Inc. and William Blair & Company, which

followed Sunrise's business and wrote reports which were distributed to the sales force

and customers of their respective brokerage firms. Those reports were publicly available

and affected the public marketplace.

43.    As a result of the above, the market for Sunrise common stock promptly digested

current information with respect to the Company from all publicly available sources and

reflected such information in the security's price. Under these circumstances, all purchasers of

Sunrise common stock during the Class Period suffered similar injuries through their purchases

of shares at prices which were artificially inflated by the Defendants' misrepresentations and

omissions. Thus, a presumption of reliance applies.

## VI.    THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE

44.    The statutory safe harbor provided for forward-looking statements under the

Private Securities Litigation Reform Act of 1995 ("PSLRA"), which applies to forward-looking

statements, does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sunrise who knew that those statements were materially false when made.

## VII.    BACKGROUND AND FACTS

45.    Sunrise is one of the largest providers of senior living services, offering a full range of senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing and rehabilitative care.

46.    Sunrise was founded by Paul and Teresa Klaassen in 1981, and was intended to redefine senior living in America. Sunrise has been pursuing an aggressive growth strategy and has grown quickly to currently operate more than 420 senior living communities in 37 states, the District of Columbia, Canada, the United Kingdom and Germany with a combined resident capacity of more than 52,000. In furtherance of its growth strategy, Sunrise has over 46 communities under construction.

47.    In recent years, Sunrise has moved to a management services business model. This business model provides opportunities for Sunrise to generate income in three different ways: (i) before a community is open, Sunrise generates fees by providing pre-opening services, including feasibility studies, site selection, architectural and interior design services, zoning, permitting, construction and project management, staffing, training, sales and marketing; (ii) after a community is open, Sunrise earns management fees from the long-term management contracts in place; and (iii) during the years of long-term management, the Company generates attractive returns for shareholders through their percentage ownership in these communities and from the incentives that they receive when those ventures exceed performance thresholds.

According to Sunrise's President, Thomas Newell, the business model has allowed the Company to maintain and increase its pace of development of new, purpose-built communities, and freed the Company from having to make acquisitions for growth.

48.     During its period of growth, Sunrise has engaged in joint ventures with capital partners in senior living communities. Sunrise is a minority partner in some ventures, owning an average of 20% of the community. In those ventures, the capital, or majority, partner receives certain preferences. Those preferences include cash flow preferences and preferential distributions on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties. Currently, approximately 15% of Sunrise's communities are held by joint ventures that contain such preferences. At any given time, the Company typically has many ventures in many stages, some newly formed, some with mature properties and some refinancing and selling their interests. Sunrise typically accounted for initial losses from these joint ventures by using only their minority share. However, because the capital partners received preferential distributions, the Company was required to absorb all of the initial losses, not just its minority share of the losses, which was Sunrise's previous accounting policy.

49.     In addition, when Sunrise sells real estate to its venture partners or to third parties, it provides guarantees and commitments. These guarantees and commitments have included construction completion, operating cash flow deficit guarantees to lenders and ventures, limited guarantees of net operating income and certain limited debt guarantees. As a result of these guarantees and commitments, the transactions can not be immediately accounted for as a sale, as Sunrise historically has done.

50.     Sunrise has also engaged in stock option back-dating, which occurs when a company manipulates the grant date of an option so it appears to be granted on a date when the

market price of the company's stock is lower than the market price on the actual grant date. This improper back-dating results in option grants with lower exercise prices that improperly increases the value of the options, giving the recipients instant ill-gotten profits. Back-dating constitutes to a violation of accounting rules as well as federal securities laws. According to Generally Accepted Accounting Principles ("GAAP"), if the market price on the date of the grant exceeds the exercise price of the options, the company must recognize the difference as an expense, thereby reducing the company's net income. Accordingly, the Defendants' back-dating of stock options resulted in the Company issuing materially misleading financial statements that understated expenses and overstated net profit.

## VIII.   DEFENDANTS' MATERIALLY FASLE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

51.     On April 14, 2000, Sunrise filed a Form DEF-14A Proxy Statement with the SEC. Sunrise circulated the Proxy Statement to shareholders which stated in relevant part:

> **STOCK OPTIONS**
>
> Stock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. ***Stock options are granted by the stock option committee at an exercise price equal to the market price of the common stock at the date of the grant*** . . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

(Emphasis added).

52.     The April 14, 2000 Proxy Statement was materially false and misleading because it failed to disclose that: (a) the Company was engaging in stock option back-dating, in violation of GAAP and the Company's own internal accounting policies; and (b) top officers were

17

permitted to manipulate the option grant process and had picked grant dates that were most

advantageous to them.

53.    On March 29, 2001, Sunrise filed a Form DEF-14A Proxy Statement with the

SEC.  The Proxy Statement, which was circulated to shareholders, stated in relevant part:

### COMPENSATION OF EXECUTIVE OFFICERS

The compensation policies of Sunrise are designed to enable
Sunrise to attract, motivate and retain experienced and qualified
executives.  Sunrise seeks to provide competitive compensation.
Sunrise's policy has been to provide a significant component of an
executive officer's compensation through the grant of stock
options.  Sunrise believes that grants of stock options to
executives, as well as to employees generally, help align the
interests of these persons with the interests of Company's
stockholders.

The following describes in more specific terms the
elements of compensation of executive officers for 2000:

* * *

### STOCK OPTIONS

Stock options are considered an effective long-term
incentive because gains are linked to increases in the stock value,
which in turn provides stockholder gains.  ***Stock options are
granted by the stock option committee at an exercise price equal
to the market price of the common stock at the date of the grant.***

(Emphasis added).

54.    The March 29, 2001 Proxy Statement was materially false and misleading for the

reasons set forth above in paragraph 52.

55.    On April 5, 2002, Sunrise filed a Form DEF-14A Proxy Statement with the SEC.

Sunrise circulated the Proxy Statement to shareholders which stated in relevant part:

### COMPENSATION OF EXECUTIVE OFFICERS

The compensation policies of Sunrise are designed to
enable Sunrise to attract, motivate and retain experienced and

qualified executives. Sunrise seeks to provide competitive compensation. Sunrise's policy has been to provide a significant component of an executive officer's compensation through the grant of stock options. *Sunrise believes that grants of stock options to executives, as well as to employees generally, help align the interests of these persons with the interests of Company's stockholders . . . .*

(Emphasis added).

56.     The April 5, 2002 Proxy Statement was materially false and misleading for the

reasons set forth above in paragraph 52.

57.     On April 9, 2003, Sunrise filed a Form DEF-14A Proxy Statement with the SEC.

The Proxy Statement, which was circulated to shareholders, stated in relevant part:

**STOCK OPTIONS**

Stock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options were granted by the stock option committee, and are now granted by the compensation committee, at *an exercise price equal to the market price of the common stock at the date of the grant* . . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

\* \* \*

**REPORT OF THE AUDIT COMMITTEE**

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the financial statements and the reporting process, including the systems of internal controls. In fulfilling its oversight responsibilities, the audit committee reviewed the audited financial statements in the Annual Report on Form 10-K for the year ended December 31, 2002 with management, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements.

The audit committee has reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the quality, not just the acceptability, of Sunrise's accounting principles and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from management and Sunrise, including the matters in the written disclosure required by the Independent Standards Board and considered the compatibility of nonaudit services with the auditors' independence.

The audit committee discussed with Sunrise's independent auditors the overall scope and plans for their respective audits. The audit committee meets with the independent auditors, with and without management present, to discuss the results of their examinations, their evaluations of the Sunrise's internal controls, and the overall quality of Sunrise's financial reporting. The audit committee held four meetings during fiscal year 2002.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2002 for filing with the Securities and Exchange Commission.

> Respectfully Submitted,
> Ronald V. Aprahamian, Chairman
> Thomas J. Donohue
> David G. Bradley

(Emphasis added).

58.    The April 9, 2003 Proxy Statement was materially false and misleading because Sunrise failed to disclose that:

(a)    the Company underreported its losses from joint ventures in which partners receive a preference;

(b)    the Company improperly accounted for gains on real estate sales in which it provided guarantees and commitments to venture partners and third parties;

(c)     the Company engaged in stock option back-dating, in violation of GAAP and the

Company's own policies;

(d)     top officers were permitted to manipulate the option grant process and had picked

grant dates that were most advantageous to them;

(e)     the Company's financial statements were not in compliance with GAAP; and

(f)     the Company's business outlook, when reported, lacked any reasonable basis.

59.     On April 19, 2004, Sunrise filed a Form DEF-14A Proxy Statement with the SEC.

Sunrise circulated the Proxy Statement to shareholders which stated in relevant part:

**STOCK-BASED COMPENSATION**

The compensation committee considers stock options to be
an effective long-term incentive because gains are linked to
increases in the stock value, which in turn provides stockholder
gains. Stock options are granted by the compensation committee,
*at an exercise price equal to the market price of the common
stock at the date of the grant* . . . . The full benefit of the options
is realized upon appreciation of the stock price in future periods,
thus providing an incentive to create value to Sunrise's
stockholders through appreciation of the stock price.

\* \* \*

**REPORT OF THE AUDIT COMMITTEE**

The audit committee oversees Sunrise's financial reporting
process on behalf of the board of directors. Management has the
primary responsibility for the financial statements and the
reporting process, including the systems of internal controls. In
fulfilling its oversight responsibilities, the audit committee has
reviewed and discussed with management the audited financial
statements in Sunrise's Annual Report on Form 10-K for the year
ended December 31, 2003.

The audit committee has reviewed with the independent
auditors, who are responsible for expressing an opinion on the
conformity of those audited financial statements with generally
accepted accounting principles, their judgments as to the
acceptability of the audited financial statements and such other
matters as are required to be discussed with the audit committee

21

under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from management and Sunrise, including the matters in the written disclosure required by the Independent Standards Board and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussion referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2003 for filing with the Securities and Exchange Commission.

> Respectfully Submitted,
> Ronald V. Aprahamian, Chairman
> Thomas J. Donohue
> David G. Bradley

(Emphasis added).

60.    The April 19, 2004 Proxy Statement was materially false and misleading for the reasons set forth above in paragraph 58.

61.    On April 7, 2005, Sunrise filed a Form DEF-14A Proxy Statement with the SEC. The Proxy Statement, which was circulated to shareholders, stated in relevant part:

**STOCK-BASED COMPENSATION**

The compensation committee considers restricted stock and restricted stock units to be an effective long-term incentive for individuals as it provides them with an opportunity to acquire or increase their proprietary interest in the company and encourages key individuals to continue to serve the company long-term. The full benefit of the restricted stock or restricted stock unit grant is realized upon the appreciation of Sunrise's stock price, providing an incentive for key employees to create value for Sunrise's stockholders through their service to Sunrise. The compensation committee believes that restricted stock and restricted stock units have and will continue to be helpful in attracting and retaining skilled executive personnel.

The compensation committee also considers stock options to be an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder

gains. Stock options are granted by the compensation committee at *an exercise price equal to the market price of the common stock at the date of the grant . . . . The full benefit of the options is realized upon appreciation of the stock price in future periods*, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

\* \* \*

## REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the company's financial statements and reporting process, including its systems of internal controls. In fulfilling its oversight responsibilities, the audit committee has reviewed and discussed with management the audited financial statements in Sunrise's Annual Report on Form 10-K for the year ended December 31, 2004.

The audit committee has also reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the acceptability of the audited financial statements and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from Sunrise and its management, including the matters in the written disclosure received by the audit committee as required by the Independence Standards Board, and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2004 for filing with the Securities and Exchange Commission.

> Respectfully Submitted,
> Ronald V. Aprahamian, Chairman
> Thomas J. Donohue
> Craig R. Callen

(Emphasis added).

62.     The April 7, 2005 Proxy Statement was materially false and misleading for the reasons set forth above in paragraph 58.

63.     On August 4, 2005, Sunrise issued a press release announcing financial results for the Second Quarter of 2005, entitled "Sunrise Reports Second-Quarter 2005 EPS of $0.46 and Raises Full-Year 2005 Outlook." The press release, "*referring to growth in equity in earnings on investments in unconsolidated senior living properties*," stated in relevant part:

> "We are extremely pleased with the results we are reporting today," said Paul Klaassen, Sunrise Senior Living chairman and CEO. "We are benefiting from our typical growth drivers which include revenue growth in our operating portfolio of management properties, additional community openings and new construction, and we expect our recent acquisitions to further fuel our growth in the second-half of 2005 and for the full-year 2006."
>
> \* \* \*
>
> "At the end of the quarter, we have minority equity interests in 132 communities held in joint ventures, with a balance sheet investment book value of over $108 million," said Thomas Newell, president, Sunrise Senior Living. "*Since a substantial majority of our new development activity, most of our acquisitions, are being conducted through joint ventures, we expect our minority equity investments to continue to grow. We participate in the earnings of the joint ventures communities based on our percentage ownership and we also expect to continue to receive incentives as these ventures exceed performance thresholds. As a result, we expect to see substantial growth in our income from earnings and returns on equity investments going forward.*

(Emphasis added).

64.     The August 4, 2005 press release was materially false and misleading for the same reasons stated above in paragraph 58.

65.     Later that morning, Sunrise held a conference call with analysts to discuss the Company's business and its financial results. During the call, the following exchange occurred:

[**P. Klaassen – CEO:**]  We had an excellent second quarter.  Virtually every segment performed at or above expected levels.  As a result we have a significant increase in core earnings which were defined as total earnings excluding income from property sales and acquisitions transition expenses . . . .  We have now met or exceeded our expectations every quarter for the past six years and we continue that unbroken streak in the second quarter.  *We significantly exceeded the high end of our guidance range.  In hindsight our forecast is probably a bit conservative as we outperformed . . . earnings from joint ventures . . .*

* * *

[**Question:**]  One of the things that drove number for the quarter I guess was unexpected on my part, was the equity in earnings line.  I understand that some of those were incentive fees related to sale.  I was wondering if you can give color exactly on the transaction but quarter?  And if you can give us any help on thinking about projecting that on a go forward basis, additional sales and incentive fees that we might see?

[**P. Klaassen:**]  The transaction on the quarter I will not break down too much.  We negotiate these things every day and night to not want to hurt ourselves and those negotiations by giv[ing] too much information on it.  We try to make the best deal that we can, you could see the growth that occurred in that line item, it gives to the idea of the range.  For competitive reasons I do not want to get too detailed . . . .  All I can say is that those investments are long-term.  We're happy with the structure.  We think those are good investments.  The money was spent wisely and we think over the long-term they will pay off.

66.    The statements made in the August 8, 2006 conference call were materially false and misleading for the reasons stated above in paragraph 58.

67.    The next day, on August 9, 2005, Sunrise filed its Second Quarter 2005 10-Q Report with the SEC.  The Second Quarter 2005 10-Q, which was signed by Rush and Anschutz, stated in relevant part:

| | Three months ended 6/30 | | Six months ended 6/30 | |
| | 2005 | 2004 | 2005 | 2004 |
|---|---|---|---|---|
| Income from operations | $12,358 | $22,184 | $22,966 | $43,307 |
| Equity in earnings and return on investment in unconsolidated | $3,696 | $2,072 | $5,220 | $3,740 |

| senior living properties | | | | |
| --- | --- | --- | --- | --- |
| Net income | $10,338 | $15,132 | $18,350 | $29,063 |
| Diluted net income per common share | $0.46 | $0.66 | $0.82 | $1.26 |

68.    The Second Quarter 2005 10-Q Report also stated the following:

**Stock-Based Compensation**

Stock options are granted for a fixed number of shares to employees *with an exercise price equal to the fair market value of the shares at the date of the grant.*  Sunrise accounts for stock-based compensation using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), and accordingly, *does not recognize compensation expense for stock option grants . . .*

* * *

**Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Sunrise's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e).  *Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at June 30, 2005.*  In connection with the evaluation by management…no changes in Sunrise's internal controls over financial reporting during the quarter ended June 30, 2005 were identified that have materially affected or are reasonably likely to materially affect Sunrise's internal control over financial reporting.

(Emphasis added).

69.    The Second Quarter 2005 10-Q Report also contained the following Sarbanes-

Oxley certifications, signed by P. Klaassen and Rush:

I, [Paul J. Klaassen/Bradley B. Rush], certify that:

1. I have reviewed this quarterly report on Form 10-Q of Sunrise Senior Living, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made. in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2005          [Paul J. Klaassen
                              Chief Executive Officer

                              Bradley B. Bush
                              Chief Financial Officer]

*   *   *

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
AND CHIEF FINANCIAL OFFICER PURSUANT
TO SECTION 906 OF THE SARBANES-OXLEY
ACT OF 2002 (18 U.S.C. SECTION 1350)**

The undersigned, the Chief Executive Officer and the Chief Financial Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

> (a) the Quarterly Report on Form 10-Q of the Company for the Period Ended June 30, 2005 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

> (b) information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Paul J. Klaassen
Paul J. Klaassen

Chief Executive Officer
Date: August 9, 2005

/s/ Bradley B. Rush
Bradley B. Rush
Chief Financial Officer
Date: August 9, 2005

70.     The Second Quarter 2005 10-Q Report was materially false and misleading for the reasons stated above in paragraph 58. In addition, the statements in the Company's 10-Q above were false and misleading because:

(a)     Defendants violated Section 303 of Regulation S-K and Rule 10b-5 by misrepresenting their financial statements and business prospects, when defendants knew or recklessly disregarded that they were engaging in a scheme to defraud investors by inflating earnings through improper accounting for minority interest in joint ventures, real estate sales and stock options.

(b)     the Company violated the Sarbanes-Oxley Act of 1934 ("Sarbanes-Oxley") by issuing the false certification above; and

(c)     the Company violated Section 13(b)(2)(B) of the Exchange Act by misrepresenting the Sunrise maintained adequate internal controls, when, in fact, Sunrise's internal controls were severely deficient, allowing defendants to engage in a scheme whereby they were able to inflate earnings through improper accounting for joint ventures and stock options. Moreover, Sunrise's utter lack of controls resulted in severe inaccuracies in the Company's reporting financial statements.

71.    On November 8, 2005, the Company issued a press release, entitled "Sunrise Reports Third-Quarter 2005 Results and Re-Affirms Full Year 2005 Earnings Guidance," which stated in relevant part:

> Sunrise Senior Living, Inc. today reported third-quarter 2005 earnings per share of $0.24 (diluted) compared to $0.21 (diluted) per share in the third quarter 2004. *The 14 percent increase in third-quarter, year-over-year earnings per share reflects . . . growth in equity in earnings and return on investments in unconsolidated senior living properties.*
>
> * * *
>
> *Sunrise's income from equity in earnings and return on investments in unconsolidated senior living properties increased to $7.8 million in the third quarter of 2005 from $2.1 million in the prior year period primarily as a result of a transaction in which a venture partner sold its equity portion of 13 senior living communities.* Through this transaction, Sunrise's ownership interest in the venture increased to 25 percent from 20 percent and Sunrise received performance inventive distributions under the terms of the venture agreement. Sunrise venture agreements typically include provisions rewarding Sunrise through various performance incentives. Sunrise continues to manage these 13 senior living communities under long-term management contracts.
>
> *"We continue to benefit from our management services business model and our minority equity investments in unconsolidated properties,"* said Thomas Newell, president, Sunrise Senior Living. "At the end of the third quarter, we had minority equity investments in 152 communities in unconsolidated ventures with a balance sheet investment book value of $128 million . . . . We have set a long-term target to earn a 15 percent annual return on our investments in unconsolidated senior living properties."

(Emphasis added).

72.    The November 8, 2005 press release was materially false and misleading for the reasons stated above in paragraph 58.

73.    Later that morning, Sunrise held a conference call with analysts to discuss the Company's earnings. During the call, the following occurred:

**[P. Klaassen, CEO:]** Our income statement, balance sheet and cash flow are all in excellent shape and ready to support a very strong '06 outlook. Our growth drivers are producing consistent with our expectations and as a result we are able to report earnings per share excluding acquisition transition and hurricane related expenses of $0.26 a share in 2003 after our two for one stock split. . . . ***As anticipated, we also continued to benefit from growth in our equity and earnings line.*** Our 152 joint venture communities are making substantial contributions to our growth through our percentage ownership in these communities . . . . We target a 15% annual return on our $128 million investment in these unconsolidated senior living properties. And we expect to continue to benefit from our percentage ownership in these joint venture communities for many years to come.

* * *

**[Question:]** I want to ask a little bit about equity and earnings and guidance. The equity and earnings bounces around a little bit because you're selling properties. You have various things coming in. I wanted to see if we could get additional guidance on that beyond what you provided and clarify maybe what your own assumptions are say in '05, '06 numbers for that.

**[Newell - President:]** . . . We have given a target long-term of 15% earnings on the $128 million we invested. That's through 152 properties and joint ventures and it is lumpy as you said because included in that line will be start of - startup losses from homes in development ventures as they open. As they ramp up then, we begin to share in the earnings and cash from those joints ventures. As performance hurdles are met, we begin to share disproportionately which is what you saw in this quarter and last quarter as investor partners received distributions in excess of the hurdles we generate substantial returns. Our assumptions internally that over time from those investments we will hit a 15% irr. We model out all 152 communities over a long period of time and calculate that in our guidance. It's very difficult to predict out more than one or two quarters. We have a sense of what's coming and we do our best and giving guidance what we are very confident of these are very good investments and communities that are performing very well. For the long run for Sunrise, we will generate a great return on that.

(Emphasis added).

74. The statements in the November 8, 2005 were false and misleading for the same reasons stated above in paragraph 58.

75. The next day, November 9, 2005, Sunrise filed its Third Quarter 2005 10-Q Report with the SEC. The Third Quarter 2005 10-Q, stated in relevant part:

|  | Three months ended 9/30 | | Six months ended 9/30 | |
|---|---|---|---|---|
|  | **2005** | **2004** | **2005** | **2004** |
| Income from operations | $9,395 | $11,821 | $32,361 | $55,130 |
| Equity in earnings and return on investment in unconsolidated senior living properties | $7,801 | $2,095 | $13,021 | $5,834 |
| Net income | $11,049 | $8,912 | $29,379 | $37,975 |
| Diluted net income per common share | $0.24 | $0.21 | $0.66 | $0.84 |

The Third Quarter 2005 10-Q Report also stated:

**Stock-Based Compensation**

Stock options are granted for a fixed number of shares to employees *with an exercise price equal to the fair market value of the shares at the date of the grant.* Sunrise accounts for stock-based compensation using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"). and accordingly, *does not recognize compensation expense for stock option grants . . .*

\* \* \*

**Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Sunrise's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). *Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at September 30, 2005.* In connection with the evaluation by management . . . no changes in Sunrise's internal controls over financial reporting during the quarter ended September 30, 2005 were identified that have materially affected or are reasonably likely to materially affect Sunrise's internal control over financial reporting.

(Emphasis added).

76.    In addition, the Third Quarter 2005 10-Q contained essentially the same false and misleading Sarbanes-Oxley certifications stated above in paragraph 69.

77.    The Third Quarter 2005 10-Q was materially false and misleading for the same reasons stated above in paragraph 70.

78.    On March 7, 2006, Sunrise issued a press release, entitled "Sunrise Reports Fourth-Quarter 2005 Results, Reaffirms Full-Year 2006 Earnings Guidance and Expects 15 to 20 Percent Full-Year 2007 EPS Growth," which stated in relevant part:

> Sunrise Senior Living, Inc., today reported fourth-quarter 2005 earnings of $1.01 per share (diluted) compared to $0.28 (diluted) per share in the fourth quarter of 2004. For the full year 2005, Sunrise reported earnings per share of $1.67 (diluted) compared to earnings per share of $1.12 (diluted) in 2004 . . . .
>
> "The fourth quarter and year closed strongly, as we expected, and positions us for a very good 2006 during which we will be celebrating our 25th anniversary," said Paul Klaassen, Sunrise Senior Living's chairman and CEO.
>
> *   *   *
>
> "We are extremely excited about the opportunities that lie ahead for our business," said Thomas Newell, president of Sunrise Senior Living. "As we move forward, we expect to continue to benefit from our expanded development program and our management services business model. In 2006, *we anticipate a record number of community openings and substantial returns from our minority investments in joint venture partnerships.* In addition, the strength of our balance sheet is expected to provide significant flexibility as we enter into the next phase of our growth strategy."
>
> *   *   *
>
> Sunrise's 2006 earnings per share is expected to be driven . . . by *further growth in earnings generated by Sunrise's equity investments in unconsolidated ventures.*

(Emphasis added).

79.    The March 7, 2006 press release was materially false and misleading for the same reasons stated above in paragraph 58.

80.    Later that morning, Sunrise held a conference call with analysts to discuss the Company's earnings. During the call, the following occurred:

> [P. Klaassen - CEO:]  The fourth quarter closed out strongly as we expected and ended a busy and successful year for Sunrise. All four of our growth engines are firing on all cylinders. As you may know, those four growth engines are: 1, growth from new construction; 2, growth from new management contract; 3, internal growth from existing operations; 4, growth generated by our balance sheet. . . . Our success in 2005 was the result of many factors . . . . ***Regarding equity in earnings, excluding the $3.6 million one-time write-down of our original investment in that at-home venture, we would have reported equity in earnings ofun [sic] - of approximately $3.8 million in Q4, and, I guess that would be $16.8 million for the year. We expect an additional 15 percent growth in this business segment in 2006.*** Our ownership percentage in these 156 unconsolidated joint venture communities in which we have invested $138 million should therefore generate about $19 million in pretax income this year. These minority ownership positions align our interests with our capital partners, and allows you to participate in community performance upside, without the negative impact of increased debt levels or additional amortization and depreciate quags [sic] expenses . . . .

(Emphasis added).

81.    The statements in the March 7, 2006 conference call were materially false and misleading for the same reasons stated above in paragraph 58.

82.    On March 16, 2006, the Company filed its Form 10-K Report for the fiscal year ended December 31, 2005, which included its previously reported 2003-2005 financial results and statements. Sunrise's Form 10-K Report stated in relevant part:

> 13. Stockholders' Equity
>
> ***Stock Option Plan***
>     Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors,

consultants and advisors . . . . *Under the terms of the plans, the option exercise price and vesting provisions of the options are fixed when the option is granted . . . . The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.*

*. . . Under the terms of the Directors' Plan, the option exercise price was not less than the fair market value of a share of common stock on the date the option was granted.*

(Emphasis added).

83.    In addition, the Form 10-K Report contained essentially the same false and misleading Sarbanes-Oxley certifications stated above in paragraph 69.

84.    The March 16, 2006 10-K Report was materially false and misleading for the same reasons stated above in paragraph 70.

85.    On April 10, 2006, Sunrise filed a Form DEF-14A Proxy Statement with the SEC. Sunrise circulated the Proxy Statement to shareholders which stated in relevant part:

**STOCK-BASED COMPENSATION**

The compensation committee also considers stock options to be an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the compensation committee, *at an exercise price equal to the market price of the common stock at the date of the grant* . . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

\* \* \*

**REPORT OF THE AUDIT COMMITTEE**

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the company's financial statements and reporting process, including its systems of internal controls. In fulfilling its oversight responsibilities, the audit committee has reviewed and discussed with management the audited financial

statements in Sunrise's Annual Report on Form 10-K for the year ended December 31, 2005.

The audit committee has also reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the acceptability of the audited financial statements and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from Sunrise and its management, including the matters in the written disclosure received by the audit committee as required by the Independence Standards Board, and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2005 for filing with the Securities and Exchange Commission.

Respectfully Submitted,
Ronald V. Aprahamian, Chairman
Thomas J. Donohue
Craig R. Callen

(Emphasis added).

86.     The April 10, 2006 Proxy Statement was materially false and misleading for the reasons set forth above in paragraph 58.

87.     On April 27, 2006, Sunrise issued its 2005 Annual Report to Shareholders, which reported:

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Operating revenues | $1,819,479 | $1,446,471 | $1,096,260 |
| Net income | $79,742 | $20,687 | $62,178 |
| Total assets | $1,328,276 | $1,105,756 | $1,009,798 |
| Stockholder's equity | $632,677 | $523,518 | $490,276 |

88.     The 2005 Annual Report to Shareholders also stated, in relevant part:

13. Stockholders' Equity

Stock Option Plan

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees. directors. consultants and advisors . . . . *Under the terms of the plans, the option exercise price and vesting provisions of the options are fixed when the option is granted . . . . The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.*

*. . . Under the terms of the Directors' Plan, the option exercise price was not less than the fair market value of a share of common stock on the date the option was granted.*

\* \* \*

**Joint Venture Partners** Strong industry demographics. operations excellence. and our strong financial condition continue to accelerate interest among our impressive group of joint venture partners. *At the end of 2005, 156 of our communities were held in joint ventures, and nearly all of our new development and acquisitions are conducted through joint ventures.* Through our percentage ownership in these communities and the incentives we receive for exceeding performance thresholds. *these partnerships contributed significantly to our growth in 2005.* In addition. these joint venture partnerships reduce our corporate risk profile *since we share capital and construction risk with our partners.*

\* \* \*

**Equity in Earnings and Return on Investment in Unconsolidated Senior Living Communities**

Equity in earnings and return on investment in unconsolidated senior living communities represents our allocation of the results of operations and returns on our investment from the distributions of proceeds from transactions with our unconsolidated ventures.

**2005 Compared to 2004**

Equity in earnings and return on investment in unconsolidated senior living communities was $13.2 million in 2005 compared to $9.4 million in 2004. an increase of $3.8 million. or 41%. which was primarily comprised of:

- $8.8 million return on our investment pursuant to the terms of a venture agreement;

- a decrease of $4.9 million from our portion of start-up losses associated with two international development ventures. In 2005, these two ventures opened four communities which incurred losses in 2005;

- $2.9 million return on our investment whereby an unconsolidated venture sold two senior living communities to Sunrise REIT;

- $3.0 million return on our investment whereby an unconsolidated venture sold its three senior living communities and distributed the proceeds to its members. We recognized the $3.0 million of cash received in excess of our investment;

- a decrease of $3.6 million from the write-down of our interest in Sunrise at Home; and

- a decrease of $2.5 million from the results of operations from other unconsolidated ventures, including our portion of start-up losses from development ventures.

**2004 Compared to 2003**

Equity in earnings and return on investment in unconsolidated senior living communities was $9.4 million in 2004 compared to $5.3 million in 2003, an increase of $4.1 million, or 76%, which primarily resulted from improved operations and additional incentive fees.

\* \* \*

**Management's Report on Internal Control over Financial Reporting**

\* \* \*

The Company's internal control over financial reporting is supported by written policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the Company's transactions and dispositions of the Company's assets; [and] (2) *provide reasonable assurance that transactions are recorded as necessary to permit preparation of the consolidated financial statements in accordance with generally accepted accounting principles* . . . .

In connection with the preparation of the Company's annual consolidated financial statements, management has undertaken an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO Framework). *Management's assessment included an evaluation of the design of the Company's internal control over financial reporting and testing of the operational effectiveness of those controls.*

*Based on this assessment, management has concluded that as of December 31, 2005, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.*

\* \* \*

Paul J. Klaassen Chief Executive Officer
Bradley B. Rush Chief Financial Officer

\* \* \*

**Investments in Unconsolidated Senior Living Communities**

Sunrise holds an interest in ventures established to develop or acquire and own senior living communities. When these ventures are considered to be variable interest entities ("VIEs") in accordance with FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary. When Sunrise has determined it is not the primary beneficiary or, for non-VIEs when it determines that it owns a non-controlling interest (because other partners or members control or participate in the management decisions of these ventures), *the investments are accounted for under the equity method.*

*The equity method investments are recorded at cost* and subsequently are adjusted for equity in net income (losses) and distributions. Sunrise determines its share of the investees' earnings or losses based on the distributions of cash flow from a hypothetical liquidation of the investee's assets and liabilities. The equity earnings are adjusted for the impact on the investee's reported earnings, if any, for the basis differences between Sunrise's carrying value of the equity investments and the

39

investee's underlying assets. Sunrise recognizes profits on sales of
services to these ventures to the extent of the ventures' outside
ownership interest.

*Sunrise owned interests in 187 unconsolidated senior living
communities (31 of which are under development) through
ownership interests in 30 unconsolidated ventures at December
31, 2005 that are accounted for under the equity method and one
unconsolidated venture accounted for under the cost method.*
Those ventures are generally limited liability companies and
partnerships. Sunrise's interest in those ventures generally range
from five to 25%. Sunrise has one community in which it owns
less than lo%, 147 communities in which it owns between 10% and
20%, and 20 communities in which it owns between 10% and
30%, and 19 communities in which it owns more than 30%.

**Variable Interest Entities**

At December 31, 2005, Sunrise had an interest in 11
ventures that are considered VIEs. Sunrise is the primary
beneficiary and, therefore, consolidates eight of these VIEs. Seven
of these consolidated VIEs are development communities in which
Sunrise has a majority of the voting interest and is developing for
Sunrise REIT (see Note 4). At December 31, 2005, included in
Sunrise's consolidated balance sheet were $56.1 million of
development costs and $50.7 million of debt, including $6.6
million of third-party construction debt secured by the
development communities and $44.1 million of borrowings from
Sunrise REIT guaranteed by Sunrise. The only recourse to Sunrise
with respect to these seven VGFIEs is under borrowings from
Sunrise REIT.

(Emphasis added).

89.     The 2005 Annual Report was materially false and misleading for the same reasons

stated above in paragraph 70.

## IX.    THE TRUTH BEGINS TO EMERGE

90.     On May 9, 2006, Sunrise issued a press release, entitled "Sunrise to Reschedule

First Quarter Earnings Announcement," which stated in relevant part:

Sunrise Senior Living, Inc., today announced it is
rescheduling its first quarter 2006 earnings release to allow

> additional time for further review of the accounting treatment
> applied to investments in unconsolidated senior living
> communities, and to complete the review of its Form 10-Q for the
> first quarter ended March 31, 2006 . . . .

91.     As a result of the disclosure, Sunrise's stock price fell to $32.35 per share on May

9, 2006, on huge trading volume of 4.4 million shares, from a closing price of $39.30 per share

on May 8, 2006.

92.     The next day, on May 10, 2006, Sunrise issued another press release, entitled

"Sunrise Provides Update on Accounting Treatment Review and Release of First Quarter

Financial Results," which stated in relevant part:

> The accounting treatment review is focused on the allocation of
> profits and losses for a limited number of Sunrise joint ventures
> where Sunrise is a minority partner and the capital partner receives
> a preference, either on return of its capital over Sunrise's capital in
> the event of a refinancing or sale of the venture's properties, or
> cash flow from operations.  Preferences on return of capital are no
> longer typical.

93.     On May 11, 2006, the Company issued yet another press release, entitled "Sunrise

Reports Preliminary Selected Financial Data For First-Quarter 2006," which stated in relevant

part:

> As a result of the review, Sunrise has decided to use a different
> methodology to allocate profits and losses in its joint ventures
> based on such rights and priorities of the partners.  Sunrise is
> evaluating whether this methodology will require adjustments to
> prior period financial statements.

> * * *

> Sunrise will not file its Form 10-Q until it completes its review.
> This review encompasses a multi-year analysis of each affected
> venture and is being completed as thoroughly and quickly as
> possible . . . .

94.     Later that morning, Defendants held a conference call with analysts, hosted by P.

Klaassen.  During the conference call, P. Klaassen stated in relevant part:

The issue that necessitated this additional review has to do with the accounting treatment applied to certain of our investments in unconsolidated senior living communities. Specifically, this accounting treatment review is focused on the allocation of profits and losses for those joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties.

\* \* \*

In connection with this review, our accounting team determined and then brought to the attention of our auditors that there is a more preferable method under generally accepted accounting principles for allocating such profits and losses among the partners of theses ventures and for determining the timing of such allocations during the lifecycle of the ventures, from startup losses to stabilized cash flow refinancing or sale or the property.

*Now, as a result, we are now in the process of assessing the implications of adopting this alternative methodology and whether adjustments are necessary to prior period financial statements . . . .*

\* \* \*

*We will completely avoid this accounting issue in the future by no longer providing preferential return on capital in any future ventures. We were able to do this now because of the successful track record that we have established with these ventures.*

\* \* \*

The general effect of using this different methodology – known, I am told, as the hypothetical liquidation at book value method – *is to shift more of any losses to Sunrise in the early days of any venture where the capital partner has a preference for return of capital . . . .*

\* \* \*

Now, if this partnership were to experience 1 million of initial losses . . . Sunrise would initially recognize 20% (minority interest) or $200,000 of the $1 million of losses . . . .

Now, if the same venture has *included a capital return* preferences . . . Sunrise *would be allocated 100% or all million dollars of the initial losses . . . .*

(Emphasis added).

42

95.    Also during the May 11, 2006 conference call, when asked if the new accounting method was a new option to the Company or if it had been available for years, Defendant Rush admitted the new accounting method the Company was using going forward was "available for a number of years."

96.    At the end of the Class Period, June 15, 2006, *MarketWatch* published an article, entitled "Sunrise Sr. Living full-year estimated cut by Stifel Nicolaus," which stated in relevant part:

> Sunrise Senior Living Inc. (SRZ) had one quarter and two years' worth of per-share earnings estimated cut by Stifel Nicolaus on Thursday, though the firm reiterated its buy rating on the stock . . . . Preliminary first-quarter results provided by the company . . . prompted Stifel Nicolaus to take its full-year 2006 outlook to $1.15 from $1.18 a share. The firm also reduced its full-year 2007 per-share forecast to $1.32 from $1.36, and lowered its first-quarter forecast to 21 cents from 23 cents.

## X.    POST CLASS PERIOD DEVELOPMENTS

97.    On July 31, 2006, Sunrise issued a press release, entitled "Sunrise Provides Update On Accounting Review," which stated in relevant part:

> [T]he Company will *restate* its financial statements for the years ended December 31, 2003, 2004 and 2005 primarily to adjust the *accounting treatment related to ventures that contain partner preferences and the timing of sale accounting and recognition of income from prior sales of real estate.* The cumulative impact of the restatement is *expected to reduce net income for all periods impacted, including 1999 through 2005, by an estimated $60 million to $110 million . . . .* Sunrise is unable at this time to provide that precise impacts of the restatement since its review of these issues has not yet concluded.... The Company noted that its previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and its unaudited quarterly financial statements during these years *should no longer be relied upon.*

\* \* \*

43

As the review unfolded, Sunrise looked not only at partner preferences, but also at all guarantees and commitments provided to our venture partners and third party investors. Certain of these guarantees *should have been considered at the time of the sale* of real estate to these entities . . . .

Allocation of profits and losses in those ventures in which Sunrise's partners receive a preference on cash flow. This area of the review focused on the timing of both the recognition of profits and losses from ventures and the recognition of pre-opening fees from ventures in which our partners receive a cash flow preference . . . . In the future, Sunrise will no longer offer preferences on cash flows for its ventures. Sunrise will account for its equity in earnings of unconsolidated ventures by a method knows as Hypothetical Liquidation at Book Value ("HLBV"), rather than on its historical method based upon percentage ownership.

\* \* \*

The impact of this restatement will require *Sunrise to record additional losses in prior periods for those ventures with cash flow preferences.*

\* \* \*

Effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate. Primarily during the period from 2000 to 2003, Sunrise sold mature senior living properties to ventures or independent third parties. In addition, as part of its development program, Sunrise sometimes owns real estate during the zoning…process and then sells or contributes the real estate to a venture of third party investor. Sunrise *historically has recognized income upon the completion of such sales.* In connection with some of Sunrise's sales of real estate . . . *Sunrise has provided limited guarantees or commitments . . . .* In accordance with SFAS 66, *Accounting for Sales of Real Estate,* based on the nature of the guarantee or commitment, *Sunrise may be required to defer some or all of the income* or may not be able to immediately record the transaction as a sale.

