# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| In Re SUNRISE SENIOR LIVING, INC.  ) | **Civil Action No. 07-00143** |
| Derivative Litigation                        ) | |
| _____ ) | |
|                                                         ) | |
| This Document Relates To:               ) | |
|                                                         ) | |
|                                                         ) | |
| ALL ACTIONS                                ) | |
| _____ ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO NOMINAL DEFENDANT SUNRISE SENIOR LIVING INC.'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, STAY PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT

DAVIS, COWELL & BOWE, LLP
George R. Murphy (DC Bar 75200)
Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
1701 K Street NW, Suite 210
Washington, DC 20006
Telephone:    (202) 223-2620
Facsimile:     (202) 223-8651

*Liaison Counsel for Plaintiffs*

DATED: July 24, 2008

*Additional Counsel Appear on Signature Page*

<u>**TABLE OF CONTENTS**</u>

I.      INTRODUCTION ............................................................................................... 1

II.     PROCEDURAL HISTORY.............................................................................. 2

III.    STATEMENT OF FACTS .............................................................................. 3

IV.     ARGUMENT .................................................................................................... 7

        A.      DEMAND ON SUNRISE'S BOARD WOULD HAVE
                BEEN FUTILE ..................................................................................... 7

                1.      Legal Standard Governing Demand Futility.................................. 7

                2.      Plaintiffs Have Alleged Particularized Facts Which Create
                        Reasonable Doubt as to the Independence or Disinterestedness
                        of a Majority of the Directors in Their Ability to Consider a
                        Demand ...................................................................................... 10

                        a.      The Complaint Pleads Particularized Facts
                                Showing a Pattern of Systematic and Continuous
                                Accounting Manipulations................................................. 10

                                (i)     The Stock Option Backdating Scheme ................. 10

                                (ii)    The *Ultra Vires* Stock Option Grants ................... 15

                                (iii)   Improper Accounting for Real Estate
                                        Transactions ........................................................... 15

                        b.      Reasonable Doubt Exists as to the Disinterestedness
                                of Defendants P. Klaassen, Aprahamian, Donohue
                                and Callen Due to Their Receipt Of Significant Financial
                                Benefits From Backdated Stock Options.......................... 17

                        c.      Defendants Callen and Donohue Are Substantially
                                Likely to Be Held Liable for Granting Backdated
                                and *Ultra Vires* Stock Options......................................... 19

                        d.      Demand Is Futile With Respect to the Entire Board
                                Because Defendants P. Klaassen, T. Klaassen, Aprahamian,
                                Donohue, Callen, Holladay and Little Are Substantially
                                Likely to Be Held Liable for Engaging in a Continuous
                                Accounting Scheme to Artificially Inflate Sunrise's
                                Financial Statements and Causing Sunrise to Issue False
                                and Misleading Financial Statements ............................... 23

e.    Defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Callen and Holladay Are Substantially Likely to Be Held Liable for Their Insider Sales of Sunrise Common Stock ................................. 26

f.    Sunrise's Attacks on a Pattern of Backdating Fail............ 28

g.    Sunrise Ignores *Conrad*, which the Court Should Follow ................................................................ 32

B.    THE DISMISSAL OF THE *VON GUGGENBERG* ACTION DOES NOT COLLATERALLY ESTOP OR PRECLUDE THE INSTANT ACTION......................................................... 34

C.    THE ACTION SHOULD NOT BE STAYED IN FAVOR OF THE SECURITIES CLASS ACTION ................................ 38

V.    CONCLUSION................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Angstadt v. Atlantic Mutual Ins.*
  457 S.E.2d 67, 87 (Va. 1995)..............................................................................................37

*Belova v. Sharp,*
  No. 07-299-MO, 2008 U.S. Dist. LEXIS 19880 (D. Ore. March 13, 2008) ................9, 13, 14

*Brehm v. Eisner,*
  746 A.2d 244 (Del. 2000) (Hartnett, J., concurring)..................................................................8

*Brudno v. Wise,*
  No. 03-19953, 2003 Del. Ch. LEXIS 35 (Del. Ch. Apr. 1, 2003) ...........................................39

*Bryant v. Avado Brands, Inc.,*
  187 F.3d 1271 (11th Cir. 1999) ............................................................................................28

*Conrad v. Blank,*
  940 A.2d 28 (Del. Ch. 2007)......................................................................................... passim

*Dellinger v. Mitchell,*
  442 F.2d 782 (D.C. Cir. 1971) ..............................................................................................38

*Desimone v. Barrows,*
  924 A.2d 908 (Del. Ch. 2007)..................................................................................13, 30, 31

*Edmonds v. Getty,*
  524 F. Supp. 2d 1267 (W.D. Wa. 2007) ........................................................................ passim

*Fairview Hosp. v. Leavitt,*
  No. 05-1065, 2007 U.S. Dist. LEXIS 37296 (D.D.C. May 22, 2007)....................................39

*Grimes v. Donald,*
  673 A.2d 1207 (Del. 1996) ...................................................................................................18

*Grobow v. Perot,*
  526 A.2d 914 (Del. Ch. 1987), *aff'd*, 539 A.2d 180 (Del. 1988)............................................20

*Guttman v. Huang,*
  823 A.2d 492 (Del. Ch. 2003)...................................................................................20, 26, 27

*Hawaii Laborers' Pension Fund v. Farrell,*
  No. 06-cv-06935, Slip op. (C.D. Cal. August 23, 2007) ........................................................17

*Hughes v. Doe,*
    273 Va. 45 (Va. 2007) ............................................................................................... 37

*In re Atmel Derivative Litig.,*
    No. 06-4592, slip op. (N.D. Cal. June 25, 2008) ....................................................... 9

*In re CNET Networks Inc. S'holder Deriv. Litig.,*
    483 F. Supp. 2d 947 (N.D. Cal. 2007) ........................................................... passim

*In re Computer Scis Corp. Deriv. Litig.,*
    244 F.R.D. 580 (C.D. Cal. 2007) ........................................................... 17, 21, 22

*In re Fannie Mae Sec.,*
    503 F. Supp. 2d 9 (D.D.C. 2007) ............................................................................. 7

*In re Finisar Corp. Deriv. Litig.,*
    542 F. Supp. 2d 980 (N.D. Cal. 2008) ................................................................... 13

*In re Linear Technology Deriv. Litig.,*
    No. C-06-3290 MMC, 2006 U.S. Dist. LEXIS 90986 (N.D. Cal. Dec. 7, 2006) ............. 13, 33

*In re Openwave Sys. Inc.,*
    503 F. Supp. 2d 1341 (N.D. Cal. 2007) ............................................................ 13, 34

*In re Silicon Graphics Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) .................................................................................. 20

*In re Sonus Networks, Inc.,*
    499 F.3d 47 (1st Cir. 2007) .................................................................................... 36

*In re THQ, Inc. Deriv. Litig.,*
    No. BC357699, 2007 WL 4990689, slip op. (Cal. Super. Ct. Oct. 11, 2007) ................ 18, 21

*In re Tyson Foods, Inc. Consol. S'holder Litig.,*
    919 A.2d 563 (Del. Ch. 2007) ("*Tyson I*") ........................................................ 18, 31

*In re Tyson Foods, Inc. Consol. Shareholder Litig.,*
    No. 1106-CC, 2007 Del. Ch. LEXIS 120 (Del. Ch. Aug. 15, 2007) ("*Tyson
    II*") ......................................................................................................................... 23

*In re UNUMprovident Corp. Securities Litigation,*
    396 F. Supp. 2d 858 (E.D. Tenn. 2005) ................................................................. 28

*In re Zoran Corp. Derivative Litig.,*
    511 F. Supp. 2d (N.D. Cal.) ....................................................................... passim

*infoUSA, Inc. S'holders Litig.,*
    C.A. No. 1956-CC, 2007 Del. Ch. LEXIS 123 (Del. Ch. Aug. 13, 2007) ................... 24

*IOTEX Communs., Inc. v. Defries,*
    No. 15817, 1998 Del. Ch. LEXIS 236 (Del. Ch. Dec. 21, 1998) ...........................................25

*Kamen v. Kemper Fin. Servs., Inc.,*
    500 U.S. 90 (1991).....................................................................................................7, 8

*Kaufman v. Belmont,*
    479 A.2d 282 (Del. Ch. 1984)..........................................................................................18

*Lewis v. Anderson,*
    477 A.2d 1040 (Del. 1984) .............................................................................................38

*Lovelace v. Software Spectrum, Inc.,*
    78 F.3d 1015 (5th Cir. 1996) ...........................................................................................28

*Malone v. Brincat,*
    722 A.2d 5 (Del. 1998) ..................................................................................................25

*McCall v. Scott,*
    239 F.3d 808 (6th Cir. 2001) ...........................................................................................19

*Mills v. State of Delaware,*
    732 A.2d 845 (Del. 1999) .................................................................................................8

*Mizel v. Connelly,*
    C.A. No. 16638, 1999 Del. Ch. LEXIS 157 (Del. Ch. July 22, 1999)....................................18

*North River Ins. Co. v. Gourdine,*
    205 Va. 57 (Va. 1964)....................................................................................................35

*Pogostin v. Rice,*
    480 A.2d 619 (Del. 1984) ...............................................................................................17

*Rales v. Blasband,*
    634 A.2d 927 (Del. 1993) .....................................................................................8, 9, 11, 17

*Reiter v. Universal Marion Corp.,*
    299 F.2d 449 (D.C. Cir. 1962)..........................................................................................35

*Ryan v. Gifford,*
    918 A.2d 341 (Del. Ch. 2007)................................................................................... passim

*Semtek Int'l Inc. v. Lockheed Martin Corp.,*
    531 U.S. 497 (2001).......................................................................................................35

*Strougo v. Carroll,*
    No. 8040, 1991 WL 9978 (Del. Ch. Jan. 29, 1991) ...............................................................9

*Vandalia R. Co. v. Schnull,*
  255 U.S. 113 (1921)................................................................................................................35

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) ...........................................................................................................21, 25, 28

Fed. R. Civ. P. 12(d) ...................................................................................................................30

## I.    INTRODUCTION

Sunrise Senior Living Inc. ("Sunrise" or the "Company") is a publicly-owned corporation that seems to be run solely for the benefit of its co-founders, Paul and Teresa Klaassen (the "Klaassens") and their friends, who collectively dominate the Company's Board of Directors (the "Board").  The Klaassens, together with the other Individual Defendants,[1] collaborated and conspired to manipulate the Company's financial reports, which resulted in their wrongful receipt of millions of dollars from the Company.  The Individual Defendants accomplished their goals by knowingly and secretly manipulating the Company's financial statements for nearly a decade while contemporaneously selling nearly $175 million worth of Sunrise stock at inflated prices based on their knowledge of the Company's true financial position.  Despite the Company's massive restatement of its financial results for multiple years, the millions of dollars of resulting damages the Company has suffered, the disclosure of accounting "errors" that led to the restatement, multiple public demands by shareholders of the Company to reform their corporate governance practices and an ongoing Securities and Exchange Commission ("SEC") investigation, the Individual Defendants have done little, if anything, to remedy their past misconduct.  Indeed, it is not in their interests to do so.