\* \* \*

This accounting issue should not recur as Sunrise *does not expect to offer guarantees to new ventures or lenders* that would preclude sale accounting or require deferral of income.

(Emphasis added).

98.    Also on July 31, 2006, Sunrise filed a Form 8-K with the SEC which added to the press release that "the Company expects to report a material weakness in its internal control over financial reporting in it amended 2005 Form 10-K."

99.    Subsequently, on August 8, 2006, Sunrise issued a press release, entitled "Sunrise Reports Preliminary Selected Financial and Operating Data for Second-Quarter," which proved provided an update to the Company's accounting review. In that statement, the Company announced that it was "able to narrow the range of the estimated impact to net income from the restatement. The cumulative impact . . . is currently expected to reduce net income . . . by an estimated *$65 million to $100 million.*"

100.    On the same day, Sunrise filed a Form 8-K/A with the SEC, amending its July 31, 2006 Form 8-K. In its amended filing, Sunrise announced that, based on the Company's earlier disclosures, the SEC requested additional information regarding the method used for determining Sunrise's share of equity in earnings or losses and its interpretation of SOP 78-9, *Accounting for Investments in Real Estate Ventures*.

101.    Later, on November 7, 2006, Sunrise issued a press release, entitled "Sunrise Reports Preliminary Selected Financial and Operating Data for Third-Quarter 2006," which stated in relevant part:

> Sunrise is completing its review of the accounting treatment
> related to ventures that contain partner preferences and to the
> timing of sale accounting and recognition of income from sales of
> real estate or partnership interests in joint ventures. Subject to
> completion of its auditor's review and *clearing comments from the
> SEC,* Sunrise currently expects to file its restated 2005 Form 10-K
> before year end, which will be followed by the filing of Sunrise's
> Forms 10-Q for the first three quarters of 2006. Sunrise currently
> expects to be current in its filings with the Securities and Exchange
> Commission upon the filing of its 2006 Form 10-K on or before
> March 1, 2007.

> The cumulative impact of the restatement is currently anticipated
> to reduce net income for all periods impacted, including 1999
> through 2005, by approximately ***$100 million***.

(Emphasis added).

102.    Soon after, on November 20, 2006, the Service Employees International Union

("SEIU"), a shareholder of Sunrise, sent a letter to the Company calling for an independent

investigation into concerns about insider stock sales, questionable accounting practices, and

improbably-timed stock option grants.  This request came after a review of the Company's

finances by the SEIU Capital Stewardships Program found that executives sold $32 million

worth of shares, many of the stock options grants were fortuitously timed and all members of the

Audit and Compensation Committees have personal ties to the company.

103.    As a result, on December 11, 2006, Sunrise announced that its BOD had

appointed a special independent committee to review recent insider sales of Sunrise stock and the

Company's historical practices related to stock option grants.  The Company further disclosed

that the SEC had requested information relating to the Company's insider trading and stock

option practices.  In addition, the Company stated that the review by the special committee

would be conducted in parallel with the Company's ongoing efforts to complete the previously

announced restatement.

104.    Most recently, on January 15, 2006, Sunrise issued a press release, entitled

"Sunrise Provides Update on Pending Restatement," which stated in relevant part:

> Sunrise believes that is it close -- weeks, not months -- to
> submitting its recast 2005 financial information with the SEC for
> its review, the essential first step in the process.  However, due to
> factors including the complexity of the issues involved, the need to
> clear comments with the SEC, as well as the ongoing review by the
> recently formed special committee of the board of directors,
> Sunrise will not be current with all SEC filings, including the 2006

Form 10-Qs and 2006 Form 10-K by March 1, 2007, as previously anticipated.

Sunrise plans to hold its quarterly conference call on February 27, 2007 to provide a further update on this review and the progress toward completion of its restatement . . . .

## XI.    CAUSATION ALLEGATIONS

105.    At all relevant times, Sunrise's common stock was traded on the NYSE.  As described above, Defendants' material misrepresentations and omissions had the effect of creating and maintaining an artificially inflated price for Sunrise's common stock.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by maintaining and supporting the false public perception of Sunrise's business, operations, performance and prospects, and particularly the profitability of its joint ventures.

106.    Defendants had a duty to disseminate promptly accurate and truthful information with respect to Sunrise's financial and operational condition or to cause and direct that such information be disseminated and to correct promptly any previously disseminated information that was misleading to the market.  As a result of their failure to do so, the price of Sunrise's common stock was artificially inflated during the Class Period, severely damaging Plaintiff and the Class.

107.    Defendants' false and misleading statements and omissions in their press releases and other public statements directly caused losses to the Class.  On the strength of these false statements, misrepresentations and material omissions in its press releases, announcements and other public statements concerning its financial condition, the Company's stock was artificially inflated to a Class Period high of $39.49 per share on March 29, 2006.  Thereafter, the stock fell

to $28.54 per share by the end of the Class Period, June 15, 2006, thereby inflicting substantial damages on Plaintiff and the Class.

108.    Until shortly before Plaintiff filed this Complaint, it was unaware of all of the facts, as described herein, and could not have reasonably discovered the Defendants' fraudulent scheme by the exercise of reasonable diligence.

## XII.    SCIENTER ALLEGATIONS

109.    As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or recklessly disregarded that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

110.    Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Sunrise and, thus, controlled the information disseminated to the investing public in the Company's press releases, SEC filings and communications with analysts. As a result, each could falsify the information that reached the public about the Company's business and performance. With respect to non-forward looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.

111.    Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly participated in and orchestrated the fraudulent scheme alleged herein to defraud investors by inflating earnings through improper accounting for minority interests in

joint ventures, real estate sales and stock options, thereby allowing Sunrise to attain its aggressive growth strategy and obtain new joint venture partners. The Individual Defendants were motivated to engage in the fraud alleged herein to profit from improper insider sales. While Sunrise stock was trading at artificially inflated prices due to the Defendants false statements, the Section 20A Defendants personally profited from their wrongful conduct and scheme by selling over $35 million worth of their individual holdings in Sunrise common stock, as follows:

| Insider | Date | No. of Shares | Price Per Share | Proceeds |
|---|---|---|---|---|
| Anschutz, Barron | 11/21/2005 | 2,000 | $ 33.04 | $ 66,080.00 |
| | 11/21/2005 | 3,000 | $ 33.00 | $ 99,000.00 |
| | 1/3/2006 | 826 | $ 32.06 | $ 26,481.56 |
| | 1/3/2006 | 100 | $ 32.05 | $ 3,205.00 |
| **Total for Anschutz, Barron** | | **5,000** | | **$ 194,766.56** |
| | | | | |
| Aprahamian, Ronald V. | 4/18/2006 | 20,000 | $ 37.85 | $ 757,000.00 |
| **Total for Aprahamian, Ronald V.** | | **20,000** | | **$ 757,000.00** |
| | | | | |
| Donohue, Thomas J. | 11/21/2005 | 24,000 | $ 33.04 | $ 792,960.00 |
| | 11/21/2005 | 32,000 | $ 33.04 | $ 1,057,280.00 |
| | 11/21/2005 | 10,000 | $ 33.04 | $ 330,400.00 |
| | 11/21/2005 | 30,000 | $ 33.04 | $ 991,200.00 |
| | 11/21/2005 | 6,666 | $ 33.04 | $ 220,244.64 |
| **Total for Donohue, Thomas J.** | | **102,666** | | **$ 3,392,084.64** |
| | | | | |
| Holladay, J. Douglas | 9/23/2005 | 5,000 | $ 64.00 | $ 320,000.00 |
| | 10/3/2005 | 4,000 | $ 67.00 | $ 268,000.00 |
| | 11/7/2005 | 2,300 | $ 35.00 | $ 80,500.00 |
| | 12/6/2005 | 1,700 | $ 35.00 | $ 59,500.00 |
| | 12/12/2005 | 6,000 | $ 36.50 | $ 219,000.00 |
| | 3/21/2006 | 8,000 | $ 39.00 | $ 312,000.00 |
| **Total for Holladay, J. Douglas** | | **27,000** | | **$ 1,259,000.00** |
| | | | | |
| Hulse, Larry E. | 8/4/2005 | 15,000 | $ 57.62 | $ 864,300.00 |
| | 8/12/2005 | 20,973 | $ 61.24 | $ 1,284,386.52 |

| | 8/12/2005 | 1.000 | $ | 61.24 | $ | 61,240.00 |
|---|---|---|---|---|---|---|
| **Total for Hulse, Larry E.** | | **36,973** | | | $ | **2,209,926.52** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Klaassen, Paul J. & Teresa M. | 12/19/2005 | 50,000 | $ | 34.78 | $ | 1,739,000.00 |
| | 12/20/2005 | 50,000 | $ | 34.58 | $ | 1,729,000.00 |
| | 1/3/2006 | 50,000 | $ | 32.11 | $ | 1,605,500.00 |
| | 1/4/2006 | 50,000 | $ | 34.39 | $ | 1,719,500.00 |
| | 2/1/2006 | 50,000 | $ | 36.27 | $ | 1,813,500.00 |
| | 2/2/2006 | 50,000 | $ | 36.14 | $ | 1,807,000.00 |
| | 3/1/2006 | 50,000 | $ | 34.76 | $ | 1,738,000.00 |
| | 3/2/2006 | 50,000 | $ | 34.26 | $ | 1,713,000.00 |
| | 4/3/2006 | 50,000 | $ | 38.82 | $ | 1,941,000.00 |
| | 4/4/2006 | 50,000 | $ | 38.50 | $ | 1,925,000.00 |
| | 5/1/2006 | 50,000 | $ | 37.04 | $ | 1,852,000.00 |
| | 5/1/2006 | 50,000 | $ | 36.77 | $ | 1,838,500.00 |
| **Total for Klaaseen Paul J. & Teresa M.** | | **600,000** | | | $ | **21,421,000.00** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Newell, Thomas B. | 8/22/2005 | 12,000 | $ | 60.10 | $ | 721,200.00 |
| | 9/22/2005 | 6,636 | $ | 63.01 | $ | 418,134.36 |
| | 9/22/2005 | 5,364 | $ | 63.01 | $ | 337,985.64 |
| | 10/24/2005 | 24,000 | $ | 32.52 | $ | 780,480.00 |
| | 11/22/2005 | 24,000 | $ | 33.68 | $ | 808,320.00 |
| | 12/22/2005 | 24,000 | $ | 34.66 | $ | 831,840.00 |
| | 1/23/2006 | 24,000 | $ | 35.29 | $ | 846,960.00 |
| | 2/22/2006 | 24,000 | $ | 34.20 | $ | 820,800.00 |
| | 3/22/2006 | 24,000 | $ | 38.27 | $ | 918,480.00 |
| | 4/24/2006 | 24,000 | $ | 38.12 | $ | 914,880.00 |
| **Total for Newell, Thomas B.** | | **192,000** | | | $ | **7,399,080.00** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Rush, Bradley B. | 9/8/2005 | 687 | $ | 59.51 | $ | 40,883.37 |
| | 9/12/2005 | 3,000 | $ | 62.59 | $ | 187,770.00 |
| | 9/12/2005 | 2,000 | $ | 62.60 | $ | 125,200.00 |
| | 9/12/2005 | 1,150 | $ | 62.63 | $ | 72,024.50 |
| | 9/12/2005 | 100 | $ | 62.66 | $ | 6,266.00 |
| **Total for Rush, Bradley B.** | | **6,937** | | | $ | **432,143.87** |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Grand Total** | | **990,576** | | | $ | **37,065,001.59** |

## XIII.  SUNRISE'S GAAP VIOLATIONS

112.    Throughout the Class Period, Defendants represented that Sunrise's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.  However, in order to artificially inflate the price of Sunrise's common stock, Defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate the Company's reported earnings in the interim quarters and fiscal years during the Class Period.

113.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-0 1(a).

114.    Sunrise's materially false and misleading financial statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding Sunrise's actual operating results.  Defendants caused the Company to violate GAAP and its own accounting policies by:

(a)    Prematurely recognizing income from its unconsolidated senior living centers;

(b)    Improperly recognizing as a sale, the transfer of assets where Sunrise provided the purchaser with certain commitments and guarantees; and

(c)    Failing to properly account for backdated stock options given to top Company

executives.

115.    As a result of these material violations of GAAP, the Defendants have now

admitted that the Company will be forced to restate its financial statements for the period 2003

through 2005, the cumulative impact of which is expected to reduce net income for 1999 through

2005 by an estimated $60 million to $100 million.

116.    As set forth in Financial Accounting Standards Board ("FASB") Statements of

Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting

is that it provide accurate and reliable information concerning an entity's financial performance

during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an
> enterprise's financial performance during a period.  Investors and
> creditors often use information about the past to help in assessing
> the prospects of an enterprise.  Thus, although investment and
> credit decisions reflect investors' and creditors' expectations about
> future enterprise performance, those expectations are commonly
> based at least partly on evaluations of past enterprise performance.

117.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements

filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be

misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing

financial statements that conform with GAAP.  As noted by the American Institute of Certified

Public Accountants ("AICPA") professional standards:

> financial statements are management's responsibility . . . .
> [M]anagement is responsible for adopting sound accounting
> policies and for establishing and maintaining internal control that
> will, among other things, record, process, summarize, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities and
> equity are within the direct knowledge and control of management

52

. . . . Thus. the fair presentation of financial statements in
conformity with Generally Accepted Accounting Principles is an
implicit and integral part of management's responsibility.

A.    **Sunrise Prematurely Recognized Income from Its Unconsolidated Senior Living Centers**

118.    GAAP requires an investor (*e.g.*. Sunrise) holding an equity investment in a non-corporate investee that possesses the ability to exercise a significant influence over the investee (as defined under GAAP) to use the equity method of accounting to account for that investor's percentage interest in the investee.

119.    Until November 15. 2001. AICPA Statement of Position ("SOP") 78-9. *Accounting for Investments in Real Estate Ventures*. governed the method of accounting for investments in unconsolidated real estate ventures. In November 2000. the AICPA issued new guidance for accounting for unconsolidated real estate investees. which superseded SOP 78-9 and became effective on December 15. 2001. Under this new guidance. investors of unconsolidated real estate ventures that exercised significant influence over the investee must use the hypothetical liquidation at book value ("HLBV") equity method of accounting.

120.    Unlike the conventional "percentage of equity ownership interest" method of accounting.[1] the HLBV method requires that the investor determine its share of the earnings or losses of an investee by determining the difference between its claim on the investee's book value as of the balance sheet date. The value of the investor's earnings or losses under the HLBV method is calculated as the amount that the investor would receive (or be obligated to pay) if the investee were to liquidate all of its assets at recorded amounts determined in accordance with GAAP and distribute the resulting cash to creditors and investors. The new

---

[1]  Under the "percentage of equity ownership interest" method. the investor determines its share of the investee's earnings or losses by multiplying the investor's ownership percentage in the investee by the investee's earnings or losses for the period.

approach takes into account difficulties in the investee's capital structure where the investee gives different rights and priorities to its owners.

121.    As disclosed in Sunrise's financial statements, it invests in unconsolidated joint ventures where certain of the Company's joint venture partners received partner preferences, such as cash flow preferences. Despite the AICPA's new guidance, which required the Company to use the HLBV equity method of accounting, Sunrise, continued to use the percentage of ownership interest method, in direct violation of GAAP. As a result of the Company's misapplication of GAAP, it announced on July 31, 2006 that it would be required to restate its financial results for the period of 2003 through 2005, to record the impact of additional losses in prior periods related the cash flow preferences.

**B.    Sunrise Improperly Accounted For Sales of Real Estate To Its Joint Venture Partners and Third Party Investors**

122.    Sunrise has admitted that the Company improperly recorded as a sale, purported sales of real estate to certain of its joint venture partners and other third-party investors where the Company provided the purchasers in these transactions limited guarantees or commitments, such as operating cash flow deficit guarantees. Under GAAP, specifically, the FASB Statement of Financial Accounting Standards ("SFAS") No. 66, *Accounting for* Sales *of Real Estate,* where an entity has continued involvement in the risks associated with the real estate sold by providing guarantees of the return of investment, the sale cannot be treated as a sale. *See* SFAS No. 66, ¶¶ 25-29. Rather, SFAS No. 66 requires the deferral of some or all of the income from the sale until such commitments are satisfied.

123.    As such, Sunrise's real estate sales where the Company provided such commitments and guarantees should not have been recognized as a sale immediately. Instead, the income form the sale should have been deferred until the Company was no longer obligated

under the commitment or guarantee.  By recording the transaction as a sale up front, however,

Sunrise was able to inflate its earnings, in violation of GAAP.

### C.     Sunrise Improperly Accounted For Back-Dated Stock Options

124.    Pursuant to Accounting Principles Board No. 25 ("APB No. 25"), *Accounting for*

*Stock Issued to Employees* - the standard for accounting for employee stock options in effect

until 1995 - any difference between the market price on the measurement date and the exercise

price must be recorded in the Company's income statement as compensation expense.  In 1995,

FASB implemented SFAS No. 123, *Accounting for Stock-Based Compensation*, effective

December 15, 1995.  SFAS No. 123 requires companies to use the "fair value" method for

accounting for stock-based compensation plans.  In December 2004, SFAS No. 123 was revised

to require recognition of the cost of options (as per the fair value method) as an expense in the

income statement.

125.    In the Company's financial statements, Defendants claimed to have complied

with these standards.  In reality, Sunrise's financial statements and related disclosures were

materially false and misleading because Defendants were back-dating options to dates when the

price was lower than the market price on the day the options were actually granted.  By back-

dating its stock options, Sunrise was able to avoid recording additional compensation expense

because the market price on the measurement date was at or near the exercise price.  In reality,

had the Company used the exercise price on the true grant date, it would have incurred

substantial compensation expense.

126.    By engaging in the above improper accounting practices, Sunrise violated GAAP

and understated its compensation expense and overstated its earnings for the period of

restatement. As a result of its improper accounting practices, Sunrise has now announced a probe into its stock option practices.

127.    As a result of the accounting improprieties detailed at ¶¶ 108 - 122, Defendants caused Sunrise's reported financial results to violate, among other things, the following provisions of GAAP for which each defendant is necessarily responsible:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶ 34);

(b)    The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Statement of Concepts No. 2, ¶ 132);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the

extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (FASB Statement of Concepts No. 1, ¶ 50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASB Statement of Concepts No. 1, ¶ 42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting.  (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79);

(h)    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  (FASB Statement of Concepts No. 2, ¶ 80);

(i)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what

is reported represents what it purports to represent. (FASB Statement of Concepts No. 2, ¶¶ 95, 97); and

(j)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10).

## D.    Defendants' Internal Control Violations

128.    Defendants also violated Section 13(b)(2) of the Exchange Act requiring that every reporting company "devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP." Moreover, Defendants P. Klaassen and Rush violated Sarbanes Oxley, 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 1934, by issuing the false certifications above.

129.    As alleged herein, Sunrise did not have effective internal controls in place needed for accurate financial reporting. Because the Company lacked such controls, Defendants were able to execute their scheme to defraud investors by inflating earnings through improper accounting for minority interest in joint ventures, real estate sales and stock options. As a result, Sunrise overstated earnings and understated expense throughout the Class Period. Accordingly, Sunrise's lack of adequate internal controls rendered the Company's Class Period financial reporting inherently unreliable and precluded Sunrise from preparing financial statements that complied with GAAP. Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

## COUNT 1

### Violations of § 10(b) Of The Exchange Act And
### Rule 10b-5 Promulgated Thereunder Against All Defendants

130.    Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

131.    During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges to: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sunrise common stock; and (iii) cause Plaintiff and other members of the Class to purchase Sunrise common stock at artificially inflated prices that did not reflect their true value.  As the truth became known in the Class Period, the trading price of Sunrise common stock fell precipitously.  In furtherance of their unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

132.    Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants also are sued as controlling persons of Sunrise, as alleged below.

133.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts, among others:  (i) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public they either knew, or recklessly disregarded, was materially false and misleading.

134.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were done knowingly, or recklessly, and for the purpose and effect of concealing the truth with respect to Sunrise's operations, business, performance and prospects from the investing public and supporting the artificially inflated price of its common stock.

135.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Sunrise's common stock during the Class Period.  In ignorance of the fact that the market prices of Sunrise's common stock were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, or on the integrity of the market in which the Company's common stock trades, or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and other members of the Class purchased

Sunrise's common stock during the Class Period at artificially high prices. As the truth eventually emerged, the price of Sunrise's common stock fell.

136.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and other members of the Class and the marketplace known the truth with respect to the business, operations, performance and prospects of Sunrise, which was concealed by Defendants, Plaintiff and other members of the Class would not have purchased Sunrise's common stock or would not have purchased such stock at the prices they paid.

137.    By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

138.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

### Violations of § 20(a) Of The Securities Exchange Act Of 1934
### Against The Individual Defendants

139.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

140.    Each of the Individual Defendants acted as a controlling person of Sunrise within the meaning of § 20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the

content and dissemination of the various statements Plaintiff alleges were materially false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports. press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

141.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

142.    As set forth above, Sunrise and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT III

### Violations Of § 20A Of The Securities Exchange Act Of 1934
### Against The Section 20A Defendants

143.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

144.    This claim is asserted against the Section 20A Defendants pursuant to Section 20A of the Exchange Act by Plaintiff and on behalf of the Class members who purchased Sunrise common stock contemporaneously with the sales of the Company's common stock by the Section 20A Defendants.

145.    The Section 20A Defendants were privy to confidential, material, non-public adverse information concerning the Company as alleged herein.  Notwithstanding the Section 20A Defendants' duty to refrain from trading in Sunrise common stock unless they disclosed the foregoing material facts, the Section 20A Defendants sold, in the aggregate, approximately 990,576 shares of Sunrise common stock during the Class Period and realized proceeds of over $37 million, while in possession of material, non-public adverse information, as set forth above.

146.    The Section 20A Defendants sold their shares of Sunrise common stock as alleged above, at market prices artificially inflated by the nondisclosure, and/or misrepresentations, of such material facts in the public statements Defendants made or that they caused the Company to make.

147.    Before selling their Sunrise common stock, the Section 20A Defendants were obligated to publicly disclose the material information they possessed.

148.    By reason of the foregoing, the Section 20A Defendants, by use of the means or instrumentalities of interstate commerce, the mails and the facilities of the national securities exchanges, employed devices, schemes and artifices to defraud, and engaged in acts and transactions and a course of conduct which operated as a fraud or deceit upon Plaintiff and the other Class members, who purchased Sunrise common stock contemporaneously with the sales by the Section 20A Defendants.

149.    Plaintiff and all other Class members who purchased shares of Sunrise common stock contemporaneously with the sales of Sunrise stock by the Section 20A Defendants:  (i) have suffered substantial damages in that they paid artificially inflated prices for Sunrise common stock as a result of the violations of Section 10(b) and Section 20(a) of the Exchange Act and SEC Rule 10b-5 as alleged herein; and (ii) would not have purchased Sunrise common

stock at the artificially inflated prices that they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements.

150.    As a result of Plaintiff's and Class members' purchases of Sunrise common stock contemporaneously with the Section 20A Defendants' sales of Sunrise common stock, Plaintiff and Class members have suffered recoverable damages. The Section 20A Defendants are liable to Plaintiff and the Class as a result of such transactions.

151.    The Section 20A Defendants are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

## COUNT IV

### For Violation of § 14(a) of the Exchange Act
### Against the Director Defendants

152.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except allegations of fraud or intent which are not necessary to assert this Claim for Relief.

153.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

154.    The 2000 through 2006 Proxy Statements violated § 14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were engaging in stock option back-dating, in violation of accounting principles and the Company's own policies.

155.    In the exercise of reasonable care, the Director Defendants should have known that the Proxy Statements were materially false and misleading.

156.    The misrepresentations and omissions in the Proxy Statements were material to Plaintiff and Class members in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option manipulation scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies, including approval or ratification of the stock option plans.

157.    Sunrise shareholders were damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

**WHEREFORE**, Plaintiff prays for relief and judgment on behalf of themselves and the Class:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.      Awarding Plaintiff and the Class their costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  February 8, 2007

FINKELSTEIN THOMPSON LLP

By: _____
Donald J. Enright (DC Bar # 463007)
Stan M. Doerrer (DC Bar # 502496)
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC  20007
Telephone:  (202) 337-8000
Facsimile:  (202) 337-8090

**ENTWISTLE & CAPPUCCI LLP**

Vincent R. Cappucci
Shannon L. Hopkins
Laura J. Moore
280 Park Avenue, 26th Floor West
New York, NY  10017
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

## CERTIFICATION

FIRST NEW YORK SECURITIES, L.L.C. declares the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     It has reviewed a copy of the complaint filed in the action, captioned *United Food And Commercial Workers Union Local 880-Retail Food Employers Joint Pension Fund and United Food And Commercial Workers Union-Employer Pension Fund v. Sunrise Senior Living, Inc.*, Civil Action No. 07-CV-00102 (D.D.C.).

2.     It did not acquire any of the relevant securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.     It is willing to serve as a representative party in this action and it recognizes its duties as such, including monitoring and directing the litigation, and providing testimony at deposition and trial, if necessary.

4.     It will not accept any payment for serving as a representative party beyond its *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

5.     It has not sought to serve or served as a representative party for a class in any action under the federal securities laws within the past three years, except in *In re Cardinal Health. Inc. Securities Litigation*, Civil Action No. 04-CV-00575-ALM-NMK (S.D.Ohio).

6.     Its transactions during the proposed class period in Sunrise Senior Living, Inc. securities, that are the subject of this litigation, are described in the chart attached hereto as Schedule A.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this _31st_ day of January 2007

By: _____

Harris Sufian
General Counsel
First New York Securities, L.L.C.

Schedule A

| Trade Date | Buy / Sell | Quantity | Price |
|---|---|---|---|
| 1/25/2005 | B | 2,500 | 43.3928 |
| 1/25/2005 | S | 2,500 | 43.4 |
| 5/3/2005 | B | 750 | 48.1 |
| 5/3/2005 | S | 1,750 | 48.0742857 |
| 5/3/2005 | S | 1,000 | 48.08 |
| 5/4/2005 | B | 1,000 | 48.948 |
| 5/4/2005 | B | 1,000 | 48.72 |
| 9/26/2005 | B | 2,500 | 63.8088 |
| 9/26/2005 | S | 2,500 | 63.7464 |
| 11/8/2005 | B | 3,000 | 33.0273333 |
| 11/8/2005 | S | 3,000 | 33.037 |
| 1/20/2006 | B | 1,000 | 36.607 |
| 1/20/2006 | S | 1,000 | 37.04 |
| 4/7/2006 | S | 5,000 | 36.714 |
| 4/10/2006 | B | 5,000 | 36.2588 |
| 5/9/2006 | S | 4,000 | 31.80975 |
| 5/10/2006 | B | 3,000 | 33.7036667 |
| 5/11/2006 | B | 1,000 | 34.63 |
| 6/12/2006 | S | 500 | 31.0583 |
| 6/12/2006 | S | 1,000 | 30.9748 |
| 6/13/2006 | S | 450 | 30.5962 |
| 6/14/2006 | S | 75 | 28.8 |
| 6/15/2006 | B | 20,000 | 28.7828 |
| 6/16/2006 | B | 50 | 28.54 |
| 6/21/2006 | B | 300 | 27.3238 |
| 6/21/2006 | B | 575 | 27.7196 |
| 6/21/2006 | B | 1,100 | 27.3579 |
| 7/12/2006 | S | 20,000 | 27.4312 |
| 7/31/2006 | B | 20,000 | 25.0155 |
| 7/31/2006 | S | 20,000 | 26.8133 |
| 8/15/2006 | B | 2,000 | 27.5395 |
| 8/15/2006 | S | 2,000 | 27.7455 |
| 11/27/2006 | B | 8,400 | 30.8439 |
| 11/30/2006 | B | 5,000 | 31.802 |
| 12/1/2006 | S | 5,000 | 31.6486 |

# EXHIBIT  3

**VIRGINIA:**

FILED
AND TAKE

06 AUG 11  PH 2: 04

CLERK, CIRCUIT COURT
FAIRFAX, VA

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

| | |
|---|---|
| NICHOLAS VON GUGGENBERG,<br>Derivatively on Behalf of Nominal<br>Defendant SUNRISE SENIOR LIVING,<br>INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>PAUL J. KLAASSEN, DAVID W.<br>FAEDER, TIMOTHY S. SMICK,<br>THOMAS B. NEWELL, BRIAN C.<br>SWINTON, CHRISTIAN B.A. SLAVIN,<br>LARRY E. HULSE, TIFFANY L.<br>TOMASSO, RONALD V.<br>APRAHAMIAN, CRAIG R. CALLEN,<br>and THOMAS J. DONAHUE, )<br><br>SERVE ALL DEFENDANTS AT: )<br><br>7902 WESTPARK DRIVE<br>MCLEAN, VA  22102 )<br><br>Defendants, )<br><br>and )<br><br>SUNRISE SENIOR LIVING, INC., )<br><br>SERVE:<br>Any officer, director or managing<br>Agent at:<br>7902 WESTPARK DRIVE<br>MCLEAN, VA  22102 )<br><br>Nominal Defendant. ) | Case No. ___ CL 2006 10174<br><br><br><br>**JURY TRIAL DEMANDED** |

1

## VERIFIED DERIVATIVE COMPLAINT

COMES NOW THE Plaintiff, NICHOLAS VON GUGGENBERG, by his undersigned attorneys, submits this Verified Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of Directors (the "Board"), and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

2.      In gross breach of their fiduciary duties as officers and/or directors of Sunrise, the Individual Defendants (as defined herein) colluded with one another to:

   a.   improperly backdate dozens of grants of Sunrise stock options to Sunrise executives, in violation of the Company's shareholder-approved stock option plans;

   b.   improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP"); and

   c.   produce and disseminate to Sunrise shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

3.      As a result of the Individual Defendants' egregious misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

2

## PARTIES

4.     Plaintiff Nicholas Von Guggenberg is, and was at all relevant times, a shareholder of nominal defendant Sunrise.

5.     Nominal defendant Sunrise Senior Living, Inc. is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102. According to its public filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

6.     Defendant Paul J. Klaassen ("Klaassen") founded the Company with his wife, Sunrise director Teresa M. Klaassen ("Teresa Klaassen"), and has served as Chairman and Chief Executive Officer of Sunrise since 1991.

7.     Defendant David W. Faeder ("Faeder") served as the Company's and its predecessor entities' Executive Vice President and Chief Financial Officer from 1993 to 1997. Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant to the Company from April 2000 to March 2004.

8.     Defendant Timothy S. Smick ("Smick") served as the Chief Operating Officer from February 1996 to January 1998, as Executive Vice President from May 1996 to January 1998, and as a director from October 1996 to March 1998.

9.     Defendant Thomas B. Newell ("Newell") has served as the Company's President since April 2000, as Executive Vice President from May 1996 to April 2000, and as President of Sunrise Development, Inc., the Company's development subsidiary, and General Counsel from January 1996 to April 2000.

10.     Defendant Brian C. Swinton ("Swinton") served as the Company's Executive

3

Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc. from September 2000 to December 2002.

11.     Defendant Christian B.A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May 1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004.

12.     Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003, and as Chief Financial Officer from April 2000 to 2005.

13.     Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003, as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994.

14.     Collectively, defendants Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Hulse, and Tomasso are referred to herein as the "Officer Defendants."

15.     Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of the Company since 1995. Aprahamian has also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in at least 1996, the Compensation Committee of the Board ("Compensation Committee") since at least 1996, and as a member of the Audit Committee of the Board ("Audit Committee") since at least 1996, including serving as Chair

4

since 2003.

16.    Defendant Craig R. Callen ("Callen") has served as a director of the Company since 1999, and as a member of the Compensation Committee and Audit Committee since 2004. Callen also served as a member of the Stock Option Committee from 1999 to 2002, as a member of the Compensation Committee from 1999 to 2002, and as a member of the Audit Committee in 1999.

17.    Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995. Donohue has also served as a member of the Compensation Committee since at least 1996, including serving as Chair since 2002, and as a member of the Audit Committee since at least 1996. Donohue also served as a member of the Stock Option Committee from at least 1996 to 2002.

18.    Collectively, defendants Aprahamian, Callen, and Donohue are referred to herein as the "Committee Defendants."

19.    Collectively, the Officer Defendants and Committee Defendants are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

20.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal

5

interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

21.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

22.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.      exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;
>
> b.      exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;
>
> c.      exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and
>
> d.      exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and
>
> e.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

6

23.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that —

(a)    transactions are executed in accordance with management's general or specific authorization;

(b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

24.    Sunrise's Audit Committee Charter provides that the Audit Committee shall, among other things,

a.    meet to review and discuss the company's annual audited financial statements and quarterly financials statements with management and the independent auditor, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

b.    review major issues regarding accounting principles and financial statement presentations, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

c.    review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of financial statements; and

7

> d.    determine whether to recommend to the Board of Directors that the annual audited financial statements be included in the Company's annual report on Form 10-K.

## FACTUAL ALLEGATIONS

25.    At all times relevant hereto the Stock Option Committee and the Compensation Committee approved grants under and supervised the administration of the Company's stock option plans.

26.    From 1996 to 2002, the Stock Option Committee and the Compensation Committee granted the Officer Defendants Sunrise stock options as follows:

| Name | Purported Date of Grant | Exercise Price | Number of Options |
|------|-------------------------|----------------|-------------------|
| Klaassen | 9/11/00 | $17.00 | 350,000 |
| | | | |
| Faeder | 12/13/96 | $25.625 | 150,000 |
| | 5/2/97 | $24.375 | 100,000 |
| | 9/14/98 | $25.00 | 200,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | | | |
| Smick | 12/13/96 | $25.625 | 100,000 |
| | 5/2/97 | $24.375 | 150,000 |
| | | | |
| Newell | 12/13/96 | $25.625 | 125,000 |
| | 5/2/97 | $24.375 | 100,000 |
| | 9/14/98 | $25.00 | 200,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | 2/25/00 | $12.38 | 60,000 |
| | 3/28/00 | $12.44 | 25,000 |
| | 5/11/01 | $20.00 | 70,000 |
| | | | |
| Swinton | 12/13/96 | $25.625 | 75,000 |
| | 5/2/97 | $24.375 | 75,000 |
| | 9/14/98 | $25.00 | 100,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | 2/25/00 | $12.38 | 45,000 |
| | 3/28/00 | $12.44 | 15,000 |
| | 5/11/01 | $20.00 | 30,000 |

8

| Slavin | 2/25/00 | $12.38 | 55,000 |
|---|---|---|---|
| | 3/28/00 | $12.44 | 15,000 |
| | 11/24/00 | $26.31 | 75,000 |
| | 11/12/01 | $26.95 | 60,000 |
| | 5/17/02 | $27.15 | 60,000 |
| Hulse | 5/11/01 | $20.00 | 25,000 |
| | 5/17/02 | $27.15 | 40,000 |
| Tomasso | 9/14/98 | $25.00 | 230,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | 2/25/00 | $12.38 | 55,000 |
| | 3/28/00 | $12.44 | 15,000 |
| | 5/11/01 | $20.00 | 30,000 |
| | 5/17/02 | $27.15 | 60,000 |

27.    Pursuant to the terms of the Company's stock option plans, the exercise price of the options must be equal to the market price of the Company's stock at the date of the grant or the Company's closing stock price on the day before the grant.

28.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

29.    In a striking pattern that could not have been the result of chance, each and every one of the foregoing stock option grants was dated just before a substantial rise in Sunrise's stock price, as demonstrated in the following chart:

9

**Summary of Option Grants and Surrounding Stock Price Performance**

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days Before Grant | Stock Price 10 Trading Days After Grant | % Rise in Stock Price After Grant |
|---|---|---|---|---|
| 12/13/96 | $25.625 | $24.25 | $26.62 | 3.9% |
| 5/2/97 | $24.375 | $25.00 | $29.50 | 21.0% |
| 9/14/98 | $25.00 | $27.38 | $34.63 | 38.5% |
| 11/8/99 | $12.75 | $10.94 | $12.81 | 0.5% |
| 9/11/00 | $17.00 | $19.94 | $24.00 | 41.2% |
| 2/25/00 | $12.38 | $13.81 | $15.56 | 25.7% |
| 3/28/00 | $12.44 | $14.50 | $13.88 | 11.6% |
| 11/24/00 | $26.31 | $26.19 | $29.38 | 11.7% |
| 5/11/01 | $20.00 | $21.87 | $23.85 | 19.3% |
| 11/12/01 | $26.95 | $30.00 | $28.05 | 4.1% |
| 5/17/02 | $27.15 | $26.05 | $28.03 | 3.2% |

30.     The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the Officer Defendants, the Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates. This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer Defendants and improperly reduced the amounts they had to pay the Company upon exercise of the options.

**Dissemination of False Financial Statements**

31.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants,

> a.     violated the terms of the Company's shareholder-approved stock option plans;

10

b.  violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

c.  produced and disseminated to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants.

32.  The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

a.  Form 10-K for the fiscal year ended December 31, 1996, filed with the SEC on March 31, 1997 and signed by defendants Klaassen, Faeder, Smick, Hulse, and Aprahamian;

b.  Form 10-K for the fiscal year ended December 31, 1997, filed with the SEC on March 31, 1998 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue;

c.  Form 10-K for the fiscal year ended December 31, 1998, filed with the SEC on March 31, 1999 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue;

d.  Form 10-K for the fiscal year ended December 31, 1999, filed with the SEC on March 30, 2000 and signed by defendants Klaassen, Faeder, Slavin, Hulse, Aprahamian, Callen, and Donohue;

e.  Form 10-K405 for the fiscal year ended December 31, 2000, filed with the SEC on March 30, 2001 and signed by defendants Klaassen, Faeder, Hulse, and Donohue;

f.  Form 10-K for the fiscal year ended December 31, 2001, filed with the SEC on March 29, 2002 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue;

g.  Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 27, 2003 and signed by defendants Klaassen, Hulse, and Callen.

33.  Furthermore, from 1996 to 2003, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of

concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Officer Defendants.

### THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

34.    The Officer Defendants breached their fiduciary duties by:

  a.    colluding with the Committee Defendants to backdate stock option grants;

  b.    colluding with the Committee Defendants to violate GAAP;

  c.    colluding with the Committee Defendants to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

  d.    colluding with the Committee Defendants to file false proxy statements in order to conceal the improper backdating of stock options.

35.    The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company.

36.    The Committee Defendants breached their fiduciary duties by:

  a.    colluding with the Officer Defendants to backdate stock option grants;

  b.    colluding with the Officer Defendants to violate GAAP;

  c.    colluding with the Officer Defendants to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

  d.    colluding with the Officer Defendants to file false proxy statements in order to conceal the improper backdating of stock options.

37.    The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly

benefit the Officer Defendants at the expense of the Company.

38.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

39.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

40.    Plaintiff is an owner of Sunrise common stock and was an owner of Sunrise common stock at all times relevant hereto.

41.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

42.    As a result of the facts set forth herein, plaintiff has not made any demand on the Sunrise Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

43.    The Board currently consists of seven directors: defendants Klaassen, Aprahamian, Callen, and Donohue, and directors Teresa Klaassen, J. Douglas Holladay, and William G. Little. The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

        a.    Klaassen, because he is directly interested in the improperly backdated stock option grants complained of herein;

13

b.     Aprahamian, Callen, and Donohue, because as members of the Stock Option Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants, as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

c.     Aprahamian, Callen, and Donohue because as members of the Compensation Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants, as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

d.     Aprahamian, Callen, and Donohue because as members of the Audit Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants, as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants; and

e.     Klaassen, Aprahamian, Callen, and Donohue, because as directors of the Company they directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Klaassen, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants.

f.     Teresa Klaassen, the wife of defendant Klaassen and the co-founder of the Company, because of her close familial and business relationship with Klaassen.