Plaintiffs seek to recover for the Company the unjust benefits obtained by the Individual Defendants through their deceit, fraud and rampant breaches of fiduciary duties of loyalty, good faith and candor owed to the Company.  A majority of the Board's directors are incapable of independently and disinterestedly considering a demand, because of their improper actions and

---

[1] The Individual Defendants are: Paul J. Klaassen ("P. Klaassen"), Teresa M. Klaassen ("T. Klaassen"), Ronald V. Aprahamian ("Aprahamian"), Craig R. Callen ("Callen"), Thomas J. Donohue ("Donohue"), J. Douglas Holladay ("Holladay"), William G. Little ("Little"), David G. Bradley ("Bradley"), Peter A. Klisares ("Klisares"), Scott F. Meadow ("Meadow"), Robert R. Slager ("Slager"), Thomas B. Newell ("Newell"), Tiffany L. Tomasso ("Tomasso"), John F. Gaul ("Gaul"), Bradley B. Rush ("Rush"), Carl Adams ("Adams"), David W. Faeder ("Faeder"), Larry E. Hulse ("Hulse"), Timothy S. Smick ("Smick"), Brian C. Swinton ("Swinton") and Christian B. A. Slavin ("Slavin").

the benefits they received while "serving" the Company.  Plaintiffs' Amended Consolidated Complaint pleads these allegations with ample particularity.  Because a majority of the Board could not have, and indeed would not have, independently and disinterestedly considered a demand to take action against themselves and their co-conspirators, any such demand is futile as a matter of law.

Therefore, for the reasons stated below, Plaintiffs respectfully request that the Court deny Nominal Defendant Sunrise Senior Living Inc.'s Motion to Dismiss or, in the Alternative, Stay Plaintiffs' Amended Consolidated Complaint ("Sunrise's Memo.").

## II.    PROCEDURAL HISTORY

This Action was commenced on January 19, 2007, with the filing of the first of three federal shareholders' derivative complaints on behalf of Sunrise against the Company's current and former officers and directors, alleging violations of state and federal law relating to a myriad of accounting violations.[2]  Plaintiffs Catherine Molner ("Molner") and Robert Anderson ("Anderson") filed complaints raising substantially similar factual and legal claims on January 31, 2007 and February 5, 2007, respectively.  The Court consolidated these cases under the above caption on May 9, 2007.  On June 29, 2007, Plaintiffs filed a Consolidated Complaint.

On August 27, 2007, Defendants moved to dismiss the Consolidated Complaint.  On October 26, 2007, Plaintiffs filed an Amended Consolidated Complaint incorporating allegations

---

[2] As Sunrise notes, there are a number of other dismissed or pending shareholder derivative actions brought on behalf of Sunrise against certain of the Individual Defendants.  On August 11, 2006 a derivative action styled *Von Guggenberg v. Klaasen, et al.,* Case No. CI-2006-10174, (the "*Von Guggenberg* action") was filed in the Virginia Circuit Court for Fairfax County (the "State Court") naming P. Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Hulse, Tomasso, Aprahamian, Callen and Donahue as defendants (the "State Defendants").  On September 15, 2006, the *Von Guggenberg* action was dismissed without prejudice and with no explanation of the basis for the State Court sustaining the State Defendants' demurrer.  *See* Sunrises' Memo., Exhibit 4 at 1.  Additionally, on March 6, 2007, a derivative action styled *Young, et al. v. Klaassen, et al.*, C.A. No. 2770-N (the "Delaware Action") was filed in the Delaware Chancery Court, which was "virtually identical" to the Action.  *See* Sunrise's Memo. at 8; Plaintiffs' Omnibus Reply Memorandum in Further Support of Their Motion to Partially Lift Discovery Stay [Docket No. 66] at 5 n.2.  All parties to the Delaware Action have fully briefed motions to dismiss the Delaware Action, which are currently pending before the Delaware Chancery Court.

based on information previously unavailable to Plaintiffs, which was accepted for filing by this Court's Order dated March 28, 2008. Then on May 16, 2008, Plaintiffs filed a Motion to Partially Lift Discovery Stay, which has been fully briefed by both Plaintiffs and Defendants and is currently pending before the Court.[3] On June 16, 2008, Defendants filed four separate motions to dismiss encompassing more than 135 pages, to which Plaintiffs now respond.

## III.    STATEMENT OF FACTS

From 1997 through 2006 (the "Relevant Period") the Individual Defendants engaged in a concerted scheme to improperly inflate the Company's financial results, thereby artificially inflating the Company's stock price, which allowed certain of the Individual Defendants to reap over $174 million in illicit proceeds from their illegal inside sales of Sunrise stock. Amended Consolidated Complaint at ¶2, 241-242 (hereinafter, ACC at ¶__ or ¶¶__). As a result of the Individual Defendants' accounting manipulations, Sunrise has been subjected to massive damages and was forced to restate its historical financial results for fiscal years 2002 through 2005, reducing the Company's gross income before taxes by over $180 million, or in terms of the Company's net income, a reduction of over $116 million. *See* Excerpts of Sunrise's March 24, 2008 Form 10-K, attached hereto as Exhibit 1.

From 1997 through 2001, the Stock Option Committee of the Board (the "Stock Option Committee"), which consisted at relevant times of current defendant directors Callen and Donohue as well as former defendant directors Bradley and Meadow,[4] granted millions of backdated and otherwise *ultra vires* stock options to themselves and Company insiders in direct violation of the Company's shareholder-approved stock option plans. ACC at ¶¶7, 73-74, 77-

---

[3] Plaintiffs respectfully request that this Court rule on Plaintiffs' Motion to Partially Lift Discovery Stay prior to rendering a decision on any of the Defendants' motions to dismiss.
[4] The Amended Consolidated Complaint reflects the membership of Sunrise's Board as of the commencement of the original complaint in this Action.

131.  The pattern of backdating Sunrise's stock options is undeniable.  From 1997 through 2001, the Stock Option Committee backdated 13 of 21 total grants – 62% – often to dates on which Sunrise's stock closed at prices at or near monthly, quarterly and yearly lows.[5]  ACC at ¶¶7, 69, 130-132.[6]  To confirm the common-sense conclusion that this pattern was the result of intentional backdating, Plaintiffs conducted two separate statistical analyses of the pattern of stock option granting at the Company, one following the methodology of a Merrill Lynch analysis endorsed by numerous courts in this context and one based on a statistical analysis performed by Service Employees International Union Master Trust ("SEIU"), a large institutional shareholder of Sunrise.  ACC at ¶¶70-72.  Applying the Merrill Lynch analysis to Sunrise's stock option grants reveals that Sunrise executives enjoyed an average annualized return of 148% on their stock options, as compared to a 20% average annualized return achieved by ordinary investors.  ACC at ¶71.  The SEIU analysis demonstrated that the 30-day average return on Sunrise stock leading up to an option grant was -2.7% and the 30-day average return on Sunrise stock following a grant was 12.1%.  ACC at ¶72.  As these analyses show, such extremely favorable returns on common shares underlying Sunrise's stock options strongly indicate that the exercise prices of Sunrise's stock options were established with 20/20 hindsight to achieve favorable exercise prices for option recipients.

These in-the-money grants of stock options required the Company to recognize a compensation expense; however, by backdating the stock options so that they were apparently granted on favorable dates, the Individual Defendants knowingly understated the Company's compensation expense and thereby overstated the Company's net income.  ACC at ¶7, 243-253.

---

[5] In the Amended Consolidated Complaint, Plaintiffs allege a backdating pattern of 13 of 16 discretionary stock option grants because five of the 21 total grants made during the relevant period did not give the Stock Option Committee the discretion to choose the grant date and therefore could not have been backdated.  ACC at ¶132.
[6] During this period, the Stock Option Committee also made two grants that violated the Company's stock option plans, and as such were *ultra vires*, as set forth herein.

In 2002, with the passage of the Sarbanes-Oxley Act ("SOX"), the Individual Defendants were required to report all stock options grants within two days of the grant date by filing Forms 4 with the SEC, effectively ending the Individual Defendants' ability to backdate stock options by more than two days.

While the Individual Defendants could no longer grant or receive backdated stock options after SOX's enactment, the Individual Defendants had devised another way to inflate the Company's reported income and keep Sunrise's stock price at inflated levels, which would allow them to realize benefits from backdated or otherwise *ultra vires* stock options at the Company's expense. Starting at least as early as 2002, but likely as far back as 1999, the entire Board, comprised at certain times of current director defendants P. Klaassen, T. Klaasen, Aprahamian, Donohue, Callen, Holladay and Little as well as former defendant directors Bradley, Klisares, Meadow, Slager and Faeder, along with certain of the other Individual Defendants, knowingly caused or allowed Sunrise to improperly account for a myriad of real-estate related transactions, a core part of Sunrise's business. ACC at ¶¶5-6, 56-57. Certain of these improper accounting mechanisms employed by the Individual Defendants included: (i) improper application of the Hypothetical Liquidation at Book Value methodology in accounting for joint ventures with equity partners; (ii) the use of excess insurance reserves to cover earnings shortfalls; (iii) improper accounting treatment of gains on the sale of real estate assets which were subject to guarantees and commitments; and (iv) improper accounting treatment for losses relating to construction projects under development. ACC at ¶¶3, 10. As a result, the Company's periodic financial reports approved by current defendant directors P. Klaassen, T. Klaasen, Aprahamian, Donohue, Callen, Holladay and Little, former director defendants Bradley, Klisares, Meadow and Slager, and former Chief Financial Officers Rush, Hulse and Faeder, were completely

fraudulent as demonstrated by the vast disparity in net income for each year of Company's restated financial results for 2002 through 2004.[7]  ACC at ¶¶144-202.

To ensure that Sunrise's stock price would stay inflated, certain of the Individual Defendants, additionally, made false and materially misleading public statements regarding the Company's "successful" real estate operations.  These Individual Defendants made those false and misleading statements despite knowing that the Company, at the behest of these same Individual Defendants, was improperly accounting for income from the Company's real estate ventures.  ACC at ¶¶44-57.  Moreover, in an effort to further inflate the Company's stock price, and enable the Individual Defendants to reap even greater profits from their exercise of backdated or otherwise *ultra vires* stock options, the Board authorized the repurchase of more than $202.1 million worth of Sunrise common stock between 2000 and 2005.  ACC at ¶312.