44.     Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS

14

## FOR BREACH OF FIDUCIARY DUTY

45.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

46.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

47.     As alleged in detail herein, the Officer Defendants breached their fiduciary duties by:

      a.     colluding with the Committee Defendants to backdate stock option grants;

      b.     colluding with the Committee Defendants to violate GAAP;

      c.     colluding with the Committee Defendants to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

      d.     colluding with the Committee Defendants to file false proxy statements in order to conceal the improper backdating of stock options.

48.     The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company.

49.     As alleged in detail herein, the Committee Defendants breached their fiduciary duties by:

      a.     colluding with the Officer Defendants to backdate stock option grants;

      b.     colluding with the Officer Defendants to violate GAAP;

      c.     colluding with the Officer Defendants to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and

concealed the improper backdating of stock options; and

d.    colluding with the Officer Defendants to file false proxy statements in order to conceal the improper backdating of stock options.

50.    The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

51.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## COUNT II

### AGAINST THE OFFICER DEFENDANTS
### FOR UNJUST ENRICHMENT

52.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

53.    The Officer Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

54.    To remedy the Officer Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

16

WHEREFORE, Plaintiff demands judgment as follows:

A.  Against all of the Individual Defendants and in favor of the Company for the amount of $25,000,000.00 in damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.  Ordering the Officer Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.  Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.  Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: 8/11/06

Respectfully submitted,

LAW OFFICES OF JOHN C. PASIERB, PLC

John C. Pasierb (27446)
2200 Wilson Boulevard, Suite 800
Arlington, VA 22201
Telephone: (703) 875-2260
Fax: (703) 528-3692

SCHIFFRIN & BARROWAY, LLP
Eric L. Zagar
Sandra G. Smith
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (610) 667-7056

*Attorneys for Plaintiff*

17

## VERIFICATION

I, Nicholas Von Guggenberg hereby verify that I have reviewed the Complaint and authorized its filing and that the foregoing is true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

DATE: _August 8, 2006_                     _Nicholas Von Guggenberg_
                                           Nicholas Von Guggenberg

Aug. 25. 2006  3:16PM    No. 2426  P. 2

COMMONWEALTH OF VIRGINIA
### CIRCUIT COURT OF FAIRFAX COUNTY
4110 CHAIN BRIDGE ROAD
FAIRFAX, VIRGINIA 22030
703-691-7320
(Press 3, Press 1)

Nicholas Von Guggenberg  vs.  Paul J Klaassen, etal.

CL-2006-0010174

> TO:    Sunrise Senior Living Inc
> Serve Any Officer director or Managing Agent
> 7902 Westpark Drive
> McLean VA 22102

## SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on Monday, August 21, 2006.

JOHN T. FREY, CLERK

By: _____
Deputy Clerk

Plaintiff's Attorney  John C. Paslerb

------------------------------------

## VIRGINIA:

# EXHIBIT  4

**V I R G I N I A :**

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

CATHERINE MOLNER, Derivatively on )
Behalf of Nominal Defendant SUNRISE )
SENIOR LIVING, INC., )
                          )
        Plaintiff, )
                          )     Case No. _CL_ **2006 1 1 2 4 4**
       v. )
                          )
PAUL J. KLAASSEN, DAVID W. )
FAEDER, TIMOTHY S. SMICK, )
THOMAS B. NEWELL, BRIAN C. )
SWINTON, CHRISTIAN B.A. SLAVIN, )
LARRY E. HULSE, TIFFANY L. )
TOMASSO, RONALD V. )
APRAHAMIAN, CRAIG R. CALLEN, )
and THOMAS J. DONOHUE, )
                          )
    SERVE ALL DEFENDANTS AT: )
                          )
    7902 WESTPARK DRIVE )
    MCLEAN, VA 22102 )
                          )
        Defendants, )
                          )
       and )
                          )
SUNRISE SENIOR LIVING, INC., )
                          )
      Nominal Defendant. )
_____ )

### DERIVATIVE COMPLAINT
### JURY TRIAL DEMANDED

    COMES NOW THE Plaintiff, CATHERINE MOLNER, by her attorneys, submits this
Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

    1.    This is a shareholder's derivative action brought for the benefit of nominal defendant
Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of

-1-

Directors (the "Board"), and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

    2.     In gross breach of their fiduciary duties as officers and/or directors of Sunrise, the Individual Defendants (as defined herein) colluded with one another to:

        a.     improperly backdate dozens of grants of Sunrise stock options to Sunrise executives and directors, in violation of the Company's shareholder-approved stock option plans;

        b.     improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP"); and

        c.     produce and disseminate to Sunrise shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

    3.     As a result of the Individual Defendants' egregious misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## PARTIES

    4.     Plaintiff Catherine Monlner is, and was at all relevant times, a shareholder of nominal defendant Sunrise.

    5.     Nominal defendant Sunrise is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102. According to its public filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

    6.     Defendant Paul J. Klaassen ("Klaassen") founded the Company with his wife, Sunrise director Teresa M. Klaassen ("Teresa Klaassen"), and has served as Chairman and Chief Executive Officer of Sunrise since 1991.

    7.     Defendant David W. Faeder ("Faeder") served as the Company's and its predecessor

entities' Executive Vice President and Chief Financial Officer from 1993 to 1997. Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant to the Company from April 2000 to March 2004.

8.   Defendant Timothy S. Smick ("Smick") served as Chief Operating Officer of the Company from February 1996 to January 1998, as Executive Vice President of the Company from May 1996 to January 1998, and as a director of the Company from October 1996 to March 1998.

9.   Defendant Thomas B. Newell ("Newell") has served as the Company's President since April 2000, as Executive Vice President from May 1996 to April 2000, and as President of Sunrise Development, Inc., the Company's development subsidiary, and General Counsel from January 1996 to April 2000.

10.   Defendant Brian C. Swinton ("Swinton") served as the Company's Executive Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc. from September 2000 to December 2002.

11.   Defendant Christian B.A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May 1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004.

12.   Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003, as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994.

13.    Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003, and as Chief Financial Officer from April 2000 to 2005.

14.    Collectively, defendants Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Tomasso, and Hulse are referred to herein as the "Officer Defendants."

15.    Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of the Company since 1995. Aprahamian has also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in 1996 and as a member of the Audit Committee of the Board ("Audit Committee") since 1996, including serving as Chair since 2003. Aprahamian also served as a consultant to the Company beginning in May 1997.

16.    Defendant Craig R. Callen ("Callen") has served as a director of the Company since 1999. Callen served as a member of the Audit Committee in 1999 and since 2004, and as a member of the Stock Option Committee from 1999 to August 23, 2002, when the Stock Option Committee merged with the Compensation Committee of the Board.

17.    Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995 and as a member of the Audit Committee since 1996. Donohue served as a member of the Stock Option Committee from 1996 to August 23, 2002.

18.    Collectively, defendants Aprahamian, Callen, and Donohue are referred to herein as the "Committee Defendants."

19.    Collectively, the Officer Defendants and Committee Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

20.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants

-4-

owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

21.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

22.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

      b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

      c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

    d.    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

    e.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

23.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

    (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    (2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

        (a)    transactions are executed in accordance with management's general or specific authorization;

        (b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

24.    Sunrise's Audit Committee Charter provides that the Audit Committee shall, among other things,

    a.    meet to review and discuss the company's annual audited financial statements and quarterly financials statements with management and the independent auditor, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

    b.    review major issues regarding accounting principles and financial statement presentations, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

    c.    review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection

with the preparation of financial statements; and

d.    determine whether to recommend to the Board of Directors that the annual audited financial statements be included in the Company's annual report on Form 10-K.

## FACTUAL ALLEGATIONS

### Stock Option Grants to the Officer Defendants and Committee Defendants

25.    According to the Company's annual proxy statements, from June 5, 1996 to August 23, 2002, the Stock Option Committee had the power and authority to take all actions and make all determinations under the Company's stock option plans, including the grant of options thereunder.  On August 23, 2002, the Stock Option Committee merged with the Compensation Committee, and thereafter the Compensation Committee was responsible for administering the Company's stock option plans and determining the grants awarded under the stock option plans.

26.    From 1997 to 2001, the Stock Option Committee granted the Officer Defendants and Committee Defendants Sunrise stock options as follows:

| Name | Purported Date of Grant | Exercise Price[1] | Number of Options |
|------|-------------------------|------------------|-------------------|
| Klaassen | 9/11/00 | $17.00 | 350,000 |
| Faeder | 5/2/97 | $24.375 | 100,000 |
|  | 9/14/98 | $25.00 | 200,000 |
|  | 11/8/99 | $12.75 | 65,000 |
| Smick | 5/2/97 | $24.375 | 150,000 |

---

[1]    The options purportedly granted on September 14, 1998 were granted pursuant to a repricing program authorized and implemented by the Stock Option Committee.  The repricing program allowed Sunrise officers to trade in options with an exercise price of more than $29.00 in exchange for an equal number of options at an exercise price of $25.00, which was the closing price of Sunrise stock on September 14, 1998.

| <u>Name</u> | Purported<br>Date of<br><u>Grant</u> | Exercise<br>Price[2] | Number<br>of Options |
|---|---|---|---|
| Newell | 5/2/97 | $24.375 | 100,000 |
|  | 9/14/98 | $25.00 | 200,000 |
|  | 11/8/99 | $12.75 | 65,000 |
|  | 2/25/00 | $12.38 | 60,000 |
|  | 3/28/00 | $12.44 | 25,000 |
|  | 5/11/01 | $20.00 | 70,000 |
| Swinton | 5/2/97 | $24.375 | 75,000 |
|  | 9/14/98 | $25.00 | 100,000 |
|  | 11/8/99 | $12.75 | 65,000 |
|  | 2/25/00 | $12.38 | 45,000 |
|  | 3/28/00 | $12.44 | 15,000 |
|  | 5/11/01 | $20.00 | 30,000 |
| Slavin | 2/25/00 | $12.38 | 55,000 |
|  | 3/28/00 | $12.44 | 15,000 |
|  | 11/24/00 | $26.31 | 75,000 |
|  | 11/12/01 | $26.95 | 60,000 |
| Tomasso | 9/14/98 | $25.00 | 230,000 |
|  | 11/8/99 | $12.75 | 65,000 |
|  | 2/25/00 | $12.38 | 55,000 |
|  | 3/28/00 | $12.44 | 15,000 |
|  | 5/11/01 | $20.00 | 30,000 |
| Hulse | 5/11/01 | $20.00 | 25,000 |
| Aprahamian | 5/2/97 | $24.375 | 105,000 |
|  | 2/25/00 | $12.38 | 11,000 |
| Callen | 11/8/99 | $12.75 | 10,000 |
|  | 2/25/00 | $12.38 | 8,000 |
| Donohue | 5/2/97 | $24.375 | 5,000 |
|  | 2/25/00 | $12.38 | 16,000 |

---

[2]     The options purportedly granted on September 14, 1998 were granted pursuant to a repricing program authorized and implemented by the Stock Option Committee.  The repricing program allowed Sunrise officers to trade in options with an exercise price of more than $29.00 in exchange for an equal number of options at an exercise price of $25.00, which was the closing price of Sunrise stock on September 14, 1998.

27.   Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1996 Directors' Stock Option Plan and the 1997, 1998, 1999, 2000, and 2001 Stock Option Plans, the exercise price of options must be no less than the fair market value of Sunrise stock on the date of grant, which is defined as the closing price of Sunrise stock on the trading date immediately preceding the date of grant.

28.   Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the measurement date exceeds the exercise price of the options, the company must recognize the difference as an expense.

29.   In a striking pattern that could not have been the result of chance, each and every one of the foregoing stock option grants was dated just after a steep drop and just before a substantial rise in Sunrise's stock price, as demonstrated in the following charts:

a.   Summary of Option Grants and Surrounding Stock Price Performance

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days Before Grant | Stock Price 10 Trading Days After Grant | % Rise in Stock Price After Grant |
|---|---|---|---|---|
| 5/2/97 | $24.375 | $25.00 | $29.50 | 21.0% |
| 9/14/98 | $25.00[3] | $27.38 | $34.63 | 38.5% |
| 11/8/99 | $12.75 | $10.94 | $12.81 | 0.5% |
| 2/25/00 | $12.38 | $13.81 | $15.56 | 25.7% |
| 3/28/00 | $12.44 | $14.50 | $13.88 | 11.6% |
| 9/11/00 | $17.00 | $19.19 | $24.00 | 41.2% |
| 11/24/00 | $26.31 | $26.19 | $29.38 | 11.7% |
| 5/11/01 | $20.00 | $21.87 | $23.85 | 19.3% |
| 11/12/01 | $26.95 | $30.00 | $28.05 | 4.1% |

---

[3]   *See* note 1, *supra.*

b.    Stock Price Performance Surrounding Option Grant Dated 5/2/97



c.    Stock Price Performance Surrounding Option Grant Dated 9/14/98



d.    Stock Price Performance Surrounding Option Grant Dated 11/8/99



e.    Stock Price Performance Surrounding Option Grant Dated 2/25/00



f.    Stock Price Performance Surrounding Option Grant Dated 3/28/00



g.    Stock Price Performance Surrounding Option Grant Dated 9/11/00



h.    Stock Price Performance Surrounding Option Grant Dated 11/24/00



i.    Stock Price Performance Surrounding Option Grant Dated 5/11/01



j.    Stock Price Performance Surrounding Option Grant Dated 11/12/01



30.    The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were

-12-

made.    Rather, at the behest of the Officer Defendants, the Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates.  This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer Defendants and Committee Defendants and improperly reduced the amounts they had to pay the Company upon exercise of the options.

     31.    Further evidence of defendants' backdating of stock options is the fact that the prices of many of the foregoing options coincide with some of Sunrise's lowest closing prices of the respective years 1997 to 2001, as demonstrated in the following charts:

     a.    1997 Closing Prices



-13-

b.    1998 Closing Prices



c.    1999 Closing Prices



d.    2000 Closing Prices



e.    2001 Closing Prices



### Dissemination of False Financial Statements

32.    As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants,

    a.    violated the terms of the Company's shareholder-approved stock option plans;

    b.    violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted; and

    c.    produced and disseminated to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and falsely stated that "[t]he Company grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. The Company accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees and accordingly recognizes no compensation expense for the stock option grants."

33.    The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

    a.    Form 10-K for the fiscal year ended December 31, 1997, filed with the SEC on March 31, 1998 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue;

    b.    Form 10-K for the fiscal year ended December 31, 1998, filed with the SEC on March 31, 1999 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue;

-15-

c.   Form 10-K for the fiscal year ended December 31, 1999, filed with the SEC on March 30, 2000 and signed by defendants Klaassen, Faeder, Slavin, Hulse, Aprahamian, Callen, and Donohue;

d.   Form 10-K for the fiscal year ended December 31, 2000, filed with the SEC on March 30, 2001 and signed by defendants Klaassen, Faeder, Hulse, and Donohue;

e.   Form 10-K for the fiscal year ended December 31, 2001, filed with the SEC on March 29, 2002 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue.

**Defendants' Concealment of Their Misconduct**

34.   From 1998 to 2002, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant," as follows:

a.   Sunrise's proxy statement filed with the SEC on April 3, 1998 falsely reported that options granted to Faeder, Smick, Newell, and Swinton were granted on May 2, 1997, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

b.   Sunrise's proxy statement filed with the SEC on April 6, 1999 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on September 14, 1998, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

c.   Sunrise's proxy statement filed with the SEC on April 14, 2000 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on November 8, 1999, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

d.   Sunrise's proxy statement filed with the SEC on March 29, 2001 falsely reported that options granted to Klaasen were granted on September 11, 2000, that options granted to Newell, Slavin, Swinton, and Tomasso were granted on

February 25, 2000 and March 28, 2000, and that options granted to Slavin were granted on November 24, 2000, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

e.  Sunrise's proxy statement filed with the SEC on April 5, 2002 falsely reported that options granted to Newell, Swinton, Tomasso, and Hulse were granted on May 11, 2001 and that options granted to Slavin Were granted on November 12, 2001, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

35.   From 2003 to 2006, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Form 4's that falsely reported the dates of stock option grants to the Individual Defendants, as follows:

a.  Faeder's Form 4 filed with the SEC on July 16, 2003 falsely reported that options granted to Faeder had been granted on November 8, 1999;

b.  Faeder's Form 4 filed with the SEC on August 21, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

c.  Faeder's Form 4 filed with the SEC on August 22, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

d.  Newell's Form 4 filed with the SEC on August 25, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

e.  Faeder's Form 4 filed with the SEC on September 2, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

f.  Hulse's Form 4 filed with the SEC on September 5, 2003 falsely reported that options granted to Faeder had been granted on February 25, 2000 and March 28, 2000;

g.  Newell's Form 4 filed with the SEC on September 23, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

h.  Faeder's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Faeder had been granted on May 2, 1997;

i.  Swinton's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Swinton had been granted on February 25, 2000;

j.    Swinton's Form 4 filed with the SEC on October 14, 2003 falsely reported that options granted to Swinton had been granted on November 8, 1999;

k.    Swinton's two Form 4's filed with the SEC on October 21, 2003 falsely reported that options granted to Swinton had been granted on May 11, 2001;

l.    Newell's Form 4 filed with the SEC on October 23, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

m.    Swinton's Form 4 filed with the SEC on October 29, 2003 falsely reported that options granted to Swinton had been granted on May 11, 2001;

n.    Tomasso's Form 4 filed with the SEC on October 30, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999;

o.    Tomasso's Form 4 filed with the SEC on October 31, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999 and March 28, 2000;

p.    Swinton's Form 4 filed with the SEC on November 6, 2003 falsely reported that options granted to Swinton had been granted on May 2, 1997;

q.    Slavin's Form 4 filed with the SEC on November 7, 2003 falsely reported that options granted to Slavin had been granted on February 25, 2000;

r.    Tomasso's Form 4 filed with the SEC on November 7, 2003 falsely reported that options granted to Tomasso had been granted on February 25, 2000;

s.    Hulse's Form 4 filed with the SEC on November 12, 2003 falsely reported that options granted to Hulse had been granted on May 11, 2001;

t.    Slavin's Form 4 filed with the SEC on November 12, 2003 falsely reported that options granted to Slavin had been granted on November 8, 1999, February 25, 2000, March 28, 2000, November 24, 2000, and November 12, 2001;

u.    Faeder's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Faeder had been granted on November 8, 1999;

v.    Hulse's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Hulse had been granted on November 8, 1999;

w.    Swinton's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Swinton had been granted on November 8, 1999;

x.    Tomasso's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999;

-18-

y.    Slavin's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Slavin had been granted on November 8, 1999;

z.    Newell's Form 4 filed with the SEC on November 26, 2003 falsely reported that options granted to Newell had been granted on March 28, 2000;

aa.   Slavin's Form 4 filed with the SEC on December 5, 2003 falsely reported that options granted to Slavin had been granted on November 24, 2000 and November 12, 2001;

bb.   Tomasso's Form 4 filed with the SEC on December 22, 2003 falsely reported that options granted to Tomasso had been granted on May 11, 2001;

cc.   Newell's Form 4 filed with the SEC on December 23, 2003 falsely reported that options granted to Newell had been granted on November 8, 1999 and March 28, 2000;

dd.   Newell's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ee.   Newell's Form 4 filed with the SEC on February 25, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ff.   Hulse's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Hulse had been granted on February 25, 2000;

gg.   Tomasso's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Tomasso had been granted on February 25, 2000;

hh.   Faeder's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Faeder had been granted on February 25, 2000;

ii.   Slavin's Form 4 filed with the SEC on March 4, 2004 falsely reported that options granted to Slavin had been granted on February 25, 2000;

jj.   Slavin's Form 4 filed with the SEC on March 5, 2004 falsely reported that options granted to Slavin had been granted on February 25, 2000;

kk.   Swinton's Form 4 filed with the SEC on March 9, 2004 falsely reported that options granted to Swinton had been granted on February 25, 2000;

ll.   Newell's Form 4 filed with the SEC on March 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

mm.   Hulse's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Hulse had been granted on March 28, 2000;

nn.   Tomasso's Form 4 filed with the SEC on March 31, 2004 falsely reported that

options granted to Tomasso had been granted on March 28, 2000;

oo.  Slavin's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Slavin had been granted on March 28, 2000;

pp.  Newell's Form 4 filed with the SEC on April 23, 2004 falsely reported that options granted to Newell had been granted on February 25, 2000;

qq.  Newell's Form 4 filed with the SEC on May 24, 2004 falsely reported that options granted to Newell had been granted on February 25, 2000;

rr.  Hulse's Form 4 filed with the SEC on May 26, 2004 falsely reported that options granted to Hulse had been granted on May 11, 2001;

ss.  Newell's Form 4 filed with the SEC on June 23, 2004 falsely reported that options granted to Newell had been granted on March 28, 2000;

tt.  Newell's Form 4 filed with the SEC on July 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999 and March 28, 2000;

uu.  Newell's Form 4 filed with the SEC on August 24, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

vv.  Newell's Form 4 filed with the SEC on September 24, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ww.  Newell's Form 4 filed with the SEC on October 25, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

xx.  Newell's Form 4 filed with the SEC on November 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

yy.  Tomasso's Form 4 filed with the SEC on December 16, 2004 falsely reported that options granted to Tomasso had been granted on May 11, 2001;

zz.  Newell's Form 4 filed with the SEC on December 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

aaa.  Newell's Form 4 filed with the SEC on January 25, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

bbb.  Newell's Form 4 filed with the SEC on February 24, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ccc.  Newell's Form 4 filed with the SEC on March 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ddd.    Newell's Form 4 filed with the SEC on April 26, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

eee.    Hulse's Form 4 filed with the SEC on May 12, 2005 falsely reported that options granted to Hulse had been granted on May 2, 1997;

fff.    Newell's Form 4 filed with the SEC on May 24, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ggg.    Aprahamian's Form 4 filed with the SEC on May 24, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

hhh.    Aprahamian's Form 4 filed with the SEC on May 26, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

iii.    Aprahamian's Form 4 filed with the SEC on May 31, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

jjj.    Newell's Form 4 filed with the SEC on June 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

kkk.    Newell's Form 4 filed with the SEC on July 25, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

lll.    Newell's Form 4 filed with the SEC on August 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

mmm. Newell's Form 4 filed with the SEC on September 26, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

nnn.    Donohue's Form 4 filed with the SEC on November 22, 2005 falsely reported that options granted to Donohuel had been granted on February 25, 2000;

ooo.    Aprahamian's Form 4 filed with the SEC on April 20, 2006 falsely reported that options granted to Aprahamian had been granted on May 2, 1997.

36.    The Individual Defendants have never disclosed the true grant dates of the stock options described herein.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF
## FIDUCIARY DUTIES AND UNJUST ENRICHMENT

37.    The Officer Defendants breached their fiduciary duties by:

a.    colluding with the Committee Defendants and each other to backdate stock option grants;

b.    colluding with the Committee Defendants and each other to violate GAAP;

c.    colluding with the Committee Defendants and each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.    colluding with the Committee Defendants and each other to file false proxy statements, false financial statements, and False Form 4's in order to conceal the improper backdating of stock options.

38.    The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves and the Committee Defendants at the expense of the Company.

39.    The Committee Defendants breached their fiduciary duties by:

a.    colluding with the Officer Defendants and each other to backdate stock option grants;

b.    colluding with the Officer Defendants and each other to violate GAAP;

c.    colluding with the Officer Defendants and each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.    colluding with the Officer Defendants and each other to file false proxy statements, false financial statements, and false Form 4's in order to conceal the improper backdating of stock options.

40.    The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves and the Officer Defendants at the expense of the Company.

41.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

42.    The Officer Defendants and Committee Defendants have exercised hundreds of thousands of backdated options at improperly low prices and have then sold the shares for substantial profits.  Consequently, these defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

43.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

44.    Plaintiff is an owner of Sunrise common stock and was an owner of Sunrise common stock at all times relevant hereto.

45.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

46.    As a result of the facts set forth herein, plaintiff has not made any demand on the Sunrise Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

47.    At the time this action was commenced the Board consisted of seven directors: defendants Klaassen, Aprahamian, Callen, and Donohue, and directors Teresa Klaassen, J. Douglas Holladay, and William G. Little.   The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

a.    Klaassen, Aprahamian, Callen, and Donohue, because they are directly interested in the improperly backdated stock option grants complained of herein;

b.    Aprahamian, Callen, and Donohue, because as members of the Stock Option Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein.  Moreover, by colluding with the Officer Defendants,

-23-

as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

c.     Aprahamian, Callen, and Donohue because as members of the Audit Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants, as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

d.     Klaassen, Aprahamian, Callen, and Donohue, because as directors of the Company they directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Klaassen, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants; and

e.     Teresa Klaassen, the wife of defendant Klaassen and the co-founder of the Company, because of her close familial and business relationship with Klaassen.

48.     Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

49.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

50.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

51.     As alleged in detail herein, the Officer Defendants breached their fiduciary duties by:

a.     colluding with the Committee Defendants and each other to backdate stock option grants;

b.     colluding with the Committee Defendants and each other to violate GAAP;

-24-

c. colluding with the Committee Defendants and each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d. colluding with the Committee Defendants and each other to file false proxy statements, false financial statements, and False Form 4's in order to conceal the improper backdating of stock options.

52. The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves and the Committee Defendants at the expense of the Company.

53. As alleged in detail herein, the Committee Defendants breached their fiduciary duties by:

a. colluding with the Officer Defendants and each other to backdate stock option grants;

b. colluding with the Officer Defendants and each other to violate GAAP;

c. colluding with the Officer Defendants and each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d. colluding with the Officer Defendants and each other to file false proxy statements, false financial statements, and false Form 4's in order to conceal the improper backdating of stock options.

54. The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves and the Officer Defendants at the expense of the Company.

55. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR UNJUST ENRICHMENT

56.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

57.    The Individual Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

58.    To remedy the Individual Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of $25,000,000.00 in damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Ordering the Individual Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.    Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: September 5, 2006

Respectfully submitted,

LAW OFFICES OF JOHN C. PASIERB, PLC

John C. Pasierb (27446)
2200 Wilson Boulevard, Suite 800
Arlington, VA 22201
Telephone: (703) 525-2260
Fax: (703) 525-2489

SCHIFFRIN & BARROWAY, LLP
Eric L. Zagar
Sandra G. Smith
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (610) 667-7056

*Attorneys for Plaintiff*

I, **Catherine R. Molner** hereby verify that I have reviewed the Complaint and authorized its filing and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: ___8/24/06___          *Catherine R. Molner*

                                     **CATHERINE R. MOLNER**

# EXHIBIT  5



VIRGINIA:

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

NICHOLAS VON GUGGENBERG,          )
                                  )
              Derivative Plaintiff, )
                                  )
       v.                         )       Case No. CL-200610174
                                  )
PAUL J. KLAASSEN, ET AL.,         )
                                  )
              Defendants,         )
                                  )
          and                     )
                                  )
SUNRISE SENIOR LIVING, INC.,      )
                                  )
          Nominal Defendant.      )
                                  )

*FINAL*     **ORDER**

This matter comes before the Court on Nominal Defendant Sunrise Senior Living, Inc.'s ("Sunrise") Demurrer. Having considered Sunrise's Demurrer and memorandum in support thereof, the opposition thereto, the oral arguments of counsel, and the entire record herein, it is hereby ORDERED, ADJUDGED, and DECREED that:

1.     The Demurrer is SUSTAINED;

2.     The Verified Derivative Complaint of derivative defendant Nicholas Von Guggenberg shall be and hereby is DISMISSED without prejudice. *AND LEAVE TO AMEND IS DENIED.*

Entered this _15_ day of September, 2006.

_____
Circuit Court Judge

WE ASK FOR THIS:

N. Thomas Connally, VSB #36318
Jon M. Talotta, VSB #44590
HOGAN & HARTSON, LLP
8300 Greensboro Drive, Suite 1100
McLean, Virginia 22102
Phone: (703) 610-6100
Fax: (703) 610-6200

Charlie C.H. Lee, VSB #30410
MOORE & LEE LLP
1750 Tysons Boulevard
Suite 1450
McLean, Virginia 22102
Phone: 703-506-2050
Fax: 703-506-2051

OF COUNSEL:
George H. Mernick
HOGAN & HARTSON, LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone: 202-637-5726
Fax: 202-637-5910

Counsel for Nominal Defendant
Sunrise Senior Living, Inc.

SEEN AND OBJECTED TO FOR THE REASONS IN PLAINTIFFS PLEADINGS & IN ORAL ARGUMENT

John C. Pasierb, VSB #27446
LAW OFFICES OF JOHN C. PASIERB, PLC
2200 Wilson Boulevard
Suite 800

Arlington, Virginia 22201
Phone: 703-875-2260
Fax: 703-528-3692

Eric L. Zagar
Sandra G. Smith
SCHIFFRIN & BARROWAY, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Phone: 610-667-7706
Fax: 610-667-7056

Counsel for Derivative Plaintiff
Nicholas Von Guggenberg

A COPY TESTE:
JOHN T. FREY, CLERK
BY: _____
        Deputy Clerk
Date: __7-25-06__
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia

# EXHIBIT  6



## News Release

### Sunrise Announces Appointment of New Director

MCLEAN, Va., June 21, 2007 /PRNewswire-FirstCall via COMTEX News Network/ -- Sunrise Senior Living, Inc. (NYSE: SRZ), today announced that, effective June 20, 2007, its board of directors had expanded the size of the board from seven to eight members and appointed Stephen D. Harlan to the newly created directorship in the class of directors whose term of office expires at the 2008 annual meeting of stockholders.

"Steve is a welcome addition to Sunrise's board of directors," said Doug Holladay, chairman of Sunrise's nominating and corporate governance committee. "He shares Sunrise's mission and commitment to seniors, and we believe his accounting and business expertise will be extremely beneficial to the company."

Mr. Harlan was vice chairman of KPMG Peat Marwick, where he also served on KPMG's international council, board of directors, and management committee. In June 1995, President Clinton appointed Mr. Harlan to the District of Columbia Financial Responsibility and Management Assistance Authority, where he served as vice chairman until September 1998. Mr. Harlan also served as a director of FBR Asset Investment Corporation, a real estate investment trust that invested in mortgage-backed securities and in debt and equity securities of companies engaged in real estate-related and other businesses, since its founding in 1997 and, upon the merger of FBR Asset Investment Corporation with Friedman, Billings, Ramsey Group, Inc., an investment banking firm, in March 2003, he became a director of Friedman, Billings, Ramsey Group, Inc. He also serves as chairman of the audit committee of its board of directors. He is the chairman of Harlan Enterprises, LLC, a specialized real estate firm that invests in commercial real estate. Before joining Harlan Enterprises, LLC, he was chairman of H.G. Smithy, a specialized real estate firm that provides mortgage banking, finance, investment advisory and property management services to commercial real estate investors, from 1993 to 2001. Mr. Harlan is a member of the board of directors of Harris Interactive Inc., a market research, polling and consulting company and of ING Direct Bank, a retail virtual bank offering services over the internet, phone or by mail. He is also a director of Medstar Health, a non-profit, community-based healthcare organization serving the Baltimore/Washington region, a director of the Loughran Foundation, a non-profit organization dedicated to education and the performing arts, and a Trustee of the Carnegie Endowment for International Peace, a private, non-profit organization dedicated to advancing cooperation between nations and promoting active international engagement by the United States.

In addition to his appointment as a director of the Company, Mr. Harlan was also appointed as a member of the audit committee. In connection with Mr. Harlan's appointment as a director, the Company's board determined that Mr. Harlan is "independent" within the meaning of the rules of the New York Stock Exchange and the Company's corporate governance guidelines and qualifies as an "audit committee financial expert" as defined under the rules of the Securities and Exchange Commission. As a member of the Company's audit committee, it is expected that Mr. Harlan will play an important role in overseeing completion of the pending restatement of the Company's historical financial statements.

Mr. Harlan's appointment as a director was unanimously recommended by the nominating and corporate governance committee of Sunrise's board of directors. Consistent with the Company's corporate governance guidelines, the nominating and corporate governance committee will continue to review and evaluate the composition of Sunrise's board, including the appointment of additional directors as necessary.

About Sunrise Senior Living

Sunrise Senior Living, a McLean, Va.-based company, employs approximately 40,000 people. As of March 31, 2007, Sunrise operated 444 communities in the United States, Canada, Germany and the United Kingdom, with a combined capacity for more than 52,000 residents. At quarter end, Sunrise also had 42 communities under construction in these countries with a combined capacity for more than 6,300 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing, rehabilitative and hospice care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

SOURCE Sunrise Senior Living, Inc.

Lisa Mayr, Vice President, Investor Relations and Capital Markets for Sunrise Senior Living, Inc., +1-703-744-1787

# EXHIBIT  7

## VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on* Friday *the* 27th *day of* April, 2007.

Nicholas Von Guggenberg,                                          Appellant,

  against      Record No. 062587
                 Circuit Court No. CL-2006-10174

Paul J. Klaassen, et al.,                                         Appellees.

From the Circuit Court of Fairfax County

      Upon review of the record in this case and consideration of the argument submitted in support of and in opposition to the granting of an appeal, the Court is of opinion there is no reversible error in the judgment complained of. Accordingly, the Court refuses the petition for appeal.

            A Copy,

            Teste:

                   Patricia L. Harrington, Clerk

          By:
                   Deputy Clerk

# EXHIBIT  8

**EFiled: Mar 6 2007 4:58PM EST**
**Transaction ID 14029609**
**Case No. 2770-N**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| PETER V. YOUNG and ELLEN ROBERTS YOUNG, Derivatively on Behalf of Defendant SUNRISE SENIOR LIVING, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PAUL L. KLAASSEN, TERESA M. KLAASSEN, DAVID W. FAEDER, TIMOTHY S. SMICK, THOMAS B. NEWELL, BRIAN C. SWINTON, CHRISTIAN B.A. SLAVIN, LARRY E. HULSE, TIFFANY L. TOMASSO, ROBERT R. SLAGER, CARL ADAMS, RONALD V. APRAHAMIAN, CRAIG R. CALLEN, DAVID G. BRADLEY, J. DOUGLAS HOLLADAY and THOMAS J. DONOHUE, <br><br> Defendants, <br><br> SUNRISE SENIOR LIVING, INC., <br><br> Nominal Defendant. | C.A. No. |

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, Peter V. Young and Ellen Roberts Young, for their Derivative Complaint (the "Complaint"), alleges on personal knowledge as to themselves and as to all other facts based on the investigation of their counsel, alleges on information and belief as follows:

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers, seeking to remedy

defendants' breaches of fiduciary duties and other violations of law that have caused damage to Sunrise. This action arises out of defendants' conduct of authorizing, or through abdication of duty permitting, the back-dating of stock option grants to and for the benefit of Sunrise's officers and directors, including defendants Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Tomasso, Hulse, Aprahamian, Callen, Donohue, Bradley, Holladay, Slager, and Adams and at the expense of Sunrise and its shareholders. Based on this unlawful conduct, the Individual Defendants ("Individual Defendants") realized over $172 million in illicit proceeds through the sale of stock at a time when they knew of material non-public information concerning the improper backdating of options which led to the financial statements issued by Sunrise and its stock price being falsely inflated.

2. A "stock option" is a contract that gives the holder the option to purchase a designated quantity of shares of a company's stock at a set price, the "exercise price." Stock options are granted as part of employee compensation packages as a means to create incentives to boost profitability and stock value. When the option is exercised, the holder acquires the designated number of shares from the company at the exercise price, regardless of the stock's contemporaneous market price. The exercise price of stock options is the market price on the date of the grant of the option. If the stock price goes up over time, the executive makes a profit when he sells the stock acquired by exercising the option. If the exercise price is lower than it should be, the employee pays less and the company gets less when the stock option is exercised.

3. If the system is abused by "backdating" the options granted--which refers to picking an option-grant date earlier than the actual date the option was granted--a date when the stock price was lower than the actual grant date--the executive gets an instant profit. The company is hurt, as the "spread" between the true grant exercise price and the market price is

required by law to be treated as compensation expense, which reduces profit. In addition, the backdating of options causes the corporate stock option plan to lose its tax protections, and results in the corporation's internal non-public information's being misappropriated by the executives for their personal profit.

4. In violation of the Company's own stated policies, defendants engaged in or permitted "backdating" of options in the issuance of the executive stock options for many years. All of the Company's stock options plans required stock options to have an exercise price equal to the fair market value on the date of the grant, and defendants regularly represented that stock options covered by the stock options plans were not granted at less than 100% of fair market value on the date of the grant. Since at least 1999, backdated options have been granted to numerous Sunrise officers and directors.

5. The Individual Defendants' illegal backdating scheme not only lined the pockets of the backdated option recipients and caused Sunrise to issue materially false financial statements, but also undermined the key purpose of stock option-based executive compensation: to provide incentives to improve the Company's performance and increase the Company's stock price and market capitalization. By manipulating options such that they carried an exercise price lower than the trading price of the stock on the date of grant, Sunrise insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition.

6. In breach of their fiduciary duties as officers and/or directors of Sunrise, the Individual Defendants colluded with one another to:

      a. improperly backdate dozens of grants of Sunrise stock options to Sunrise executives and directors, in violation of the Company's shareholder-approved stock option plans;

b.   improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

c.   improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

d.   produce and disseminate to Sunrise shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

7.   As a result of the Individual Defendants' misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## PARTIES

8.   Plaintiff Ellen Roberts Young is currently a shareholder of Sunrise and has continuously been a shareholder of Sunrise since April 19, 1999.

9.   Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of the Company since 1995, and as a member of the Audit Committee of the Board ("Audit Committee") since 1996, chairing the Audit Committee since 2003. Aprahamian also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in 1997, and has served as a consultant to the Company beginning in May 1997.

10.   Defendant Craig R. Callen ("Callen") has served as a director of the Company since 1999. Callen served as a member of the Audit Committee in 1999 and since 2004, and as a member of the Stock Option Committee from 1999 to August 23, 2002, when the Stock Option Committee merged with the Compensation Committee of the Board ("Compensation Committee").

4

11.     Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995 and as a member of the Audit Committee since 1996. Donohue served as a member of the Stock Option Committee from 1996 to August 23, 2002.

12.     Defendant David G. Bradley ("Bradley") served as a director of the Company from 1997 to 2005, as a member of the Stock Option Committee from 1998 to August 23, 2002, and as a member of the Audit Committee from 2002 to 2004.

13.     Defendant J. Douglas Holladay ("Holladay") has served as a director of Sunrise since 2000, and was a member of the Audit Committee in 2001.

14.     Defendant Paul J. Klaassen ("Klaassen") founded the Company with his wife, Sunrise Director Teresa M. Klaassen ("Teresa Klaassen"), and has served as Chairman of the Board and Chief Executive Officer of Sunrise since 1991.

15.     Defendant Teresa Klaassen ("T. Klaassen"), wife of Paul Klaassen, has served as a director of Sunrise since 1981 and was Executive Vice President from 1981 to November 2003. She currently serves as Sunrise's Chief Cultural Officer.

16.     Defendant David F. Faeder ("Faeder") served as the Company's and its predecessor entities' Executive Vice President and Chief Financial Officer from 1993 to 1997. Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant to the Company from April 2000 to March 2004.

17.     Defendant Timothy S. Smick ("Smick") served as Chief Operating Officer of the Company from February 1996 to January 1998, as Executive Vice President of the Company from May 1996 to January 1998, and as a director of the Company from October 1996 to March 1998.