On December 11, 2006, the Company formed a Special Committee of the Board (the "Special Committee") with the stated purpose of investigating both (i) recent sales of the Company's common stock by Company insiders and (ii) the Company's historical stock option granting practices.  ACC at ¶229.  On March 2, 2007, the Company announced that the Special Committee's mandate had been expanded to investigate accounting issues leading to Sunrise's restatement.  ACC at ¶232.  Finally, on September 28, 2007, the Company reported that the Special Committee had completed its "fact-finding."  Among the disclosed purported findings regarding the Company's historical stock option grants, the Special Committee indicated that there were:

---

[7] In 2002, the Company originally reported its net income as $54.661 million, which was restated to $28.314 million.  In 2003, the Company originally reported its net income as $47.473 million, which was restated to $14.705 million.  In 2004, the Company originally reported its net income as $49.573 million, which was restated to $1.114 million, nearly eliminating Sunrise's reported income for that year.  *See* Excerpts of Sunrise's March 24, 2008 Form 10-K, attached to the accompanying Affidavit of Mark Hanna (hereinafter, "Hanna Aff.") as Exhibit 1.

- Three grants in which the exercise price for the options was set at the closing price for the Company's stock on the date of the grant, rather than at the closing price of the trading date immediately prior to the date of the grant, as contemplated by the terms of the Company's stock option plans.

- Certain grants which lacked sufficient documentation to determine when the stock option grant was authorized.

- Certain grants in connection with which the Company corrected administrative errors retroactively, which included adding grants to new hires who had been inadvertently omitted from a recommendation list and correcting the number of options granted to individuals.

- Certain grants in which the Company modified the terms of a grant after it was made.

ACC at ¶237. Despite these reported findings, the Company disclosed that the Special Committee concluded that there was no evidence of intentional misconduct. *Id.*

The Individual Defendants' continuous and systematic scheme to benefit themselves at the Company's expense has caused the Company to suffer millions of dollars in damages, while the Individual Defendants have realized millions of dollars in illicit profits. ACC at ¶11.

## IV.    ARGUMENT

### A.    DEMAND ON SUNRISE'S BOARD WOULD HAVE BEEN FUTILE

#### 1.    Legal Standard Governing Demand Futility

A complaint in a derivative suit must meet the procedural requirements of Rule 23.1 of the Federal Rules of Civil Procedure. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991). "Under Rule 23.1, a plaintiff must set forth 'with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiffs failure to obtain the action or for not making the effort.'" *In re Fannie Mae Sec.*, 503 F. Supp. 2d 9, 14 (D.D.C. 2007) (quoting *Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 68-70 (D.C.

Cir. 1988)).  The law of the state of the company's incorporation determines whether demand would have been futile.  *Kamen*, 500 U.S. at 108-09.  Sunrise is a Delaware corporation, and therefore Delaware law applies to the demand futility analysis.

Under well-settled Delaware law, demand is excused where a plaintiff pleads particularized facts creating a reasonable doubt that a majority of the directors will "fairly evaluate the claims of the shareholder plaintiff."  *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).  Where, as here, the whole board has not approved the transaction at issue, demand is futile where a plaintiff creates a "reasonable doubt that the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  *Rales*, 634 A.2d at 933.  The reasonable doubt inquiry is fact-intensive and turns on the totality of the factual allegations in each particular case.  *Brehm v. Eisner*, 746 A.2d 244, 268 (Del. 2000) (Hartnett, J., concurring) ("Because of the absence of a precise formula in [Delaware Court of Chancery] Rule 23.1 for pleading compliance with the demand requirement, the sufficiency of a complaint under Rule 23.1 is determined on the basis of the facts of each case.").  A plaintiff need not plead factual allegations that conclusively demonstrate that the Board was "incapable" of considering a demand; rather, Plaintiffs need only plead allegations that, ***in their totality***, create a reasonable doubt that a majority of the directors would have been independent and disinterested when considering the demand.  *Id.*

Accordingly, a "reasonable doubt" does not mean that Plaintiffs have to prove their claim.  Instead, a reasonable doubt is merely a "doubt based upon reason and common sense which … intelligent, reasonable and impartial people may honestly entertain."  *Mills v. State of Delaware*, 732 A.2d 845, 851 (Del. 1999) (quotation omitted).  If a complaint establishes that a majority of the board is interested, and that a "reasonable doubt" has thus been raised as to those

directors, demand is excused as futile. *Strougo v. Carroll*, No. 8040, 1991 WL 9978, at *4 (Del. Ch. Jan. 29, 1991).

Plaintiffs clearly satisfy the *Rales* test. At the time the Action commenced, there were seven members of the Board. The Amended Consolidated Complaint specifically alleges that the entire Board engaged in a concerted scheme to inflate the Company's financial statements over the course of nine years to allow current Board members P. Klaassen, T. Klaassen, Aprahamian, Donohue, Callen, Holladay and others to illegally sell hundreds of millions of shares of Sunrise common stock at inflated prices and on the basis of non-public material information. Moreover, four members of the current Board -- defendants P. Klaassen, Aprahamian, Donohue and Callen, all received backdated stock options. Under established Delaware law, this fact alone excuses demand. Furthermore, two of the seven Board members, Donohue and Callen, served on the Stock Option Committee during the relevant period and personally approved backdated options, including substantial grants to themselves.[8]

For the Demand to be excused, Plaintiffs need only raise a reasonable doubt regarding the disinterestedness or independence of four directors on the seven-member Sunrise Board. Plaintiffs have met this standard. Plaintiffs' particularized allegations are more than sufficient to raise a reasonable doubt as to the disinterestedness or independence of a minimum of four of the seven directors of the Sunrise Board, and therefore, demand is excused and Sunrise's Motion to Dismiss must be denied.

---

[8] Contrary to Sunrise's suggestion, Plaintiffs need not establish that there is a reasonable doubt regarding the disinterestedness of at least four Board members for each separate claim. Rather, Plaintiffs need only raise a reasonable doubt regarding the disinterestedness of at least four directors with respect to the Amended Consolidated Complaint as a whole. *See Conrad v. Blank*, 940 A.2d 28, 40 (Del. Ch. 2007) (excusing demand as to the directors who granted any backdated grants); *Edmonds v. Getty*, 524 F. Supp. 2d 1267, 1277 (W.D. Wa. 2007); *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007); *Belova v. Sharp*, No. 07-299-MO, 2008 U.S. Dist. LEXIS 19880 at *30 (D. Ore. March 13, 2008); *In re Atmel Derivative Litig.*, No. 06-4592, slip op. at 11-12 (N.D. Cal. June 25, 2008) attached to the Hanna Aff. as Exhibit 2.

     2.     **Plaintiffs Have Alleged Particularized Facts Which Create Reasonable Doubt as to the Independence or Disinterestedness of a Majority of the Directors in Their Ability to Consider a Demand**

     a.     **The Complaint Pleads Particularized Facts Showing a Pattern of Systematic and Continuous Accounting Manipulations**

The Amended Consolidated Complaint contains substantial allegations showing a pattern of systematic and continuous accounting manipulations undertaken by Sunrise at the direction of the Individual Defendants. From 1997 to 2005, the Individual Defendants employed numerous devices in a concerted scheme to improperly inflate Sunrise's reported income, most notably by backdating grants of stock options without recognizing a compensation expense and by improperly accounting for various real estate transactions. Throughout this period, the Individual Defendants knowingly and repeatedly made false and misleading public statements with the knowledge of this systematic and continuous scheme of accounting manipulations.

     (i)     **The Stock Option Backdating Scheme**

A pattern of backdated Sunrise options emerges when considering all of Sunrise's stock option grants during the relevant period. Sunrise made stock option grants to its officers and directors on 21 dates during the years 1997 through 2001: April 28, 1997, May 2, 1997, August 28, 1997, November 4, 1997, January 19, 1998, March 3, 1998, April 27, 1998, September 14, 1998, October 8, 1998, December 10, 1998, March 5, 1999, April 26, 1999, November 8, 1999, February 25, 2000, March 28, 2000, May 22, 2000, September 11, 2000, November 24, 2000, January 9, 2001, May 11, 2001 and November 12, 2001. Of the 21 total grants, at least five were made on pre-established dates and the Stock Option Committee lacked discretion to grant these options on any other dates.[9] Of the remaining 16 discretionary grants, 13 were backdated to

---

[9] The grants made contemporaneously with the Company's annual shareholder's meetings or pursuant to the appointment of directors to the Board on April 28, 1997, April 27, 1998, April 26, 1999, May 22, 2000 and May 11,

dates on which Sunrise's stock price was particularly favorable for the option recipients. Indeed, these 13 stock option grants were priced (i) at or near the lowest market price of the year for Sunrise's stock (five grants), (ii) at or near the lowest market price of Sunrise's stock for the fiscal quarter in which the options were granted (three additional grants), or (iii) immediately before a substantial price increase in Sunrise's market price (five additional grants). ACC ¶¶69, 83, 87, 91, 95, 100, 104, 108, 111, 116, 120, 124, 128-129.

Statistical analyses demonstrate the extent of the Defendants' fortune in this regard. As alleged in the Amended Consolidated Complaint, Merrill Lynch published an analysis of option grants made at various companies in a report dated May 22, 2006 as further evidence that the returns enjoyed by options grantees at many companies were not by mere chance. ACC at ¶70. The report analyzes the twenty-day performance of each option grant reported in a company's proxy statements during the relevant backdating period. *Id.* The analysis also calculates the annualized return of the option grants at twenty days after the grant and compares that annualized return with the company's overall annual return. *Id.* Plaintiffs employed that precise methodology with all of Sunrise's stock option grants disclosed in the stock option grant table of the Company's proxy statements during the relevant period (May 2, 1997, August 28, 1997, January 20, 1998, March 3, 1998, September 14, 1998, November 8, 1999, February 25, 2000, March 28, 2000, September 11, 2000, November 24, 2000, May 11, 2001, November 12, 2001), revealing that recipients of stock options reported in the Company's proxy statements for 1997 to 2001 enjoyed an average annualized return of 148%, as compared to a 20% average annualized return to investors. Stated plainly, the Individual Defendants averaged more than seven (7) times the return of ordinary investors. ¶71. Notably, Plaintiffs, in strict adherence to the Merrill Lynch

---

2001 were non-discretionary as to their date of grant. ACC at ¶¶7 n.2, 132. Therefore, those five grants could not have been backdated.

analysis, included three grants, January 20, 1998, March 3, 1998 and May 11, 2001, that Plaintiffs did not allege as backdated, while not including the grant dates of November 4, 1997, October 8, 1998, December 10, 1998 and March 5, 1999, which Plaintiffs had pled as backdated but were not reported in the Company's proxy statements. However, applying the Merrill Lynch analysis to all 21 grants during the relevant period results in an average annualized return to stock option recipients of 128%, more than six times the 20% average annualized return to investors.