5

18. Defendant Thomas B. Newell ("Newell") has served as the Company's President since April 2000, as Executive Vice President from May 1996 to April 2000 and was President of Sunrise Development, Inc., the Company's development subsidiary, and General Counsel from January 1996 to April 2000.

19. Defendant Brian C. Swinton ("Swinton") served as the Company's Executive Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc., from September 2000 to December 2002.

20. Defendant Christian B.A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May 1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004.

21. Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003. Tomasso previously served as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994.

22. Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003, and as Chief Financial Officer from April 2000 to 2005.

23. Defendant Robert R. Slager ("Slager") served as a director of the Company from 1999 to 2001.

6

24.     Defendant Carl Adams ("Adams") has served as Senior Vice President and Treasurer of Sunrise since December 2005. Previously, Adams served as Senior Vice President of Sunrise Capital Group from November 2004 to December 2005, and as Sunrise's Chief Accounting Officer from May 2000 to November 2004.

25.     Collectively, defendants Klaassen, T. Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Tomasso, Hulse, Aprahamian, Callen, Donohue, Bradley, Holladay, Slager, and Adams are referred to herein as the "Option Recipient Defendants."

26.     Collectively, all Defendants except nominal defendant Sunrise are referred to as the "Individual Defendants."

27.     Sunrise is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102. According to its public filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, truth, loyalty, and due care, and were and are required to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not for self-aggrandizement. Each director and officer of the Company owes the Company and its shareholders the fiduciary duty to exercise good faith, loyalty and

diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;
>
> b.    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and
>
> c.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

31.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate and complete financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

> (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

8

(2)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

    a.     transactions are executed in accordance with management's general or specific authorization;

    b.     transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Option Recipient Defendants

32.     Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1996 Directors' Stock Option Plan ("1996 Director Plan"), the 1997 Stock Option Plan, the 1998 Stock Option Plan, the 1999 Stock Option Plan, the 2000 Stock Option Plan, and the 2001 Stock Option Plan (collectively, the "Plans"):

The Plan is intended to advance the interests of the Corporation and any subsidiary thereof within the meaning of Rule 405 of Regulation C under the Securities Act of 1933, as amended (with the term "person" as used in such Rule 405 being defined as in Section 2(2) of such Act) (a "Subsidiary"), by providing eligible individuals (as designated pursuant to Section 4 below) with incentives to improve business results, by providing an opportunity to acquire or increase a proprietary interest in the Corporation, which thereby will create a stronger incentive to expend maximum effort for the growth and success of the Corporation and its Subsidiaries, and will encourage such eligible individuals to continue to serve the Corporation and its Subsidiaries, whether as an employee, as a director, as a consultant or advisor or in some other capacity. To this end, the Plan provides for the grant of stock options....

33.     According to the terms of each of the Plans, the Plans were administered by the Board of Directors of the Corporation, which had the full power and authority to take "all actions and to make all determinations required or provided for under the Plans or any Option granted or Option Agreement entered into hereunder and all such other actions and determinations not inconsistent with the specific terms and provisions of the Plans deemed by the Board to be necessary or appropriate to the administration of the Plan or any Option granted or Option Agreement entered into thereunder."

9

34.    The terms of the Plans further provide that "[t]he Option Price shall be not less than the greater of par value or 100 percent of the fair market value of a share of Stock on the date on which the Option is granted," where fair market value is defined as "the closing price of the Stock on such exchange or system or in such market ... on the trading date immediately before the Option is granted...." Additionally, each of the Plans specifically provides that "[t]he date of grant of an Option under this Plan shall be the date as of which the Board approves the grant."

35.    At the Annual meeting held on April 26, 1999, shareholders of Sunrise approved the 1999 Stock Option Plan.

36.    According to the 1999 Proxy Statement, the members of the Stock Option Committee were Meadow, Bradley, and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

37.    On March 5, 1999, Sunrise granted Hulse and Slavin a total of at least 165,000 stock options. However, Slavin did not even begin his employment with the Company until May 1999, according to the Company's 2003 proxy statement. These options were backdated to an adjusted exercise price of $18.81, one of the lowest prices of Sunrise stock for the first quarter.

38.    On November 8, 1999, Sunrise granted stock options to seven of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement. Callen, one of the recipients of these options, was on the Stock Option Committee and the Audit Committee on the date of grant. These options were

10

backdated to one of the lowest prices of Sunrise stock for the fiscal year, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Adjusted Exercise Price |
|---|---|---|---|---|
| 11/08/99 | Newell | $12.75 | 130,000 | $6.38 |
| | Swinton | $12.75 | 80,000 | $6.38 |
| | Tomasso | $12.75 | 130,000 | $6.38 |
| | Faeder | $12.75 | 130,000 | $6.38 |
| | Hulse | $12.75 | 35,000 | $6.38 |
| | Slavin | $12.75 | 70,000 | $6.38 |
| | Callen | $12.75 | 10,000 | $6.38 |

39.    According to Sunrise's Form 10-K for the year ended December 31, 1999: "Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. At December 31, 1999, these plans provided for the grant of options to purchase up to 6,324,910 shares of common stock. In February 2000, an additional 500,000 shares of common stock were allocated for the granting of options to employees. The option exercise price and vesting provisions of the options are fixed when the option is granted. The options expire ten years from the date of grant and generally vest over a four year period. The option exercise price is not less than the fair market value of a share of common stock on the date immediately before the day the option is granted (*i.e*, the prior day's closing price). Sunrise also had a stock option agreement with one of its senior executives. The agreement, as amended, was effective as of January 4, 1995 and covered 450,000 shares of common stock that were reserved for issuance at an exercise price of $8.00. As of December 31, 1999, all options were exercised."

40.    The 1999 Form 10-K further states:

11

Sunrise grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. Sunrise accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

41.    At the Annual meeting held on May 12, 2000, shareholders of Sunrise were asked to vote on, and approved, the 2000 Stock Option Plan.

42.    According to the 2000 Proxy Statement, the members of the Stock Option Committee were Bradley, Callen, and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options

43.    On February 25, 2000 and March 28, 2000, Sunrise granted options to 11 of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement. Furthermore, Donohue and Bradley, two of the recipients of the February 25, 2000 options, were members of the Stock Option Committee on the date of grant, and Aprahamian, Donohue, and Callen, the recipients of the February 25, 2000 options, comprised the entire Audit Committee on the date of grant. These options were backdated to two of the lowest stock prices of $6.19 on February 24, 2000 and $6.22 on March 27, 2000 for the 2000 fiscal year.

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying | Adjusted Exercise Price |
|---|---|---|---|---|
| 02/25/00 | Newell | $12.38 | 120,000 | $6.19 |
| | Slavin | $12.38 | 110,000 | $6.19 |
| | Swinton | $12.38 | 90,000 | $6.19 |
| | Tomasso | $12.38 | 110,000 | $6.19 |
| | Faeder | $12.38 | 120,000 | $6.19 |
| | Hulse | $12.38 | 14,444 | $6.19 |
| | Donahue | $12.38 | 32,000 | $6.19 |
| | Aprahamian | $12.38 | 22,000 | $6.19 |
| | Slager | $12.38 | 10,000 | $6.19 |

|          | Bradley | S12.38 | 14,000 | $6.19 |
|----------|---------|--------|--------|-------|
|          | Callen  | S12.38 | 16,000 | $6.19 |
| 03/28/00 | Newell  | S12.44 | 50,000 | S6.22 |
|          | Slavin  | S12.44 | 30,000 | S6.22 |
|          | Swinton | $12.44 | 30,000 | S6.22 |
|          | Tomasso | $12.44 | 30,000 | $6.22 |
|          | Hulse   | $12.44 | 50,000 | $6.22 |

44.   On May 22, 2000, Sunrise granted Adams and Holladay a total of at least 14,500 stock options. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock, as demonstrated below:

| Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Price |
|------------|-----------|----------------|----------------------------------------------|-------|
| 05/22/00   | Adams     | $15.56         | At least 5,000                               | S7.78 |
|            | Holladay  | $15.56         | At Least 24,000                              | $18.81 |

45.   On September 11, 2000, Co-founder, Chairman of the Board, and CEO Klaassen was granted 350,000 stock options at an exercise price of $8.50. The Company's proxy statement indicates that this was pursuant to an new employment agreement entered into with Klaassen in September of 2000, which conveniently granted stock options to him when Sunrise stock was at the lowest price of the month of September and near the lowest price of the fiscal quarter.

46.   On November 24, 2000, Sunrise granted 75,000 options to Slavin. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock.

47.   According to Sunrise's Form 10-K for the year ended December 31, 2000:

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. At December 31, 2000, these plans provided for the grant of options to purchase up to 7,323,910 shares of common stock. The option exercise price and vesting provisions of the options are fixed when the option is granted. The options expire ten years from the date of grant and generally vest over a four-year period. The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.

48.    The 2000 Form 10-K further states:

Sunrise grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. Sunrise accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

49.    At the Annual Meeting held on May 11, 2001, shareholders of Sunrise approved the 2001 Stock Option Plan.

50.    According to the 2001 Proxy Statement the members of the Stock Option Committee were Bradley, Callen and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

51.    On November 12, 2001, stock options were backdated to a point just prior to a precipitous rise in the price of Sunrise Stock, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Exercise Price |
|---|---|---|---|---|
| 11/12/01 | Slavin | $26.96 | 120,000 | $13.48 |

14

52.    On May 11, 2001, options were purportedly granted at one of the lowest prices of Sunrise Stock for the fiscal year, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Adjusted Exercise Price |
|---|---|---|---|---|
| 05/11/01 | Faeder | $20.00 | 100,000 | $10.00 |
|  | Newell | $20.00 | 140,000 | $10.00 |
|  | Swinton | $20.00 | 60,000 | $10.00 |
|  | Tomasso | $20.00 | 60,000 | $10.00 |
|  | Hulse | $20.00 | 50,000 | $10.00 |
|  | Adams | $20.00 | 30,000 | $10.00 |
|  | Donohue | $20.00 | 24,000 | $10.00 |
|  | Bradley | $20.00 | 14,000 | $10.00 |
|  | Callen | $20.00 | 20,000 | $10.00 |

53.    According to Sunrise's Form 10-K for the year ended December 31, 2001:

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. At December 31, 2001, these plans provided for the grant of options to purchase up to 8,148,910 shares of common stock. The option exercise price and vesting provisions of the options are fixed when the option is granted. The options expire ten years from the date of grant and generally vest over a four-year period. The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.

54.    Each and every one of the aforementioned stock option grants was dated just before a significant increase in Sunrise stock price and/or at or near Sunrise's lowest closing price of the pertinent fiscal quarter or year. The reason for the extraordinary patterns set forth in the preceding paragraphs is that the purported grant dates set forth therein were *not* the actual dates on which the stock option grants were made. Rather, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and

15

deliberately backdated the stock option grants to make it appear as though the grants had been made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the Option Recipient Defendants at the Company's expense. This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options and improperly reduced the amounts the Option Recipient Defendants had to pay the Company upon exercise of the options.

### The Individual Defendants' Dissemination of False Financial Statements

55.     The Individual Defendants prepared, approved, and/or signed Sunrise's annual and quarterly SEC reports during the relevant period. The Individual Defendants knowingly and deliberately caused the Company to disseminate materially false and misleading statements in the periodic filings that the Individual Defendants prepared, approved, and/or signed.

56.     The Individual Defendants' option backdating scheme caused each of Sunrise's Forms 10-K and Forms 10-Q for the relevant period to materially understate Sunrise's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Individual Defendants failed to expense the in-the-money portion of Sunrise's stock option grants during the period, as required by APB 25.

57.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants:

> a.     violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices that were less than the closing price of Sunrise stock on the day before the date of grant;

16

      b.    violated APB 25 by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

      c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

      d.    produced and disseminated to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expense and overstated net income.

58.    Specifically, in the Company's annual reports on Form 10-K for fiscal years 1996 to 2003, the Individual Defendants caused Sunrise to falsely state that "the Company has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related interpretations, in accounting for its employee and director stock option stock option and stock incentive plans. Under APB 25, if the exercise price of the Company's stock options is not less than the market price of the underlying stock on the date of grant, no compensation expense is recognized. Such statements were materially false and misleading in each of these years because Sunrise had granted stock options at exercise prices that were below fair market value on the date immediately preceding the grant date, and failed to account for the in-the-money options as required by APB 25.

59.    As alleged previously, APB 25 required the Individual Defendants to record compensation expense for options that were in-the-money on the date of grant. However, they did not do so, thereby materially understating Sunrise's compensation expense and materially overstating Sunrise's net income or materially understating its net loss. These statements were designed to conceal, and did in fact conceal, the fact that the Individual Defendants were engaged in am unlawful continuous and systematic scheme of backdating stock option grants

17

to Sunrise insiders. These understatements also had the effect of inflating the stock price of Sunrise shares.

60.     Additionally, Sunrise's materially false and misleading financial statements for fiscal years 1998 to 2002 were included in its Forms 10-K filed for subsequent fiscal years. For this reason, and to the extent they included financials from earlier periods, Sunrise's annual reports on Form 10-K for fiscal years 2003 to 2005 were also materially false and misleading. By participating in the secret backdating scheme, and by reviewing and/or signing these subsequent annual reports, the Individual Defendants knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading, and inflated the Company's stock price.

61.     The Individual Defendants caused Sunrise to send shareholders proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period. The Individual Defendants prepared and/or reviewed each proxy statement between 1999 and 2006. Moreover, they knew, or were deliberately reckless in not knowing, that the proxies were materially false and misleading.

62.     The Sunrise proxy statements that were sent to shareholders in connection with annual shareholders' meetings concerned the election of directors, the approval and adoption of a new Sunrise stock option plan, and ratification of the selection of Sunrise's independent auditor. Each proxy statement sent to shareholders during this period contained materially false and misleading disclosures or omitted information about Sunrise's stock option practices, as detailed above.

63.     From 1998 to 2002, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of

18

concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

64.     Sunrise's proxy statement filed with the SEC on April 3, 1998 falsely reported that options granted to Faeder, Smick, Newell, and Swinton were granted on May 2, 1997, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant.

65.     Sunrise's proxy statement filed with the SEC on April 6, 1999 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on September 14, 1998, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

66.     Sunrise's proxy statement filed with the SEC on April 14, 2000 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on November 8, 1999, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

67.     Sunrise's proxy statement filed with the SEC on March 29, 2001 falsely stated that options granted to Klaasen were granted on September 11, 2000, that options granted to Newell, Slavin, Swinton, and Tomasso were granted on February 25, 2000 and March 28, 2000, that options granted to Slavin were granted on November 24, 2000, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the

market price of the Common Stock at the date of the grant." Sunrise's proxy statement filed with the SEC on April 5, 2002 falsely stated that options granted to Newell, Swinton, Tomasso, and Hulse were granted on May 11, 2001 and that options granted to Slavin were granted on November 12, 2001, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

68.     Moreover, in the Compensation Committee Reports included in the Company's proxy statements filed from 1998 to 2002, the Company falsely stated that "[t]he full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price," when in fact the backdated stock options and *ultra vires* stock options provided the Option Recipient Defendants with immediate profits regardless of the Company's stock performance.

69.     On December 11, 2006, Sunrise announced an SEC investigation of the Company and the appointment of a special committee whose bifurcated purpose was to review insider sales of Sunrise stock and the Company's historical practices relating to stock option grants:

> Sunrise Senior Living, Inc. (NYSE: SRZ) today announced that its Board of Directors has appointed a special independent committee to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants. The Board's decision followed receipt of a letter from a union shareholder that was simultaneously sent to news outlets, which resulted in media coverage and a subsequent request by the Securities and Exchange Commission (SEC) for information about matters raised in the media reports. The special committee has retained independent outside legal counsel to assist in its review.
>
> Sunrise is committed to sound corporate governance and transparency and the Board has determined that a comprehensive review by a special committee and independent counsel is the most appropriate way to address these matters in a timely manner.

20

The review by the special committee will be conducted in parallel with the Company's ongoing efforts to complete the previously announced restatement of its financial statements. In view of these ongoing efforts and the special committee review, the Company now anticipates that its restated 2005 Form 10-K will be delayed beyond year-end, but still expects to be current in all of its filings with the SEC by March 1, 2007.

70. As of the filing date of this Complaint, Sunrise has not released any finding from the special committee. However on January 15, 2007, the Company did admit that Sunrise will not be current in all of its filings with the SEC by March 1, 2007 contrary to the statement in its December 11, 2006 press release.

71. Defendants, who had a fiduciary duty to act with the utmost due care, loyalty and good faith, either expressly authorized the practice of back-dating options or, in conscious abrogation of their fiduciary duties, permitted the practice to recur repeatedly over the years. The practice apparently ceased after the passage of sweeping changes to the federal securities laws in 2002, which curtailed the potential for backdating by requiring companies to disclose option grants within two days.

### The Individual Defendants Have Been Unjustly Enriched At Sunrise's Expense

72. From 1999 to 2006, certain of the Individual Defendants, while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold millions of dollars in Sunrise stock, a significant portion of which was obtained through the exercise of improperly backdated stock options, as demonstrated below:

**Carl G. Adams**

| ADAMS, CARL G. | | Sale | $33,153 | 1,250 | 9/3/2003 | S26.52 |
|---|---|---|---|---|---|---|

**Paul J Klaassen/ Teresa M. Klasssssen**

| KLAASSEN PAUL J & TERESA M | Sale | $1,838,590 | 50,000 | 5/2/2006 | S36.77 |
|---|---|---|---|---|---|
| KLAASSEN PAUL J & TERESA M | Sale | $1,852,040 | 50,000 | 5/1/2006 | $37.04 |

21

| KLAASSEN PAUL J & TERESA M | Sale | $1,924,955 | 50,000 | 4/4/2006 | S38.50 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,940,940 | 50,000 | 4/3/2006 | S38.82 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,718,050 | 50,000 | 3/2/2006 | S34.36 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,738,240 | 50,000 | 3/1/2006 | $34.76 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,806,930 | 50,000 | 2/2/2006 | $36.14 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,813,600 | 50,000 | 2/1/2006 | $36.27 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,719,670 | 50,000 | 1/4/2006 | $34.39 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,605,610 | 50,000 | 1/3/2006 | $32.11 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,728,980 | 50,000 | 12/20/2005 | $34.58 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,738,975 | 50,000 | 12/19/2005 | $34.78 |

## Thomas Newell

| NEWELL, THOMAS B. | Sale | $914,830 | 24,000 | 4/24/2006 | $38.12 |
| NEWELL, THOMAS B. | Sale | $918,401 | 24,000 | 3/22/2006 | $38.27 |
| NEWELL, THOMAS B. | Sale | $820,694 | 24,000 | 2/22/2006 | $34.20 |
| NEWELL, THOMAS B. | Sale | $846,996 | 24,000 | 1/23/2006 | $35.29 |
| NEWELL, THOMAS B. | Sale | $831,727 | 24,000 | 12/22/2005 | $34.66 |
| NEWELL, THOMAS B. | Sale | S808,361 | 24,000 | 11/22/2005 | S33.68 |
| NEWELL, THOMAS B. | Sale | S780,547 | 24,000 | 10/24/2005 | $32.52 |
| NEWELL, THOMAS B. | Sale | $756,120 | 12,000 | 9/22/2005 | $63.01 |
| NEWELL, THOMAS B. | Sale | $721,212 | 12,000 | 8/22/2005 | $60.10 |
| NEWELL, THOMAS B. | Sale | $637,913 | 12,000 | 7/22/2005 | $53.16 |
| NEWELL, THOMAS B. | Sale | $634,579 | 12,000 | 6/22/2005 | $52.88 |
| NEWELL, THOMAS B. | Sale | $624,282 | 12,000 | 5/23/2005 | $52.02 |
| NEWELL, THOMAS B. | Sale | $575,464 | 12,000 | 4/22/2005 | $47.96 |
| NEWELL, THOMAS B. | Sale | S592,463 | 12,000 | 3/22/2005 | S49.37 |
| NEWELL, THOMAS B. | Sale | $561,840 | 12,000 | 2/22/2005 | $46.82 |
| NEWELL, THOMAS B. | Sale | $522,360 | 12,000 | 1/24/2005 | $43.53 |
| NEWELL, THOMAS B. | Sale | $536,455 | 12,000 | 12/22/2004 | $44.70 |
| NEWELL, THOMAS B. | Sale | $509,698 | 12,000 | 11/22/2004 | $42.47 |
| NEWELL, THOMAS B. | Sale | $432,000 | 12,000 | 10/22/2004 | $36.00 |
| NEWELL, THOMAS B. | Sale | $422,110 | 12,000 | 9/22/2004 | S35.18 |
| NEWELL, THOMAS B. | Sale | $415,092 | 12,000 | 8/23/2004 | $34.59 |
| NEWELL, THOMAS B. | Sale | $427,980 | 12,000 | 7/22/2004 | $35.67 |
| NEWELL, THOMAS B. | Sale | $452,258 | 12,000 | 6/22/2004 | $37.69 |
| NEWELL, THOMAS B. | Sale | $410,388 | 12,000 | 5/21/2004 | $34.20 |
| NEWELL, THOMAS B. | Sale | $398,498 | 12,000 | 4/22/2004 | $33.21 |
| NEWELL, THOMAS B. | Sale | S421,416 | 12,000 | 3/22/2004 | S35.12 |
| NEWELL, THOMAS B. | Sale | $499,320 | 12,000 | 2/23/2004 | $41.61 |
| NEWELL, THOMAS B. | Sale | $483,144 | 12,000 | 1/22/2004 | $40.26 |
| NEWELL, THOMAS B. | Sale | S1,137,718 | 33,000 | 11/24/2003 | $34.48 |
| NEWELL, THOMAS B. | Sale | $464,400 | 12,000 | 12/22/2003 | $38.70 |
| NEWELL, THOMAS B. | Sale | $145,376 | 5,500 | 9/22/2003 | $26.43 |

| | | | | | |
|---|---|---|---|---|---|
| NEWELL, THOMAS B. | Sale | $138,555 | 5,000 | 10/22/2003 | $27.71 |
| NEWELL, THOMAS B. | Sale | $113,029 | 4,500 | 8/22/2003 | $25.12 |
| NEWELL, THOMAS B. | Sale | $292,500 | 11,700 | 11/22/2002 | $25.00 |
| NEWEII, THOMAS B. | Sale | $268,530 | 10,000 | 8/22/2002 | $26.85 |
| NEWELL, THOMAS B. | Sale | $147,555 | 5,000 | 6/24/2002 | $29.51 |
| NEWELL, THOMAS B. | Sale | $139,750 | 5,000 | 5/22/2002 | $27.95 |
| NEWELL, THOMAS B. | Sale | $147,000 | 5,000 | 4/22/2002 | $29.40 |
| NEWELL, THOMAS B. | Sale | $383,670 | 15,000 | 3/22/2002 | $25.58 |
| NEWELL, THOMAS B. | Sale | $133,250 | 5,000 | 12/24/2001 | $26.65 |
| NEWELL, THOMAS B. | Sale | $137,500 | 5,000 | 11/23/2001 | $27.50 |
| NEWELL, THOMAS B. | Sale | $281,000 | 10,000 | 10/22/2001 | $28.10 |
| NEWELL, THOMAS B. | Sale | $130,000 | 5,000 | 8/22/2001 | $26.00 |
| NEWELL, THOMAS B. | Sale | $148,150 | 5,000 | 7/23/2001 | $29.63 |
| NEWELL, THOMAS B. | Sale | $889,350 | 35,000 | 6/22/2001 | $25.41 |

**Thomas Donohue**

| | | | | | |
|---|---|---|---|---|---|
| DONOHUE, THOMAS J | Sale | $3,391,838 | 102,666 | 11/21/2005 | $33.04 |
| DONOHUE, THOMAS J | Sale | $340,684 | 6,667 | 5/6/2005 | $51.12 |

**Ronald Aprahamian**

| | | | | | |
|---|---|---|---|---|---|
| APRAHAMIAN, RONALD V. | Sale | $757,040 | 20,000 | 4/18/2006 | $37.85 |
| APRAHAMIAN, RONALD V. | Sale | $1,513,200 | 29,100 | 5/27/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $104,008 | 2,000 | 5/26/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $46,800 | 900 | 5/26/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $10,400 | 200 | 5/24/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,300,000 | 25,000 | 5/23/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $104,008 | 2,000 | 5/23/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,026,048 | 20,000 | 5/16/2005 | $51.30 |
| APRAHAMIAN, RONALD V. | Sale | $273,600 | 7,200 | 10/28/2004 | $38.00 |
| APRAHAMIAN, RONALD V. | Sale | $106,400 | 2,800 | 10/27/2004 | $38.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,084,400 | 40,000 | 7/9/2001 | $27.35 |
| APRAHAMIAN, RONALD V. | Sale | $681,040 | 20,000 | 11/13/2003 | $34.05 |
| APRAHAMIAN, RONALD V. | Sale | $149,163 | 6,100 | 6/5/2003 | $24.45 |
| APRAHAMIAN, RONALD V. | Sale | $340,565 | 13,900 | 6/4/2003 | $24.50 |

**Craig Callen**

| | | | | | |
|---|---|---|---|---|---|
| CALLEN, CRAIG | Sale | $521,093 | 10,000 | 5/26/2005 | $52.11 |

**Larry Hulse**

| | | | | | |
|---|---|---|---|---|---|
| HULSE, LARRY | Sale | $1,345,624 | 21,973 | 8/12/2005 | $61.24 |

| HULSE, LARRY | Sale | $864,300 | 15,000 | 8/4/2005 | $57.62 |
|---|---|---|---|---|---|
| HULSE, LARRY | Sale | $509,869 | 10,000 | 5/17/2005 | $50.99 |
| HULSE, LARRY | Sale | $319,569 | 6,250 | 5/11/2005 | $51.13 |
| HULSE, LARRY | Sale | $400,000 | 10,000 | 11/4/2004 | $40.00 |
| HULSE, LARRY | Sale | $214,142 | 6,250 | 3/29/2004 | $34.26 |
| HULSE, LARRY | Sale | $138,431 | 3,306 | 2/25/2004 | $41.87 |
| HULSE, LARRY | Sale | $2,000,000 | 50,000 | 1/21/2004 | $40.00 |
| HULSE, LARRY | Sale | $280,641 | 8,750 | 11/10/2003 | $32.07 |
| HULSE, LARRY | Sale | $787,500 | 22,500 | 11/7/2003 | $35.00 |
| HULSE, LARRY | Sale | $217,485 | 8,055 | 9/4/2003 | $27.00 |
| HULSE, LARRY | Sale | $217,512 | 8,056 | 5/13/2002 | $27.00 |
| HULSE, LARRY | Sale | $247,363 | 8,750 | 11/13/2001 | $28.27 |
| HULSE, LARRY | Sale | $923,503 | 33,890 | 6/27/2001 | $27.25 |

**David W. Faeder**

| FAEDER, DAVID W. | Sale | $627,429 | 15,000 | 2/25/2004 | $41.83 |
|---|---|---|---|---|---|
| FAEDER, DAVID W. | Sale | $394,875 | 11,700 | 11/19/2003 | $33.75 |
| FAEDER, DAVID W. | Sale | $153,563 | 4,550 | 11/17/2003 | $33.75 |
| FAEDER, DAVID W. | Sale | $523,660 | 16,250 | 11/10/2003 | $32.23 |
| FAEDER, DAVID W. | Sale | $301,925 | 10,800 | 10/13/2003 | $27.96 |
| FAEDER, DAVID W. | Sale | $698,100 | 25,000 | 10/10/2003 | $27.92 |
| FAEDER, DAVID W. | Sale | $3,169,518 | 114,200 | 10/7/2003 | $27.75 |
| FAEDER, DAVID W. | Sale | $2,049,038 | 74,000 | 10/6/2003 | $27.69 |
| FAEDER, DAVID W. | Sale | $1,961,023 | 71,100 | 10/3/2003 | $27.58 |
| FAEDER, DAVID W. | Sale | $4,260,044 | 154,900 | 10/2/2003 | $27.50 |
| FAEDER, DAVID W. | Sale | $117,970 | 4,700 | 8/29/2003 | $25.10 |
| FAEDER, DAVID W. | Sale | $383,049 | 15,300 | 8/21/2003 | $25.04 |
| FAEDER, DAVID W. | Sale | $399,686 | 16,300 | 8/20/2003 | $24.52 |
| FAEDER, DAVID W. | Sale | $58,822 | 2,400 | 8/18/2003 | $24.51 |
| FAEDER, DAVID W. | Sale | $31,850 | 1,300 | 8/15/2003 | $24.50 |
| FAEDER, DAVID W. | Sale | $242,637 | 10,000 | 8/14/2003 | $24.26 |
| FAEDER, DAVID W. | Sale | $44,345 | 1,810 | 8/12/2003 | $24.50 |
| FAEDER, DAVID W. | Sale | $701,250 | 28,050 | 7/15/2003 | $25.00 |
| FAEDER, DAVID W. | Sale | $655,576 | 26,200 | 6/2/2003 | $25.02 |
| FAEDER, DAVID W. | Sale | $125,000 | 5,000 | 5/30/2003 | $25.00 |
| FAEDER, DAVID W. | Sale | $105,823 | 3,250 | 1/14/2002 | $32.56 |
| FAEDER, DAVID W. | Sale | $1,389,593 | 47,917 | 7/16/2001 | $29.07 |

**James D. Holladay**

| HOLLADAY, J. DOUGLAS | Sale | $312,000 | 8,000 | 3/21/2006 | $39.00 |
|---|---|---|---|---|---|
| HOLLADAY, J. DOUGLAS | Sale | $219,000 | 6,000 | 12/12/2005 | $36.50 |
| HOLLADAY, J. DOUGLAS | Sale | $59,500 | 1,700 | 12/6/2005 | $35.00 |

| HOLLADAY, J. DOUGLAS | Sale | $80,500 | 2,300 | 11/7/2005 | $35.00 |
| HOLLADAY, J. DOUGLAS | Sale | $268,000 | 4,000 | 10/3/2005 | $67.00 |
| HOLLADAY, J. DOUGLAS | Sale | $320,000 | 5,000 | 9/23/2005 | $64.00 |
| HOLLADAY, J. DOUGLAS | Sale | $288,585 | 5,500 | 5/31/2005 | $52.54 |
| HOLLADAY, J. DOUGLAS | Sale | $325,520 | 6,500 | 5/12/2005 | $50.21 |

**Pete A. Klisares**

| KLISARES, PETE A. | Sale | $582,890 | 16,665 | 5/7/2004 | $34.98 |
| KLISARES, PETE A. | Sale | $346,417 | 9,999 | 12/2/2003 | $34.65 |
| KLISARES, PETE A. | Sale | $69,700 | 2,000 | 11/25/2003 | $34.92 |

**Bradley B. Rush**

| RUSH, BRADLEY B. | Sale | $391,188 | 6,250 | 9/12/2005 | $62.66 |
| RUSH, BRADLEY B. | Sale | $40,883 | 687 | 9/8/2005 | $59.51 |

**Christian B.A. Slavin**

| SLAVIN, CHRISTIAN B.A. | Sale | $28,050 | 1,000 | 10/15/2001 | $28.15 |
| SLAVIN, CHRISTIAN B.A. | Sale | $26,300 | 1,000 | 8/15/2001 | $26.31 |
| SLAVIN, CHRISTIAN B.A. | Sale | $29,000 | 1,000 | 7/16/2001 | $29.00 |
| SLAVIN, CHRISTIAN B.A. | Sale | $100,000 | 4,000 | 6/15/2001 | $25.00 |
| SLAVIN, CHRISTIAN B.A. | Sale | $422,188 | 17,500 | 12/29/2000 | $24.13 |

**Brian C. Swinton**

| SWINTON, BRIAN C. | Sale | $721,201 | 19,754 | 3/5/2004 | $36.51 |
| SWINTON, BRIAN C. | Sale | $320,732 | 10,000 | 11/10/2003 | $32.07 |
| SWINTON, BRIAN C. | Sale | $4,575,000 | 150,000 | 11/5/2003 | $32.50 |
| SWINTON, BRIAN C. | Sale | $2,950,000 | 100,000 | 11/4/2003 | $29.75 |
| SWINTON, BRIAN C. | Sale | $74,100 | 2,600 | 10/27/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $2,850 | 100 | 10/20/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $350,550 | 12,300 | 10/17/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $280,000 | 10,000 | 10/10/2003 | $28.00 |
| SWINTON, BRIAN C. | Sale | $309,375 | 11,250 | 10/2/2003 | $27.50 |
| SWINTON, BRIAN C. | Sale | $93,563 | 3,750 | 5/16/2003 | $24.95 |
| SWINTON, BRIAN C. | Sale | $426,904 | 15,695 | 4/18/2002 | $29.50 |
| SWINTON, BRIAN C. | Sale | $885,000 | 30,000 | 7/16/2001 | $29.50 |
| SWINTON, BRIAN C. | Sale | $600,150 | 25,000 | 6/26/2001 | $26.75 |
| SWINTON, BRIAN C. | Sale | $294,700 | 10,000 | 11/8/2001 | $29.47 |

**Tiffany L. Tomasso**

| TOMASSO, TIFFANY L. | Sale | $1,410,000 | 30,000 | 2/2/2005 | $47.00 |

| TOMASSO, TIFFANY L. | Sale | $337,500 | 7,500 | 12/15/2004 | $45.00 |
|---|---|---|---|---|---|
| TOMASSO, TIFFANY L. | Sale | $128,485 | 3,750 | 3/29/2004 | $34.26 |
| TOMASSO, TIFFANY L. | Sale | $575,751 | 13,750 | 2/25/2004 | $41.87 |
| TOMASSO, TIFFANY L. | Sale | $8,740,000 | 230,000 | 12/19/2003 | $38.00 |
| TOMASSO, TIFFANY L. | Sale | $2,072,000 | 56,000 | 12/18/2003 | $37.00 |
| TOMASSO, TIFFANY L. | Sale | $521,190 | 16,250 | 11/10/2003 | $32.07 |
| TOMASSO, TIFFANY L. | Sale | $525,000 | 15,000 | 11/7/2003 | $35.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $951,200 | 32,800 | 10/29/2003 | $29.00 |
| TOMASSO, TIFFANY L. | Sale | $208,800 | 7,200 | 10/28/2003 | $29.00 |
| TOMASSO, TIFFANY A. | Sale | $491,221 | 16,250 | 8/7/2001 | $30.23 |
| TOMASSO, TIFFANY A. | Sale | $437,500 | 17,500 | 6/6/2001 | $25.00 |
| TOMASSO, TIFFANY A. | Sale | $68,730 | 2,900 | 5/7/2001 | $23.70 |
| TOMASSO, TIFFANY L. | Sale | $178,222 | 8,101 | 3/14/2001 | $22.00 |

73.     Had defendants and the Stock Option Committee not permitted the stock options to be backdated, the Option Recipient Defendants' profits and unrealized gains on exercisable stock options would have been tens of millions of dollars less.

74.     The practice of backdating stock options not only lined the pockets of Sunrise executives at the direct expense of the Company, which dollar for dollar received money when the options are exercised, but also resulted in the overstatement of Sunrise's profits and an understatement of its tax liabilities.

75.     As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Sunrise to violate GAAP, SEC regulations and IRS rules and regulations.

76.     Sunrise's financial results for 1999 through 2006 were included in reports filed with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Sunrise's financial results were presented in a fair manner and in accordance with GAAP.

77.     The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, and the financial information was not "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

78.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

79.     During the relevant period, the Individual Defendants caused the Company to understate its compensation expenses by improperly accounting for its stock options under GAAP, thus overstating the Company's net earnings.

80.     Under well-settled accounting principles in effect throughout the relevant period, Sunrise did not need to record an expense for options granted to employees at the current market price ("at the money"). The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in the money"). In order to provide Sunrise executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Individual Defendants systematically falsified Company

records to create the false appearance that options had been granted at the market price on an earlier date.

81.     From 1999 to 2006, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25, and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated options.

82.     Throughout the relevant period, Sunrise accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees." Under APB No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at-the-money or out-of-the-money on the measurement date need not be expensed. Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

83.     Due to its failure to recognize necessary charges relating to options-based compensation, the Company presented its financial results and statements in a manner that violated GAAP, including the following principles:

> (a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, X10);

    (b)    The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, T34);

    (c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, 140);

    (d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, T50);

    (e)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, IT58-59);

    (f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, 179); and

    (g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, 1195, 97).

84.    Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

85.    During the relevant period, the Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

86.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers--the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options... If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant......" Item 402(c)(2)(iv).

87.    The Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date that the Stock Option Committee approved the grant.

88.    During the relevant period, the Individual Defendants further caused Sunrise to violate IRS rules and regulations due to its improper accounting for the backdated stock

30

options. As a result, the Company's tax liabilities were understated, exposing Sunrise to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

89.     The Individual Defendants caused the Company to violate Internal Revenue Code §162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance based." In order for compensation to be performance-based, the Stock Option Committee must have set pre-established and objective performance goals. The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant. Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

90.     Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What Section [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

91.     The Individual Defendants caused Sunrise to violate IRC §162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As

31

a result, all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

92.     The Individual Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Sunrise's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

93.     ISOs are a form of equity compensation that may be provided to a company's employees. ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment because they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential treatment because they are subject to income tax and FICA withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

94.     By improperly treating its backdated options as ISOs, the Individual Defendants failed to provide proper income tax and FICA withholdings upon the exercise of options by its executives and employees, in violation of IRS rules and regulations.

95.     Meanwhile, the Option Recipient Defendants were causing the Company to grant them hundreds of thousands of backdated Sunrise stock options. The Company's

executives and directors received a significant number of backdated Sunrise stock options as compensation during the relevant period.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

96.     The Individual Defendants' misconduct alleged herein was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

97.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to: (a) the additional compensation expenses and tax liabilities the Company is required to incur; (b) loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grants; (c) costs and expenses incurred in connection with the Company's internal investigation and restatement of historical financial statements; and (d) the cost of the SEC investigation of the Company.

98.     As alleged herein, certain of the Option Recipient Defendants exercised hundreds of thousands of backdated Sunrise stock options at improperly low prices and then sold the shares for substantial profits. Consequently, these defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

99.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

100.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

101.     As a result of the facts set forth herein, plaintiff has not made any demand on the Sunrise Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

102.     Plaintiff brings this action derivatively in the right and for the benefit of Sunrise to redress injuries suffered and to be suffered by Sunrise as a result of the breaches of fiduciary duty by the Individual Defendants.

103.     Plaintiff did not make a demand on the Sunrise Board to bring the claims alleged herein because such a demand would have been futile.  At the time Plaintiff filed this derivative action, the Sunrise Board consisted of the following members: Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little (collectively, the "Director Defendants"). Each of these Board members has been named as a Defendant in this action.  Of the seven Board members at the time of filing this Complaint, six benefited materially from the wrongdoing.  As detailed below, each of the directors faces a sufficiently substantial likelihood of liability on the derivative claims alleged herein and is therefore in no position to render a disinterested judgment as to whether the Company should bring such claims, and/or lacks sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims against the Individual Defendants.

34

104.    The Board is responsible for approving the compensation awarded to the Sunrise executive officers. This compensation includes the stock options that were secretly backdated by Sunrise insiders. Therefore, the entire Board is liable for failing to fulfill its fiduciary duties to Sunrise in approving the option grants as dated. The Board should have properly informed itself of the circumstances surrounding the options granted to the Sunrise insiders before approving them. Accordingly, there is reason to doubt that the Director Defendants were disinterested because they face substantial liability for their breaches of fiduciary duty to Sunrise. The Board's decision to approve the options was not the product of valid business judgment. Thus, demand is futile as to the Director Defendants.