Despite Sunrise's obfuscation, there is no mystery to the Merrill Lynch analysis. Its methodology is easily stated and widely available. Several courts have accepted the results of analyses using Merrill Lynch's or similar methodology (whether or not the company was named in the actual Merrill Lynch report) as indicative of backdating at the pleading state, rendering empty Sunrise's contention that the results of the analysis are flawed. *See, e.g.*, *Ryan*, 918 A.2d at 354-55 (accepting Merrill Lynch's analysis of stock options granted by a public company as indicative of backdating at the pleading stage); *In re Zoran Corp. Derivative Litig.,* 511 F. Supp. 2d at 986, 1008-09 (N.D. Cal.) (denying a motion to dismiss based, in part, on the likelihood of options backdating as demonstrated by a statistical analysis, as was done in *Ryan*); *Conrad*, 940 A.2d 28, 39 n.30 ("Here, [plaintiff] has done the same analysis [performed by Merrill Lynch].... It is sufficient that the plaintiff presented this court with the same statistical methods and similar aberrant option returns as those alleged in *Ryan*").

The Western District of Washington's decision in *Edmonds* is instructive here as well. In *Edmonds*, Getty Images, Inc. ("Getty") moved to dismiss shareholder derivative claims involving backdated stock options for failure to make a pre-suit demand and challenged the plaintiff's use of the Merrill Lynch analysis to support a claim of historical backdating, arguing that the

analysis is unreliable for a variety of reasons, including many voiced by Sunrise here. *Edmonds* at 1274-75. However, the court rejected Getty's challenges, noting, that "at the pleading stage, the plaintiff need not prove that backdating occurred but rather must only allege circumstances from which it may be reasonably inferred that backdating occurred." *Id*. at 1272. In particular, the court rejected Getty's challenges to the merits of the Merrill Lynch analysis, accepting the analysis as indicative, at the pleading stage, of a pattern of stock-options backdating. *Id*. at 1274-75. The court in *Edmonds* additionally distinguished that situation from those in other backdating cases in which demand futility motions were granted, noting, *inter alia*, that the plaintiff in *Edmonds* had pleaded facts (i) regarding the "full universe" of publicly reported option grants, (ii) regarding which directors approved each grant, (iii) regarding plan requirements that stock options be priced as of the actual date of grant, and (iv) that all option grants in the relevant period were evaluated as part of a statistical analysis employing Merrill Lynch's methodology and suggesting a pattern of favorable option strike prices that could not have been the result of chance. *Id*. at 1275-76.[10] *See also Belova*, 2008 U.S. Dist. LEXIS 19880 at *11-*15 (denying motion to dismiss backdating claims for failure to make a pre-suit demand, and finding that statistical analyses supported a pattern of backdating at the pleading stage).

Here, too, Plaintiffs plead particularized facts (i) showing that 13 of Sunrise's 21 option grants made during the relevant period are priced at or near periodic lows in Sunrise's stock price, including monthly, quarterly and yearly lows, ACC at ¶¶69, 83, 87, 91, 95, 100, 104, 108, 111, 116, 120, 124, 128-129; (ii) identifying the directors who approved each grant, ACC at ¶¶

---

[10] Specifically, the *Edmonds* court distinguished *In re CNET Networks Inc. S'holder Deriv. Litig.*, 483 F. Supp. 2d 947 (N.D. Cal. 2007); *Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007); *In re Openwave Sys. Inc.*, 503 F. Supp. 2d 1341 (N.D. Cal. 2007); and *In re Linear Technology Deriv. Litig.*, No. C-06-3290 MMC, 2006 U.S. Dist. LEXIS 90986 (N.D. Cal. Dec. 7, 2006), all of which Sunrise cites in favor of dismissal. 524 F. Supp. 2d at 1275. *In re Finisar Corp. Deriv. Litig.*, 542 F. Supp. 2d 980 (N.D. Cal. 2008), upon which Sunrise relies, is similarly distinguishable because here Plaintiffs' statistical analysis compares the 20-day returns on stock option grants with "market returns over the comparable period." *Id.* at 992.

80-82, 84-86, 88-90, 92-94, 97-99, 101-103, 105-107, 109-111, 112-115, 117-119, 121-123, 125-127; (iii) setting forth the Plans' requirement that stock options be priced as of the closing price of Sunrise's stock on the date prior to the actual date of grant, ACC at ¶¶ 65-67; and (iv) setting forth that all stock option grants made during the relevant period were evaluated as a part of Plaintiffs' analysis of Sunrise's stock option grants under Merrill Lynch's methodology.  ACC at ¶71 n.4; Footnote 11, *supra*.  Accordingly, under *Edmonds*, this Court should accept the Merrill Lynch analysis as indicative, at the pleading stage, of a pattern of backdated option grants at Sunrise.

Moreover, not only does the Merrill Lynch analysis indicate a pattern of backdating at Sunrise, another analysis performed by a large institutional shareholder of Sunrise, SEIU, also shows that the timing of Sunrise's reported stock option grants strongly indicates that the grant dates were chosen with hindsight and could not be the result of random chance.  ACC at ¶72.  Notably, the SEIU analysis addresses all stock option grants during the relevant period and beyond, and Sunrise does not challenge its validity.

Having shown that 13 of Sunrise's 21 option grants during the relevant period have highly fortuitous exercise prices at or near periodic lows in Sunrise's stock price, that two current directors approved the backdated option grants and that statistical analyses indicate the exercise prices of those options could not have been the result of random chance, Plaintiffs have established, for pleading purposes, the eminently reasonable inference that Sunrise's discretionary stock options were historically backdated.  *See Ryan*, 918 A.2d at 354-55; *Zoran*, 511 F.Supp.2d at 1004-09; *Conrad*, 940 A.2d at 38-40; *Edmonds*, 524 F. Supp. 2d at 1267; *Belova*, 2008 U.S. Dist. LEXIS 19880 at *11-15.

### (ii)    The *Ultra Vires* Stock Option Grants

Plaintiffs plead with particularity that options granted on March 3, 1998 by Donohue, among others, and that options granted on May 11, 2001 by Callen and Donohue, among others, violated the terms of the Company's stock option plans because both grants were granted below fair market value on the grant date, and as such were *ultra vires*. ACC at ¶¶133-139. The Company has disclosed the Special Committee's conclusion that this is true, announcing that there were "[t]hree grants in which the exercise price for the options was set at the closing price for the Company's stock on the date of the grant, rather than at the closing price of the trading date immediately prior to the date of the grant, as contemplated by the terms of the Company's stock option plans." ACC at ¶237. Sunrise's **only** argument against demand excusal with respect to these grants is that none of the current directors of the Board received any options on these grant dates. *See* Sunrise's Memo. at 30. Defendants ignore, however, that Callen and Donohue were both personally involved with ***granting*** these options, and as such face a substantial likelihood of liability for violating their fiduciary duties by violating the Company's stock option plans. *See* Section IVA2c, *infra*. Moreover, while the Company has acknowledged that these grants were *ultra vires*, the Board has disclosed no remedial action to correct the exercise prices of these stock option grants, which further suggests that demand on the Board would have been futile. *See Conrad*, 940 A.2d at 37 (finding that the board's failure to remedy erroneously dated stock options undermined confidence in the board's ability to properly consider a demand).

### (iii)    Improper Accounting for Real Estate Transactions

Plaintiffs plead with particularity that, after SOX's enactments, the current defendant directors P. Klaassen, T. Klaassen, Aprahamain, Donohue, Callen, Holladay and Little continued to improperly account for the Company's real estate transactions to maintain the Company's

artificially inflated stock price so that defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Callen, Holladay and others could sell millions of shares of Sunrise stock at these inflated prices. ACC at ¶¶2-6. Specifically, the current Board improperly applied the Hypothetical Liquidation at Book Value methodology in accounting for joint ventures with equity partners, used excess insurance reserves to cover earnings shortfalls, improperly accounted for certain gains on real estate investments/assets, improperly accounted for construction losses relating to development projects, and improperly accounted for other real estate matters. ACC at ¶¶2, 5, 56-57.

These improper accounting practices, which the whole Board knowingly employed to inflate the Company's earnings and financial performance, resulted in materially misleading financial statements in the Company's public filings. ACC at ¶¶243-46, 250-55, 266. In these same public filings, these Board members simultaneously and knowingly caused or allowed the Company to state that it was following the very accounting rules they were violating. ACC at ¶¶161-64, 179, 186-202. Moreover, the Board, and specifically defendant Klaassen, made repeated false and misleading public statements to the market regarding the Company's real estate ventures. ACC at ¶¶45-55. These accounting manipulations together with the backdating of stock options led to a massive restatement of Sunrise's financial results for the years 2002 through 2005. *See* Exhibit 1. During this same period, defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Callen and Holladay sold 1,860,684 shares of Sunrise common stock, realizing proceeds of $71,338,336.00. ACC at ¶¶241.

        **b.**     **Reasonable Doubt Exists as to the Disinterestedness of Defendants P. Klaassen, Aprahamian, Donohue and Callen Due to Their Receipt Of Significant Financial Benefits From Backdated Stock Options**

There is a reasonable doubt regarding a director's disinterestedness if the plaintiff alleges with specificity that the director has received a personal financial benefit from the alleged misconduct. *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Virtually every court to consider the issue has determined that a director's receipt of any number of backdated or otherwise manipulated stock options, standing alone, renders that director interested for purposes of determining whether demand is excused. *See, e.g., Conrad*, 940 A.2d at 38 (board member's receipt of backdated stock options renders that director interested for purposes of analyzing demand futility); *Ryan*, 918 A.2d at 355-56 (board member's acceptance of manipulated stock options raise a reasonable doubt as to that board member's disinterestedness); *Hawaii Laborers' Pension Fund v. Farrell*, No. 06-cv-06935, Slip op. at 8 (C.D. Cal. August 23, 2007) (a director who received backdated stock options is considered "interested" under *Rales*); *In re CNET*, 483 F. Supp. 2d at 962 ("By receiving backdated options, [a director] still has a chance of being subject to personal liability…Plaintiffs have [thus] pleaded facts that give rise to a reasonable doubt that [the director] was disinterested."); *In re Computer Scis Corp. Deriv. Litig.*, 244 F.R.D. 580, 588 (C.D. Cal. 2007) (a director who received allegedly backdated options is substantially likely to be held liable for restitution); *Zoran*, 511 F. Supp. 2d at 1008-09 (because a company's decision to reprice backdated stock options would have a materially detrimental impact on a director who received such options, such a director is not disinterested under *Rales*); *Edmonds*, 524 F. Supp. 2d at 1276 (finding that directors' receipt of backdated options is sufficient to raise a reason to doubt those directors' disinterestedness and to suggest that they would have been incapable of impartially

considering a demand); *In re THQ, Inc. Deriv. Litig.*, No. BC357699, 2007 WL 4990689, slip op. at 3-4 (Cal. Super. Ct. Oct. 11, 2007) (finding that director was interested because he received a personal financial benefit from his receipt of backdated options); *see also Kaufman v. Belmont*, 479 A.2d 282, 288 (Del. Ch. 1984) (holding that the plaintiff created reasonable doubt as to disinterestedness of directors who were "major beneficiaries of the challenged resolution – each received $123,017 in connection with [the transaction]").