105.    The Compensation Committee of the Board is specifically responsible under its charter for reviewing and approving grants of stock options and other equity awards to Sunrise insiders. The Sunrise Compensation Committee Charter provides that the Compensation Committee shall, *inter alia*:

> a.    [A]dminister and implement the Company's incentive compensation plans and equity-based plans that are subject to Board approval in which directors, the CEO, other executive officers and other employees of the Company and its subsidiaries may be participants, including, but not limited to, (a) approving option grants and restricted stock or other awards, (b) interpreting the plans, (c) determining rules and regulations relating to the plans, (d) modifying or canceling existing grants or awards and (e) imposing limitations, restrictions and conditions upon any grant or award as the Compensation Committee deems necessary or advisable.

The Compensation Committee at the time this derivative action was filed consisted of Defendants Aprahamian, Callen, and Donohue. Director Defendants Aprahamian and Donohue have been members of the Compensation Committee since FY1996. Donohue has been Chair of the Compensation Committee since FY2001. Director Defendant Callen has been a member of the Committee from FY2004 to present and from FY1999 to August 23, 2002. On August 23,

35

2002 the Company reformed the then existing Compensation Committee and Stock Option Committee into one Compensation Committee. Director Defendants Callen and Donohue were both members of the Stock Option Committee before its reformation into the Compensation Committee. Defendant Callen was a member of the Stock Option Committee from FY1999 until August 2002. Defendant Donohue was a member of the Stock Option Committee from FY1996 until August 2002 and Chair during FY2001. These Defendants were responsible as members of the Compensation Committee and/or Stock Option Committee to review and grant stock options to Sunrise insiders during their respective tenures on the Committee. The Compensation Committee's and/or Stock Option Committee's practice of allowing and/or authorizing the practice of granting back-dated stock options during this time was not the product of valid business judgment. Alternatively, these Defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding these option grants, thereby causing or allowing the Company's insiders to obtain unreasonable and unreported compensation via the backdating of stock option grants. Accordingly, there is a reasonable doubt that Defendants Aprahamian, Callen, and Donohue are disinterested as they face substantial liability for their breaches of fiduciary duty to Sunrise. Thus, demand is futile as to Defendants Aprahamian, Callen, and Donohue on these additional bases.

106.    The Audit Committee is responsible, by its Charter, for reviewing and discussing, with management and the independent auditors, Sunrise financial statements and earnings releases. The Sunrise Audit Committee Charter provides that the Audit Committee shall, *inter alia*:

a.   Meet to review and discuss the company's annual audited financial statements with management and the independent auditor, including reviewing the company's specific disclosures;

b.   Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the company's selection or application of accounting principles, and major issues as to the adequacy of the company's internal controls and any special audit steps adopted in light of material control deficiencies;

c.   Review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements; and

d.   Prepare the audit committee report required by the rules of the SEC to be included in the company's annual proxy statement.

The Audit Committee is responsible for assisting the Board in its oversight responsibilities relating to the integrity of the Company's systems of internal accounting and financial controls, and the compliance by the Company with legal and regulatory requirements. The Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls. Thus, the Audit Committee was responsible for overseeing and directly participating in the Sunrise financial reporting process. The Audit Committee at the time of the filing of this derivative action was comprised of Director Defendants Aprahamian, Callen, and Donohue. Defendants Aprahamian and Donohue are and have been members of the Audit Committee since FY1996. Defendant Callen has been a member of the Audit Committee since FY2004. Defendant Aprahamian has been the Chair of the Audit Committee since FY2001. Accordingly, Defendants Aprahamian, Callen, and Donohue breached their fiduciary duties of due care, loyalty and good faith because the Audit Committee participated in the preparation of earnings press releases and financial statements that contained false and/or misleading material information. Particularly, these Defendants reviewed

and failed to correct the Sunrise improper earnings releases and financial statements issued from FY1997 to present which contained false and/or misleading material information during the relevant time period. Additionally, during the relevant time period of the practice at Sunrise in granting back-dated stock options, the Audit Committee was meeting only once or twice per year. Specifically, the Audit Committee only met once in FY1997, once in FY1998, and twice in FY1999. As a result, these Defendants face a likelihood of liability for their breach of fiduciary duties. Therefore, demand is futile as to Defendants Aprahamian, Callen, and Donohue.

107.    The Nominating and Corporate Governance Committee is composed of members of the Board and is charged with the general duties of reviewing and reassessing the adequacy of the Corporate Governance Guidelines of the Company and recommending membership to and monitoring membership of the Board. The Sunrise Nominating and Corporate Governance Committee Charter provides that the Nominating and Corporate Governance Committee shall, *inter alia*:

      a.    [R]eceive comments from all directors and report annually to the Board on an assessment of the Board's performance, to be discussed with the Board following the end of each fiscal year. The Nominating and Corporate Governance Committee shall also oversee the annual evaluation of management, and periodically make a report to the Board on succession planning for the Chief Executive Officer; and

      b.    [R]eview and reassess the adequacy of the corporate governance principles of the Company annually and recommend any proposed changes to the Board for approval, including any changes in director fees.

The Nominating and Corporate Governance Committee at the time this derivative action was filed was comprised of Director Defendants Donohue, Holladay and Little. Defendants Donohue and Holladay have been members of the Nominating and Corporate Governance Committee since the Committee's inception in August 2002. Defendant Little has been a member of the Committee since FY2005. Defendant Aprahamian was a member of the Committee from August

38

2002 through FY2003. Defendant Holladay has been the Chair of the Committee since August 2002. These Defendants were responsible, as members of the Nominating and Corporate Governance Committee, for reviewing and/or reassessing governance principles at Sunrise and reviewing and/or maintaining the Board's membership during their tenures on the Committee. Clearly, these Defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding certain practices such as the back-dating of stock option grants which were adverse or should have been adverse to corporate governance principles, thereby causing or allowing the Company to issue false and/or misleading statements and/or press releases. Additionally, the Committee members, during their respective tenures, did not fulfill this duty because they did not fully and adequately monitor and/or remedy the actions of the Board complained of herein. Accordingly, there is a reasonable doubt that Defendants Aprahamian, Donohue, Holladay, and Little are disinterested because they face substantial liability for their breaches of fiduciary duty to Sunrise. The Nominating and Corporate Governance Committee's decisions to not adequately respond to clear departures from corporate governance procedures and not monitor and/or remedy the actions of the Board complained of herein were not the product of valid business judgment. Thus, demand is futile as to Defendants Aprahamian, Donohue, Holladay and Little.

108.    Each of the Director Defendants faces a substantial likelihood of liability in this action because of his or her failure, as a director, to ensure that reliable systems of financial controls and information and reporting were in place and functioning effectively. The dramatic breakdowns and gaps in those controls were so widespread and systemic that each of the Director Defendants faces substantial exposure to liability for his or her total abrogation of his or her duty of oversight. These directors either knew or should have known, in the absence of

39

complete recklessness, that violations of law were occurring and took no steps in good faith to prevent or remedy that situation, proximately causing millions of dollars of losses to the Company. Thus, demand is futile as to Defendants P. Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little.

109. Each of the Director Defendants participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings during the relevant time period. As such, Director Defendants face a sufficiently substantial likelihood of liability for the same. Thus, demand is futile as to Defendants P. Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little.

110. Certain Director Defendants participated in the wrongdoing complained of herein so that they could: (a) protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby; and (b) inflate the price of the Company's common stock in order to enhance the value of their securities holdings and options to purchase Sunrise stock and allow them to sell and reap millions of dollars in illegal insider trading proceeds. Such participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of), authorizing, approving and acquiescing in the conduct complained of herein. Specifically, certain Director Defendants benefited immensely from the disposition of the following Sunrise shares from 1997 to 2006, as seen below:

| DEFENDANT(S) | SHARES SOLD | AGGREGATE PROCEEDS |
|---|---|---|
| P. KLAASSEN & T. KLAASSEN, JOINTLY | 1,462,106 | $56,363,094.63 |
| APRAHAMIAN | 215,200 | $8,848,497.20 |
| CALLEN | 10,000 | $521,093.00 |
| DONOHUE | 134,378 | $3,732,527.28 |

40

| HOLLADAY | 39,000 | $1,873,125.00 |

These Director Defendants reaped extreme profits in the disposition of shares during the practices complained of herein. Therefore, any demand upon the Board would have been futile.

111.    The Sunrise Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Sunrise stockholders or recklessly, consciously and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees and directors, and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting. Pursuant to their specific duties as Board members, Defendants are charged with the management of the Company and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to Sunrise in that they failed to prevent and correct the improper stock option granting and financial reporting. Certain directors are also dominated and controlled by other Defendants and cannot act independently of them. Thus, the Sunrise Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

112.    Also, as revealed by the Company in its Press Release dated December 11, 2006, the staff of the SEC has commenced an inquiry into the Company's stock option practices requesting relevant information from the Company. Defendants face a substantial likelihood of

41

being held liable for these practices.    Accordingly, as such any demand upon Director
Defendants would have been futile.

## The Members of the Board of Directors Lack Independence

113.    Director Defendant Paul J. Klaassen founded Sunrise with his wife, Director
Defendant Teresa M. Klaassen, in 1981. Since its inception, P. Klaassen has served as Chief
Executive Officer and Chairman of the Board of Sunrise. His principal occupation since 1981 is
his employment with Sunrise. As to the wrongdoing alleged herein, P. Klaasen is neither
disinterested nor independent.

114.    Director Defendant Teresa M. Klaassen founded Sunrise with her husband,
Director Defendant P. Klaassen, in 1981. T. Klaassen currently serves as Chief Cultural Officer
of Sunrise. T. Klaassen served as Executive Vice President from 1981 until November 2003.
Her principal occupation, since 1981, has been her employment with Sunrise. As to the
wrongdoing alleged herein, T. Klaasen is neither disinterested nor independent.

115.    Director Defendants P. Klaassen and T. Klaassen, because they are husband and
wife, have debilitating conflicts of interest that prevent them from taking the necessary and
proper action on behalf of the Company as requested herein. Because of their personal and
professional relationships, it is reasonable to conclude that they would not authorize suit against
each other. Therefore, demand upon Defendants P. Klaassen and T. Klaassen is futile.

116.    P. Klaassen and T. Klaassen, also have significant business relationships with the
Company, and therefore, have debilitating conflicts of interest that prevent them from taking the
necessary and proper action on behalf of the Company as requested herein. Specifically,

> a.    Defendants P. Klaassen and T. Klaassen lease the real property on which
> the Fairfax facility is located to the Company under a 99-year ground
> lease. Sunrise has paid rents to Defendants P. Klaassen and T. Klaassen
> for the following years totaling approximately: $262,000 in FY1996,

42

$262,000 in FY1997, $262,000 in FY1998, $262,000 in FY1999, $262,000 in FY2000, $447,236 in FY2001, $299,000 in FY2002, $258,333 in FY2003, $158,700 in FY2004, and $300,000 in FY2005; and

b.    Sunrise leases certain real property located in Fairfax County, Virginia to Defendants P. Klaassen and T. Klaassen for use as a residence under a 99-year ground lease entered into in June 1994. Defendants P. Klaassen and T. Klaassen pay rent to the Company under this lease totaling $1.00 per month.

Due to Defendants P. Klaassen's and T. Klaassen's significant interest in these properties and their deep inter-related business and personal relationships with the Company, demand as to Director Defendants P. Klaassen and T. Klaassen is futile.

117.    P. Klaassen also has other significant business dealings with the Company, the potential risk of loss of which creates debilitating conflicts of interest that prevent him from taking the necessary and proper action on behalf of the Company as requested herein. Specifically, a company owned by Defendant P. Klaassen owns an airplane used by Sunrise for business travel. Sunrise made payments for the use of the airplane during FY1999 and FY2000 of approximately $76,433.00 per year.

118.    Director Defendants P. Klaassen, T. Klaassen, and Donohue, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Specifically,

      c.    Defendants P. Klaassen and Donohue have served on the Board of Trustees for Marymount University together;

      d.    It has been reported that for a period of time, Defendants P. Klaassen and T. Klaassen lived with Defendant Donohue; and

      e.    It has been reported that Defendant Donohue invested in the first home of Defendants P. Klaassen and T. Klaassen.

During the time these Defendants were working, investing and living together, Defendants P. Klaassen, T. Klaassen, and Donohue developed social, personal, and professional relationships from which it is reasonable to conclude that they would not authorize suit against each other. Therefore, demand on Director Defendants P. Klaassen, T. Klaassen, and Donohue is futile.

119.    Director Defendants P. Klaassen, Donohue, and Little enjoy certain professional relationships outside of Sunrise such that they have debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Specifically,

      f.    Defendants P. Klaassen, Donohue, and Little serve together on the Board of Directors of the U.S. Chamber of Commerce. Defendant Donohue serves as the President and Chief Executive Officer of the U.S. Chamber of Commerce; and

      g.    Defendants P. Klaassen, Donohue, and Little serve together on the Board of Directors of the National Chamber Foundation. Defendant Little serves as Chairman of the Board of the National Chamber Foundation. Defendant Donohue serves as President of the National Chamber Foundation.

During their several years working together at the U.S. Chamber of Commerce and the National Chamber Foundation, Defendants P. Klaassen, Donohue and Little developed both social and professional relationships from which it is reasonable to conclude that they would not authorize suit against each other.

120.    Further, Defendant Donohue has demonstrated an indifference regarding ethical corporate governance procedures. Defendant Donohue has served as a member of the Board of

44

Directors of XM Satellite Radio Holdings, Inc. ("XM") since October 1999. Additionally, Defendant Donohue, during the relevant times, served on the Compensation Committee and Nominating Committee at XM. For an extended period of time while Donohue was a member of the Board at XM, XM improperly misrepresented the financial condition and business prospects of the company. As a result of these practices, XM and its Board members, including Defendant Donohue, have been named as defendants in and exposed to millions of dollars of liability from securities class action lawsuits, as well as an SEC investigation into the conduct of XM. Due to Defendant Donohue's alleged corporate misconduct during his tenure as a member of the Compensation Committee, Nominating Committee, and the Board of Directors at XM, it is unlikely that Donahue would prosecute claims on behalf of Sunrise related to alleged director or officer misconduct.Director Defendant Callen, because of his inter-related business with the Company, has debilitating conflicts of interest that prevent him from taking the necessary and proper action on behalf of the Company as requested herein. Specifically, Defendant Callen is a managing director and head of US Health Care Investment Banking at Credit Suisse First Boston ("CSFB"). CSFB acquired Donaldson, Lufkin & Jenrette Securities Corporation in 2001. Defendant Callen was a managing director of Health Care Investment Banking at Donaldson, Lufkin & Jenrette before the acquisition. From 1999 to 2001, Donaldson, Lufkin & Jenrette provided financial advisory services to Sunrise. Additionally, in 1998 and 1999, Sunrise entered into joint ventures with several affiliates of Donaldson, Lufkin & Jenrette in order to raise over \$70 million in capital to develop up to 37 assisted living projects.

121.    Further, Defendant Callen owns a 1.1375% interest in two of the joint ventures entered into between Sunrise and these certain affiliates of Donaldson, Lufkin & Jenrette. Also, CSFB was the initial purchaser of Sunrise's January 2002 Rule 14A private placement of \$125

million aggregate principal amount of 5 ¼% convertible subordinated notes due February 1, 2009. Due to Defendant Callen's significant interest in these inter-related business relationships between the Company and himself, CSFB, and/or Donaldson, Lufkin & Jenrette, Callen is unlikely to take any action that would jeopardize those relationships and the benefits thereof.In addition, should the Director Defendants decide to bring claims against themselves, it would likely trigger an "insured vs. insured" exclusion which is typical for D&O insurance policies, which would make D&O insurance coverage unavailable to them. Therefore, demand is futile as to all Director Defendants.

122.    In addition, demand would be futile and useless for the additional following reasons:

- a.    The Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

- b.    The Director Defendants of Sunrise, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Sunrise stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.    Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

- c.    In order to bring this suit, a majority of the directors of Sunrise would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

- d.    The acts complained of constitute violations of the fiduciary duties owed by the Sunrise officers and directors and these acts are incapable of ratification;

46

e.    Sunrise has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sunrise any part of the damages Sunrise suffered and will continue to suffer;

f.    The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands; and

g.    Any suit by the directors of Sunrise to remedy these wrongs would likely expose the Director Defendants and Sunrise to liability for violations of securities laws which could result in additional civil actions being filed against one or more of the Director Defendants. Thus, they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

123.    Sunrise has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

(b)    Costs incurred relating to the informal SEC probe.

(c)    Taxes, penalties, interest, etc.

124.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Sunrise's proxy statements, the stated purpose of granting stock options is to attract and retain skilled executive personnel and align their interests with those of the stockholders. Specifically, the Compensation Committee reports state: "[s]tock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains." However, by granting Sunrise stock options with backdated exercise prices, the Individual Defendants undermined the purpose of the stock option plans by

47

awarding employees compensation that had intrinsic value regardless of Sunrise's performance. In effect, this practice constituted nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders and the Company.

125.    There was no basis or justification for backdating the stock options, which practice was *ultra vires* and in violation of the stock option plans. Backdating was designed solely to surreptitiously benefit the Option Recipient Defendants in a manner that was inconsistent with the Plans and the Company's public disclosures, to the detriment of the Company.

126.    The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected Sunrise to potentially massive liability. The SEC has initiated an investigation into Sunrise's stock option granting practices. Sunrise will also likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unfairly benefiting himself and other Company insiders at the expense of the Company.

129.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to

themselves and/or certain other officers and directors of the Company and cover up their misconduct.

130. In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

131. The Individual Defendants' misconduct as alleged herein was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to and did unduly benefit the Option Recipient Defendants at the expense of the Company.

132. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, as well as the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT II

### Against the Option Recipient Defendants for Unjust Enrichment

133. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

134. The Option Recipient Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

135. To remedy the Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received,

49

including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT III

### Against the Option Recipient Defendants for Recission

136.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

137.    As a result of the acts alleged herein, the stock option contracts between the Option Recipient Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control. Further, the backdated Sunrise stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

138.    All contracts that provide for stock option grants to the Option Recipient Defendants and were entered into during the relevant period should therefore be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

WHEREFORE, Plaintiff demands judgment as follows:

    a.  Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

    b.  Awarding to Sunrise restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Option Recipient Defendants as a result of the conduct alleged herein;

c.  Rescinding and/or repricing the back-dated stock options granted to the Options Recipient Defendants;

d.  Equitable and/or injunctive relief as permitted by law and equity, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendant's trading activities or their other assets so as to assure that plaintiff on behalf of Sunrise has an effective remedy;

e.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

f.  Granting such other and further relief as the Court deems just and proper.

Dated: March 6, 2007

ROSENTHAL, MONHAIT & GODDESS, P.A.

By: _Carmella P. Keener_

Carmella P. Keener (DSBA No. 2810)
919 North Market Street
Suite 1401, Citizens Bank Center
Wilmington, Delaware 19899
(302) 656-4433
Attorneys for Plaintiff

**OF COUNSEL:**

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
Roy L. Jacobs
20 East 42nd Street, 46th Floor
New York, New York 10016
(212) 685-0969

**JACOBS LAW GROUP, PC**
Samuel R. Simon
1800 John F. Kennedy Boulevard, Suite 404
Philadelphia, PA 19103
(215) 569-9701

**ABBEY SPANIER RODD ABRAMS & PARADIS, LLP**
Nancy Kaboolian
212 East 39th Street
New York, New York 10016
(212) 889-3700

# EXHIBIT  9

EFiled: Jul 31 2007 3:48PM EDT
Transaction ID 15778555
Case No. 2770-VCL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| PETER V. YOUNG and<br>ELLEN ROBERTS YOUNG, | ) | |
| | ) | |
| Derivative Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAUL J. KLAASSEN, et al., | ) | C.A. No. 2770-VCL |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SUNRISE SENIOR LIVING, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## JOINT STIPULATION AMENDING SCHEDULING ORDER

IT IS HEREBY STIPULATED AND AGREED, subject to approval of the Court, that the scheduling order governing the initial proceedings in this action shall be amended as follows:

1.     Briefing on the motions to dismiss or stay this action filed on June 28, 2007, by Nominal Defendant Sunrise Senior Living, Inc. ("Sunrise"), and the individual Defendants, shall be and hereby is continued;

2.     On or before September 17, 2007, Plaintiffs shall either (a) file an amended complaint, or (b) together with Sunrise and the individual Defendants file a joint stipulation staying this action in favor of the actions pending in the U.S. District Court for the District of Columbia; and

3.     In the event that Plaintiffs file an amended complaint as set forth above, the parties shall confer and submit to the Court a further stipulation and proposed order setting

forth a schedule for Sunrise and the individual Defendants to answer, move or otherwise respond to the amended complaint.

ROSENTHAL, MONHAIT & GODDESS, P.A.

/s/ Carmella P. Keener
Carmella P. Keener (#2810)
919 Market St., Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302-656-4433)

*Attorneys for Plaintiffs*

OF COUNSEL:
Laurence D. Paskowitz
Roy L. Jacobs
PASKOWITZ & ASSOCIATES
20 East 42nd Street, 46th Floor
New York, NY 10016

Samuel R. Simon
JACOBS LAW GROUP, PC
1800 John F. Kennedy Blvd., Suite 404
Philadelphia, PA 19103

Nancy Kaboolian
ABBEY SPANIER RODD ABRAMS &
PARADIS, LLP
212 East 39th Street
New York, NY 10016

ASHBY & GEDDES

_/s/ Lawrence C. Ashby_
Lawrence C. Ashby (#468)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
(302-654-1888)

_Attorneys for Nominal Defendant_
_Sunrise Senior Living, Inc._

OF COUNSEL
George H. Mernick, III
HOGAN & HARTSON, LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004

N. Thomas Connally
Jon M. Talotta
HOGAN & HARTSON
8300 Greensboro Drive, Suite 1100
McLean, VA 22102

MORRIS, NICHOLS, ARSHT & TUNNELL

_/s/ Kenneth J. Nachbar_
Kenneth Nachbar (#2067)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302-351-9294)

_Attorneys for the Defendants Paul L. Klaassen,_
_Carl Adams, Ronald V. Aprahamian, Craig R._
_Callen, Thomas J. Donohue, David W. Faeder,_
_J. Douglas Holladay, Larry E. Hulse, Teresa M._
_Klaassen, Thomas B. Newell, Robert R. Slager,_
_Christian B.A. Slavin, Timothy S. Smick, Brian_
_C. Swinton and Tiffany L. Tomasso_

OF COUNSEL
John C. Millian
Jill S. Henderson
Matthew R. Estabrook
GIBSON DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/ Arthur G. Connolly, III*
Arthur G. Connolly, III (#2667)
Jeremy D. Anderson (#4515)
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
(302-658-914)1

*Attorneys for Defendant David G. Bradley*

OF COUNSEL
Philip A. Sechler
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

IT IS SO ORDERED this _____ day of _____, 2007.

Stephen P. Lamb
Vice Chancellor

# EXHIBIT  10



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BROCKTON CONTRIBUTORY RETIREMENT SYSTEM, Derivatively on Behalf of Nominal Defendant SUNRISE SENIOR LIVING, INC., <br><br>     Plaintiff, <br><br>    v. <br><br> PAUL J. KLAASSEN, DAVID W. FAEDER, TIMOTHY S. SMICK, THOMAS B. NEWELL, BRIAN C. SWINTON, CHRISTIAN B.A. SLAVIN, LARRY E. HULSE, TIFFANY L. TOMASSO, ROBERT R. SLAGER, CARL ADAMS, RONALD V. APRAHAMIAN, CRAIG R. CALLEN, DAVID G. BRADLEY, J. DOUGLAS HOLLADAY and THOMAS J. DONOHUE, <br><br>     Defendants, <br><br>    and <br><br> SUNRISE SENIOR LIVING, INC., <br><br>     Nominal Defendant. | Case No. 1:07-cv-00143-RBW <br><br> Judge Walton |

### STIPULATION AND ORDER
### CONSOLIDATING CASES FOR ALL PURPOSES AND APPOINTING A
### LEADERSHIP STRUCTURE

*To Be Consolidated With:*

| | |
|---|---|
| CATHERINE MOLNER, Derivatively on Behalf of Nominal Defendant SUNRISE SENIOR LIVING, INC., ) ) ) | Case No. 1:07-cv-00227-RBW |
| ) | Judge Walton |
| Plaintiff, ) ) | |
| v. ) ) | |
| PAUL J. KLAASSEN, DAVID W. FAEDER, TIMOTHY S. SMICK, THOMAS B. NEWELL, BRIAN C. SWINTON, CHRISTIAN B.A. SLAVIN, LARRY E. HULSE, TIFFANY L. TOMASSO, ROBERT R. SLAGER, CARL ADAMS, RONALD V. APRAHAMIAN, CRAIG R. CALLEN, DAVID G. BRADLEY, J. DOUGLAS HOLLADAY and THOMAS J. DONOHUE, ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, ) ) | |
| and ) ) | |
| SUNRISE SENIOR LIVING, INC., ) ) | |
| Nominal Defendant. ) ) | |

*To Be Consolidated With:*

| | |
|---|---|
| ROBERT ANDERSON 3296 Saint Johns Lane Ellicott City, MD 21042, Derivatively On Behalf of SUNRISE SENIOR LIVING, INC., Plaintiff, ) ) ) ) ) ) ) | Case No. 1:07-cv-00286-RBW |
| ) | Judge Walton |
| PAUL J. KLAASSEN 9050 FALLS RUN RD. MC LEAN, VA 22102 ) ) ) ) | |
| TERESA MERRITT KLAASSEN 9050 FALLS RUN RD. MCLEAN, VA 22102 ) ) ) ) | |

2

THOMAS B. NEWELL                              )
9119 MILL POND VALLEY DR.                     )
MC LEAN, VA 22102                             )
                                              )
TIFFANY L. TOMASSO                            )
12834 PARAPET WAY                             )
HERNDON, VA 20171-1736                        )
                                              )
JOHN F. GAUL                                  )
2250 CLARENDON BLVD., APT. 2011               )
ARLINGTON, VA 22201                           )
                                              )
BRADLEY B. RUSH                               )
371 CHURCH NE ST.                             )
VIENNA, VA 22180                              )
                                              )
RONALD V. APRAHAMIAN                          )
6822 MCLEAN PROVINCE CIR.                     )
FALLS CHURCH, VA 22043                        )
                                              )
THOMAS J. DONOHUE                             )
8008 COACH ST.                                )
POTOMAC, MD 20854                             )
                                              )
DOUGLAS J. HOLLADAY                           )
4786 OLD DOMINION DR.                         )
ARLINGTON, VA 22207                           )
                                              )
CRAIG R. CALLEN                               )
55 TRUMBULL ST., APT. 1201                    )
HARTFORD, CT 06103-2426                       )
                                              )
WILLIAM G. LITTLE                             )
118 HOPKINS RD.                               )
WASHINGTON, ME 04574                          )
                                              )
DAVID W. FAEDER                               )
1133 CONNECTICUT AVE. N.W.                    )
WASHINGTON, DC 20036                          )
                                              )
TIMOTHY S. SMICK                              )
225 OSPREY CT.                                )
VERO BEACH, FL 32963                          )
                                              )
BRIAN C. SWINTON                              )

3

11283 INGLISH MILL DR.                          )
GREAT FALLS, VA 22066-1708                      )
                                                )
LARRY E. HULSE                                  )
1087 LARKSPUR TER.                              )
ROCKVILLE, MD 20850-1003                        )
                                                )
CHRISTIAN B.A. SLAVIN                           )
9897 WINDY HO RD.                               )
GREAT FALLS, VA 22066                           )
                                                )
PETER A. KLISARES                               )
2810 CHARLOTTE LN.                              )
BURLINGTON, NC 2721                             )
                                                )
RICHARD R. SLAGER                               )
30210 N. 148TH ST.                              )
SCOTTSDALE, AZ 85262                            )
                                                )
DAVID G. BRADLEY                                )
2211 30TH ST. N.W.                              )
WASHINGTON, DC 20008                            )
                                                )
RICHARD A. DOPPELT                              )
540 N HARVEY AVE.                               )
OAK PARK, IL 60302                              )
                                                )
SCOTT F. MEADOW                                 )
4950 S CHICAGO BEACH DR., # 15A                 )
CHICAGO, IL 60615                               )
                                                )
J. WILLARD MARRIOTT, JR.                        )
27 BRACKETT HILL RD.                            )
ALFRED, ME 04002-3318                           )
                                                )
DARCY J. MOORE                                  )
4959 BILFORD LN.                                )
LAKE OSWEGO, OR 97035                           )
                                                )
            and                                 )
                                                )
SUNRISE SENIOR LIVING, INC.,                    )
a Delaware Corporation,                         )
                                                )
                Nominal Defendant.              )
                                                )

WHEREAS, on January 19, 2007, Plaintiff Brockton Contributory Retirement System filed the above-captioned shareholder derivative complaint on behalf of Sunrise Senior Living, Inc. ("Sunrise") against Paul J. Klaassen, David W. Faeder, Timothy S. Smick, Thomas B. Newell, Brian C. Swinton, Christian B.A. Slavin, Larry E. Hulse, Tiffany L. Tomasso, Robert R. Slager, Carl Adams, Ronald V. Aprahamian, Craig R. Callen, David G. Bradley, J. Douglas Holladay and Thomas J. Donohue;

WHEREAS, on January 31, 2007, Plaintiff Catherine Molner filed the above-captioned shareholder derivative complaint on behalf of Sunrise against Paul J. Klaassen, David W. Faeder, Timothy S. Smick, Thomas B. Newell, Brian C. Swinton, Christian B.A. Slavin, Larry E. Hulse, Tiffany L. Tomasso, Robert R. Slager, Carl Adams, Ronald V. Aprahamian, Craig R. Callen, David G. Bradley, J. Douglas Holladay and Thomas J. Donohue;

WHEREAS, on February 5, 2007, Plaintiff Robert Anderson filed the above-captioned shareholder derivative complaint on behalf of Sunrise against Paul J. Klaassen, David W. Faeder, Timothy S. Smick, Thomas B. Newell, Brian C. Swinton, Christian B.A. Slavin, Larry E. Hulse, Tiffany L. Tomasso, Robert R. Slager, Carl Adams, Ronald V. Aprahamian, Craig R. Callen, David G. Bradley, J. Douglas Holladay, Thomas J. Donohue, Teresa Merritt Klaassen, John F. Gaul, Bradley B. Rush, William G. Little, Peter A. Klisares, Richard A. Doppelt, Scott F. Meadow, J. Willard Marriott, Jr. and Darcy J. Moore (each person identified in this or the preceding two paragraphs shall be referred to collectively as the "Individual Defendants");

WHEREAS, the three above-captioned shareholder derivative actions are related as they arise out of the same transactions and occurrences, involve the same or substantially similar issues of law and fact, and, therefore, should be consolidated for all purposes;

5

WHEREAS, Sunrise agrees to consolidation of the above-captioned actions, takes no position with respect to appointment of Lead Plaintiffs and Lead Counsel, and reserves all jurisdictional and other rights with respect to the above-captioned actions and any subsequently consolidated action; and

WHEREAS, counsel for Plaintiffs and Sunrise have met and conferred and have agreed that, given the anticipated filing of an Amended Complaint in the consolidated action, Sunrise and the Individual Defendants need not respond to the current Brockton, Molner and Anderson complaints. Counsel for Plaintiffs and Sunrise are in discussions regarding an agreed schedule for Sunrise and the Individual Defendants to respond to the Amended Complaint.

THEREFORE, IT IS STIPULATED AND AGREED by Plaintiffs and Sunrise, through their respective counsel of record, as follows:

## I. SERVICE OF PROCESS, CONSOLIDATION OF ACTIONS AND RESPONSE TO THE COMPLAINTS

1.      Sunrise's counsel shall promptly seek authority to accept service on behalf of all Defendants not already served, without Sunrise or the Individual Defendants waiving any jurisdictional or other rights.  Sunrise shall, within ten (10) days hereof, verify in writing to Lead Counsel (as identified below) that Sunrise is accepting service for (i) all Individual Defendants, or (ii) all Individual Defendants except for particular defendants, whom Sunrise shall identify by name, whom Sunrise has been unable to contact or who have declined to authorize Sunrise to accept service on their behalf.

2.      The above-captioned actions and any other shareholder derivative action on behalf of Sunrise filed in or transferred to this Court that involves questions of law or fact similar to those contained in the above-captioned actions are hereby consolidated for all purposes, including pretrial proceedings, trial, and appeal.

3.    The caption of these consolidated actions shall be "*In re Sunrise Senior Living, Inc. Derivative Litigation*" and the files of these consolidated actions shall be maintained in one file under Master File No. 07-00143.  Any other actions now pending or later filed in this Court which arise out of or are related to the same facts as alleged in the above-identified cases shall be consolidated for all purposes, if and when they are brought to the Court's attention.

4.    Every pleading filed in the consolidated actions, or in any separate action included herein, shall bear the following caption:

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **In re SUNRISE SENIOR LIVING, INC.** | ) | |
| **Derivative Litigation** | ) | |
| | ) | **Civil Action No.  07-00143** |
| | ) | |
| **This Document Relates To:** | ) | |
| | ) | |

When the document being filed pertains to all plaintiffs, the phrase "All Plaintiffs" shall appear immediately below the phrase "This Document Relates To."  When a pleading applies to some, but not all, of the plaintiffs, the document shall list the individual plaintiff or plaintiffs immediately below the phrase "This Document Relates To."

5.    All related actions that are subsequently filed in, or transferred to, this District shall be consolidated into Civil Action No. 07-00143.  This Order shall apply to every such related action and to all current or subsequently added parties, absent an Order of the Court to the contrary.  A party that objects to such consolidation, or to any other provision of this Order, must file an application for relief from this Order within ten days after receiving the Order.

6.    The parties shall file a Notice of Related Cases whenever a case that should be consolidated into this action is filed in, or transferred to, this District.  If the Court determines

7

that the case is related, the Clerk shall administratively close any such case and transfer the plaintiff from the closed case to Civil Action No. 07-00143.

7.    Sunrise and the Individual Defendants need not respond to the current Brockton, Mollner and Anderson complaints. Upon entry of this stipulation by the Court, the parties will submit a joint proposed schedule for the filing of a consolidated Amended Complaint and response(s) thereto.

## II. APPOINTMENT OF LEAD PLAINTIFFS, LEAD COUNSEL, AND LIAISON COUNSEL

7.    Plaintiffs Brockton Contributory Retirement System, Catherine Molner, and Robert Anderson shall be appointed as Lead Plaintiffs.

8.    The law firms of Schiffrin Barroway Topaz & Kessler, LLP, Saxena White P.A., and Robbins, Umeda & Fink LLP shall be appointed as Lead Counsel for Plaintiffs in the consolidated action.

9.    Lead Counsel shall have the authority to speak for Plaintiffs in matters regarding pretrial and trial procedure and settlement negotiations, and shall make all work assignments in such a manner as to facilitate the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort.

10.    Lead Counsel shall be responsible for coordination of all activities and appearances on behalf of Plaintiffs and for the dissemination of notices and orders of this Court. No motion, request for discovery, or other pretrial proceeding shall be initiated or filed by Plaintiffs except through Lead Counsel.

11.    Lead Counsel shall also be available and responsible for communications to and from this Court. Lead Counsel shall be responsible for the creation and maintenance of a master service list of all parties and their respective counsel.

12.    The law firm of Davis, Cowell & Bowe, LLP shall be appointed as Liaison Counsel and is authorized to receive orders, notices, correspondence, and telephone calls from the Court on behalf of all Plaintiffs and shall be responsible for the preparation and transmission of copies of such orders, notices, correspondence, and memoranda of such telephone calls to Plaintiffs' counsel.

13.    Sunrise takes no position with respect to appointment of Lead Plaintiffs or Lead Counsel.

14.    Sunrise and the Individual Defendants may rely upon all agreements made between their counsel and Lead Counsel or other duly authorized representatives of Plaintiffs. Such agreements shall be binding on Plaintiffs.

IT IS SO STIPULATED.

Dated: April 3, 2007                    Respectfully submitted,

DAVIS, COWELL & BOWE, LLP

George R. Murphy (DC Bar 75200)
Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
1701 K Street NW, Suite 210
Washington, DC 20006
Tel. (202) 223-2620
Fax: (202) 223-8651
*Attorneys for Plaintiff Brockton*
*Contributory Retirement System and*
*Proposed Liaison Counsel*

SCHIFFRIN BARROWAY TOPAZ
& KESSLER, LLP
Eric L. Zagar
Robin Winchester
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

9

*Attorneys for Plaintiff Catherine Molner
and Proposed Lead Counsel*

SAXENA WHITE P.A.
Maya Saxena
Joseph White
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
*Attorneys for Plaintiff Brockton
Contributory Retirement System and
Proposed Lead Counsel*

ROBBINS, UMEDA, & FINK LLP
Brian J. Robbins
Felipe J. Arroyo
Ashley R. Palmer
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
*Attorneys for Plaintiff Robert Anderson and
Proposed Lead Counsel*

Dated: April 3, 2007                    HOGAN & HARTSON, LLP

                                        /s/ George H. Mernick, III
                                        George H. Mernick, III (DC Bar 294256)
                                        Columbia Square
                                        555 Thirteenth Street, NW
                                        Washington, D.C. 20004
                                        Phone: 202-637-5726
                                        Fax: 202-637-5910

                                        N. Thomas Connally (DC Bar 448355)
                                        Jon M. Talotta (DC Bar 473626)
                                        HOGAN & HARTSON, LLP
                                        8300 Greensboro Drive, Suite 1100
                                        McLean, Virginia 22102
                                        Phone: (703) 610-6100
                                        Fax: (703) 610-6200
                                        *Attorneys for Nominal Defendant
                                        Sunrise Senior Living, Inc.*

**IT IS SO ORDERED.**

Dated: 5/9/07

REGGIE B. WALTON
United States District Judge

# EXHIBIT  11

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED FOOD AND COMMERCIAL
WORKERS UNION LOCAL 880—RETAIL
FOOD EMPLOYERS JOINT PENSION
FUND, and UNITED FOOD AND
COMMERCIAL WORKERS UNION –
EMPLOYER PENSION FUND,

Individually and On Behalf of All Others
Similarly Situated,

        Plaintiff,

        v.

SUNRISE SENIOR LIVING, INC., PAUL J.
KLAASSEN, THOMAS B. NEWELL,
BRADLEY R. RUSH, RONALD V.
APRAHAMIAN, J. DOUGLAS
HOLLADAY, THOMAS J. DONAHUE,
WILLIAM G. LITTLE, TERESA M..
KLAASSEN, CRAIG R. CALLEN, and
J. BARRON ANSCHUTZ,

        Defendants.

Case No. 07CV00102 (RBW)

DEMAND FOR JURY TRIAL

[Caption continued on following page]

## STIPULATION AND [PROPOSED] ORDER RE: APPOINTMENT OF LEAD PLAINTIFFS, APPROVAL OF COUNSEL, CONSOLIDATION OF RELATED CASES AND FURTHER ORGANIZATION OF THE CASE

FIRST NEW YORK SECURITIES LLC,

Individually and On Behalf of All Others
Similarly Situated,

        Plaintiff,

        v.

SUNRISE SENIOR LIVING, INC., PAUL J.
KLAASSEN, THOMAS B. NEWELL,
BRADLEY R. RUSH, RONALD V.
APRAHAMIAN, J. DOUGLAS
HOLLADAY, THOMAS J. DONAHUE,
WILLIAM G. LITTLE, TERESA M..
KLAASSEN, CRAIG R. CALLEN, and
J. BARRON ANSCHUTZ,

        Defendants.