In the case at bar, Defendants P. Klaassen, Aprahamian, Donohue and Callen received 700,000, at least 220,000, at least 76,000 and at least 56,000 backdated or otherwise *ultra vires* stock options, respectively.[11]    ACC at ¶¶19-22, 80-139, 287-306.    These are sufficient allegations to raise a reason to doubt the disinterestedness of a majority of Sunrise's board and to suggest that those directors are incapable of impartially considering a demand.  *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 591 n. 72 (Del. Ch. 2007) (*"Tyson I"*); *Ryan*, 918 A.2d at 356..

As noted above, virtually every court to consider the issue has determined that a director's receipt of any amount of backdated or otherwise manipulated stock options, in and of itself, renders that director interested for purposes of determining whether demand is excused. For example, in *Zoran*, the plaintiff asserted five separate theories for demand excusal.  Finding that only one theory was necessary, the court concluded that the plaintiff had demonstrated that demand would have been futile because five of the eight directors received backdated options.

---

[11] P. Klaassen's receipt of backdated options also disables his wife T. Klaassen from being able to disinterestedly consider a demand on the Board to take action against her husband.  *See Mizel v. Connelly*, C.A. No. 16638, 1999 Del. Ch. LEXIS 157 at *11-13 (Del. Ch. July 22, 1999) ("The existence of a very close family relationship between directors should, without more, generally go a long (if not the whole) way toward creating a reasonable doubt [of disinterestedness].."); *Grimes v. Donald*, 673 A.2d 1207 (Del. 1996) (indicating that a "material financial or familial interest" raises a reasonable doubt as to a director's disinterestedness).

*See Zoran*, 511 F. Supp. 2d at 1008-09.  It was dispositive that a majority of the directors had received backdated stock options.  *Id.* at 1008.  No reported decision is to the contrary.

The same holds true in this case.  Plaintiffs have raised a reasonable doubt regarding the disinterestedness of four of the seven Board members.  Defendants P. Klaassen, Aprahamian, Donohue and Callen all are interested because each of them received backdated option grants.  Accordingly, demand is excused and Sunrise's motion to dismiss should be denied.  *See, e.g., Conrad* at 40-41; *Zoran* at 1008-09 (finding that receipt, standing alone, renders a director interested and excusing demand on that basis).

        **c.**      **Defendants Callen and Donohue Are Substantially Likely to Be Held Liable for Granting Backdated and *Ultra Vires* Stock Options**

Demand is excused upon Callen and Donohue because of their role in granting backdated and *ultra vires* stock options.  While the mere threat of personal liability is not sufficient, "reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present 'a substantial likelihood' of liability on the part of a director."  *McCall v. Scott*, 239 F.3d 808, 817 (6th Cir. 2001) (applying Delaware law).  A director's approval of backdated stock options is a necessarily intentional act inconsistent with the lawful exercise of fiduciary duties, creating a substantial likelihood of that director being held liable for that wrongful conduct and rendering such directors interested for demand futility purposes.  *Ryan*, 918 A.2d at 355; *see also Conrad*, 940 A.2d at 38-39 (the approval of backdated stock options is sufficient to excuse demand as to the approving board member).  A director who approves backdated stock options necessarily does so intentionally and knowingly, as the Delaware Chancery Court first recognized in *Ryan* and reiterated in *Conrad*:

> [I]t is difficult to understand how a plaintiff can allege that directors backdated options without simultaneously alleging that such directors knew that the options were being backdated.  After all, any grant of options had to have been approved

by the compensation committee, and that compensation committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant.

*Conrad* at 40, quoting *Ryan*, 918 A.2d at 355 n.35.[12]  Thus "[a] director who approves the backdating of options faces at the very least a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty."  *Ryan*, 918 A.2d at 355.  By logical extension, Callen and Donohue face an equally substantial likelihood of liability for knowingly granting the *ultra vires* stock options as they do for granting backdated options because the *ultra vires* stock option grants also violated the shareholder-approved stock option plans.  *See id.* at 350, 355 (finding that "intentional non-compliance with shareholder-approved [stock option] plans" is a breach of a director's fiduciary duty); *Conrad*, 928 A.2d at 40 (finding that violating "a stockholder-approved option plan that required the exercise price of option grants to equal the market value of the common stock on the date of grant" was a breach of a director's fiduciary duty).

Recognizing that discovery and evidence adduced at trial might show otherwise, the *Conrad* court determined that allegations of approving backdated stock options raise a reasonable inference that the board members who approved the stock options "acted knowingly in awarding options priced at dates other than the actual dates of the grant" sufficient to establish a substantial likelihood of liability for purposes of demand futility.  924 A.2d at 40; *See also*

---

[12] Sunrise's reliance on *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999), *Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003) and *Grobow v. Perot*, 526 A.2d 914, 924 (Del. Ch. 1987), *aff'd*, 539 A.2d 180 (Del. 1988) to suggest that Plaintiffs' pleadings are not sufficiently particularized to establish that Callen and Donohue "face a substantial threat of liability simply because of their service on the Compensation Committee [sic]" is misplaced. *See* Sunrise's Memo. at 32-33.  These decisions upon which Sunrise relies do not evaluate a director's potential liability in the context of stock options backdating as do the litany of cases upon which Plaintiffs rely.  It is quite clear from both the *Ryan* and *Conrad* decisions that Callen and Donohue, as members of the Stock Option Committee, which had the sole authority to grant stock options, are substantially likely to be held liable for breaching their fiduciary duties in granting backdated and *ultra vires* stock options.

*Ryan* 918 A.2d at 355-56 (finding that directors who were alleged to have approved backdated stock options were incapable of impartially considering demand); *In re THQ, Inc. Deriv. Litig.*, 2007 WL 4990689, slip op. at 3-4 (finding that demand was excused as to the compensation committee members who were alleged to have granted the backdated options); *Edmonds*, 524 F. Supp. 2d at 1277 (holding that demand is futile as to the compensation committee members who backdated options); *In re Computer Scis. Corp. Deriv. Litig.*, 244 F.R.D. at 591 (finding that the complaint raises a reasonable doubt as to the interestedness of compensation committee member Bailey "by virtue of having concurrently served on the committee that most directly controlled [stock option grants'] timing, pricing and approval").[13]

The Amended Consolidated Complaint contains specific allegations that defendants Donohue and Callen, as members of Sunrise's Stock Option Committee during the time backdated options were granted, deliberately backdated stock options or granted stock options that were otherwise *ultra vires* and are substantially likely to be held liable for the effects of that conduct, thereby raising a reasonable doubt regarding their disinterestedness.  ACC at ¶¶73-139, 300, 304.  There is no allegation in the Amended Consolidated Complaint – nor any argument by Sunrise – that anyone other than the Stock Option Committee actually chose option grant dates from 1997-2001.  Indeed, the Amended Consolidated Complaint alleges particularized facts indicating that defendants Donohue and Callen each breached their fiduciary duties to the Company by granting backdated and otherwise *ultra vires* stock options while misrepresenting the true grant dates and falsely stating that they were granting stock options pursuant to the Company's shareholder-approved stock option plans.

As a consequence, Sunrise's true compensation costs were understated to investors.  ACC at ¶¶2, 7, 58, 247-49.  The Company expressly stated in its Proxy Statements that from June 5,

---

[13] Knowledge, of course, may be averred generally.  Fed. R. Civ. P. 9(b).

1996 to August 23, 2002, the Stock Option Committee "ha[d] the power and authority to take **all** actions and make **all** determinations under the Company's stock option plans, including the grant of options thereunder. ACC at ¶68. Defendants Callen and Donohue served on the Stock Option Committee at times when backdated and otherwise *ultra vires* stock options were granted. ACC at ¶¶73, 80, 84, 88, 92, 97, 101, 105, 109, 112, 117, 121, 125, 130, 135, 138, 300, 304. Callen and Donohue approved the grant of backdated and otherwise *ultra vires* stock options. ACC at ¶¶80-82, 84-86, 88-90, 92-94, 97-99, 101-103, 105-107, 109-115, 117-119, 121-123, 125-127, 129, 131, 135, 138.

Callen and Donohue necessarily knew that the reported grant dates were in the past when they – on a later date – approved the issuance of those stock options and that they violated the terms of the relevant stock option plans. *Id*; *see Ryan*, 918 A.2d at 355; *Conrad*, 940 A.2d at 40. In each instance, the stock options issued and approved by defendants Callen and Donohue violated the relevant stock option plans because they were backdated, improbably timed to be granted just before a sharp increase in the price of Sunrise stock and/or to coincide with periodic low market prices of Sunrise's stock, or otherwise deliberately priced below the fair market value of Sunrise's stock price on the date of grant. ACC at ¶¶80-138.

Because they approved improperly backdated stock option grants, as set forth in detail in the Amended Consolidated Complaint, defendants Callen and Donohue face a substantial likelihood of personal liability and, thus, demand upon them would have been futile. *See, e.g., Conrad*, 940 A.2d at 40-41 (finding that directors face a substantial likelihood of liability for granting backdated stock options)*; Ryan*, 918 A.2d at 355-56 (same). As the *Conrad* court reasoned under indistinguishable circumstances:

> a reasonable inference [exists] that the compensation committee members acted
> knowingly in awarding options priced at dates other than the actual dates of the

grant. The evidence developed in discovery and adduced at trial may more strongly support some other inference. For example, the evidence may support the same conclusion Staples claims to have reached in its internal review: i.e., that there was no intentional wrongdoing by those directors. That is, however, for another day.

*Conrad*, 940 A.2d at 40.  Plaintiffs have, thus, established a reasonable doubt as to the

disinterestedness of defendants Callen and Donohue.

> **d.    Demand Is Futile With Respect to the Entire Board Because Defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Callen, Holladay and Little Are Substantially Likely to Be Held Liable for Engaging in a Continuous Accounting Scheme to Artificially Inflate Sunrise's Financial Statements and Causing Sunrise to Issue False and Misleading Financial Statements**

Demand is also excused as to the entire Sunrise Board pursuant to *In re Tyson Foods, Inc.*

*Consol. Shareholder Litig.*, No. 1106-CC, 2007 Del. Ch. LEXIS 120 (Del. Ch. Aug. 15, 2007)

("*Tyson II*").  In that case, the Delaware Chancery Court discussed the fiduciary duties that

directors of a Delaware corporation owe to shareholders:

> The affairs of Delaware corporations are managed by their board of directors, who owe to shareholders duties of unremitting loyalty.  This means that their actions must be taken in the good faith belief that they are in the best interest of the corporation and its stockholders, especially where conflicts with the individual interest of directors are concerned.

> Loyalty. Good faith. Independence. Candor. These are words pregnant with obligation. The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor

> *            *            *

> Where a board of directors intentionally conceals the nature of its earlier actions, it is reasonable for a court to infer that the act concealed was itself one of disloyalty that could not have arisen from a good faith business judgment.