Case No. 07CV00294 (RBW)

DEMAND FOR JURY TRIAL

Movants the City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami Retirement Trust") and the Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") (collectively, the "Public Retirement Systems") and Defendants, by and through their respective undersigned counsel, hereby stipulate, subject to court approval, as follows, concerning the appointment of Lead Plaintiffs, approval of Lead and Liaison Counsel, consolidation of related actions, and scheduling of the filing of a Consolidated Amended Complaint and briefing thereon.

## <u>RECITALS</u>

WHEREAS, on January 16, 2007, Plaintiffs United Food and Commercial Workers Union Local 880—Retail Food Employers Joint Pension Fund, and United Food and Commercial Workers Union – Employer Pension Fund, filed a federal securities class action against Sunrise Senior Living, Inc. ("Sunrise" or the "Company"), Paul J. Klaassen, Thomas B. Newell, Bradley R. Rush, Ronald V. Aprahamian, J. Douglas Holladay, Thomas J. Donahue, William G. Little, Teresa M.. Klaassen, Craig R. Callen, and J. Barron Anschutz, Case No. 07-cv-00102-RBW;

WHEREAS, on February 8, 2007, Plaintiff First New York Securities LLC, filed a federal securities class action against the Company, Paul J. Klaassen, Thomas B. Newell, Bradley R. Rush, Ronald V. Aprahamian, J. Douglas Holladay, Thomas J. Donahue, William G. Little, Teresa M.. Klaassen, Craig R. Callen, and J. Barron Anschutz, Case No. 07-cv-00294-RBW;

WHEREAS, the claims in these actions arise under the provisions Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78-4, *et. seq*;

WHEREAS, these actions present virtually identical factual and legal issues, as they arise out of the same alleged circumstances regarding the Company's violations of the federal securities laws, and there is no opposition to the consolidation of these actions pursuant to Federal Rule of Civil Procedure 42(a);

WHEREAS, on March 19, 2007, the Public Retirement Systems moved (1) for appointment as Lead Plaintiffs; (2) approval of their selection of the law firms of Bernstein Litowitz Berger & Grossmann LLP and Berman DeValerio Pease Tabacco Burt & Pucillo as Co-Lead Counsel and for the Class and Cohen, Milstein, Hausfeld & Toll P.L.L.C. as Liaison Counsel for the Class, and (3) for consolidation of all related securities class actions pursuant to Fed. R. Civ. P. 42(a), including Case Nos. 07-cv-00143-RBW and 07-cv-00102-RBW, set forth above. (Dkt. No. 20);

WHEREAS, on March 19, 2007, only one competing motion for appointment as Lead Plaintiff was filed by a group comprised of the United Food and Commercial Workers Union Local 880 – Retail Food Employers Joint Pension Fund and United Food and Commercial Workers Union – Employer Pension Fund's Motion Appointment (collectively, the "United Food Funds"). (Dkt. No. 17);

WHEREAS, on April 2, 2007, the United Food Funds filed a brief in which they conceded that, based upon their review of the Public Retirement Systems' motion, the Public Retirement Systems had the largest financial interest in this Action. (Dkt. No. 24);

WHEREAS, Defendants take no position with respect to the appointment of Lead Plaintiffs or Lead and Liaison Counsel;

WHEREAS, Sunrise has disclosed in Securities and Exchange Commission filings that the Company will restate its financial statements for the years ended December 31, 2003, 2004 and 2005 (the "Restatement");

WHEREAS, upon appointment, Lead Plaintiffs intend to file a Consolidated Amended Complaint, and Defendants may file motion(s) pursuant to Federal Rule of Civil Procedure 12 or otherwise respond to the Consolidated Amended Complaint;

WHEREAS, the Public Retirement Systems and Defendants have conferred and agree that in the interests of justice and to conserve judicial resources, Lead Plaintiffs should be permitted to file their Consolidated Amended Complaint a reasonable period of time after the Company files its Restatement with the SEC.

**THEREFORE, IT IS HEREBY STIPULATED AND AGREED** by the Public Retirement Systems and by Sunrise on behalf of all Defendants, through their respective counsel of record, as follows:

1.      Miami Retirement Trust and the Oklahoma Firefighters shall be appointed to serve as Lead Plaintiffs pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995, in the above-captioned actions and all related actions consolidated pursuant to paragraph 3 below.

2.      The Public Retirement Systems' selection of counsel shall be approved, and Bernstein Litowitz Berger & Grossmann LLP and Berman DeValerio Pease Tabacco Burt & Pucillo shall be appointed Co-Lead Counsel for the Class and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. appointed as Liaison Counsel for the Class.

3.      Pursuant to Fed. R. Civ. P. 42(a), the above-captioned actions, and any subsequently filed or transferred actions on behalf of purchasers of securities of Sunrise Senior Living, Inc., related to the claims asserted in these actions, shall be consolidated for all purposes. This action shall be captioned "*In re Sunrise Senior Living, Inc. Securities Litigation*," and the file shall be maintained under Case No. 07-CV-00102-RBW.

4.      Lead Plaintiffs shall file and serve a Consolidated Amended Complaint no later than 45 days after the Company files its Restatement with the Securities and Exchange Commission.

5.      Defendants shall file and serve responsive pleading(s) or motion(s) no later than 45 days after the filing of the Consolidated Amended Complaint.

6.      Lead Plaintiffs shall file and serve opposition brief(s) no later than 45 days after the filing of Defendants' motion(s).

7.      Defendants shall file and serve reply brief(s) no later than 30 days after the filing of Lead Plaintiffs opposition brief(s).


**IT IS SO ORDERED.**


**DATED**: _____          _____
                                   **REGGIE B. WALTON**
                                   **UNITED STATES DISTRICT JUDGE**

Dated: June 8, 2007

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**

/s/ Daniel S. Sommers_____
Steven J. Toll, D.C. Bar #225623
Daniel S. Sommers, D.C. Bar #416549
Elizabeth S. Finberg, D.C. Bar #468555
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C.  20005-3964
Telephone:  (202) 408-4600
Facsimile: (202) 408-4699
*Proposed Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
J. Erik Sandstedt
Laura H. Gundersheim
1285 Avenue of the Americas, 38th Fl.
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
*Proposed Co-Lead Counsel for the Class*

**BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**
Michael J. Pucillo
Jay W. Eng
Esperanté Building
222 Lakeview Avenue, Suite 900
West Palm Beach, FL 33401
Telephone: (561) 835-9400
Facsimile: (561) 835-0322
*Proposed Co-Lead Counsel for the Class*

**KLAUSNER & KAUFMAN, PA**
Robert D. Klausner
10059 N.W. 1st Court
Plantation, FL 33324
Telephone: (954) 916-1202
Fax: (954) 916-1232
*Additional Counsel for the City of Miami General Employees' & Sanitation Employees' Retirement Trust*

Respectfully submitted,

**HOGAN & HARTSON, LLP**

/s/ George H. Mernick, III_____
George H. Mernick, III, D.C. Bar #294256
555 Thirteenth Street, N.W.
Washington, D.C., 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

**HOGAN & HARTSON, LLP**
N. Thomas Connally, D.C. Bar # 448355
Jon M. Talotta, D.C. Bar #473626
8300 Greensboro Drive, Suite 1100
McLean, Virginia 22102
Telephone: (703) 610-6100
Facsimile: (703) 610-6200

*Counsel for Defendant Sunrise Senior Living, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the forgoing, Stipulation and [Proposed] Order Re: Appointment of Lead Plaintiffs, Approval of Counsel, Consolidation of Related Cases and Further Organization of the Case, was served this 8th day of June, 2007, in accordance with the Court's CM/ECF Guidelines, and via first-class mail, postage prepaid, on:

>Steven J. Toll, D.C. Bar #225623
>Daniel S. Sommers, D.C. Bar #416549
>Elizabeth S. Finberg, D.C. Bar #468555
>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
>1100 New York Ave., N.W.
>West Tower, Suite 500
>Washington, D.C.  20005-3964
>Telephone:  (202) 408-4600
>Facsimile: (202) 408-4699
>*Proposed Liaison Counsel for the Class*
>
>J. Erik Sandstedt
>Laura H. Gundersheim
>BERNSTEIN LITOWITZ BERGER
>& GROSSMANN LLP
>1285 Avenue of the Americas, 38th Fl.
>New York, NY 10019
>Telephone: (212) 554-1400
>Facsimile: (212) 554-1444
>*Proposed Co-Lead Counsel for the Class*
>
>Michael J. Pucillo
>Jay W. Eng
>BERMAN DEVALERIO PEASE TABACCO BURT &
>PUCILLO
>Esperanté Building
>222 Lakeview Avenue, Suite 900
>West Palm Beach, FL 33401
>Telephone: (561) 835-9400
>Facsimile: (561) 835-0322
>*Proposed Co-Lead Counsel for the Class*

Robert D. Klausner
KLAUSNER & KAUFMAN, PA
10059 N.W. 1st Court
Plantation, FL 33324
Telephone: (954) 916-1202
Fax: (954) 916-1232
*Additional Counsel for the City of*
*Miami General Employees' & Sanitation Employees'*
*Retirement Trust*

Donald J. Enright
FINKLESTEIN THOMPSON & LOUGHRAN
1050 30th Street, NW
Washington, DC 20007
Telephone: (202) 337-8000
Fax: (202) 337-8090
*Counsel for First New York Securities, L.L.C.*

Jonathan W. Cuneo
CUNEO GILBERT & LADUCA, LLP
507 C Street, NE
Washington, DC 20002
Telephone: (202) 789-3960
Fax: (202) 789-1813
*Counsel for United Food and Commercial Workers Union*
*Local 880 – Retail Food Employers' Joint Pension Fund,*
*and United Food and Commercial Workers Union*
*Employer Pension Fund*

Jeffrey M. King
John M. Dowd
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC 20036
Telephone: (202) 887-4347
Telephone: (202) 887-4386
Fax: (202) 833-2292
*Counsel for Defendant Bradley Rush*

/s/ Jon M. Talotta
Jon M. Talotta
jmtalotta@hhlaw.com

-7-

# EXHIBIT  12



# FORM 10-Q

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: November 10, 1998 (period: September 30, 1998)**

Quarterly report which provides a continuing view of a company's financial position

1

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-Q

(Mark One)
[X] Quarterly Report Pursuant to Section 13 or 15(d) of the Securities
    Exchange Act of 1934 For the Period Ended September 30, 1998

OR

[ ] Transition Report Pursuant to Section 13 or 15(d) of the Securities
    Exchange Act of 1934 For the Transition Period From _____ to

COMMISSION FILE NUMBER:  0-20765

SUNRISE ASSISTED LIVING, INC.
(Exact name of registrant as specified in its charter)

DELAWARE                                    54-1746596
(State or other jurisdiction of            (I.R.S. Employer
 incorporation of organization)             Identification No.)

9401 LEE HIGHWAY, SUITE 300
FAIRFAX, VIRGINIA 22031
(Address of principal executive offices)

(703) 273-7500
(Registrant's telephone number, including area code)

    Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter periods that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.

            Yes  X                 No  _____
                -----

As of November 2, 1998, there were 19,384,082 shares of the Registrant's Common
Stock outstanding.

Source: SUNRISE SENIOR LIVIN, 10-Q, November 10, 1998

2

SUNRISE ASSISTED LIVING, INC.

FORM 10-Q

SEPTEMBER 30, 1998

INDEX

PART I.  FINANCIAL INFORMATION                                    PAGE

Item 1. Financial Statements

        Consolidated Balance Sheets at September 30, 1998 and
        December 31, 1997                                           3

        Consolidated Statements of Operations for the three months
        ended September 30, 1998 and 1997 and nine months ended
        September 30, 1998 and 1997                                 4

        Consolidated Statements of Cash Flows for the nine
        months ended September 30, 1998 and 1997                    5

        Notes to Consolidated Financial Statements                 6

Item 2. Management's Discussion and Analysis of Financial
        Condition and Results of Operations                       12


PART II. OTHER INFORMATION

        Item 6. Exhibits and Reports on Form 8-K                  22

        Signatures                                                22

2

8

SUNRISE ASSISTED LIVING, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Unaudited)

3. STOCK OPTION PLANS (CONTINUED)

A summary of the Company's stock option activity and related information as of September 30, 1998, is presented below:

| Fixed Options | Shares (000) | Weighted - Average Exercise Price |
|---|---|---|
| Outstanding - January 1, 1998 | 3,156 | $22.76 |
| Granted | 2,969 | 31.72 |
| Exercised | (318) | 15.43 |
| Forfeited | (1,973) | 36.74 |
| Outstanding - September 30, 1998 | 3,834 | 23.12 |
| Exercisable - September 30, 1998 | 761 | |

The following table summarizes information about stock options outstanding at September 30, 1998:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding (000) | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number Exercisable (000) | Weighted-Average Exercise Price |
| $ 3.00 to 8.00 | 236 | 6.9 | $ 5.55 | 152 | $ 5.64 |
| 8.01 to 20.00 | 375 | 7.6 | 16.97 | 226 | 16.70 |
| 20.01 to 25.63 | 3,188 | 9.2 | 24.95 | 352 | 25.04 |
| 25.64 to 44.56 | 35 | 9.2 | 40.06 | 31 | 41.28 |
| | 3,834 | | | 761 | |

In September 1998, the Company canceled 1.6 million options granted to employees at exercise prices greater than $29 and granted an equal number of options with an exercise price of $25. In connection with the new grants certain vesting periods of the executive officers were extended.

8

# EXHIBIT  13



# FORM DEF 14A

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: April 06, 1999 (period: April 26, 1999)**

Official notification to shareholders of matters to be brought to a vote (Proxy)

13

OPTION GRANTS

The following table contains certain information with respect to stock options granted in 1998 to each of the named executive officers of Sunrise, including repriced options. All options granted in 1998, other than repriced options, were ten-year non-qualified options.

OPTION GRANTS IN LAST FISCAL YEAR

| NAME | SHARES OF COMMON STOCK UNDERLYING OPTIONS GRANTED | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE ($/SH) | EXPIRATION DATE | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM | |
|------|------|------|------|------|------|------|
| | | | | | 5% ($) | 10% ($) |
| Paul J. Klaassen | -0- | -0-% | $-0- | -0- | $-0- | $-0- |
| David W. Faeder | 200,000(1) | 6.0 | 43.50 | 3/3/08 | 5,512,106 | 13,930,403 |
| | 200,000(2) | 6.0 | 25.00 | 3/3/08 | 2,523,942 | 6,436,046 |
| Thomas B. Newell | 200,000(1) | 6.0 | 43.50 | 3/3/08 | 5,512,106 | 13,930,403 |
| | 200,000(2) | 6.0 | 25.00 | 3/3/08 | 2,523,942 | 6,436,046 |
| Brian C. Swinton | 100,000(1) | 3.0 | 43.50 | 3/3/08 | 2,756,053 | 6,965,201 |
| | 100,000(2) | 3.0 | 25.00 | 3/3/08 | 1,261,971 | 3,218,023 |
| Tiffany Tomasso | 100,000(1) | 3.0 | 43.50 | 3/3/08 | 2,756,053 | 6,965,201 |
| | 100,000(1) | 3.0 | 44.00 | 1/19/08 | 2,767,136 | 7,012,467 |
| | 100,000(2) | 3.0 | 25.00 | 3/3/08 | 1,261,971 | 3,218,023 |
| | 100,000(2) | 3.0 | 25.00 | 1/19/08 | 1,261,971 | 3,218,023 |
| | 30,000(2) | 0.9 | 25.00 | 8/28/07 | 378,591 | 965,407 |

- ----------------------

(1)    These options were canceled upon the regrant of a corresponding number of options in September 1998, as indicated in the table. The original vesting period of the options was four years. Vesting of options is accelerated if the options are not assumed in connection with any dissolution or liquidation of Sunrise, the sale of substantially all of Sunrise's assets, a merger, reorganization or consolidation in which Sunrise is not the surviving corporation or any other transaction approved by the board of directors which results in any person or entity owning 80% or more of the total combined voting power of all classes of stock of Sunrise.

(2)    Represents options regranted in September 1998. The regranted options vest over a five-year period, as follows: 15%, 15%, 20%, 20%, and 30%.

- 10 -

Source: SUNRISE SENIOR LIVIN, DEF 14A, April 06, 1999

# EXHIBIT  14



# FORM 10-K

## SUNRISE SENIOR LIVING INC − SRZ

**Filed: March 31, 1998 (period: December 31, 1997)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

## PART IV

Item 14. Exhibits, Financial Statement Schedules, and Reports

## PART I

**ITEM 1.**   BUSINESS.
**ITEM 2.**   PROPERTIES.
**ITEM 3.**   LEGAL PROCEEDINGS.
**ITEM 4.**   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

## PART II

**ITEM 5.**   MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED
             STOCKHOLDER
**ITEM 6.**   SELECTED FINANCIAL DATA.
**ITEM 7.**   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
             AND
**ITEM 7A.**  QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK.
**ITEM 8.**   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.
**ITEM 9.**   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON
             ACCOUNTING AND

## PART III

**ITEM 10.**  DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.
**ITEM 11.**  EXECUTIVE COMPENSATION.
**ITEM 12.**  SECURITIES OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND
             MANAGEMENT.
**ITEM 13.**  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.

## PART IV

**ITEM 14.**  EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON
             FORM 8-K
SIGNATURES
INDEX TO EXHIBITS
EX-10.20 (SUNRISE ASSISTED LIVING, INC.1995 STOCK OPTION PLAN, AS
AMENDED)
EX-10.21 (Material contracts)

EX-10.24 (Material contracts)

EX-10.25 (SUNRISE ASSISTED LIVING, INC.1997 STOCK OPTION PLAN, AS
AMENDED)
EX-10.31.1 (with the Agent, the "Lenders") who are particto an Amended and Restated
Agency Agreement orestated or substituted from time to time, th)

EX−10.31.2 (AMENDED AND RESTATED FINANCING AND SECURITY A(MASTER AGREEMENT))

EX−10.31.3 (AMENDED AND RESTATED MASTER CONSTRUCTION LOAN)

EX−10.31.4 (MANAGEMENT FEE SUBORDINATION AGREEMENT)

EX−10.31.5 (AMENDED AND RESTATED PLEDGE,ASSIGNMENT AND SECURITY AGREEMENT(MASTER))

EX−10.31.6 (THIS MASTER GUARANTY OF PERFORMANCE (the "Agr23rd day of December, 1997, by SUNRISE ASSISTcorporation (the "Guarantor") in favor of NAT)

EX−10.31.7 (COLLATERAL ASSIGNMENT OF OPERATINGAGREEMENTS AND MANAGEMENT CONTRACTS(MASTER))

EX−10.31.8 (AMENDED AND RESTATED COLLATERAL ASSIGNMENT OFPARTICIPATION AGREEMENTS AND RESIDENT AGREEME(MASTER))

EX−10.31.9 (AMENDED AND RESTATED MASTERGUARANTY OF PAYMENT AGREEMENT)

EX−13 (Annual report to security holders)

EX−21 (Subsidiaries of the registrant)

EX−23 (Consents of experts and counsel)

EX−27.1

EX−27.2

EX−27.3

22

INDEX TO EXHIBITS

| Exhibit Number | Identity of Exhibit | Page (by Sequential Numbering System) |
|---|---|---|
| 3.1 | Restated Certificate of Incorporation of the Company (Exhibit 3.1 to the Company's Form S-1 Registration Statement No. 333- 13731). | |
| 3.2 | Amended and Restated Bylaws of the Company, as amended (Exhibit 3 to the Company's Form 10-Q for the quarter ended September 30, 1997). | |
| 4.1 | Form of Common Stock certificate (Exhibit 4.1 to the Company's Form S-1 Registration Statement No. 333-13731). | |
| 4.2 | Stockholder Rights Agreement (Exhibit 4.2 to the Company's Form S-1 Registration Statement No. 333-13731). | |
| 10.1 | Assignment and Contribution Agreement, effective as of January 4, 1995, by and between Paul and Teresa Klaassen and the Company (Exhibit 10.1.1 to the Company's Form S-1 Registration Statement No. 333-2582). | |
| 10.2 | Assignment and Contribution Agreement, dated as of January 4, 1995, by and between Paul J. Klaassen and Teresa M. Klaassen, Sunrise Partners, L.P. and Sunrise Assisted Living Investments, Inc. (Exhibit 10.1.2 to the Company's Form S-1 Registration Statement No. 333-2582). | |
| 10.3 | Letter Agreement, dated January 4, 1995, from Paul J. Klaassen and Teresa M. Klaassen to the Series A Preferred Stockholders regarding cash distributions from Sunrise Retirement Investments, Inc., Sunrise Terrace of Gunston, Inc., Sunrise Terrace of Countryside, Inc. and Sunrise Atrium, Inc. (Exhibit | |

-22-

23

10.19 to the Company's Form S-1 Registration Statement No. 33-2852).

10.4     Registration Agreement, dated January 4, 1995, by and among the Company, the Investors (as defined therein) and Paul and Teresa Klaassen (Exhibit 10.3 to the Company's Form S-1 Registration Statement No. 333-2582).

10.5     Promissory Note, dated June 8, 1994, executed by Sunrise Assisted Living Limited Partnership in favor of General Electric Capital Corporation (Exhibit 10.4 to the Company's Form S-1 Registration Statement No. 333-2582).

10.6     Indemnity Agreement dated as of June 8, 1994 by Paul J. Klaassen and Teresa M. Klaassen to and for the benefit of General Electric Capital Corporation (Exhibit 10.4.1 to the Company's Form S-1 Registration Statement No. 333-2582).

10.7     First Loan Modification Agreement dated as of February 15, 1996 by and between General Electric Capital Corporation and Sunrise Assisted Living Limited Partnership (Exhibit 10.4.2 to the Company's Form S-1 Registration Statement No. 333-2582).

10.8     Second Loan Modification Agreement dated as of May 1, 1996 by and between General Electric Capital Corporation and Sunrise Assisted Living Limited Partnership (Exhibit 10.4.3 to the Company's Form S-1 Registration Statement No. 333-2582).

10.9     Letter Agreement dated as of May 1, 1996 by and between General Electric Capital Corporation and Sunrise Assisted Living Limited Partnership (Exhibit 10.4.4 to the Company's Form S-1 Registration Statement No. 333-2582).

10.10    Letter agreement dated as of December 30, 1996 by and between General Electric Capital Corporation and Sunrise Assisted Living Partnership (Exhibit 10.11 to the Company's 1996 Form 10-K).

-23-

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

24

| | |
|---|---|
| 10.11 | Third Loan Modification Agreement dated as of March 4, 1997 by and between General Electric Capital Corporation and Sunrise Assisted Living Limited Partnership. |
| 10.12 | Credit Line Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, dated as of June 8, 1994 (Arlington, Bluemont Park and Falls Church) (Exhibit 10.5 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.13 | Credit Line Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, dated as of June 8, 1994 (Gunston and Oakton) (Exhibit 10.6 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.14 | Credit Line Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and financing Statement, dated as of June 8, 1994 (Fairfax Leasehold) (Exhibit 10.7 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.15 | Credit Line Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, dated as of June 8, 1994 (Warrenton) (Exhibit 10.8 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.16 | Credit Line Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, dated as of June 8, 1994 (Countryside and Leesburg) (Exhibit 10.9 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.17 | First Mortgage and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, dated as of June 8, 1994 (Boca Raton) (Exhibit 10.10 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.18 | First Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and |

-24-

25

Financing Statement, dated as of June 8, 1994 (Frederick) (Exhibit 10.11 to the Company's Form S-1 Registration Statement No. 333-2582).

10.19   First Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, Dated as of June 8, 1994 (Mercer Island) (Exhibit 10.12 to the Company's Form S-1 Registration Statement No. 333-2582).

10.20   1995 Stock Option Plan, as amended.

10.21   1996 Directors' Stock Option Plan, as amended.

10.22   Stock Option Agreement, entered into, effective as of January 4, 1995, by and between the Company and David W. Faeder (Exhibit 10.14 to the Company's Form S-1 Registration Statement No. 333-2582).

10.23   Amendment No. 1 to Stock Option Agreement by and between the Company and David W. Faeder (Exhibit 10.14.1 to the Company's Form S-1 Registration Statement No. 333-13731).

10.24   1996 Non-Incentive Stock Option Plan, as amended.

10.25   1997 Stock Option Plan, as amended.

10.26   Amended and Restated Lease Agreement and Assignment of Leasehold Right, dated June 6, 1994, by and among Barbara M. Volentine and Teresa M. Klaassen, the Executor of the Estate of Eldon J. Merritt, Sunrise Assisted Living Limited Partnership Assisted Living Group -- Fairfax Associates, and Sunrise Foundation, Inc. (Exhibit 10.15 to the Company's Form S-1 Registration Statement No. 333-2582).

10.27   Ground Lease, dated June 7, 1994, by and between Sunrise Assisted Living Limited Partnership and Paul J. Klaassen and Teresa M. Klaassen (Exhibit 10.16 to the Company's Form S-1 Registration Statement No. 333-2582).

10.28   Amended and Restated Agreement of Sublease, Indemnification and Easements dated February 5,

-25-

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

26

1995 by and between Assisted Living Group -- Fairfax Associates and
Sunrise Foundation, as amended (Exhibit 10.17 to the Company's Form
S-1 Registration Statement No. 333-2582).

10.29   Loan Agreement, dated as of March 19, 1996, between the Company and
Creditanstalt-Bankverein (Exhibit 10.20 to the Company's Form S-1
Registration Statement No. 333-2582).

10.30   Warrant Agreement, dated as of March 19, 1996, between the Company
and Creditanstalt-Bankverein (Exhibit 10.21 to the Company's Form S-1
Registration Statement No. 333-2582).

10.31.1   Amended, Restated, Consolidated and Increased Master Promissory Note
dated as of December 23, 1997 by and between NationsBank, N. A. as
agent and for certain additional lenders and Sunrise East Assisted
Living Limited Partnership.

10.31.2   Amended and Restated Financing and Security Agreement dated as of
December 23, 1997 by and between NationsBank, N. A. as agent and for
certain additional lenders and Sunrise East Assisted Living Limited
Partnership.

10.31.3   Amended and Restated Master Construction Loan Agreement dated as of
December 23, 1997 by and between NationsBank, N. A. as agent and for
certain additional lenders and Sunrise East Assisted Living Limited
Partnership.

10.31.4   Management Fee Subordination Agreement dated as of December 23, 1997
by and between NationsBank, N. A. as agent and for certain additional
lenders and Sunrise East Assisted Living Limited Partnership.

10.31.5   Amended and Restated Pledge, Assignment and Security Agreement dated
as of December 23, 1997 by and between NationsBank, N. A. as agent
and for certain additional lenders and Sunrise East Assisted Living
Limited Partnership.

-26-

27

| | |
|---|---|
| 10.31.6 | Master Guaranty of Performance dated as of December 23, 1997 by and between NationsBank, N. A. as agent and for certain additional lenders and Sunrise East Assisted Living Limited Partnership. |
| 10.31.7 | Amended and Restated Collateral Assignment of Operating Agreements and Management Contracts dated as of December 23, 1997 by and between NationsBank, N. A. as agent and for certain additional lenders and Sunrise East Assisted Living Limited Partnership. |
| 10.31.8 | Amended and Restated Collateral Assignment of Licenses, Participation Agreements and Resident Agreements dated as of December 23, 1997 by and between NationsBank, N. A. as agent and for certain additional lenders and Sunrise East Assisted Living Limited Partnership. |
| 10.31.9 | Amended and Restated Master Guarantee of Payment Agreement dated as of December 23, 1997 by and between NationsBank, N. A. as agent and for certain additional lenders and Sunrise East Assisted Living Limited Partnership. |
| 10.32 | Form of Indemnification Agreement (Exhibit 10.24 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 13 | 1997 Annual Report to Stockholders (which is not deemed to be "filed" except to the extent that portions thereof are expressly incorporated by reference in this Annual Report on Form 10-K). |
| 21 | Subsidiaries of the Registrant. |
| 23 | Consent of Ernst & Young LLP. |
| 27.1 | Financial Data Schedule as of and for the year ended December 31, 1997. |
| 27.2 | Restated Financial Data Schedule as of and for the nine months ended September 30, 1997, as of and for the six months ended June 30, 1997, and as of and for the three months ended March 31, 1997. |
| 27.3 | Restated Financial Data Schedule as of and for the year ended December 31, 1996, as of and for the nine  months ended September 30, 1996, and as of and for the six months ended June 30, 1996. |

-27-

</TEXT>
</DOCUMENT>

1

EXHIBIT 10.21

SUNRISE ASSISTED LIVING, INC.
1996 DIRECTORS' STOCK OPTION PLAN, AS AMENDED

1.      NAME AND PURPOSE.

1.1      This plan is the SUNRISE ASSISTED LIVING, INC. 1996
DIRECTORS' STOCK OPTION PLAN (the "Plan").

1.2      The purposes of the Plan are to enhance the Company's
ability to attract and retain highly qualified individuals to serve as members
of the Company's Board of Directors and to provide additional incentives to
Directors to promote the success of the Company.  The Plan provides Directors
of the Company an opportunity to purchase shares of the Stock of the Company
pursuant to Options.  Options granted under the Plan shall not constitute
"incentive stock options" within the meaning of Section 422 of the Internal
Revenue Code of 1986, as amended.

1.3      This Plan is intended to constitute a "formula plan"
and the Directors are intended to be "disinterested administrators" of Other
Plans for purposes of Rule 16b-3 under the Securities Exchange Act of 1934, as
amended (the "Exchange Act").

2.      DEFINITIONS.

For purposes of interpreting the Plan and related documents
(including Stock Option Agreements), the following definitions shall apply:

2.1      "Additional Option" means any Option other than an
Initial Option.

2.2      "Board" means the Board of Directors of the Company.

2.3      "Commencement of Service" means the date of election
of the Director to his or her first term as a Director.

2.4      "Company" means Sunrise Assisted Living, Inc., a
Delaware corporation.

2.5      "Director" means a member of the Company's Board who
is not an officer or employee of the Company or any of its subsidiaries and was
not serving as a Series A Director (as defined in that certain Stockholders'
Agreement dated as of January 4, 1995) on the Effective Date.

2.6      "Effective Date" means the date the Plan was adopted
by the Board.

2.7      "Exercise Price" means the Option Price multiplied by
the number of shares of Stock purchased pursuant to exercise of an Option.

2.8      "Expiration Date" means the tenth anniversary of the
Grant Date, or, if earlier, the termination of the Option pursuant to Section
4.2(c).

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

2

       2.9     "Fair Market Value" means the value of each share of Stock subject to this Plan determined as follows:  If on the Grant Date or other determination date the Stock is listed on an established national or regional stock exchange, is admitted to quotation on the National Association of Securities Dealers Automated Quotation System, or is publicly traded on an established securities market, the Fair Market Value of the Stock shall be the closing price of the Stock on such exchange or in such market (the highest such closing price if there is more than one such exchange or market) on the trading day immediately preceding the Grant Day or other determination date (or, if there is no such reported closing price, the Fair Market Value shall be the mean between the highest bid and lowest asked prices or between the high and low sale prices on such trading day), or, if no sale of the Stock is reported for such trading day, on the next preceding day on which any sale shall have been reported.  If the Stock is not listed on such an exchange, quoted on such System or traded on such a market, Fair Market Value shall be determined by the Board in good faith.

       2.10    "Grant Date" means the date on which an Option takes effect pursuant to Section 7 of this Plan.

       2.11    "Initial Option" means an Option received by each Director as of the Director's Commencement of Service.

       2.12    "Option" means any option to purchase one or more shares of Stock pursuant to this Plan including both Initial Options and Additional Options.

       2.13    "Optionee" means a person who holds an Option under this Plan.

       2.14    "Option Period" means the period during which Options may be exercised as defined in Section 9.

       2.15    "Option Price" means the purchase price for each share of Stock subject to an Option.

       2.16    "Other Plan" means the Sunrise Assisted Living, Inc. 1995 Stock Option Plan and any other stock option plan adopted by the Company or any of its subsidiaries other than the Plan.

       2.17    "1933 Act" means the Securities Act of 1933, as now in effect or as hereafter amended.

       2.18    "Stock" means the Common Stock, par value $.01 per share, of the Company.

       2.19    "Stock Option Agreement" means the written agreement evidencing the grant of an Option hereunder.

2

3

3.     ADMINISTRATION OF THE PLAN.

The Plan shall be administered by the Board.  The Board's responsibilities under the Plan shall be limited to taking all legal actions necessary to document the Options provided herein, to maintain appropriate records and reports regarding those Options, and to take all acts authorized by this Plan.

4.     STOCK SUBJECT TO THE PLAN.

4.1     Subject to adjustments made pursuant to Section 4.2, the maximum number of shares of Stock which may be issued pursuant to the Plan shall not exceed 100,000.  If any Option expires, terminates or is canceled for any reason before it is exercised in full, the shares of Stock that were subject to the unexercised portion of the Option shall be available for future Options granted under the Plan.

4.2     (a)     If the outstanding shares of Stock are increased or decreased or changed into or exchanged for a different number or kind of shares or other securities of the Company by reason of any recapitalization, reclassification, stock split-up, combination of shares, exchange of shares, stock dividend or other distribution payable on capital stock, or other increase or decrease in such shares effected without receipt of consideration by the Company, occurring after the effective date of the Plan, the number and kinds of shares for the purchase of which Options may be granted under the Plan shall be adjusted proportionately and accordingly by the Company.  In addition, the number and kind of shares for which Options are outstanding shall be adjusted proportionately and accordingly so that the proportionate interest of the holder of the Option immediately following such event shall, to the extent practicable, be the same as immediately prior to such event.  Any such adjustment in outstanding Options shall not change the aggregate Option Price payable with respect to shares subject to the unexercised portion of the Option outstanding but shall include a corresponding proportionate adjustment in the Option Price per share.

(b)     Subject to Subsection (c) hereof, if the Company shall be the surviving corporation in any reorganization, merger or consolidation of the Company with one or more other corporations, any Option theretofore granted pursuant to the Plan shall pertain to and apply to the securities to which a holder of the number of shares of Stock subject to such Option would have been entitled immediately following such reorganization, merger or consolidation, with a corresponding proportionate adjustment of the Option Price per share so that the aggregate Option Price thereafter shall be the same as the aggregate Option Price of the shares remaining subject to the Option immediately prior to such reorganization, merger or consolidation.

(c)     Upon the dissolution or liquidation of the Company, or upon a merger, consolidation or reorganization of the Company with one or more other corporations in which the Company is not the surviving corporation, or upon a sale of all or substantially all of the assets of the Company to another corporation, or upon any transaction (including, without limitation, a merger or reorganization in which the Company is the surviving corporation) approved by the Board which results in any person

3

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

4

or entity owning 80 percent or more of the combined voting power of all classes of stock of the Company, the Plan and all Options outstanding hereunder shall terminate, except to the extent provision is made in writing in connection with such transaction for the continuation of the Plan, the assumption of the Options theretofore granted, or for the substitution for such Options of new options covering the stock of a successor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kinds of shares and exercise prices, in which event the Plan (if applicable) and Options theretofore granted shall continue in the manner and under the terms so provided.  In the event of any such termination of the Plan and Options, each individual holding an Option shall have the right immediately prior to the occurrence of such termination and during such period occurring prior to such termination as the Board in its sole discretion shall determine and designate, to exercise such Option to the extent that such Option was otherwise exercisable at the time such termination occurs.  The Board shall send written notice of an event that will result in such a termination to all individuals who hold Options not later than the time at which the Company gives notice thereof to its stockholders.

                    (d)      Adjustments under this Section 4.2 related to stock or securities of the Company shall be made by the Board, whose determination in that respect shall be final, binding, and conclusive.  No fractional shares of Stock or units of other securities shall be issued pursuant to any such adjustment, and any fractions resulting from any such adjustment shall be eliminated in each case by rounding downward to the nearest whole share or unit.

                    (e)      The grant of an Option pursuant to the Plan shall not affect or limit in any way the right or power of the Company to make adjustments, reclassifications, reorganizations or changes of its capital or business structure or to merge, consolidate, dissolve or liquidate, or to sell or transfer all or any part of its business or assets.

          5.      ELIGIBILITY.

                    Eligibility under this Plan is limited to Directors of the
Company.

          6.      THE OPTION PRICE.

                    The Option Price of the Stock covered by each Option granted under this Plan shall be the greater of the Fair Market Value or the par value of such Stock on the Grant Date.  The Option Price shall be subject to adjustment as provided in Section 4.2 hereof.

          7.      NUMBER OF SHARES AND GRANT DATES.

                    Each Director whose Commencement of Service is after the Effective Date and before termination of the Plan shall be granted an Initial Option, as of the date of the Director's Commencement of Service, to purchase 10,000 shares of Stock.  An Additional

4

5

Option to purchase 5,000 shares of Stock shall be granted immediately after each subsequent annual meeting of the Company's stockholders (commencing with the 1997 annual meeting) occurring before the Plan terminates to each Director who is then serving on the Board.  Notwithstanding the foregoing, no Director shall be eligible to receive an Additional Option grant if on the Grant Date such individual also is an officer or employee of the Company or any of its subsidiaries.

     8.     VESTING OF OPTIONS.

          Subject to the provisions of Section 9, the Initial and Additional Options shall be vested upon the respective Grant Date (but shall not be exercisable before approval of the Plan by stockholders).

     9.     OPTION PERIOD.

          An Option shall be exercisable only during the Option Period. The Option Period shall commence six months after the later of (i) the Grant Date or (ii) the date on which the Plan is approved by the stockholders of the Company (or, if a six-month delay on the sale of stock acquired pursuant to the exercise of an Option is no longer necessary to satisfy the requirements of Rule 16b-3 under the Exchange Act, upon the later of such dates), and shall end at the close of business on the Expiration Date.  Termination of the Optionee's status as a Director for any reason shall not cause an Option to terminate.

     10.     TIMING AND METHOD OF EXERCISE.

          Subject to the limitations of Sections 8 and 9, an Optionee may, at any time, exercise an Option with respect to all or any part of the shares of Stock then subject to such Option by giving the Company written notice of exercise, specifying the number of shares as to which the Option is being exercised.  Such notice shall be addressed to the Secretary of the Company at its principal office, and shall be effective when actually received (by personal delivery, fax or other delivery) by the Secretary of the Company. Such notice shall be accompanied by an amount equal to the Exercise Price of such shares, in the form of any one or combination of the following:  cash or cash equivalents, or shares of Stock valued at Fair Market Value in accordance with the Plan.  If shares of Stock that are acquired by the Optionee through exercise of an Option or an option issued under an Other Plan are surrendered in payment of the Exercise Price of Options, the Stock surrendered in payment must have been (i) held by the Optionee for more than six months at the time of surrender, or (ii) acquired under an Option granted not less than six months prior to the time of surrender.  However, payment in full of the Exercise Price need not accompany the written notice of exercise provided the notice of exercise directs that the Stock certificate or certificates for the shares for which the Option is exercised be delivered to a licensed broker acceptable to the Company as the agent for the individual exercising the Option and, at the time such Stock certificate or certificates are delivered, the broker tenders to the Company cash (or cash equivalents acceptable to the Company) equal to the Exercise Price.

5

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

6

11.    NO STOCKHOLDER RIGHTS UNDER OPTION.

No Optionee shall have any of the rights of a stockholder with respect to the shares of Stock subject to an Option except to the extent the certificates for such shares shall have been issued upon the exercise of the Option.

12.    CONTINUATION OF SERVICE.

Nothing in the Plan shall confer upon any person any right to continue to serve as a Director.

13.    STOCK OPTION AGREEMENT.

Each Option granted pursuant to the Plan shall be evidenced by a written Stock Option Agreement notifying the Optionee of the grant and incorporating the terms of this Plan.  The Stock Option Agreement shall be executed by the Company and the Optionee.