*Id.* at *10-13.  While *Tyson II* was decided in the context of the manipulation of stock options,

these principles apply to all of the accounting manipulations employed by the defendants P.

Klaassen, T. Klaassen, Aprahamian, Donohue, Callen, Holladay and Little during their respective tenures on the Board. These Defendants' purposeful and intentional scheme to manipulate the accounting of stock options and the Company's real estate transactions in order to inflate the Company's financial statements was a breach of their fiduciary duties. Plaintiffs allege, in particular, that Defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Callen, Holladay and Little improperly accounted for joint ventures with equity partners, used excess insurance reserves to cover earnings shortfalls, improperly accounted for certain gains on real estate investments/assets, improperly accounted for construction losses relating to development projects, and improperly accounted for other real estate matters. ACC at ¶¶3-6, 56-57, 227, 236, 238, 243, 268-69, 287, 289, 294, 298, 300, 304, 307, 309. *See also In re infoUSA, Inc. S'holders Litig.,* C.A. No. 1956-CC, 2007 Del. Ch. LEXIS 123 at *57-60 (Del. Ch. Aug. 13, 2007) (a director's approval of false financial statements renders that director interested for purposes of demand futility).

The breaches of fiduciary duties are especially egregious for Audit Committee members Aprahamian, Donohue, Callen and Holladay, since they were charged under the Audit Committee Charter with ensuring the accuracy of the Company's financial statements. ACC at ¶¶43, 298, 300, 304, 307. Moreover, as defendants Donohue and Callen were also Stock Option Committee members, members of the Audit Committee plainly knew of the backdated stock options and similarly face a substantial likelihood of liability for approving false financial statements. *See Ryan*, 918 A.2d at 356 n.38 (noting that the compensation committee members "were also members of the audit committee, and as such, directly responsible for approving any false financial statements that resulted from mischaracterization of these option grants. Thus,

they might be exposed to potential criminal liability for securities fraud, tax fraud, and mail and wire fraud.").

Moreover, from Plaintiffs' well-pled allegations and Sunrise's massive restatement, it can be reasonably inferred that the systematic and continuous scheme of accounting manipulations was "knowable" and that the P. Klaassen and the members of the Audit Committee were in a position to be aware of it. *See IOTEX Communs., Inc. v. Defries*, No. 15817, 1998 Del. Ch. LEXIS 236 at *12-13 (Del. Ch. Dec. 21, 1998) ("where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it"). Therefore, Plaintiffs' factual allegations raise an inference that at a minimum P. Klaassen, Aprahamian, Donohue, Callen and Holladay's knowing allowance of Sunrise's false financial statements that concealed the backdating and other accounting improprieties at Sunrise breached their fiduciary duties and they are entitled to no business judgment protection. *See id.*; *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) (holding that "directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty"). Additionally, T. Klaassen and Little, by virtue of their Board positions and T. Klaassen's relationship with her spouse, were also in a position to know of the accounting improprieties. *See IOTEX Communs.*, 1998 Del. Ch. LEXIS 236 at *12-13; *see also* Fed. R. Civ. P. 9(b) (averments of knowledge may be made generally). Accordingly, demand should be excused with respect to the entire current Board.

- 25 -

> **e.    Defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Callen and Holladay Are Substantially Likely to Be Held Liable for Their Insider Sales of Sunrise Common Stock**

Where, as here, a plaintiff alleges that a majority of a board of directors engaged in improper insider trading, the court's demand futility analysis should:

> "focus . . . on whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition."

*Guttman v. Huang*, 823 A.2d at 502.  Plaintiffs here clearly satisfy the *Guttman* standard, establishing demand futility with respect to defendant directors P. Klaassen, T. Klaassen, Aprahamian, Donohue, Callen and Holladay.

Specifically, Plaintiffs allege that throughout the Relevant Period, current defendant directors P. Klaassen, T. Klaassen, Aprahamian, Donohue, Callen and Holladay, employed a concerted and continuous scheme to inflate the Company's financial statements so that these same six individuals could sell millions of shares of Sunrise stock for more than $71 million. ACC at ¶¶2, 241.  The most egregious of these sales came in the six months prior to the Company's announcement of its accounting problems, when P. Klaassen and T. Klaassen sold 600,000 shares in twelve (12) transactions between December 19, 2005 and May 2, 2006 garnering more than $21 million in proceeds.[14]  The most recent of those sales occurred just ***seven days*** before the Company was forced to announce that it would have to reschedule its earnings release.  ACC at ¶¶221, 241.  It is reasonable to infer that P. Klaassen and T. Klaassen knew about material non-public information at least when they made the most recent sale.  *See*

---

[14] The Klaassens' sale of 600,000 shares over this six month period accounted for approximately 42% of all the shares the Klaassens sold over the period from December 1997 through May 2006.  ACC ¶241-242.  To put it another way, in the six months leading up to Sunrise's announcement of its accounting problems, the Klaassens sold roughly as much stock as they had in the preceding 8 years.

*Guttman*, 823 A.2d at 503-04 (noting that suspicious timing and pattern of trades may support an inference of insider selling).

Aprahamian, Donohue, Callen and Holladay's timing of stock sales was similarly suspicious. Aprahamian sold stock on April 18, 2006, less than a month prior to the Company's announcement. ACC at ¶¶221, 241. Holladay sold stock on March 21, 2006, approximately a month and a half before the announcement. ACC at ¶¶221, 241. Callen and Donohue, long-standing members of the Board, sold 144,378 shares (Callen – 10,000, Donohue 134,378) of Sunrise stock between January 29, 2004 and November 21, 2005, and they had never before sold any Sunrise stock before. ACC at ¶241.

Plaintiffs thus plead with particularity that six directors on Sunrise's seven-member Board, defendants P. Klassen, T. Klaassen, Aprahamian, Donohue, Callen and Holladay, are substantially likely to be held liable for selling shares of Sunrise stock based on their knowledge of inside information regarding their own scheme to inflate the Company's financial statements through systematic and continuous accounting manipulations.

Indeed, Plaintiffs' particularized allegations bear no resemblance to the "wholly conclusory" insider trading allegations in *Guttman*. *See Guttman*, 823 A.2d at 503.[15] Plaintiffs here allege precisely what roles the directors played, the information that came to their attention in those roles, and why they perceived the accounting irregularities. ACC at ¶¶19-24, 42-43, 241, 287-89, 294-95, 298-99, 300-01, 304-05,307-08. Moreover, while the complaint in *Guttman* "cannot be fairly said to contain particularized facts providing an inference of insider trading," *see Guttman*, 823 A.2d at 503, Plaintiffs' particularized allegations regarding the unusual timing and amounts of the insider sales provide a strong inference that the directors sold

---

[15] The complaint in *Guttman* contained no "well-pled, particularized allegations of fact detailing the precise roles that [the] directors played at the company, the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities." *Id*.

their Sunrise shares based on their knowledge of inside information.  ACC at ¶¶241-42; *see also* Fed R. Civ. P. 9(b) (knowledge may be averred generally).  Thus, demand is excused with respect to defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Callen and Holladay, as they face a substantial likelihood of liability for their insider sales of Sunrise stock.

### f.    Sunrise's Attacks on a Pattern of Backdating Fail

Plaintiffs have demonstrated through specific allegations that there is a clear pattern of backdating of Sunrise's stock option grants, and the Court should reject Sunrise's unfounded contentions to the contrary.  Sunrise attempts to mount a challenge to eight of the grants Plaintiffs allege were backdated, but Sunrise's arguments are not persuasive.  Sunrise challenges five option grants (September 14, 1998, November 9, 1998, February 25, 2000, March 28, 2000 and September 11, 2000) as not being backdated because they are tied to "corporate events." While, Plaintiffs do not deny that the Court can take judicial notice of the filings and press releases upon which Sunrise's arguments are based, the Court cannot accept as true that the events actually took place at the time Sunrise reported them.  *See In re UNUMprovident Corp. Securities Litigation,* 396 F. Supp. 2d 858, 877 (E.D. Tenn. 2005) ("While the Court could consider [on a Rule 12(b)(6) motion] SEC filings for the purpose of determining what disclosures were or were not made, the Court cannot consider them as proof of the actual activities or transactions which they purport to disclose.") (emphasis added); *see also Bryant v. Avado Brands, Inc*., 187 F.3d 1271, 1278 (11th Cir. 1999) (making clear judicial notice is "for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents"); *Lovelace v. Software Spectrum, Inc*., 78 F.3d 1015, 1018 (5th Cir. 1996) (noting that although court may take judicial notice of documents filed with the SEC, "[s]uch documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents").  These unverifiable

- 28 -

"corporate events" are meaningless and provide no basis to undermine an inference of backdating, especially when Plaintiffs provide competing inferences that must necessarily militate in Plaintiffs' favor at the pleading stage.  Any counter inferences are matters for discovery and trial.

For example, with respect to the September 14, 1998 grant, there is no evidence that the claimed re-pricing actually took place on that date because the re-pricing was not disclosed until November 10, 1998, after Sunrise's stock price had risen by more than 70%.  ACC at ¶95.  For the November 8, 1999 grant, nothing tangible supports Sunrise's proposition that Callen assumed his directorial position on November 8, 1999.  Additionally, even if Callen were elected to the Board on November 8, 1999, there remains no explanation of the grants to six other recipients of stock options on that date.  ACC at ¶111.  Likewise, with regard to the February 25, 2000 grant, Sunrise presents nothing to indicate that the 2000 Stock Option Plan was actually adopted on that date.  Moreover, even if the plan were adopted on that date, its adoption does not support an inference that stock options were necessarily granted on that date.  Similarly, with regard to the March 28, 2000 grant, Sunrise's reference to a press release discussing the reorganization of Sunrise's executive positions does not necessarily mean that (i) the executives actually started in their positions on that date and (ii) the promotion of those executives supports an inference that options were granted on that date.  For both the February 25, 2000 and March 28, 2000 grants, Sunrise likewise fails to counter the inference that backdating the options by only a few days resulted in significant windfalls to the recipients, and considering the date that the Forms 4 were filed by the Individual Defendants there is a reasonable inference for when they were actually granted.  ACC at ¶116.  Finally, nothing shows that Klaassen's employment agreement was executed on September 12, 2000, and considering that his employment agreement was not

announced for two months while the stock price continued to rise, there is a competing inference that the grant was backdated. ACC at ¶120.[16] Sunrise fails to show that reasonable inferences do not support the finding of a pattern of backdating at Sunrise.