14.    WITHHOLDING.

The Company shall have the right to withhold, or require an Optionee to remit to the Company, an amount sufficient to satisfy any applicable federal, state, local or foreign withholding tax requirements imposed with respect to exercise of Options.  To the extent permissible under applicable tax, securities, and other laws, the Optionee may satisfy a tax withholding requirement by directing the Company to apply shares of Stock to which the Optionee is entitled as a result of the exercise of an Option to satisfy withholding requirements under this Section 14.

15.    NON-TRANSFERABILITY OF OPTIONS.

Each Option granted pursuant to this Plan shall, during Optionee's lifetime, be exercisable only by Optionee, and neither the Option nor any right thereunder shall be transferable by the Optionee by operation of law or otherwise other than by will or the laws of descent and distribution, or pursuant to a qualified domestic relations order as defined in Section 414(p)(1)(B) of the Internal Revenue Code of 1986, as amended and shall not be pledged or hypothecated (by operation of law or otherwise) or subject to execution, attachment or similar processes.

16.    USE OF PROCEEDS.

Cash proceeds realized from the sale of Stock pursuant to Options granted under the Plan shall constitute general funds of the Company.

6

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

7

17.    ADOPTION, AMENDMENT, SUSPENSION AND TERMINATION OF THE PLAN.

17.1    The Plan shall be effective as of the date of adoption by the Board, subject to approval of the Plan within one year of its adoption by the Board by the affirmative votes of the holders of a majority of the Stock of the Company present, or represented, and entitled to vote at a meeting duly held in accordance with applicable laws of the state of Delaware, or by consent as permitted by law, provided, that upon approval of the Plan by the stockholders of the Company, all Options granted under the Plan on or after the Effective Date shall be fully effective as if the stockholders had approved the Plan on the Effective Date.

17.2    Subject to the limitation of Section 17.4, the Board may at any time suspend or terminate the Plan, and may amend it from time to time in such respects as the Board may deem advisable; provided, however, to the extent required under Rule 16b-3 under the Exchange Act as in effect at the time of such amendment, the Board shall not amend the Plan in the following respects without the approval of stockholders then sufficient to approve the Plan in the first instance:

(a)    To materially increase the benefits accruing to participants under the Plan (for example, to increase the number of Options that may be granted to any Director);

(b)    To materially increase the maximum number of shares of Stock that may be issued under the Plan; or

(c)    To materially modify the requirements as to eligibility for participation in the Plan.

17.3    No Option may be granted during any suspension or after the termination of the Plan, and no amendment, suspension or termination of the Plan shall, without the Optionee's consent, alter or impair any rights or obligations under any Stock Option Agreement previously entered into under the Plan.  This Plan shall terminate ten years after the Effective Date unless previously terminated pursuant to Section 4.2 or by the Board pursuant to this Section 17.

17.4    Notwithstanding the provisions of Section 17.2, except to the extent permissible under Rule 16b-3 under the Exchange Act, the formula provisions of this Plan shall not be amended more than once in any six-month period other than to comport with changes in the Internal Revenue Code of 1986, the Employee Retirement Income Security Act of 1974, or the rules promulgated thereunder.

18.    REQUIREMENTS OF LAW.

18.1    The Company shall not be required to sell or issue any shares of Stock under any Option if the sale or issuance of such shares would constitute a violation by the individual exercising the Option or the Company of any provisions of any law or

7

8

regulation of any governmental authority, including without limitation any federal or state securities laws or regulations. Specifically in connection with the 1933 Act, upon exercise of any Option, unless a registration statement under such Act is in effect with respect to the shares of Stock covered by such Option, the Company shall not be required to sell or issue such shares unless the Board has received evidence satisfactory to the Board that the holder of such Option may acquire such shares pursuant to an exemption from registration under such Act. Any determination in this connection by the Board shall be final, binding, and conclusive. The Company may, but shall in no event be obligated to, register any securities covered hereby pursuant to the 1933 Act. The Company shall not be obligated to take any affirmative action in order to cause the exercise of an Option or the issuance of shares pursuant thereto to comply with any law or regulation of any governmental authority. As to any jurisdiction that expressly imposes the requirement that an Option shall not be exercisable unless and until the shares of Stock covered by such Option are registered or are subject to an available exemption from registration, the exercise of such Option (under circumstances in which the laws of such jurisdiction apply) shall be deemed conditioned upon the effectiveness of such registration or the availability of such an exemption.

18.2     The intent of this Plan is to qualify for the exemption provided by Rule 16b-3 under the Exchange Act. To the extent any provision of the Plan or action by the Plan administrators does not comply with the requirements of Rule 16b-3, it shall be deemed inoperative, to the extent permitted by law and deemed advisable by the Plan administrators, and shall not affect the validity of the Plan. In the event Rule 16b-3 is revised or replaced, the Board may exercise discretion to modify this Plan in any respect necessary to satisfy the requirements of the revised exemption or its replacement.

19.     GOVERNING LAW.

The validity, interpretation and effect of this Plan, and the rights of all persons hereunder, shall be governed by and determined in accordance with the laws of Delaware, other than the choice of law rules thereof.

\* \* \* \* \*

8

</TEXT>
</DOCUMENT>

# EXHIBIT  15



# FORM 10−K

## SUNRISE SENIOR LIVING INC − SRZ

**Filed: March 31, 1999 (period: December 31, 1998)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

## PART IV

Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K............ 68

## PART I

**ITEM 1.** BUSINESS.
**ITEM 2.** PROPERTIES.
**ITEM 3.** LEGAL PROCEEDINGS.
**ITEM 4.** SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

## PART II

**ITEM 5.** MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS.
**ITEM 6.** SELECTED FINANCIAL DATA
**ITEM 7.** MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
**ITEM 7A.** QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK.
**ITEM 8.** FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.
**ITEM 9.** CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND

## PART III

**ITEM 10.** DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.
**ITEM 11.** EXECUTIVE COMPENSATION.
**ITEM 12.** SECURITIES OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.
**ITEM 13.** CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.

## PART IV

**ITEM 14.** EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K.
SIGNATURES
INDEX TO EXHIBITS
EX-10.36 (Material contracts)

EX-10.41 (SUNRISE ASSISTED LIVING, INC.1998 STOCK OPTION PLAN)

EX-21 (Subsidiaries of the registrant)

EX-23 (Consents of experts and counsel)

EX-27

EX-99.3 (FORM OFLETTER AGREEMENT)

EX-99.4 (EXHIBIT 99.4REVOLVING LOAN AGREEMENT)

EX-99.5 (FIRST AMENDMENT TO REVOLVING LOAN AGREEMENT)

EX-99.6 (Pursuant to paragraph 6 of Amendment No. 1 to4, 1999, Sunrise Assisted Living, Inc. ("SunrKarrington Health, Inc. ("Karrington") an add)

EX-99.7 (MANAGEMENT SERVICES AGREEMENTFOR)

EX-99.8 (MANAGEMENT CONSULTING AGREEMENT)

EX-99.9 (DEVELOPMENT AGREEMENT(Edina, Minnesota))

EX-99.10 (DEVELOPMENT AGREEMENT(Farmington Hills, Michigan))

EX-99.11 (DEVELOPMENT AGREEMENT)

72

INDEX TO EXHIBITS

| Exhibit Number | Identity of Exhibit | Page (by Sequential Numbering System) |
| --- | --- | --- |
| 2.1 | Agreement of Merger, dated as of October 18, 1998, among Sunrise, Buckeye Merger Corporation and Karrington (Exhibit 2.1 to Sunrise's Form 8-K dated October 28, 1998). | |
| 2.2 | Amendment No. 1 to Agreement of Merger, dated as of March 4, 1999, among Sunrise, Buckeye Merger Corporation and Karrington (Exhibit 2.1 to Sunrise's From 8-K dated March 5, 1999). | |
| 2.3 | Letter dated October 16, 1998 from Sunrise to Meditrust Mortgage Investments, Inc. setting forth terms and conditions under which Sunrise would acquire certain properties subject to leases and certain mortgage loans. (Exhibit 2.1 to Sunrise's Form 8-K dated December 17, 1998). | |
| 2.4 | Trust Agreement, dated as of December 2, 1998, between the several holders from time to time parties thereto, as the holders, and First Security Bank, National Association, as the Owner Trustee (Sunrise Trust 1998-1) (Exhibit 2.2 to Sunrise's Form 8-K dated December 17, 1998). | |
| 2.5 | Credit Agreement, dated as of December 2, 1998, among First Security Bank, National Association, not individually, except as expressly stated therein, but solely as the Owner Trustee under the Sunrise Trust | |

-1-

73

1998-1, as the Borrower, the several lenders from time to time parties thereto, and Nationsbank, N.A., as the Agent (Exhibit 2.3 to Sunrise's Form 8-K dated December 17, 1998).

2.6     Participation Agreement, dated as of December 2, 1998, among Sunrise Midwest Leasing, L.L.C., as the Construction Agent and as the Lessee, Sunrise, as the Guarantor, First Security Bank, National Association, not individually, except as expressly stated therein, but solely as the Owner Trustee under the Sunrise Trust 1998-1, the various banks and other lending institutions which are parties thereto from time to time, as the holders, the various banks and other lending institutions which are parties thereto from time to time, as the lenders, and Nationsbank, N.A., as the Agent for the Lenders and respecting the Security Documents, as the Agent for the Lenders and the Holders, to the extent of their interests (Exhibit 2.4 to Sunrise's Form 8-K dated December 17, 1998).

2.7     Security Agreement, dated as of December 2, 1998, between First Security Bank, National Association, not individually, but solely as the owner trustee under the Sunrise Trust 1998-1 and Nationsbank, N.A., as the agent for the lenders and the holders and accepted and agreed to by Sunrise Midwest Leasing, L.L.C. (Exhibit 2.5 to Sunrise's Form 8-K dated December 17, 1998).

2.8     Lease Agreement, dated as of December 2, 1998, between First Security Bank, National Association, not individually, but solely as the Owner Trustee under the Sunrise Trust

-2-

74

1998-1, as Lessor and Sunrise Midwest Leasing, L.L.C., as Lessee (Exhibit 2.6 to Sunrise's Form 8-K dated December 17, 1998).

3.1     Restated Certificate of Incorporation of Sunrise (Exhibit 3.1 to Sunrise's Form S-1 Registration Statement No. 333- 13731).

3.2     Amended and Restated Bylaws of Sunrise, as amended (Exhibit 3 to Sunrise's Form 10-Q for the quarter ended September 30, 1997).

4.1     Form of common stock certificate (Exhibit 4.1 to Sunrise's Form S-1 Registration Statement No. 333-13731).

4.2     Stockholder Rights Agreement (Exhibit 4.2 to Sunrise's Form S-1 Registration Statement No. 333-13731).

4.3     Amendment No. 1 to Rights Agreement, dated as of December 17, 1998, between Sunrise and First Union National Bank of North Carolina (Exhibit 99(a) to Sunrise's Form 8-K dated December 18, 1998).

10.1    Assignment and Contribution Agreement, effective as of January 4, 1995, by and between Paul and Teresa Klaassen and Sunrise (Exhibit 10.1.1 to Sunrise's Form S-1 Registration Statement No. 333-2582).

10.2    Assignment and Contribution Agreement, dated as of January 4, 1995, by and between Paul J. Klaassen and Teresa M. Klaassen, Sunrise Partners, L.P. and Sunrise Assisted Living Investments, Inc.

-3-

1

EXHIBIT 10.36

SUNRISE ASSISTED LIVING, INC.
1996 DIRECTORS' STOCK OPTION PLAN, AS AMENDED

1.  NAME AND PURPOSE.

1.1 This plan is the SUNRISE ASSISTED LIVING, INC. 1996 DIRECTORS'
STOCK OPTION PLAN (the "Plan").

1.2 The purposes of the Plan are to enhance the Company's ability
to attract and retain highly qualified individuals to serve as members of the
Company's Board of Directors and to provide additional incentives to Directors
to promote the success of the Company. The Plan provides Directors of the
Company an opportunity to purchase shares of the Stock of the Company pursuant
to Options. Options granted under the Plan shall not constitute "incentive stock
options" within the meaning of Section 422 of the Internal Revenue Code of 1986,
as amended.

1.3 This Plan is intended to constitute a "formula plan" and the
Directors are intended to be "disinterested administrators" of Other Plans for
purposes of Rule 16b-3 under the Securities Exchange Act of 1934, as amended
(the "Exchange Act").

2.  DEFINITIONS.

For purposes of interpreting the Plan and related documents
(including Stock Option Agreements), the following definitions shall apply:

2.1 "Additional Option" means any Option other than an Initial
Option.

2.2 "Board" means the Board of Directors of the Company.

2.3 "Commencement of Service" means the date of election of the
Director to his or her first term as a Director; provided, however, that with
respect to Richard A. Doppelt and Scott A. Meadow, "Commencement of Service"
shall mean the date of each of their respective reelections to the Board of
Directors (if so reelected) at the 1998 annual meeting of stockholders (in the
case of Mr. Doppelt) and at the 2000 annual meeting of stockholders (in the case
of Mr. Meadow).

2.4 "Company" means Sunrise Assisted Living, Inc., a Delaware
corporation.

2.5 "Director" means a member of the Company's Board who is not an
officer or employee of the Company or any of its subsidiaries.

2.6 "Effective Date" means the date the Plan was adopted by the
Board.

2.7 "Exercise Price" means the Option Price multiplied by the
number of shares of Stock purchased pursuant to exercise of an Option.

1

2

2.8 "Expiration Date" means the tenth anniversary of the Grant Date, or, if earlier, the termination of the Option pursuant to Section 4.2(c).

2.9 "Fair Market Value" means the value of each share of Stock subject to this Plan determined as follows: If on the Grant Date or other determination date the Stock is listed on an established national or regional stock exchange, is admitted to quotation on the National Association of Securities Dealers Automated Quotation System, or is publicly traded on an established securities market, the Fair Market Value of the Stock shall be the closing price of the Stock on such exchange or in such market (the highest such closing price if there is more than one such exchange or market) on the trading day immediately preceding the Grant Date or other determination date (or, if there is no such reported closing price, the Fair Market Value shall be the mean between the highest bid and lowest asked prices or between the high and low sale prices on such trading day), or, if no sale of the Stock is reported for such trading day, on the next preceding day on which any sale shall have been reported. If the Stock is not listed on such an exchange, quoted on such System or traded on such a market, Fair Market Value shall be determined by the Board in good faith.

2.10 "Grant Date" means the date on which an Option takes effect pursuant to Section 7 of this Plan.

2.11 "Initial Option" means an Option received by each Director as of the Director's Commencement of Service.

2.12 "Option" means any option to purchase one or more shares of Stock pursuant to this Plan including both Initial Options and Additional Options.

2.13 "Optionee" means a person who holds an Option under this Plan.

2.14 "Option Period" means the period during which Options may be exercised as defined in Section 9.

2.15 "Option Price" means the purchase price for each share of Stock subject to an Option.

2.16 "Other Plan" means the Sunrise Assisted Living, Inc. 1995 Stock Option Plan and any other stock option plan adopted by the Company or any of its subsidiaries other than the Plan.

2.17 "1933 Act" means the Securities Act of 1933, as now in effect or as hereafter amended.

2.18 "Stock" means the Common Stock, par value $.01 per share, of the Company.

2.19 "Stock Option Agreement" means the written agreement evidencing the grant of an Option hereunder.

2

3

3. ADMINISTRATION OF THE PLAN.

The Plan shall be administered by the Board. The Board's responsibilities under the Plan shall be limited to taking all legal actions necessary to document the Options provided herein, to maintain appropriate records and reports regarding those Options, and to take all acts authorized by this Plan.

4. STOCK SUBJECT TO THE PLAN.

4.1 Subject to adjustments made pursuant to Section 4.2, the maximum number of shares of Stock which may be issued pursuant to the Plan shall not exceed 75,000. If any Option expires, terminates or is canceled for any reason before it is exercised in full, the shares of Stock that were subject to the unexercised portion of the Option shall be available for future Options granted under the Plan.

4.2 (a) If the outstanding shares of Stock are increased or decreased or changed into or exchanged for a different number or kind of shares or other securities of the Company by reason of any recapitalization, reclassification, stock split-up, combination of shares, exchange of shares, stock dividend or other distribution payable on capital stock, or other increase or decrease in such shares effected without receipt of consideration by the Company, occurring after the effective date of the Plan, the number and kinds of shares for the purchase of which Options may be granted under the Plan shall be adjusted proportionately and accordingly by the Company. In addition, the number and kind of shares for which Options are outstanding shall be adjusted proportionately and accordingly so that the proportionate interest of the holder of the Option immediately following such event shall, to the extent practicable, be the same as immediately prior to such event. Any such adjustment in outstanding Options shall not change the aggregate Option Price payable with respect to shares subject to the unexercised portion of the Option outstanding but shall include a corresponding proportionate adjustment in the Option Price per share.

(b) Subject to Subsection (c) hereof, if the Company shall be the surviving corporation in any reorganization, merger or consolidation of the Company with one or more other corporations, any Option theretofore granted pursuant to the Plan shall pertain to and apply to the securities to which a holder of the number of shares of Stock subject to such Option would have been entitled immediately following such reorganization, merger or consolidation, with a corresponding proportionate adjustment of the Option Price per share so that the aggregate Option Price thereafter shall be the same as the aggregate Option Price of the shares remaining subject to the Option immediately prior to such reorganization, merger or consolidation.

(c) Upon the dissolution or liquidation of the Company, or upon a merger, consolidation or reorganization of the Company with one or more other corporations in which the Company is not the surviving corporation, or upon a sale of all or substantially all of the assets of the Company to another corporation, or upon any transaction (including, without limitation, a merger or reorganization in which the Company is the surviving corporation) approved by the Board which results in any person or entity owning 80 percent or more of the combined voting power of all classes of stock of the Company, the

3

4

Plan and all Options outstanding hereunder shall terminate, except to the extent provision is made in writing in connection with such transaction for the continuation of the Plan, the assumption of the Options theretofore granted, or for the substitution for such Options of new options covering the stock of a successor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kinds of shares and exercise prices, in which event the Plan (if applicable) and Options theretofore granted shall continue in the manner and under the terms so provided. In the event of any such termination of the Plan and Options, each individual holding an Option shall have the right immediately prior to the occurrence of such termination and during such period occurring prior to such termination as the Board in its sole discretion shall determine and designate, to exercise such Option to the extent that such Option was otherwise exercisable at the time such termination occurs. The Board shall send written notice of an event that will result in such a termination to all individuals who hold Options not later than the time at which the Company gives notice thereof to its stockholders.

(d) Adjustments under this Section 4.2 related to stock or securities of the Company shall be made by the Board, whose determination in that respect shall be final, binding, and conclusive. No fractional shares of Stock or units of other securities shall be issued pursuant to any such adjustment, and any fractions resulting from any such adjustment shall be eliminated in each case by rounding downward to the nearest whole share or unit.

(e) The grant of an Option pursuant to the Plan shall not affect or limit in any way the right or power of the Company to make adjustments, reclassifications, reorganizations or changes of its capital or business structure or to merge, consolidate, dissolve or liquidate, or to sell or transfer all or any part of its business or assets.

5.   ELIGIBILITY.

Eligibility under this Plan is limited to Directors of the Company.

6.   THE OPTION PRICE.

The Option Price of the Stock covered by each Option granted under this Plan shall be the greater of the Fair Market Value or the par value of such Stock on the Grant Date. The Option Price shall be subject to adjustment as provided in Section 4.2 hereof.

7.   NUMBER OF SHARES AND GRANT DATES.

Each Director whose Commencement of Service is after the Effective Date and before termination of the Plan shall be granted an Initial Option, as of the date of the Director's Commencement of Service, to purchase 10,000 shares of Stock. An Additional Option to purchase 5,000 shares of Stock shall be granted immediately after each subsequent annual meeting of the Company's stockholders (commencing with the 1997 annual meeting) occurring before the Plan terminates to each Director who is then serving on the Board. Notwithstanding the foregoing, no Director shall be eligible to receive an Additional Option

4

5

grant if on the Grant Date such individual also is an officer or employee of the Company or any of its subsidiaries.

8.  VESTING OF OPTIONS.

Subject to the provisions of Section 9, the Initial and Additional Options shall be vested upon the respective Grant Date (but shall not be exercisable before approval of the Plan by stockholders).

9.  OPTION PERIOD.

An Option shall be exercisable only during the Option Period. The Option Period shall commence six months after the later of (i) the Grant Date or (ii) the date on which the Plan is approved by the stockholders of the Company (or, if a six-month delay on the sale of stock acquired pursuant to the exercise of an Option is no longer necessary to satisfy the requirements of Rule 16b-3 under the Exchange Act, upon the later of such dates), and shall end at the close of business on the Expiration Date. Termination of the Optionee's status as a Director for any reason shall not cause an Option to terminate.

10.  TIMING AND METHOD OF EXERCISE.

Subject to the limitations of Sections 8 and 9, an Optionee may, at any time, exercise an Option with respect to all or any part of the shares of Stock then subject to such Option by giving the Company written notice of exercise, specifying the number of shares as to which the Option is being exercised. Such notice shall be addressed to the Secretary of the Company at its principal office, and shall be effective when actually received (by personal delivery, fax or other delivery) by the Secretary of the Company. Such notice shall be accompanied by an amount equal to the Exercise Price of such shares, in the form of any one or combination of the following: cash or cash equivalents, or shares of Stock valued at Fair Market Value in accordance with the Plan. If shares of Stock that are acquired by the Optionee through exercise of an Option or an option issued under an Other Plan are surrendered in payment of the Exercise Price of Options, the Stock surrendered in payment must have been (i) held by the Optionee for more than six months at the time of surrender, or (ii) acquired under an Option granted not less than six months prior to the time of surrender. However, payment in full of the Exercise Price need not accompany the written notice of exercise provided the notice of exercise directs that the Stock certificate or certificates for the shares for which the Option is exercised be delivered to a licensed broker acceptable to the Company as the agent for the individual exercising the Option and, at the time such Stock certificate or certificates are delivered, the broker tenders to the Company cash (or cash equivalents acceptable to the Company) equal to the Exercise Price.

11.  NO STOCKHOLDER RIGHTS UNDER OPTION.

No Optionee shall have any of the rights of a stockholder with respect to the shares of Stock subject to an Option except to the extent the certificates for such shares shall have been issued upon the exercise of the Option.

5

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1999

6

12. CONTINUATION OF SERVICE.

     Nothing in the Plan shall confer upon any person any right to continue to serve as a Director.

13. STOCK OPTION AGREEMENT.

     Each Option granted pursuant to the Plan shall be evidenced by a written Stock Option Agreement notifying the Optionee of the grant and incorporating the terms of this Plan. The Stock Option Agreement shall be executed by the Company and the Optionee.

14. WITHHOLDING.

     The Company shall have the right to withhold, or require an Optionee to remit to the Company, an amount sufficient to satisfy any applicable federal, state, local or foreign withholding tax requirements imposed with respect to exercise of Options. To the extent permissible under applicable tax, securities, and other laws, the Optionee may satisfy a tax withholding requirement by directing the Company to apply shares of Stock to which the Optionee is entitled as a result of the exercise of an Option to satisfy withholding requirements under this Section 14.

15. NON-TRANSFERABILITY OF OPTIONS.

     Each Option granted pursuant to this Plan shall, during Optionee's lifetime, be exercisable only by Optionee, and neither the Option nor any right thereunder shall be transferable by the Optionee by operation of law or otherwise other than by will or the laws of descent and distribution, or pursuant to a qualified domestic relations order as defined in Section 414(p)(1)(B) of the Internal Revenue Code of 1986, as amended and shall not be pledged or hypothecated (by operation of law or otherwise) or subject to execution, attachment or similar processes.

16. USE OF PROCEEDS.

     Cash proceeds realized from the sale of Stock pursuant to Options granted under the Plan shall constitute general funds of the Company.

17. ADOPTION, AMENDMENT, SUSPENSION AND TERMINATION OF THE PLAN.

     17.1 The Plan shall be effective as of the date of adoption by the Board, subject to approval of the Plan within one year of its adoption by the Board by the affirmative votes of the holders of a majority of the Stock of the Company present, or represented, and entitled to vote at a meeting duly held in accordance with applicable laws of the state of Delaware, or by consent as permitted by law, provided, that upon approval of the Plan by the stockholders of the Company, all Options granted under the Plan on or after the Effective Date shall be fully effective as if the stockholders had approved the Plan on the Effective Date.

6

7

17.2 Subject to the limitation of Section 17.4, the Board may at any time suspend or terminate the Plan, and may amend it from time to time in such respects as the Board may deem advisable; provided, however, to the extent required under Rule 16b-3 under the Exchange Act as in effect at the time of such amendment, the Board shall not amend the Plan in the following respects without the approval of stockholders then sufficient to approve the Plan in the first instance:

(a) To materially increase the benefits accruing to participants under the Plan (for example, to increase the number of Options that may be granted to any Director);

(b) To materially increase the maximum number of shares of Stock that may be issued under the Plan; or

(c) To materially modify the requirements as to eligibility for participation in the Plan.

17.3 No Option may be granted during any suspension or after the termination of the Plan, and no amendment, suspension or termination of the Plan shall, without the Optionee's consent, alter or impair any rights or obligations under any Stock Option Agreement previously entered into under the Plan. This Plan shall terminate ten years after the Effective Date unless previously terminated pursuant to Section 4.2 or by the Board pursuant to this Section 17.

17.4 Notwithstanding the provisions of Section 17.2, except to the extent permissible under Rule 16b-3 under the Exchange Act, the formula provisions of this Plan shall not be amended more than once in any six-month period other than to comport with changes in the Internal Revenue Code of 1986, the Employee Retirement Income Security Act of 1974, or the rules promulgated thereunder.

18. REQUIREMENTS OF LAW.

18.1 The Company shall not be required to sell or issue any shares of Stock under any Option if the sale or issuance of such shares would constitute a violation by the individual exercising the Option or the Company of any provisions of any law or regulation of any governmental authority, including without limitation any federal or state securities laws or regulations. Specifically in connection with the 1933 Act, upon exercise of any Option, unless a registration statement under such Act is in effect with respect to the shares of Stock covered by such Option, the Company shall not be required to sell or issue such shares unless the Board has received evidence satisfactory to the Board that the holder of such Option may acquire such shares pursuant to an exemption from registration under such Act. Any determination in this connection by the Board shall be final, binding, and conclusive. The Company may, but shall in no event be obligated to, register any securities covered hereby pursuant to the 1933 Act. The Company shall not be obligated to take any affirmative action in order to cause the exercise of an Option or the issuance of shares pursuant thereto to comply with any law or regulation of any governmental authority. As to any jurisdiction that expressly imposes the requirement that an Option shall not be

7

8

exercisable unless and until the shares of Stock covered by such Option
are registered or are subject to an available exemption from registration, the
exercise of such Option (under circumstances in which the laws of such
jurisdiction apply) shall be deemed conditioned upon the effectiveness of such
registration or the availability of such an exemption.

18.2 The intent of this Plan is to qualify for the exemption
provided by Rule 16b-3 under the Exchange Act. To the extent any provision of
the Plan or action by the Plan administrators does not comply with the
requirements of Rule 16b-3, it shall be deemed inoperative, to the extent
permitted by law and deemed advisable by the Plan administrators, and shall not
affect the validity of the Plan. In the event Rule 16b-3 is revised or replaced,
the Board may exercise discretion to modify this Plan in any respect necessary
to satisfy the requirements of the revised exemption or its replacement.

19. GOVERNING LAW.

The validity, interpretation and effect of this Plan, and the
rights of all persons hereunder, shall be governed by and determined in
accordance with the laws of Delaware, other than the choice of law rules
thereof.

* * * * *

8

</TEXT>
</DOCUMENT>

# EXHIBIT  16



# FORM DEF 14A

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: April 14, 2000 (period: May 12, 2000)**

Official notification to shareholders of matters to be brought to a vote (Proxy)

11

Stock Option Committee. The members of the stock option committee are Messrs. Bradley, Callen and Donohue, all of whom are non-employee directors. The stock option committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options. The stock option committee held six meetings during 1999.

The entire board of directors of Sunrise acts as a nominating committee for selecting management's nominees for election as directors and has made its nominations for the annual meeting. Sunrise's bylaws require that stockholder nominations for directors be made by timely notice in writing to the secretary of Sunrise. To be timely, notice must be delivered to, or mailed to and received at, the principal executive offices of Sunrise not less than 60 days prior to the meeting. However, if less than 75 days notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder to be timely must be received no later than the close of business on the 15th day following the day on which notice of the date or public disclosure was made. Public notice of the expected date of the annual meeting was made on March 8, 2000 by the issuance of a press release and on March 9, 2000 by the filing of a current report on Form 8-K with the SEC. The annual meeting date subsequently was rescheduled from April 28, 2000 to May 12, 2000 because of delays in printing the annual report to stockholders due to revisions made to reflect the Company's recent reorganization into three separate divisions and to permit additional time for the solicitation of proxies for the annual meeting. A stockholder's notice of nomination must set forth information specified in Sunrise's bylaws concerning each person the stockholder proposes to nominate for election and the nominating stockholder. No nominations by stockholders were received at the time of mailing of this proxy statement. Sunrise's bylaws provide that no person may be elected as a director unless nominated in accordance with the procedures set forth in the bylaws.

COMPENSATION OF DIRECTORS

Non-employee directors are reimbursed for expenses incurred in attending meetings of the board of directors. No fees are paid for attendance at board or committee meetings.

In 1999, Messrs. Aprahamian, Bradley and Donohue each received grants of ten-year non-qualified stock options for 5,000 shares of common stock at an exercise price of $41.25 per share under Sunrise's 1996 directors' stock option plan, as amended. Mr. Callen received an initial option grant in 1999 for 10,000 shares of common stock at an exercise price of $41.25 per share. Mr. Slager also received an initial option grant in 1999 for 10,000 shares of common stock at an exercise price of $36.50 per share. An aggregate of 75,000 shares of common stock were reserved for issuance under the 1996

8

Source: SUNRISE SENIOR LIVIN, DEF 14A, April 14, 2000

20

COMPENSATION DEDUCTIBILITY POLICY

Under Section 162(m) of the Internal Revenue Code of 1986, as amended, and applicable Treasury regulations, no deduction is allowed for annual compensation in excess of $1 million paid by a publicly traded corporation to its chief executive officer and the four other most highly compensated officers. Under those provisions, however, there is no limitation on the deductibility of "qualified performance-based compensation." In general, Sunrise's policy is to maximize the extent of tax deductibility of executive compensation under the provisions of Section 162(m) so long as doing so is compatible with its determinations as to the most appropriate methods and approaches for the design and delivery of compensation to Sunrise's executive officers.

Respectfully submitted,

| Participating Members of the Board of Directors | Participating Members of the Compensation Committee |
|---|---|
| Paul J. Klaassen, Chairman | Thomas J. Donohue, Chairman |
| Ronald A. Aprahamian | Ronald A. Aprahamian |
| Thomas J. Donohue | |
| David W. Faeder | Participating Members |
| Teresa M. Klaassen | of the Stock Option Committee |
| David G. Bradley | |
| Richard R. Slager | Thomas J. Donohue, Chairman |
| | David G. Bradley |

SENIOR EXECUTIVE SEVERANCE PLANS

Effective as of February 25, 2000, the Sunrise board of directors adopted senior executive severance plans under which designated executive officers of Sunrise are eligible to receive severance benefits if such executive officer's employment with Sunrise is terminated by the executive officer within two years after a "change in control" for "good reason" or if, following a change in control, the executive officer's employment is terminated by Sunrise for any reason other than for "cause." Each of the named executive officers is eligible to participate under these plans. For purposes of the plans, a "change in control" means, generally, the acquisition by a third party of more than 50% of the outstanding common stock of Sunrise or of the combined voting power of all voting securities of Sunrise entitled to vote generally in the election of directors, a change in the composition of the board of directors of Sunrise whereby the members of the Sunrise board on the effective date of the plans, or any successor board member approved by a majority of the then-existing Sunrise board members, cease to constitute at least a majority of the board of directors

16

Source: SUNRISE SENIOR LIVIN, DEF 14A, April 14, 2000

24

A company owned by Paul J. Klaassen owns an airplane used by Mr. Klaassen and, from time to time, other Sunrise employees for business travel. In April 2000, Sunrise reimbursed Potomac Pilots, the company that operates the airplane for Mr. Klaassen, $76,433 for fuel and other costs of operating the airplane for Sunrise business travel during 1999.

For a description of certain other transactions involving Sunrise and its directors, see "Compensation Committee Interlocks and Insider Participation."

APPROVAL OF
2000 STOCK OPTION PLAN
(PROPOSAL 2)

On February 25, 2000, the board of directors adopted the 2000 stock option plan, subject to approval of stockholders at the annual meeting. As of that date, there were approximately 1,400 directors, officers and employees of Sunrise and its subsidiaries who would be eligible to participate in the 2000 stock option plan.

The principal provisions of the 2000 stock option plan are summarized below. This summary is not complete and is qualified in its entirety by the terms of the 2000 stock option plan, a copy of which is attached to this proxy statement as Exhibit A.

DESCRIPTION OF 2000 STOCK OPTION PLAN

The 2000 stock option plan will be administered by the stock option committee. A total of 500,000 shares of common stock will be reserved for issuance under the 2000 stock option plan. All directors, officers and employees of Sunrise or any subsidiary, and any consultant or adviser providing bona fide services to Sunrise or any subsidiary, whose participation in the 2000 stock option plan is determined by the stock option committee to be in the best interests of Sunrise will be eligible to receive option grants under the plan. The 2000 stock option plan does not have a termination date, but the grant of a qualified stock option within the meaning of Section 422 of the Internal Revenue Code may not occur more than ten years after February 25, 2000, the effective date of the plan. Only employees may be granted qualified stock options.

The option exercise price of options granted under the 2000 stock option plan will be fixed by the stock option committee when the option is granted. However, the per share option exercise price may not be less than the fair market value of Sunrise common stock on the date of grant, as determined under the plan. Options to purchase no more than 250,000 shares of common

20

# EXHIBIT  17


FORM

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0104 |
| Expires: December 31, 2001 | |
| Estimated average burden | |
| hours per response........0.5 | |

(Print or Type Responses)

| 1. Name and Address of Reporting Person* | | | 2. Date of Event Requiring Statement (Month/Day/Year) 05/19/00 | 4. Issuer Name and Ticker or Trading Symbol Sunrise Assisted Living, Inc. SNRZ |
|---|---|---|---|---|
| Holladay | J. | Douglas | | |
| (Last) | (First) | (Middle) | | |

| | 3. I.R.S. Identification Number of Reporting Person, if an entity (voluntary) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | 6. If Amendment, Date of Original (Month/Day/Year) |
|---|---|---|---|
| 600 14th Street, N.W. (Street) | | X  Director          10% Owner | |
| Washington   D.C.   20005 | | ___ Officer (give title below)   ___ Other (specify below) | 7. Individual or Joint/Group Filing (Check Applicable Line) X Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)   (State)   (Zip) | | | |

Table I — Non-Derivative Securities Beneficially Owned

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I)   (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SUN 003708

Reminder:  Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, *see* Instruction 5(b)(v).

(Over)
SEC 1473 (3-99)

Potential persons who are to respond to the collection of information contained in this form are not required
to respond unless the form displays a currently valid OMB control number

FORM 3 (continued)

Table II – Derivative Securities Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |
| Options | 5/22/00 | 5/22/10 | Common Stock | 12,000 | 15 9/16 | D | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Explanation of Responses:

\*\*Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
*See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:    File three copies of this Form, one of which must be manually signed. If space provided is insufficient, *See* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

_____  5/25/00
Signature of Reporting Person        Date

Page 2

# EXHIBIT  18



# FORM 10−Q

## SUNRISE SENIOR LIVING INC − SRZ

**Filed: November 13, 2000 (period: September 30, 2000)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART II.

OTHER INFORMATION
**ITEM 3.** QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK.
**ITEM 6.** EXHIBITS AND REPORTS ON FORM 8-K
SIGNATURES
Exhibit 10.1
EX-27

36

INDEX OF EXHIBITS

| Exhibit No. | Exhibit Name | Page |
|---|---|---|
| 10.1 | Employment Agreement, dated as of September 12, 2000, by and between Sunrise Assisted Living, Inc. and Paul J. Klaassen | |
| 27 | Financial Data Schedule, which is submitted electronically to the Securities and Exchange Commission for information only and is not filed | |

36

Source: SUNRISE SENIOR LIVIN, 10-Q, November 13, 2000

37

Exhibit 10.1

September 12, 2000

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") made and effective as of September 12, 2000, (the "Effective Date"), by and between Sunrise Assisted Living, a corporation organized and existing under the laws of Delaware (the "Company") and Paul J. Klaassen (the "Executive").

W I T N E S S E T H:

WHEREAS, the Company wishes to employ the Executive as Chairman and Chief Executive Officer on the terms and conditions set forth in this Agreement; and

WHEREAS, the Executive is willing to accept such employment on such terms and conditions;

NOW, THEREFORE, in consideration of the premises and of the mutual promises, representations and covenants herein contained, the parties hereto agree as follows:

1.  SCOPE OF EMPLOYMENT. The Company hereby agrees to employ the Executive upon the terms and conditions herein set forth and to perform such executive duties as may be determined and assigned to him by the Board of Directors of the Company (the "Board"). The Executive hereby accepts such employment, subject to the terms and conditions herein set forth. The Executive shall have the title of Chairman and Chief Executive Officer. While serving as Chairman and Chief Executive Officer, the Executive shall have the customary duties and powers of such position. Executive shall not be employed by any other organization during the Term of this Agreement.

2.  TERM.

    (a)  The term of Executive's employment under this Agreement shall be for five (5) years. It shall begin on the Effective Date and thereafter on an annual basis be extended for a five-year period, unless it is earlier terminated as follows:

        (i)  By the Company for Good Cause (as hereinafter defined);

        (ii)  By the Company for other than Good Cause upon the giving of thirty (30) days written notice. For purposes hereof, Executive shall be deemed terminated by the Company for other than Good Cause if he terminates employment for Good Reason (as hereinafter defined);

        (iii)  In the event of the Company's dissolution or liquidation;

        (iv)  By the Executive for any reason other than retirement upon the giving of thirty (30) days written notice;

38

(v)    In the event of the death of the Executive; or

(vi)    In the event of the disability of Executive (as hereinafter defined).

(b)    For purposes hereof, "Good Cause" shall mean, and be limited to, (i) any material breach by the Executive of the terms of this Agreement, (ii) the Executive's willful commission of acts of dishonesty in connection with his position, (iii) chronic absenteeism (other than by reason of disability), (iv) the Executive's willful failure or refusal to perform the essential duties of his position, (v) conviction of a felony, or (vi) the Executive's engaging in illegal or other wrongful conduct substantially detrimental to the business or reputation of the Company. If a ground for termination under this Section 2(b) is amenable to cure, the Company shall provide the Executive with written notice describing the nature of the ground for termination. If the Executive cures same within thirty (30) days after receiving such notice, there shall be no termination for Good Cause.

(c)    For purposes hereof, the term "Good Reason" shall mean the occurrence of any one or more of the following events unless Executive specifically agrees in writing that such event shall not be Good Reason:

(i)    the assignment to Executive by the Board of Directors or other officers or representatives of Company of duties materially inconsistent with the duties associated with the position described in Section 1 as such duties are constituted as of the Effective Date;

(ii)    a material change in the nature or scope of Executive's authority from those applicable to him as Chairman and Chief Executive Officer as such duties are constituted on the Effective Date;

(iii)    the occurrence of material acts or conduct on the part of Company or its officers and representatives which have as their purpose forcing the resignation of Executive or preventing him from performing his duties and responsibilities pursuant to this Agreement;

(iv)    a material breach by Company of any material provision of this Agreement, provided that failure of Company to pay any amount, or to provide any benefit, pursuant to the provision of Articles 3 and 4 hereof shall be deemed to be a material breach by Company of a material provision of this Agreement and shall provide Executive the right to terminate his employment under this Agreement at any time after such 30 day period; or

(v)    requiring Executive to be principally based at any office or location more than 50 miles from the current offices of the Company in McLean, Virginia.