Further, Sunrise improperly relies on *CNET*, *Zoran* and *Desimone*, to show that an option grant date tied to a "corporate event" necessarily removes that grant from consideration towards the Court's inference of a pattern of backdating. *See* Sunrise's Memo. at 19, 22. Neither, *Zoran* nor *Desimone*, however, support that notion. In each, the courts only suggest that a stock option grant cannot be considered backdated if it was granted automatically pursuant to a company's stockholder plan which set the dates for option grants to be tied to a director's election to the board or pursuant to an annual meeting. *See Zoran*, 511 F.Supp.2d at 1004-05; *Desimone*, 924 A.2d at 948 n. 131. This is precisely why Plaintiffs did not allege that the April 28, 1997, April 27, 1998, April 26, 1999, May 22, 2000 and May 11, 2001 grants were backdated. While *CNET* may suggest a more rigorous standard for eliminating stock option grants as backdated when such grants are tied to "corporate events," the *CNET* court, as Sunrise acknowledges, does require that the disclosure of a "corporate event" be contemporaneous with the grant date. *See* Sunrise's Memo. at 22. Thus, the Company's challenges to the September 14, 1998, November 8, 1999, February 25, 2000 and September 11, 2000 grant dates are unconvincing as each grant was disclosed well after the purported date of grant. *See In re CNET Networks, Inc.*, 483 F. Supp. 2d at 959 (holding that where a public disclosure came six days after the alleged corporate event, and the stock price increased in that intervening period, the disclosure did not negate an

---

[16] Of course, considering any of Sunrise's supplemental materials would require the Court to convert Sunrise's Motion to Dismiss into a motion for summary judgment and to grant Plaintiffs a reasonable opportunity to conduct discovery concerning Sunrise's evidentiary offerings. *See* Fed. R. Civ. P. 12(d).

inference of backdating).[17]    Accordingly, *Zoran*, *Desimone* and *CNET* provide no support for Sunrise's argument that there is no pattern of backdating here.

Sunrise also contends that two of the grants alleged by Plaintiffs as backdated (November 24, 2000 and November 12, 2001) do not support an inference of backdating because other grant dates during the relevant fiscal quarters would have provided a lower stock price.  *See* Sunrise's Memo. at 23-24.  However, both of these option grants, as demonstrated by the graphs which accompany them, ACC at ¶¶124, 128, were purportedly granted following a decline and prior to a rise in the stock price.  Moreover, as the court in *CNET* recognized, possible lower prices surrounding the purported grant date do not necessarily negate an inference of backdating: "Perhaps they did not want to make it too obvious by being too greedy.  The simple fact that there were days close in time where the stock closed at an even lower price is not sufficient to defeat the facts pleaded by plaintiffs."  483 F. Supp. 2d at 961.

Sunrise also disputes the November 4, 1997 grant because Plaintiffs' allegations are purportedly contradictory.  *See* Sunrise's Memo. at 24-25.  However, regardless of whether the option was backdated or spring-loaded, the timing of that grant supports the reasonable inference that the Stock Option Committee manipulated the grant date, either (i) retrospectively, as it coincided with a low price of Sunrise common stock or (ii) in advance, to take advantage of non-public, materially positive information that the Stock Option Committee likely anticipated would positively affect the Company's stock price.  ACC ¶¶88-91.  Either way, the fact that this grant was manipulated may be used to infer that a pattern of stock option granting manipulation existed at the Company.  *See Tyson I*, 919 A.2d at 592-93 (noting that a backdating and spring-loading stock options deceive shareholders and are breaches of a director's fiduciary duty); *Ryan*,

---

[17] Moreover, to the extent that *CNET* imposes a stricter requirement than the *Ryan* decision on establishing a pattern of backdating, such analysis is explicitly condemned by the subsequent *Conrad* decision, as discussed below.

918 A.2d at 355 n.34 ("Given the choice between improbable good fortune and knowing manipulation of option grants, the Court may reasonably infer the latter, even when applying the heightened pleading standards of Rule 23.1."). .

Finally, even if the Court accepted every one of the Sunrise's arguments against Plaintiffs' alleged pattern of backdating, the five out of a possible 19 stock option grants for which Sunrise offers no explanation (May 2, 1997, August 8, 1997, October 8, 1998, December 10, 1998 and March 5, 1999)[18] are sufficient to establish a pattern of backdating. *See Zoran*, 511 F. Supp. 2d at 1005 (11 backdated grants out of a possible 32 grants, or 34% of the total, established a pattern of backdating); *Conrad*, 940 A.2d at 31 (12 backdated grants out of 51 total grants, or 23.5% of the total, established a backdating pattern). Thus, even if only five out of 19 Sunrise stock option grants made from 1997 to 2001, or 26% of the total, were backdated, there is nevertheless a pattern of backdating.

### g.     Sunrise Ignores *Conrad*, which the Court Should Follow

In *Conrad*, the Delaware Chancery Court considered circumstances substantially identical to those present here. In that case, shareholders of Staples, Inc. ("Staples"), did not make a demand on the Staples' board before filing their claims that Staples' stock options were backdated by members of the Staples' board's compensation committee. *Conrad* at 31-32. The plaintiff alleged that five members of Staples' 10-member board could not impartially consider a demand, two because they received allegedly backdated stock options, and three others because they served on the compensation committee and approved the allegedly backdated stock options

---

[18] Interestingly, the stock option grants for which Sunrise offers no explanation are among the most fortuitously priced and egregious backdated grants alleged by Plaintiffs: March 2, 1997, *second lowest closing price for the year*; August 28, 1997, *second lowest closing price of the quarter*; October 8, 1998, *lowest closing price of the quarter*; December 10, 1998, *stock price rose by 26% in the 14 days following the grant*; and March 5, 1999, *stock price rose by 23% the day following the date of grant and one of the recipients was not even employed by Sunrise until two months later*. ACC at ¶¶83, 87, 100, 104, 108. The likelihood of the exceedingly fortuitous timing of these grants occurring naturally without the benefit of hindsight is astronomical – this is a pattern of backdating in and of itself.

as Staples reported in its SEC filings. *Id*. at 34-35. The plaintiff also supported her claim that Staples engaged in a pattern of options backdating by demonstrating that 12 of the company's 51 discretionary grants made from 1997 through 2006 were priced as of dates when the market price for Staples stock was particularly low, often at monthly or quarterly lows, and by engaging in the same methodology employed by Merrill Lynch in a statistical analysis on which the plaintiff in *Ryan* relied to establish a pattern of backdating. *Id.* That Merrill-Lynch-like analysis showed that the allegedly backdated grants outperformed returns on common stock over a stated period by nearly four times. *Id*. at 35 n.10.

Regarding the two Staples directors who received backdated options, the Chancery Court followed the virtually unanimous view that those directors were interested, given the financial benefit inherent in receiving backdated stock options. *Id*. at 38. The three directors who approved backdated stock options as members of the Staples board committee charged with administering the Staples stock option plans were also deemed interested, given the substantial likelihood of their liability for awarding stock options set at prices lower than those required by shareholder-approved stock option plans. *Id*. at 38-39. Thus, the court concluded that demand was futile. *Id*. The identical analysis, set forth above, shows that a demand on Sunrise's board would also have been futile.

Sunrise incorrectly argues that Plaintiffs' allegations are not sufficiently particularized, relying partially on *CNET,* 483 F. Supp. 2d at 962-63, *Linear*, 2006 U.S. Dist. LEXIS 90986 and *Openwave I. See* Sunrise's Memo. at 15, 19, 22, 26, n.18. However, the Delaware Chancery Court in *Conrad* specifically rejected those courts' findings that there was no backdating pattern:

> To the extent *CNET Networks Inc. S'holder Deriv. Litig*., 483 F. Supp. 2d 947 (N.D. Cal. 2007) and several other recent decisions of that court, *In re Linear Technology Deriv. Litig.*, No. 06-3290, 2006 WL 3533024 (N.D. Cal. Dec. 7, 2006); *In re OpenWave Systems Inc. S'holder Deriv. Litig.*, No. 06-3468, 2007

WL 1456039 (N.D. Cal. May 17, 2007) can be read as applying a substantially harsher standard than is applied in *Ryan* or in this decision, the court declines to follow them.  Particularly in relation to options granted to senior executives pursuant to plans that require at-the-money pricing, a finding of a pattern or of assigning improper measurement dates to option grants resulting in the issuance of millions of stock options with strike prices set at a lower price than required by the plan raises substantial risks of personal liability on the part of both the grant executives who got the options and the directors who approved them.

*Conrad*, 940 A.2d at 38 n.22.  Moreover, this case is distinguishable from *CNET, Linear* and *Openwave* because Plaintiffs here pleaded facts (i) regarding the "full universe" of publicly reported option grants, (ii) regarding which directors approved each grant, (iii) regarding plan requirements that stock options be priced as of the actual date of grant, and (iv) that all option grants in the relevant period were evaluated as part of a statistical analysis employing Merrill Lynch's methodology and suggesting a pattern of favorable option strike prices that could not have been the result of chance.  *See Edmonds* at 1275-76; fn. 11, *supra*.

Since this Court is Erie-bound to follow Delaware law on demand futility, the Court should follow the demand futility standard as set forth and applied in *Conrad* and *Ryan*.  The circumstances in the Action are substantively identical, and actually more compelling on certain significant points, to those considered in *Conrad*, and this Court should follow *Conrad* in denying Sunrise's motion to dismiss for failure to make a pre-suit demand.[19]

## B.    THE DISMISSAL OF THE *VON GUGGENBERG* ACTION DOES NOT COLLATERALLY ESTOP OR PRECLUDE THE INSTANT ACTION

The State Court's dismissal without prejudice of the *Von Guggenberg* action necessarily condemns Sunrise's arguments in favor of collateral estoppel and/or issue preclusion with respect to the instant action.  The State Court's September 15, 2006 Order dismissing the *Von Guggenberg* action clearly states that "[t]he Verified Derivative Complaint of derivative

---

[19] For the Court's ease of comparison, the complaints in *Ryan* and *Conrad* and the amended complaint in *Edmonds* are attached to the Hanna Aff. as Exhibits 3, 4, and 5, as examples of complaints alleging improper backdating that pass muster under Delaware law.

defendant [sic] Nicholas Von Guggenberg shall be and hereby is DISMISSED *without prejudice* . . .” *See* Sunrise's Memo., Exhibit 4 at 1 (emphasis added). The Supreme Court has offered the following analysis of the legal effect of a dismissal without prejudice:

> The primary meaning of "dismissal without prejudice," we think, is dismissal without barring the defendant from returning later, to the same court, with the same underlying claim. That will also ordinarily (though not always) have the consequence of not barring the claim from other courts, but its primary meaning relates to the dismissing court itself. Thus, Black's Law Dictionary (7th ed. 1999) defines "dismissed without prejudice" as "removed from the court's docket in such a way that the plaintiff may refile the same suit on the same claim," *id.*, at 482, and defines "dismissal without prejudice" as "[a] dismissal that does not bar the plaintiff from refiling the lawsuit within the applicable limitations period," *ibid.*

*Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001).[20] *See also Vandalia R. Co. v. Schnull,* 255 U.S. 113, 123 (1921) (holding that dismissal without prejudice did not preclude right to bring suit based on the same claims again); *North River Ins. Co. v. Gourdine*, 205 Va. 57, 63 (Va. 1964) ("'A dismissal without prejudice has been aptly described as being like a person blowing out a candle, which at his own pleasure may be lit again.'") (citations omitted).[21] Accordingly, the dismissal of the *Von Guggenberg* action does not even preclude that plaintiff, let alone Plaintiffs in the instant action, from commencing a new action for the same relief.