(d)    For purposes hereof, the term "disability" shall have the same definition as is set forth in the then current group disability policy, if any, maintained by the Company for its executive employees. In the event that the Company does not have such a group term disability policy, the definition of "disability" shall be as is set forth in the individual disability policy, if any, purchased in order to fund the Company's liability under this

39

Agreement in the event of the Executive's disability. In the event that the Company maintains no such disability policies, "disability" shall mean the inability of the Executive, due to illness, accident or any other physical or mental incapacity, to perform his duties in a normal manner for a period of six (6) consecutive months.

3.    COMPENSATION.

(a)    Annual Salary. The Company agrees to pay the Executive, and the Executive agrees to accept, in payment for services to be rendered by the Executive hereunder, an initial base salary of Three Hundred Thousand Dollars ($300,000) per annum. The salary shall be payable in equal periodic installments, not less frequently than monthly, less such sums as may be required to be deducted or withheld under the provisions of federal, state or local law. The Company agrees to review the Executive's salary annually at or around January 1st of each calendar year (or such other time as the Company and Executive mutually agree), commencing on or about January 1, 2001, for adjustment based on the Executive's performance.

(b)    Annual Bonus. In addition to Executive's salary, the Executive shall be eligible to receive an annual bonus based upon the achievement of goals established by the compensation committee of the Board of the Company (the "Compensation Committee") after due consultation with the Executive. Initially, the Executive's annual bonus will be targeted at a minimum of $300,000.

The Compensation Committee in its discretion, shall base such bonus payment upon the satisfaction of one or more performance goals ("Performance Goals"). The Performance Goals shall be based upon the achievement of (i) a specified level, of (x) the Company's consolidated pre-tax or after-tax earnings or EBITDA or (y) the pre-tax or after-tax earnings, or the EBITDA, of any particular subsidiary, division or other business unit of the Company, (ii) the achievement of a specified level of revenues, earnings, costs, return on assets, return or equity, return on capital, return on investment, return on assets under management, net operating income or net operating income as a percentage of book value with regard to the Company, particular subsidiaries, divisions or business units of the Company, particular assets or groups of assets or particular employees or groups of employees, or (iii) any combination of the foregoing. Prior to the payment of any such bonus hereunder, the Compensation Committee shall have certified that any applicable Performance Goals have been satisfied.

(c)    Stock Options. Executive was awarded an incentive stock option grant on September 11, 2000 under the Company's Stock Option Plan for 350,000 shares of stock. Such grant will vest at the rate of 25% (87,500 shares per year) at the end of each calendar year beginning on December 31, 2000, and ending on December 31, 2003.

40

4.    FRINGE BENEFITS, REIMBURSEMENT OF EXPENSES, ETC.

(a)    The Executive shall be entitled to paid vacation, holidays and sick leave benefits in accordance with the Company's policies for executive employees.

(b)    The Executive and/or his family shall be entitled to medical insurance from the Company in accordance with the Company's policies for employees. In addition, Executive shall be entitled to a fully-insured executive medical/dental plan providing supplemental coverage for Executive and his family for those items not covered under the Company's general health plan (for example, prescriptions, orthodontia, eye surgery or other coverages which may be excluded from the group medical plan). Notwithstanding the termination of this Agreement for any reason, the Company and any of its successors and assigns, shall provide to Executive until age 65, similar medical coverage to that described above, at the expense of the Company.

(c)    The Company agrees to pay the premiums on a permanent life insurance policy equal to $150,000 per year for 12 years and to pay Executive an additional amount equal to the tax due to the income imputed to Executive as a consequence of such policy. Such policy shall be a "split dollar" policy such that the Company shall recapture the cost of the premiums paid on the policy, to the extent and at such time as is permissible under the policy. Such policy shall be owned by the Executive and funded by the Company for the above described period even if this Agreement is terminated.

(d)    The Company agrees to pay, or promptly reimburse the Executive for, all reasonable expenses incurred by the Executive in furtherance of or in connection with the business of the Company, provided that the Executive furnishes appropriate documentation for such expenses in accordance with the Company's practices and procedures.

(e)    Executive shall be entitled to participate in those retirement plans, both defined contribution and defined benefit, qualified and non-qualified, as are then currently available to the Company's executive employees and such new retirement plans, if any, as may be adopted by the Company from time to time.

5.    TERMINATION BENEFITS: In addition to the benefits described under the Agreement that survive the termination of the Agreement, the following benefits will be paid on account of the termination of the Agreement for the following reasons:

(a)    Upon termination of this Agreement by the Company for Good Cause pursuant to Section 2(a)(i), or by the Executive for other than Good Reason, death or disability, Company shall pay to Executive immediately after the date of termination an amount equal to

(i)    the sum of Executive's accrued base salary and any bonus amount earned but not yet paid;

41

    (ii)   the Company shall make additional payments to the Executive each year for three consecutive years following said termination equal to his annual salary and bonus for the year of termination; and

    (iii)   the Company shall provide to Executive's spouse (and children through their attainment of age 22), in the event of death (after termination of the Agreement under this section), and the Executive in the event of disability (after the termination of the Agreement under this section), medical insurance through the date the Executive attains age 65.

(b)     Upon termination of this Agreement due to the Executive's death or disability, the Company shall pay to Executive, immediately after the Date of Termination, an amount which is equal to the Executive's base salary and annual bonus amount for the remaining term of the Agreement. The Company shall make additional payments each year for three consecutive years following said termination equal to his annual salary and bonus for the year of termination. The Company shall provide to Executive's spouse (and children through their attainment of age 22), in the event of death, and to the Executive and his family, in the event of disability (after the termination of the Agreement under this section) medical insurance through the date the Executive would attain age 65. In addition, any stock options, shall be fully vested in the event of the Executive's death or disability.

(c)     Upon termination of this Agreement by the Company for other than Good Cause or by the Executive for Good Reason, Executive shall be entitled to:

    (i)   the Company shall pay to Executive or his beneficiaries, as the case may be, immediately after the Date of Termination an amount which is equal to the Executive's base salary and annual bonus amount for the remaining term of the Agreement;

    (ii)   the Company shall make additional payments each year for three consecutive years following said termination equal to his annual salary and bonus for the year of termination;

    (iii)   the Company shall provide to Executive's spouse (and children through their attainment of age 22), in the event of death (after the termination of the Agreement under this section), and the Executive in the event of disability (after the termination of the Agreement under this section), medical insurance through the date the Executive would attain age 65; and

    (iv)   the Company shall fully vest any stock options previously granted to the Executive.

(d)     Upon a Change In Control, Executive shall be entitled to the following from either the Company or its successor, if any:

    (i)   the Company shall pay to Executive or his beneficiaries, as the case may be, immediately after the Date of Termination an amount which is equal to the

42

Executive's base salary and annual bonus amount for the remaining term of the Agreement;

(ii)   the Company shall make additional payments each year for three consecutive years following said termination equal to his annual salary and bonus for the year of termination;

(iii)  Executive's spouse (and any children through their attainment of age 22), in the event of death (after the termination of the Agreement under this section), and the Executive in the event of disability (after the termination of the Agreement under this section) shall be entitled to medical insurance through the date the Executive would attain age 65;

(iv)   the Company shall fully vest any stock options previously granted to the Executive and shall pay Executive an amount determined in accordance with Section 4(a)(i)(D) of the Senior Executive Severance Plan in effect on the date of this Agreement;

(v)    In recognition of services by Executive in connection with any corporate activity that constitutes a Change of Control, the Company shall pay the Executive in a lump sum concurrent with or as soon as practicable following a Change in Control as defined in (vii)(A), (B) or (C), a disposition fee in the amount of 1% of the Company's enterprise value, defined as its market cap plus debt as of the date of the Change in Control. To the extent such amount is determined to be a golden parachute payment under section 280G of the Internal Revenue Code of 1986, as amended, the Company and its successors or assigns shall pay to the Executive an amount necessary to gross-up such amount for any taxes associated with such amount; and

(vi)   A "Change in Control" means any of the following events:

(A)    any person (as such term is used in Rule 13d-5 under the Securities Exchange Act of 1934 ("Exchange Act")) or group (as such term is defined in Sections 3(a)(9) and 13(d)(3) of the Exchange Act), other than a subsidiary or any employee benefit plan (or any related trust) of the Company or a subsidiary, becomes, after effective date of the Agreement the beneficial owner of 20% or more of the common stock or of securities of the Company that are entitled to vote generally in the election of directors of the Company ("Voting Securities") representing 20% or more of the combined voting power of all Voting Securities of the Company.

(B)    individuals who, as of the effective date of this Agreement, constitute the Board (the "Incumbent Board") cease for any reason to constitute a majority of the members of the Board; provided that any individual who becomes a director after the effective date of this Agreement whose election or nomination for election by the Company's shareholders was approved by a majority of the members of the Incumbent

43

Board (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened "election contest" relating to the election of the directors of the Company (as such terms are used in Rule 14a-11 under the Exchange Act), "tender offer" (as such term is used in Section 14(d) of the Exchange Act) or a proposed Merger (as defined below)) shall be deemed to be members of the Incumbent Board; or

(C)     approval by the stockholders of the Company of either of the following:

      (I)     a merger, reorganization, consolidation or similar transaction (any of the foregoing, a "Merger") as a result of which the persons who were the respective beneficial owners of the outstanding common stock and Voting Securities of the Company immediately before such Merger are not expected to beneficially own, immediately after such Merger, directly or indirectly, more than 60% of, respectively, the common stock and the combined voting power of the Voting Securities of the corporation resulting from such Merger in substantially the same proportions as immediately before such Merger, or

      (II)     a plan of liquidation of the Company or a plan or agreement for the sale or other disposition of all or substantially all of the assets of the Company.

Notwithstanding the foregoing, there shall not be a Change in Control if, in advance of such event, Executive agrees in writing that such event shall not constitute a Change in Control.

(e)     The Company's obligations under this Section 6 shall survive termination of this Agreement.

6.     INSURANCE. It is understood that the Company may purchase insurance policies to fund all or part of the obligations set forth in this Agreement, provided it is understood that said obligations shall not be affected by the availability or unavailability of insurance coverage. Executive agrees to execute such applications for insurance and to make himself available for and to undergo all reasonable medical examinations which may be required in the event the Company determines to procure or place any insurance to fund all or any part of the aforementioned obligations.

7.     ENTIRE AGREEMENT. This Agreement contains the entire understanding between the parties hereto and supersede all other oral and written agreements or understandings between them. All previous oral or written agreements between the parties hereto shall be deemed to have been completely fulfilled by both parties and shall be superseded by

44

this Agreement. No modification or addition hereto or waiver or cancellation of any provision shall be valid except by a writing signed by the party to be charged therewith.

8.    SUCCESSORS AND ASSIGNS. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, successors, assigns and personal representatives. As used herein, the successors of the Company shall include, but not be limited to, any successor by way of merger, consolidation, sale of all or substantially all of its assets, or similar reorganization. In no event may the Executive assign any duties or obligations under this Agreement.

9.    CONTROLLING LAW. The validity and construction of this Agreement or of any of its provisions shall be determined under the laws of the Commonwealth of Virginia. The invalidity or unenforceability of any provision of this Agreement shall not affect or limit the validity and enforceability of the other provisions hereof.

10.    COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

11.    HEADINGS. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof.

12.    INDEMNIFICATION. The Company shall indemnify and hold Executive harmless from and against all claims, investigations, actions, awards and judgments, including costs and attorneys' fees, incurred by Executive in connection with acts or decisions made by Executive in good faith in his capacity as either a director or as an officer of the Company, so long as Executive reasonably believed that the acts or decisions were in the best interests of the Company. The Company further agrees to retain and pay the fees and costs of counsel selected by Executive to represent him in any action or proceeding covered by this indemnification or in enforcing or pursuing his rights under this Agreement. The Company shall not settle any claim or action or pay any award or judgment against Executive without Executive's prior written consent, which shall not be unreasonably withheld. The Company may obtain coverage for Executive under an insurance policy covering the directors and officers of the Company against claims set forth herein if such coverage is possible at a reasonable cost, provided, however, it is understood and agreed that the Company's obligation to indemnify Executive as set forth in this Section 12 shall not be affected by the Company's ability or inability to obtain insurance coverage.

45

          IN WITNESS WHEREOF, the parties have duly executed this Agreement as of
the date and year first above written.

WITNESS:                                   Sunrise Assisted Living


   /s/  Gregori Lebedev                  By:   /s/ Thomas J. Donohue
----------------------------------         ----------------------------

                                           Thomas J. Donohue
                                           Director and
                                           Chairman, Compensation Committee


WITNESS:


   /s/  Linda Bolino                        /s/  Paul J. Klaassen
----------------------------------         ----------------------------------
                                           Paul J. Klaassen

</TEXT>
</DOCUMENT>

# EXHIBIT  19

| FORM 4 | |
|---|---|

☐ Check this box if no longer
subject to Section 16. Form 4 or
Form 5 obligations may continue.
*See* Instruction 1(b).

(Print or Type Responses)

UNITED STATES SECURITIES / EXCHANGE COMMISSION
Washington, D.C. 20549

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number:    3235-0287
Expires:    September 30, 1998
Estimated average burden
hours per response. . . . . . . .0.5

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Hulse     Larry     E. | Sunrise Assisted Living, Inc. (SNRZ) | _____ Director          _____ 10% Owner |
| (Last)     (First)     (Middle) | 3. IRS or Social Security Number of Reporting Person (Voluntary) | 4. Statement for Month/Year March 2000 | X Officer (give title below)     _____ Other (specify below) |
| 7902 Westpark Drive | | Chief Financial Officer |
| (Street) | | |
| McLean     Virginia   22102 | 5. If Amendment, Date of Original (Month/Year) | 7. Individual or Joint/Group Filing (Check Applicable Line) X Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/ Day/ Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Bene- ficial Owner- ship (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

WDC - 63844/2 - 0394621.01

(Over)
SEC 1474 (7-96)

SUN 002751

0087

FORM 4 (continued)

Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $12.3750 | 2/25/00 | A | | 7,222 | | (1) | 2/25/10 | Common Stock | 7,222 | | 7,222 | D | |
| Employee Stock Option (right to buy) | $12.4375 | 3/28/00 | A | | 25,000 | | (2) | 3/28/10 | Common Stock | 25,000 | | 25,000 | D | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Explanation of Responses:
   (1) The option vests in four equal annual installments beginning February 25, 2001
   (2) The option vests in four equal annual installments beginning March 28, 2001

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
     See 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
     If space is insufficient, see Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained
in this form are not required to respond unless the form displays a currently valid OMB Number.

** Signature of Reporting Person                     April 10, 2000
                                                          Date

SUN 002752

WDC - 638442 - 0396621.01

Page 2
SEC 1474 (7-96)

# EXHIBIT  20

**FORM 5**

- ☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).
- ☐ Form 3 Holdings Reported
- ☐ Form 4 Transactions Reported

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## ANNUAL STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number:          3235-0362
Expires:    September 30, 1998
Estimated average burden
hours per response. . . . . . . .1.0

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Aprahamian    Ronald    V. <br> (Last)       (First)       (Middle) <br><br> 9401 Lee Highway, Suite 300 <br> (Street) | Sunrise Assisted Living, Inc  (SNRZ) | X  Director           ____ 10% Owner <br><br> ____ Officer (give title below)    ____ Other (specify below) |
| | 3. IRS or Social Security Number of Reporting Person (Voluntary) | 4. Statement for Month/Year <br> 12/31/97 | |
| Fairfax       Virginia      22031 <br> (City)        (State)       (Zip) | 5. If Amendment, Date of Original (Month/Year) | 7. Individual or Joint/Group Filing (Check Applicable Line) <br> X  Form filed by One Reporting Person <br> ____ Form filed by More than One Reporting Person |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Issuer's Fiscal Year (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|
| | | Year | Amount | (A) or (D) | Price | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, see instruction 4(b)(v).

Page 1 of 2
2270 (7-96)

FORM 5 (continued)

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Year (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Director Stock Option (right to buy) | $24.875 | 4/28/97 | A | 5,000 | | (2) | 4/28/07 | Common Stock | 5,000 | | 5,000 | D | |
| Director Stock Option (right to buy) | $24.375 | 5/02/97 | A | 100,000 | | (1) | 5/02/07 | Common Stock | 100,000 | | 100,000 | D | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Explanation of Responses:

(1) The option vests in four equal annual installments beginning on May 2, 1998.
(2) The option vested on 4/28/97.

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
   *See* 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
   If space provided is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond, unless the form displays a currently valid OMB number.

** Signature of Reporting Person
As attorney-in-fact for Ronald V. Aprahamian

February 5, 1998
Date

Page 2 of 2
SEC 2270 (7-96)

STIN 003257

# EXHIBIT  21

**FORM 3**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number:      3235-0104
Expires:   September 30, 1998
Estimated average burden
hours per response........0.5

(Print or Type Responses)

| 1. Name and Address of Reporting Person* | | | 2. Date of Event Requiring Statement (Month/Day/Year) 03/03/98 | 4. Issuer Name and Ticker or Trading Symbol Sunrise Assisted Living, Inc.  (SNRZ) | |
|---|---|---|---|---|---|
| Tomasso          Tiffany          L. | | | | | |
| (Last)          (First)          (Middle) | | | 3. IRS or Social Security Number of Reporting Person (Voluntary) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) ___Director          ___10% Owner  X Officer (give title below)      ___Other (specify below)  Executive Vice President | 6. If Amendment, Date of Original (Month/Day/Year) |
| c/o Sunrise Assisted Living, Inc. 9401 Lee Highway, Suite 300 | | | | | |
| (Street) | | | | | |
| Fairfax          Va.          22031 | | | | | 7. Individual or Joint/Group Filing (Check Applicable Line)  X Form filed by One Reporting Person ___Form filed by More than One Reporting Person |
| (City)          (State)          (Zip) | | | | | |

Table I — Non-Derivative Securities Beneficially Owned

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I)  (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, see Instruction 5(b)(v).

(Over)

SEC 1473 (7-96)

VADC - 62844/2 - 0594613.01

SUN 002275

0065

FORM 3 (continued)          Table II – Derivative Securities Beneficially Owned (*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security. | 5. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |
| Employee Stock Option (right to buy) | (1) | 7/21/05 | Common Stock | 10,501 | $3.00 | D | |
| Employee Stock Option (right to buy) | (2) | 1215/05 | Common Stock | 3,334 | $7.50 | D | |
| Employee Stock Option (right to buy) | (3) | 2/28/06 | Common Stock | 12,000 | $10.50 | D | |
| Employee Stock Option (right to buy) | (4) | 5/30/06 | Common Stock | 20,000 | $20.00 | D | |
| Employee Stock Option (right to buy) | (5) | 12/13/06 | Common Stock | 20,000 | $25.625 | D | |
| Employee Stock Option (right to buy) | (6) | 12/13/06 | Common Stock | 45,000 | $25.625 | D | |
| Employee Stock Option (right to buy) | (7) | 8/28/07 | Common Stock | 30,000 | $30.75 | D | |
| Employee Stock Option (right to buy) | (8) | 1/19/08 | Common Stock | 100,000 | $44.00 | D | |

Explanation of Responses:

(1)  2,167 options currently exercisable;  4,167 exercisable on 6/5/98, and 4,167 exercisable on 6/5/99.   (2)  1,667 options currently exercisable;  833 exercisable on 6/5/98; and 833 exercisable on 6/5/99.

(3)  6,000 options currently exercisable;  3,000 exercisable on 6/5/98, and 3,000 exercisable on 6/5/99.   (4)  5,000 options currently exercisable;  5,000 exercisable on 5/30/98; 5,000 exercisable on 5/30/99; 5,000 exercisable on 5/30/00.

(5)  20,000 options currently exercisable.   (6)  11,250 options currently exercisable;  11,250 exercisable on 12/13/98; 11,250 exercisable on 6/5/99; 11,250 exercisable on 12/13/00.

(7)  7,500 options exercisable on 8/28/98 and 25% on each of the next three anniversary dates thereof.   (8)  20,000 options exercisable on 1/19/99; 1/19/00; 1/19/01, respectively; and 40,000 exercisable on 1/19/02.

**Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
*See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:       File three copies of this Form, one of which must be manually signed.  If space provided is insufficient,
*See* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not
required to respond unless the form displays a currently valid OMB Number.

**Signature of Reporting Person          March 4, 1998
                                                        Date

SUN 002276

# EXHIBIT  22

## FORM 5

- ☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).
- ☐ Form 3 Holdings Reported
- ☐ Form 4 Transactions Reported

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

### ANNUAL STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

**OMB APPROVAL**

OMB Number: 3235-0362
Expires: September 30, 1998
Estimated average burden hours per response........1.0

| 1. Name and Address of Reporting Person* | | | 2. Issuer Name and Ticker or Trading Symbol | | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|---|---|---|
| Aprahamian | Ronald | V. | **Sunrise Assisted Living, Inc** (SNRZ) | | X___ Director | _____ 10% Owner |
| (Last) | (First) | (Middle) | 3. IRS or Social Security Number of Reporting Person (Voluntary) | 4. Statement for Month/Year | _____ Officer (give title below) | _____ Other (specify below) |
| 9401 Lee Highway, Suite 300 | | | | 12/31/99 | | |
| (Street) | | | | | | |
| Fairfax      Virginia      22031 | | | 5. If Amendment, Date of Original (Month/Year) | | 7. Individual or Joint/Group Filing (Check Applicable Line) | |
| (City)     (State)     (Zip) | | | | | X___ Form filed by One Reporting Person | |
| | | | | | _____ Form filed by More than One Reporting Person | |

**Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Issuer's Fiscal Year (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|
| | | | Amount | (A) or (D) | Price | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, see instruction 4(b)(v).

Page 1 of 2
SEC 2270 (7-96)

SUN 003247

0008

FORM 5 (continued)

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Year (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Director Stock Option (right to buy) | $44.5625 | 4/27/98 | A | 5,000 | | (2) | 4/27/08 | Common Stock | 5,000 | | 5,000 | D | |
| Director Stock Option (right to buy) | $41.2500 | 4/26/99 | A | 5,000 | | (1) | 4/26/09 | Common Stock | 5,000 | | 5,000 | D | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Explanation of Responses:

(1) The option vested on 4/26/99.
(2) The option vested on 4/27/98.

SUN 003248

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
*See* 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
If space provided is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

** Signature of Reporting Person
As attorney-in-fact for Ronald V. Aprahamian

February 15, 2000
Date

Page 2 of 2
SEC 2270 (7-96)

# EXHIBIT  23

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*

(Print or Type Responses)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: December 31, 2001 |
| Estimated average burden hours per response........0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Aprahamian   Ronald   V. <br>(Last)   (First)   (Middle) | Sunrise Assisted Living, Inc. (SNRZ) | X   Director          _____ 10% Owner |
| 7902 Westpark Drive <br>(Street) | 3. I.R.S. Identification Number of Reporting Person, if an entity (voluntary) | 4. Statement for Month/Year <br>**January 2001** | _____ Officer (give title below)    _____ Other (specify below) |
| McLean   VA   22102 <br>(City)   (State)   (Zip) | 5. If Amendment, Date of Original (Month/Year) | 7. Individual or Joint/Group Filing (Check Applicable Line) <br> X Form filed by One Reporting Person <br> _____ Form filed by More than One Reporting Person |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number

(Over)
SEC 1474 (3-99)

SUN 003240

0005



ntinued)

Table II – Derivative Securities Acq, d, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2.Conversion or Exercise Price of Derivative Security | 3.Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8.Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $20.5625 | 1/9/01 | A | | 9,000 | | 1/9/01 | 1/9/11 | Common Stock | 9,000 | | 9,000 | D | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Explanation of Responses:

SUN 003241

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
See 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note:  File three copies of this Form, one of which must be manually signed.
If space is insufficient, see Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained
in this form are not required to respond unless the form displays a currently valid OMB Number.

_____    7/9/01
** Signature of Reporting Person    Date
As attorney-in-fact for Ronald V. Aprahamian

# EXHIBIT  24

# FORM 5

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

☐ Form 3 Holdings Reported
☐ Form 4 Transactions Reported

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## ANNUAL STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

**OMB APPROVAL**

| | |
|---|---|
| OMB Number: | 3235-0362 |
| Expires: | September 30, 1998 |
| Estimated average burden hours per response. . . . . . . .1.0 | |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Donohue  Thomas  J. <br> (Last)  (First)  (Middle) | **Sunrise Assisted Living, Inc** (SNRZ) | X  Director _____ 10% Owner |
| 9401 Lee Highway, Suite 300 <br> (Street) | 3. IRS or Social Security Number of Reporting Person (Voluntary) | 4. Statement for Month/Year <br> 12/31/98 | _____ Officer (give title below)  _____ Other (specify below) |
| Fairfax  Virginia  22031 <br> (City)  (State)  (Zip) | 5. If Amendment, Date of Original (Month/Year) | 7. Individual or Joint/Group Filing (Check Applicable Line) <br> X  Form filed by One Reporting Person <br> _____ Form filed by More than One Reporting Person |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Trans-action Date (Month/Day/Year) | 3. Trans-action Code (Instr. 8) | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Issuer's Fiscal Year (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Owner-ship (Instr. 4) |
|---|---|---|---|---|---|---|---|---|
| | | | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/22/98 | G | 6,700 | D | $48.375 | 45,800  Shares | D | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, see Instruction 4(b)(v).

Page 1 of 2
SEC 2270 (7-96)

SUN 003397

0014

**FORM 5 (continued)**

**Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Year (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Director Stock Option (right to buy) | $44.5625 | 4/27/98 | A | 5,000 | | 4/28/98 | 4/28/08 | Common Stock | 5,000 | | 5,000 | D | |
| Director Stock Option (right to buy) | $30.8125 | 10/8/98 | A | 10,000 | | 10/8/98 | 10/8/08 | Common Stock | 10,000 | | 10,000 | D | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Explanation of Responses:

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
   *See* 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
      If space provided is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

** Signature of Reporting Person
As attorney-in-fact for Thomas J. Donohue

February 12, 1999
Date

Page 2 of 2
SEC 2270 (7-96)

# EXHIBIT  25



# FORM SC 13G/A

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: February 14, 2007 (period: )**

An amendment to the SC 13G filing

| OMB APPROVAL |
|---|
| OMB Number: 3235-0145 |
| Expires: February 28, 2009 |
| Estimated average burden |
| hours per response...10.4 |

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## SCHEDULE 13G

### Under the Securities Exchange Act of 1934
### (Amendment No. 9)*

# Sunrise Senior Living, Inc.
(Name of Issuer)

Common stock, par value $0.01 per share
(Title of Class of Securities)

86768K 10 6
(CUSIP Number)

December 31, 2006
(Date of Event Which Requires Filing of this Statement)

Check the appropriate box to designate the rule pursuant to which this Schedule is filed:

☐ Rule 13d-1(b)

☐ Rule 13d-1(c)

☒ Rule 13d-1(d)

* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter the disclosures provided in a prior cover page.

The information required in the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No. 86768K 10 6          Page 2 of 6

| 1 | NAMES OF REPORTING PERSONS:<br>Paul J. Klaassen **/<br><br>I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY): |
|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS):<br>(a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY: |
| 4 | CITIZENSHIP OR PLACE OF ORGANIZATION:<br><br>United States |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH: | 5 | SOLE VOTING POWER:<br>-0- |
|---|---|---|
| | 6 | SHARED VOTING POWER:<br>6,004,425 |
| | 7 | SOLE DISPOSITIVE POWER:<br>-0- |
| | 8 | SHARED DISPOSITIVE POWER:<br>4,504,425 |

| 9 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON:<br><br>6,004,425 |
|---|---|
| 10 | CHECK IF THE AGGREGATE AMOUNT IN ROW (9) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS):<br>☐ |
| 11 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (9):<br><br>11.7% |
| 12 | TYPE OF REPORTING PERSON (SEE INSTRUCTIONS):<br><br>IN |

**/ Consists of (i) 5,153,140 shares held jointly by Mr. and Mrs. Klaassen as tenants by the entireties, (ii) stock options to purchase 700,000 shares of common stock held individually by Mr. Klaassen, (iii) 60,089 shares held directly by Mr. Klaassen; (iv) 27,777 shares of restricted stock held individually by Mr. Klaassen, (iv) 23,919 restricted stock units held individually by Mr. Klaassen and (v) 39,500 shares held by The Klaassen Family Private Foundation.

Source: SUNRISE SENIOR LIVIN, SC 13G/A, February 14, 2007

CUSIP No. 86768K 10 6                                          Page 3 of 6

| 1 | NAMES OF REPORTING PERSONS:<br>Teresa M. Klaassen **/<br><br>I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (ENTITIES ONLY): |
|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS):<br>(a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY: |
| 4 | CITIZENSHIP OR PLACE OF ORGANIZATION:<br><br>United States |

| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH: | 5 | SOLE VOTING POWER:<br>-0- |
|---|---|---|
| | 6 | SHARED VOTING POWER:<br>6,004,425 |
| | 7 | SOLE DISPOSITIVE POWER:<br>-0- |
| | 8 | SHARED DISPOSITIVE POWER:<br>4,504,425 |

| 9 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON:<br><br>6,004,425 |
|---|---|
| 10 | CHECK IF THE AGGREGATE AMOUNT IN ROW (9) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS):<br>☐ |
| 11 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (9):<br>11.7% |
| 12 | TYPE OF REPORTING PERSON (SEE INSTRUCTIONS):<br>IN |

**/ Consists of (i) 5,153,140 shares held jointly by Mr. and Mrs. Klaassen as tenants by the entireties, (ii) stock options to purchase 700,000 shares of common stock held individually by Mr. Klaassen, (iii) 60,089 shares held directly by Mr. Klaassen; (iv) 27,777 shares of restricted stock held individually by Mr. Klaassen, (iv) 23,919 restricted stock units held individually by Mr. Klaassen and (v) 39,500 shares held by The Klaassen Family Private Foundation.

Source: SUNRISE SENIOR LIVIN, SC 13G/A, February 14, 2007

**SCHEDULE 13G**

**Item 1.**

   (a)   **Name of Issuer:**

       Sunrise Senior Living, Inc.

   (b)   **Address of Issuer's Principal Executive Offices:**

       7902 Westpark Drive
       McLean, Virginia 22102

**Item 2.**

   (a)   **Name of Persons Filing:**

       Paul J. and Teresa M. Klaassen

   (b)   **Address of Principal Business Office or, if none, Residence:**

       7902 Westpark Drive
       McLean, Virginia 22102

   (c)   **Citizenship:**

       United States

   (d)   **Title of Class of Securities:**

       Common Stock

   (e)   **CUSIP Number:**

       86768K 10 6

**Item 3: If this statement is filed pursuant to §§240.13d-1(b) or 240.13d-2(b) or (c), check whether the person filing is a:**

       Not applicable.

**SCHEDULE 13G**

CUSIP No. 86768K 10 6                                                                                 Page 5 of 6 Pages

**Item 4. Ownership:**

Provide the following information regarding the aggregate number and percentage of the class of securities of the issuer identified in Item 1.

(a)    Amount beneficially owned:

6,004,425 (Paul J. Klaassen)
6,004,425 (Teresa M. Klaassen)

(b)    Percent of class:

11.7% (Paul J. Klaassen)
11.7% (Teresa M. Klaassen)

(c)    Number of shares to which the person has:

(i)    Sole power to vote or to direct the vote:

None

(ii)   Shared power to vote or to direct the vote:

6,004,425 (Paul J. Klaassen)
6,004,425 (Teresa M. Klaassen)

(iii)  Sole power to dispose or to direct the disposition of:

None

(iv)   Shared power to dispose or to direct the disposition of:

4,504,425 (Paul J. Klaassen)
4,504,425 (Teresa M. Klaassen)

**Item 5. Ownership of Five Percent or Less of Class:**

Not applicable.

**SCHEDULE 13G**

**Item 6. Ownership of More than Five Percent on Behalf of Another Person:**

    Not applicable.

**Item 7. Identification and Classification of the Subsidiary Which Acquired the Security Being Reported on By the Parent Holding Company:**

    Not applicable.

**Item 8. Identification and Classification of Members of the Group:**

    Not applicable.

**Item 9. Notice of Dissolution of Group:**

    Not applicable.

**Item 10. Certification:**

    Not applicable.

**SIGNATURE**

    After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: February 14, 2007

By: /s/ Paul J. Klaassen _____
    Paul J. Klaassen

By: /s/ Teresa M. Klaassen _____
    Teresa M. Klaassen

_____

Created by 10KWizard    www.10KWizard.com

# EXHIBIT  26



# FORM DEF 14A

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: April 05, 2002 (period: May 17, 2002)**

Official notification to shareholders of matters to be brought to a vote (Proxy)

date or public disclosure was made. Public notice of the expected date of the annual meeting was made on February 27, 2002 by the issuance of a press release. A stockholder's notice of nomination must set forth information specified in Sunrise's bylaws concerning each person the stockholder proposes to nominate for election and the nominating stockholder. Sunrise's bylaws provide that no person may be elected as a director unless nominated in accordance with the procedures set forth in the bylaws.

COMPENSATION OF DIRECTORS

Non-employee directors are reimbursed for expenses incurred in attending meetings of the board of directors. No fees are paid for attendance at board or committee meetings. However, Sunrise directors are typically granted stock options on an annual basis.

In 2001, Mr. Aprahamian received a grant of ten-year non-qualified stock options for 9,000 shares of common stock at an exercise price of $20.56 per share. Mr. Bradley received a grant of ten-year non-qualified stock options for 7,000 shares of common stock at an exercise price of $20.56 per share. Mr. Callen received a grant of ten-year non-qualified stock options for 10,000 shares of common stock at an exercise price of $20.56 per share. Mr. Donohue received a grant of ten-year non-qualified stock options for 12,000 shares of common stock at an exercise price of $20.56 per share. Mr. Holladay received a grant of ten-year non-qualified stock options for 7,000 shares of common stock at an exercise price of $20.56 per share. Peter A. Klisares received and option grant for 5,000 shares of common stock at an exercise price of $20.56 per share.

Sunrise has entered into a consulting agreement with David W. Faeder, effective as of April 1, 2000. Under the consulting agreement, Mr. Faeder performs consulting services as and when reasonably requested by the chairman of the board and chief executive officer or by the president of Sunrise. Initially, the consulting agreement provided for Mr. Faeder to receive, during the term of the agreement, annual compensation of $262,000 and reimbursement of reasonable expenses incurred in connection with the performance of consulting services. On May 31, 2001, the consulting agreement was amended to provide an annual compensation rate of $177,000 per year and up to $131,000 in additional bonuses per year, payable quarterly or at certain milestones. At that time, Mr. Faeder was rehired as an employee for limited purposes and receives an annual salary of $85,000 and is eligible to participate in the company's health and benefits plans. The consulting agreement expires on March 31, 2003, unless extended or earlier terminated by the parties. Either party may terminate the consulting agreement upon 30 days' prior notice. Under the terms of the consulting agreement, all of Mr. Faeder's then existing options continue to vest and be exercisable or available as if his employment with Sunrise had continued through March 31, 2003. In addition, the consulting agreement provides that Mr. Faeder is entitled to the benefits under the senior executive severance plan, as described below, on the same basis as Sunrise's president. The total compensation paid in 2001 to Mr. Faeder under these arrangement was $393,000.

In September 2001, Mr. Faeder was awarded 52.5 shares of restricted stock in Sunrise At-Home, or .0525% of the issued and outstanding Sunrise At-Home common stock at the time of the award. In February 2002, Mr. Faeder surrendered his restricted stock award for cancellation. In December 2001, Mr. Faeder was awarded restricted limited partnership points in ordinary partnership units in Holdings I, our international joint venture with DLJ (now Credit Suisse First Boston) and affiliated entities ("Holdings I"), or 0.66% of the issued and outstanding ordinary partnership interests in that joint venture at the date of the award. See "Report on Executive Compensation" and "Compensation Committee Interlocks and Insider Participation" for additional information. In February 2002, Mr. Faeder surrendered his restricted ordinary partnership award in Holdings I for cancellation.

6

Source: SUNRISE SENIOR LIVIN, DEF 14A, April 05, 2002

# EXHIBIT  27

# FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

(Print or Type Responses)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| OMB APPROVAL |
|---|
| OMB Number: 3235-0287 |
| Expires: December 31, 2001 |
| Estimated average burden hours per response........0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|
| Callen    Craig    R. | Sunrise Assisted Living, Inc. (SNRZ) | X    Director | _____ 10% Owner |
| (Last)    (First)    (Middle) | | | |
| 7902 Westpark Drive | 3. I.R.S. Identification Number of Reporting Person, if an entity (voluntary) | 4. Statement for Month/Year | _____ Officer (give title below) | _____ Other (specify below) |
| (Street) | | January 2001 | |
| McLean    VA    22102 | 5. If Amendment, Date of Original (Month/Year) | 7. Individual or Joint/Group Filing (Check Applicable Line) |
| (City)    (State)    (Zip) | | X Form filed by One Reporting Person |
| | | _____ Form filed by More than One Reporting Person |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, see Instruction 4(b)(v).

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number

(Over)
SEC 1474 (3-99)

SUN 003329

6000

FORM 4 (continued)

Table II - Derivative Securities Acq'd, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $20.5625 | 1/9/01 | A | | 10,000 | | 1/9/01 | 1/9/11 | Common Stock | 10,000 | | 10,000 | D | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Explanation of Responses:

SUN 003330

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
See 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
If space is insufficient, see Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained
in this form are not required to respond unless the form displays a currently valid OMB Number.

_(signature)_                          7/9/01

** Signature of Reporting Person        Date
As attorney in fact for Craig R. Callen

## FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

(Print or Type Responses)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

COPY

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2001 |
| Estimated average burden hours per response........0.5 | |

| 1. Name and Address of Reporting Person* | | | | 2. Issuer Name and Ticker or Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|---|---|---|
| Donohue | Thomas | J. | | Sunrise Assisted Living, Inc. (SNRZ) | X Director | 10% Owner |
| (Last) | (First) | (Middle) | | 3. I.R.S. Identification Number of Reporting Person, if an entity (voluntary) | 4. Statement for Month/Year | Officer (give title below) — Other (specify below) |
| 7902 Westpark Drive | | | | | January 2001 | |
| (Street) | | | | 5. If Amendment, Date of Original (Month/Year) | 7. Individual or Joint/Group Filing (Check Applicable Line) | |
| McLean | VA | 22102 | | | X Form filed by One Reporting Person | |
| (City) | (State) | (Zip) | | | Form filed by More than One Reporting Person | |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, see Instruction 4(b)(v).
Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number

(Over)
SEC 1474 (3-99)

SUN 003388

0017



(...ontinued)

**Table II – Derivative Securities Acqu...d, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $20.5625 | 1/9/01 | A | | 12,000 | | 1/9/01 | 1/9/11 | Common Stock | 12,000 | | 12,000 | D | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Explanation of Responses:

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
    See 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note:  File three copies of this Form, one of which must be manually signed.
    If space is insufficient, see Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained
in this form are not required to respond unless the form displays a currently valid OMB Number.

_____    7/9/01
** Signature of Reporting Person    Date
As attorney-in-fact for Thomas J. Donohue

SUN 003389

Page 2