Moreover, Sunrise acknowledges that Plaintiffs' Amended Consolidated Complaint challenges additional grants and, as such, is factually different than the *Von Guggenberg* Action. Since demand futility is a "fact-intensive" inquiry that depends on the totality of the facts and circumstances alleged, the question is whether there is a "significant change" in the demand

---

[20] While the Supreme Court is discussing the concept of "dismissal without prejudice" in the context of Federal Rule of Civil Procedure 41, Plaintiffs find no reason why the analysis would be inapplicable to the issue at hand.

[21] For this reason, Sunrise's reliance on *Reiter v. Universal Marion Corp.*, 299 F.2d 449 (D.C. Cir. 1962), is misplaced. In *Reiter*, the United States Court of Appeals for the District of Columbia Circuit held that an action that had been settled and dismissed *with prejudice* in another jurisdiction should be accorded *res judicata* effect. Id. at 451-52.

futility analysis here from what was present in the *Von Guggenberg* complaint. *See In re Sonus Networks, Inc.*, 499 F.3d 47, 62-63 (1st Cir. 2007) (collateral estoppel would not apply to "new" allegations). While Sunrise correctly argues that the Court should not analyze only a subset of the challenged grants "in a vacuum," Sunrise's Memo at 25, the Company nonetheless contends in this context that the Court should consider only the grants not alleged in the *Von Guggenberg* action. *See id.* at 17. This argument is nonsensical. The issues in the *Von Guggenberg* action and the instant action are clearly ***not*** identical, because the Complaint in the instant action contains new and different factual allegations with respect to demand futility than those alleged in the *Von Guggenberg* action. Simply put, the allegations in this Action significantly change the demand futility analysis.

First, Plaintiffs name the entire Board as defendants in the Action, which includes defendants T. Klaassen, Holladay and Little, significantly changing the demand futility calculation from that which was presented in the *Von Guggenberg* action. ACC at ¶¶281-315. Second, Plaintiffs allege in the Amended Consolidated Complaint an entirely different theory of liability that incorporates claims relating both to backdating and other improper accounting mechanisms employed by the Board in a concerted scheme to artificially inflate the Company's financial statements, enabling the Individual Defendants to profit from their illegal insider sales of Sunrise common stock. ACC at ¶¶2-11, 44-57, 241-42. Third, Plaintiffs include allegations set forth in defendant Rush's complaint that were only brought to light after the *Von Guggenberg* action had been dismissed and have direct bearing on the issue of demand futility. ACC at ¶¶3, 11. Fourth, Plaintiffs allege the disclosures of the Special Committee's suspect findings, which were not released until after the *Von Guggenberg* action had been dismissed and would likely have impacted the demand futility analysis. ACC at ¶¶229-238. This Court's analysis of the

need for a pre-suit demand must necessarily account for new and significantly different factual allegations from those present in the *Von Guggenberg* complaint.  Consequently, the *Von Guggenberg* action has no preclusive effect on this Action.

Moreover, Sunrise mischaracterizes the basis for the State Court's decision in *Von Guggenberg* by incorrectly asserting that "it has been determined on the merits that demand was required with respect to claims based on these nine grants [alleged in the *Von Guggenberg* action]." Sunrise's Memo at 16; Sunrise's Memo., Exhibit 4 at 1.  In the September 15, 2006 Order, the State Court articulated no basis for sustaining Sunrise's demurrer, and Sunrise acknowledges that its demurrer was based on multiple arguments.  *See id.;* Sunrise's Memo. at 4.  Sunrise, accordingly, cannot legitimately maintain that the demurrer was sustained on any particular basis, let alone on the issue of the need for a pre-suit demand.  *See* Sunrise's Memo. at 15-16.  Thus, the demand futility issue cannot be determined to have been essential to the State Court's judgment in the *Von Guggenberg* action, and the *Von Guggenberg* decision therefore lack preclusive effect.  *See Angstadt v. Atlantic Mutual Ins*. Co., 457 S.E.2d 67, 87 (Va. 1995) (requiring that for a decision to have preclusive effect the contested issue must have been essential to the prior judgment).  Moreover, the Virginia Supreme Court has noted that dismissals without prejudice are not dismissals on the merits.  *See e.g. Hughes v. Doe*, 273 Va. 45, 53 (Va. 2007) (indicating that all dismissals without prejudice are not determinative on the merits). Collateral estoppel or other preclusion doctrines, therefore, do not bar Plaintiffs' claims.  *See Angstadt*, 457 S.E.2d at 87.

Accordingly, for the foregoing reasons, the prior decision in the *Von Guggenberg* action has no preclusive effect here.

## C.    THE ACTION SHOULD NOT BE STAYED IN FAVOR OF THE SECURITIES CLASS ACTION

The standard for granting a stay of proceedings in the District of Columbia Circuit is set forth in *Dellinger v. Mitchell*, 442 F.2d 782 (D.C. Cir. 1971):

> The suppliant for a stay must make out *a clear case* of hardship or inequity in being required to go forward, *if there is even a fair possibility* that the stay for which he prays will work damage to some one else. ***Only in rare circumstances*** will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.

*Id. at 786.*  (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)) (emphasis added).

While this Court has discretion to stay the Action in favor of the Securities Class Action, Sunrise provides no legitimate basis for doing so.

Sunrise cannot demonstrate that it will legitimately "suffer hardship or inequity in being required to go forward."  Derivative and class actions routinely proceed in parallel.  Plaintiffs, however, can demonstrate a "fair possibility" that the stay would damage Plaintiffs, derivatively on behalf of Sunrise.  According to a complaint filed by defendant Rush, certain of the Individual Defendants have attempted to sell the Company, which could potentially extinguish derivative liability and leave Sunrise uncompensated for the enormous damages caused by the Individual Defendants.  *See* ACC at ¶¶4, 220; *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984) ("A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit.").  While Plaintiffs do not agree with Sunrise's position that the outcome of many of Plaintiffs' claims will turn on the determination of the same factual and legal issues in the Securities Class Action, Sunrise's argument is exactly what the court in *Dellinger* suggests should only be permitted in rare circumstances.  As *Dellinger* indicates, the Court "must weigh [the] competing interests" of the litigants, and the balance clearly tips in favor of the Plaintiffs here.  *See Dellinger*, 442 F.2d at 786 n.7 (citation omitted).

Moreover, and despite any factual similarities between this case and the Securities Class Action, Plaintiffs plead numerous additional defendants and assert different theories of liability, including Plaintiffs' multiple state law claims that are unrelated to the federal securities law claims asserted in the Securities Class Action. Thus, Sunrise's reliance on *Brudno v. Wise*, No. 03-19953, 2003 Del. Ch. LEXIS 35 (Del. Ch. Apr. 1, 2003), is misplaced.[22] There, the Court stayed a derivative action in favor of a securities class action because "the [derivative action] primarily [sought] to hold the defendant-directors responsible for any damages or costs that [the company] will incur as a result of federal securities suits (the "Federal Securities Action") and Federal Energy Regulatory Commission ("FERC") inquiries pending against [the company] and certain company insiders." *Id.* at *1. Plaintiffs' claims here, by contrast, seek relief wholly unrelated to any relief that might be awarded in the Securities Class Action. There is likewise no basis for staying an action merely because certain witnesses could be called to testify in both proceedings.

Sunrise fails to establish a "clear case of hardship or inequity" required to merit a stay here. Accordingly, the Court should deny Sunrise's request for a stay of the Action in favor of the Securities Class Action.

## V.    CONCLUSION

A majority of Sunrise's board is substantially likely to be held liable in connection with the receipt or approval of backdated or otherwise unauthorized stock options, and all of the Company's current Board is substantially likely to be held liable for accounting manipulations related to Sunrise's real estate ventures. Moreover, there is no basis for staying this action in

---

[22] Defendants similarly improperly rely on *Fairview Hosp. v. Leavitt*, No. 05-1065, 2007 U.S. Dist. LEXIS 37296 (D.D.C. May 22, 2007), which had a completely different procedural posture in that the plaintiff moved for a stay after the defendant had filed a dispositive motion despite the fact that the defendant had agreed to stays of identical actions in competing jurisdictions. *Id.* at *2, 6-7. Moreover, the claims raised and the legal defenses applicable to those claims were identical between the competing cases, which is not true of the claims and legal defenses set forth in the Action and the Securities Class Action. *See id.* at *4-6.

favor of the Securities Class Action.  Accordingly, the Court should deny Sunrise's motion in its entirety.

DATED: July 24, 2008                    Respectfully submitted,

                                        DAVIS, COWELL & BOWE, LLP


                                        __/s/ Mark Hanna_____
                                        George R. Murphy (DC Bar 75200)
                                        Mark Hanna (DC Bar 471960)
                                        Joni S. Jacobs (DC Bar 493846)
                                        1701 K Street NW, Suite 210
                                        Washington, DC 20006
                                        Telephone:  (202) 223-2620
                                        Facsimile:  (202) 223-8651

                                        *Liaison Counsel*

                                        SCHIFFRIN BARROWAY
                                        TOPAZ & KESSLER, LLP
                                        Lee D. Rudy
                                        Michael C. Wagner
                                        J. Daniel Albert
                                        280 King of Prussia Road
                                        Radnor, PA  19087
                                        Telephone:  (610) 667-7706
                                        Facsimile: (610) 667-7056

                                        SAXENA WHITE P.A.
                                        Maya Saxena
                                        Joseph White
                                        Christopher Jones
                                        2424 North Federal Highway, Suite 257
                                        Boca Raton, FL  33431
                                        Telephone:  (561) 394-3399
                                        Facsimile:  (561) 394-3382

                                        ROBBINS, UMEDA, & FINK LLP
                                        Jeffrey P. Fink
                                        Felipe J. Arroyo
                                        Ashley R. Palmer
                                        610 West Ash Street, Suite 1800
                                        San Diego, CA  92101

Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991

*Co-Lead Counsels for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| In Re SUNRISE SENIOR LIVING, INC.    ) | **Civil Action No. 07-00143** |
| Derivative Litigation    ) | |
| _____) | |
| ) | |
| This Document Relates To:    ) | |
| ) | |
| ) | |
| ALL ACTIONS    ) | |
| _____) | |

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies, under penalty of perjury, that the foregoing was served electronically via ECF on counsel for Defendants on July 24, 2008, and that no Defendant needs to be served by mail.

July 24, 2008                        /s/ Mark Hanna_____