**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| In Re SUNRISE SENIOR LIVING, INC.  ) | **Civil Action No. 07-00143** |
| Derivative Litigation                        ) | |
| _____) | |
|                                                      ) | |
| This Document Relates To:              ) | |
|                                                      ) | |
| ALL ACTIONS                               ) | |
| _____) | |

**AFFIDAVIT OF MARK HANNA IN SUPPORT OF PLAINTIFFS'**
**MEMORANDUM OF LAW IN OPPOSITION TO NOMINAL DEFENDANT**
**SUNRISE SENIOR LIVING INC.'S MOTION TO DISMISS OR, IN THE**
**ALTERNATIVE, STAY PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT**
**AND IN SUPPORT OF PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN**
**OPPOSITION TO THE INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS**
**PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT**

I, Mark Hanna, declare under penalty of perjury that the following is true and correct:

1.      Attached hereto as Exhibit 1 is a true and correct copy, in relevant part, of Sunrise Senior Living, Inc.'s Form 10-K, filed with the United States Securities and Exchange Commission on March 24, 2008.

2.      Attached hereto as Exhibit 2 is a true and correct copy of the Opinion in the case entitled *In re Atmel Derivative Litig.,* No. 06-4592, slip op. (N.D. Cal. June 25, 2008).

3.      Attached hereto as Exhibit 3 is a true and correct copy of the Complaint in *Ryan v. Gifford*, C.A. No. 2213-N, (Del. Ch. June 12, 2006).

4.      Attached hereto as Exhibit 4 is a true and correct copy of the Complaint in *Conrad v. Blank*, C.A. No. 2611-N, (Del. Ch. Jan. 19, 2007).

5.      Attached hereto as Exhibit 5 is a true and correct copy of the Amended Complaint in *Edmonds v. Getty*, No. 07-cv-0317, (W.D. Wash. Aug. 27, 2007).

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 24, 2008                              Respectfully submitted,


                                                   __/s/ Mark Hanna_____
                                                   Mark Hanna (DC Bar 471960)
                                                   DAVIS, COWELL & BOWE, LLP
                                                   1701 K Street NW, Suite 210
                                                   Washington, DC 20006
                                                   Tel. (202) 223-2620
                                                   Fax: (202) 223-8651
                                                   *Liaison Counsel*

# EXHIBIT 1

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10–K**

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2006**

**Commission File Number 1–16499**

**SUNRISE SENIOR LIVING, INC.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 54–1746596 |
| (State or other jurisdiction incorporation or organization) | (I.R.S. Employer Identification No.) |
| 7902 Westpark Drive McLean, VA | 22102 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (703) 273–7500

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common stock, $.01 par value per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well–known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports,) and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non–accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b–2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ | Non–accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Exchange Act). Yes ☐ No ☑

The aggregate market value of the Registrant's Common Stock held by non–affiliates (based upon the closing price of $27.65 per share on the New York Stock Exchange on June 30, 2006 was $1,235 million. Solely for the purposes of this calculation, all directors and executive officers of the registrant are considered to be affiliates.

The number of shares of Registrant's Common Stock outstanding was 50,486,492 at February 29, 2008.

**DOCUMENTS INCORPORATED BY REFERENCE**

None

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| PART I |  |  |  |
|  | Item 1. | Business | 6 |
|  | Item 1A. | Risk Factors | 30 |
|  | Item 1B. | Unresolved Staff Comments | 47 |
|  | Item 2. | Properties | 48 |
|  | Item 3. | Legal Proceedings | 48 |
|  | Item 4. | Submission of Matters to a Vote of Security Holders | 52 |
| PART II |  |  |  |
|  | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 53 |
|  | Item 6. | Selected Financial Data | 54 |
|  | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 57 |
|  | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 106 |
|  | Item 8. | Financial Statements and Supplementary Data | 107 |
|  | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 175 |
|  | Item 9A. | Controls and Procedures | 175 |
|  | Item 9B. | Other Information | 187 |
| PART III |  |  |  |
|  | Item 10. | Directors, Executive Officers and Corporate Governance | 188 |
|  | Item 11. | Executive Compensation | 192 |
|  | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 221 |
|  | Item 13. | Certain Relationships and Related Transactions, and Director Independence | 226 |
|  | Item 14. | Principal Accountant Fees and Services | 230 |
| PART IV |  |  |  |
|  | Item 15. | Exhibits and Financial Statement Schedules | 231 |
| SIGNATURES |  |  | 232 |

2

*This annual report on Form 10-K contains forward-looking statements that involve risks and uncertainties. Although we believe the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurance that our expectations will be realized. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to:*

- *the time required for us to prepare and file our 2007 Form 10-K, Form 10-Q for the quarter ending March 31, 2008 and Form 10-Qs for the first three quarters of 2007, and for Ernst & Young LLP to audit our 2007 financial statements and review our Form 10-Qs;*
- *our ability to remediate material weaknesses in our internal controls over financial reporting;*
- *the outcome of the Securities and Exchange Commission's ("SEC") investigation;*
- *the outcomes of pending putative class action and derivative litigation;*
- *the outcome of the lawsuit filed by our former CFO;*
- *the outcome of the Trinity OIG investigation and qui tam proceeding;*
- *the outcome of the IRS audit of the Company's tax returns for the tax years ended December 31, 2005 and 2006 and employment tax returns for 2004, 2005 and 2006;*
- *the outcome of the exploration of strategic alternatives;*
- *our ability to comply with the terms of the amendments to our bank credit facility or to obtain a further extension of the period for providing the lenders with required financial information;*
- *development and construction risks;*
- *acquisition risks;*
- *licensing risks;*
- *business conditions;*
- *competition;*
- *changes in interest rates;*
- *our ability to manage our expenses;*
- *market factors that could affect the value of our properties;*
- *the risks of downturns in general economic conditions;*
- *availability of financing for development; and*
- *other risk factors contained in this Form 10-K.*

*Information provided in this Form 10-K for 2007 and 2008 is preliminary and remains subject to audit by Ernst & Young LLP. As such, this information is not final or complete, and remains subject to change, possibly materially.*

*We assume no obligation to update or supplement forward-looking statements that become untrue because of subsequent events. Unless the context suggests otherwise, references herein to "Sunrise," the "Company," "we," "us" and "our" mean Sunrise Senior Living, Inc. and our consolidated subsidiaries.*

**Explanatory Note**

**Accounting Restatement**

   This Form 10-K for the year ended December 31, 2006 was delayed due to the time required to perform a comprehensive accounting review to restate our previously filed financial statements to correct various accounting errors ("Accounting Review"), as well as to complete the independent inquiry conducted by a Special Independent Committee of our Board of Directors. As previously disclosed, we have not filed our quarterly reports on Form 10-Q for the quarters ended March 31, 2006, June 30, 2006, September 30, 2006, March 31, 2007, June 30, 2007 or September 30, 2007, and we did not file our Form 10-K for the fiscal year ended December 31, 2007 by the required due date. This Form 10-K includes certain unaudited quarterly financial information for the years 2005 and 2006. The quarterly information for 2005 is restated to give effect to the restatement adjustments. As previously disclosed, we no longer plan to file a 2005 Form 10-K/A or 2006 Form 10-Qs, as we believe the amount of time and monetary resources that would be required to produce this information does not justify any related benefit that would result. We also have not provided quarterly information for 2004 as we believe the amount of time and monetary resources that would be required to produce this information does not justify any related benefit that would result. This 2006 Form 10-K filing is expected to be followed by the filing of the 2007 Form 10-K, and Form 10-Qs for the quarters

3

ended March 31, 2007, June 30, 2007 and September 30, 2007 and Form 10–Q for the quarter ending March 31, 2008.

Note 2 to our Consolidated Financial Statements included in this Form 10–K entitled "Restatement of Consolidated Financial Statements" includes a description of each of the following major restatement adjustment categories:

- real estate sales;
- costs of real estate projects;
- equity method investments with preferences;
- revenue recognition for Greystone contracts;
- stock–based compensation;
- reimbursed expenses; and
- other adjustments.

Note 2 to our Consolidated Financial Statements also includes in this Form 10–K:

- the impact of the restatement adjustments for 2003 and prior periods cumulatively on the Company's retained earnings as of January 1, 2004;

- the impact of the restatement adjustments for 2005 and 2004 on income before the provision for income taxes for 2005 and 2004;

- the consolidated statements of income and consolidated statements of cash flows for 2005 and 2004 as previously reported and after giving effect to the restatement adjustments; and

- the consolidated balance sheets as of December 31, 2005 and 2004 as previously reported and as restated.

In addition, Management's Discussion and Analysis of Financial Condition and Results of Operations provides unaudited condensed selected quarterly statements of income and balance sheets in accordance with Rule 10–01 of Regulation S–X for each of the quarters in the year ended December 31, 2005 as previously reported and as restated.

Item 6 to this Form 10–K, "Selected Financial Data," shows the impact of the restatement adjustments on income before provision for income taxes for 2005, 2004, 2003 and 2002 and presents the statements of income for 2003 and 2002 as previously reported and as restated.

Item 7 to this Form 10–K, "Management's Discussion and Analysis of Financial Condition and Results of Operations," includes a discussion of the restated annual information for 2004 and 2005 and restated quarterly information for 2005.

**Special Independent Committee Inquiry**

In December 2006, our Board of Directors established a Special Independent Committee to review certain allegations made by the Service Employees International Union ("SEIU") that questioned the timing of certain stock option grants to our directors and officers over a period of time, and stock sales by certain directors in the months prior to the May 2006 announcement of our Accounting Review. In March 2007, our Board of Directors expanded the scope of the Special Independent Committee's mandate to include the review of facts and circumstances relating to the historical accounting treatment of certain categories of transactions in our accounting restatement, and to develop recommendations regarding any remedial measures, including those pertaining to internal controls and processes over financial reporting, that it may determine to be warranted.

The Special Independent Committee of our Board of Directors consists of two independent directors: William Little and Stephen Harlan. Mr. Harlan has been determined by our Board of Directors to be an "audit committee financial expert" as defined in the SEC rules. The Special Independent Committee was advised by independent outside counsel, WilmerHale. The factual findings of the Special Independent Committee's inquiry are briefly summarized in Item 7 of this Form 10–K, "Management's Discussion and Analysis of Financial Condition and

4

Results of Operations." The Special Independent Committee's recommendations regarding remedial measures, as adopted by our Board of Directors, are described in Item 9A of this Form 10–K, "Controls and Procedures."

**Ineffectiveness of Internal Control Over Financial Reporting and Disclosure Controls and Procedures**

As disclosed in Item 9A of this Form 10–K, in accordance with Section 404 of the Sarbanes Oxley Act of 2002, management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2006 based on the criteria set forth by *Internal Control–Integrated Framework Issued by the Committee of Sponsoring Organizations of the Treadway Commission.* We are disclosing material weaknesses that were identified as a result of our Accounting Review. We have detailed the nature of the material weaknesses, the impact on financial reporting and the control environment and management's current plans for remediation of material weaknesses in Item 9A.

**SEC Investigation**

As described in Item 3 of this Form 10–K, "Legal Proceedings," on May 25, 2007, we were advised by the staff of the SEC that the SEC has commenced a formal investigation. For additional information, please refer to Item 3.

**Pending Putative Securities Class Actions and Derivative Litigation**

As described in Item 3 of this Form 10–K, putative class action complaints and putative shareholder derivative complaints have been filed against us. For additional information, please refer to Item 3.

5

**Item 6.    Selected Financial Data**

The selected consolidated financial data set forth below should be read in conjunction with our consolidated financial statements and notes thereto appearing elsewhere herein.

| | | | December 31, | | | |
|---|---|---|---|---|---|
| | **2006(1)** | **2005 as Restated(2)(3)** | **2004 as Restated(2)** | **2003 as Restated(2)(4) (Unaudited)** | **2002 as Restated(2) (Unaudited)** |
| | | | (Dollars in thousands, except per share amounts) | | |
| **STATEMENTS OF INCOME DATA:** | | | | | |
| Operating revenues(5) | $ 1,648,399 | $ 1,509,438 | $ 1,267,640 | $ 998,283 | $ 728,184 |
| Operating expenses(5) | 1,713,137 | 1,468,175 | 1,277,274 | 1,003,499 | 723,530 |
| (Loss) income from operations | (64,738) | 41,263 | (9,634) | (5,216) | 4,654 |
| Gain on the sale and development of real estate and equity interests | 51,347 | 81,723 | 14,025 | 51,276 | 71,224 |
| Sunrise's share of earnings, return on investment in unconsolidated communities and loss on profit sharing investments | 42,845 | 12,615 | (70) | 962 | 3,818 |
| Net income | 20,357 | 87,089 | 1,114 | 14,705 | 28,314 |
| Net income per common share(6)(7): | | | | | |
| Basic | $ 0.42 | $ 2.10 | $ 0.03 | $ 0.35 | $ 0.63 |
| Diluted | 0.40 | 1.82 | 0.03 | 0.34 | 0.62 |
| **BALANCE SHEET DATA:** | | | | | |
| Total current assets as restated | $ 356,084 | $ 326,888 | $ 282,524 | $ 204,726 | $ 257,614 |
| Total current assets as previously reported | | 416,772 | 330,695 | 235,895 | 254,386 |
| Total current liabilities as restated | 421,109 | 280,684 | 203,998 | 137,526 | 83,594 |
| Total current liabilities as previously reported | | 341,909 | 252,551 | 164,772 | 114,747 |
| Property and equipment as restated | 609,385 | 494,069 | 359,070 | 509,833 | 293,753 |
| Property and equipment as previously reported | | 458,546 | 369,632 | 412,228 | 299,683 |
| Property and equipment subject to a sales contract, net as restated | 193,158 | 255,231 | 473,485 | 459,187 | 161,978 |
| Property and equipment subject to a sales contract, net as previously reported | | — | — | — | — |
| Property and equipment subject to financing, net as restated | 62,520 | 64,174 | 28,988 | — | — |
| Property and equipment subject to financing, net as previously reported | | — | — | — | — |
| Goodwill as restated | 218,015 | 153,328 | 121,825 | 104,475 | 32,749 |
| Goodwill as previously reported | | 165,028 | 123,713 | 106,139 | 32,749 |
| Total assets as restated | 1,817,428 | 1,587,785 | 1,506,453 | 1,501,608 | 1,188,926 |
| Total assets as previously reported | | 1,328,276 | 1,105,756 | 1,009,798 | 1,116,151 |
| Total debt as restated | 190,605 | 248,396 | 191,666 | 270,332 | 456,969 |
| Total debt as previously reported | | 202,789 | 191,666 | 198,122 | 456,969 |

| | | December 31, | | | |
|---|---|---|---|---|---|
| | 2006(1) | 2005 as Restated(2)(3) | 2004 as Restated(2) | 2003 as Restated(2)(4) (Unaudited) | 2002 as Restated(2) (Unaudited) |
| | | | (Dollars in thousands, except per share amounts) | | |
| Deposits related to properties subject to a sales contract as restated | 240,367 | 324,782 | 599,071 | 540,382 | 155,845 |
| Deposits related to properties subject to a sales contract as previously reported | | — | — | — | — |
| Liabilities related to properties accounted for under the financing method as restated | 66,283 | 64,208 | 24,247 | — | — |
| Liabilities related to properties accounted for under the financing method as previously reported | | — | — | — | — |
| Deferred income tax liabilities as restated | 89,267 | 78,004 | 63,637 | 65,010 | 54,778 |
| Deferred income tax liabilities as previously reported | | 165,957 | 148,790 | 129,661 | 96,112 |
| Total liabilities as restated | 1,153,612 | 1,082,689 | 1,135,170 | 1,083,323 | 772,424 |
| Total liabilities as previously reported | | 691,418 | 580,658 | 517,919 | 648,472 |
| Stockholders' equity as restated(6) | 647,301 | 492,385 | 369,703 | 389,191 | 415,535 |
| Stockholders' equity as previously reported | | 632,677 | 523,518 | 490,276 | 465,818 |
| **OPERATING AND OTHER DATA:** | | | | | |
| Cash dividends declared per common share | $     — | $     — | $     — | $     — | $     — |
| Communities (at end of period): | | | | | |
| Communities consolidated | 65 | 61 | 60 | 66 | 81 |
| Communities in unconsolidated ventures | 183 | 156 | 125 | 120 | 100 |
| Communities managed for third party owners | 192 | 198 | 195 | 187 | 28 |
| Total | 440 | 415 | 380 | 373 | 209 |
| Resident capacity: | | | | | |
| Communities consolidated | 8,646 | 7,980 | 7,943 | 8,539 | 5,497 |
| Communities in unconsolidated ventures | 20,433 | 16,485 | 10,929 | 10,561 | 8,781 |
| Communities managed for third party owners | 23,091 | 26,208 | 24,237 | 23,651 | 2,322 |
| Total | 52,170 | 50,673 | 43,109 | 42,751 | 16,600 |

(1) In September 2006, we acquired 100% of the equity interests in Trinity a large provider of hospice services in the United States. The operating results of Trinity are included in our consolidated statements of income beginning September 13, 2006.

(2) The financial information included in this table for the years 2002 through 2005 has been restated to correct errors in the accounting for real estate projects, investments in real estate ventures, stock–based compensation and other matters as discussed in Note 2 to our Consolidated Financial Statements. The table below reconciles income before provision for income taxes previously reported and restated for the years 2005, 2004, 2003 and 2002.

(3) In May 2005, we acquired 100% of the equity interests in Greystone, a developer and manager of CCRCs. The operating results of Greystone are included in our restated consolidated statement of income beginning May 10, 2005.

(4) In March 2003, we completed the acquisition of all of the outstanding stock of Marriott International, Inc.'s wholly owned subsidiary, MSLS, which owns and operates senior independent full−service and assisted living communities. The operating results of MSLS are included in our restated consolidated statement of income beginning March 28, 2003.

(5) In 2006, Five Star bought out 18 management contracts and we received $134.7 million related to their buyout. We also wrote off $25.4 in unamortized management contract intangible assets. In 2005, Five Star bought out 12 management contracts and we received $83.0 million related to their buyout. We also wrote off $14.6 million in unamortized management contract intangible assets.

(6) In October 2005, we completed a two−for−one stock split in the form of a 100% stock dividend. As a result of the stock split, each stockholder received one additional share of common stock for each share on that date. All per share amounts have been adjusted to reflect the stock split for all periods presented.

(7) In February 2006, we completed the redemption of our remaining 5.25% convertible subordinated notes due February 1, 2009 through the issuance of common stock. Prior to the redemption date, substantially all of the approximately $120 million principal amount of the notes outstanding at the time the redemption was announced had been converted into approximately 6.7 million shares of common stock. The conversion price was $17.92 per share in accordance with the terms of the indenture governing the notes.

**Accounting Restatement**

|  | | Years Ended December 31, | | |
|---|---|---|---|---|
|  | 2005 | 2004 | 2003 | 2002 |
|  |  |  | (Unaudited) | (Unaudited) |
| Income before provision for income taxes, as previously reported | $ 126,213 | $ 80,456 | $ 97,153 | $ 88,163 |
| Restatement Adjustments: |  |  |  |  |
| Real estate sales | 48,893 | (57,259) | (57,942) | (28,148) |
| Costs of real estate projects | (2,336) | (5,036) | (2,197) | (4,168) |
| Equity method investments with preferences | (4,024) | (4,112) | (4,016) | 962 |
| Stock−based compensation | (2,255) | (687) | (4,224) | (3,547) |
| Revenue recognition for Greystone development contracts | (13,034) | — | — | — |
| Other adjustments | (11,645) | (12,733) | (8,369) | (5,064) |
| Income before provision for income taxes, as restated | 141,812 | 629 | 20,405 | 48,198 |
| (Provision for) benefit from income taxes, as restated | (54,723) | 485 | (5,700) | (19,884) |
| Net income, as restated | $ 87,089 | $ 1,114 | $ 14,705 | $ 28,314 |

Note 2 to our consolidated financial statements includes a table that reconciles amounts previously reported and restated amounts for the years ended December 31, 2005 and 2004. The following table summarizes the consolidated statements of income for the periods indicated, giving effect to the restatement adjustments described above and showing previously reported and restated amounts for the years ended December 31, 2003 and 2002 (in thousands), except per share amounts.

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2003 | | | 2002 | | |
| | As Previously Reported (Unaudited) | Increase (Decrease) (Unaudited) | As Restated (Unaudited) | As Previously Reported (Unaudited) | Increase (Decrease) (Unaudited) | As Restated (Unaudited) |
| Total operating revenues | $ 1,096,260 | $ (97,977) | $ 998,283 | $ 421,539 | $ 20,293 | $ 441,832 |
| Total operating expenses | 1,072,451 | (68,952) | 1,003,499 | 390,052 | 47,126 | 437,178 |
| Income (loss) from operations | 23,809 | (29,025) | (5,216) | 31,487 | (26,833) | 4,654 |
| Other non-operating expense | (16,571) | (8,327) | (24,898) | (24,120) | (7,218) | (31,338) |
| Gain on the sale and development of real estate and equity interests | 85,677 | (34,401) | 51,276 | 80,261 | (9,037) | 71,224 |
| Sunrise's share of earnings, return on investment in unconsolidated communities and loss on profit sharing investments | 5,343 | (4,381) | 962 | 695 | 3,123 | 3,818 |
| Minority interests | (1,105) | (614) | (1,719) | (160) | — | (160) |
| Income before income taxes | 97,153 | (76,748) | 20,405 | 88,163 | (39,965) | 48,198 |
| (Provision for) benefit from for income taxes | (34,975) | 29,275 | (5,700) | (33,502) | 13,618 | (19,884) |
| Net income | $ 62,178 | $ (47,473) | $ 14,705 | $ 54,661 | $ (26,347) | $ 28,314 |
| Earnings per share data: | | | | | | |
| Basic net income per common share | $ 1.46 | $ (1.11) | $ 0.35 | $ 1.22 | $ (0.59) | $ 0.63 |
| Diluted net income per common share | 1.32 | (0.98) | 0.34 | 1.12 | (0.50) | 0.62 |
| Total assets | $ 1,009,798 | $ 491,810 | $ 1,501,608 | $ 1,116,151 | $ 72,775 | $ 1,188,926 |
| Total debt | 198,122 | 72,210 | 270,332 | 456,969 | — | 456,969 |
| Stockholders' equity | 490,276 | (101,085) | 389,191 | 465,818 | (50,283) | 415,535 |

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following discussion should be read together with the information contained in our consolidated financial statements, including the related notes, and other financial information appearing elsewhere herein.

**Overview**

We are a provider of senior living services in the United States, Canada, the United Kingdom and Germany. We offer a full range of personalized senior living services, from independent living, to assisted living, to care for individuals with Alzheimer's and other forms of memory loss, to nursing, rehabilitative and hospice care. We also develop senior living communities for ourselves, for ventures in which we retain an ownership interest and for third parties.

Our long-range strategic objective is to grow our senior living business through a management services business model that is built on long-term management contracts. Our four primary growth drivers consist of: (1) generating revenue growth from our existing operating portfolio of owned and managed communities; (2) adding additional communities through new construction, primarily with venture partners; (3) generating profitable growth

# EXHIBIT 2

1                                                              **\*\*E-Filed 6/25/2008\*\***

2

3

4

5

6

7

                                    NOT FOR CITATION

8

                  **IN THE UNITED STATES DISTRICT COURT**

9

           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

                          **SAN JOSE DIVISION**

11

12

13   IN RE ATMEL CORPORATION DERIVATIVE LITIGATION

14

15

16

17

18

        Case Number C 06-4592 JF (HRL)

        ORDER[1] GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS FOR (1)FAILURE TO COMPLY WITH FED. R. CIV. PRO. 23.1; AND (2) FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

        [re: docket nos. 90, 92, 96, 125]

19

20                                  **I. BACKGROUND**

21   **1.**      **Procedural Background**

22           On July 27, 2006, Plaintiff James Juengling ("Juengling") filed a shareholder derivative

23   complaint against a number of the directors and officers of nominal Defendant Atmel

24   Corporation ("Atmel"). The complaint alleged improper backdating of stock options and

25   asserted claims for: (1) breach of fiduciary duty; (2) violation of Section 10(b) of the Securities

26

27         [1] This disposition is not designated for publication and may not be cited.

28

1  Exchange Act and Rule 10b-5 promulgated thereunder; and (3) restitution/unjust enrichment.  On

2  October 4, 2006, the Court consolidated the Juengling action with two other derivative actions[2]

3  and appointed a leadership structure for the consolidated action ("Plaintiffs").

4          On November 3, 2006, Plaintiffs filed a consolidated complaint which named eighteen

5  individual defendants ("the Individual Defendants") who served as officers or directors of Atmel.

6  The consolidated complaint separated the Individual Defendants into two categories: the "Option

7  Recipient Defendants" (Gust Perlegos, Tsung-Ching Wu ("Wu"), Kris Chellam ("Chellam"),

8  Jack Peckham ("Peckham"), Donald Colvin ("Colvin"), Mike Sisois ("Sisois"), B. Jeffrey Katz

9  ("Katz"), Francis Barton ("Barton"), Graham Turner ("Turner"), Bernard Pruniaux ("Pruniaux"),

10  and Steven Schumann ("Schumann")) and the "Director Defendants" (George Perlegos, T. Peter

11  Thomas ("Thomas"), Chaiho Kim ("Kim"), Pierre Fougere ("Fougere"), Norman Hall ("Hall"),

12  David Sugishita ("Sugishita"), and Steven Laub ("Laub")).  The consolidated complaint asserted

13  eleven claims: (1) violation of §10(b) and Rule 10b-5 of the Securities and Exchange Act

14  (against the Individual Defendants); (2) violations of §14(a) of the Securities Exchange Act

15  (against the Individual Defendants); (3) violations of §20(a) of the Securities Exchange Act

16  (against Chellam, Barton, Wu and the Director Defendants); (4) accounting (against the

17  Individual Defendants); (5) breach of fiduciary duty and/or aiding and abetting (against the

18  Individual Defendants); (6) unjust enrichment (against the Option Recipient Defendants); (7)

19  rescission (against the Option Recipient Defendants); (8) constructive fraud (against the

20  Individual Defendants); (9) corporate waste (against the Individual Defendants); (10) breach of

21  contract (against the Option Recipient Defendants); and (11) violation of California Corporations

22

23  _____

24      [2] The plaintiff in *Noble v. Perlegos, et al.*, Case No. C 06-4973 JF brought claims for: (1)
    violation of Section 14(a) of the Exchange Act; (2) breach of fiduciary duty; (3) gross
25  mismanagement; (4) waste of corporate assets; and (5) unjust enrichment and breach of the duty
    of loyalty.
26      The plaintiff in *Kelley v. Perlegos, et al.*, Case No. C 06-4680 JF brought claims for: (1)
    breach of fiduciary duty; (2) violation of Section 10(b) of the Securities Exchange Act and Rule
27  10b-5 promulgated thereunder; and (3) restitution/unjust enrichment.

28                                                    2
    Case No. C 06-4592 JF (HRL)
    ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS FOR (1) FAILURE TO STATE
    A CLAIM UPON WHICH RELIEF MAY BE GRANTED; AND (2) FAILURE TO COMPLY WITH FED. R. CIV.
    PRO. 23.1
    (JFLC1)(JFEX2)

1   Code § 25402 (against the Individual Defendants, with the exception of Barton, Fougere, Kim,

2   Laub and Sugishita).  No demand was made upon Atmel's Board of Directors (the Board")

3   pursuant to Fed. R. Civ. Pro. 23.1.  Plaintiffs alleged that such a demand would be futile.

4          On January 29, 2007, fifteen of the Individual Defendants filed a joint motion to dismiss

5   for failure to state a claim upon which relief may be granted ("the Barton Motion").  Defendants

6   Gust Perlegos and George Perlegos moved separately to dismiss and joined the Barton Motion

7   with a limited exception ("Perlegos Motion").  Atmel also moved to dismiss for failure to make a

8   demand ("Atmel Motion").  On January 30, 2007, Defendant Sisois moved to dismiss, joining

9   the Barton Motion with limited exceptions ("Sisois Motion").  Plaintiffs filed an omnibus

10  opposition to the four motions to dismiss.

11         On July 16, 2007, the Court dismissed the consolidated complaint with leave to amend.

12  The Court concluded that: Plaintiffs had not pled section 10(b) and Rule 10b-5 violations with

13  the particularity required under Rule 9(b) and the Private Securities Litigation Reform Act

14  ("PSLRA").  Specifically, it concluded that the consolidated complaint did not identify the roles

15  each defendant played in the alleged backdating scheme, nor did it allege facts giving rise to a

16  strong inference of scienter on the part of each defendant.

17         The Court also concluded that Plaintiffs' section 14(a) claim was untimely because it was

18  based on alleged false statements made more than three years prior to the filing of the original

19  action.  Accordingly, it held that any amended Section 14(a) claim must allege wrongful acts that

20  occurred on or after July 27, 2003 and not later than one year after discovery of the violation.  It

21  advised Plaintiffs that greater specificity likely would strengthen the Section 14(a) claim

22  considerably.  Plaintiffs' Section 20(a) claim was dismissed for failure to state a predicate

23  violation.

24         The Court concluded that Plaintiffs did not plead their fifth claim for breach of fiduciary

25  duty with sufficient particularity, and that Plaintiffs' pleadings did not put the Individual

26  Defendants, particularly the non-officer defendants, on notice as to how they were alleged to

27  have violated their fiduciary duties.  With respect to Plaintiffs' fourth and seventh claims, the

28                                               3

1    Court held that Plaintiffs should identify accounting and rescission as remedies rather than as

2    claims for relief, and dismissed Plaintiffs' constructive fraud claim, directing that the claim be

3    restated as part of Plaintiffs' claim for breach of fiduciary duty.  The Court also dismissed

4    Plaintiffs' corporate waste claim, finding that Plaintiffs had failed to allege that the transaction at

5    issue either served no purpose or was so completely bereft of consideration that it amounted to aa

6    gift of corporate funds.  It dismissed Plaintiffs' claim for breach of contract because Plaintiffs

7    failed to allege which, if any, of the defendants entered into a binding contract that incorporated

8    the terms of an option plan.  Finally, the Court concluded that those portions of Plaintiffs' insider

9    trading claims based on alleged sales prior to July 27, 2001 were time-barred and that none of the

10   insider trading claims was pled with sufficient particularity.  The Court held that all other state

11   law claims were timely.  Having thus dismissed all of the substantive claims in the consolidated

12   complaint, the Court did not reach the issue of demand.

13        On August 21, 2007, Plaintiffs filed an Amended Consolidated Shareholder Derivative

14   Complaint ("Amended Complaint").  The Amended Complaint, which contains more than 200

15   paragraphs of amended allegations, asserts claims against all of the Individual Defendants named

16   in the consolidated complaint with the exception of Laub and Sugishita, who no longer are

17   named.  The Amended Complaint also adds one new Defendant, J. Michael Ross ("Ross").  The

18   Amended Complaint asserts nine claims: (1) violation of §10(b) and Rule 10b-5 of the Securities

19   and Exchange Act (against George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas,

20   Fougere, and Kim); (2) violations of §14(a) of the Securities Exchange Act (against George

21   Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim); (3) violations of §20(a) of

22   the Securities Exchange Act (against George Perlegos, Gust Perlegos, Chellam, Hall, Thomas,

23   Fougere and Kim); (4) breach of fiduciary duty and/or aiding and abetting (against George

24   Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim); (5) unjust enrichment

25   (against Gust Perlegos, Wu, Chellam, Peckham, Covlin, Sisois, Katz, Barton, Turner, Pruniaux

26   and Schumann); (6) constructive fraud (against George Perlegos, Gust Perlegos, Ross, Chellam,

27   Hall, Thomas, Fougere and Kim); (7) corporate waste (against all Individual Defendants); (8)

28                                          4

1   breach of contract (against Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton,

2   Turner, Pruniaux and Schumann); and (9) violation of California Corporation Code § 25402

3   (against Chellam, Hall, Gust Perlegos, George Perlegos and Thomas).

4        Defendants have filed four new motions to dismiss: (1) George and Gust Perlegos move

5   to dismiss for failure to state a claim upon which relief may be granted ("Perlegos' Motion"); (2)

6   Individual Defendant Mike Sisois moves to dismiss for failure to state a claim upon which relief

7   may be granted ("Sisois Motion"); (3) Individual Defendant J. Michael Ross moves to dismiss

8   the amended complaint for failure to state a claim upon which relief may be granted ("Ross

9   Motion"); and (4) Atmel moves to dismiss for failure to comply with the demand requirement

10   pursuant to Fed. R. Civ. Pro. 23.1 ("Atmel Motion").

11   **2.    Factual Background**

12        The Amended Complaint alleges that the Individual Defendants had the following

13   relationships with Atmel:

| Defendant | Role with Atmel |
|---|---|
| George Perlegos | President, CEO,[3] & director from Atmel's inception in 1984 to August 2006. |
| Gust Perlegos | Executive VP Office of the President, 2001 to August 2006. Director, January 1985 to August 2006. Executive VP & GM, January 1996 to 2001. VP, GM January 1985 to January 1996. |
| Thomas | Director since December 1987. Member of the Compensation Committee & the Audit Committee since at least 1996. |
| Kim | Director & member of the Audit Committee since September 2002. Member of the Compensation Committee from September 2002 through 2003. |
| Fougere | Director, member of the Audit Committee, & member of the Compensation Committee since February 2001. |

---

    [3]CEO refers to Chief Executive Officer, CFO refers to Chief Financial Officer, VP refers to Vice President, and GM refers to General Manager.

5

| Hall | Director from August 1992 until in or about 2005. Member of the Compensation Committee from 1997 to 2004, & member of the Audit Committee from 1997 to 2003. |
| --- | --- |
| Wu | Executive VP, Office of the President since 2001. Director since 1985. Executive VP & GM, January 1996 to 2001. VP, Technology, January 1986 to January 1996. |
| Chellam | VP, Finance Administration, & CFO, September 1991 to July 1998. |
| Peckham | GM, ASIC Operations, January 1992 to 1998. VP, Sales, January 1986 to January 1992. Director of Sales, June 1985 to January 1986. |
| Colvin | VP, Finance, & CFO March 1998 to January 2003. CFO, Atmel Rousset S.A. 1995 to 1998. |
| Sisois | VP, Planning & Information Systems, 1986 to August 2006. Director of Information Systems, February 1985 to 1986. |
| Katz | VP, Marketing, November 1998 to about 2005. |
| Barton | Executive VP & CFO, May 2003 to July 2005. |
| Turner | VP and GM, Microcontroller Segment since October 2001. Served in various positions since he joined the Company in 1989, including VP of European Operations from 1993 to October 2001. |
| Pruniaux | VP and GM, ASIC Segment since November 2001. CEO of Atmel Rousset S.A., May 1995 to November 2001. |
| Schumann | VP and GM, Non-Volatile Memory Segment since January 2002. Served in various positions since he joined the Company in 1985, including VP of Non-Volatile Memory Products from February 1996 to January 2002. |
| Ross | General Counsel from 1989 to August 2006. VP, General Counsel and Assistant Secretary until August 2006. |

As summarized below, the Amended Complaint alleges that the Individual Defendants received thirty backdated option grants on fourteen separate dates:

| Recipient | Purported Grant Date | Shares | Share Price |
| --- | --- | --- | --- |
| Gust Perlegos | February 22, 1995 | 320,000 | $3.8516 |
| | April 11, 1997 | 40,000 | $6.0938 |
| | February 14, 2002 | 100,000 | $7.69 |
| | November 14, 2002 | 50,000 | $2.11 |

6

| Wu | February 22, 1995<br>April 11, 1997<br>February 14, 2002<br>November 14, 2002 | 320,000<br>40,000<br>100,000<br>100,000 | $3.8516<br>$6.0938<br>$7.69<br>$2.11 |
| --- | --- | --- | --- |
| Chellam | February 4, 1994<br>February 22, 1995<br>April 11, 1997 | 128,000<br>80,000<br>40,000 | $2.29<br>$3.8516<br>$6.0938 |
| Peckham | February 4, 1994<br>February 22, 1995<br>April 11, 1997 | 160,000<br>80,000<br>40,000 | $2.29<br>$3.8516<br>$6.0938 |
| Colvin | February 12, 1999<br>July 16, 1999<br>November 17, 2000<br>September 17, 2001<br>November 14, 2002 | 20,000<br>40,000<br>40,000<br>100,000<br>50,000 | $3.6719<br>$7.8281<br>$12.125<br>$7.12<br>$2.11 |
| Sisois | June 11, 1999<br>July 11, 2002<br>November 14, 2002 | 40,000<br>30,000<br>40,000 | $5.9063<br>$5.13<br>$2.11 |
| Katz | July 16, 1999 | 10,000 | $7.8281 |
| Barton | April 30, 2003 | 500,000 | $1.81 |
| Turner | February 4, 1994<br>October 9, 1998<br>July 16, 1999 | 160,000<br>100,000<br>40,000 | $2.29<br>$1.9844<br>$7.8281 |
| Pruniaux | October 9, 1998 | 200,000 | $1.9844 |
| Schumann | February 22, 1994<br>October 9, 1998 | 192,000<br>192,000 | $3.8516<br>$1.9844 |

The Amended Complaint also alleges the following. Between 1994 and 2006, Atmel adopted three stock option plans that were in effect at separate times - the 1986 Incentive Stock Option Plan, the 1996 Stock Plan and the 2005 Stock Plan (collectively, "the Plans"). The Individual Defendants violated the terms of the Plans by knowingly and deliberately backdating grants of stock options, making it appear as though the grants were made on dates when the market price of Atmel stock was lower than the market price on the actual grant date. The Individual Defendants also represented in proxy statements that the stock option grants carried an exercise price that was equal to the fair market value on the date of the grant.

On October 30, 2006, Atmel issued a press release reporting the preliminary conclusions

Case No. C 06-4592 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS FOR (1) FAILURE TO STATE
A CLAIM UPON WHICH RELIEF MAY BE GRANTED; AND (2) FAILURE TO COMPLY WITH FED. R. CIV.
PRO. 23.1
(JFLC1)(JFEX2)

1   of an Audit Committee responsible for investigating suspicions of backdating.  The press release

2   stated that "the actual measurement dates for certain stock options differed from the recorded

3   measurement dates for such stock options" and that consequently, Atmel's prior financial

4   statements were not reliable.  On April 30, 2007, the Audit Committee issued a second press

5   release reporting further findings of the investigation.  The Audit Committee found that 93 of

6   112 stock option grants during the period from January 1, 1997 through August 3, 2006 included

7   some options that were not issued on the date set forth in the company's stock option records.

8   On May 1, 2007, Atmel announced that "[a]s a result of the measurement date errors identified in

9   the Audit Committee's investigation, [Atmel] has determined that material stock-based

10  compensation adjustments are required for measurement date errors in the period beginning in

11  1993 and continuing through January 2004."  On June 8, 2007, Atmel filed its fiscal 2006

12  financial statements, stating that "[u]pon completion of that investigation, [Atmel] recorded

13  additional aggregate non-cash stock-based compensation expenses for the period from 1993

14  through 2005, excluding payroll and income tax adjustments, of approximately $116 million."

15

16                                    **II.  DISCUSSION**

17  **1.      Demand Futility**

18         A derivative complaint must "allege with particularity the efforts, if any, made by the

19  plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and,

20  if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to

21  obtain the action or for not making the effort."  Fed. R. Civ. P. 23.1.  The existence and

22  satisfaction of a demand requirement is a substantive issue governed by state law.[4]  *See Kamen*

23  *v. Kemper Fin. Servs, Inc.*, 500 U.S. 90, 96-97 (1991).  When the challenged decision is that of

24  the board in place at the time of the filing of the complaint, failure to make demand may be

25

26  ─────────────────

27        [4]  The parties agree that Delaware law applies to the instant action because Ditech is
     incorporated in Delaware.

28                                          8

1    excused if a plaintiff can raise a reason to doubt that a majority of the board is disinterested or

2    independent or that the challenged acts were the product of the board's valid exercise of business

3    judgment. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *see also Ryan v. Gifford*, 918 A.2d

4    341, 352 (Del. Ch. 2007) (discussing *Aronson*). However, "[w]here there is no conscious

5    decision by the corporate board of directors to act or refrain from acting, the business judgment

6    rule has no application." *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993); *see also Ryan*, 918

7    A.2d at 352 (discussing *Rales*). In such a situation, demand may be excused only if a plaintiff

8    "can create a reasonable doubt that, as of the time the complaint is filed, the board of directors

9    could have properly exercised its independent and disinterested business judgment in responding

10   to a demand." *Id.* at 353 (citing *Rales*, 634 A.3d 933-34).

11         The parties dispute which board of directors should be examined for the purpose of

12   determining demand futility. Atmel argues that Plaintiffs must establish a reasonable doubt that

13   the board of directors in place on August 21, 2007, the filing date of the Amended Complaint,

14   could have satisfied the *Rales* standard. Plaintiffs, on the other hand, argue that the *Rales* inquiry

15   should be directed at the board that existed on July 27, 2006, when the original complaint in this

16   action was filed. Under Delaware law, plaintiffs generally are not required to make demand or

17   re-plead futility after an action has commenced:

18         When claims have been properly laid before the court and are in litigation, neither
           Rule 23.1 nor the policy it implements requires that a court decline to permit
19         further litigation of those claims upon the replacement of the interested board with
           a disinterested one . . . . Such a change in control does not require a derivative
20         plaintiff to present a demand to the new board, or to allege facts that would excuse
           demand as of the time a plaintiff elects to amend his pleadings.
21

22   *Harris v. Carter*, 582 A.2d 222, 231 (Del. Ch. 1990). However, in *Braddock v. Zimmerman*, 906

23   A.2d 776 (Del. 2006), the Supreme Court of Delaware recognized the following exception:

24         [W]hen an amended derivative complaint is filed, the existence of a new
           independent board of directors is relevant to a Rule 23.1 demand inquiry only as
25         to derivative claims in the amended complaint that are not already validly in
           litigation. Three circumstances must exist to excuse a plaintiff form making
26         demand under Rule 23.1 when a complaint is amended after a new board of
           directors is in place: first the original complaint was well pleaded as a derivative
27         action; second, the original complaint satisfied the legal test for demand excusal;
           and third, the act or transaction complained of in the amendment is essentially the

28                                              9

1       same as the act or transaction challenged in the original complaint. . . .
        A complaint that is dismissed without prejudice but with express leave to
2       amend is nevertheless a dismissed complaint. It constitutes a judicial
    determination that the original complaint was either not well pleaded as a
3       derivative action or did not satisfied the legal test for demand excusal. Following
    such a dismissal, for purposes of a Rule 23.1 demand inquiry, the complaint is not
4       validly in litigation.

5   *Id.* at 786.

6       Plaintiffs seek to distinguish *Braddock* on the basis that the original complaint in that

7   case was dismissed for failure to make demand, while in the instant case the Court dismissed

8   Plaintiff's original complaint for failure to state a claim and deferred the issue of demand futility.

9   The thrust of Plaintiff's argument is that a claim is not "validly in litigation" under *Braddock*'s

10   first exception *only* if it was not well pleaded *as a derivative* claim, meaning a claim that

11   otherwise is insufficiently pleaded remains validly in litigation. This is consistent with language

12   in *Braddock* recognizing that it is not necessary to make demand or re-plead futility when a

13   complaint is amended to add new facts relating to the acts or transactions alleged in the original

14   pleading. *Id.* at 785 ( "[A]n amendment or supplement to a complaint that elaborates upon facts

15   relating to acts or transactions alleged in the original pleading, or asserts new legal theories of

16   recovery based upon the acts or transactions that formed the substance of the original pleading,

17   would not . . . constitute a matter that would require a derivative plaintiff to bring any part of an

18   amended or supplemental complaint to the board prior to filing."). Accordingly, the Court will

19   evaluate the futility of making demand on the board in place at the time the initial complaint was

20   filed. That board consisted of eight members: George and Gust Perlegos, Wu, Fougere, Thomas,

21   Kim, Sugishita and Laub.

22       Under Delaware law, courts may base a finding of reasonable doubt regarding

23   disinterestedness on two types of allegations. First, "[d]irector interest exists whenever divided

24   loyalties are present, or a director either has received, or is entitled to receive, a personal financial

25   benefit from the challenged transaction which is not equally share by the stockholders."

26   *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) (citing *Aronson*, 473 A.2d at 812). Second, a

27   plaintiff may plead specific facts showing that "the directors face a 'substantial likelihood' of

28                           10

1  personal liability, [so that] their ability to consider a demand impartially is compromised."

2  *Ratter v. Bidzos*, No. Civ. A. 19700, 2003 WL 22284323 at *12 (Del. Ch. Oct. 7, 2003).

3        Plaintiffs assert that Gust Perlegos and Wu are interested because they received backdated

4  options.   The Delaware Chancery Court has held that a director's receipt of allegedly backdated

5  options adequately raises a reasonable doubt as to a director's disinterestedness because such

6  directors "have a strong financial incentive to maintain the status quo by not authorizing any

7  corrective action that would devalue their current holding or cause them to disgorge improperly

8  obtained profits.  This creates an unacceptable conflict that restricts them from evaluating the

9  litigation properly." *Conrad v. Blank*, No. 2611-VCL, 2007 Del. Ch. LEXIS 130 at *24 (Del.

10  Ch. Ct. Aug. 2, 2007).  Plaintiffs have alleged that Gust Perlegos and Wu received 510,000 and

11  560,000 backdated stock options respectively, which provided them with a benefit that was not

12  equally shared with Atmel shareholders.  These allegations are sufficient to raise a reasonable

13  doubt as to their disinteretedness.

14        Plaintiffs contend further that Thomas, Kim and Fougere face a substantial likelihood of

15  liability for approving backdated options.  The Amended Complaint alleges that as members of

16  the compensation committee, Thomas, Kim and Fougere were responsible for backdating

17  because they "had the sole authority to choose the date and, in fact, did choose the date on which

18  these stock options were granted," Amended Complaint ¶ 136, and further, that these defendants

19  knew that the Plans required options to be priced at fair market value and intentionally violated

20  those plans by approving backdated options. *Id.* at ¶¶ 100, 136-84.  In *Ryan*, the Delaware

21  Chancery Court considered the question of whether, for the purpose of determining demand

22  futility, these same allegations were sufficient to establish that the defendants knowingly

23  participated in a backdating scheme.  The court found that these allegations established a

24  substantial likelihood of liability.  The court explained:

25        It is difficult to understand how a plaintiff can allege that directors backdated
        options without simultaneously alleging that such directors knew that the options
26        were being backdated.  After all, any grant of options had to have been approved
        by the compensation committee, and that compensation committee can be
27        reasonably expected to know that date of the options as well as the date on which

28                                              11

1    they actually approve the grant.

2    *Ryan*, 918 A.2d at 335.  In *Conrad*, the court applied this reasoning to similar allegations and

3    concluded that "for the purpose of the *Rales* analysis, the allegations of the complaint are

4    sufficient to excuse demand on the members of the compensation committee, since they raise . . .

5    a reasonable inference the compensation committee members acted knowingly in awarding

6    options priced at dates other than the actual dates of the grant." *Conrad*, 2007 Del. Ch. LEXIS

7    130 at * 30.

8        Atmel urges this Court to follow *Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. Ct.

9    2007).  The court in *Desimone* posited several scenarios regarding a hypothetical compensation

10   committee's approval of stock options, including a scenario in which a compensation committee

11   approved a backdated option but did not know that doing so violated the terms of the applicable

12   stock option plan.  In contrast to its counterparts in *Ryan* and *Conrad,* the court in *Desimone*

13   concluded that exclusive authority coupled with knowledge of the terms of the option agreement

14   was not necessarily sufficient to establish liability.  Instead, the court concluded only that this

15   scenario presented "interesting questions about the culpability the compensation committee

16   members have for harm caused to the corporation by the option grants."  *Id.* at 933.

17       Atmel argues that *Desimone* precludes a finding that Plaintiffs have satisfied the demand

18   futility pleading requirement.  However, *Desimone* does not go so far as to hold that the

19   allegations plead in *Ryan* are insufficient to establish demand futility.   *Desimone* involved

20   allegations distinguishable from those involved in *Ryan* and in the present case.  As the court

21   observed:

22       This case presents a different question than those involved in *Ryan* . . . which is
         whether corporate officials breached their fiduciary duties when they, despite
23       having a express permission under stockholder-approved option plan to grant
         below-market options, represent to shareholders, markets and regulatory
24       authorities that they are granting fair-market-value options when in fact they are
         secretly manipulating the exercise price of the option.
25
     *Id.* at 908.  Having considered all of the relevant authorities, this Court is satisfied that Plaintiffs
26
     have raised a reasonable doubt as to whether Thomas, Kim and Fougere were disinterested.
27

28                                      12

1   **2.      Motions to Dismiss**

2         For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the

3   Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v.*

4   *McKeithen*, 395 U.S. 411, 421 (1969).  Leave to amend must be granted unless it is clear that the

5   complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*,

6   66 F.3d 245, 248 (9th Cir. 1995).  When amendment would be futile, however, dismissal may be

7   ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).  On a motion to

8   dismiss, the Court's review is limited to the face of the complaint and matters judicially

9   noticeable. *North Star International v. Arizona Corporation Commission*, 720 F.2d 578, 581

10   (9th Cir. 1983); *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *Beliveau*

11   *v. Caras*, 873 F. Supp. 1393, 1395 (C.D. Cal. 1995).  However, under the "incorporation by

12   reference" doctrine, the Court also may consider documents that are referenced extensively in the

13   complaint and are accepted by all parties as authentic, even though the documents are not

14   physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d

15   970 (9th Cir. 1999).

16        **a.      Claim One: Violation of Section 10(b) and Rule 10b-5**

17        Section 10(b) makes it unlawful

18        [t]o use or employ, in connection with the purchase or sale of any security
          registered on a national securities exchange or any security not so registered . . .
19        any manipulative or deceptive device or contrivance in contravention of such rules
          and regulations as the Commission may prescribe as necessary or appropriate in
20        the public interest or for the protection of investors.

21   15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for any person to use interstate commerce

22        (a) To employ any device, scheme, or artifice to defraud,
          (b) To make any untrue statement of a material fact or to omit to state a material
23        fact necessary in order to make the statements made, in the light of the
          circumstances under which they were made, not misleading, or
24        (c) To engage in any act, practice, or course of business which operates or would
          operate as a fraud or deceit upon any person, in connection with the purchase or
25        sale of any security.

26   17 C.F.R. § 240.10b-5.  In cases involving publicly-traded securities and purchases or sales in

27   public securities markets, the elements of an action under Section 10(b) and Rule 10b-5 are:  (1)

28                                                    13

1   a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale

2   of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc.*

3   *v. Broudo*, 544 U.S. 336, 341-42 (2005).

4        Plaintiffs must meet two heightened pleading standards. Fed. R. Civ. P. 9(b) requires that

5   "the circumstances constituting fraud . . . be stated with particularity." The Ninth Circuit has

6   explained that a "plaintiff must include statements regarding the time, place, and nature of the

7   alleged fraudulent activities, and that mere conclusory allegations of fraud are insufficient." *In*

8   *re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994). A plaintiff asserting fraud

9   "must set forth an explanation as to why the statement or omission complained of was false or

10  misleading." *Id.* (internal quotation marks omitted); *see also Yourish v. California Amplifier*,

11  191 F.3d 983, 992-93 (9th Cir. 1999). The Private Securities Litigation Reform Act ("PSLRA")

12  raises the pleading standard further:

13       (1) Misleading statements and omissions
         In any private action arising under this chapter in which the plaintiff alleges that
14       the defendant–
         (A) made an untrue statement of a material fact; or
15       (B) omitted to state a material fact necessary in order to make the statements
         made, in the light of the circumstances in which they were made, not misleading;
16       the complaint shall specify each statement alleged to have been misleading, the
         reason or reasons why the statement is misleading, and, if an allegation regarding
17       the statement or omission is made on information and belief, the complaint shall
         state with particularity all facts on which that belief is formed.
18
         (2) Required state of mind
19       In any private action arising under this chapter in which the plaintiff may recover
         money damages only on proof that the defendant acted with a particular state of
20       mind, the complaint shall, with respect to each act or omission alleged to violate
         this chapter, state with particularity facts giving rise to a strong inference that the
21       defendant acted with the required state of mind.

22  15 U.S.C. § 78u-4b(1)-(2).

23       **i.    Compensation Committee Members**

24       "[T]he pleading standard [that applies to a motion to dismiss] does not reach so high a bar

25  as Rule 23.1." *Ryan*, 918 A.2d at 357. Accordingly, courts have held that where a plaintiff has

26  alleged facts sufficient to prove demand futility they have also satisfied the burden under Rule

27  12(b)(6). *Id.* ("[W]here plaintiff alleges particularized facts sufficient to prove demand futility . .

28                                          14

1    . that plaintiff *a fortiori* rebuts the business judgment rule for the purpose of surviving a motion

2    to dismiss pursuant to Rule 12(b)(6)."). For the reasons set forth above, the Court concludes that

3    Plaintiffs sufficiently have alleged demand futility with respect to the members of the

4    Compensation Committee named in this claim. Plaintiffs base their claim against the

5    Compensation Committee on specific statements, and Plaintiffs have identified the time and

6    place of the alleged violations.

7             **ii.**      **George and Gust Perlegos**

8        Plaintiffs allege that George Perlegos established a policy of backdating at Atmel and also

9    that he attended all of the Compensation Committee meetings between 1994 and 2003, at which

10    stock options were granted and that he participated in the backdating of those options. Plaintiffs

11    also allege that Atmel has admitted in its own press release that George Perlegos "was aware of,

12    and often directed, the backdating of stock option grants." According to the complaint,

13    "evidence [of backdating] included handwritten notations from George Perlegos expressly

14    directing stock administration employees to use prior Board meeting dates for many employees'

15    stock option grants." Amended Complaint ¶ 198. These allegations meet the requirements of

16    Rule 9(b) and the PSLRA.

17        Plaintiffs base their claim that Gust Perlegos participated in the alleged backdating

18    scheme on the allegation that, as VP of Atmel with "broad knowledge" of the company, as well

19    as and a recipient of backdated stock options, he must have known of the scheme and permitted it

20    to occur. *See* Amended Complaint ¶¶ 138, 150. These allegations are insufficient to establish

21    that Gust Perlegos knowingly received backdated options or that he played an active role in the

22    alleged scheme. Accordingly, the Section 10(b) claim against Gust Perlegos will be dismissed

23    with leave to amend.

24             **iii.**      **Ross**

25        Plaintiffs base many of their allegations against Ross on Atmel's press release dated April

26    30, 2007, which stated that Ross "handled communications with the Board of Directors regarding

27    stock options and, during certain periods, supervised Atmel's stock administration department,"

28

<div align="center">15</div>

1   Amended Complaint ¶¶ 17-18, and also concluded that Ross was aware of and participated in

2   the backdating scheme and actually "directed stock administration employees to issue backdated

3   stock option grants to employees and directed or permitted other actions to be taken contrary to

4   the terms of Atmel's stock option plans." *Id.* at ¶¶ 21-22. According to the Amended

5   Complaint, the Audit Committee also found that Ross was well aware that the practice of

6   backdating was a violation of the option plans and that the grant date should be set at the date of

7   board approval. The Audit Committee concluded that "the evidence indicated that Mike Ross

8   lacked management integrity with respect to the stock option process." *Id.* at ¶ 55. Based on

9   these statements and on Ross's position as general counsel at Atmel, Plaintiffs claim that Ross

10  was aware of, and in several instances knowingly approved and participated in, the backdating of

11  stock option grants. They further allege that he was involved in the dissemination of false and

12  misleading financial statements.

13      While the basis of a Rule 10b-5 claim typically is either a false statement or material

14  omission, 17 C.F.R § 240.10b-5(b), the United States Supreme Court recently held that "conduct

15  itself can be deceptive." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761,

16  769(2008). Plaintiffs allege that Ross exhibited deceptive conduct. Plaintiffs allege that Ross

17  not only knew that the Board was falsifying the grant date of stock options in contravention of

18  the company's shareholder-approved stock option plans but also personally directed the

19  backdating in many instances, although this scheme had the purpose and effect of defrauding

20  Atmel and its shareholders.

21      The requisite state of mind for a section 10(b) claim is one of "deliberate recklessness."

22  *In re Silicon Graphics, Inc. Sec. Litigation*, 183 F.3d 970, 975 (9th Cir. 1999). Recklessness

23  satisfies the scienter requirement under section 10(b) if it reflects some degree of intentional or

24  conscious misconduct. *Id.* at 977. Plaintiffs have alleged sufficiently that Ross acted with

25  scienter. The Amended Complaint alleges that Ross assisted in the backdating scheme by

26  directing the widespread and intentional backdating of stock option grants, colluding with other

27  defendants to carry out a policy of backdating options, and receiving backdated options. The

28                                    16

1   Amended Complaint also alleges that in order to conceal this misconduct, Ross caused Atmel to

2   disseminate false financial statements and false proxy statements.

3       **b.    Claim Three: Violation of Section 20(a)**

4       Section 20(a) provides that:

5       Every person who, directly or indirectly, controls any person liable under any
        provision of this chapter or of any rule or regulation thereunder shall also be liable
6       jointly and severally with and to the same extent as such controlled person to any
        person to whom such controlled person is liable, unless the controlling person
7       acted in good faith and did not directly or indirectly induce the act or acts
        constituting the violation or cause of action.
8
    15 U.S.C. § 78t(a).  "To establish 'controlling person' liability, the plaintiff must show that a
9
    primary violation was committed and that the defendant 'directly or indirectly' controlled the
10
    violator."  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).
11
    As discussed above, Plaintiffs adequately have pled a claim for primary violation of the securities
12
    laws against George Perlegos, Chellam, Hall, Thomas, Fougere and Kim.
13
        Relying on PSLRA cases, Plaintiffs argue that to establish liability under Section 20(a)
14
    for exercising "control" over a primary violator they need only allege that each defendant had the
15
    status of control person.  Post-PSLRA cases are clear that simply alleging a defendant's position
16
    within the company is insufficient.  *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C 99-
17
    00109, 2000 WL 1727405 at *16 (N.D. Cal. Sept. 29, 2000) ("The mere fact that an individual is
18
    a director of a firm is not sufficient to show he is a control person of the firm.").  Under the
19
    PSLRA, plaintiffs are required to "plead the circumstances of the control relationship with
20
    particularity."  *Id.* at * 15.  Because Plaintiffs have not met this pleading standard the third claim
21
    will be dismissed with leave to amend.
22
        **c.    Claim Four: Breach of Fiduciary Duty and/or Aiding and Abetting**
23
        Plaintiffs allege that the Individual Defendants have breached their fiduciary duties by:
24
    (1) colluding with each other to backdate stock options; (2) colluding with each other to violate
25
    GAAP and section 162(m); (3) colluding with each other to produce and disseminate false
26
    financial statements to Atmel shareholders and the market that improperly recorded and
27

28                                                17

1    accounted for backdated options grants and concealed the improper backdating of stock options;

2    and (4) colluding with each other to file false proxy statements, false financial statements, and

3    false Form 4's in order to conceal the improper backdating of stock options. Because Plaintiffs'

4    claim sounds in fraud, it must be alleged with particularity pursuant to Fed. R. Civ. Pro. 9(b). *In*

5    *re Ditech Networks, Inc. Deriv. Litig.*, No. C 06-5157 JF, at 17 (N.D. Cal. July 16, 2007); *see*

6    *also In re Atmel Corp.*, 2007 WL 2070299, at *9; *Perretta v. Prometheus Development Co., Inc.*,

7    No. C05-02987 WHA, 2005 WL 3445627, at *5 (N.D. Cal. Dec. 15, 2005) (applying Rule 9(b)

8    to breach of fiduciary duty claim because "all of plaintiffs' claims sound in fraud"). Under

9    Delaware law, "[t]he elements of a breach of fiduciary duty that must be proven by a

10   preponderance of evidence by the plaintiff are: (I) that a fiduciary duty exists; and (ii) that a

11   fiduciary breached that duty." *Heller v. Kiernam*, No. 1483, 2002 Del. Ch. LEXIS 17, at *9 (Del.

12   Ch. Feb. 27, 2002).

13        Plaintiffs assert that they are not required to meet the heightened pleading standard of

14   Rule 9(b). Relying on cases such as *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity*

15   *Fraud*, 624 A.2d 1199, 1207 (Del. 1993), Plaintiffs contend that a claim for breach of fiduciary

16   duty that is pled "along side" a fraud claim need only meet the requirements of Rule 8. Here,

17   however, the facts of Plaintiffs' claim for breach of fiduciary duty do sound in fraud. *See Zoran*,

18   2007 U.S. Dist. LEXIS 43402 at *74-75 ("Backdating is a form of fraud."). Accordingly, the

19   claim must be pled to satisfy 9(b) which requires that Plaintiffs plead the "who what when and

20   how" of the fraudulent conduct.

21             **i.    George and Gust Perlegos and Members of the Compensation**

22                    ***Committee***

23        Again relying on *Desimone*, Defendants argue that Plaintiffs have not met the pleading

24   requirement because Plaintiffs have not alleged adequately that Defendants knew that the options

25   violated Atmel's stock option plans. For the reasons already set forth in its discussion of demand

26   futility, the Court concludes that *Desimone* is not controlling here. Accordingly, the claim for

27   breach of fiduciary duty asserted against George Perlegos, Gust Perlegos, Chellam, Hall,

28                                              18

1  Thomas, Fougere and Kim will not be dismissed.

2              **ii.    Ross**

3          The parties do not dispute that as General Counsel and Assistant Secretary of Atmel,

4  Ross owed its shareholders a fiduciary duty.  Plaintiffs allege that Ross breached his duty of

5  loyalty to the company by knowingly approving of and participating in the backdating of several

6  grant options to insiders, including himself, and by approving of and participating in the

7  dissemination of false financial statements.  Under Delaware law, allegations that suggest

8  knowledge of backdating by an officer defendant who "also kept silent and concealed his

9  knowledge in order to escape detection" constitute a "deception [which] is disloyal conduct in

10  breach of his duty as a fiduciary."  *Ryan v. Gifford*, 935 A.2d 258, 272 (Del. Ch. 2007).  Here,

11  Ross is alleged to have done more than merely keep silent: he allegedly approved of and

12  participated in the backdating and assisted in causing the dissemination of false financial

13  statements.  Plaintiffs allege that Ross intended to and did unduly benefit Defendants at the

14  expense of Atmel.  As the *Ryan* court held: "[t]he intentional violation of a shareholder approved

15  stock option plan, coupled with fraudulent disclosures regarding the directors' purported

16  compliance with that plan, constitute conduct that is disloyal to the corporation and is therefore

17  an act in bad faith."  *Ryan v. Gifford*, 918 A.2d 341, 358 (Del. Ch. 2007).

18              **d.    Claim Five: Unjust Enrichment**

19          "The elements of a claim for unjust enrichment are: (1) an enrichment, (2) an

20  impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence

21  of justification, and (5) the absence of a remedy provided by law."  *Zoran Corp. Derivative*

22  *Litig.*, 511 F. Supp. 2d 986, 1018 (N.D. Cal. 2007).  None of the moving Defendants asserts that

23  these requirement have not been met.  Instead, Defendants argue that Plaintiffs cannot plead an

24  unjust enrichment claim simply by asserting that individuals received backdated options; they

25  must also plead, with specific supporting facts, that the recipients *knew* that they were not

26  entitled to the options exercise price they received.  However, Defendants cite no authority for

27

28                              19

1  this argument.[5]

2      **e.    Claim Six: Constructive Fraud**

3          In its order dated July 16, 2007, the Court instructed Plaintiffs to restate their constructive

4  fraud claim as a claim for breach of fiduciary duty.  Plaintiffs have ignored this portion of the

5  Court's order.  For the reasons set forth in the Court's previous order, Plaintiffs' sixth claim for

6  constructive fraud will be dismissed without leave to amend.

7      **f.    Claim Seven: Corporate Waste**

8          "The judicial standard for determination of corporate waste is well developed.  Roughly,

9  a waste entails an exchange of corporate assets for consideration so disproportionately small as to

10  lie beyond the range at which any reasonable person might be willing to trade . . . .  Such a

11  transfer is in effect a gift." *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. Ct. 1997).  A

12  plaintiff must allege facts that, if true, establish that the defendant directors "authorized an

13  exchange that is so one sided that no business person of ordinary, sound judgment could

14  conclude that the corporation has received adequate consideration." *Glazer v. Zapata Corp.*, Del.

15  Ch. 658 A.2d 176, 183 (1993).

16      **i.    Director Defendants**

17          Plaintiffs have alleged sufficiently that the directors and officers of Atmel – George

18  Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere, and Kim – authorized a one-

19  sided exchange.  The Amended Complaint contains allegations of conduct that inured to the

20  benefit of few and the detriment of many.  Morever, Plaintiffs allege that certain directors and

21  officers were unjustly enriched in the form of unjustified salaries, benefits, bonuses, stock option

22  grants, and other emoluments of office.  These enrichments came at the expense of Atmel, which

23  rather than receiving any benefit from these payments suffered damages as a result.  The

24  Amended Complaint thus states a claim for corporate waste.

25

26          ⁵ Defendants cite an unpublished New York opinion, *In re Comverse Tech., Inc.*, No.

27  601272/06 (N.Y. Aug. 14, 2007), as well as *Vredenburgh v. Jones*, 349 A.2d 22, 44 (Del. Ch.
   1975).  Neither of these cases involves a claim for unjust enrichment.

28                                                        20

1    **ii.    Option Recipient Defendants**

2    While Plaintiffs have alleged that the option recipients – Gust Perlegos, Wu, Chellam,

3    Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruiaux, and Schumann – received the benefits of

4    the one-sided exchange, they fail to cite any authority that as mere recipients these Defendants

5    are liable for corporate waste.  Accordingly, the claim against the option recipients will be

6    dismissed with leave to amend.

7    **g.    Claim Eight: Breach of Contact**

8    "In order to successfully plead a breach of contract, . . . the aggrieved party must allege

9    the making of the contract, the obligation thereby assumed, and the breach." *Goodrich v. E.F.*

10   *Hutton Group, Inc.*, 542 A.2d 1200, 1203-04 (Del. Ch. 1988).  "Merely pleading that a breach of

11   contract occurred, without alleging the existence of a contract, is not sufficient to state a valid

12   claim." *Id.* at 1204.

13   Plaintiffs have alleged that when Defendants Gust Perlegos, Wu, Chellam, Peckham,

14   Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann received backdated stock opinions

15   these Defendants entered into invalid contracts with Atmel.  Plaintiffs also state that because the

16   options were backdated, they contained incorrect grant dates and improper exercise prices, which

17   violated the terms of the Plans.  These allegations are sufficient to state a claim for breach of

18   contract.

19   **h.    Claim Nine: Violation of California Corporation Code Section 25402**

20   The Court held previously that Plaintiffs' insider trading claim lacked the particularity

21   required under Rule 9(b).  To state a valid claim, Plaintiffs are required to "explain which true

22   adverse facts each of the selling defendants knew, when each knew those facts, how they

23   acquired the knowledge, or which sales were made when defendants were in possession of the

24   information." *In re Verisign*, No, 06-4165, 2007 WL 2705221 at *45 (N.D. Cal. Sept 14, 2007).

25   Plaintiffs have not amended their insider trading claim to address this deficiency.

26   Additionally, California Corporations Code section 25402 contains a five-year statute of

27   limitations, and the Court concluded previously that no insider trading claim may be asserted

28                                        21

1   under this provision for trades made prior to July 27, 2001. Three of the individuals against

2   whom this claim is asserted are Chellam, Hall and Thomas. The latest that any of these

3   Defendants is alleged to have held stock is August 31, 2000, more than six years prior to the

4   filing of Plaintiffs' complaint. Amended Complaint ¶¶ 346-47, 350. Accordingly, the insider

5   trading claims will be dismissed as to these Defendants without leave to amend. The insider

6   trading claim against George and Gust Perlegos will be dismissed with leave to amend.

7

8       **i.**    **Statute of Limitations**

9       In its order dated July 16, 2007, the Court explained that Plaintiffs' § 10(b), and 20(a)

10   claims were subject to a two year/five year period of repose and their § 14(a) claim was subject

11   to a one year/three year scheme. The Court instructed Plaintiffs to omit from any Amended

12   Complaint allegations that were time barred. Plaintiffs did not make such omissions. On its

13   own motion, the Court will strike those portions of Plaintiffs' § 10(b) and § 20(a) claims based

14   on options granted or Form 10-Ks issued before July 21, 2001, and those portions of Plaintiffs' §

15   14(a) claims based on proxy statements other than the March 30, 2004 statement.

16

17                            **IV.  ORDER**

18       For the reasons stated above, IT IS HEREBY ORDERED that the motion to dismiss for

19   failure to make demand is DENIED. The motions to dismiss for failure to state a claim are

20   GRANTED in part and DENIED in part as set forth above. Any amended complaint must be

21   filed within thirty (30) days of the date of this order.

22

23

24   DATED: June 25, 2008

25

26

27                           JEREMY FOGEL
                           United States District Judge

28                                22

| | |
|---|---|
| 1 | This Order has been served upon the following persons: |
| 2 | |
| 3 | Alan R Plutzik  aplutzik@bramsonplutzik.com |
| 4 | Betsy Carol Mnifold   manifold@whafh.com |
| 5 | Emanuel Schachmurove   mshachmurove@sbtklaw.com |
| 6 | Eric L. Zagar  ezagar@sbtklaw.com |
| 7 | Francis M. Gregorek   gregorek@whafh.com |
| 8 | Kathryn Anne Schofield        kschofield@bramsonplutzik.com |
| 9 | Lawrence Timothy Fisher      ltfisher@bramsonplutzik.com |
| 10 | Marisa C. Livesay    livesay@whafh.com |
| 11 | Nichole T. Browning  nbrowning@stklaw.com |
| 12 | Rachele R. Rickert    rickert@whafh.com |
| 13 | Tara Puhua Kao       tkao@sbtklaw.com |
| 14 | Jessica oren Nall    jnall@fbm.com |
| 15 | John L. Cooper       jcooper@fbm.com |
| 16 | Brian Lawrence levine        Blevine@mofo.com |
| 17 | Darryl Paul Rains    drains@mofo.com |
| 18 | Todd L. Burlingame   burlingame@mofo.com |
| 19 | James Lawrence Pagano        paganolaw@aol.com |
| 20 | Erin l. Bansal  ebansal@orrick.com |
| 21 | Karen Julie Stambaugh        kstambaugh@orrick.com |
| 22 | Michael David Torpey        mtorpey@orrick.com |
| 23 | W. Reece Bader      wrbader@orrick.com |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

Case No. C 06-4592 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS FOR (1) FAILURE TO STATE
A CLAIM UPON WHICH RELIEF MAY BE GRANTED; AND (2) FAILURE TO COMPLY WITH FED. R. CIV.
PRO. 23.1
(JFLC1)(JFEX2)

# EXHIBIT 3

EFiled: Jun 12 2006 2:46PM EDT
Transaction ID 11505185

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**

|  |  |
|---|---|
| WALTER E. RYAN, JR., In the right of and for the benefit of MAXIM INTEGRATED PRODUCTS, Inc., <br><br> Plaintiff, <br><br> v. <br><br> JOHN F. GIFFORD, JAMES R. BERGMAN, B. KIPLING HAGOPIAN, A.R. FRANK WAZZAN, ERIC P. KARROS, M.D. SAMPELS, <br><br> Defendants, <br><br> and <br><br> MAXIM INTEGRATED PRODUCTS, Inc., <br><br> Nominal Defendant. | Civil Action No. |

## DERIVATIVE ACTION COMPLAINT

Plaintiff, WALTER E. RYAN, JR., for his derivative action complaint, based upon the investigation of his counsel, alleges as follows on information and belief:

1.  This shareholder's derivative action is brought in the right of, and for the benefit of nominal defendant MAXIM INTEGRATED PRODUCTS, INC. ("MAXIM" or the "Company") against its Chief Executive Officer and Chairman of the Board of Directors, John F. Gifford, as

well as members of the Board of Directors, James R. Bergman, B. Kipling Hagopian, A.R. Frank

Wazzan, Eric P. Karros, and M.D. Sampels, all of whom as Board Members authorized, or

through abdication of duty permitted, the back-dating of stock option grants to and for the benefit

of Defendant Gifford at the expense of Maxim and its shareholders.

2. A stock option granted to an employee of a corporation allows the employee to

purchase company stock at a specified price – referred to as the "exercise price" – for a specified

period of time. Stock options are granted as part of employee compensation packages as a

means to create incentives to boost profitability and stock value. When the employee exercises

the option, he or she purchases the stock from the company at the exercise price, regardless of

the stock's market price at the time the option is exercised. If the exercise price is lower than it

should be, the employee pays less and the company gets less when the stock option is exercised.

3. Essentially, a back-dated option is a retroactive grant, so that the exercise price is

lower, or in some cases, much lower, than the actual market price as of the time when the options

were in fact granted. This creates a windfall for the grantee, who realizes an instant paper gain.

4. On  May 22, 2006, Merrill Lynch issued an analysis of the options grant timing for

the semiconductor and semiconductor equipment companies that comprise the Philadelphia

Semiconductor Index ("SOX"). Maxim and Defendant Gifford were included in this study.

(Exhibit A attached hereto).

5. The study was conducted in response to recent scrutiny of conduct related to stock

option grants.

6. To analyze the validity of the options grants, Merrill Lynch looked at whether the

stock price performance, subsequent to options pricing, diverges from stock price performance

over a long period of time. Specifically, Merrill Lynch then looked at annualized stock price returns for the 20 day period subsequent to options pricing in comparison to stock price returns for the calendar year in which the options were granted.

7.    Merrill Lynch noted that theoretically, if the timing of options grants are at arms length, there should not be material difference between the two measurements. Instead, Merrill Lynch found that Maxim management's (including Gifford's) 20 day return on the grants was approximately 14%, averaged for the period from 1997 to 2002, or a annualized return of 243%.

8.    In contrast, Merrill Lynch found that annualized market returns in the same period averaged 29%.

9.    Merrill Lynch pointed out that the companies in the study, including Maxim, must have been remarkably effective at timing options pricing events. Merrill Lynch did not take a position as to whether back-dating occurred. Plaintiff alleges that the Merrill Lynch research demonstrates that options were back-dated.

10. On June 7, 2006, Maxim announced that it had been contacted by the Securities and Exchange Commission for an informal inquiry into its past stock option grants.

11. Maxim's stock option plans provided that stock option grants must be priced at not less than the fair market value of the common stock on the date of the grant, as measured by the publicly traded closing price for the stock on the date of the grant. Thus back-dating violated the terms of Maxim's stock option plans. It also was in breach of Defendants' fiduciary duties of care, loyalty and good faith to the Company.

12. Defendants' conduct has unjustly enriched Defendant Gifford, to the detriment of the Company and its shareholders.

**PARTIES**

13. Plaintiff Walter E. Ryan, Jr. is a resident of Illinois. He is currently a shareholder of Maxim and has continuously been a shareholder since his Dallas Semiconductor Incorporated shares were converted to Maxim shares upon Maxim's acquisitions of Dallas Semiconductor on April 11, 2001.

14. Defendant Gifford is a founder of MAXIM, and has served as Chairman of the Board of Directors of MAXIM since its inception in 1983. He also served as Chief Executive Officer of the Company from its formation to the present. He has personally benefited from the back-dated stock option grants described herein.

15. Defendant Bergman is currently, and has been, on Maxim's Board of Directors since 1988. Defendant Bergman was a member of the Board that granted Defendant Gifford's stock options from 1998 to 2002. In addition, Defendant Bergman was a member of the Compensation Committee 1998 to 2002. The Compensation Committee approved Defendant Gifford's option grants from 1998 to 2002.

16. Defendant Hagopian is currently, and has been, on Maxim's Board of Directors since at least 1997. Defendant Hagopian was a member of the Board that granted Defendant Gifford's stock options from 1998 to 2002. In addition, Defendant Hagopian was a member of the Compensation Committee 1998 to 2002. The Compensation Committee approved Defendant Gifford's option grants from 1998 to 2002.

17. Defendant Wazzan is currently, and has been, on the Board of Directors since 1990. Defendant Wazzan was a member of the Board that granted Defendant Gifford's stock options from 1998 to 2002. In addition, Defendant Wazzan was a member of the Compensation

4

Committee 1998 to 2002. The Compensation Committee approved Defendant Gifford's option grants from 1998 to 2002.

18. Defendant Karros, served on the Board of Directors from 2000 until 2002. Defendant Karros was a member of the Board that granted Defendant Gifford's stock options from 2000 to 2002.

19. Defendant Sampels has been on the Board of Directors from 2001 until 2005. Defendant Sampels was a member of the Board that granted Defendant Gifford's stock options during 2001 and 2002.

## FACTS

20. Maxim is a worldwide leader in design, development, and manufacture of linear and mixed-signal integrated circuits (ICs). Its products are used in a wide variety of microprocessor-based electronics equipment, including personal computers and peripherals, process control, instrumentation, test equipment, handheld devices, wireless and fiber communications, and video displays.

21. Between 1998 and mid-2002, Maxim, through the actions of its Board of Directors, granted stock options for the purchase of millions of shares of the Company's common stock to Gifford.

22. In shareholder approved stock option plans filed with the Securities and Exchange Commission, Maxim contracted and represented that the exercise price of all of the stock options granted would be no less than the fair market value of the Company's common stock, measured by the publicly traded closing price for Maxim stock, on the date of the grant.

5

23.    For example Maxim's 1983 Stock Option Plan, amended as of November 10, 1994, provides in relevant part:

> (b) The exercise price of each option shall be not less than one hundred percent (100%) of the fair market value of the stock subject to the option on the date the option is granted.

24.    Similarly, Maxim's 1999 Amended Stock Incentive Plan, located in its 1999 10-K form filed with the SEC provides in relevant part:

> "(a) Exercise Price. The exercise price for an Option shall be as follows:
>
> (i) In the case of an Incentive Stock Option:
>
> (A) granted to an Employee who, at the time of the grant of such Incentive Stock Option owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be not less than one hundred ten percent (110%) of the Fair Market Value per Share on the date of grant.
>
> (B) granted to any Employee other than an Employee described in the preceding paragraph, the per Share exercise price shall be not less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant."

25.    These particular provisions of the plan are also required under applicable provisions of the Internal Revenue Code, in order to qualify for the desired tax treatment for both the company and the grantee. 26 U.S.C. § 422(b)(4).

26.    Maxim's 1999 Amended Stock incentive plan also provides for how the plan is administered:

> "(i) Administration with Respect to Directors and Officers.
>
> With respect to grants of Options to Directors or Employees who are also Officers or Directors of the Company, the Plan shall be administered by

6

> (A) the Board or (B) a Committee designated by the Board, which
> Committee shall be constituted in such a manner as to satisfy the Applicable
> Laws and to permit such grants and related transactions under the Plan to be
> exempt from Section 16(b) of the Exchange Act in accordance with Rule
> 16b-3. Once appointed, such Committee shall continue to serve in its
> designated capacity until otherwise directed by the Board."

27.    Defendants, as Board members, were responsible for granting the options to
Defendant Gifford.

28.    Contrary to the foregoing contractual provisions and Maxim's public disclosures,
the multi-year pattern of grant dates that were highly favorable to Defendant Gifford (discussed
in greater detail in paragraphs 31 through 40 below), demonstrates that the stock options were
not priced "on the date of the grant" but were in fact back-dated. In many instances, the annual
grants were purportedly dated the very day that Maxim stock hit its low price for the year or just
prior to a sharp increase in the market price of the Company's stock.

29.    Many companies make their stock option grants at the same time each year, a
policy that eliminates the potential for surreptitious back-dating. Providing for predetermined
dates for the granting of those options (and hence the date on which the exercise price would be
set) eliminates the potential for back-dating.

30.    In contrast, between 1998 and 2002, Maxim granted stock options to Gifford in
each of the following months: January, March, April, May, July, September, October and
December.

31.    Purportedly on October 27, 1998, Defendant Gifford was granted 800,000 options at
an exercise price of $14.53 per share.

7

32.    Purportedly in July 1998, Defendant Gifford was granted 600,000 options at an exercise price of $14.06 per share.

33.    Purportedly on May 25, 1999, Defendant Gifford was granted 1,040,000 options at an exercise price of $24.59 per share, which was the lowest trading price of the stock until 2002.

34.    Purportedly on March 15, 2000, Defendant Gifford was granted 600,000 options at an exercise price of $57.81, the day's closing trade. On March 16, 2000, Maxim's price closed at $70.31. That difference produced a paper gain, for one day, of $7,500,000.

35.    Purportedly on September 18, 2000, Defendant Gifford was granted 53,333 options at an exercise price of $75.00 per share. Ten days later, on September 28, the stock closed at $85.06 per share, a ten day paper gain of over $533,333.

36.    Purportedly on October 11, 2000, Defendant Gifford was granted 59,590 options at an exercise price of $67.19 per share.

37.    Purportedly on January 30, 2001, Defendant Gifford was granted 600,000 options at an exercise price of $58.13 per share. On February 12, 2001, the stock closed at $60.19, generating a twelve day gain of over $1,200,000.

38.    Purportedly on September 27, 2001, Defendant Gifford was granted another 600,000 in options at $33.68, the lowest price the stock was traded at between the beginning of 2000 and the beginning of 2002. Subsequently, on October 11, 2001, fourteen days later, the stock closed at $47.23, a fourteen day paper gain of $8,130,000.

39.    Purportedly on April 26, 2002 Defendant Gifford was granted 600,000 options at an exercise price of $48.19.

40.    The Merrill Lynch report, on page 14, shows that most of the option grants in question were purportedly granted at the low market price of the month, or year, in which the stock was traded.

41.    Many of the other grants occurred from one day to one week before a major rise in the market price of Maxim common stock.  As the charts in the Merrill Lynch SOX report show on page 14, each trade was made in a "valley" on the chart.  The timing is too favorable on a repeated basis to be mere coincidence.

42.    As a result of the back-dating of options issued to Defendant Gifford, he has been unjustly enriched at the expense of Maxim, which receives less money from Defendant Gifford when he exercises his options at prices substantially lower than he would have if the options had not been back-dated.

43.    Had Defendant Gifford's stock options not been back-dated, his profits and unrealized gains on exercisable stock options would have been tens of millions of dollars less.

44.    The practice of back-dating stock options not only lined the pockets of Defendant Gifford at the direct expense of the Company, which dollar for dollar receives money when the options are exercised, but also may have resulted in the overstatement of Maxim's profits in the years 1998, through 2002. This is because options priced below the stock's fair market value at the time of award bring the recipient an instant paper gain.  Under accounting rules, that is the equivalent of additional compensation and thus must be treated as a cost to the company.  On information and belief, Maxim did not account for the amount by which the market price of the Company's stock, on the actual date the options were issued, exceeded the exercise price of the

options, as expenses, and thus the Defendants' conduct described herein may have caused the company to overstate its profits.

45.    Defendant Gifford, who was CEO and Chairman of the Board of Directors of Maxim, with a fiduciary duty to act with the utmost due care, loyalty, and good faith, either expressly authorized the practice of back-dating options or in conscious abrogation of their fiduciary duties, permitted it to occur repeatedly over the years. The practice only ceased after the passage of sweeping changes to the federal securities laws in 2002, which curtailed the potential for back-dating by requiring companies to disclose option grants within two days.

46.    Defendants stood in a fiduciary relationship with the company's shareholders, and had a duty to disclose the practice of back-dating stock options. In violation of that duty, the Defendants fraudulently concealed the fact that the options had been granted to Defendant Gifford with an exercise price less than the market price on the date of grant. Instead, the Compensation Committee's report in the proxy statement asserts that all options are granted pursuant to the Company's stock option plans.

## DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

47.    Plaintiff brings this action derivatively in the right and for the benefit of Maxim to redress the injuries suffered, and to be suffered, by Maxim as a direct result of the breach of fiduciary duty and unjust enrichment alleged herein. Maxim is named as a nominal defendant solely in a derivative capacity.

48.    Plaintiff will adequately and fairly represent the interest of Maxim in enforcing and prosecuting its rights.

49.    Plaintiff is and has continuously been an owner of Maxim stock since 2001.

50.    Plaintiff did not make a demand on the Board of Directors to bring this action on behalf of Maxim because such a demand would have been a futile, wasteful, and useless act. Maxim's Board of Directors currently consists of six Directors. Defendants Gifford, Bergman, Hagopian, and Wazzan are still currently serving on Maxim's Board of Directors. Only two of the six current Directors, Michael J. Byrd and Peter De Roetth, were elected after the wrongdoing, in 2005.

51.    Under the 1983 Stock Option Plan and the 1999 Stock Incentive Plan, the stock option exercise price "is determined by the Board according to the terms of the plan." Thus, as members of the Board, each of the Defendants authorized and enabled Maxim to back-date stock options issued to Defendant Gifford. The board has no discretion to contravene the terms of the stock option plans. The back-dating of stock options was in direct violation of the stock option plans, which cannot be an exercise of business judgment.

52.    Under the terms of the 1999 plan, the Board could designate a Committee to approve the options, known as the Compensation Committee. Defendants Bergman, Hagopian, and Wazzan, were members of the Compensation Committee that approved the option grants to Defendant Gifford.

53.    Because the Defendants approved and/or accepted the benefit of the alleged back-dating, they are personally liable for the company's losses.

11

## CAUSES OF ACTION

### COUNT I
**Breach of Fiduciary Duty Against All Defendants**

54.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

55.    The Defendants owe Maxim fiduciary obligations.  By reason of their fiduciary relationships, the Defendants owed and owe Maxim the highest obligation of good faith, fair dealing, loyalty and due care.

56.    The Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

57.    Each of the Defendants authorized, or by abdication of duty permitted, the stock options granted to Defendant Gifford to be back-dated.  These actions were not a good faith exercise of business judgment to protect and promote the Company's corporate interests.

58.    As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, Maxim has sustained and will continue to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

59.    Defendants caused Maxim to "give away" for no consideration the difference between the exercise prices of Gifford's options and the exercise prices the options should have had pursuant to the governing plans. The transactions acted as a fraud on the corporation, giving a windfall to Defendant Gifford.

60.    In approving and/or accepting back dated options, Defendants knowingly preferred the interest of Gifford over those of Maxim and its shareholders.

61.    Plaintiff has no adequate remedy at law.

## COUNT II
### Against Defendant Gifford for Unjust Enrichment

62.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

63.    As a result of the back-dating of the options granted to him, Defendant Gifford has been and will continue to be unjustly enriched at the expense of and to the detriment of Maxim.

64.    Accordingly, this Court should order Defendant Gifford to disgorge all profits, benefits, and other compensation he obtained from the wrongful conduct and fiduciary breaches described herein, and should order the options held by Defendant Gifford, which have not yet been exercised, to be rescinded or repriced at the market price of Maxim's stock on the dates the Court finds that those options were, in fact, granted.

65.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment as follows:

a. Against Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties;

b.    Ordering disgorgement of all profits, benefits and other compensation Gifford obtained by as a result of the conduct alleged herein;

13

c. Rescinding and/or repricing the back-dated stock options;

d. Imposing a constructive trust for the benefit of Maxim on the amounts by which Maxim has been unjustly enriched;

e. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

f. Granting such other and further relief as the Court deems just and proper.

Dated: June 12, 2006

ROSENTHAL, MONHAIT & GODDESS, P.A

By: _____

Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
P.O. Box 1070
Wilmington, Delaware 19899
(302) 656-4433
Attorneys for Plaintiff


KRISLOV & ASSOCIATES, LTD.
Clinton A. Krislov
20 N. Wacker Drive Suite 1350
Chicago, IL 60606
(312) 606-0500

14

# EXHIBIT 4

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| DONNA CONRAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2611-N |
| | ) | |
| ARTHUR M. BLANK, BASIL L. ANDERSON, BRENDA C. BARNES, JOHN B. WILSON, JOHN C. BINGLEMAN, JOHN J. MAHONEY, JOSEPH S. VASSALLUZZO, LOUIS R. PEPI, MARTIN E. HANAKA, MARTIN TRUST, MARY E. BURTON, PAUL F. WALSH, ROBERT C. NAKASONE, RONALD L. SARGENT, ROWLAND T. MORIARTY, SUSAN S. HOYT, THOMAS G. STEMBERG, JAMES E. FLAVIN, ROBERT K. MAYERSON, PATRICK A. HICKEY, JACK A. VANWOERKOM, and JEFFREY E. NACHBOR, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STAPLES, INC., | ) | |

Nominal Defendant.

### DERIVATIVE ACTION COMPLAINT

Plaintiff, Donna Conrad, for her Derivative Action Complaint, based upon the investigation of her counsel, alleges as follows on information and belief:

### INTRODUCTION

1.    This shareholders' derivative action is brought in the right of, and for the benefit of nominal defendant Staples, Inc. ("Staples" or the "Company") against certain members of its

current and former Board of Directors and certain of its current and former executive officers (collectively, "Defendants") to remedy Defendants' breaches of fiduciary duties and other violations of law which have caused damage to Staples. This action arises out of Defendants' conduct of authorizing, or through abdication of duty permitting, the back-dating of stock option grants to and for the benefit of Staples' officers and Directors, including Management Defendants Sargent, Anderson, Mahoney, Stemberg, Hanaka, Wilson, Hoyt, Bingleman, Vassalluzzo, Pepi, Flavin, Mayerson, Hickey, VanWoerkom, and Nachbor and at the expense of Staples and its shareholders.

2.    A stock option granted to an employee of a corporation allows the employee to purchase company stock at a specified price – referred to as the "exercise price" – for a specified period of time. Stock options are granted as part of employee compensation packages as a means to create incentives to boost profitability and stock value. When the employee exercises the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's price at the time the option is exercised. Exercise prices are almost universally set at the fair market value of the stock on the date of the option grant. This method ensures that employees have an incentive to increase the company's stock value, since their options are worthless unless the stock price increases.

3.    An option is back-dated if the stated date of the option is earlier than the date that the option was actually granted. Back-dating allows a company to choose a grant date retrospectively on which the stock price (and thus the exercise price) was lower than it was on the grant date. Back-dating also allows a company retrospectively to choose a particularly favorable date grant date (i.e., a date on which the stock price is particularly low). Options that were back-dated in this manner are thus already valuable when they are received (they are "in the

2

money"), even if the stock price does not go up at all after the date of the grant. When these options are exercised, the employee pays less than he or she should for company stock, and the company receives less money than it should for the stock.

4.    As detailed below, the multi-year pattern of grant dates that were highly favorable to a number of past and present Directors and officers, demonstrates that the stock options were, in fact, back-dated. In many instances, grants were purportedly made on the very day that Staples stock hit its low price for the month and/or just prior to a sharp increase in the market price of the Company's stock.

5.    Back-dating the date of issuance of stock options violated Staples' stock option plans, which provided that stock option grants be priced at not less than the fair market value of the common stock on the date of the grant, as measured by the publicly traded closing price for the stock on the date of the grant. Additionally, Staples filed numerous documents with the SEC, including proxy statements and Annual Reports on Form 10-K, that falsely stated that stock options were granted with the exercise price not less than the market value of the stock on the date of the grant. Back-dating options was a direct breach of Defendants' fiduciary duties of loyalty, care, fair dealing, and good faith to Staples.

6.    Defendants' conduct has unjustly enriched many of Staples' past and present officers and Directors, including each of the Management Defendants (as defined below), to the detriment of Staples and its shareholders.

## PARTIES

7.    Plaintiff Donna Conrad is a resident of Massachusetts. She is currently a shareholder of Staples and has continuously been a shareholder of Staples since February 5, 1998.

3

8.     Nominal Defendant Staples is a Delaware corporation with its corporate headquarters in Framingham, Massachusetts.

**Management Defendants – Received Back-Dated Options**

9.     Defendant Ronald L. Sargent ("Sargent") has been CEO of Staples since 2002, Chairman of the Board since 2005, and a Director since 1999.  He was President from 1998 until January of 2006, COO from 1998 until 2002, and President – North American Operations from 1997 until 1998. He previously held other positions after joining the Company in 1989.  Sargent authorized, approved and personally benefited from back-dated stock option grants described herein.

10.     Defendant Basil L. Anderson ("Anderson") has served on the Board of Staples since 1997.  He served on the Audit Committee from 1998 until 2001.  He was also Vice-Chairman from 1997 until March of 2006.  Anderson authorized, approved and personally benefited from back-dated stock option grants described herein.

11.     Defendant John J. Mahoney ("Mahoney") has been the Vice-Chairman (non-Board) and CFO of Staples since January of 2006.  He was promoted to these positions after serving as Executive Vice-President, Chief Administrative Officer, and CFO beginning in October 1997.  He was Executive Vice-President and CFO from 1996 until 1997.  Mahoney personally benefited from back-dated stock option grants described herein.

12.     Defendant Thomas G. Stemberg ("Stemberg") was a co-Founder of Staples, Inc. and is currently Chairman Emeritus, a non-Board position. He was a Director beginning in 1986, Chairman of the Board from 1998 until 2004, and CEO from 1986 until 2002.  He has also served as both Executive and Non-Executive Chairman.  Stemberg authorized, approved and personally benefited from back-dated stock option grants described herein.

4

13.    Defendant Martin E. Hanaka ("Hanaka") was President and COO of Staples from 1994 until 1997 and a Director from 1996 until 1997. Hanaka authorized, approved and personally benefited from back-dated stock option grants described herein.

14.    Defendant John B. Wilson ("Wilson") was Executive Vice-President – Finance and Strategy as well as CFO of Staples from 1992 until 1996. Wilson personally benefited from back-dated stock option grants described herein.

15.    Defendant Susan S. Hoyt ("Hoyt") was Executive Vice-President – Human Resources of Staples from 1996 until 2002. Hoyt personally benefited from back-dated stock option grants described herein.

16.    Defendant John C. Bingleman ("Bingleman") was President – Staples International of Staples from 1997 until 2000 and President – North American Superstores from 1994 until 1997. Bingleman personally benefited from back-dated stock option grants described herein.

17.    Defendant Joseph S. Vassalluzzo ("Vassalluzzo") was Vice-Chairman of Staples from 1999 until 2004. He was President – Realty and Development from 1997 until 1999 and President – Staples Realty from 1996 until 1997. He was an Executive Vice-President – Global Growth and Development from 1993 until 1996. Vassalluzzo personally benefited from back-dated stock option grants described herein.

18.    Defendant Louis R. Pepi ("Pepi") was Executive Vice-President – Human Resources of Staples from 1994 until 1995. He was President – Staples, the Office Superstore from 1993 until 1994 and Executive Vice-President – Operations from 1990 until 1993. Pepi personally benefited from back-dated stock option grants described herein.

19.    Defendant James E. Flavin ("Flavin") served as Senior Vice-President - Finance

5

and Corporate Controller for Staples from 1995 until 1997. Flavin personally benefited from back-dated stock option grants described herein.

20.    Defendant Robert K. Mayerson ("Mayerson") served in various capacities at Staples, including as Senior Vice-President – Finance, Treasurer, and Corporate Controller. He has also served as the Treasurer of Quill Corporation, a Staples subsidiary. He worked at Staples from 1993 until 1999 and then again beginning in 2004. Mayerson personally benefited from back-dated stock option grants described herein.

21.    Defendant Patrick A. Hickey was Senior Vice-President and Corporate Controller for Staples from 1999 to 2002. Prior to that, he served in various capacities after joining Staples in June 1993, including Vice-President and Treasurer from 1997 to 1999, Vice-President— Financial Planning, Analysis & Reporting from 1996 to 1997 and Director of Financial Planning from 1994 to 1996. Hickey personally benefited from back-dated stock option grants described herein.

22.    Defendant Jack A. VanWoerkom ("VanWoerkom") has been Executive Vice-President, General Counsel and Corporate Secretary for Staples since 2003. Prior to that, he was Senior Vice-President, General Counsel and Secretary beginning in 1999. VanWoerkom personally benefited from back-dated stock option grants described herein.

23.    Defendant Jeffrey E. Nachbor ("Nachbor") was Senior Vice-President and Corporate Controller for Staples from 2003 until 2004. Nachbor personally benefited from back-dated stock option grants described herein.

24.    The above Defendants (other than nominal Defendant Staples) are hereinafter sometimes referred to collectively as "Management Defendants."

6

**Director Defendants – Authorized Back-Dated Options**

25.     Defendant Arthur M. Blank ("Blank") has served on the Board of Staples since 2001. He has served on the Company's Compensation Committee since 2002. Blank authorized and approved back-dated stock option grants described herein.

26.     Defendant Martin Trust ("Trust") has served on the Board of Staples since 1987. He served on the Compensation Committee from at least 1995 until 2003. Trust authorized and approved the back-dated stock option grants described herein.

27.     Defendant Robert C. Nakasone ("Nakasone") has served on the Board of Staples since 1986. He served on the Compensation Committee from at least 1995 until 2002. Nakasone authorized and approved the back-dated stock option grants described herein.

28.     Defendant Brenda C. Barnes ("Barnes") has served on the Board of Staples since 2002. She served on the Audit Committee in 2003. Barnes authorized and approved back-dated stock option grants described herein.

29.     Defendant Mary E. Burton ("Burton") has served on the Board of Staples since 1993 and on the Audit Committee since at least 1995. Burton authorized and approved the back-dated stock option grants described herein.

30.     Defendant Paul F. Walsh ("Walsh") has served on the Board of Staples since 1990 and on the Audit Committee since at least 1995. Walsh authorized and approved the back-dated stock option grants described herein.

31.     Defendant Rowland T. Moriarty ("Moriarty") has served on the Board of Staples since 1986. Moriarty authorized and approved the back-dated stock option grants described herein.

32.     Defendants Blank, Trust, and Nakasone are hereinafter sometimes referred to collectively as "Compensation Committee Defendants."

33.     Defendants Barnes, Burton, Walsh, and Anderson are hereinafter sometimes referred to collectively as "Audit Committee Defendants."

34.     Defendants Blank, Trust, Nakasone, Barnes, Burton, Walsh, Moriarty, Sargent, and Anderson are hereinafter sometimes referred to collectively as "Current Director Defendants."

35.     Defendants Blank, Trust, Nakasone, Barnes, Burton, Walsh, Moriarty, Sargent, Anderson, Stemberg, and Hanaka are hereinafter sometimes referred to collectively as "Director Defendants."

36.     All of the Defendants identified above (except for Nominal Defendant Staples) are sometimes collectively referred to as the "Defendants."

## FACTS

37.     Staples (a Fortune 500 company) is the world's largest supplier of office products.

38.     Between 1994 and July 2003, Staples, through the actions of its Board of Directors and the Compensation Committee thereof, granted stock options for the purchase of millions of shares of the Company's common stock to past and present officers and Directors.

### A.     THE STOCK OPTION PLANS.

39.     In shareholder approved stock option plans filed with the Securities and Exchange Commission ("SEC"), Staples contracted and represented that the exercise price of the stock options would be no less than the fair market value of the Company's common stock, measured by the publicly traded closing price for Staples stock, on the date of grant. Staples has a number of stock option plans that were in effect during the relevant period, all of which bar back-dating.

40.    The 1987 Stock Option Plan (the "1987 Plan") expired in 1997. The Company has stated in its Annual Reports filed in 1996 through 2001, that, under the 1987 Stock Plan, "The exercise price of options granted . . . may not be less than 100% of the fair market value of the [Company's] stock at the date of grant." In its Annual Reports filed in 2001 through 2004, the Company stated that, under the 1987 Plan, "Options have an exercise price equal to the fair market value of the common stock on the date of grant." Thus, back-dating of options is barred by this plan. According to the Company's Proxy Statements, the 1987 Plan was administered by the Compensation Committee.

41.    The Amended and Restated 1992 Equity Incentive Plan (the "1992 Plan") prohibited the issuance of "in the money options" and required at all relevant times:

> [T]he purchase price per share of stock deliverable upon the exercise of an option shall be determined by the Board of Directors but shall in no event be less than 100% of the fair market value of such stock, as determined by the Board of Directors, at the time of grant of such option . . . .

42.    The 1992 Plan further provided that it was to be administered by the Board of Directors, or a committee as delegated by the Board, specifically providing as follows:

- "The Plan will be administered by the Board of Directors of the Company...."

- "The Board of Directors may ... delegate any or all of its powers under the Plan to a committee (the "Committee") appointed by the Board of Directors...."

- "Options granted pursuant to the Plan shall be authorized by action of the Board (or a committee designated by the Board of Directors)..."

According to the Company's Proxy Statements and the Compensation Committee Charter, the administration of the Plan has been delegated to the Compensation Committee.

9

## B.    THE STOCK OPTION BACKDATING SCHEME.

43.    Contrary to the foregoing contractual requirements and representations to the shareholders and the public, the multi-year pattern of grant dates that were highly favorable to the Management Defendants (discussed in greater detail below), demonstrates that the stock options were not, in fact, priced on the date of the grant but were back-dated. In many instances, the annual grants were purportedly dated the very day that Staples stock hit its low price for the month and/or just prior to a sharp increase in the market price of the Company's stock.

44.    Many companies make their stock option grants at the same time each year, a policy that eliminates the potential for surreptitious back-dating. In contrast, between 1994 and July of 2003, stock options were granted to Staples executives and Directors in every month of the calendar year. Interestingly, Staples already appears to generally have followed a better model for its Non-Employee Directors: They generally have received options on scheduled dates, thus reducing the possibility of back-dating.

45.    Based on public filings, it appears that between 1994 and July 1, 2003,[1] Staples granted options on 71 separate dates to Executives and Directors. Of those grant dates, 20 were scheduled in advance and thus could not be back-dated. Of the remaining 51 grants for which timing was discretionary, 12 (23.5%), representing 7,577,291 options, appear to be back-dated:

- Two of the 51 purported grant dates fell on dates that coincided with the lowest trading price of the fiscal quarter (and hence month) for Staples stock.

- Six of the 51 purported grant dates fell on dates that coincided with the lowest trading price of the month for Staples stock.

---

[1] After August 29, 2002, Staples was required under the Sarbanes-Oxley Act to report grants within two days. Staples appears to have adopted this procedure, and stopped back-dating, after July 1, 2003.

- Four of the 51 purported grant dates fell on dates that were otherwise exceptionally favorable for recipients, such as at the bottom of a dip in prices.

Staples's stock increased substantially in price within 20 trading days (approximately one calendar month) of each of these dates. The odds of this favorable a series of grants having occurred by chance are extraordinarily low.

The following table lists Staples' apparently back-dated option grants. (Note that due to a number of lapses in SEC reporting by Staples, this table is likely to underreport back-dated grants to Staples executives and Directors.)

| Purported Grant Date | Why Grant is Exceptionally Favorable | Recipient | Title | # Shares | Total # Shares | Exercise Price | % Increase From Exercise Price After 20 Trading Days* |
|---|---|---|---|---|---|---|---|
| 09/23/94 | Lowest of the month | John B. Wilson | Executive Vice-President - Finance & Strategy, CFO | 39,000 | 281,500 | $29.63 | 12.24% |
| | | Joseph S. Vassalluzzo | Executive Vice-President - Global Growth and Development | 25,000 | | | |
| | | Louis R. Pepi | Executive Vice-President - Human Resources | 25,000 | | | |
| | | Martin E. Hanaka | President, COO | 50,000 | | | |
| | | Thomas G. Stemberg | Chairman, CEO | 142,500 | | | |
| 08/01/96 | Second lowest of the month -- preceding sharp rise in prices | Susan S. Hoyt | Executive Vice-President - Human Resources | 65,000 | 65,000 | $17.30 | 14.91% |
| 11/01/96 | Lowest of the month | Demos Parneros | Vice-President - Operations | 5,000 | 5,000 | $17.88 | 11.90% |
| 05/01/97** | Lowest of the quarter and month | Jeanne Brown Lewis | Senior Vice-President - Marketing and Small Business | | | $18.63 | 18.10% |
| 08/28/97 | Lowest of the | Thomas G Stemberg | Chairman, CEO | 160,000 | 464,000 | $23.13 | 10.81% |

11

| Purported Grant Date | Why Grant is Exceptionally Favorable | Recipient | Title | # Shares | Total # Shares | Exercise Price | % Increase From Exercise Price After 20 Trading Days* |
|---|---|---|---|---|---|---|---|
| 08/28/97 (cont'd) | quarter and month | John J. Mahoney | Executive Vice-President, Chief Administrative Officer, CFO | 55,000 | | | |
| | | Ronald L. Sargent | President - North American Operations | 55,000 | | | |
| | | Joseph S. Vassalluzzo | President - Realty and Development | 35,000 | | | |
| | | Evan P. Stern | President – Staples National Advantage | 15,000 | | | |
| | | Todd J. Krasnow | Executive Vice-President – Small Business | 35,000 | | | |
| | | James E. Flavin | Senior Vice-President – Finance, Corporate Controller | 15,000 | | | |
| | | Jeffrey L. Levitan | Senior Vice-President - Strategic Planning and Business Development | 24,000 | | | |
| | | Susan S. Hoyt | Executive Vice-President - Human Resources | 35,000 | | | |
| | | Richard R. Gentry | Executive Vice-President - Merchandising | 35,000 | | | |
| 08/29/97 | At the bottom of dip in prices (second lowest of the month) | James C. Peters | Executive Vice-President - U.S. Stores | 35,000 | 35,000 | $23.50 | 15.40% |
| 10/30/97 | At the bottom of dip in prices (third lowest of the month) | John J. Mahoney | Executive Vice-President, Chief Administrative Officer, CFO | 91,667 | 416,251 | $25.94 | 8.67% |
| | | Ronald L. Sargent | President - North American Operations | 111,667 | | | |
| | | Joseph S. Vassalluzzo | President - Realty and Development | 62,917 | | | |
| | | Susan S. Hoyt | Executive Vice-President - Human Resources | 50,000 | | | |
| | | Richard R. Gentry | Executive Vice-President - Merchandising | 50,000 | | | |

12

| Purported Grant Date | Why Grant is Exceptionally Favorable | Recipient | Title | # Shares | Total # Shares | Exercise Price | % Increase From Exercise Price After 20 Trading Days* |
|---|---|---|---|---|---|---|---|
| 10/30/97 (cont'd) | | James C. Peters | Executive Vice-President - U.S. Stores | 50,000 | | | |
| 07/01/98 | Lowest of the month | Thomas G. Stemberg | Chairman, CEO | 1,600,000 | 3,989,000 | $30.13 | 12.45% |
| | | Ronald L. Sargent | President, COO | 390,000 | | | |
| | | John J. Mahoney | Executive Vice-President, CFO, Chief Administrative Officer | 390,000 | | | |
| | | Joseph S. Vassalluzzo | President - Realty and Development | 390,000 | | | |
| | | John C. Bingleman | President - Staples International | 300,000 | | | |
| | | Jeffrey L. Levitan | Senior Vice-President - Strategic Planning and Business Development | 42,000 | | | |
| | | Susan S. Hoyt | Executive Vice-President - Human Resources | 200,000 | | | |
| | | Edward C. Harsant | President - The Business Depot, Ltd | 55,000 | | | |
| | | Jeanne Brown Lewis | Senior Vice-President - Marketing | 42,000 | | | |
| | | Robert K. Mayerson | Senior Vice-President, Corporate Controller | 45,000 | | | |
| | | Richard R. Gentry | Executive Vice-President - Merchandising | 200,000 | | | |
| | | Brian T. Light | Senior Vice-President, Chief Information Officer | 55,000 | | | |
| | | James C. Peters | President - U.S. Stores | 200,000 | | | |
| | | David B. Crosier | Executive Vice-President - Supply Chain Management | 80,000 | | | |
| 12/01/98 | At the bottom of dip in prices (second lowest of the month) | Joseph G. Doody | President - Staples Contract and Commercial | 58,332 | 58,332 | $32.25 | 21.80% |
| 06/06/00 | Lowest of the month | Thomas G. Stemberg | Chairman, CEO | 150,000 | 953,125 | $14.06 | 10.67% |
| | | Ronald L. Sargent | President, COO | 187,500 | | | |

13

| Purported Grant Date | Why Grant is Exceptionally Favorable | Recipient | Title | # Shares | Total # Shares | Exercise Price | % Increase From Exercise Price After 20 Trading Days* |
|---|---|---|---|---|---|---|---|
| 06/06/00 (cont'd) | | John J. Mahoney | Executive Vice-President, CFO, Chief Administrative Officer | 105,000 | | | |
| | | Joseph S. Vassalluzzo | Vice-Chairman | 155,000 | | | |
| | | Susan S. Hoyt | Executive Vice-President - Human Resources | 37,500 | | | |
| | | Jacques Levy | President - Staples International | 50,000 | | | |
| | | Richard R. Gentry | Executive Vice-President - Merchandising | 50,000 | | | |
| | | Patrick A. Hickey | Senior Vice-President - Corporate Controller | 13,000 | | | |
| | | Edward C. Harsant | President - The Business Depot, Ltd. | 15,000 | | | |
| | | Jeffrey L. Levitan | Executive Vice-President - Strategy/Business Development for Staples.com | 6,375 | | | |
| | | Jeanne Brown Lewis | President - Staples.com | 12,750 | | | |
| | | Brian T. Light | Executive Vice-President, Chief Information Officer | 20,000 | | | |
| | | Lawrence J. Morse | President - Quill Corporation | 13,500 | | | |
| | | Jack A. Van Woerkom | General Counsel, Secretary, Senior Vice-President | 15,000 | | | |
| | | Joseph G. Doody | President - Staples Contract and Commercial | 25,000 | | | |
| | | Deborah G. Ellinger | Senior Vice-President - Strategic Planning and New Business Development | 7,500 | | | |
| | | David B. Crosier | Executive Vice-President - Supply Chain Management | 20,000 | | | |
| | | Robert J. Moore | Executive Vice-President - Marketing | 20,000 | | | |

14

| Purported Grant Date | Why Grant is Exceptionally Favorable | Recipient | Title | # Shares | Total # Shares | Exercise Price | % Increase From Exercise Price After 20 Trading Days* |
|---|---|---|---|---|---|---|---|
| 06/06/00 (cont'd) | | James C. Peters | President – U.S. Stores | 50,000 | | | |
| 08/01/00 | Lowest of the month | Edward C. Harsant | President - North American Stores | 157,083 | 157,083 | $13.31 | 17.84% |
| 07/01/03 | Lowest of the month | Ronald L. Sargent | President, CEO | 350,000 | 1,152,000 | $18.35 | 7.90% |
| | | Thomas G. Stemberg | Non-Executive Chairman, Chairman of the Board | 350,000 | | | |
| | | John J. Mahoney | Executive Vice-President, Chief Administrative Officer | 100,000 | | | |
| | | Joseph S. Vassalluzzo | Vice-Chairman | 100,000 | | | |
| | | Basil L. Anderson | Vice-Chairman | 120,000 | | | |
| | | Demos Parneros | President – U.S. Stores | 50,000 | | | |
| | | Joseph G. Doody | President-Staples North American Delivery | 50,000 | | | |
| | | Jack A. VanWoerkom | Executive Vice-President, General Counsel, Secretary | 20,000 | | | |
| | | Jeffrey E. Nachbor | Senior Vice-President, Controller | 12,000 | | | |
| **Totals** | | | | **7,577,291** | | | |

\*   Grants on 08/28/97 were first reported to SEC within 9 days, so at least some of them could be back-dated by at most 9 days. Thus, the 9-day return is used for this date instead of the 20-day return.  The 20-day return was 21.4%.  Grants on 07/01/03 were reported to SEC within 16 days, so, for the same reason, the 16-day return is used.  The 20-day return was 8.7%.

\*\* Grant was reported to SEC without listing number of options granted.

### Fiscal Year 1994 Back-Dated Option Grants

46.     Staples purportedly made the following option grants on September 23, 1994: a grant of 39,000 options to Wilson, a grant of 25,000 options to Vassalluzzo, a grant of 25,000 options to Pepi, a grant of 50,000 options to Hanaka, and a grant of 142,500 options to Stemberg. The exercise price of these grants was $29.63, which matched the closing stock price on that date. September 23, 1994 had the lowest closing Staples stock price of the month, and came at the bottom of a dip in prices and just before a sharp increase. The stock rose 12.24% over the following 20 trading days (approximately one trading month). If these 281,500 options were back-dated by 20 trading days, they would have been in the money to the tune of $1 million.

### Fiscal Year 1996 Back-Dated Option Grants

47.     Staples purportedly granted options for 65,000 shares to Hoyt on August 1, 1996. The exercise price of this grant was $17.30, which matched the closing price of the stock on that date. August 1, 1996 had the second lowest closing Staples stock price of the month, and preceded a sharp rise in stock prices. The stock rose 14.91% over the following 20 trading days (approximately one trading month). If these options were back-dated by 20 trading days, they would have been in the money to the tune of $168,000 for one executive.

48.     Staples purportedly granted options for 5,000 shares to Demos Parneros on November 1, 1996. The exercise price of these grants was $17.88, which matched the closing price of the stock on that date. November 1, 1996 had the lowest closing Staples stock price of the month, and came at the bottom of a dip in prices and just before a sharp increase. The stock rose 11.90% over the following 20 trading days (approximately one trading month). If these options were back-dated by 20 trading days, they would have been in the money to the tune of $13,000 for one executive.

16

### Fiscal Year 1997 Back-Dated Option Grants

49.    Staples purportedly granted shares to Jeanne B. Lewis on May 1, 1997. The exercise price of these grants was $17.88, which matched the closing price of the stock on that date. Interestingly, the number of options granted on this date was not reported to the SEC. May 1, 1997 had the lowest closing Staples stock price of the quarter and month, and came before a sharp increase. The stock rose 18.90% over the following 20 trading days (approximately one trading month).

50.    Staples purportedly made the following option grants on August 28, 1997: a grant of 160,000 options to Stemberg, a grant of 55,000 options to Mahoney, a grant of 55,000 options to Sargent, a grant of 35,000 options to Vassalluzzo, a grant of 15,000 options to Flavin, and a grant of 35,000 options to Hoyt, as well as a grant of 24,000 options to Jeffrey L. Levitan, a grant of 15,000 options to Evan P. Stern, a grant of 35,000 options to Todd J. Krasnow, and a grant of 35,000 options to Richard R. Gentry. The exercise price of these grants was $23.13, which matched the closing stock price on that date. August 28, 1997 had the lowest closing Staples stock price of the fiscal quarter and month, and came at the bottom of a sharp dip in prices and just before a sharp increase. The stock rose 10.81% over the following nine trading days. (These options were first reported to the SEC after nine trading days.) If these 464,000 options were back-dated by nine trading days, they would have been in the money to the tune of $1.2 million. Interestingly, while Stemberg and Stern did report their grants within nine days to the SEC, other recipients reported grants substantially later, with reports to the SEC trickling in until Vassalluzzo made the final report on January 14, 1998 – four and a half months later. This pattern suggests that additional recipients might have been added to this grant date as it became

clear over time how favorable it was. The fiscal quarter ended in October and $23.13 was the lowest price for Staples stock in the entire second half of its fiscal year.

51.    Staples purportedly granted 35,000 options to James C. Peters on August 29, 1997. The exercise price of these grants was $23.50, which matched the closing price of the stock on that date. August 29, 1997 had the second lowest closing Staples stock price of the fiscal quarter and month, and came before a sharp increase. The stock rose 15.40% over the following 20 trading days (approximately one trading month). If these options were back-dated by 20 trading days, they would have been in the money to the tune of $127,000 for one executive.

52.    Staples purportedly made the following option grants on October 30, 1997: a grant of 91,667 options to Mahoney, a grant of 111,667 options to Sargent, a grant of 62,917 options to Vassalluzzo, and a grant of 50,000 options to Hoyt, as well a grant of 50,000 options to Richard R. Gentry, and a grant of 50,000 options to James C. Peters. The exercise price of these grants was $25.94, which matched the closing stock price on that date. October 30, 1997 had the third lowest closing Staples stock price of the month, and came at the bottom of a dip in prices and just before a substantial increase. The stock rose 8.67% over the following 20 trading days (approximately one trading month). If these 416,251 options were back-dated by 20 trading days, they would have been in the money to the tune of $937,000.

### Fiscal Year 1998 Back-Dated Option Grants

53.    Staples purportedly made the following option grants on July 1, 1998: a grant of 1,600,000 options to Stemberg, a grant of 390,000 options to Sargent, a grant of 390,000 options to Mahoney, a grant of 390,000 options to Vassalluzzo, a grant of 300,000 options to Bingleman, a grant of 45,000 options to Mayerson, and a grant of 200,000 options to Hoyt, as well as a grant

18

of 42,000 options to Jeffrey L. Levitan, a grant of 55,000 options to Edward C. Harsant, a grant

42,000 options to Jeanne B. Lewis, a grant of 200,000 options to Richard R. Gentry, a grant of

55,000 options to Brian T. Light, a grant of 200,000 options to James C. Peters, and a grant of

80,000 options to David B. Crosier. The exercise price of these grants was $30.13, which

matched the closing stock price on that date. July 1, 1998 had the lowest closing Staples stock

price of the month, and came before a substantial increase in prices. The stock rose 12.45% over

the following 20 trading days (approximately one trading month). If these 3,989,000 options

were back-dated by 20 trading days, they would have been in the money to the tune of $14

million. Interestingly, while Crosier, like the other recipients, did not report this grant until

August, he did report another unrelated transaction to the SEC in mid-July. He could have

reported this grant on the same Form 4, but did not do so – further suggesting that this grant was

not actually made on July 1st.

54.    Staples purportedly granted 58,332 options to Joseph G. Doody on December 1,

1998. The exercise price of these grants was $32.25, which matched the closing price of the

stock on that date. December 1, 1998 had the second lowest closing Staples stock price of the

month, and came at the bottom of a dip in prices. The stock rose 21.80% over the following 20

trading days (approximately one trading month). If these options were back-dated by 20 trading

days, they would have been in the money to the tune of $448,000 for one executive.

### Fiscal Year 2000 Back-Dated Option Grants

55.    Staples purportedly made the following option grants on June 6, 2000: a grant of

150,000 options to Stemberg, a grant of 187,500 options to Sargent, a grant of 105,000 options to

Mahoney, a grant of 155,000 options to Vassalluzzo, a grant of 37,500 options to Hoyt, a grant

of 13,000 options to Hickey, and a grant of 15,000 options to Van Woerkom, as well as a grant

of 50,000 options to Jacques Levy, a grant of 50,000 options to Richard R. Gentry, a grant of 15,000 options to Edward C. Harsant, a grant of 6,375 options to Jeffrey L. Levitan, a grant of 12,750 options to Jeanne B. Lewis, a grant of 20,000 options to Brian T. Light, a grant of 13,500 options to Lawrence J. Morse, a grant of 25,000 options to Joseph G. Doody, a grant of 7,500 options to Deborah G. Ellinger, a grant of 20,000 options to David B. Crosier, a grant of 20,000 options to Robert J. Moore, and a grant of 50,000 options to James C. Peters. The exercise price of these grants was $14.06, which matched the closing stock price on that date. June 6, 2000 had the lowest closing Staples stock price of the month, and came at the very bottom of a sharp dip in prices. The stock rose 10.67% over the following 20 trading days (approximately one trading month). If these 953,125 options were back-dated by 20 trading days, they would have been in the money to the tune of $1.4 million. Interestingly, while these option grants were not reported to the SEC until July, Mahoney and Vassalluzzo each reported separate transactions in mid-June. They could have reported this grant on the same Form 4, but did not do so -- further suggesting that this grant was not actually made on June 6th.

56.    Staples purportedly granted 157,083 options to Edward C. Harsant on August 1, 2000. The exercise price of these grants was $13.31, which matched the closing price of the stock on that date. August 1, 2000 had the lowest closing Staples stock price of the month, and came at the bottom of a steep dip in prices. The stock rose 17.84% over the following 20 trading days (approximately one trading month). If these options were back-dated by 20 trading days, they would have been in the money to the tune of $373,000 for one executive.

**Fiscal Year 2003 Back-Dated Option Grants**

57.    Staples purportedly made the following option grants on July 1, 2003: a grant of 350,000 options to Sargent, a grant of 350,00 options to Stemberg, a grant of 100,000 options to

Mahoney, a grant of 100,000 options to Vassalluzzo, a grant of 120,000 options to Anderson, a grant of 20,000 options to Van Woerkom, and a grant of 12,000 options to Nachbor, as well as a grant of 50,000 options to Demos Parneros, and a grant of 50,000 options to Joseph G. Doody. The exercise price of these grants was $18.35, which matched the closing stock price on that date.[2] July 1, 2003 had the lowest closing Staples stock price of the month, and came at the bottom of a dip in prices. The stock rose 7.90% over the following 16 trading days. (This grant was first reported to the SEC 16 trading days later on July 24, 2003.) If these 1,152,000 options were back-dated by 16 trading days, they would have been in the money to the tune of $1.7 million. As the Company admits in its 2004 Proxy, these option grants were not reported to the SEC until late July, in violation of the Sarbanes-Oxley Act requirement (effective August 29, 2002) that options be reported within two days of their grant date. It is noteworthy that Stemberg reported several other transactions before he reported the July 1st grant on July 24, 2004. On July 3, 2003, he timely reported on a Form 4 that he exercised options for 50,000 shares on July 1, 2003 (the same day as his purported 350,000 option grant) and sold those shares on the same day. On July 10, 2003, he filed a Form 4/A amending the July 3, 2003 Form 4 to reflect additional holdings not previously reported. On July 16, 2003, he timely reported another exercise and sale transaction on that same day. He could have reported his purported July 1, 2003 grant on the earlier Form 4s, but did not do so – further suggesting that this grant was not actually made on July 1st.

---

[2] The Company's 2004 Proxy lists the exercise price for Defendants Sargent, Stemberg, Mahoney, Vassalluzzo, and Anderson as being $18.35, which was the closing price on the purported grant date. The Form 4s filed by all of the grant recipients list the exercise price as $18.00. Assuming that the $18.00 figure is not a typographical error, a grant at that exercise price represents a per se violation of the Company's option plans.

## C.    FALSE STATEMENTS CONCERNING STAPLES' STOCK OPTIONS.

58.    Over the course of the relevant period, Staples, through the actions of its Directors (including Director Defendants), made numerous false statements in proxies and Annual Reports on Form 10-K representing that stock options were granted at the fair market value of Staples' stock on the date of the grant, which they knew, or absent recklessness, should have known, was not the case, because stock options were in fact back-dated.

59.    Each of the annual Proxy Statements filed from 1995 through 1999, states: "The exercise price of all options granted [to executives] was the fair market value of the Common Stock on the date of grant." This statement is false. As detailed herein, a number of options were granted at prices below the fair market value on the date of the grant.

60.    In each of the annual Proxy Statements filed from 1995 through 2004 (as well as the Form 10-K filed on April 30, 1997, the Form 10-K filed on March 10, 2000, the Form 10-K/A filed on April 5, 2000, and the Form 10-K/A filed on June 30, 2000), the Company included a required table showing option grants to Senior Executives during the previous fiscal year. Along with each and every one of these tables, a footnote clearly stated that the exercise price for the grants was equal to the fair market value per share of Staples Stock on the date of grant. For at least the fiscal years 1994, 1996, 1997, 1998, 2000, and 2003, this statement was false, because grants were actually made at prices below the fair market value per share of Staples stock on the date of grant.

61.    The annual Proxy Statements filed with the SEC solicited shareholder action in favor of the election or re-election of the following Directors:

| Year | Director |
|------|----------|
| 1996 | Burton, Moriarty, and Hanaka |
| 1997 | Anderson, Nakasone and Stemberg |
| 1998 | Trust and Walsh |
| 1999 | Burton and Moriarty |
| 2000 | Anderson, Nakasone, Sargent, and Stemberg |
| 2001 | Blank, Trust, and Walsh |
| 2002 | Barnes, Burton, and Moriarty |
| 2003 | Anderson, Nakasone, Sargent, and Stemberg |
| 2004 | Blank, Trust, and Walsh |

62.    False statements were also made in the Company's Annual Reports on Form 10-K, filed with the SEC from 1996 through 2001, each of which state:

> The exercise price of options granted under the [Company's option] plans may not be less than 100% of the fair market value of the Company's common stock at the date of grant.    Options generally have an exercise price equal to the fair market value of the common stock on the date of grant.

This statement was false because, as detailed herein, a number of options were back-dated and granted at prices below the fair market value on the date of the grant.

63.    Likewise, the Annual Reports on Form 10-K filed in 2002 through 2004 each state: "Options [under the Company's option plans] have an exercise price equal to the fair market value of the common stock on the date of grant." As in the previous years, this statement was false because, as detailed herein a number of options were back-dated and granted at prices below the fair market value on the date of the grant.

64.    Moreover, because Staples granted options with exercise prices below the fair market value on the date of grant, it was required to record a compensation expense in its financial statements.  However, the Company did not do so.  As the Annual Reports on Form

23

10-K filed in 1997 through 2004 each state: "Under [Accounting Principles Board Opinion (APB)] No. 25, since the exercise price of Staples' employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized." As discussed herein, this statement is false, because the exercise price of employee stock options was not equal to the market price of the stock of the date of grant.

65.    Finally, as discussed in detail below, by failing to account properly for the back-dated option grants, Defendants understated expenses, and overstated earnings from operations and net earnings. Thus, the financial statements included in the foregoing Form 10-K filings were false because the Company, in violation of APB 25, understated compensation expenses it was required to incur when the improperly back-dated options were granted, and therefore overstated its net income.

66.    The Annual Reports filed on Form 10-K (and 10-K/A) from 1996 through 2004 were signed by the following Defendants:

| Year | Signatories |
|------|-------------|
| 1996 | Stemberg, Burton, Moriarty, Nakasone, Trust, Walsh, Wilson, and Flavin |
| 1997 | Stemberg, Burton, Hanaka, Moriarty, Nakasone, Trust, Walsh, Mahoney, and Flavin |
| 1998 | Stemberg, Anderson, Burton, Moriarty, Nakasone, Trust, Walsh, Mahoney, and Mayerson |
| 1999 | Stemberg, Anderson, Burton, Moriarty, Nakasone, Trust, Walsh, Mahoney, and Mayerson |
| 2000 | Stemberg, Anderson, Burton, Moriarty, Nakasone, Sargent, Trust, Walsh, Mahoney, and Hickey |
| 2001 | Stemberg, Anderson, Burton, Moriarty, Nakasone, Sargent, Trust, Walsh, Mahoney, and Hickey |
| 2002 | Stemberg, Anderson, Blank, Burton, Moriarty, Nakasone, Sargent, Trust, Walsh, Mahoney, and Hickey. |
| 2003 | Stemberg, Anderson, Barnes, Blank, Burton, Moriarty, Nakasone, Sargent, Trust, Walsh, and Mahoney* |
| 2004 | Stemberg, Anderson, Barnes, Blank, Burton, Moriarty, Nakasone, Sargent, Trust, Walsh, Mahoney, and Nachbor.** |

*Additionally, Sargent (as Principal Executive Officer) and Mahoney (as Principal Financial

Officer) signed further detailed certifications.
** Also signed by current Board member Gary L. Crittenden.

### D.    ADMISSIONS OF INACCURATE REPORTING OF GRANT DATES.

67.    In a Form 10-Q filed on November 14, 2006, Staples admitted for the first time

that at least some of its options were not actually granted on the dates that had been reported, but

were in fact granted on other dates when the price of the stock was higher:

> During the third quarter of 2006, the Company and its Audit
> Committee, assisted by outside counsel, conducted a review of its
> historical stock option granting practices during the period from
> 1997 to the present. Based on the results of the review, the
> Company has recorded a $10.8 million expense ($8.6 million net
> of taxes) in the third quarter to reflect the cumulative impact of
> accounting errors due to the use of incorrect measurement dates,
> without restating any historical financial statements. The Company
> has concluded that the use of incorrect measurement dates was not
> the result of intentional wrongdoing and has taken steps to improve
> the controls over its option granting processes.

> The amount of this correction in any single year would have been
> no more than 0.6% of operating income for that year. We recorded
> the cumulative impact of these errors as a charge in the third
> quarter of 2006 without restating any historical financial
> statements. This charge increased cost of goods sold and
> occupancy costs by $0.3 million, operating and selling expenses by
> $3.9 million, general and administrative expenses by $6.6 million,
> and reduced income tax expense by $2.2 million, resulting in an
> $8.6 million reduction in net income for the third quarter of 2006.

68.    Whether or not the now admitted use of incorrect grant dates was the result of

"intentional wrongdoing" is immaterial to the relief sought in this action. As alleged herein, the

granting of in-the-money stock options was an *ultra vires* act in violation of the Company's

stock option plans that could not be the valid or good faith exercise of business judgment.

Regardless, the Company's assertion that there was no "intentional wrongdoing" rings hollow in

light of the extraordinarily favorable timing of the Company's option grants and in light of the

volume and clarity of previous assurances to shareholders and the public that in-the-money

25



grants were not being made.

69.    The Company's 10-Q filing indicates that the Audit Committee, assisted by outside counsel, participated in the review.    The Audit Committee currently consists of Defendants Walsh and Burton as well as Gary L. Crittenden.    As alleged herein, Defendants Walsh and Burton, as Directors and members of the Audit Committee at the time that back-dated options were granted, had responsibility for the granting of back-dated options and for the dissemination of false information relating to back-dating.    The review was thus not independent.

70.    The Company's review did not appear to result in any individuals being held financially accountable to the Company for their wrongdoing.    This action seeks such relief.

71.    The Company's 10-Q filing of November 14, 2006 suggests that its review (along with all needed corrective actions) was complete at the time of filing.    Nonetheless, at the end of the day on Friday December 22, 2006 (the last trading day before Christmas), the Company stated in a Form 8-K that further corrections were needed:

> On December 20, 2006, Staples, Inc. (the "Company") amended certain outstanding and unexercised non-qualified stock options granted under the Company's Amended and Restated 1992 Equity Incentive Plan to the executive officers listed below.    These amendments increased the per share exercise prices of the options listed below from $12.2333 to $12.88 (adjusted to reflect stock splits) and were made to avoid potential adverse tax consequences.

72.    The Company included the following table of amended options:

| Option Recipient | Date of Grant | Number of Shares (Split Adjusted) | Original Exercise Price (Split Adjusted) | Amended Exercise Price (Split Adjusted) |
|---|---|---|---|---|
| Ronald L. Sargent, Chairman and Chief Executive Officer | July 1, 2003 | 525,000 | $12.2333 | $12.88 |
| John J. Mahoney, Vice Chairman and Chief Financial Officer | July 1, 2003 | 150,000 | $12.2333 | $12.88 |
| Joseph G. Doody, President, North American Delivery | July 1, 2003 | 75,000 | $12.2333 | $12.88 |

73.    Also on December 22, 2006, Defendants Sargent and Mahoney, as well as Joseph

G. Doody, filed Forms 4 with the SEC that reflected these amendments.   Although their options

were not mentioned in the Company's Form 8-K, Demos Parneros filed a similar Form 4 on the

same date regarding options for 75,000 shares, and Defendant VanWoerkom filed a similar Form

4 on the same date regarding options for 30,000 shares.  Each of the Forms 4 indicates that the

change is a "Correction of Exercise Price" and that the options vested 25% on July 1, 2004 and

then 2.083% each month thereafter.

74.    Neither the Form 8-K nor any Forms 4 filed discuss the options granted on July 1,

2003 to Defendants Vassalluzzo, Nachbor, Anderson, and Sternberg.

75.    Adjusted for a three-for-two stock split effected in the form of a stock dividend

distributed on April 15, 2005, the original prices and share quantities in the recent SEC filings

match precisely the original prices and share quantities for the July 1, 2003 grants discussed in

Section B above.

76.    Neither the Company nor the recipients disclosed what the correct grant date for

the amended options should have been.  However, the only date in fiscal year 2003 on which the

Company's split-adjusted stock price closed at $12.88 was July 10, 2003 – suggesting that the

Company believes that this was the correct grant date for these grants.

77.    The Company has not disclosed what "potential adverse tax consequences" it sought to avoid by making these corrections.  However, under Internal Revenue Code § 409A, 26 U.S.C. § 409A (and related regulations), recipients of in-the-money options that vest after December 31, 2004 (as portions of the corrected options do) are subject to stiff tax penalties. Amendments to options to avoid these penalties were required to be made by December 31, 2006.  It would thus appear that avoiding these personal penalties for the option recipients, and not any interest of the Company, was the goal of the December 22, 2006 option amendments.

###    E.    DEFENDANTS' BREACHES OF FIDUCIARY DUTY.

78.    Defendants had a fiduciary duty to act with loyalty and good faith.  Nonetheless, they either expressly authorized the practice of back-dating options or in conscious abrogation of their fiduciary duties, permitted it to occur repeatedly over the years.  The practice only ceased in 2003 after the Company began complying with the Sarbanes-Oxley Act, which curtailed the potential for back-dating by requiring companies to disclose option grants within two days.

79.    The Audit Committee has general oversight responsibilities relating to the Company's financial statements.  For example, the 2003 Proxy[3] states:

> The Audit Committee provides the opportunity for direct contact between our independent auditors and the Board. The Committee assists the Board in overseeing our compliance with legal and regulatory requirements; the integrity of our financial statements; . . . and the performance of our internal audit function and the independent auditors through receipt and consideration of certain reports from the independent auditors. In addition, the Committee discusses the Company's risk management policies and reviews and discusses with management and the independent auditors the Company's annual and quarterly financial statements and related disclosures. The Committee is directly responsible for

---

[3] Defendants Walsh, Burton, and Barnes served on the Audit Committee in 2003 when back-dated options were granted and then improperly accounted for.

28

> appointing, compensating, evaluating and, when necessary,
> terminating our independent auditors, and our independent auditors
> report directly to the Committee. . . . In addition, in 2002, our
> management, in conjunction with the Committee, created a
> disclosure committee, composed of members of management, to
> assist us in fulfilling our obligations to maintain adequate
> disclosure controls and procedures and to coordinate and oversee
> the process of preparing our periodic securities filings.

80.    Defendants Walsh, Burton, Barnes, and Anderson served on the Staples Audit
Committee when fraudulent financial statements were issued that contained incorrect
information relating to back-dated options. Anderson himself received back-dated options.
These Defendants failed in their fiduciary duties as members of the Audit Committee to ensure
that the Company issued accurate and truthful financial statements.

81.    The Compensation Committee administers the Company's various stock option
plans under authority delegated by the Board. Specifically, the Compensation Committee
Charter provides that:

> The Committee shall exercise all rights, authority and functions of
> the Board under all of the Company's stock option, stock
> incentive, employee stock purchase and other equity-based plans,
> including without limitation, the authority to interpret the terms
> thereof, to grant option thereunder and to make stock awards
> thereunder; provided, however, that except as expressly authorized
> to to so by a plan or resolution of the Board, the Committee shall
> not be authorized to amend such plan. To the extent permitted by
> applicable law and the provisions of a given equity-based plan, the
> Committee may delegate to one or more executive officers of the
> Company the power to grant options or other stock awards
> pursuant to such equity-based plan to employees of the Company
> or any subsidiary of the Company who are not directors or
> executive officers of the Company.

29

82.    Although still maintaining oversight, the Board has broadly delegated responsibility to determine option grants to the Compensation Committee. For example, the Proxy Statement filed in 2004 states:

> The Compensation Committee's responsibilities include setting the compensation levels of directors and executive officers, including the Chief Executive Officer (subject to ratification by the Board of Directors), reviewing and providing recommendations to the Board regarding compensation programs, administering our equity incentive, stock purchase and other employee benefit plans and authorizing option and restricted stock grants under our stock incentive plans.

Proxy Statements from at least 1995 through 2003 contain substantially the same language.

83.    Defendants Blank, Trust, and Nakasone served on the Staples Compensation Committee when back-dated options were given out. Nakasone himself received back-dated options. These Defendants failed in their fiduciary duties as members of the Compensation Committee to properly administer the Company's stock option plans in a manner that was protective of the interests of shareholders and consistent with the shareholder approved stock option plans. Instead, they administered these plans in a manner that unjustly enriched past and present officers and Directors at the expense of shareholders and that was both contrary to the Company's stock option plans and in violation of numerous laws and accounting standards.

84.    All of the Defendants would have become aware that stock options to a number of past and present officers and Directors were back-dated when they either personally approved the back-dating or when they received stock option grants.

85.    As of the date of the filing of this Complaint, the practice of back-dating stock options remained undisclosed to the shareholders of Staples.

86.    Defendants stood in a fiduciary relationship with the company's shareholders, and

had a duty to disclose their practice of back-dating stock options.  In violation of their fiduciary duties of loyalty and good faith, Defendants fraudulently concealed the fact that the options granted to numerous past and present Officers and Directors were back-dated and made affirmative misrepresentations to the contrary.  Defendants misrepresented and caused the Company to misrepresent in the stock option plans, incorporated into various public SEC filings, that stock options were priced at no less than the fair market value of the stock on the date of the grant, thereby affirmatively concealing the claims set forth herein. The Defendants also misrepresented the grant dates for the stock option in various proxy filings, as discussed above, by which they solicited shareholder action, *inter alia*, in favor of the re-election of the Director Defendants.  Defendants' misrepresentations about their stock option pricing practices were known to be false or were made in reckless disregard of its truth or falsity, and the concealment could not have been discovered through reasonable diligence by the typical shareholder as of the date of the filing of this Complaint.

**F.    MANAGEMENT DEFENDANTS HAVE BEEN UNJUSTLY ENRICHED AT THE EXPENSE OF THE COMPANY.**

87.    Management Defendants have been unjustly enriched at the expense of Staples and its shareholders, as a result of the secretive back-dating scheme.

88.    Management Defendants received 6,071,751 of the back-dated options as described above.

89.    Had Management Defendants' stock options not been back-dated, their profits and unrealized gains on exercisable stock options would have been millions of dollars less.

90.    The practice of back-dating stock options not only lines the pockets of Staples' executives at the direct expense of the Company, which dollar for dollar receives money when the options are exercised, but also resulted in the overstatement of Staples' profits and an

31

understatement of its tax liabilities.

91.    The grants of secretly back-dated, in-the-money options not only disguised the fact that the Company was conferring on the Management Defendants higher, unusual and excessive compensation without disclosure or shareholder approval of this kind of payment, but this built-in paper gain also carried with it numerous tax, accounting, and disclosure obligations. The discount from receiving in-the-money options is generally treated as a compensation expense under GAAP, specifically Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (October 1972) ("APB 25").

92.    Pursuant to APB 25, the applicable GAAP provision at the time of the option grants set forth herein, if the stock's market price on the date of grant exceeds the exercise price of the options, the corporation must recognize the difference as an expense, which directly impacts earnings.    Defendants caused Staples not to expense this additional fraudulent compensation to the Management Defendants even though the back-dated stock options at issue in this action were priced below the fair market value of the Company's stock at the date of grant and issuance. Thus, Defendants caused the Company to violate GAAP.

93.    As a result of the improper backdating of stock options, Staples, with the knowledge, approval, and participation of each of the Defendants, violated GAAP by failing to recognize compensation expenses incurred when the improperly back-dated options were granted; and produced and disseminated to Staples shareholders and the market false financial statements that improperly recorded and accounted for the back-dated option grants, including, *inter alia*, financial statements in each the Company's Form 10-Ks filed from 1996 through 2004.

94.    The back-dating of stock options also may have resulted in the underpayment of

32

tax liabilities and associated interest. Pursuant to Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

95.    Compensation "attributable to a stock option" is deemed to qualify as "performance based compensation" under the tax code:

> if the grant or award is made by the compensation committee; the plan under which the option or right is granted states the maximum number of shares with respect to which options or rights may be granted during a specified period to any employee; *and, under the terms of the option or right, the amount of compensation the employee could receive is based solely on an increase in the value of the stock after the date of the grant or award. Conversely, if the amount of compensation the employee will receive under the grant or award is not based solely on an increase in the value of the stock after the date of grant or award (e.g., in the case of restricted stock, or an option that is granted with an exercise price that is less than the fair market value of the stock as of the date of grant), none of the compensation attributable to the grant or award is qualified performance-based compensation* because it does not satisfy the requirement of this paragraph (e)(2)(vi)(A).... The rule that the compensation attributable to a stock option or stock appreciation right must be based solely on an increase in the value of the stock after the date of grant or award does not apply if the grant or award is made on account of, or if the vesting or exercisability of the grant or award is contingent on, the attainment

33

of a performance goal that satisfies the requirements of this paragraph (e)(2).

96.     The option backdating scheme also caused Staples to violate Section 162(m). Compensation from exercised stock options issued in connection with the backdating scheme was not deductible under Section 162(m).

97.     Defendants breached their fiduciary duties of loyalty and good faith by causing or, through complete abdication of duty, allowing Staples to engage in the illegal actions and course of conduct, alleged herein.  As a result the Company has suffered millions of dollars in damages.

98.     As a result of the back-dating of options, the Management Defendants have been unjustly enriched at the expense of Staples, which has received and will receive less money from the Management Defendants when they exercise their options at prices substantially lower than they would have if the options had not been back-dated.

99.     Defendants' misconduct caused substantial injury to Staples, including:

a.      lost payment upon the exercise of stock options whose exercise prices were manipulated downward;

b.      penalties and interest to be paid due to under-reported income taxes;

c.      millions of dollars of costs will be needed to carry out internal investigations and restatements of financial statements, including fees paid to outside counsel and auditors;

d.      exposure to potential shareholder actions for violation of the federal securities laws; and

e.      indirect expenses such as reputational injury and lost productivity as the Company will be forced to focus management efforts on addressing past fraudulent behavior instead of focusing on running and growing the business.

34

## DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

### Derivative Allegations

100.    Plaintiff brings this action derivatively in the right of and for the benefit of the Company pursuant to Rule 23.1 of the Delaware Chancery Rules.  Staples is named as a nominal defendant solely in a derivative capacity.

101.    Plaintiff has been a continuous shareholder of Staples since February 5, 1998, and there is no collusion between the parties.

102.    Plaintiff fairly and adequately represents the interests of the shareholders of Staples in enforcing the rights of the Company.

### Demand Futility Allegations

103.    Plaintiff did not make a demand on the Staples Board prior to instituting this action regarding any of the derivative claims because: (1) the wrongful acts complained of herein -- *i.e.*, the stock option backdating scheme -- were not only illegal and self-dealing, but also *ultra vires* and wasteful, and, hence, were not, nor could they have been, the product of a valid or good faith exercise of business judgment; and (2) there is not a majority of disinterested and independent Directors on Staples' board to appropriately consider a demand as nine out of Staples' ten Directors have disabling interests or conflicts.  As such, demand should be excused.

104.    The wrongs complained of herein were unlawful, *ultra vires* and not a product of a valid exercise of business judgment.  The Company's option plans simply did not permit the granting of options at prices below the fair market value of the stock on the date of the grant.  Defendants' actions are not protected by the business judgment rule because it was *ultra vires* and violated the express terms of the shareholder approved stock option plans.  In addition, Defendants' scheme to grant, obtain, approve, and/or acquiesce in the issuance of back-dated

35

stock options to the Management Defendants was unlawful, lacked any legitimate business purpose and was not a product of a valid exercise of business judgment because they did not act honestly and in good faith to advance the best interests of Staples. As such, demand should be excused as futile.

105.    Defendants could not authorize Staples to back-date the stock options in the absence of receiving consideration therefor and there was no consideration for the transactions. Hence, the transactions constituted a waste and a gift of corporate assets, and could not have been the product of the proper exercise of business judgment by the Defendants.

106.    There was no basis or justification for back-dating the stock options. It was designed solely to benefit the Management Defendants in a manner that was inconsistent with the stock option plans and the Company's public disclosures, to the detriment of the Company. Hence, the transactions constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by the Defendants.

107.    A reasonable doubt exists as to whether a majority of Staples' Board of Directors is disinterested and independent. Moreover, Plaintiff can show that at least 50% of the current Board is disabled from considering a demand due to their participation and approval of the backdating scheme, their interest, and their lack of independence.

108.    The ten members of Staples' board at the time of the filing of this First Amended Derivative Action Complaint (and at the time of the filing of the original Derivative Action Complaint) are: the Current Director Defendants (Sargent, Barnes, Burton, Moriarty, Blank, Trust, Walsh, Anderson, and Nakasone) as well as Gary L. Crittenden ("Crittenden").

109.    The nine Current Board Defendants were all on the Board when back-dated options were granted. Under the Company's option plans, the Board is responsible, either

36

directly or through delegation, for the granting of options. Thus, all nine of these Directors are responsible for the granting of back-dated options, face a substantial likelihood of liability with respect to such actions, and are incapable of considering a demand here.

110.    Two of the current Directors (Sargent and Anderson) were financially self-interested in the fraudulently back-dated issue here as recipients of the grants, and demand is therefore excused as to these individuals. Not only are they conflicted from challenging their own actions, but they also stand to lose substantial amounts of money if they are forced to disgorge any profits from exercised back-dated options and rescind any unexercised back-dated options. Further, the disclosure of more information related to back-dated options here might subject these Directors to personal civil or criminal tax investigations if they did not record the receipt of back-dated options as such on their personal tax filings.

111.    Three additional Directors (Defendants Blank, Trust, and Nakasone) authorized the fraudulent options to at least some of the Management Defendants as members of the Compensation Committee during the relevant time period.    As discussed above, the Compensation Committee was directly responsible for administering and managing the Company's executive compensation program and its stock option plans. Its members during the relevant time period therefore approved, ratified, and were otherwise responsible for the back-dated or otherwise manipulated stock option grants. Such members could not have acted in good faith or with the requisite care and concern for the best interest of the Company and its shareholders, because no legitimate process could have been employed that would have allowed the backdating of stock options and the cover-up of such improprieties. Indeed, as detailed above, the actions of the Compensation Committee with respect to the option grants at issue here were in direct violation of the Company's Stock Option Plans and therefore unlawful,

37

unauthorized and *ultra vires*.  As members of the Compensation Committee during the relevant time period who were responsible for approving the Staples stock option grants, Defendants Blank, Trust, and Nakasone knew, or recklessly disregarded, that they were approving stock option grants after the fact in a manner that was unlawful and not a valid exercise of business judgment.    Accordingly, there is significant doubt that these Director Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, care, and loyalty.

112.    Four of the Current Director Defendants served on the Audit Committee (Defendants Barnes, Burton, Walsh, and Anderson).  As noted above, the Audit Committee oversees the Company's compliance with legal and regulatory requirements, the integrity of the Company's financial statements, and the Company's internal controls and external audits.  This oversight was clearly inadequate, as Staples' internal controls were deficient, and its financial statements were inaccurate as set forth above.  Thus, as members of Staples' Audit Committee, Defendants Barnes, Burton, Walsh, and Anderson are hopelessly conflicted.  They are unable to make an independent determination in response to a demand that they cause the Company to bring this action, which challenges their own conduct.

113.    All of the Current Director Defendants (Sargent, Barnes, Burton, Moriarty, Blank, Trust, Walsh, Anderson, and Nakasone) authorized the filing of Proxy Statements, in support of their election as Directors, which made false and misleading statements about the Company's stock option practices and failed to disclose that stock options issued to Management Defendants had been back-dated.  All of the Current Director Defendants also authorized the filing and signed Annual Reports on Form 10-K which made false and misleading statements about the Company's stock option practices and contained false financial statements that underreported

38

compensation expenses and overstated net earning. These Defendants will not cause Staples to bring suit to remedy the wrongs complained of herein because it would expose themselves to suit for securities fraud and proxy violations; thus, all of the Current Defendants are hopelessly conflicted and unable to make an independent determination in response to a demand that they cause the Company to bring this action.

114. Thus, nine of the ten current members of the Staples Board of Directors either personally benefited from back-dated stock options, were either members of the Compensation Committee that was responsible for authorizing the back-dated grants, or they were members of the Audit Committee that was directly responsible for approving of the Company's materially false and misleading financial statements, and/or personally were responsible for the dissemination of false and misleading financial statements. The following chart summarizes these conflicts:

| Current Director | Received Back-Dated Options | Board Member at Time Back-Date Options Were Granted | Oversaw False Financial Statements as Member of Audit Committee | Authorized Back-Dated Grants as Member of Compensation Committee | Disseminated Fraudulent Proxy Statements and Annual Reports |
|---|---|---|---|---|---|
| Sargent | X | X | | | X |
| Barnes | | X | X | | X |
| Burton | | X | X | | X |
| Moriarty | | X | | | X |
| Blank | | X | | X | X |
| Trust | | X | | X | X |
| Walsh | | X | X | | X |
| Anderson | X | X | X | | X |
| Nakasone | | X | | X | X |
| Crittenden | | | | | |

39

115.    Defendant Sargent is currently employed as CEO of Staples.  His ability to continue to hold this position depends on the goodwill of the other Directors.  According to the most recent Proxy, in fiscal year 2005, Sargent received compensation of $2,619,023 in cash and other payments, $3,258,000 in restricted stock awards, and 525,000 common stock options. Sargent's interest in maintaining this generous compensation package makes him incapable of considering a demand here.

116.    Defendant Blank is a co-founder of The Home Depot, Inc.  At various times between 1978 and 2001 he served as Co-Chairman of the Board, Director, CEO, President, and COO.  Home Depot recently admitted that it back-dated options for 20 years, from 1981 to 2000, and as a result understated compensation expenses by $200 million.  This practice is the subject of litigation and is under investigation by the SEC and U.S. Attorney for the Southern District of New York.  Given that Blank will be intimately involved in the Home Depot scandal, he has a vested interest in minimizing character-tarnishing investigations into his involvement in back-dating at Staples.  He is thus incapable of considering a demand here.

## CAUSES OF ACTION

### COUNT I
### Against all Defendants for Breach of Fiduciary Duty

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    Defendants owe Staples fiduciary obligations.  By reason of their fiduciary relationships, the Defendants owed and owe Staples the highest obligation of good faith, fair dealing, loyalty and due care.

119.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, fair dealing, and good faith.

40

120.    Each of the Defendants authorized, or by abdication of duty, permitted stock options granted to past and present officers and Directors to be back-dated.  These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

121.    As a direct and proximate result of the Defendants' failure to perform their fiduciary obligations, Staples has sustained and will continue to sustain significant damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

122.    Plaintiff has no adequate remedy at law.

## COUNT II
### Against all Defendants for Waste

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by sacrificing without consideration payments Staples would have received for properly priced stock options, Defendants, without any valid corporate purpose, have caused Staples to waste valuable corporate assets solely for the financial gain of numerous past and present officers and Directors.

125.    As a result of the waste of corporate assets, the Defendants are liable to the Company.

126.    Plaintiff has no adequate remedy at law.

41

### COUNT III
### Against Management Defendants for Unjust Enrichment

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    As a result of the back-dating of the options granted to them, the Management Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of Staples.

129.    Accordingly, this Court should order the Management Defendants to disgorge all profits, benefits and other compensation obtained by the Management Defendants, and each of them, from their wrongful conduct and fiduciary breaches described herein, and should order the stock options held by the Management Defendants, which have not yet been exercised, to be rescinded or repriced at the market price of Staples' stock on the dates the Court finds that those options were actually, in fact, granted.

130.    Plaintiff has no adequate remedy at law.

### COUNT IV
### Against the Management Defendants for Rescission of *Ultra Vires* Grants and Imposition of Constructive Trust

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.    The back-dated stock options issued to the Management Defendants violated the terms of the Plans and were *ultra vires*. As such, they are void, or voidable by this Court, pursuant to 8 Del. C. § 124, which provides:

> No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such conveyance or transfer, but such lack of capacity or power may be asserted:

42

* * *

> (2) In a proceeding by the corporation, whether acting directly or through a receiver, trustee or other legal representative, or through stockholders in a representative suit, against an incumbent or former officer or director of the corporation, for loss or damage due to such incumbent or former officer's or director's unauthorized act;

133.    As a result, all back-dated stock option grants to the Management Defendants are invalid and should, therefore, be rescinded.  All shares obtained and held, as well as gains realized on sales of shares sold, should be returned to the Company directly or placed in constructive trust.  All executory contracts relating to back-dated options should be cancelled and declared void.

134.    Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

a.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of these Defendants' breaches of fiduciary duties and waste of corporate assets;

b.    Against the Management Defendants and in favor of the Company for the amount of their unjust enrichment;

c.    Awarding to Staples restitution from the Management Defendants and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Management Defendants as a result of the conduct alleged herein;

43

d.    Rescinding and/or repricing the back-dated stock options granted to the Management Defendants, or to the extent such options have been exercised, put profits in constructive trust for the benefit of the Company;

e.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Staples have an effective remedy;

f.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

g.    Granting such other and further relief as the Court deems just and proper.

ROSENTHAL, MONHAIT & GODDESS, P.A.

Jessica Zeldin (Del. Bar No. 3558)
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
(302) 656-4433
Attorneys for Plaintiff

OF COUNSEL:

Thomas G. Shapiro
Edward F. Haber
Michelle H. Blauner
Robert E. Ditzion
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA 02109

Herbert E. Milstein
Steven J. Toll
Joseph P. Helm, III
COHEN, MILSTEIN, HAUSFELD & TOLL PLLC
1100 New York Ave., NW
Suite 500, West Tower
Washington, D.C. 20009

January 19, 2007

44

# EXHIBIT 5

The Honorable James L. Robart

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

RICHARD B. EDMONDS, derivatively on behalf of nominal defendant Getty Images, Inc.,

            Plaintiff,

      v.

MARK H. GETTY, JONATHAN D. KLEIN, A.D. ALBERS, JAMES N. BAILEY, JEFF BEYLE, M. LEWIS BLACKWELL, NICK EVANS-LOMBE, JOHN Z. FERGUSON, ANDREW S. GARB, JIM GURKE, ELIZABETH J.HUEBNER, SCOTT A. MISKIMENS, WILLIAM O'NEILL, STEPHEN M. POWELL, CHRISTOPHER J. ROLING, CHRISTOPHER H. SPORBORG, SALLY VON BARGEN, and WARWICK K. WOODHOUSE,

            Defendants,

        and

GETTY IMAGES, INC.,

            Nominal Defendant.

No. C 07-0317 JLR

**AMENDED SHAREHOLDER VERIFIED DERIVATIVE COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1    Plaintiff, Richard B. Edmonds, (Plaintiff"), by the undersigned attorneys, derivatively on

2    behalf of Getty Images, Inc. ("Getty Images" or the "Company") allege upon personal

3    knowledge as to himself and his own acts, and upon information and belief as to all other

4    matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys,

5    which included, among other things, a review of Securities and Exchange Commission ("SEC")

6    filings, news reports, press releases, and other publicly available documents regarding Getty

7    Images.

8    <u>**NATURE OF THE ACTION**</u>

9    1.    This is a shareholder's derivative action brought for the benefit of nominal

10   defendant Getty Images against certain members of its Board of Directors (the "Board") and

11   certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties,

12   unjust enrichment, statutory violations, and other violations of law relating to the "backdating"

13   of stock option grants to Getty Images insiders.

14   2.    From April 1999 to February 2002, a majority of Getty Images directors, together

15   with its top officers, engaged in a secret scheme to grant undisclosed, in-the-money stock options

16   to themselves and others by backdating stock option grants to coincide with historically low

17   prices of Getty Images common stock. Indeed, in a striking pattern, 21 out of 25 discretionary

18   grants made from April 1999 to February 2002 coincided with historically low prices – eight of

19   the grants were purportedly made at or near the *lowest price of the fiscal year* and fourteen were

20   made at or near the *lowest price of the fiscal quarter*.

21   3.    This action seeks redress for the harm done to Getty Images, and indirectly to its

22   stockholders, resulting from the self-dealing of certain of the Company's top executives and

23   directors who breached their fiduciary duties of loyalty and good faith to the Company by

24   intentionally manipulating Getty Images stock option grants between April 1999 and February

25   2002. As a result of their misconduct, these top executives and directors have secured a huge

26   windfall for themselves at the expense of Getty Images and caused the misstatement of Getty

27   Images' financial results from the Company's fiscal year 1999 through the present. In fact, the

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                - 1 -
(No. C 07-0317 JLR)

1    Company restated its historical financial statements to account for over *$27 million* in additional
2    compensation expenses.

3        4.    These key executives and directors backdated stock option grants in order to
4    exercise the stock option grants at a lower strike price, thus pocketing more money than they
5    were otherwise entitled to receive.  A stock option granted to an employee or director of the
6    Company allows the employee or director to purchase Company stock at a specified price –
7    referred to as the "exercise price" – for a specified period of time.  Stock options are typically
8    granted as part of an employee's or director's compensation package to create incentives for him
9    or her to boost profitability and the Company's stock value.  When an employee or director
10   exercises an option, he or she purchases the stock from the Company at the exercise price,
11   regardless of the stock price at the time the option is exercised.  Option pricing is based on the
12   price of the Company's common stock on the day of the grant.  If an option is backdated to a day
13   on which the market price was lower than the price on the day the option is granted, as Getty
14   Images has admitted was the case here, then the employee or director pays less for the stock
15   option.  Consequently, the Company gets less money for the stock when the option is exercised.

16       5.    As demonstrated below, these perfectly-timed option grants could not have been
17   the result of mere coincidence.  They were, in fact, the result of improper and opportunistic
18   option granting practices.  Because the Company failed to comply with the Generally Accepted
19   Accounting Principles ("GAAP") governing the expensing of stock option grants, the backdating
20   scheme had a material effect on Getty Images' financial statements from 1999 through the
21   present.  As explained *infra*, to the extent the Company failed to record, as a compensation
22   expense, the difference between the price of Getty Images stock on the date of the actual grant
23   and the "backdated" exercise price of the options, this deliberate omission resulted in the
24   material understatement of the Company's reported compensation expense and a material
25   overstatement of its reported net income throughout the relevant period.

26       6.    The backdating practices directed by defendants rendered materially false and
27   misleading each of the Company's annual proxy statements to shareholders, which purported to

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                        - 2 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1   set forth the true amount and type of compensation of its most highly-compensated executives,

2   as required by rules promulgated by the SEC.  The practice of backdating also rendered the

3   defendants' statements regarding the Company's executive and director stock-based

4   compensation, contained in Getty Images' annual reports and annual proxy statements,

5   materially false and misleading.

6        7.    The secret practice of backdating stock options was exposed on March 18, 2006,

7   when *The Wall Street Journal* published an article entitled "The Perfect Payday," which

8   described stock option backdating practices by a number of companies where their executives

9   had achieved extremely fortuitous stock option paydays -- the likelihood of which defied random

10  chance.  *The Wall Street Journal*, together with Erik Lie, a professor at Tippie College of

11  Business at the University of Iowa, David Yermack, a professor at New York University Stern

12  School of Business, and John Emerson, a professor at Yale University, studied patterns of

13  particularly favorable stock grants at certain companies and calculated the probability of such

14  patterns occurring randomly and concluded that the odds were improbable.

15       8.    This practice of backdating stock options, though widespread, remained virtually

16  undetected until such academic research revealed patterns of stock option grants that could not

17  be explained by chance.  These studies noted the frequency with which stock option grants

18  occurred just after a drop in stock price and immediately before a significant increase in stock

19  price, often at the lowest price of the year.  Such timing could not be statistically explained by

20  random selection of grant dates.  One study hypothesized that the dates of the grants had been

21  selected retroactively.  Such retroactive dating, or "backdating," would permit the grantor to

22  select the most advantageous price for the stock option and to effectively grant "in-the-money"

23  stock options (where the exercise price of the option is lower than the stock price on the date of

24  grant) that appeared to be granted when the stock price was at a historical low.  Since companies

25  are required to report in-the-money grants as compensation to the recipient and as a charge to the

26  corporation, the practice of backdating would provide a means to confer additional stock value,

27

AMERICAN SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 3 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   or compensation, to officers and employees that was not detectable, thereby permitting Company

2   insiders to conceal the additional compensation and forego reporting or recording the charge.

3        9.    Former SEC Chairman Harvey L. Pitt was quoted saying "[w]hat's so terrible

4   about backdating options grants? For one thing, it likely renders a company's proxy materials

5   false and misleading. Proxies typically indicate that options are granted at fair market value.

6   But if the grant is backdated, the options value isn't fair – at least not from the vantage point of

7   the company and its shareholders." Deputy Attorney General Paul J. McNulty has described the

8   practice of stock option backdating "as a brazen abuse of corporate power." The Chairman of

9   the Banking, Housing Urban Affairs Committee of the United States Senate, Senator Richard

10  Shelby, has also stated that manipulation of options grant dates is a "***black-and-white example of***

11  ***securities fraud.***"

12       10.    SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a

13  question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of

14  knowingly betting on a race that's already been run." He has also announced that "[backdating

15  in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to

16  efficient markets]. . . . It is securities fraud if you falsify books and records. It is securities fraud

17  if you present financial statements to the SEC that do not comply with generally accepted

18  accounting principles. There is no requirement that (the defendant) personally profit [to prove

19  that a crime occurred.]" He has further stated, "[r]ather obviously, this fact pattern [of

20  backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting

21  rules, and also a violation of the tax laws." The Commissioner of the Internal Revenue Service

22  ("IRS") Mark Everson agreed and has further stated, "[p]icking a date on which the stock price

23  was low in comparison with the current price gives the employee the largest potential for gain on

24  the option and makes it possible for the employee to benefit from corporate performance that

25  occurred before the option was granted."

26       11.    In addition to the foregoing, a recent academic study revealed that outside

27  directors of companies were also benefiting from backdating and were recipients of manipulated

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT     - 4 -
(No. C 07-0317 JLR)

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1  stock option grants, as detailed in *The Wall Street Journal* article published on December 18,

2  2006 below:

> A new academic study suggests that many outside directors received manipulated stock-option grants, a finding that may help explain why the practice of options backdating wasn't stopped by the boards of some companies.
>
> The statistical study, which names no individuals or firms, estimates that 1,400 outside directors at 460 companies received questionable option grants, suggesting the widespread practice extended well beyond the executive suite.
>
> The study is notable because it suggests that outside, or independent, directors -- who are supposed to play a special role safeguarding against cozy board relationships with management -- may have been co-opted in options backdating by receiving manipulated grants themselves. The New York Stock Exchange requires that a majority of board seats, and all compensation- and audit-committee members, be independent . . . .
>
> The evidence "contributes to understanding the possible factors that led to or enabled manipulation to occur," states the unpublished study, which was conducted by professors at Harvard and Cornell universities and the French business school Insead . . . .

17      12.     According to an August 26, 2007 article in the *National Law Journal* entitled

18  "Lawyers Fly Blind on Options Penalties," the stock options backdating scandal has produced 16

19  criminal prosecutions, 220 companies that have been subject to internal or federal investigations

20  and 100 corporate earnings restatements totaling approximately $12.4 billion.

21      13.     Getty Images is one of the many companies that have been subject to both an

22  internal investigation and SEC investigation involving options backdating at the Company.

23  After the internal investigation was completed, the Company ***admitted that past option grants***

24  ***were "improperly dated" and that the Company would be required to restate financial data.***

25  Specifically, the Company has determined that "it is necessary to revise the measurement dates

26  for approximately 3,700 . . . grants, covering grants made on approximately 130 occasions." On

27  June 13, 2007, the Company filed its fiscal 2006 financial report and the first and second quarter

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 5 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  amended reports, which were adjusted to account for additional compensation expenses totaling

2  *over $27 million*.

3        14.    In addition to being unjustly enriched by the receipt of backdated options, from

4  February 25, 1999 to January 20, 2006, Defendants Garb, Getty, Klein and Sporborg, while in

5  possession of materially adverse non-public information regarding the backdating of stock

6  options and the false financial statements resulting therefrom, sold approximately 3.1 million

7  shares of Getty Images stock and collectively realized ***total proceeds of over $169 million***, a

8  significant portion of which was obtained through the exercise of improperly backdated stock

9  options. Furthermore, Getty Image's executives were also overpaid cash bonuses based on

10  inflated earnings, which created an inflated market capitalization for Getty Images common

11  stock.

12        15.    As alleged in detail herein, in gross breach of their fiduciary duties as officers

13  and/or directors of Getty Images, defendants intentionally colluded with one another to:

14      a.    improperly backdate multiple grants of Getty Images stock options to several
15               Getty Images executives and directors, in violation of the Company's
             shareholder-approved stock option plans;

16
17      b.    improperly record and account for the backdated stock options, in violation of
             GAAP;

18
19      c.    improperly take tax deductions based on the backdated stock options, in violation
             of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section
20               162(m)");

21      d.    produce and disseminate false financial statements and other false SEC filings to
             Getty Images shareholders and the market that improperly recorded and
22               accounted for the backdated option grants and concealed the improper backdating
             of stock options; and

23
24      e.    improperly cause Getty Images to violate applicable federal and state laws, rules,
             and regulations requiring the dissemination of accurate financial statements and
25               restricting the misuse of material non-public information.

26        16.    By engaging in this scheme, defendants were able to conceal that Getty Images

27  was not accounting for its compensation expenses properly and was materially overstating the

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 6 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    Company's net income and earnings for 1999 through the present. In addition to the serious and

2    adverse tax consequences resulting from the Company's failure to record the appropriate non-

3    cash stock-based compensation expenses, Getty Images faces millions in costs associated with

4    the review by the Special Committee of the Board (the "Special Committee") and the related

5    restatements.

6        17.    This action states derivative claims for the defendants' violations of Sections

7    10(b), 14(a) and 20(a) of the Exchange Act and SEC Rule 10b-5. This action also seeks

8    disgorgement of bonuses or other incentive-based or equity-based compensation received by the

9    defendants who also received backdated options, and for any profits realized from their sale of

10   Getty Images stock, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002.

11       18.    As a result of defendants' secret scheme to backdate options and issue false and

12   misleading statements to conceal such backdating, Getty Images has sustained millions of dollars

13   in damages, including damage to its reputation and loss of goodwill in general, exposure to an

14   adverse opinion by its outside auditors and considerable financial cost in having to review and

15   restate previously issued financial statements. Moreover, Getty Images has been exposed to civil

16   liability and potential regulatory fines by the SEC and IRS for failure to pay or withhold taxes.

17   Meanwhile, the recipients of the backdated stock options -- top executives and directors at Getty

18   Images -- have garnered millions of dollars in unlawful profits at the expense of the Company.

19                            **JURISDICTION AND VENUE**

20       19.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that

21   this Complaint states a federal question. This Court also has jurisdiction over this action

22   pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states

23   and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court

24   has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C.

25   §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States

26   which it would not otherwise have.

27       20.    Venue is proper in this district because a substantial portion of the transactions

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 7 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ♦ Fax: (425) 868-7870

1 and wrongs complained of herein, including the defendants' primary participation in the

2 wrongful acts detailed herein, occurred in this district.  One or more of the defendants either

3 resides in or maintains executive offices in this district, and defendants have received substantial

4 compensation in this district by engaging in numerous activities and conducting business here,

5 which had an effect in this district.

6 <div align="center">**PARTIES**</div>

7   21. Plaintiff Edmonds is a shareholder of Getty Images, was a shareholder of Getty

8 Images at the time of the wrongdoing alleged herein, and has been a shareholder of Getty Images

9 continuously since that time.  Plaintiff Edmonds is a citizen of the State of Pennsylvania.

10   22. Nominal defendant, Getty Images, is a Delaware corporation with its principal

11 executive offices located at 601 North 34th Street, Seattle, WA 98103.  According to its public

12 filings, Getty Images is a leading creator and distributor of visual content.

13 **Defendant Getty**

14   23. Defendant Mark H. Getty ("Getty") is a co-founder of Getty Images and has

15 served as a director and as Chairman of the Board since February 1998.

16   24. Upon information and belief, Getty received approximately the following as

17 compensation, not including stock option grants:

18

19

20

21

22

23

| Fiscal Year | Compensation |
|-------------|--------------|
| 2005 | $123,003 |
| 2004 | $137,099 |
| 2003 | $564,616 |
| 2002 | $482,775 salary |
| 2001 | $460,889 salary |
| 2000 | $481,292 salary and $500,000 bonus |
| 1999 | $343,904 salary and $224,250 bonus |

24   25. Upon information and belief, Defendant Getty received 915,000 backdated Getty

25 Images stock options, as shown below:

26

27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 8 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

| Purported grant date | # of Options | Exercise price |
|---|---|---|
| 10/22/99 | 15,000 | $19.07 |
| 04/28/00 | 400,000 | $30.32 |
| 05/24/00 | 400,000 | $28.63 |
| 03/30/01 | 50,000 | $16.85 |
| 10/15/01 | 50,000 | $12.41 |

26.    From 2003 to 2006, Defendant Getty sold 1,407,635 shares of Getty Images stock with total proceeds of $76,183,332.60, a significant portion of which was obtained through the exercise of improperly backdated stock options.

27.    Upon information and belief, Getty is a citizen of the State of Washington.

**Defendant Klein**

28.    Defendant Jonathan D. Klein ("Klein") is a co-founder of Getty Images and has served as Chief Executive Officer ("CEO") and as a director since February 1998.  Klein has served as the only member of the Stock Option Committee of the Board, later renamed the Equity Compensation Committee (the "Stock Option Committee") since its formation in July 2001 until its dissolution in 2007.

29.    Upon information and belief, Klein received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2006 | $950,000 |
| 2005 | $950,000 salary and $691,600 bonus |
| 2004 | $962,500 salary and $828,208 bonus |
| 2003 | $1,100,000 salary and $325,000 bonus |
| 2002 | $1,100,000 salary and $420,000 bonus |
| 2001 | $625,000 salary |
| 2000 | $463,177 salary |
| 1999 | $355,976 salary and $224,250 bonus |

30.    Upon information and belief, Klein received 1,317,000 backdated Getty Images stock options, as shown below:

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 9 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

| Purported grant date | # of options | Exercise price |
|---|---|---|
| 10/22/99 | 15,000 | $19.07 |
| 04/28/00 | 400,000 | $30.32 |
| 05/24/00 | 400,000 | $28.63 |
| 03/30/01 | 50,000 | $16.85 |
| 05/07/01 | 232,000 | $25.43 |
| 06/26/01 | 170,000 | $25.43 |
| 10/15/01 | 50,000 | $12.41 |

31.    Upon information and belief, Klein is a citizen of the State of Washington.

**Defendant Sporborg**

32.    Defendant Christopher H. Sporborg ("Sporborg") has served as a director of the Company and as a member of the Compensation Committee of the Board (the "Compensation Committee") since February 1998 and served as a director of Getty Communications Limited from May 1996 to February 1998. Defendant Sporborg also served as a member of the Audit Committee of the Board (the "Audit Committee") from 1998 to 2004.

33.    Upon information and belief, Sporborg received an option grant dated July 23, 2001 to purchase at least 8,333 shares of Getty Images common stock at the exercise price of $15.80. Moreover, from 2004 to 2005, Defendant Sporborg sold 9,583 shares of Getty Images stock with total proceeds of $577,309.86, a significant portion of which was obtained through the exercise of improperly backdated stock options.

34.    Upon information and belief, Sporborg is a citizen of the State of Washington.

**Defendant Bailey**

35.    Defendant James N. Bailey ("Bailey") has served as a director of Getty Images and as a member of the Compensation Committee and the Audit Committee since February 1998. Bailey also served as a director of Getty Communications Limited from September 1996 to February 1998.

36.    Upon information and belief, Bailey is a citizen of the State of Washington.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 10 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

**Defendant Garb**

37.     Defendant Andrew S. Garb ("Garb") has served as a director of the Company and as a member of the Compensation Committee since February 1998.  Garb also served as a director of Getty Communications Limited from May 1996 to February 1998.  He has also served as a member of the Audit Committee from 1998 to 2002 and since 2005.  Garb is currently of counsel to the law firm of Loeb & Loeb LLP, where he was managing partner from 1986 to 1992.

38.     Upon information and belief, Garb is a citizen of the State of Washington.

**Defendant Albers**

39.     Defendant A.D. Albers ("Albers") served as the Company's Senior Vice President and Chief Technology Officer from October 1999 to March 2003.

40.     Upon information and belief, Defendant Albers received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 2002 | $260,000 salary and $100,000 bonus |
| 2001 | $275,000 salary |
| 2000 | $248,542 salary and $137,500 bonus |
| 1999 | $44,128 salary and $17,500 bonus |

41.     Upon information and belief, Defendant Albers received 95,000 backdated Getty Images stock options, as shown below:

| Purported grant date | # of options | Exercise price |
| --- | --- | --- |
| 08/28/00 | 25,000 | $40.41 |
| 10/11/00 | 25,000 | $24.78 |
| 03/30/01 | 25,000 | $16.85 |
| 10/15/01 | 20,000 | $12.41 |

42.     From November 1, 2002 to March 4, 2003 Defendant Albers sold 51,771 shares of Getty Images stock with total proceeds of $1,525,407.73, a significant portion of which was obtained through the exercise of improperly backdated stock options.

43.     Upon information and belief, Albers is a citizen of the State of Washington.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 11 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

**Defendant Beyle**

44.    Defendant Jeff Beyle ("Beyle") has served as Senior Vice President and General Counsel of Getty Images since November 2000.

45.    Upon information and belief, Defendant Beyle received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2005 | $290,000 salary and $120,640 bonus |
| 2004 | $290,000 salary and $141,520 bonus |
| 2003 | $282,500 salary and $102,080 bonus |
| 2002 | $260,000 salary and $100,000 bonus |
| 2001 | $248,750 salary |
| 2000 | $22,705 salary and $15,000 bonus |

46.    Upon information and belief, Defendant Beyle received 63,500 backdated Getty Images stock options, as shown below:

| Purported grant date | # of options | Exercise price |
|---|---|---|
| 03/30/01 | 18,500 | $16.85 |
| 07/17/01 | 25,000 | $16.94 |
| 10/15/01 | 20,000 | $12.41 |

47.    From October 27, 2003 to October 25, 2005, Defendant Beyle sold 138,500 shares of Getty Images stock with total proceeds of $9,364,596.00, a portion of which was obtained through the exercise of improperly backdated stock options.

48.    Upon information and belief, Beyle is a citizen of the State of Washington.

**Defendant Blackwell**

49.    Defendant M. Lewis Blackwell ("Blackwell") served as Getty Images' Senior Vice President, Creative Customers from September 2003 to 2006 and as its Senior Vice President, Creative Direction from July 2001 to September 2003.

50.    Upon information and belief, Defendant Blackwell received approximately the following as compensation, not including stock option grants:

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                     - 12 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

| Fiscal Year | Compensation |
|---|---|
| 2004 | $312,913 salary and $147,352 |
| 2003 | $264,468 salary and $105,428 |
| 2002 | $231,000 salary and $75,000 bonus |
| 2001 | $221,760 salary |

51.    Upon information and belief, Defendant Blackwell received an option grant dated October 15, 2001 to purchase 10,000 shares of Getty Images common stock at the exercise price of $12.41.  On May 27, 2003, Defendant Blackwell sold 10,000 shares of Getty Images stock with total proceeds of $376,400.00, a significant portion of which was obtained through the exercise of improperly backdated stock options.

52.    Upon information and belief, Blackwell is a citizen of the State of Washington.

**Defendant Evans-Lombe**

53.    Defendant Nick Evans-Lombe ("Evans-Lombe") has served as the Company's Senior Vice President, Images and Services since August 2004.  Evans-Lombe also served as its Senior Vice President, Editorial Customers from September 2003 to July 2004, its Senior Vice President, Editorial from January 2002 to September 2003, its Senior Vice President, Strategy and Corporate Development from February 1998 to January 2002, and Director of Strategy and Corporate Development of Getty Communications Limited, its predecessor, from February 1996 to February 1998.

54.    Upon information and belief, Defendant Evans-Lombe received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2006 | $350,750 committee fees and $30,000 bonus |
| 2004 | $240,000 salary and $119,040 bonus |
| 2003 | $238,750 salary and $89,000 bonus |
| 2002 | $235,000 salary and $66,000 bonus |

55.    Upon information and belief, Defendant Evans-Lombe received 140,000 backdated Getty Images stock options, as shown below:

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 13 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

| Purported grant date | # of options | Exercise price |
|---|---|---|
| 05/04/99 | 30,000 | $26.82 |
| 07/27/99 | 30,000 | $18.44 |
| 10/22/99 | 15,000 | $19.07 |
| 03/30/01 | 20,000 | $16.85 |
| 10/15/01 | 20,000 | $12.41 |
| 02/05/02 | 25,000 | $19.43 |

56.    From January 2, 2003 to August 26, 2005, Defendant Evans-Lombe sold 118,355 shares of Getty Images stock with total proceeds of $6,644,231.85, a significant portion of which was obtained through the exercise of improperly backdated stock options.

57.    Upon information and belief, Evans-Lombe is a citizen of the State of Washington.

**Defendant Ferguson**

58.    Defendant John Z. Ferguson ("Ferguson") served as Getty Images' Senior Vice President, Sales, Americas, and held other senior vice president positions at the Company from at least 1999 to 2005.

59.    Upon information and belief, Defendant Ferguson received 31,400 backdated Getty Images stock options, as shown below:

| Purported grant date | # of options | Exercise price |
|---|---|---|
| 08/03/99 | 3,500 | $18.33 |
| 10/22/99 | 7,500 | $19.07 |
| 02/01/00 | 400 | $38.63 |
| 03/30/01 | 10,000 | $16.85 |
| 10/09/01 | 10,000 | $12.82 |

60.    From November 11, 2003 to July 29, 2005, Defendant Ferguson sold 51,500 shares of Getty Images stock with total proceeds of $3,348,535.00, a portion of which was obtained through the exercise of improperly backdated stock options.

61.    Upon information and belief, Ferguson is a citizen of the State of Washington.

**Defendant Gurke**

62.    Defendant Jim Gurke ("Gurke") has served as the Company's Senior Vice

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 14 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    President, Human Resources and Chief of Staff since July 2004 and previously served as its Vice

2    President of New Revenues from December 2003 to July 2004, as its Vice President of Sales,

3    Americas from October 2002 to August 2002, and as its Vice President of Sales and Marketing

4    from 1999 to 2002.

5        63.    Upon information and belief, Defendant Gurke received 35,900 backdated Getty

6    Images stock options, as shown below:

| Purported grant date | # of options | Exercise price |
|----------------------|--------------|----------------|
| 08/03/99 | 3,000 | $18.33 |
| 10/22/99 | 7,500 | $19.07 |
| 02/01/00 | 400 | $38.63 |
| 03/30/01 | 15,000 | $16.85 |
| 10/09/01 | 10,000 | $12.82 |

12      64.    From November 11, 2003 to January 3, 2006, Defendant Gurke sold 1,407,635

13   shares of Getty Images stock with total proceeds of $76,183,332.60, a portion of which was

14   obtained through the exercise of improperly backdated stock options.

15      65.    Upon information and belief, Gurke is a citizen of the State of Washington.

16   **Defendant Huebner**

17      66.    Defendant Elizabeth J. Huebner ("Huebner") served as Getty Images' Senior Vice

18   President and Chief Financial Officer from October 2000 to early 2006.

19      67.    Upon information and belief, Defendant Huebner received approximately the

20   following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|-------------|--------------|
| 2006 | $187,500 salary |
| 2005 | $392,500 salary and $208,000 bonus |
| 2004 | $370,000 salary and $229,400 bonus |
| 2003 | $361,250 salary and $181,300 bonus |
| 2002 | $335,000 salary and $185,000 bonus |
| 2001 | $312,500 salary |
| 2000 | $74,178 salary and $41,250 bonus |

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)                                      - 15 -                        LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

68.    Upon information and belief, Defendant Huebner received: (i) an option grant dated March 30, 2001 to purchase 35,000 shares of Getty Images common stock at the exercise price of $16.85, and (ii) an option grant dated October 15, 2001 to purchase 20,000 shares of Getty Images common stock at the exercise price of $12.41.

69.    From October 27, 2003 to May 16, 2006, Defendant Huebner sold 257,917 shares of Getty Images stock with total proceeds of $16,071,192.23, a portion of which was obtained through the exercise of improperly backdated stock options.

70.    Upon information and belief, Huebner is a citizen of the State of Washington.

**Defendant Miskimens**

71.    Defendant Scott A. Miskimens ("Miskimens") served as the Company's Senior Vice President, Technology and Content from December 2003 to 2004, as its Senior Vice President, Technology, Content and Artist Operations from January 2003 to December 2003, as its Senior Vice President, Content and Artist Operations, from November 2002 to January 2003, and as its Vice President, Technology Services from January 2000 to November 2002.

72.    Upon information and belief, Defendant Miskimens received 28,944 backdated Getty Images stock options, as shown below:

| Purported grant date | # of options | Exercise price |
|---|---|---|
| 05/30/00 | 10,000 | $29.10 |
| 03/30/01 | 9,375 | $16.85 |
| 07/17/01 | 5,569 | $16.94 |
| 10/09/01 | 4,000 | $12.82 |

73.    From May 16, 2003 to February 12, 2004, Defendant Miskimens sold 14,284 shares with total proceeds of $586,154.04, a significant portion of which was obtained through the exercise of improperly backdated stock options.

74.    Upon information and belief, Miskimens is a citizen of the State of Washington.

**Defendant O' Neill**

75.    Defendant William O'Neill ("O'Neill") has been the Senior Vice President of

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                     - 16 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  Human Resources of the Company from April 2000 to December 2002.

2      76.    Upon information and belief, Defendant O'Neill received an option grant dated

3  March 30, 2001 to purchase 30,000 shares of Getty Images common stock at the exercise price

4  of $16.85.

5      77.    Upon information and belief, O'Neill is a citizen of the State of Washington.

6  **Defendant Powell**

7      78.    Defendant Stephen M. Powell ("Powell") served as Getty Images' President of

8  the Press and Editorial Division from 1998 to 2001.

9      79.    Upon information and belief, Defendant Powell received 90,000 backdated Getty

10  Images stock options, as shown below:

| Purported grant date | # of options | Exercise price |
|---|---|---|
| 04/09/99 | 50,000 | $23.32 |
| 07/06/99 | 25,000 | $18.32 |
| 10/22/99 | 15,000 | $19.07 |

15      80.    Upon information and belief, Powell is a citizen of the State of Washington.

16  **Defendant Roling**

17      81.    Defendant Christopher J. Roling ("Roling") served as the Company's Senior Vice

18  President, Finance and Chief Financial Officer from January 1999 to May 2000.

19      82.    Upon information and belief, Defendant Roling received 28,000 backdated Getty

20  Images stock options, as shown below:

| Purported grant date | # of options | Exercise price |
|---|---|---|
| 05/04/99 | 10,000 | $26.82 |
| 08/03/99 | 3,000 | $18.33 |
| 10/22/99 | 15,000 | $19.07 |

25      83.    Upon information and belief, Roling is a citizen of the State of Washington.

26  **Defendant von Bargen**

27      84.    Defendant Sally von Bargen ("von Bargen") served as the Company's Senior

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 17 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1  Vice President and Director of Marketing from February 2001 to December 2001 and as the

2  President of Creative Professional Division of Getty Images from July 1999 to February 2001.

3      85.    Upon information and belief, Defendant von Bargen received 135,000 backdated

4  Getty Images stock options, as shown below:

| Purported grant date | # of options | Exercise price |
|---|---|---|
| 04/09/99 | 75,000 | $23.32 |
| 10/22/99 | 40,000 | $19.07 |
| 03/30/01 | 20,000 | $16.85 |

9      86.    Upon information and belief, von Bargen is a citizen of the State of Washington.

10  **Defendant Woodhouse**

11      87.    Defendant Warwick K. Woodhouse ("Woodhouse"), served as Getty Images'

12  Senior Vice President, Organizational Development from May 2003 to 2004. He also served as

13  its Senior Vice President, Operations and Logistics from September 2000 to August 2002, as its

14  Senior Vice President, Planning from February 1998 to September 2000, and as the Group

15  Planning Director of Getty Communications Limited from October 1996 to February 1998.

16      88.    Upon information and belief, Defendant Woodhouse received 92,000 backdated

17  Getty Images stock options, as shown below:

| Purported grant date | # of options | Exercise price |
|---|---|---|
| 10/25/99 | 2,000 | $19.38 |
| 10/11/00 | 25,000 | $24.78 |
| 03/30/01 | 30,000 | $16.85 |
| 07/17/01 | 25,000 | $16.94 |
| 10/15/01 | 10,000 | $12.41 |

23      89.    From May 15, 2003 to August 31, 2004, Defendant Woodhouse sold 105,500

24  shares of Getty Images stock with total proceeds of $4,909,275.00, a significant portion of which

25  was obtained through the exercise of improperly backdated stock options.

26      90.    Upon information and belief, Woodhouse is a citizen of the State of Washington.

27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 18 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1

**Individual Defendants**

2  91. Collectively, defendants Getty, Klein, Sporborg, Bailey, Garb, Albers, Beyle,

3 Blackwell, Evans-Lombe, Ferguson, Gurke, Huebner, Miskimens, O'Neill, Powell, Roling, von

4 Bargen and Woodhouse are referred to herein as the "Individual Defendants."

5

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

6  92. By reason of their positions as officers and/or directors of the Company and

7 because of their ability to control the business and corporate affairs of the Company, the

8 Individual Defendants, particularly Getty, Klein and Compensation Committee members Bailey,

9 Garb and Sporborg, owed the Company and its shareholders the fiduciary obligations of good

10 faith, trust, loyalty and due care, and were and are required to use their utmost ability to control

11 and manage the Company in a fair, just, honest and equitable manner.  The Individual

12 Defendants were and are required to act in furtherance of the best interests of the Company and

13 its shareholders so as to benefit all shareholders equally and not in furtherance of their personal

14 interest or benefit.  Each director and officer of the Company owes to the Company and its

15 shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

16 affairs of the Company and in the use and preservation of its property and assets, and the highest

17 obligations of fair dealing.

18  93. Defendants Getty, Klein, Sporborg, Bailey and Garb, because of their positions of

19 control and authority as directors and/or officers of the Company, were able to and did, directly

20 and/or indirectly, exercise control over the wrongful acts complained of herein.

21  94. To discharge their duties, Defendants Getty, Klein, Sporborg, Bailey and Garb, as

22 the officers and directors of the Company, were required to exercise reasonable and prudent

23 supervision over the management, policies, practices and controls of the Company.  By virtue of

24 such duties, the officers and directors of the Company were required to, among other things:

25  a. exercise good faith in ensuring that the affairs of the Company were conducted in

26   an efficient, business-like manner so as to make it possible to provide the highest
quality performance of its business;

27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 19 -

b.  exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.  exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports, or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d.  exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

e.  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

95.  The Individual Defendants, particularly Getty and Klein, and Audit Committee members Sporborg, Bailey and Garb, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

a.  make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

b.  devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

1.  transactions are executed in accordance with management's general or specific authorization; and

2.  transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 20 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA. 98074-7033
Tel: (425) 868-7813 ■ Fax: (425) 868-7870

**DUTIES AND RESPONSIBILITIES OF THE AUDIT, COMPENSATION, AND STOCK OPTION COMMITTEES**

96.    The standing committees of the Board include: (i) the Audit Committee; (ii) the Compensation Committee; and (iii) Stock Option Committee

97.    These Committees set the policies which admittedly permitted the backdating of options to occur.

*Compensation Committee*

98.    The following directors served on the Compensation Committee of the Getty Images Board at certain times during the relevant period:

| Compensation Committee | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| **Bailey** | M | M | M | M | M | M | M | M | M |
| **Garb** | M | C | C | C | C | C | C | C | C |
| **Sporborg** | M | M | M | M | M | M | M | M | M |

M=Member; C=Chairman of Committee

99.    According to the Company's Compensation Committee Charter, the Compensation Committee's responsibilities include, among other things:

a.    Review and approve corporate goals and objectives relevant to the Chief Executive Officer's compensation, evaluate the Chief Executive Officer's performance in light of those goals and objectives, and, either as a committee or together with the other independent directors (as directed by the Board), determine and approve the Chief Executive Officer's compensation level based on this evaluation;

b.    Either as a Committee or together with the other independent directors, as directed by the Board, determine and approve non-Chief Executive Officer Executive Officer compensation and incentive-compensation and equity-based plans that are subject to Board approval, including, but not limited to, base salaries, annual and other incentive awards, stock options and other equity-based compensation, deferred compensation, retirement benefits, special benefits, executive perquisites and employment/severance contracts;

c.    Administer the [Option] Plan in a manner that is not inconsistent with the terms and provisions of such plan, construe all terms and provisions, conditions and

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 21 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    limitations to the [Option] Plan, and make all factual determinations required for

2    the administration of the [Option]Plan; . . .

3    d.    Adopt and periodically review a comprehensive statement of compensation

philosophy, strategy and principles for Executive Officers that has the support of

4    management and the Board, and administer the Company's compensation

5    program fairly and consistently within such principles; . . .

6    e.    The Chair (or other Committee member as designated by the Committee) shall

meet annually with the Chief Executive Officer and any other members of

7    management the Board and Committee members deem appropriate to discuss and

8    review the performance criteria and compensation levels of key members of

Executive Officers. . . .

9

10    f.    The Committee shall prepare a report to be included in the Company's annual

proxy statement or Annual Report on Form 10-K, in accordance with applicable

11    rules and regulations of the New York Stock Exchange, the Securities and

Exchange Commission and other applicable regulatory bodies.

12

13    g.    The Committee also shall review and discuss with management the Company's

executive compensation disclosure (including the Company's disclosures under

14    "Compensation Discussion and Analysis") included in reports and registration

statements with the Securities and Exchange Commission.

15    *Audit Committee*

16    100.    The following directors served on the Audit Committee of the Board at certain

17    times during the relevant period:

18

| Audit Committee | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Bailey | M | M | M | M | M | M | M | M | M |
| Garb | M | M | M | M | M | | | M | M |
| Sporborg | C | C | C | C | C | M | M | | |
| M=Member; C=Chairman of Committee | | | | | | | | | |

23    101.    Getty Images' Audit Committee Charter provides that the Audit Committee shall,

24    among other things:

25    a.    Discuss with management and the independent auditors the Company's annual

26    audited financial statements and quarterly financial statements, including the

27    Company's specific disclosures under "Management's Discussion and Analysis of

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT    - 22 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

b. Review with management and the independent auditor the type and presentation of information to be included in earnings press releases, and discuss any financial information and earnings guidance provided to analysts, investors and rating agencies. The Committee's responsibility to discuss earnings releases, as well as financial information and earnings guidance, may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made). The Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

c. Based on the review and discussions referred to in this Section, determine whether to recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the last fiscal year for filing with the Securities and Exchange Commission.

d. Discuss with the independent auditors the matters required to be discussed by Statement of Auditing Standards No. 61 ("SAS No. 61"), Communications with Audit Committees, SAS No. 89, Audit Adjustments, and SAS No. 90, Audit Committee Communications, as each is amended from time to time, together with any other matters as may be required or appropriate under applicable laws, rules and regulations.

e. Review significant reserves, estimates and judgments by management, and the processes that provide the basis for the CEO and CFO to sign their quarterly certifications in the Company's SEC filings.

### *Stock Option Committee*

102. The Stock Option Committee was formed in July 2001 and was later renamed the Equity Compensation Committee. From its formation until its dissolution in 2007, the Stock Option Committee consisted of only one member, Defendant Klein. The Stock Option Committee was discontinued at the recommendation of the Special Committee in relation to its investigation of the Company's stock option granting practices. According to Getty Images' proxy statements, the Stock Option Committee "[was] responsible for the administration of the Amended and Restated Getty Images, Inc. 1998 Stock Incentive Plan for those employees who are not executive officers of the Company." The Committee may act only within limits set by the Board of Directors.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 23 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## BACKGROUND

### The Stock Option Backdating Scandal

103.    Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense, as long as the option's strike price was at or above the market's price for the stock on the day the options were granted.  If the option granted was priced below the market price on the date granted (known as an in-the-money option grant), SEC regulations required that any publicly traded company recognize and record the difference as a compensation expense in its financial statements. *See, e.g.*, Accounting Principles Board Opinion No. 25 ("APB 25"), superseded in 2004 by FAS 123(R).[1]   Accounting rules also required that companies recognize the same compensation expense if in-the-money options were granted to non-employees.  Thus, while in-the-money stock options are more valuable to those to whom they are granted, the additional expenses, if disclosed, reduce the total amount of net income reported to shareholders of a publicly traded company.

104.    In addition, pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's most highly compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation; and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were

---

[1] Pursuant to APB 25, the applicable GAAP provision at the time of the stock option grants enumerated herein, if the market price on the date of grant exceeds the exercise price of the options, the Company must recognize the difference as an expense.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 24 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1  in fact satisfied.

2    105.  Since the date of *The Wall Street Journal* article which first revealed the unlawful
3  practice of backdating stock options, more than 220 companies have reported internal and/or
4  governmental investigations of their backdating practices.  Additional research by Professor Lie
5  suggests that between 1996 and 2005, 18.9% of unscheduled option grants to top executives
6  were backdated or manipulated by nearly one-third of the companies investigated.

7    106.  As the public scrutiny has intensified, backdating has been revealed not only as a
8  practice to maximize the grant recipients' gain while concealing company expenses, but also as a
9  tax avoidance vehicle for some executives.  Reporting on an analysis written by an economist at
10  the SEC, the *San Jose Mercury News* reported, "[i]n a new wrinkle in the scandal over
11  backdating stock options, an analyst has found evidence that some executives manipulated the
12  exercise dates of their options in order to cheat on their taxes."  Marcy Gordon, SEC: Backdating
13  Done to Avoid Paying More Taxes, *San Jose Mercury News*, December 13, 2006, *available at*
14  http://www.mercurynews.com/search/ci_4831931.

15    107.  Indeed, like the stock option grants examined by *The Wall Street Journal*, the
16  pattern of option grants identified at Getty Images is more than randomly fortuitous, and the
17  more likely reason for the extraordinary pattern is that the stock options were improperly
18  backdated.

19                              **Getty Images' Stock Option Plans**

20    108.  During the relevant period that defendants engaged in their secret scheme to
21  backdate stock options, Getty Images had one stock option plan in effect, the 1998 Stock
22  Incentive Plan (the "1998 Plan"), which has been amended several times since its adoption.

23    109.  Under the 1998 Plan, those eligible to receive stock option awards are "officers or
24  other key employees or consultants of the Company or a Subsidiary with the potential to
25  contribute to the future success of the Company or its Subsidiaries."  Each option grant was
26  evidenced by a stock option agreement between the Company and the employee or consultant to
27  whom such option was granted.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                          - 25 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   110.   The Company's proxy statements also stated that the 1998 Plan was administered

2   by the Compensation Committee.

3   111.   The delegation of the Compensation Committee's authority to administer the

4   1998 Plan is permitted under the 1998 Plan but is limited as follows:

5   The Committee may, but need not, from time to time delegate some or all of its

6   authority under the Plan to an Administrator consisting of one or more members
    of the Committee or of one or more officers of the Company; provided, however,

7   that the Committee may not delegate its authority (i) to grant Awards to Eligible
    Individuals (A) who are subject on the date of the grant to the reporting rules

8   under Section 16(a) of the Exchange Act, (B) who are Section 162(m)

9   Participants or (C) who are officers of the Company who are delegated authority
    by the Committee hereunder, or (ii) under Sections 3(b) and 17 of the Plan . . . .

10  Nothing in the Plan shall be construed as obligating the Committee to delegate

11  authority to an Administrator, and the Committee may at any time rescind the
    authority delegated to an Administrator appointed hereunder or appoint a new

12  Administrator.

13  112.   Further, the exercise price of option grants under the 1998 Plan was determined

14  by the Compensation Committee.  Under the 1998 Plan, the exercise price of options must be

15  "no less than 100% of the Fair Market Value per share on the date of grant," where fair market

16  value is defined as "the average of the high and low prices of the Common Stock on such

17  exchange or such quotation on the date set for valuation."

18  113.   According to the Company's proxy statements, at all times relevant hereto the

19  Compensation Committee "review[ed] the compensation of the senior officers of the Company,

20  including executive bonus plan allocations, and [was] responsible for the administration of the

21  Amended and Restated Getty Images, Inc. 1998 Stock Incentive Plan for the executive officers

22  of the Company."

23  **SUBSTANTIVE ALLEGATIONS**

24  **Backdating of Getty Images Stock Option Grants**

25  114.   As discussed below, 21 out of 25 discretionary grant dates from April 1999 to

26  February 2002 were backdated, and the pattern of grants was more than fortuitous – eight were

27  made at or near the lowest price of the fiscal year, and fourteen were made at or near the lowest

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                      - 26 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  price of the fiscal quarter.

2      115.    Merrill Lynch & Co., Inc. ("Merrill Lynch") published an analysis of options

3  grants made at various companies in a report dated May 22, 2006 as further evidence that the

4  returns enjoyed by options grantees at many companies were not by mere chance.  The report

5  analyzes the twenty day performance of each option grant reported in a company's proxy

6  statements during the relevant backdating period.  The analysis also calculates the annualized

7  return of the option grants at twenty days after the grant and compares that annualized return

8  with the company's overall annual return.

9      116.    An application of the Merrill Lynch analysis for all of the stock grants disclosed

10 in proxy statements from 1999 to 2001 further indicates that the grants were backdated as the

11 vast discrepancies between the annualized management and annualized investors returns can

12 only be explained by a practice of backdating.  For example, the average annualized return to

13 management on the option grants identified in the relevant proxy statements for calendar years

14 1999 to 2001 is 317%, as compared to 38.62% average annualized return to investors – a

15 difference of 278.37%.

16     117.    From 1999 to 2006, the Compensation Committee and certain directors (Getty,

17 Klein, Bailey, Garb and Sporborg) knowingly and deliberately violated the terms of the 1998

18 Plan, APB 25 and Section 162(m) by knowingly and deliberately backdating grants of stock

19 options to make it appear as though the grants were made on dates when the market price of

20 Getty Images stock was lower than the market price on the actual grant dates, thereby unduly

21 benefiting the recipients of the backdated options.  Defendants Getty, Klein, Bailey, Garb and

22 Sporborg knew that the publicly reported grant dates and statements that the Company followed

23 APB 25 and granted options with exercise prices equal to the fair market value of Getty Images

24 stock on the date of grant were false because the grants were in fact backdated.  Defendants

25 Getty, Klein, Bailey, Garb and Sporborg knowingly and deliberately approved the backdating

26 scheme with knowledge of its consequences, *e.g.*, its effects on Getty Images' financial

27 statements, especially because Bailey, Garb and Sporborg were also on the Audit Committee and

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 27 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

1    reviewed and oversaw the filing of Getty Images' financial results.

2         118.    Between 1999 and 2006, the defendants repeated in proxy statements that the
3    stock option grants made during that period carried an exercise price that was equal the fair
4    market value on the date of grant. However, until 2006, the defendants concealed that the stock
5    option grants were repeatedly and consciously backdated to ensure that the strike price
6    associated with the option grants was below fair market value. Upon information and belief, the
7    Board members and the Compensation Committee members, including defendants Getty, Klein,
8    Bailey, Garb and Sporborg, who issued the grants would review historical stock prices before
9    issuing stock options to select a grant date when the stock prices was significantly below the
10   current market price. They would then falsify the relevant documents to make it appear as if the
11   stock options were granted on the earlier date.

12        119.    As a result, the executive to whom the options were granted could realize the gain
13   observed between the historical and actual grant date while the Company's records would appear
14   to show no difference between the option price and the market price on the purported date of the
15   grant, thereby avoiding both the reporting requirement and the additional compensation expense.

16        120.    In addition, in order to maximize remuneration to its officers and employees, and
17   to attract non-employee executives to the Company's ranks without impacting its reported
18   income, the defendants engaged in a practice of backdating the issue date of stock options to
19   certain key personnel and other Getty Images employees as admitted in the Company's April 16,
20   2007 press release and financial statements filed on June 13, 2007.

21        121.    According to the Company's Form 10-K for fiscal year 2006 filed with the SEC
22   on June 13, 2007 (the "2006 Annual Report"), from 1996 to 1998, the Compensation Committee
23   had the authority to, and did, grant options to employees, officers and directors.

24        122.    Then, from August 1998 through 2001, the Compensation Committee continued
25   to grant options to executive officers and created option "pools" from which defendant Klein and
26   unnamed senior vice presidents were authorized to grant options to employees and non-executive
27   officers.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                      - 28 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

123.    According to the 2006 Annual Report, these pools were used by the executive officers to grant options in connection with the hiring and promotion of employees or as incentive awards.

124.    The April 16, 2007 press release and the 2006 Annual Report stated that a total of 7,102 option grants and 1,062 RSUs grants were made on 465 occasions during the Relevant Period, as follows:

- "Pool options" in which "pools" of options were approved by the Compensation Committee for later grant to employees by executive officers (2,277 grants).

- "Acquisition option grants" in which options were granted by the Board of Directors or Compensation Committee to employees and officers in connection with the Company's acquisition of other companies and in which outstanding options held by employees of acquired companies were exchanged for Getty Images options at pre-determined conversion ratios (1,464 grants).

- "Other option grants" which cover all remaining stock option grants during the Relevant Period (3,361 grants).

- "RSU grants" in which RSUs were granted by the Equity Compensation Committee, the Compensation Committee and the Board of Directors to employees, officers and directors (1,062 grants).

**Backdating of Stock Option Grants**

April 9, 1999 Grants

125.    The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the purported April 9, 1999 stock option grants, Defendants Bailey, Garb and Sporborg, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

126.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Bailey, Garb and Sporborg approved these grants on a date after the reported grant date and knowingly used hindsight to select a favorable date.  Defendants Bailey, Garb and

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                   - 29 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7613 ● Fax: (425) 868-7870

1   Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

2       127.    Defendants Bailey, Garb and Sporborg granted Powell and von Bargen stock

3   options dated April 9, 1999, knowing that April 9, 1999 was not the date they actually approved

4   the grants.  The April 9, 1999 grants were approved by Bailey, Garb and Sporborg on a later

5   date, occurring between the next trading day on April 10, 1999 and May 5, 1999, the date the

6   grant was disclosed in a Form 4.  Moreover, Defendants Getty and Klein knowingly approved

7   and participated in the backdating of the April 9, 1999 grant because of their positions and

8   knowledge of the Company as they were intimately involved in its management.  Specifically,

9   Getty and Klein are the co-founders of Getty Images, and Klein is the Chief Executive Officer of

10  Getty Images.

11      128.    Defendants Bailey, Garb and Sporborg, with the knowledge of Klein and Getty,

12  granted stock options to defendants Powell and von Bargen purportedly on April 9, 1999.  The

13  grant was disclosed in Form 4s almost a month later, by which point, Getty Images average

14  high/low stock price rose $3.505, or 15.04%, following the purported grant date:[2]



26  [2] All charts in the Complaint are measured using the mean of the highest and lowest prices.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 30 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870



**Fiscal Year 1999**

04/09/99
$23.32

| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 04/09/99 | Powell | $23.32 | 50,000 |
| | von Bargen | $23.32 | 75,000 |

May 4, 1999 Grants

129.    The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted. For the May 4, 1999 stock option grants, Defendants Bailey, Garb and Sporborg, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

130.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Bailey, Garb and Sporborg approved these grants on a date after the reported grant date and knowingly used hindsight to select a favorable date. Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

131.    Defendants Bailey, Garb and Sporborg granted Evans-Lombe and Roling stock options purportedly on May 4, 1999, knowing that May 4, 1999 was not the date that they approved the grant. Moreover, Defendants Getty and Klein approved and participated in the backdating of the May 4, 1999 grants. Defendants Getty, Klein Bailey, Garb and Sporborg knew

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                        - 31 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ♦ Fax: (425) 868-7870

that the May 4, 1999 grant was approved by Bailey, Garb and Sporborg on a later date, occurring the next trading day on May 5, 1999 or May 6, 1999 when Getty Images average high/low stock price rose $2.34, or 8.73%, following the purported grant date:





AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 32 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

| Purported Grant Date | Name | Exercise Price | Number of Options[3] |
|---|---|---|---|
| 05/04/99 | Evans-Lombe | $26.82 | at least 30,000 |
| | Roling | $26.82 | 10,000 |

July 6, 1999, July 27, 1999, and August 3, 1999 Grants

132.    The Compensation Committee had the authority to choose the dates and, in fact, did choose the dates on which these stock options were granted.  For the purported July 6, 1999, July 27, 1999 and August 3, 1999 stock option grants, Defendants Bailey, Garb and Sporborg, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

133.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Bailey, Garb and Sporborg approved these grants on dates after the reported grant dates and knowingly used hindsight to select dates when Getty Images' stock was at quarterly or yearly lows.  Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

134.    Defendants Bailey, Garb and Sporborg granted Powell, Evans-Lombe, Ferguson, Gurke and Roling stock options dated July 6, 1999, July 27, 1999 and August 3, 1999, knowing that these grants were actually approved on the later date.  The actual grant date of the July 6, 1999 grant is estimated to be between July 8, 1999 and the end of the year on December 31, 1999, and the actual grant dates of the July 27, 1999 and August 3, 1999 grants are estimated to be between the next trading day of those grants and December 31, 1999.  Moreover, Defendants Getty and Klein knowingly approved and participated in the backdating of the July 6, 1999, July

[3] Where the total number of options is unknown, i.e. where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 33 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

27, 1999 and August 3, 1999 grants because of their positions and knowledge of the Company as they were intimately involved in its management.

135.    Defendants Bailey, Garb and Sporborg, with the knowledge of Klein and Getty, granted stock options to defendants Powell, Evans-Lombe, Ferguson, Gurke and Roling backdated to July 6, 1999, July 27, 1999 and August 3, 1999, which coincided with Getty Images' lowest stock prices of the fiscal quarter and year as shown below:





AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 34 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 07/06/99 | Powell | $18.32 | 25,000 |
| 07/27/99 | Evans-Lombe | $18.44 | at least 30,000 |
| 08/03/99 | Ferguson | $18.33 | at least 3,500 |
| | Gurke | $18.33 | at least 3,000 |
| | Roling | $18.33 | 15,000 |

October 22, 1999 and October 25, 1999 Grants

136. The Compensation Committee had the authority to choose the dates and, in fact, did choose the dates on which these stock options were granted. For the purported October 22, 1999 and October 25, 1999 stock option grants, Defendants Bailey, Garb and Sporborg, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

137. Defendants Bailey, Garb and Sporborg were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Bailey, Garb and Sporborg approved these grants on dates after the reported grant dates and knowingly used hindsight to select dates when Getty Images' stock was at quarterly or yearly lows. Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

138. Defendants Bailey, Garb and Sporborg granted stock options to Klein, Getty, Roling, Powell, von Bargen, Evans-Lombe, Ferguson, Gurke and Woodhouse that were backdated to October 22, 1999 and October 25, 1999 with the knowledge that October 22, 1999 and October 25, 1999 were not the dates that they approved the grants. Furthermore, Defendants Klein and Getty also knew that the grants were backdated. The actual grant dates of the October 22, 1999 and October 25, 1999 grants are between the next trading day and December 31, 1999.

139. Defendants Bailey, Garb and Sporborg, with the participation and knowledge of Klein and Getty, granted stock options to defendants Klein, Getty, Roling, Powell, von Bargen, Evans-Lombe, Ferguson, Gurke and Woodhouse backdated to October 22, 1999 and October 25,

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 35 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ♦ Fax: (425) 868-7870

1999 when Getty Images' stock price was at or near quarterly and yearly lows, as shown below:





AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 36 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 10/22/99 | Klein | $19.07 | 15,000 |
| | Getty | $19.07 | 15,000 |
| | Roling | $19.07 | 15,000 |
| | Powell | $19.07 | 15,000 |
| | von Bargen | $19.07 | 40,000 |
| | Evans-Lombe | $19.07 | at least 15,000 |
| | Ferguson | $19.07 | at least 7,500 |
| | Gurke | $19.07 | at least 7,500 |
| 10/25/99 | Woodhouse | $19.38 | at least 2,000 |

February 1, 2000 Grants

140.    The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted. For the February 1, 2000 stock option grants, Defendants Bailey, Garb and Sporborg, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

141.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Bailey, Garb and Sporborg approved these grants on a date after the reported grant date and knowingly used hindsight to select a favorable date. Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

142.    Defendants Bailey, Garb and Sporborg granted Ferguson and Gurke stock options purportedly on February 1, 2000, knowing that February 1, 2000 was not the date that they approved the grants. Moreover, Defendants Getty and Klein knowingly approved and participated in the backdating of the February 1, 2000 grants. Defendants Getty, Klein Bailey, Garb and Sporborg knew that the February 1, 2000 grants were approved by Bailey, Garb and Sporborg on a later date, occurring between February 2, 2000 and March 3, 2006 when the Company's stock price was at the highest price of the quarter.

143.    In fact, in a little over a month, Getty Images average high/low stock price rose

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 37 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ♦ Fax: (425) 868-7870

1    $23.185, or 60%, by March 3, 2006 subsequent to the purported grant date.  Furthermore, the

2    purported grant date coincides with one of Getty Images' lowest stock price of the entire quarter,

3    as shown below:





| Purported<br>Grant Date | Name | Exercise<br>Price | Number of<br>Options |
|---|---|---|---|
| 02/01/00 | Ferguson | $38.625 | at least 400 |
| | Gurke | $38.625 | at least 400 |

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 38 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

1    <u>April 28, 2000 Grants</u>

2    144.    The Compensation Committee had the authority to choose the date and, in fact,

3    did choose the date on which these stock options were granted.  For the April 28, 2000 stock

4    option grants, Defendants Bailey, Garb and Sporborg, as Compensation Committee members,

5    had the authority to administer the stock option plans and grant stock options thereunder.

6    145.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans

7    required that stock options be granted at not less than fair market value on the date of grant.

8    Defendants Bailey, Garb and Sporborg approved these grants on a date after the reported grant

9    date and knowingly used hindsight to select a favorable date.  Defendants Bailey, Garb and

10   Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

11   146.    Defendants Bailey, Garb and Sporborg granted stock options to Getty and Klein

12   that were backdated to April 28, 2000.  Bailey, Garb and Sporborg knew that April 28, 2000 was

13   not the date that they approved the grant and thus approved the backdating of the April 28, 2000

14   grants.  Defendants Klein and Getty, because of their positions with the Company, also knew that

15   the April 28, 2000 grant was granted at a later date – some time between the next trading day on

16   May 1, 2000 and May 23, 2000, the day before the next grant date.

17   147.    Moreover, Getty and Klein, the co-founders of the Company, were each granted

18   at least 400,000 stock options purportedly dated on April 28, 2000 when Getty Images average

19   high/low stock price rose $4.685, or 15.45%, in the 5 trading days following the purported grant

20   date.  Furthermore, the April 28, 2000 grants were dated near the lowest stock price of the fiscal

21   quarter, as shown below:

22

23

24

25

26

27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 39 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870





| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 04/28/00 | Getty | $30.32 | at least 400,000 |
| | Klein | $30.32 | at least 400,000 |

<u>May 24, 2000 and May 30, 2000 Grants</u>

148.    The Compensation Committee had the authority to choose the dates and, in fact, did choose the dates on which these stock options were granted. For the purported May 24, 2000 and May 30, 2000 stock option grants, Defendants Bailey, Garb and Sporborg, as Compensation

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 40 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1 | Committee members, had the authority to administer the stock option plans and grant stock
2 | options thereunder.

3 | 149.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans
4 | required that stock options be granted at not less than fair market value on the date of grant.
5 | Defendants Bailey, Garb and Sporborg approved these grants on dates after the reported grant
6 | dates and knowingly used hindsight to select dates when Getty Images' stock was at quarterly or
7 | yearly lows. Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date
8 | with a lower price violated the 1998 Plan.

9 | 150.    Defendants Bailey, Garb and Sporborg granted stock options to Klein, Getty and
10 | Miskimens that were backdated to May 24, 2000 and May 30, 2000 with the knowledge that
11 | May 24, 2000 and May 30, 2000 were not the dates that they approved the grants. Furthermore,
12 | Defendants Klein and Getty also knew that the grants were backdated. The actual grant date of
13 | the May 24, 2000 grants is between May 25, 2000 and June 20, 2000, the date that the grant was
14 | disclosed in a Form 4, by which point the Getty Images' stock price had increased by $8.875, or
15 | 31%. The actual grant date of the May 30, 2000 grant to Miskimens is between the next trading
16 | day and December 31, 1999.

17 | 151.    Defendants Bailey, Garb and Sporborg, with the participation and knowledge of
18 | Klein and Getty, granted stock options to defendants Klein, Getty and Miskimens backdated to
19 | May 24, 2000 and May 30, 2000  when Getty Images' stock price was at or near a quarterly and
20 | yearly low, as shown below:

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 41 -
(No. C 07-0317 JLR)





| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 05/24/00 | Klein | $28.63 | 400,000 |
| | Getty | $28.63 | 400,000 |
| 05/30/00 | Miskimens | $29.10 | at least 10,000 |

<u>August 28, 2000 Grant</u>

152.    The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the August 28, 2000 stock option grants, Defendants Bailey, Garb and Sporborg, as Compensation Committee members,

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 42 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    had the authority to administer the stock option plans and grant stock options thereunder.

2         153.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans

3    required that stock options be granted at not less than fair market value on the date of grant.

4    Defendants Bailey, Garb and Sporborg approved these grants on a date after the reported grant

5    date and knowingly used hindsight to select a favorable date.  Defendants Bailey, Garb and

6    Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

7         154.    Defendants Bailey, Garb and Sporborg granted stock options to defendant Albers

8    purportedly on August 28, 2000. However, Bailey, Garb and Sporborg who approved the grant

9    knew that August 28, 2000 was not the actual date of their approval of the grant, which actually

10   took place at a later date — sometime between the next trading day on August 30, 2000 and

11   September 19, 2000.  Because of their involvement in the running of the Company, defendants

12   Klein and Getty also knew that the August 28, 2000 grant to Albers was backdated.

13        155.    Defendants Klein, Getty, Bailey, Garb and Sporborg approved the stock options

14   purportedly granted to Albers on August 28, 2000 when Getty Images' average high/low stock

15   price had dropped significantly before August 28, 2000 and rose $2.245, or 5.6%, in the ten

16   trading days subsequent to the purported grant:



AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 43 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870



| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 08/28/00 | Albers | $40.41 | 25,000 |

October 11, 2000 Grants

156.    The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the purported October 11, 2000 stock option grants, Defendants Bailey, Garb and Sporborg, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

157.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant.  Defendants Bailey, Garb and Sporborg approved these grants on a date after the reported grant date and knowingly used hindsight to select dates when Getty Images' stock was at a quarterly or yearly low.  Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

158.    Defendants Bailey, Garb and Sporborg, with the participation and knowledge of Klein and Getty, granted stock options to Woodhouse and Albers dated October 11, 2000 knowing that October 11, 2000 was not the date that they approved the grants.  The actual grant

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 44 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  date of the October 11, 2000 grants is between October 13, 2000 and December 31, 2000.

2    159.    Defendants Woodhouse and Albers received stock option grants purportedly

3  dated on October 11, 2000 when the Company's average high/low price dropped significantly

4  before the purported grant date and rose approximately $7.30, or 29%, in just 20 trading days.  In

5  addition, the purported October 11, 2000 option grant was dated to coincide with one of Getty

6  Images' lowest stock prices of the entire fiscal quarter and year, as demonstrated in the following

7  charts:





AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 45 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 10/11/00 | Woodhouse | $24.78 | at least 25,000 |
| | Albers | $24.78 | 25,000 |

March 30, 2001 Grants

160.    The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted. For the purported March 30, 2001 stock option grants, Defendants Bailey, Garb and Sporborg, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

161.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Bailey, Garb and Sporborg approved these grants on a date after the reported grant date and knowingly used hindsight to select dates when Getty Images' stock was at a quarterly low. Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

162.    Defendants Bailey, Garb and Sporborg, with the knowledge and participation of Klein and Getty, granted stock option to defendants Klein, Getty, von Bargen, Huebner, Albers, Beyle, Evans-Lombe, Ferguson, Gurke, Miskimens, O'Neill and Woodhouse backdated to March 30, 2001, which coincided with the Company's second lowest stock price of the first fiscal quarter of fiscal 2001, as demonstrated in the charts below. Notably, these grants were recorded in Form 4s filed with the SEC on April 6, 2001 (after the end of the fiscal quarter) with a grant date of March 22, 2001, which is the date of the lowest stock price of the fiscal quarter, and then was later changed in Amended Form 4s filed with the SEC in late-2002. As such, the actual grant date of the March 30, 2001 stock option some time occurred before April 6, 2001.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 46 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870



**First Quarter of 2001**

03/30/01
$16.85



**Fiscal Year 2001**

03/30/01
$16.85

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 47 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 03/30/01 | Klein | $16.85 | 50,000 |
| | Getty | $16.85 | 50,000 |
| | von Bargen | $16.85 | 20,000 |
| | Huebner | $16.85 | 35,000 |
| | Albers | $16.85 | 25,000 |
| | Beyle | $16.85 | at least 18,500 |
| | Evans-Lombe | $16.85 | at least 20,000 |
| | Ferguson | $16.85 | at least 10,000 |
| | Gurke | $16.85 | at least 15,000 |
| | Miskimens | $16.85 | at least 9,375 |
| | O'Neill | $16.85 | at least 30,000 |
| | Woodhouse | $16.85 | at least 30,000 |

May 7, 2001 and June 26, 2001 Grants to Klein

163.    The Compensation Committee had the authority to choose the dates and, in fact, did choose the dates on which these stock options were granted. For the purported May 7, 2001 and June 26, 2001 stock option grants to Klein, Defendants Bailey, Garb and Sporborg, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

164.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Bailey, Garb and Sporborg approved these grants on dates after the reported grant dates and knowingly used hindsight to select favorable dates. Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

165.    Defendants Bailey, Garb and Sporborg granted stock options to defendant Klein purportedly on May 7, 2001 and June 26, 2001. However, Bailey, Garb and Sporborg who approved the grant, along with Klein and Getty, knew that May 7, 2001 and June 26, 2001 were not the actual dates of their approval of the grants, which actually took place at later dates. The actual grant date of the May 7, 2001 grant is estimated to be between May 18, 2001 and June 25,

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 48 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   2001, the day before the next grant date, and the actual grant date of the June 26, 2001 grant is

2   estimated to be between June 29, 2001 and July 9, 2001.

3       166.   The May 7, 2001 and June 26, 2001 grants to Klein coincided with Getty Images'

4   historical low prices and were dated when the stock price increased significantly afterwards.  The

5   purported May 7, 2001 grant was dated when Getty Images average high/low stock price rose

6   $6.785, or 26.68%, in just over 20 trading days.  The June 26, 2001 grant was backdated to when

7   Getty Images' average high/low stock price dropped significantly before June 26, 2001 and rose

8   $1.03, or 4.2%, in less than 10 trading days following the purported grant date.





AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 49 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 05/07/01 | Klein | $25.43 | 232,000 |
| 06/26/01 | Klein | $25.43 | 170,000 |

July 17, 2001 and July 23, 2001 Grants

167.    The Compensation Committee had the authority to choose the dates and, in fact, did choose the dates on which these stock options were granted.  For the purported July 17, 2001 and July 23, 2001 stock option grants to Beyle, Miskimens, Woodhouse and Sporborg, Defendants Bailey, Garb and Sporborg, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

168.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Bailey, Garb and Sporborg approved these grants on dates after the reported grant dates and knowingly used hindsight to select favorable dates.  Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

169.    Defendants Bailey, Garb and Sporborg granted stock options to defendant Klein purportedly on July 17, 2001 and July 23, 2001.  However, Bailey, Garb and Sporborg who approved the grants, along with Klein and Getty, knew that July 17, 2001 and July 23, 2001 were not the actual dates of their approval of the grants, which actually took place at later dates.  The actual grant date of the July 17, 2001 grant is estimated to be between July 27, 2001 and August 8, 2001, and the actual grant date of the July 23, 2001 grant is estimated to be between July 26, 2001 and September 4, 2001.

170.    The stock options purportedly granted on July 17, 2001 and July 23, 2001 were dated to coincide with historically low stock prices.  The Company's average high/low stock price dropped significantly before the purported grant dates and rose approximately $3.50, or 8.5%, within 10 trading days, as demonstrated in the chart below.  Remarkably, the July 17, 2001 and July 23, 2001 grants were purportedly made subsequent to the July 10, 2001 earnings release, which reported below expected earnings and which, as expected, caused the stock price

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 50 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

1  to drop significantly, as demonstrated below:





| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 07/17/01 | Beyle | $16.94 | at least 25,000 |
| | Miskimens | $16.94 | at least 5,569 |
| | Woodhouse | $16.94 | at least 25,000 |
| 07/23/01 | Sporborg | $15.80 | at least 8,333 |

October 9, 2001 and October 15, 2001 Grants

171.   The Compensation Committee had the authority to choose the dates and, in fact,

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 51 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813  ●  Fax: (425) 868-7870

1    did choose the dates on which these stock options were granted. For the purported October 9,

2    2001 and October 15, 2001 stock option grants, Defendants Bailey, Garb and Sporborg, as

3    Compensation Committee members, had the authority to administer the stock option plans and

4    grant stock options thereunder.

5        172.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans

6    required that stock options be granted at not less than fair market value on the date of grant.

7    Defendants Bailey, Garb and Sporborg approved these grants on dates after the reported grant

8    dates and knowingly used hindsight to select dates when Getty Images' stock was at a quarterly

9    low. Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date with a

10    lower price violated the 1998 Plan.

11        173.    Compensation Committee members Bailey, Garb and Sporborg granted stock

12    options to defendants Ferguson, Gurke, Miskimens, Klein, Getty, Huebner, Albers, Beyle,

13    Blackwell, Evans-Lombe and Woodhouse purportedly on October 9, 2001 and October 15, 2001,

14    which Bailey, Garb and Sporborg, as well as Klein and Getty, knew were not the actual grant

15    dates. The actual dates of the Compensation Committee's approval of the October 9, 2001 and

16    October 15, 2001 grants occurred between October 24, 2001 and December 31, 2001.

17        174.    Defendants Bailey, Garb and Sporborg, with the participation and knowledge of

18    Klein and Getty, backdated the stock option grants purportedly dated October 9, 2001 and

19    October 15, 2001 to coincide with Getty Images' lowest stock prices of the fourth fiscal quarter

20    of 2001, as demonstrated in the chart below:

21

22

23

24

25

26

27

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27





AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 53 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 10/09/01 | Ferguson | $12.82 | at least 10,000 |
| | Gurke | $12.82 | at least 10,000 |
| | Miskimens | $12.82 | at least 4,000 |
| 10/15/01 | Klein | $12.41 | 50,000 |
| | Getty | $12.41 | 50,000 |
| | Huebner | $12.41 | 20,000 |
| | Albers | $12.41 | 20,000 |
| | Beyle | $12.41 | at least 20,000 |
| | Blackwell | $12.41 | at least 10,000 |
| | Evans-Lombe | $12.41 | at least 20,000 |
| | Woodhouse | $12.41 | at least 10,000 |

February 5, 2002 Grant

175.    The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the purported February 5, 2002, Defendants Bailey, Garb and Sporborg, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

176.    Defendants Bailey, Garb and Sporborg were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Bailey, Garb and Sporborg, with the knowledge and participation of Klein and Getty, approved these grants on a date after the reported grant date and knowingly used hindsight to select dates when Getty Images' stock was at a quarterly low.  Defendants Bailey, Garb and Sporborg knew that backdating option grants to a date with a lower price violated the 1998 Plan.

177.    Defendants Bailey, Garb and Sporborg, as Compensation Committee members, granted Defendant Evans-Lombe stock options dated February 5, 2002, knowing that it was not the date they actually approved the grant.  With the knowledge Klein and Getty, Defendants Bailey, Garb and Sporborg actually approved the February 5, 2002 grant on a later date, occurring between February 7, 2002 and the end of the fiscal year.  The February 5, 2002 grant to Evans-Lombe coincided with Getty Images' lowest stock price of the first fiscal quarter of

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 54 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  2002, as demonstrated in the chart below:





| Purported Grant Date | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 02/05/02 | Evans-Lombe | $19.43 | at least 25,000 |

178.    Each and every one of the aforementioned stock option grants were dated just before a significant increase in Getty Images' stock price and/or at or near Getty Images' lowest closing stock price of the pertinent fiscal year.  The reason for the extraordinary pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 55 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ♦ Fax: (425) 868-7870

1    dates on which the stock option grants were made. Rather, at the behest of the option recipients

2    (Getty, Klein, Sporborg, Albers, Beyle, Blackwell, Evans-Lombe, Ferguson, Gurke, Huebner,

3    Miskimens, O'Neill, Powell, Roling, von Bargen and Woodhouse), Defendants Bailey, Garb and

4    Sporborg as well as Klein and Getty improperly backdated the stock option grants to make it

5    appear as though the grants were made on dates when the market price of Getty Images stock

6    was lower than the market price on the actual grant dates. This improper backdating, which

7    violated the terms of the 1998 Plan, resulted in option grants with lower exercise prices, which

8    improperly increased the value of the options to defendants Getty, Klein, Sporborg, Albers,

9    Beyle, Blackwell, Evans-Lombe, Ferguson, Gurke, Huebner, Miskimens, O'Neill, Powell,

10   Roling, von Bargen and Woodhouse and improperly reduced the amounts they had to pay the

11   Company upon exercise of the options.

12       179.    In addition, prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"),

13   defendants Klein, Getty, Bailey, Garb and Sporborg were able to engage in backdating of option

14   grants with relative ease because under federal law they were only required to report option

15   grants to the SEC once a year.

16       180.    Pursuant to SOX, beginning on August 29, 2002, executives and directors were

17   required to report option grants to the SEC within two days of the grant. With this new reporting

18   requirement in place, the pattern of backdating options seen previously from 1999 through 2002

19   came to an end. As discussed *infra* and as admitted by the Company in its April 16, 2007 press

20   release, most of the backdated grants at Getty Images "were made before 2002." Indeed, the last

21   backdated stock option grant at Getty Images was February 5, 2002, six months before the

22   reporting requirements of SOX became effective.

23       181.    Indeed, 21 of the 25 discretionary pre-SOX grants made since April 1999

24   coincided with historically low closing prices. Specifically, 8 of the 25 grants were dated at or

25   near yearly lows, and 14 of the 25 grants were dated at or near quarterly lows. The odds of

26   hitting that many quarterly and yearly lows are astronomical and thus cannot be the result of

27   "luck."

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    182.    There were five remaining option grants made during the relevant period that

2    were non-discretionary option grants and thus are not claimed to have been backdated. The five

3    option grants dated October 4, 1999, April 6, 2000, October 9, 2000, November 27, 2000 and

4    November 12, 2001 were awarded to employees as new hire grants and are dated when those

5    individuals began employment with Getty Images.

6                                    **Merrill Lynch Analysis**

7    183.    The subject of options backdating has been the focus of numerous financial

8    analysts and experts. One reputable source, Merrill Lynch, has set forth an analytical framework

9    to determine whether options were backdated. The Merrill Lynch analysis is set forth in a May

10   22, 2006 report. The analysis analyzes the twenty day performance of each option grant reported

11   in a company's proxy statements during the relevant backdating period. The analysis also

12   calculates the annualized return of the option grants at twenty days after the grant and compares

13   that annualized return with the company's overall annual return.

14   184.    Accordingly, Plaintiff analyzed stock option grants made from 1999 to 2001 that

15   were disclosed in Getty Images' proxy statements using the same analysis as Merrill Lynch.

16   Backdating is indicated under the Merrill Lynch analysis.[4]

17   185.    Applying the Merrill Lynch analysis, the following result occurs: annualized

18   investor returns were 176.26% in 1999, -34.03% in 2000, and -26.37% in 2001. Next, a

19   comparison of the twenty day and annualized returns to management on the subject grants was

20   undertaken.

21   186.    Applying the Merrill Lynch analysis for the option grants in 1999, the average

22   twenty day return is 25.57%, or 460.31% annualized, as compared to 176.26% annualized return

23   to investors in 1999 – a difference of 280.05%.

24

25   _____

26   [4] As disclosed in the pertinent proxy statements, there were no options granted to any of the top
     officers during the year 2002.

27

AMENDED SHAREHOLDER VERIFIED                     - 57 -              LAW OFFICES OF
DERIVATIVE COMPLAINT                                            CLIFFORD A. CANTOR, P.C.
(No. C 07-0317 JLR)                                                   627 208th Ave. SE
                                                                 Sammamish, WA 98074-7033
                                                          Tel: (425) 868-7813 • Fax: (425) 868-7870

1        187.    Applying the Merrill Lynch analysis for the option grants in 2000, the average

2    twenty day return is 10.22%, or 183.91% annualized, as compared to -34.03% annualized return

3    to investors in 2000 – a difference of 217.94%.

4        188.    Applying the Merrill Lynch analysis for the option grants in 2001, the average

5    twenty day return is 17.04%, or 306.76% annualized, as compared to -26.37% annualized return

6    to investors in 2001 – a difference of 333.13%.

7        189.    The average annualized return to management on the option grants identified in

8    the relevant proxy statements for calendar years 1999 to 2001 is 317%, as compared to 38.62%

9    average annualized return to investors – a difference of 278.37%.

10       190.    The vast discrepancies between the annualized management and annualized

11   investors' returns demonstrate that Getty Images stock options were opportunistically granted to

12   Company insiders in order to provide them with greater financial gains on their Getty Images

13   stock options than were achieved in the open market.  Such a dramatically beneficial pattern of

14   option grant dates can only reasonably be explained by backdating.

15       **Getty Images' Admission of Backdating and the Internal Investigation**

16       191.    On April 16, 2007, Getty Images issued a press releasing announcing the

17   completion of its Special Committee investigation and ***admitting that the Special Committee***

18   ***"identified certain awards for which grant dates were selected retroactively."***

19       Getty Images, Inc. (NYSE: GYI) (the "Company" or "Getty Images"), the world's
20   leading creator and distributor of visual content, today announced that an
     independent special committee of its board of directors (the "Special Committee")
21   has completed its internal investigation of the Company's equity compensation
     grant practices.
22

23       As previously announced on November 9, 2006, the Special Committee was
     established by Getty Images' Board of Directors to conduct an independent
24   investigation relating to the Company's equity compensation grant practices and
     related accounting for equity compensation grants. The Special Committee
25   consists of two independent members of Getty Images' Board of Directors, Alan
     G. Spoon and Michael A. Stein, the chair of the Audit Committee. The Special
26   Committee was assisted in the investigation by independent outside legal counsel
27   Orrick, Herrington & Sutcliffe LLP.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 58 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

Together with its independent counsel, the Special Committee conducted an extensive review of equity compensation grant practices and awards made by the Company, between July 14, 1994 and November 1, 2006 (the "Relevant Period"), which covered 7,102 stock option grants and 1,062 restricted stock unit ("RSU") grants made on 465 occasions. During the investigation, numerous documents were reviewed, and extensive interviews of current and former employees of the Company and other individuals were conducted by the Special Committee's independent counsel.

As also previously announced on November 9, 2006, the Securities and Exchange Commission (the "SEC") had earlier notified the Company that it is conducting an informal inquiry into the Company's equity compensation grant practices. The Company continues to cooperate fully with the SEC in this informal inquiry.

**The Special Committee's Conclusions**

* * *

The Special Committee and the Company's management have determined that incorrect measurement dates for certain equity compensation awards made during the Relevant Period were used for financial accounting purposes and, as a result, the Company will restate its prior financial statements to correct the accounting for those awards. The use of incorrect measurement dates resulted from a number of reasons, including delays in the approval of awards, the absence of definitive documentation and modifications of previously awarded grants. *The Special Committee also identified certain awards for which grant dates were selected retroactively* . . . . Nearly all of the grants for which the measurement dates are being changed (approximately 98% of the grants) were awarded in 2001 and earlier years. The Company anticipates that the restatement will involve total pre-tax, non-cash stock-based compensation expense of approximately $28 million to $32 million, of which approximately 95% will be expensed in 2002 and earlier years. Because these estimates are preliminary and we have not quantified all of the tax impacts, the net after tax amounts to be restated have not yet been determined by the Company.

The Company also has decided to implement certain remedial measures recommended by the Special Committee and endorsed by the Board of Directors in order to ensure reliability, transparency and accuracy in its equity compensation grant practices and accounting for its equity compensation program going forward. These remedial measures are described below.

* * *

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 59 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ◆ Fax: (425) 868-7870

A total of 7,102 option grants and 1,062 RSUs grants were made on 465 occasions during the Relevant Period . . . . ***The Special Committee and the Company have determined that it is necessary to revise the measurement dates for approximately 3,700 of these grants, covering grants made on approximately 130 occasions.*** Over half of the grants for which the measurement dates are being revised relate to an all-employee award in February of 2000 pursuant to which 400 options were granted to all employees below vice president level.

**Changes in Connection with Equity Compensation Grant Practices**

In addition to the adjustment to the Company's previously filed financial statements as described above, as a result of this review, the Special Committee has recommended, and the Board of Directors has adopted, the following changes to improve the Company's equity compensation grant practices.

- Two additional independent directors will be recruited and appointed to the Company's Board of Directors.

- Membership of the Audit and Compensation Committees of the Board of Directors will be changed.

- The Equity Compensation Committee has been discontinued.

- Enhancements will be made in the oversight of the Company's corporate governance practices with respect to the Company's equity compensation programs.

- Senior management will be charged with ensuring that the equity compensation policies and processes are appropriate and provide effective controls, and that the Company's accounting for equity compensation is appropriate.

- Certain of the Company's equity compensation administrative processes and functions will move from the Company's human resources organization to the finance organization, under the supervision of the Chief Financial Officer.

- The Board of Directors has unanimously adopted an Equity Compensation Grant Policy on April 10, 2007, which provides, among other things, that:

  - All terms of each equity grant must be finalized and approved by the Board of Directors or the Compensation Committee on or prior to the grant date;

  - All stock options must have an exercise price equal to or greater than the average of the high and low prices on the grant date;

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 60 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

- All recipients of equity grants must be notified, in writing, of such grants as soon as possible following approval;

- Any equity compensation issues or actions will be reported by senior management on a timely basis to the Board of Directors or the Compensation Committee, no less frequently than quarterly.

192.    On June 13, 2007, the Company filed with the SEC its 2006 Annual Report, which restated its financial reports to account for additional compensation expenses in the amount of *$27 million*.   In addition to the Special Committee's conclusions and recommendations also announced in the April 16, 2007 press release, the 2006 Annual Report also disclosed that:

> The Special Committee and the company have determined that it is necessary to revise the measurement dates for approximately 45% of these awards ("Adjusted Options"). Over half of the awards for which the measurement date is being revised relate to the company's only all employee grant in February of 2000 to employees below the vice president level. In addition, the measurement dates for many awards were revised due to: (i) the use of the date of the approval of a pool of options as the measurement date as opposed to the date that the terms of each grant were finalized; (ii) the use of the date that a Unanimous Written Consent approving equity awards was faxed to Compensation Committee members for their approval, rather than the date when the approvals of the Compensation Committee members had been faxed back, as the measurement date for the associated grants; and (iii) the absence of a detailed list of recipients and associated grants prior to the date certain grants were entered into our equity award tracking system.

> We previously applied Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees," and its related Interpretations and provided the required pro forma disclosures under Statement of Financial Accounting Standards ("SFAS") No. 123, "Accounting for Stock-Based Compensation," through our fiscal year ended December 31, 2005. We have used the accelerated method of expensing stock options provided in Financial Accounting Standards Board Interpretation No. 28, "Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans" for recording expense and for our pro forma disclosures. Under APB Opinion No. 25, a non-cash, stock-based compensation expense was required to be recognized for any option for which the exercise price was below the market price on the measurement date. Because most of the company's Adjusted Options had an exercise price below the market price on the measurement date, there should have

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 61 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  been a non-cash charge for each of these options under APB Opinion No. 25 equal
2  to the number of option shares, multiplied by the difference between the exercise
3  price and the market price on the measurement date. That expense should have
   been amortized over the service period of the option.

4  The company also reviewed modifications made to previously granted options and
5  determined that we did not record the appropriate amount of compensation
   expense for some of the modifications ("Modified Options"). We did not record
6  the appropriate amount of stock-based compensation expense under APB Opinion
   No. 25 related to Adjusted or Modified Options in our previously issued financial
7  statements, and are recording these expenses in this Annual Report on Form 10-K.

8      193.    In sum, the Special Committee and the Company have determined that

9  approximately 3,700 grants made on 130 occasions were misdated. In addition, because of the

10 measurement date errors, Company has adjusted its financial results for the material

11 compensation expenses and thus has issued a restatement to account for the additional stock-

12 based compensation expenses.

13     194.    Although Getty Images admitted to such egregious misconduct, Getty Images

14 claimed that "the Special Committee concluded that the evidence obtained and reviewed in its

15 investigation did not establish any intentional wrongdoing by current employees, officers or

16 directors of the Company." Such a statement cannot be squared with the striking pattern of the

17 1999-2002 stock option grants set forth above, which demonstrates knowing and intentional

18 backdating to dates when Getty Images stock was at historical lows.

19     195.    Moreover, the Special Committee's conclusion conflicts with the Company's own

20 admissions that there was backdating of option grants before 2002, when current directors,

21 Defendants Klein, Getty, Bailey, Garb and Sporborg, were on the Board and/or the

22 Compensation Committee. The act of backdating stock options, by its very nature, is a knowing

23 and intentional act. As such, these defendants should be held accountable for participating in the

24 backdating scheme. In addition, the Company failed to provide specific details with respect to

25 those it did find responsible for the backdating of Getty Images stock options. As such, the

26 Special Committee's conclusion that "the evidence [] did not establish any intentional

27

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  wrongdoing by current employees, officers or directors of the Company" lacks merit and should
2  be disregarded.

3  <div align="center">**BACKDATING CAUSED HARM TO THE COMPANY**</div>

4  196.    As a result of the backdating and other manipulation of options issued to
5  Defendants Getty, Klein, Sporborg, Albers, Beyle, Blackwell, Evans-Lombe, Ferguson, Gurke,
6  Huebner, Miskimens, O'Neill, Powell, Roling, von Bargen and Woodhouse, they have been
7  unjustly enriched in the amount of millions of dollars at the expense of the Company.    The
8  Company has received and will receive less money from these defendants when they exercise
9  their options at prices substantially lower than they would have if the options had not been
10  backdated.

11  <div align="center">**Restatement of Getty Images' Financial Statements**</div>

12  197.    The practice of backdating stock options not only lined the pockets of the
13  Company's executives at the direct expense of the Company and the shareholders but also
14  resulted in the overstatement of the Company's net income.    This is because options priced
15  below the stock's fair market value when they were awarded brought the recipient an instant
16  paper gain that must be accounted for as additional compensation and treated as an expense to
17  the Company.    Indeed, the Company restated its historical financial results to account for
18  additional stock-based compensation totaling $27 million.

19  198.    The Special Committee concluded that, pursuant to the requirements of APB 25,
20  different accounting measurement dates for the purpose of computing compensation costs for
21  certain stock option grants should have been used.    Furthermore, the additional non-cash stock-
22  based compensation expense under the revised calculations will have the effect of decreasing
23  reported net income or increasing reported net loss, and increasing the reported accumulated
24  deficit contained in the Company's historical financial statements.

25  199.    On June 8, 2007, Getty Images filed its financial results the fiscal year ended
26  December 31, 2006, which included restatements of the following previously filed financial
27  statements and data:

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 63 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1
2
3
4
5
6
7
8
9

This Annual Report on Form 10-K for our fiscal year ended December 31, 2006 includes restatements of the following previously filed financial statements and data (and related disclosures), which resulted primarily from recording additional compensation expense due to changes in the measurement dates of certain equity award grants that were made as a result of the internal investigation into our historical equity award grant practices and modifications previously made to certain granted equity awards: (1) our consolidated financial statements for our fiscal years ended December 31, 2005 and 2004; (2) our selected consolidated financial data for our fiscal years ended December 31, 2005, 2004, 2003 and 2002, and (3) our unaudited quarterly financial data for each quarter in our fiscal year ended December 31, 2005 and the first and second quarters of fiscal year 2006. We have filed amended Quarterly Reports on Form 10-Q/A for the quarters ended March 31, 2006 and June 30, 2006 to reflect the restatements.

10    200.    In addition to the serious and adverse tax consequences, which resulted from the

11   Company's failure to record the additional non-cash stock-based compensation, Getty Images

12   faces millions of dollars in costs associated with the Special Committee's internal investigation

13   and the related restatements.  Getty Images also will likely admit to material weakness in its

14   financial controls resulting in a qualified opinion from its outside auditor.

15                    **Dissemination of False and Misleading Financial Statements**

16    201.    As known to defendants Klein and Getty and Compensation Committee members

17   Bailey, Garb, and Sporborg, their secret option backdating scheme caused each of Getty Images'

18   Forms 10-K and Forms 10-Q for the relevant period to materially understate Getty Images'

19   compensation expense and materially overstate the Company's net income or materially

20   understate its net loss, because these defendants failed to expense the in-the-money portion of

21   Getty Images' stock option grants during the relevant period, as required by APB 25.

22    202.    Particularly, defendants Garb, Bailey and Sporborg also served on the Audit

23   Committee and were well aware of GAAP and other accounting rules.  As such, they were aware

24   of the material effect their backdating scheme had on Getty Images' financial statements.

25   Furthermore, Defendant Klein was the Company's CEO and knowingly made false statements in

26   Getty Image's financial reports.  Defendants Garb, Bailey, Sporborg and Klein knew that, as a

27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 64 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   result of their misconduct, the compensation expenses were understated and thus their net

2   income was overstated.

3       203.    As a result of the improper backdating of stock options, the Company, with the

4   knowledge, approval and participation of defendants Klein and Getty and Compensation

5   Committee members Garb, Bailey and Sporborg:

6       a.      violated the terms of the 1998 Plan by granting stock options with exercise prices
                less than the fair market value of the stock on the actual date of grant;
7
8       b.      violated APB 25 by failing to recognize compensation expenses incurred when
                the improperly backdated options were granted;

9       c.      violated Section 162(m) by taking tax deductions based on stock option grants
                that were not payable solely on account of the attainment of one or more
10              performance goals and violated the terms of the Company's shareholder-approved
                stock option plans; and
11
12      d.      produced and disseminated false financial statements to Getty Images
                shareholders and the market that improperly recorded and accounted for the
13              backdated option grants, and thereby understated compensation expenses and
                overstated net income.

14      204.    The Company, with the knowledge, approval, and participation of Defendants

15  Klein, Getty, Garb, Bailey and Sporborg, disseminated its false financial statements in, *inter alia*,

16  the following Form 10-K filings:

17      a.      Form 10-K for the year ended December 31, 1999, filed with the SEC on March
18              30, 2000 and signed by defendants Getty, Klein, Roling, Garb, Bailey and
                Sporborg;
19
20      b.      Form 10-K for the year ended December 31, 2000, filed with the SEC on April 2,
                2001 and signed by defendants Getty, Klein, Huebner, Garb, Bailey and
21              Sporborg;

22      b.      Form 10-K for the year ended December 31, 2001, filed with the SEC on March
                29, 2002 and signed by defendants Getty, Klein, Huebner, Garb, Bailey and
23              Sporborg;
24
25      c.      Form 10-K for the year ended December 31, 2002 filed with the SEC on March
                21, 2003 and signed by defendants Getty, Klein, Huebner, Garb, Bailey and
26              Sporborg;

27      d.      Form 10-K for the year ended December 31 2003, filed with the SEC on March

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1    12, 2004 and signed by defendants Getty, Klein, Huebner, Garb, Bailey and

2    Sporborg;

3    e.    Form 10-K for the year ended December 31, 2004, filed with the SEC on March
      11, 2005 and signed by defendants Getty, Klein, Huebner, Garb, Bailey and
4    Sporborg; and

5    f.    Form 10-K for the year ended December 31, 2005, filed with the SEC on March
      9, 2006 and signed by defendants Getty, Klein, Huebner, Garb, Bailey and
6    Sporborg.

7

8    g.    Form 10-K/A for the year ended December 31, 2005, filed with the SEC on
      March 10, 2006 and signed by defendants Getty, Klein, Huebner, Garb, Bailey
9    and Sporborg.

10   205.    Furthermore, Getty Images' executives, including defendants Getty, Klein,

11   Sporborg, Albers, Beyle, Blackwell, Evans-Lombe, Ferguson, Gurke, Huebner, Miskimens,

12   O'Neill, Powell, Roling, von Bargen and Woodhouse, were overpaid improper cash bonuses

13   based on the foregoing false and misleading financial information that should be repaid to the

14   Company.

15   The 1999 Form 10-K

16   206.    On or about March 30, 2000, Getty Images filed its 1999 Report on Form 10-K

17   with the SEC.  Defendants Klein, Getty, Garb, Bailey and Sporborg approved and signed the

18   Form 10-K that included Getty Images' 1999 financial statements, which they knew were

19   materially false and misleading and presented in violation of GAAP, due to improper accounting

20   for the backdated stock options.  As stated above, Audit Committee and Compensation

21   Committee members Garb, Bailey and Sporborg, with the knowledge and participation of

22   defendants Klein and Getty, knowingly approved the April 9, 1999, May 4, 1999, July 6, 1999,

23   July 27, 1999, August 3, 1999, October 22, 1999 and October 25, 1999 grants when they knew

24   that they actually approved these grants on later dates and backdated these grants to when Getty

25   Images' stock price was lower than the actual grant dates. Defendants Klein, Getty, Garb, Bailey

26   and Sporborg granted these improperly priced and dated options for the benefit of the Company

27   insiders to the detriment of the Company.  As a result, defendants Klein, Getty, Garb, Bailey and

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                                    - 66 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

1    Sporborg knew that Getty Images' compensation expense was understated and its net earnings

2    were overstated and thus knowingly approved the false Form 10-K for fiscal year 1999 filed on

3    March 30, 2000.

4            207.    In addition, Defendants Klein, Getty, Garb, Bailey and Sporborg made the

5    following misrepresentations about Getty Images' stock option plans in the 1999 Report on Form

6    10-K:

7
          Under the Getty Images Plan, the Board has the discretion to grant stock options

8          ("Options") underlying shares of Common Stock at fair market prices, based on
          the average of the high and low prices of the Company's Common Stock on the

9          date of grant. The Options vest 25% on the first anniversary of the date of grant

10          and on a monthly *pro rata* basis over three years thereafter and have a term of ten
          years.

11

12            208.    As detailed above, this statement was knowingly false and misleading because the

13    stock options purportedly dated April 9, 1999, May 4, 1999, July 6, 1999, July 27, 1999, August

14    3, 1999, October 22, 1999 and October 25, 1999 were not granted at fair market value on the

15    date of grant but in fact had exercise prices less than the average high and low prices of the

16    Company's common stock on the actual grant dates. Defendants Klein, Getty, Garb, Bailey and

17    Sporborg knew the statement was false and misleading when they made the representation in the

18    1999 Form 10-K because they were involved in the backdating of the foregoing 1999 stock

19    option grants.

20            209.    Furthermore, Defendants Klein, Getty, Garb, Bailey and Sporborg caused Getty

21    Images to falsely state in the 1999 Form 10-K that, "[t]he Company applies Accounting

22    Principles Board Opinion No. 25 ('APB No. 25'), Accounting for Stock Issued to Employees

23    and related interpretations in accounting for its stock option plans."    This statement was

24    materially false and misleading because Klein, Getty, Garb, Bailey and Sporborg knowingly

25    granted stock options at prices that were below fair market value on the date of the grant and

26    failed to account for the in-the-money options as required by APB 25.

27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                        - 67 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1    210.   The 1999 Form 10-K was signed by defendants Getty, Klein, Roling, Garb,

2   Bailey and Sporborg and because of their involvement in the backdating scheme, defendants

3   Klein, Getty, Garb, Bailey and Sporborg knowingly approved the filing of the false Form 10-K

4   for fiscal year 1999.

5   The 2000 Form 10-K

6    211.   On or about April 2, 2001, Getty Images filed its 2000 Report on Form 10-K with

7   the SEC.  Defendants Klein, Getty, Garb, Bailey and Sporborg approved and signed the Form

8   10-K that included Getty Images' 2000 financial statements, which they knew were materially

9   false and misleading and presented in violation of GAAP, due to improper accounting for the

10   backdated stock options.  As stated above, Audit Committee and Compensation Committee

11   members Garb, Bailey and Sporborg, with the knowledge and participation of defendants Klein

12   and Getty, knowingly backdated the stock option grants to February 1, 2000, April 28, 2000,

13   May 24, 2000, May 30, 2000, August 28, 2000 and October 11, 2000 when Getty Images' stock

14   price were lower than the actual grant dates.  Defendants Klein, Getty, Garb, Bailey and

15   Sporborg knew that the grants were approved on later dates than reported.  Furthermore, these

16   defendants granted these improperly priced and dated options for the benefit of Company

17   insiders to the detriment of the Company.  As a result, defendants Klein, Getty, Garb, Bailey and

18   Sporborg knew that Getty Images' compensation expense was understated and its net earnings

19   were overstated and thus knowingly approved the false Form 10-K for fiscal year 2000 filed on

20   April 2, 2001.

21    212.   In addition, Defendants Getty, Klein, Sporborg, Bailey and Garb made the

22   following misrepresentations about 1998 Plan in the 2000 Report on Form 10-K:

23    Under the Getty Images, Inc. 1998 Stock Incentive Plan (the Plan), the Board of
     Directors has the discretion to grant stock options underlying shares of common
24    stock at fair market prices, based on the average of the high and low prices of the
     Company's common stock on the date of grant. The options vest 25% on the first
25    anniversary of the date of grant and on a monthly pro rata basis over three years
     thereafter and have a term of ten years. A total of 13 million shares are reserved
26    for issuance under this plan, with shares under options that lapse available for re-
27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                          - 68 -
(No. C 07-0317 JLR)

1    issuance. Options become exercisable when vested and remain exercisable
2    through the remainder of the option term except upon termination of employment,
3    in which case the options terminate 90 days after the employee's termination date.

4    213.    As detailed above, this statement was knowingly false and misleading because the

5    stock options purportedly dated February 1, 2000, April 28, 2000, May 24, 2000, May 30, 2000,

6    August 28, 2000 and October 11, 2000 were not granted at fair market value on the date of grant

7    but in fact had an exercise price less than the stock price on the actual date of grant. Defendants

8    Getty, Klein, Sporborg, Bailey and Garb knew the statement was false and misleading when they

9    made the representation in the 2000 Form 10-K because they were involved in the backdating of

10   the foregoing 2000 stock option grants.

11   214.    Furthermore, Defendants Klein, Getty, Garb, Bailey and Sporborg caused Getty

12   Images to falsely state in the 2000 Form 10-K that, "[t]he Company applies Accounting

13   Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to Employees' and

14   related interpretations in accounting for its stock option plan.    Accordingly, the Company

15   recognizes no compensation expense related to employee stock options as no options are granted

16   below the market price on the date of the grant."    This statement was materially false and

17   misleading because Klein, Getty, Garb, Bailey and Sporborg knowingly granted stock options at

18   prices that were below fair market value on the date of the grant and failed to account for the in-

19   the-money options as required by APB 25.

20   215.    The 2000 Form 10-K was signed by defendants Getty, Klein, Huebner, Sporborg,

21   Bailey and Garb and because of their involvement in the backdating scheme, Getty, Klein,

22   Sporborg, Bailey and Garb knowingly approved the filing of the false Form 10-K for fiscal year

23   2000.

24   The 2001 Form 10-K

25   216.    On or about March 29, 2002, Getty Images filed its 2000 Report on Form 10-K

26   with the SEC.    Defendants Klein, Getty, Garb, Bailey and Sporborg approved and signed the

27   Form 10-K that included Getty Images' 2001 financial statements, which they knew were

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 69 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ♦ Fax: (425) 868-7870

1    materially false and misleading and presented in violation of GAAP, due to improper accounting

2    for the backdated stock options.    As stated above, Audit Committee and Compensation

3    Committee members Garb, Bailey and Sporborg, with the knowledge and participation of

4    defendants Klein and Getty, knowingly backdated the stock option grants to March 30, 2001,

5    May 7, 2001, June 26, 2001, July 17, 2001, July 23, 2001, October 9, 2001 and October 15, 2001

6    when Getty Images' stock price was lower than the actual grant date. Defendants Klein, Getty,

7    Garb, Bailey and Sporborg knew that the grants were approved on dates after the purported grant

8    dates. Furthermore, these defendants granted these improperly priced and dated options for the

9    benefit of Company insiders to the detriment of the Company.    As a result, defendants Klein,

10    Getty, Garb, Bailey and Sporborg knew that Getty Images' compensation expense was

11    understated and its net earnings were overstated and thus knowingly approved the false Form 10-

12    K for fiscal year 2001 filed on March 29, 2002.

13        217.    In addition, Defendants Getty, Klein, Huebner, Garb, Bailey and Sporborg made

14    the following misrepresentations about the 1998 Plan in the 2001 Report on Form 10-K:

15
        Under the Getty Images, Inc. 1998 Stock Incentive Plan (the Plan), the Board of
16        Directors has the discretion to grant stock options underlying shares of common
        stock at the fair market value of the company's common stock on the date of
17        grant. Options generally vest 25% on the first anniversary of the date of grant and
        on a monthly *pro rata* basis over three years thereafter and have a term of ten
18        years.

19
        A total of 13 million shares are reserved for issuance under the Plan. Shares under
20        options that lapse are available for re-issuance. Options become exercisable when
        vested and remain exercisable through the remainder of the option term except
21        upon termination of employment, in which case the options generally terminate 90
        days after the employee's termination date.
22

23        The company also issued, during 2001, options for a total of 134,999 shares
24        outside of the Plan to two newly-hired executive officers and to three non-
        executive members of our Board of Directors. The terms of these options are
25        substantially identical to those granted under the Plan.

26        218.    As detailed above, this statement was knowingly false and misleading because the

27    stock options purportedly dated March 30, 2001, May 7, 2001, June 26, 2001, July 17, 2001, July

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                              - 70 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ♦ Fax: (425) 868-7870

1    23, 2001, October 9, 2001 and October 15, 2001 were not granted at fair market value on the

2    date of grant but in fact had an exercise price less than the stock price on the actual date of grant.

3    Defendants Getty, Klein, Sporborg, Bailey and Garb knew the statement was false and

4    misleading when they made the representation in the 2000 Form 10-K because they were

5    involved in the backdating of the foregoing 2001 stock option grants.

6        219.    Furthermore, Defendants Klein, Getty, Garb, Bailey and Sporborg caused Getty

7    Images to falsely state in the 2001 Form 10-K that, "[t]he company applies Accounting

8    Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to Employees' and

9    related interpretations in accounting for stock options. Accordingly, the company recognizes no

10   compensation expense related to employee stock options, as no options are granted below the

11   market price on the date of the grant." This statement was materially false and misleading

12   because Klein, Getty, Garb, Bailey and Sporborg knowingly granted stock options at prices that

13   were below fair market value on the date of the grant and failed to account for the in-the-money

14   options as required by APB 25.

15       220.    The 2001 Form 10-K was signed by defendants Getty, Klein, Huebner, Sporborg,

16   Bailey and Garb and because of their involvement in the backdating scheme, Getty, Klein,

17   Sporborg, Bailey and Garb knowingly approved the filing of the false Form 10-K for fiscal year

18   2001.

19   The 2002 Form 10-K

20       221.    On or about March 21, 2003, Getty Images filed its 2002 Report on Form 10-K

21   with the SEC. Defendants Klein, Getty, Garb, Bailey and Sporborg approved and signed the

22   Form 10-K that included Getty Images' 2002 financial statements, which they knew were

23   materially false and misleading and presented in violation of GAAP, due to improper accounting

24   for the backdated stock options. As stated above, Audit Committee and Compensation

25   Committee members Garb, Bailey and Sporborg, with the knowledge and participation of

26   defendants Klein and Getty, knowingly backdated the stock option grants to February 5, 2002

27   when Getty Images' stock price was lower than the actual grant date. Defendants Klein, Getty,

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                        - 71 -
(No. C 07-0317 JLR)                                         LAW OFFICES OF
                                                    CLIFFORD A. CANTOR, P.C.
                                                          627 208th Ave. SE
                                                    Sammamish, WA 98074-7033
                                              Tel: (425) 868-7813 ♦ Fax: (425) 868-7870

1    Garb, Bailey and Sporborg knew that the grant was approved at a later date. Furthermore, these

2    defendants granted these improperly priced and dated options for the benefit of Company

3    insiders to the detriment of the Company. As a result, defendants Klein, Getty, Garb, Bailey and

4    Sporborg knew that Getty Images' compensation expense was understated and its net earnings

5    were overstated and thus knowingly approved the false Form 10-K for fiscal year 2002 filed on

6    March 21, 2003.

7    　　　222.    In addition, Defendants Getty, Klein, Huebner, Garb, Bailey and Sporborg made

8    the following false and misleading statements about the 1998 Plan in the 2002 Report on Form

9    10-K:

10    　　　　Under the Getty Images, Inc. 1998 Stock Incentive Plan (the Plan), the Board of
11    　　　　Directors has the discretion to grant stock options underlying shares of common
　　　　stock at the fair market value of the company's common stock on the grant date.
12    　　　　Options generally have a 10-year term and a four-year vesting schedule, with 25%
　　　　vesting on the first anniversary of the grant date and a *pro rata* portion vesting
13    　　　　monthly over the remaining three years.

14    　　　　A total of 13 million shares are reserved for issuance under the Plan. Shares under
15    　　　　options that lapse (due to cancellation or expiration) are available for re-issuance.
　　　　Options become exercisable when vested and remain exercisable through the
16    　　　　remainder of the option term except upon termination of employment, in which
　　　　case the options generally terminate 90 days after the employee's termination
17    　　　　date.

18

19    　　　223.    As detailed above, this statement was knowingly false and misleading because the

20    stock options purportedly dated February 5, 2002 were not granted at fair market value on the

21    date of grant but in fact had an exercise price less than the stock price on the actual date of grant.

22    Defendants Getty, Klein, Sporborg, Bailey and Garb knew the statement was false and

23    misleading when they made the representation in the 2002 Form 10-K because they were

24    involved in the backdating of the stock option grants dated February 5, 2002, as detailed above.

25    　　　224.    Furthermore, Defendants Klein, Getty, Garb, Bailey and Sporborg caused Getty

26    Images to falsely state in the 2002 Form 10-K that, "[t]he company applies Accounting

27    Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to Employees' and

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 72 -

1    related interpretations in accounting for stock-based compensation. Accordingly, the company

2    recognizes no compensation expense related to the granting of employee stock options, as no

3    options are granted below the market price on the date of the grant." This statement was

4    materially false and misleading because Klein, Getty, Garb, Bailey and Sporborg knowingly

5    granted stock options at prices that were below fair market value on the date of the grant and

6    failed to account for the in-the-money options as required by APB 25.

7          225.    The 2002 Form 10-K was signed by defendants Getty, Klein, Huebner, Sporborg,

8    Bailey and Garb and because of their involvement in the backdating scheme, Getty, Klein,

9    Sporborg, Bailey and Garb knowingly approved the filing of the false Form 10-K for fiscal year

10    2002.

11         226.    Defendant Klein signed a Certification of Chief Executive Officer Pursuant to 18

12    U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002,

13    which attested to the purported accuracy of the financial statements contained in the 2002 annual

14    report, the effectiveness of the internal controls, and compliance with Section 13(a) of the

15    Exchange Act, when he knew that this Certification was false and misleading. Because of his

16    involvement in the backdating scheme, Defendant Klein knew that the 2002 financial results

17    understated compensation expenses and overstated net income. In the 2002 Certification, Klein

18    made the following false and misleading certification: "(1) The Report fully complies with the

19    requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The

20    information contained in the Report fairly presents, in all material respects, the financial

21    condition and results of operations of the Company."

22    The 2003 Form 10-K

23         227.    On or about March 12, 2004, Getty Images filed its 2003 Report on Form 10-K

24    with the SEC. Defendants Klein, Getty, Garb, Bailey and Sporborg approved and signed the

25    Form 10-K that included Getty Images' 2003 financial statements as well as the 1999-2002

26    financial statements, which they knew were materially false and misleading and presented in

27    violation of GAAP, due to improper accounting for the backdated stock options. As stated

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT    - 73 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   above, Audit Committee and Compensation Committee members Garb, Bailey and Sporborg,

2   with the knowledge and participation of defendants Klein and Getty, knowingly backdated the

3   1999-2002 stock option grants when Getty Images' stock price was lower than the actual grant

4   dates. Defendants Klein, Getty, Garb, Bailey and Sporborg knew that the grants were approved

5   on dates after the purported grant dates. Furthermore, these defendants granted these improperly

6   priced and dated options for the benefit of Company insiders to the detriment of the Company.

7   As a result, defendants Klein, Getty, Garb, Bailey and Sporborg knew that Getty Images'

8   compensation expense was understated and its net earnings were overstated and thus knowingly

9   approved the false Form 10-K for fiscal year 2003 filed on March 12, 2004.

10       228.    In addition, Defendants Getty, Klein, Huebner, Garb, Bailey and Sporborg made

11   the following misrepresentations about the 1998 Plan in the 2003 Report on Form 10-K:

12       Under the Getty Images, Inc. 1998 Stock Incentive Plan (the Plan), the Board of
         Directors has the discretion to grant stock options underlying shares of common
13       stock at the fair market value of our common stock on the grant date and other
         stock-based awards. Options generally have a 10-year term and a four-year
14       vesting schedule, with 25% vesting on the first anniversary of the grant date and a
         pro rata portion vesting monthly over the remaining three years. The terms of
15       other stock-based awards, such as restricted stock, vary from grant to grant.
16

17       A total of 13 million shares are reserved for issuance under the Plan. Shares under
         options and other stock-based awards that lapse due to cancellation or expiration
18       are available for re-issuance. Options become exercisable when vested and remain
         exercisable through the remainder of the option term except upon termination of
19       employment, in which case the options generally terminate 90 days after the
         employee's termination date.
20

21       229.    As detailed above, this statement was knowingly false and misleading because the

22   1999-2002 stock options were not granted at fair market value on the date of grant but in fact had

23   an exercise price less than the stock price on the actual date of grant. Defendants Getty, Klein,

24   Sporborg, Bailey and Garb knew the statement was false and misleading when they made the

25   representation in the 2003 Form 10-K because they were involved in the backdating of those

26   stock option grants.

27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 74 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

230.    Furthermore, Defendants Klein, Getty, Garb, Bailey and Sporborg caused Getty Images to falsely state in the 2003 Form 10-K that, "[w]e apply the intrinsic value provisions of Accounting Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to Employees' and related interpretations in accounting for employee stock-based compensation. We do not recognize compensation expense when granting employee stock options, as we do not grant options with exercise prices less than the market price of our common stock on the date of the grant." This statement was materially false and misleading because Klein, Getty, Garb, Bailey and Sporborg knowingly granted stock options from 1999 to 2002 at prices that were below fair market value on the date of the grant and failed to account for the in-the-money options as required by APB 25.

231.    The 2003 Form 10-K was signed by defendants Getty, Klein, Huebner, Sporborg, Bailey and Garb and because of their involvement in the backdating scheme, Getty, Klein, Sporborg, Bailey and Garb knowingly approved the filing of the false Form 10-K for fiscal year 2003.

232.    Defendant Klein signed a Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which attested to the purported accuracy of the financial statements contained in the 2003 annual report, the effectiveness of the internal controls, and compliance with Section 13(a) of the Exchange Act, when he knew that this Certification was false and misleading. Because of his involvement in the backdating scheme, Defendant Klein knew that the 2003 financial results understated compensation expenses and overstated net income. In the 2003 Certification, Klein made the following false and misleading certification: "(1) The Form 10-K fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and (2) The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company."

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 75 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

The 2004 Form 10-K

233.   On or about March 11, 2005, Getty Images filed its 2004 Report on Form 10-K with the SEC.  Defendants Klein, Getty, Garb, Bailey and Sporborg approved and signed the Form 10-K that included Getty Images' 2004 financial statements as well as the 2000-2002 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As stated above, Audit Committee and Compensation Committee members Garb, Bailey and Sporborg, with the knowledge and participation of defendants Klein and Getty, knowingly backdated the 2000-2002 stock option grants when Getty Images' stock price was lower than the actual grant dates.  Defendants Klein, Getty, Garb, Bailey and Sporborg knew that the grants were approved on later dates that those reported.  Furthermore, these defendants granted these improperly priced and dated options for the benefit of Company insiders to the detriment of the Company.  As a result, defendants Klein, Getty, Garb, Bailey and Sporborg knew that Getty Images' compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 2004 filed on March 11, 2005.

234.   In addition, Defendants Getty, Klein, Huebner, Garb, Bailey and Sporborg made the following misrepresentations about the 1998 Plan in the 2004 Report on Form 10-K:

**ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

Under the Getty Images, Inc. 1998 Stock Incentive Plan (the Plan), the Board of Directors has the discretion to grant stock options underlying shares of common stock at the fair market value of our common stock on the grant date and other stock-based awards. Options generally have a 10-year term and a four-year vesting schedule, with 25% vesting on the first anniversary of the grant date and a pro rata portion vesting monthly over the remaining three years. The terms of other stock-based awards, such as restricted stock, vary from grant to grant.

* * *

**NOTE 8. STOCK-BASED COMPENSATION**

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 76 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1
2
3
4
5
6
7

Under the Getty Images, Inc. 1998 Stock Incentive Plan (the Plan), the Board of Directors has the discretion to grant stock options underlying shares of common stock at the fair market value of our common stock on the grant date and other stock-based awards. As detailed above, this statement was knowingly false and misleading because the 1999-2002 stock options were not granted at fair market value on the date of grant but in fact had an exercise price less than the stock price on the actual date of grant. Defendants Getty, Klein, Sporborg, Bailey and Garb knew the statement was false and misleading when they made the representation in the 2003 Form 10-K because they were involved in the backdating of those stock option grants, as detailed above.

8    235.    The above statements were materially false and misleading because Defendants
9    Klein, Getty, Garb, Bailey and Sporborg knowingly granted stock options from 1999 to 2002 at
10   prices that were below fair market value on the date of the grant and failed to account for the in-
11   the-money options as required by APB 25.

12   236.    Furthermore, Defendants Klein, Getty, Garb, Bailey and Sporborg caused Getty
13   Images to falsely state in the 2004 Form 10-K that, "[w]e apply the intrinsic value provisions of
14   Accounting Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to
15   Employees' and related interpretations in accounting for employee stock-based compensation.
16   We do not recognize compensation expense when granting employee stock options, as we do not
17   grant options with exercise prices less than the market price of our common stock on the date of
18   the grant." This statement was materially false and misleading because Klein, Getty, Garb,
19   Bailey and Sporborg knowingly granted stock options from 1999 to 2002 at prices that were
20   below fair market value on the date of the grant and failed to account for the in-the-money
21   options as required by APB 25.

22   237.    The 2004 Form 10-K was signed by defendants Getty, Klein, Huebner, Sporborg,
23   Bailey and Garb and because of their involvement in the backdating scheme, Getty, Klein,
24   Sporborg, Bailey and Garb knowingly approved the filing of the false Form 10-K for fiscal year
25   2004.

26   238.    Defendant Klein signed a Certification of Chief Executive Officer Pursuant to 18
27   U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002,

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 77 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   which attested to the purported accuracy of the financial statements contained in the 2004 annual

2   report, the effectiveness of the internal controls, and compliance with Section 13(a) of the

3   Exchange Act, when he knew that this Certification was false and misleading. Because of his

4   involvement in the backdating scheme, Defendant Klein knew that the 2004 financial results

5   understated compensation expenses and overstated net income. In the 2004 Certification, Klein

6   made the following false and misleading certification: "(1) The Form 10-K fully complies with

7   the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C.

8   78m or 78o(d)); and  (2) The information contained in the Form 10-K fairly presents, in all

9   material respects, the financial condition and results of operations of the Company."

10  The 2005 Form 10-K

11      239.    On or about March 9, 2006, Getty Images filed its 2005 Report on Form 10-K

12  with the SEC. Defendants Klein, Getty, Garb, Bailey and Sporborg approved and signed the

13  Form 10-K that included Getty Images' 2005 financial statements as well as the 2001-2002

14  financial statements, which they knew were materially false and misleading and presented in

15  violation of GAAP, due to improper accounting for the backdated stock options. As stated

16  above, Audit Committee and Compensation Committee members Garb, Bailey and Sporborg,

17  with the knowledge and participation of defendants Klein and Getty, knowingly backdated the

18  2001-2002 stock option grants when Getty Images' stock price was lower than the actual grant

19  date. Defendants Klein, Getty, Garb, Bailey and Sporborg knew that the grants were approved at

20  a later date. Furthermore, these defendants granted these improperly priced and dated options for

21  the benefit of Company insiders to the detriment of the Company. As a result, defendants Klein,

22  Getty, Garb, Bailey and Sporborg knew that Getty Images' compensation expense was

23  understated and its net earnings were overstated and thus knowingly approved the false Form 10-

24  K for fiscal year 2005 filed on March 9, 2006.

25      240.    Furthermore, Defendants Klein, Getty, Garb, Bailey and Sporborg caused Getty

26  Images to falsely state in the 2005 Form 10-K that, "[w]e apply the intrinsic value provisions of

27  Accounting Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 78 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    Employees' and related interpretations in accounting for employee stock-based compensation.

2    We do not recognize compensation expense when issuing stock options as, according to the

3    terms of our 2005 Incentive Plan, we are not able issue stock options with exercise prices less

4    than the market price of our common stock on the date of the issuance." This statement was

5    materially false and misleading because Klein, Getty, Garb, Bailey and Sporborg knowingly

6    granted stock options from 1999 to 2002 at prices that were below fair market value on the date

7    of the grant and failed to account for the in-the-money options as required by APB 25.

8       241.    The 2005 Form 10-K was signed by defendants Getty, Klein, Huebner, Sporborg,

9    Bailey and Garb and because of their involvement in the backdating scheme, Getty, Klein,

10    Sporborg, Bailey and Garb knowingly approved the filing of the false Form 10-K for fiscal year

11    2005.

12       242.    Defendant Klein signed a Certification of Chief Executive Officer Pursuant to 18

13    U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002,

14    which attested to the purported accuracy of the financial statements contained in the 2005 annual

15    report, the effectiveness of the internal controls, and compliance with Section 13(a) of the

16    Exchange Act, when he knew that this Certification was false and misleading. Because of his

17    involvement in the backdating scheme, Defendant Klein knew that the 2005 financial results

18    understated compensation expenses and overstated net income. In the 2005 Certification, Klein

19    made the following false and misleading certification: "(1) The Form 10-K fully complies with

20    the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C.

21    78m or 78o(d)); and (2) The information contained in the Form 10-K fairly presents, in all

22    material respects, the financial condition and results of operations of the Company."

23    The 2005 Form 10-K/A

24       243.    On or about March 10, 2006, Getty Images filed its Amended 2005 Report on

25    Form 10-K/A with the SEC where Defendants Klein, Getty, Garb, Bailey and Sporborg

26    knowingly made the same false and misleading statements as those in the initial 2005 Form 10-

27    K. Again, Defendants Klein, Getty, Garb, Bailey and Sporborg approved and signed the Form

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 79 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1   10-K/A that included Getty Images' 2005 financial statements as well as the 2001-2002 financial

2   statements, which they knew were materially false and misleading and presented in violation of

3   GAAP, due to improper accounting for the backdated stock options.  As stated above, Audit

4   Committee and Compensation Committee members Garb, Bailey and Sporborg, with the

5   knowledge and participation of defendants Klein and Getty, knowingly backdated the 2001-2002

6   stock option grants when Getty Images' stock price was lower than the actual grant date.

7   Defendants Klein, Getty, Garb, Bailey and Sporborg knew that the grants were approved at a

8   later date.  Furthermore, these defendants granted these improperly priced and dated options for

9   the benefit of Company insiders to the detriment of the Company.  As a result, defendants Klein,

10   Getty, Garb, Bailey and Sporborg knew that Getty Images' compensation expense was

11   understated and its net earnings were overstated and thus knowingly approved the false Form 10-

12   K/A for fiscal year 2005 filed on March 10, 2006.

13       244.    Furthermore, Defendants Klein, Getty, Garb, Bailey and Sporborg caused Getty

14   Images to falsely state in the 2005 Form 10-K/A that, "We apply the intrinsic value provisions of

15   Accounting Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to

16   Employees' and related interpretations in accounting for employee stock-based compensation.

17   We do not recognize compensation expense when issuing stock options as, according to the

18   terms of our 2005 Incentive Plan, we are not able issue stock options with exercise prices less

19   than the market price of our common stock on the date of the issuance."  This statement was

20   materially false and misleading because Klein, Getty, Garb, Bailey and Sporborg knowingly

21   granted stock options from 1999 to 2002 at prices that were below fair market value on the date

22   of the grant and failed to account for the in-the-money options as required by APB 25.

23       245.    The 2005 Form 10-K/A was signed by defendants Getty, Klein, Huebner,

24   Sporborg, Bailey and Garb and because of their involvement in the backdating scheme, Getty,

25   Klein, Sporborg, Bailey and Garb knowingly approved the filing of the false Form 10-K/A for

26   fiscal year 2005.

27       246.    Defendant Klein signed a Certification of Chief Executive Officer pursuant to 18

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 80 -

1  U.S.C. Section 1350, as Adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002,

2  which attested to the purported accuracy of the financial statements contained in the Amended

3  2005 annual report, the effectiveness of the internal controls, and compliance with Section 13(a)

4  of the Exchange Act, when he knew that this Certification was false and misleading. Because of

5  his involvement in the backdating scheme, Defendant Klein knew that the 2005 financial results

6  understated compensation expenses and overstated net income. In the 2005 Certification, Klein

7  made the following false and misleading certification: "(1) The Form 10-K fully complies with

8  the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C.

9  78m or 78o(d)); and (2) The information contained in the Form 10-K fairly presents, in all

10  material respects, the financial condition and results of operations of the Company."

11  <center>**Defendants' Concealment of their Misconduct**</center>

12  247.  Defendants Bailey, Sporborg and Garb, with the knowledge and participation of

13  Defendants Getty and Klein, caused Getty Images to issue false proxy statements in connection

14  with the Company's annual shareholder meetings and periodically for special shareholder

15  meetings during the relevant period. These defendants prepared and/or reviewed the 2000-2003

16  proxy statements before the statements were disseminated to shareholders and filed with the

17  SEC. Moreover, Bailey, Sporborg Garb, Getty and Klein knew that the proxies were materially

18  false and misleading as they participated in the backdating of stock option grants from April

19  1999 to February 2002.

20  248.  Getty Images shareholders routinely relied upon the false and misleading proxy

21  statements issued by the Company and voted for the Company's stock option plans under which

22  these defendants backdated stock option grants in order to benefit Company insiders at the

23  expense of the Company and its shareholders.

24  249.  From 2000 to 2003, the Company, with the knowledge, approval, and

25  participation of Defendants Klein, Getty, Bailey, Garb and Sporborg, for the purpose and with

26  the effect of concealing the improper option backdating, disseminated to shareholders and filed

27  with the SEC annual proxy statements that falsely reported the dates of stock option grants to

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 81 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  Defendants Getty, Klein, Sporborg, Albers, Beyle, Blackwell, Evans-Lombe, Ferguson, Gurke,

2  Huebner, Miskimens, O'Neill, Powell, Roling, von Bargen and Woodhouse and falsely stated

3  that the exercise price of the options granted to these defendants was "equal to the average of the

4  high and low prices of the Common Stock of the Company on the date of grant."

5  The 2000 Proxy Statement

6      250.    The Company's proxy statement filed with the SEC on April 7, 2000 falsely

7  reported that options granted to Powell and von Bargen were granted on April 9, 1999, options

8  granted to Roling were granted on May 4, 1999 and August 3, 1999, options granted to Powell

9  were granted on July 6, 1999, and other options granted to Klein, Getty, Roling, Powell and von

10  Bargen were granted on October 22, 1999, when in fact these grants were actually approved on

11  later dates by Defendants Bailey, Garb and Sporborg.

12      251.    In the proxy statement filed on April 7, 2000, the Compensation Committee

13  (Defendants Bailey, Sporborg and Garb), made the following representations about Getty

14  Image's stock option grants:

15      All options granted by Getty Images following the consummation of the
       Transactions have been granted under, and governed by, the Plan, which was
16      adopted by the Company in connection with the Transactions. Options granted by
       the Compensation Committee under the Plan have been made at fair market value
17      (based on the average of the high and low prices of the Company's Common
18      Stock on the date of grant), vest over a period of four years, 25% on the first
       anniversary of the grant date and monthly on a pro rata basis thereafter, and expire
19      after ten years from the date of grant (with the exception of certain options granted
20      to executive officers upon the consummation of the Transactions that became
       fully exercisable upon the first anniversary of the date of grant).
21

22      252.    Each of the above statements concerning the 1998 Plan and the value of the stock

23  options on the date of grant was knowingly false and misleading because the option grants to

24  Defendants Powell and von Bargen dated April 9, 1999, options grants to Roling dated May 4,

25  1999 and August 3, 1999, and options granted to Klein, Getty, Roling, Powell and von Bargen

26  dated October 22, 1999, were, in fact, backdated.  Thus, these grants were granted at less than fair

27  market value as reported by Compensation Committee members Bailey, Sporborg and Garb and

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 82 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  as prohibited by the 1998 Plan. Contrary to the above representations, none of the backdated

2  options was ever approved by the shareholders, nor were shareholders ever aware of this illicit

3  compensation.

4     253.    Moreover, the Report of the Compensation Committee disclosed in the 2000

5  proxy statement falsely stated "[s]tock options are an integral part of executive officers

6  compensation and are utilized by the Company to provide an incentive to the officer, and to align

7  the interests of the executive with those of the Stockholders by providing him with a financial

8  interest in the company," when in fact the backdated stock options provided the officers with

9  immediate profits regardless of the Company's stock performance.

10  The 2001 Proxy Statement

11     254.    Getty Images' proxy statement filed with the SEC on April 6, 2001 falsely

12  reported that options granted to Getty and Klein were granted on May 24, 2000 and options

13  granted to Albers were granted on August 28, 2000 and October 11, 2000, when in fact these

14  grants were actually approved on later dates by Defendants Bailey, Garb and Sporborg.

15     255.    In the proxy statement filed on April 6, 2001, the Compensation Committee

16  (Defendants Bailey, Sporborg and Garb), made the following representations about Getty

17  Image's stock option grants:

18     All options granted by Getty Images following the consummation of the merger of
19     the businesses of Getty Communications plc and PhotoDisc, Inc. (the
       "Transactions"), have been granted under, and governed by, the Getty Images,
20     Inc. 1998 Stock Incentive Plan ("the Stock Incentive Plan"), which was adopted
       by the Company in connection with the Transactions. Options granted by the
21     Compensation Committee under the Stock Incentive Plan have been made at fair
       market value (based on the average of the high and low prices of the Company's
22     Common Stock on the date of grant), vest over a period of four years, 25% on the
       first anniversary of the grant date and monthly on a *pro rata* basis thereafter, and
23     expire after ten years from the date of grant (with the exception of certain options
24     granted to executive officers upon the consummation of the Transactions that
       became fully exercisable upon the first anniversary of the date of grant and a grant
25     made to Mr. Evans-Lombe in April 2000, which had a two-year vesting schedule).

26

27     256.    Each of the above statements concerning the 1998 Plan and the value of the stock

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  options on the date of grant was knowingly false and misleading because the option grants to

2  Defendants Getty and Klein dated May 24, 2000 and options granted to Defendants Albers

3  purportedly dated August 28, 2000 and October 11, 2000 were, in fact, backdated. Thus, these

4  grants were granted at less than fair market value as reported by Compensation Committee

5  members Bailey, Sporborg and Garb and as prohibited by the 1998 Plan. Contrary to the above

6  representations, none of the backdated options was ever approved by the shareholders, nor were

7  shareholders ever aware of this illicit compensation.

8      257.  Moreover, the Report of the Compensation Committee disclosed in the 2001

9  proxy statement falsely stated "[s]tock options are an integral part of an executive officer's

10  compensation and are utilized by the Company to provide an incentive to the executive officer,

11  and to align the interests of the executive officer with those of the Stockholders by providing the

12  executive officer with a financial interest in the Company," when in fact the backdated stock

13  options provided the officers with immediate profits regardless of the Company's stock

14  performance.

15  The 2002 Proxy Statement

16      258.  Getty Images' proxy statement filed with the SEC on April 19, 2002, falsely

17  reported that options granted to Klein, Getty, von Bargen, Huebner and Albers were granted on

18  March 30, 2001, options granted to Klein, Getty, Huebner and Albers were granted on October

19  15, 2001, and other options granted to Klein were granted on May 7, 2001 and June 26, 2001,

20  when in fact these grants were actually approved on later dates by Defendants Bailey, Garb and

21  Sporborg.

22      259.  In the proxy statement filed on April 19, 2002, the Compensation Committee

23  (Defendants Bailey, Sporborg and Garb), made the following representations about Getty

24  Image's stock option grants:

25      The Compensation Committee may grant either incentive stock options, which
        comply with Section 422 of the Internal Revenue Code, or nonqualified stock
26      options. The Compensation Committee sets option exercise prices and terms;
27      however, the exercise price of an incentive stock option may not be less than

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 84 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    100% of the fair market value on the date of the grant (for these purposes, "fair
2    market value" means the average of the high and low per share trading prices for
     the common stock on the date of grant as reported on the Nasdaq National
3    Market). The fair market value on March 1, 2002, was $26.31. Typically, options
     do not vest unless the recipient remains employed or continues to provide services
4    to us for at least 12 months after grant. The term of a stock option may not be
5    more than ten years.

6        260.    Each of the above statements concerning the value of the stock options on the date

7    of grant was knowingly false and misleading because the options granted to Defendants Klein,

8    Getty, von Bargen, Huebner and Albers dated March 30, 2001, options granted to Klein, Getty,

9    Huebner and Albers dated October 15, 2001, and options granted to Klein dated May 7, 2001

10   and June 26, 2001 were, in fact, backdated.  Thus, these grants were issued at less than fair

11   market value as reported by Compensation Committee members Bailey, Sporborg and Garb and

12   as prohibited by the 1998 Plan.  Contrary to the above representations, none of the backdated

13   options were ever approved by the shareholders, nor were shareholders ever aware of this illicit

14   compensation.

15       261.    Moreover, the Report of the Compensation Committee disclosed in the 2002

16   proxy statement falsely stated "[s]tock options are an integral part of an executive officer's

17   compensation. We use stock options to provide an incentive to the executive officer, and to align

18   the interests of the executive officer with those of our stockholders by providing the executive

19   officer with a financial interest in the Company," when in fact the backdated stock options

20   provided the officers with immediate profits regardless of the Company's stock performance.

21   False Form 4s

22       262.    From 1999 to 2006, the Company, with the knowledge, approval, and

23   participation of each of Klein, Getty, Bailey, Garb and Sporborg, for the purpose and with the

24   effect of concealing the improper option backdating, filed with the SEC Form 4's that falsely

25   reported the dates of stock option grants to the following defendants:

26       a.     von Bargen's Form 4 filed with the SEC on May 5, 1999 falsely reported that
27              options granted to von Bargen had been granted on April 9, 1999;

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

b.  Albers' Form 4 filed with the SEC on November 4, 2002 falsely reported that options granted to Albers had been granted on August 28, 2000, October 11, 2000, March 30, 2001 and October 15, 2001;

c.  Huebner's Form 4 filed with the SEC on November 7, 2002 falsely reported that options granted to Huebner had been granted on March 30, 2001 and October 15, 2001;

d.  Getty's Form 4 filed with the SEC on December 19, 2002 falsely reported that options granted to Getty had been granted on October 22, 1999, April 28, 2000, March 30, 2001 and October 15, 2001;

e.  Klein's Form 4 filed with the SEC on December 19, 2002 falsely reported that options granted to Klein had been granted on October 22, 1999, April 28, 2000, March 30, 2001, May 7, 2001, June 26, 2001 and October 15, 2001;

f.  Woodhouse's Form 4 filed with the SEC on December 19, 2002 falsely reported that options granted to Woodhouse had been granted on October 25, 1999, October 11, 2000 and March 30, 2001;

g.  Evans-Lombe's Form 4 filed with the SEC on January 6, 2003 falsely reported that options granted to Evans-Lombe had been granted on May 04, 1999, July 27, 1999, October 22, 1999, March 30, 2001, October 15, 2001 and February 5, 2002;

h.  Miskimens' Form 4 filed with the SEC on January 28, 2003 falsely reported that options granted to Miskimens had been granted on May 30, 2000, March 30, 2001, July 17, 2001 and October 9, 2001;

i.  Albers' Form 4 filed with the SEC on February 11, 2003 falsely reported that options granted to Albers had been granted on August 28, 2000, October 11, 2000, March 30, 2001 and October 15, 2001;

j.  Klein's Form 4's filed with the SEC on February 12, 2003, March 25, 2003, April 24, 2003, April 30, 2003, September 8, 2003, September 17, 2003, September 23, 2003, September 30, 2003, October 7, 2003, October 14, 2003, October 21, 2003, October 24, 2003, October 28, 2003, November 4, 2003 and November 12, 2003 falsely reported that options granted to Klein had been granted on October 22, 1999, April 28, 2000, March 30, 2001, May 7, 2001, June 26, 2001 and October 15, 2001;

k.  Albers' Form 4 filed with the SEC on February 12, 2003 falsely reported that options granted to Albers had been granted on August 28, 2000, March 30, 2001 and October 15, 2001;

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 86 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

l.   Albers' Form 4 filed with the SEC on March 6, 2003 falsely reported that options granted to Albers had been granted on August 28, 2000, October 11, 2000, March 30, 2001 and October 15, 2001;

m.   Evans-Lombe's Form 4 filed with the SEC on May 15, 2003 falsely reported that options granted to Evans-Lombe had been granted on March 30, 2001 and October 15, 2001;

n.   Woodhouse's Form 4 filed with the SEC on May 16, 2003 falsely reported that options granted to Woodhouse had been granted on October 15, 2001;

o.   Miskimens' Form 4 filed with the SEC on May 19, 2003 falsely reported that options granted to Miskimens had been granted on March 30, 2001 and July 17, 2001;

p.   Blackwell's Form 4 filed with the SEC on May 28, 2003 falsely reported that options granted to Blackwell had been granted on October 15, 2001;

q.   Klein's Form 4 filed with the SEC on May 28, 2003 falsely reported that options granted to Klein had been granted on October 15, 2001;

r.   Gurke's Form 4 filed with the SEC on October 22, 2003 falsely reported that options granted to Gurke had been granted on August 3, 1999, October 22, 1999, February 1, 2000, March 30, 2001 and October 9, 2001;

s.   Ferguson's Form 4's filed with the SEC on October 23, 2003 and November 5, 2003 falsely reported that options granted to Ferguson had been granted on August 03, 1999, October 22, 1999, February 1, 2000, March 30, 2001 and October 9, 2001;

t.   Huebner's Form 4 filed with the SEC on October 28, 2003 falsely reported that options granted to Huebner had been granted on March 30, 2001 and October 15, 2001;

u.   Beyle's Form 4's filed with the SEC on October 28, 2003 and November 3, 2003 falsely reported that options granted to Beyle had been granted on March 30, 2001, July 17, 2001 and October 15, 2001;

v.   Woodhouse's Form 4 filed with the SEC on November 14, 2003 falsely reported that options granted to Woodhouse had been granted on March 30, 2001, July 17, 2001 and October 15, 2001;

w.   Beyle's Form 4 filed with the SEC on February 11, 2004 falsely reported that options granted to Beyle had been granted on March 30, 2001;

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 87 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

x.    Miskimens' Form 4 filed with the SEC on February 13, 2004 falsely reported that options granted to Miskimens had been granted on October 9, 2001;

y.    Klein's Form 4 filed with the SEC on February 18, 2004, February 24, 2004, March 2, 2004, March 9, 2004 falsely reported that options granted to Klein had been granted on October 15, 2001;

z.    Sporborg's Form 4 filed with the SEC on March 8, 2004 falsely reported that options granted to Sporborg had been granted on July 23, 2001;

aa.   Klein's Form 4 filed with the SEC on March 17, 2004, March 18, 2004, March 23, 2004 and March 30, 2004 falsely reported that options granted to Klein had been granted on March 30, 2001;

bb.   Klein's Form 4 filed with the SEC on April 5, 2004 falsely reported that options granted to Klein had been granted on October 22, 1999 and March 30, 2001;

cc.   Huebner's Form 4 filed with the SEC on April 29, 2004 falsely reported that options granted to Huebner had been granted on March 30, 2001;

dd.   Beyle's Form 4 filed with the SEC on April 29, 2004 falsely reported that options granted to Beyle had been granted on March 30, 2001 and July 17, 2001;

ee.   Klein's Form 4 filed with the SEC on May 5, 2004 and May 12, 2004 falsely reported that options granted to Klein had been granted on May 7, 2001;

ff.   Woodhouse's Form 4 filed with the SEC on May 10, 2004 falsely reported that options granted to Woodhouse had been granted on March 30, 2001 and July 17, 2001;

gg.   Klein's Form 4's filed with the SEC on May 19, 2004, May 26, 2004, June 2, 2004, June 15, 2004, June 22, 2004, June 30, 2004, July 2, 2004 and July 7, 2004 falsely reported that options granted to Klein had been granted on May 7, 2001;

hh.   Ferguson's Form 4 filed with the SEC on May 20, 2004 falsely reported that options granted to Ferguson had been granted on August 3, 1999 and October 22, 1999;

ii.   Klein's Form 4's filed with the SEC on July 7, 2004, July 14, 2004, July 20, 2004, July 21, 2004, December 2, 2004, December 8, 2004, December 14, 2004, December 21, 2004 and December 28, 2004 falsely reported that options granted to Klein had been granted on June 26, 2001.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                                    - 88 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

jj.   Ferguson's Form 4 filed with the SEC on August 31, 2004 falsely reported that options granted to Ferguson had been granted on October 22, 1999 and October 9, 2001.

kk.   Evans-Lombe's Form 4 filed with the SEC on September 1, 2004 falsely reported that options granted to Evans-Lombe had been granted on July 27, 1999 and October 22, 1999;

ll.   Woodhouse's Form 4 filed with the SEC on September 02, 2004 falsely reported that options granted to Woodhouse had been granted on October 25, 1999;

mm.   Beyle's Form 4 filed with the SEC on November 5, 2004 falsely reported that options granted to Beyle had been granted on March 30, 2001 and July 17, 2001;

nn.   Sporborg's Form 4 filed with the SEC on November 5, 2004 falsely reported that options granted to Sporborg had been granted on July 23, 2001;

oo.   Getty's Form 4 filed with the SEC on November 16, 2004 falsely reported that options granted to Getty had been granted on October 22, 1999 and October 15, 2001;

pp.   Ferguson's Form 4 filed with the SEC on November 17, 2004 falsely reported that options granted to Ferguson had been granted on March 30, 2001 and October 9, 2001;

qq.   Gurke's Form 4 filed with the SEC on April 26, 2005 falsely reported that options granted to Gurke had been granted on August 3, 1999, October 22, 1999 and February 1, 2000;

rr.   Beyle's Form 4 filed with the SEC on April 26, 2005 falsely reported that options granted to Beyle had been granted on March 30, 2001 and July 17, 2001;

ss.   Ferguson's Form 4 filed with the SEC on April 27, 2005 falsely reported that options granted to Ferguson had been granted on February 1, 2000 and March 30, 2001;

tt.   Gurke's Form 4 filed with the SEC on August 1, 2005 falsely reported that options granted to Gurke had been granted on March 30, 2001 and October 9, 2001;

uu.   Huebner's Form 4 filed with the SEC on August 2, 2005 falsely reported that options granted to Huebner had been granted on March 30, 2001;

vv.   Beyle's Form 4 filed with the SEC on August 2, 2005 falsely reported that options granted to Beyle had been granted on July 17, 2001;

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 89 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    ww.   Sporborg's Form 4 filed with the SEC on August 8, 2005 falsely reported that
2          options granted to Sporborg had been granted on July 23, 2001;

3    xx.   Evans-Lombe's Form 4 filed with the SEC on August 29, 2005 falsely reported
          that options granted to Evans-Lombe had been granted on May 4, 1999, October
4          22, 1999 and October 15, 2001; and

5    yy.   Getty's Form 4 filed with the SEC on January 3, 2006 falsely reported that
6          options granted to Getty had been granted on March 30, 2001 and October 15,
          2001.
7

8                    **Revelation of Options Backdating at Getty Images**

9          263.   Defendants Klein, Getty, Bailey, Garb and Sporborg continued to conceal their

10   foregoing misconduct until November 9, 2006, when the Company issued a press release,

11   announcing an internal review of its historical stock option grants resulting from an SEC

12   investigation:

13         Getty Images, Inc. (NYSE: GYI), the world's leading creator and distributor of
           visual content, today announced that its board of directors has established a
14         special committee to conduct an internal investigation relating to the Company's
           stock option grant practices and related accounting for stock option grants. This
15         review is being conducted with the assistance of outside legal counsel retained by
16         the special committee.

17         The Division of Enforcement of the Securities and Exchange Commission (the
18         "SEC") had earlier notified the Company that it is conducting an informal inquiry
           into the Company's stock option grant practices, and has requested that the
19         Company provide the SEC with certain information relating to the Company's
20         stock option grant practices. The Company is cooperating fully with the SEC in
           this informal inquiry.
21

22         264.   As a result of the SEC inquiry, Getty's Board announced the same day that they

23   had established the Special Committee to conduct an investigation relating to the Company's

24   equity compensation grant practices and related accounting for equity compensation grants. The

25   Special Committee consisted of two members of Getty Image's Board of Directors, Alan G.

26   Spoon and Michael A. Stein, the chair of Getty Image's Audit Committee.

27

AMENDED SHAREHOLDER VERIFIED                    - 90 -              LAW OFFICES OF
DERIVATIVE COMPLAINT                                        CLIFFORD A. CANTOR, P.C.
(No. C 07-0317 JLR)                                              627 208th Ave. SE
                                                           Sammamish, WA 98074-7033
                                                      Tel: (425) 868-7813 • Fax: (425) 868-7870

265.    On April 16, 2007, the Company issued a press release admitting that their stock option grants have incorrect measurement dates that must be adjusted.

266.    On June 13, 2007, the Company filed its restatement of its financial results adjusting for $27 million in additional compensation expenses.

### INSIDER SELLING

267.    During the relevant period, Defendants Klein, Getty, Garb and Sporborg, while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold over $3 million shares of Getty Images stock with a total proceeds of over $169 million, a significant portion of which was obtained through the exercise of improperly backdated stock options, as shown in the chart below.  Specifically, Getty, from 2003 to 2006, sold 1,407,635 shares with total proceeds of $76,183,332.60, and Klein, from 1999 to 2006, sold 1,763,585 shares with total proceeds of $92,852,893.80, as shown below:

| Name | Date of Transaction | Shares Sold | Proceeds |
|---|---|---|---|
| Garb | 6/2/2005 | 3,500 | $262,850.00 |
| Getty | 11/11/03 to 1/3/06 | 1,407,635 | $76,183,332.60 |
| Klein | 2/25/99 to 1/20/06 | 1,763,585 | $92,852,893.80 |
| Sporborg | 3/4/04 to 8/4/05 | 9,583 | $577,309.86 |
| **TOTAL** | **2/25/99 to 1/20/06** | **3,184,303** | **$169,876,386.26** |

### GETTY IMAGES' FALSE FINANCIAL REPORTING
### IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES

268.    As a result of Defendants Klein, Getty, Bailey, Garb and Sporborg's improper backdating of stock options, Defendants Klein, Getty, Bailey, Garb and Sporborg caused Getty Images to violate GAAP, SEC regulations and IRS rules and regulations.

269.    Getty Images' financial results for 1999 through 2005 were included in reports filed with the SEC and in other shareholder reports.  In these reports, Defendants Klein, Getty, Bailey, Garb and Sporborg represented that Getty Images' financial results were presented in a fair manner and in accordance with GAAP.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 91 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1    270.    Defendants Klein, Getty, Bailey, Garb and Sporborg's representations were false

2    and misleading as to the financial information reported, as such financial information was not

3    prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the

4    Company's financial condition and operations, causing the financial results to be presented in

5    violation of GAAP and SEC rules.

6    271.    GAAP consists of those principles recognized by the accounting profession as the

7    conventions, rules, and procedures necessary to define accepted accounting practice at the

8    particular time. Regulation S-X, to which the Company is subject as a registrant under the

9    Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC,

10   which are not prepared in compliance with GAAP, are presumed to be misleading and

11   inaccurate.

12                                   **Violations of GAAP**

13   272.    During the relevant period, Defendants Getty, Klein, Sporborg, Bailey and Garb

14   caused the Company to understate its compensation expense by not properly accounting for its

15   stock options under GAAP and thus overstated the Company's net earnings.

16   273.    Under well-settled accounting principles in effect throughout the relevant period,

17   Getty Images did not need to record an expense for options granted to employees at the current

18   market price (at-the-money). The Company was, however, required to record an expense in its

19   financial statements for any options granted below the current market price (in-the-money). In

20   order to provide Getty Images executives and employees with far more lucrative in-the-money

21   options, while avoiding having to inform shareholders about millions of dollars incurred by the

22   Company in compensation expenses (and without paying the IRS millions of dollars in

23   employment taxes), Defendants Getty, Klein, Sporborg, Bailey and Garb systematically falsified

24   Company records to create the false appearance that options had been granted at the market price

25   on an earlier date.

26   274.    Throughout the relevant period, Getty Images accounted for stock options using

27   the intrinsic method described in APB 25, "Accounting for Stock Issued to Employees." Under

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                          - 92 -
(No. C 07-0317 JLR)

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  APB 25, employers were required to record as an expense on their financial statements the

2  "intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-

3  money on the measurement date has intrinsic value, and the difference between its exercise price

4  and the quoted market price must be recorded as compensation expense to be recognized over

5  the vesting period of the option. Options that are at-the-money or out-of-the-money on the

6  measurement date need not be expensed. Excluding non-employee directors, APB 25 required

7  employers to record compensation expenses on options granted to non-employees irrespective of

8  whether they were in-the-money or not on the date of grant.

9  **Getty Images' GAAP Violations Were Material**

10  275. Getty Images' false and misleading relevant period statements and omissions

11  regarding its accounting were material, particularly in light of SEC guidance on materiality.

12  SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions

13  of materiality. Among other items, SAB Topic 1M says: "A matter is 'material' if there is a

14  substantial likelihood that a reasonable person would consider it important." It also stresses that

15  materiality requires qualitative, as well as quantitative, considerations. For example, if a known

16  misstatement would cause a significant market reaction, that reaction should be taken into

17  account in determining the materiality of the misstatement.

18  276. SAB Topic 1M further states:

19     among the considerations that may well render material a

20  quantitatively small misstatement of a financial statement item are –

21        *   *   *

22     whether the misstatement masks a change in earnings or other

23  trends

24     whether the misstatement hides a failure to meet analysts'

25  consensus expectations for the enterprise

26        *   *   *

27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 93 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1         whether the misstatement concerns a segment or other portion of
the registrant's business that has been identified as playing a significant
2         role in the registrant's operations or profitability.

3

4     277.    SAB Topic 1M also says that an intentional misstatement of even immaterial

5   items may be illegal and constitute fraudulent financial reporting.

6     278.    Getty Images' misstatements satisfy these criteria and thus were material from

7   both a quantitative and qualitative perspective.

8   **Getty Images' Financial Statements Violated Fundamental Concepts of GAAP**

9     279.    Due to these accounting improprieties, the Company presented its financial results

10  and statements in a manner that violated GAAP, which are described by the following

11  statements:

12     (a)    The principle that interim financial reporting should be based upon the same

13            accounting principles and practices used to prepare annual financial statements
(APB No. 28, ¶10);

14

15     (b)    The principle that financial reporting should provide information that is useful to
existing and potential investors and creditors and other users in making rational

16            investment, credit and similar decisions (FASB Statement of Concepts No. 1,
¶34);

17

18     (c)    The principle that financial reporting should provide information about the
economic resources of an enterprise, the claims to those resources, and the effects

19            of transactions, events and circumstances that change resources and claims to
those resources (Financial Accounting Standards Board ("FASB") Statement of

20            Concepts No. 1, ¶40);

21     (d)    The principle that financial reporting should provide information about how

22            management of an enterprise has discharged its stewardship responsibility to
stockholders for the use of enterprise resources entrusted to it. To the extent that

23            management offers securities of the enterprise to the public, it voluntarily accepts
wider responsibilities for accountability to prospective investors and to the public

24            in general (FASB Statement of Concepts No. 1, ¶50);

25     (e)    The principle that financial reporting should be reliable in that it represents what

26            it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

27

AMENDED SHAREHOLDER VERIFIED       - 94 -         LAW OFFICES OF
DERIVATIVE COMPLAINT                      **CLIFFORD A. CANTOR, P.C.**
(No. C 07-0317 JLR)                         627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

280.    Further, the undisclosed adverse information concealed by Defendants Getty, Klein, Sporborg, Bailey and Garb during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**Getty Images' Financial Statements Violated SEC Regulations**

281.    During the relevant period, Defendants Getty, Klein, Sporborg, Bailey and Garb caused Getty Images to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

282.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security

1    on the date of grant, a separate, adjoining column shall be added showing market price on the

2    date of grant. . . ." Item 402(c)(2)(iv).

3        283.    Defendants Getty, Klein, Sporborg, Bailey and Garb caused Getty Images to

4    violate SEC regulations by failing to disclose that the Company's named executive officers had

5    been granted options with exercise prices below the market value on the date the Board or

6    Compensation Committee approved the grant.

7                    **Violations of IRS Rules and Regulations**

8        284.    During the relevant period, Defendants Getty, Klein, Sporborg, Bailey and Garb

9    further caused Getty Images to violate IRS rules and regulations due to its improper accounting

10   for the backdated stock options. As a result, the Company's tax liabilities were understated,

11   exposing Getty Images to potential amounts owed for back taxes, penalties and interest to the

12   IRS for improperly reporting compensation.

13       285.    Defendants Getty, Klein, Sporborg, Bailey and Garb caused the Company to

14   violate Section 162(m), which generally limits a publicly traded company's tax deductions for

15   compensation paid to each of its named executive officers to $1 million unless the pay is

16   determined to be "performance-based." In order for compensation to be performance-based, the

17   Compensation Committee must have set pre-established and objective performance goals. The

18   goals must then be approved by the shareholders. Section 162(m) defines stock options as

19   performance-based provided they are issued at an exercise price that is no less than the fair

20   market value of the stock on the date of the grant. Accordingly, properly issued stock options do

21   not have to be taken into account in calculating whether an executive's compensation has

22   exceeded the $1 million compensation cap.

23       286.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie

24   top executives' soaring pay packages more closely to a company's performance. This change in

25   the tax law turned compensation practices for a company's top executives away from straight

26   salary-based compensation to performance-based compensation, including stock options.

27   According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 96 -
(No. C 07-0317 JLR)

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    find other forms of compensation so people could get over the $1 million threshold without

2    running afoul of the code."

3        287.    Defendants Getty, Klein, Sporborg, Bailey and Garb caused Getty Images to

4    violate Section 162(m) by providing backdated options to the Company's named executive

5    officers, which were granted with exercise prices that were less than the fair market value of the

6    stock on the date of the grant. As a result, all of the income resulting from the exercise of the

7    options must be included for purposes of calculating whether the named executive's

8    compensation exceeds the $1 million cap for federal tax purposes.

9        288.    Defendants Getty, Klein, Sporborg, Bailey and Garb further caused the Company

10   to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax

11   from its executives and employees upon the exercise of Getty Images' stock options by

12   improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options

13   ("ISOs").

14       289.    ISOs are a form of equity compensation that may be provided to a company's

15   employees. ISOs are required to be granted at an exercise price that is no less than the fair

16   market value of the stock on the date of the grant and are entitled to preferential tax treatment as

17   they are not subject to income tax upon exercise of the options but only upon sale of the stock

18   (except for the possible imposition of alternative minimum tax on the option spread at the time of

19   exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not

20   entitled to preferential treatment as they are subject to income tax and FICA withholding upon

21   exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise

22   of NSOs by its employees would be liable for the amount of the income tax and FICA that the

23   company failed to withhold upon exercise of the options, in addition to interest and penalties.

24       290.    By improperly treating its backdated options as ISOs, Defendants Getty, Klein,

25   Sporborg, Bailey and Garb failed to provide proper income tax and FICA withholdings upon the

26   exercise of its options by its executives and employees in violation of IRS rules and regulations.

27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 97 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

291.    The chart below illustrates Getty Images' false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings:

| Fiscal Year | Reported Earnings (Loss) | Reported Basic Earnings (Loss) Per Share |
|---|---|---|
| 1999 | ($67.833 million) | ($1.94) |
| 2000 | ($7.901 million) | ($0.32) |
| 2001 | ($95.312 million) | ($1.84) |
| 2002 | $21.468 million | $0.40 |
| 2003 | $64.017 million | $1.16 |
| 2004 | $106.65 million | $1.81 |
| 2005 | $149.703 million | $2.43 |

292.    Meanwhile, Defendants Getty, Klein, Sporborg, Bailey and Garb were causing the Company to grant them hundreds of thousands of stock options, which were backdated or misdated. As such, Defendants Getty, Klein, Sporborg, Bailey and Garb, in violation of GAAP, did not account for the significant and material amount in compensation expenses as to the aforementioned stock option grants, thereby overstating earnings and earnings per share.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

293.    In a misguided effort to attract and retain employees in a competitive environment, Defendants Getty, Klein, Sporborg, Bailey and Garb exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme.    Their misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.   Specifically, Defendants Getty, Klein, Sporborg, Bailey and Garb breached their fiduciary duties by:

a.    colluding with each other to backdate stock option grants;

b.    colluding with each other to violate GAAP and Section 162(m);

c.    colluding with each other to produce and disseminate false financial statements to Getty Images shareholders and the market that improperly recorded and accounted

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 98 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    for the backdated option grants and concealed the improper backdating of stock
2    options; and

3    d.    colluding with each other to file false proxy statements, false financial statements,
       and false Form 4s in order to conceal the improper backdating of stock options.

4

5    294.    Defendants Getty, Klein, Sporborg, Bailey and Garb's foregoing misconduct was
6    not, and could not have been, an exercise of good faith business judgment.  Rather, it was
7    intended to, and did, unduly benefit defendants Getty, Klein, Sporborg, Albers, Beyle,
8    Blackwell, Evans-Lombe, Ferguson, Gurke, Huebner, Miskimens, O'Neill, Powell, Roling, von
9    Bargen and Woodhouse at the expense of the Company.

10    295.    As a direct and proximate result of Defendants Getty, Klein, Sporborg, Bailey and
11    Garb's foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in
12    damages, including, but not limited to, the additional compensation expenses and tax liabilities
13    the Company will be required to incur, the loss of funds paid to the Company upon the exercise
14    of stock options resulting from the difference between the fair market value of the stock option
15    on the true date of grant and the price that was actually paid as a result of the backdated stock
16    option grant, the costs associated with the Company's internal investigation, costs and expenses
17    incurred in connection with the Company's restatement of historical financial results, and costs
18    and expenses incurred in connection with the SEC investigation of the Company.

19    296.    Defendants Getty, Klein, Sporborg, Albers, Beyle, Blackwell, Evans-Lombe,
20    Ferguson, Gurke, Huebner, Miskimens, O'Neill, Powell, Roling, von Bargen and Woodhouse
21    have exercised numerous backdated options at improperly low prices and have then sold the
22    shares for substantial profits.  Consequently, these defendants have been unjustly enriched by
23    garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in
24    payments that the Company should have received upon exercise of the options.

25    **DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

26    297.    Plaintiff brings this action derivatively in the right and for the benefit of the
27    Company to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment,

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 99 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1    statutory violations, and/or other violations.

2        298.    Plaintiff is an owner of Getty Images common stock and was an owner of Getty

3    Images common stock at times relevant hereto.

4        299.    Plaintiff will adequately and fairly represent the interests of the Company and its

5    shareholders in enforcing and prosecuting its rights.

6        300.    As a result of the facts set forth herein, Plaintiff has not made any demand on

7    Getty Images' Board of Directors to institute this action against the Individual Defendants.  Such

8    demand would be a futile and useless act because the Board is incapable of making an

9    independent and disinterested decision to institute and vigorously prosecute this action.

10       301.    At the time this action was commenced, the Board consisted of seven directors:

11   defendants Getty, Klein, Sporborg, Bailey and Garb and directors Alan G. Spoon and Michael A.

12   Stein.  Five out of the seven directors -- a majority of the board -- received and/or approved

13   backdated options.  Thus, the Board is incapable of making an independent and disinterested

14   decision to institute and vigorously prosecute this action.

15       302.    The following chart summarizes the positions of certain directors during the

16   relevant period:

| Director | Recipient of Backdated Options | Compensation Committee Member During relevant period | Stock Option Committee Member During relevant period | Audit Committee Member During the relevant period |
|---|---|---|---|---|
| Getty | x | | | |
| Klein | x | | x | |
| Sporborg | x | x | | x |
| Bailey | | x | | x |
| Garb | | x | | x |

24       303.    The following directors are incapable of independently and disinterestedly

25   considering a demand to commence and vigorously prosecute this action:

26                                       **Getty**

27       304.    During the relevant period, Defendant Getty received 915,000 backdated options.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 100 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1   Thus, Defendant Getty is directly interested in the improperly backdated stock option grants
2   complained of herein.  Also, as a co-founder of the Company and Chairman of the Board,
3   Defendant Getty knowingly and deliberately participated in and approved the improper
4   backdating of stock options, as alleged herein, and therefore is substantially likely to be held
5   liable for the misconduct complained of herein.

6       305.    Because of his knowing participation in the backdating scheme, Getty knowingly
7   and deliberately participated in and approved the Company's filing of false financial statements
8   and other false SEC filings, as alleged herein, and knowingly and deliberately participated in and
9   approved the Company's violations of GAAP and Section 162(m), as alleged herein, and
10  therefore is substantially likely to be held liable for the misconduct complained of herein.
11  Moreover, by colluding with the other defendants who received backdated options, as alleged
12  herein, Getty has demonstrated that he is unable or unwilling to act independently of these other
13  defendants.

14      306.    Moreover, in connection with the proxy statements dated April 7, 2000, April 6,
15  2001 and April 19, 2002, Getty knowingly and intentionally misrepresented Getty Images'
16  compensation practices while simultaneously seeking shareholder approval of the stock option
17  plans under which Getty and others backdated stock options and seeking shareholder approval to
18  increase the authorized number of Company shares allowed under the stock incentive plans in
19  order to continue the backdating scheme.

20      307.    Defendant Getty is also directly interested in the stock option backdating scheme
21  because he received $76,183,332.60 in illegal proceeds from his sale of Getty Images stock, a
22  significant portion of which was obtained through the exercise of improperly backdated stock
23  options.

24                                **Klein**

25      308.    Defendant Klein is a recipient of 1,317,000 backdated options.  Thus, he is
26  directly interested in the improperly backdated stock option grants complained of herein.  Also,
27  as a director and CEO of the Company, Klein knowingly and deliberately participated in and

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

1  approved the improper backdating of stock options, as alleged herein, and therefore is
2  substantially likely to be held liable for the misconduct complained of herein.

3      309.    Because of his knowing participation in the backdating scheme, Klein knowingly
4  and deliberately participated in and approved the Company's filing of false financial statements
5  and other false SEC filings, as alleged herein, and knowingly and deliberately participated in and
6  approved the Company's violations of GAAP and Section 162(m), as alleged herein, and
7  therefore is substantially likely to be held liable for the misconduct complained of herein.
8  Moreover, by colluding with the other defendants who received backdated options and others, as
9  alleged herein, Klein has demonstrated that he is unable or unwilling to act independently of
10 those Defendants.

11     310.    Furthermore, Klein's principal professional occupation is his position as CEO of
12 the Company.  In his position as CEO of the Company, Klein stands to earn hundreds of
13 thousands of dollars in annual salary, bonuses, and other compensation, all of which must be
14 approved by defendants Bailey, Garb and Sporborg, who currently serve as members of the
15 Compensation Committee.  In 2005, for his service as CEO, Klein received a salary of $950,000,
16 a bonus of $691,600 and a grant of 350,000 stock options.  Accordingly, Klein is incapable of
17 independently and disinterestedly considering a demand to commence and vigorously prosecute
18 this action against defendants Bailey, Garb and Sporborg.

19     311.    Moreover, in connection with the proxy statements dated April 7, 2000, April 6,
20 2001 and April 19, 2002, Klein knowingly and intentionally misrepresented Getty Images'
21 compensation practices while simultaneously seeking shareholder approval of the stock option
22 plans under which Klein and others backdated stock options and seeking shareholder approval to
23 increase the authorized number of Company shares allowed under the stock incentive plans in
24 order to continue the backdating scheme.

25     312.    Defendant Klein is also directly interested in the stock option backdating scheme
26 because he received $92,852,893.80 in illegal proceeds from his sale of Getty Images stock, a
27 significant portion of which was obtained through the exercise of improperly backdated stock

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                              - 102 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ♦ Fax: (425) 868-7870

1   options.

2   **Sporborg**

3       313.    Sporborg is a recipient of at least 8,333 backdated stock options. Thus, he is

4   directly interested in the improperly backdated stock option grants complained of herein. Also,

5   as a member of the Compensation Committee as all relevant times hereto, Sporborg knowingly

6   and deliberately participated in and approved the improper backdating of stock options, as

7   alleged herein, and therefore is substantially likely to be held liable for the misconduct

8   complained of herein

9       314.    Also, as a member of the Audit Committee, Sporborg knowingly and deliberately

10  participated in and knowingly approved the filing of false financial statements and other false

11  SEC filings, as alleged herein, and knowingly and deliberately participated in and approved the

12  Company's violations of GAAP and Section 162(m), as alleged herein, and therefore is

13  substantially likely to be held liable for the misconduct complained of herein. Moreover, by

14  colluding with the Defendants who received backdated options and others, as alleged herein,

15  Sporborg has demonstrated that he is unable or unwilling to act independently of those

16  Defendants.

17      315.    Moreover, in connection with the proxy statements dated April 7, 2000, April 6,

18  2001 and April 19, 2002, Sporborg knowingly and intentionally misrepresented Getty Images'

19  compensation practices while simultaneously seeking shareholder approval of the stock option

20  plans under which Sporborg and others backdated stock options and seeking shareholder

21  approval to increase the authorized number of Company shares allowed under the stock incentive

22  plans in order to continue the backdating scheme.

23      316.    Defendant Sporborg is also directly interested in the stock option backdating

24  scheme because he received $577,309.86 in illegal proceeds from his sale of Getty Images stock,

25  a significant portion of which was obtained through the exercise of improperly backdated stock

26  options.

27

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                         - 103 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

**Bailey**

317.    Bailey, as a member of the Compensation Committee as all relevant times hereto, knowingly and deliberately participated in and approved the improper backdating of stock options, as alleged herein, and as a member of the Audit Committee, Bailey knowingly and deliberately participated in and approved the filing of false financial statements and other false SEC filings, as alleged herein, and knowingly and deliberately participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Moreover, by colluding with the Defendants who received backdated options and others, as alleged herein, Bailey has demonstrated that he is unable or unwilling to act independently of those Defendants.

318.    Moreover, in connection with the proxy statements dated April 7, 2000, April 6, 2001 and April 19, 2002, Bailey knowingly and intentionally misrepresented Getty Images' compensation practices while simultaneously seeking shareholder approval of the stock option plans under Bailey and others backdated stock options and seeking shareholder approval to increase the authorized number of Company shares allowed under the stock incentive plans in order to continue the backdating scheme.

**Garb**

319.    Garb, as a member of the Compensation Committee as all relevant times hereto, knowingly and deliberately participated in and approved the improper backdating of stock options, as alleged herein, and as a member of the Audit Committee, Garb knowingly and deliberately participated in and approved the filing of false financial statements and other false SEC filings, as alleged herein, and knowingly and deliberately participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Moreover, by colluding with the Defendants who received backdated options and others, as alleged herein, Garb has demonstrated that he is unable or unwilling to act independently of those Defendants.

320.    Moreover, in connection with the proxy statements dated April 7, 2000, April 6,

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 104 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  2001 and April 19, 2002, Garb knowingly and intentionally misrepresented Getty Images'
2  compensation practices while simultaneously seeking shareholder approval of the stock option
3  plans under Garb and others backdated stock options and seeking shareholder approval to
4  increase the authorized number of Company shares allowed under the stock incentive plans in
5  order to continue the backdating scheme.

6  <center>**Other Conflicts**</center>

7  321.    Getty, Klein, Sporborg and defendant Evans-Lombe share a long-standing
8  personal and professional relationship, especially with regard to their work at Hambros Bank
9  Limited ("Hambros"). Getty joined Hambros in 1991, prior to founding Getty Images, and Klein
10 served as a director and Manager of the media group. Moreover, Sporborg served as Hambros'
11 Chairman and CEO prior to joining Getty Images, and Evans-Lombe held various finance related
12 positions at Hambros. Accordingly, Getty, Klein, and Sporborg are incapable of independently
13 and disinterestedly considering a demand to commence and vigorously prosecute this action
14 against each other and Evans-Lombe.

15 <center>**Backdating Is Not an Exercise of Valid Business Judgment**</center>

16 322.    Demand is also excused because the misconduct complained of herein was not,
17 and could not have been, an exercise of good faith business judgment. As represented in Getty
18 Images' proxy statements, the stated purpose of the Company's shareholder-approved stock
19 option plan is to attract and retain employees by providing compensation that reflects the
20 Company's stock performance and "align[s] the interests of executive[s] with those of the
21 Stockholders by providing . . . [them] with a financial interest in the Company."

22 323.    However, by granting options with backdated exercise prices, Defendants Klein,
23 Getty, Bailey, Garb and Sporborg undermined the purpose of the Company's shareholder-
24 approved stock option plan by awarding employees compensation that had intrinsic value
25 regardless of Getty Images' stock performance. In effect, this practice was nothing more than
26 secret handouts to executives and employees at the expense of unsuspecting shareholders and the
27 Company.

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ♦ Fax: (425) 868-7870

324.    Defendants Klein, Getty, Bailey, Garb and Sporborg could have achieved the stated purpose of attracting and retaining "key executives" by granting them additional options under its incentive plan, or by granting options at a price less than the fair market value on the date of grant and simply disclosing and expensing these grants.    Instead, Defendants Klein, Getty, Bailey, Garb and Sporborg backdated option grants in violation of the Company's shareholder-approved stock option plan and improperly reported these grants in the Company's and their own financial disclosures.

325.    The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected Getty Images to potentially massive liability.    Getty Images conducted an internal investigation concerning the historical backdating of option grants and admitted to backdating stock option grants.    The SEC has also initiated its own investigation into the Company's prior option grants.    The Company also restated its previously issued financial statements due to errors in accounting for compensation expenses.    Furthermore, Getty Images will likely suffer tax liabilities for the additional compensation they will have to expense as the result of backdated options, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against Defendants Getty, Klein, Sporborg, Bailey and Garb for

### Violations of §10(b) and Rule 10b-5 of the Securities and Exchange Act

326.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

327.    Throughout the relevant period, defendants Getty, Klein, Sporborg, Bailey and Garb individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

328.    Defendants Getty, Klein, Sporborg, Bailey and Garb, as top executive officers

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 106 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    and/or directors of the Company, are liable as direct participants in the wrongs complained of

2    herein.   Through their positions of control and authority as officers and/or directors of the

3    Company, defendants Getty, Klein, Sporborg, Bailey and Garb were able to and did control the

4    conduct complained of herein.

5         329.    Defendants Getty, Klein, Sporborg, Bailey and Garb acted with scienter in that

6    they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard

7    for the truth in that they failed to ascertain and to disclose the true facts, even though such facts

8    were available to them.  Defendants Getty, Klein, Sporborg, Bailey and Garb were among the

9    senior management and/or directors of the Company and were therefore directly responsible for

10   the fraud alleged herein.

11        330.    The Company relied upon defendants Getty, Klein, Sporborg, Bailey and Garb's

12   fraud in granting defendants Getty, Klein, Sporborg, Bailey and Garb options to purchase shares

13   of the Company's common stock, as alleged herein.

14        331.    As a direct and proximate result of defendants Getty, Klein, Sporborg, Bailey and

15   Garb's fraud, the Company has sustained millions of dollars in damages, including, but not

16   limited to, the additional compensation expenses and tax liabilities the Company will be required

17   to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from

18   the difference between the fair market value of the stock option on the true date of grant and the

19   price that was actually paid as a result of the backdated stock option grant, the costs associated

20   with the Company's internal investigation, costs and expenses incurred in connection with the

21   Company's restatement of historical financial results, and costs and expenses incurred in

22   connection with the SEC investigation of the Company.

23                                    **COUNT II**

24              **Against Defendants Getty, Klein, Sporborg, Bailey and Garb**

25                 **for Violations of §14(a) of the Securities Exchange Act**

26        332.    Plaintiff incorporates by reference and realleges each and every allegation set

27   forth above, as though fully set forth herein.

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 107 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    333.    Rule 14-A-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that

2  no proxy statement shall contain "any statement which, at the time and in the light of the

3  circumstances under which it is made, is false or misleading with respect to any material fact, or

4  which omits to state any material fact necessary in order to make the statements therein not false

5  or misleading." 17 C.F.R. §240.14-A-9.

6    334.    The proxy statements described herein violated §14(a) and Rule 14-A-9 because

7  defendants Getty, Klein, Sporborg, Bailey and Garb omitted material facts, including the fact

8  that they were causing Getty Images to engage in a secret options backdating scheme, a fact

9  which defendants Getty, Klein, Sporborg, Bailey and Garb were aware of and participated in

10  from at least 1994.

11    335.    Defendants Getty, Klein, Sporborg, Bailey and Garb knew that the proxy

12  statements were materially false and misleading.

13    336.    The misrepresentations and omissions in the proxy statements were material.  The

14  proxy statements were an essential link in the accomplishment of the continuation of Defendants

15  Getty, Klein, Sporborg, Bailey and Garb's unlawful stock option backdating scheme, as

16  revelations of the truth would have immediately thwarted a continuation of the shareholders'

17  endorsement of the directors' positions, the executive officers' compensation and the Company's

18  compensation policies.

19    337.    The Company was damaged as a result of the material misrepresentations and

20  omissions in the Proxy Statements.

21                                   <u>COUNT III</u>

22               **Against Defendants Getty, Klein, Sporborg, Bailey and Garb**

23               **For Violations of §20(a) of the Securities Exchange Act**

24    338.    Plaintiff incorporates by reference and realleges each and every allegation set

25  forth above, as though fully set forth herein.

26    339.    Defendants Getty, Klein, Sporborg, Bailey and Garb, by virtue of their positions

27  with Getty Images and their specific acts, were, at the time of the wrongs alleged herein,

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 108 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   controlling persons of Getty Images within the meaning of §20(a) of the Exchange Act. They

2   had the power and influence and exercised the same to cause Getty Images to engage in the

3   illegal conduct and practices complained of herein.

### COUNT IV

**Against Defendants Getty, Klein, Sporborg, Bailey and Garb**

**for Breach of Fiduciary Duty and/or Aiding and Abetting**

7      340.    Plaintiff incorporates by reference and realleges each and every allegation set

8   forth above, as though fully set forth herein.

9      341.    As alleged in detail herein, Defendants Getty, Klein, Sporborg, Bailey and Garb

10  had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other

11  Company insiders at the expense of the Company.

12     342.    As alleged in detail herein, Defendants Getty, Klein, Sporborg, Bailey and Garb

13  breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated

14  stock options to themselves and/or certain other officers and directors of the Company and cover

15  up their misconduct.

16     343.    In breach of their fiduciary duties of loyalty and good faith, Defendants Getty,

17  Klein, Sporborg, Bailey and Garb agreed to and did participate with and/or aided and abetted one

18  another in a deliberate course of action designed to divert corporate assets to themselves and/or

19  other Company insiders.

20     344.    Defendants Getty, Klein, Sporborg, Bailey and Garb's foregoing misconduct was

21  not, and could not have been, an exercise of good faith business judgment. Rather, it was

22  intended to and did, unduly benefit Defendants Getty, Klein, Sporborg, Albers, Beyle,

23  Blackwell, Evans-Lombe, Ferguson, Gurke, Huebner, Miskimens, O'Neill, Powell, Roling, von

24  Bargen and Woodhouse at the expense of the Company.

25     345.    As a direct and proximate result of Defendants Getty, Klein, Sporborg, Bailey and

26  Garb's foregoing breaches of their fiduciary duties, the Company has sustained millions of

27  dollars in damages, including, but not limited to, the additional compensation expenses and tax

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 109 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   liabilities the Company will be required to incur, the loss of funds paid to the Company upon the

2   exercise of stock options resulting from the difference between the fair market value of the stock

3   option on the true date of grant and the price that was actually paid as a result of the backdated

4   stock option grant, the costs associated with the Company's internal investigation, costs and

5   expenses incurred in connection with the Company's restatement of historical financial results,

6   and costs and expenses incurred in connection with the SEC investigation of the Company.

7                                    **COUNT V**

8   **Against Defendants Getty, Klein, Sporborg, Albers, Beyle, Blackwell, Evans-Lombe,**

9   **Ferguson, Gurke, Huebner, Miskimens, O'Neill, Powell, Roling, von Bargen and**

10                         **Woodhouse for Unjust Enrichment**

11          346.    Plaintiff incorporates by reference and realleges each and every allegation set

12  forth above, as though fully set forth herein.

13          347.    Defendants Getty, Klein, Sporborg, Albers, Beyle, Blackwell, Evans-Lombe,

14  Ferguson, Gurke, Huebner, Miskimens, O'Neill, Powell, Roling, von Bargen and Woodhouse

15  were unjustly enriched by their receipt and retention of backdated stock option grants and the

16  proceeds they received through exercising backdated stock options, as alleged herein and it

17  would be unconscionable to allow them to retain the benefits thereof.

18          348.    To remedy defendants Getty, Klein, Sporborg, Albers, Beyle, Blackwell, Evans-

19  Lombe, Ferguson, Gurke, Huebner, Miskimens, O'Neill, Powell, Roling, von Bargen and

20  Woodhouse's unjust enrichment, the Court should order them to disgorge to the Company all of

21  the backdated stock options they received, including the proceeds of any such options that have

22  been exercised, sold, pledged, or otherwise monetized.

23                                   **COUNT VI**

24  **Against Defendants Getty, Klein, Sporborg, Bailey and Garb for Constructive Fraud**

25          349.    Plaintiff incorporates by reference and realleges each and every allegation set

26  forth above, as though fully set forth herein.

27          350.    As corporate fiduciaries, Defendants Getty, Klein, Sporborg, Bailey and Garb

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT                    - 110 -
(No. C 07-0317 JLR)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  owed to Getty Images and its shareholders a duty of candor and full accurate disclosure

2  regarding the true state of Getty Images' business and assets and their conduct with regard

3  thereto.

4      351.   As a result of the conduct complained of, Defendants Getty, Klein, Sporborg,

5  Bailey and Garb made, or aided and abetted the making of, numerous misrepresentations to

6  and/or concealed material facts from Getty Images' shareholders despite their duties to, *inter*

7  *alia*, disclose the true facts regarding their stewardship of Getty Images.  Thus they have

8  committed constructive fraud and violated their duty of candor.

9      352.   By reason of the foregoing, Getty Images has been damaged.

10  <div align="center">**COUNT VII**</div>

11  <div align="center">**Against the Individual Defendants for Corporate Waste**</div>

12      353.   Plaintiff incorporates by reference and realleges each and every allegation set

13  forth above, as though fully set forth herein.

14      354.   As a result of the conduct described above, the Individual Defendants will be and

15  have been unjustly enriched at the expense of Getty Images, in the form of unjustified salaries,

16  benefits, bonuses, stock option grants, and other emoluments of office.

17      355.   All the payments and benefits provided to the Individual Defendants were at the

18  expense of Getty Images.  The Company received no benefit from these payments, and Getty

19  Images was damaged by such payments.

20      356.   Certain defendants sold Getty Images stock for a profit during the period of

21  deception, misusing confidential non-public corporate information. These defendants should be

22  required to disgorge the gains which they have and/or will otherwise unjustly obtain at the

23  expense of Getty Images. A constructive trust for the benefit of the Company should be imposed

24  thereon.

25

26

27

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 ● Fax: (425) 868-7870

## COUNT VIII

### Against the Klein, Getty, Garb and Sporborg

### for Insider Selling and Misappropriation of Information

357.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

358.    At the time of their stock sales, defendants Klein, Getty, Garb and Sporborg knew that the Company's financial results were false and misleading.  These Defendants' sales of Getty Images common stock while in possession and control of this material adverse nonpublic information was a breach of their fiduciary duties of good faith, honesty and loyalty.

359.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the fiduciary owed by defendants Klein, Getty, Garb and Sporborg to the Company, Plaintiff, on behalf of the Company, are entitled to the imposition of a trust on any profits these Defendants obtained thereby.

360.    Plaintiff, as shareholder of Getty Images, seeks damages and other relief for Getty Images.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against Defendants Getty, Klein, Sporborg, Bailey and Garb and in favor of the Company for the amount of damages sustained by the Company as a result of their misconduct;

B.    Ordering defendants Getty, Klein, Sporborg, Albers, Beyle, Blackwell, Evans-Lombe, Ferguson, Gurke, Huebner, Miskimens, O'Neill, Powell, Roling, von Bargen and Woodhouse to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized and imposing a constructive trust thereon;

C.    Granting appropriate equitable relief to remedy Defendants Getty, Klein, Sporborg, Bailey and Garb's breaches of fiduciary duties;

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 112 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1       D.     Directing the Company to take all necessary actions to reform and improve its

2 corporate governance and internal control procedures to comply with applicable law, including,

3 but not limited to, putting forward for a shareholder vote resolutions for amendments to the

4 Company's By-Laws or Articles of Incorporation and taking such other action as may be

5 necessary to place before shareholders for a vote adoption of the following Corporate

6 Governance policies:

7          (a)     a proposal requiring that the office of CEO of the Company and Chairman

8 of the Board be permanently held by separate individuals and that the Chairman of the Board

9 meets rigorous "independent" standards;

10         (b)     a proposal to strengthen the Board's supervision of operations and develop

11 and implement procedures for greater shareholder input into the policies and guidelines of the

12 Board;

13         (c)     appropriately test and then strengthen the internal audit and control

14 functions;

15         (d)     rotate independent auditing firms every five years;

16         (e)     control and limit insider stock selling and the terms and timing of stock

17 option grants; and

18         (f)     reform executive compensation;

19       E.     Ordering an accounting of all stock option grants made to defendants Getty,

20 Klein, Sporborg, Albers, Beyle, Blackwell, Evans-Lombe, Ferguson, Gurke, Huebner,

21 Miskimens, O'Neill, Powell, Roling, von Bargen and Woodhouse, including, but not limited to,

22 the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the

23 grants, the dates the stock options were exercised, as well as the disposition of any proceeds

24 received by defendants Getty, Klein, Sporborg, Albers, Beyle, Blackwell, Evans-Lombe,

25 Ferguson, Gurke, Huebner, Miskimens, O'Neill, Powell, Roling, von Bargen and Woodhouse via

26 sale or other exercise of the grants;

27       F.     Ordering all contracts which provide for stock option grants to defendants Getty,

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)

- 113 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1 | Klein, Sporborg, Albers, Beyle, Blackwell, Evans-Lombe, Ferguson, Gurke, Huebner,
2 | Miskimens, O'Neill, Powell, Roling, von Bargen and Woodhouse and were entered into during
3 | the relevant period should, therefore, be rescinded, with all sums paid under such contracts
4 | returned to the Company, and all such executory contracts cancelled and declared void;

5 |      G.    Awarding to Plaintiff the costs and disbursements of the action, including
6 | reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7 |      H.    Granting such other and further relief as the Court deems just and proper.

8 | **JURY TRIAL DEMANDED**

9 |     Plaintiff demands a trial by jury.

10 |

11 | Dated: August 27, 2007           Respectfully submitted,

12 |                          LAW OFFICES OF CLIFFORD A. CANTOR, P.C.

13 |                            s/   Clifford A. Cantor, WSBA # 893
14 |                          627 208th Avenue SE
                         Sammamish, WA 98074
15 |                          Tel: (425) 868-7813
                         Fax: (425) 868-7870
16 |                          cacantor@comcast.net

17 |

18 |                          SCHIFFRIN & BARROWAY LLP

19 |                          s/   Lee D. Rudy
                         Lee D. Rudy
20 |                          Nichole Browning
                         Tara P. Kao
21 |                          280 King of Prussia Road
                         Radnor, PA 19087
22 |                          Tel: (610) 667-7706
23 |                          Fax: (610) 667-7056
                         lrudy@sbtklaw.com
24 |                          nbrowning@sbtklaw.com
                         tkao@sbtklaw.com
25 |

26 |

27 |

AMENDED SHAREHOLDER VERIFIED
DERIVATIVE COMPLAINT
(No. C 07-0317 JLR)        - 114 -       LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

<u>VERIFICATION</u>

I, TARA KAO, hereby declare as follows:

1.      I am an associate of the law firm of Schiffrin Barroway Topaz & Kessler, LLP, counsel for plaintiff Richard B. Edmonds in the above-entitled action. I have read the foregoing Amended Shareholder Verified Derivative Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff Richard B. Edmonds is absent from the County of Delaware, Pennsylvania where I maintain my office.

Executed this 27 day of August, 2007.


                                          /s/ Tara Kao
                                    _____
                                          TARA P. KAO

## DECLARATION OF SERVICE

I, TARA KAO, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Delaware, Pennsylvania, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 280 King of Prussia Road, Radnor, Pennsylvania 19087.

2.      That on August 27, 2007, declarant served the following AMENDED SHAREHOLDER VERIFIED DERIVATIVE COMPLAINT via the CM/ECF System to the parties listed on the attached service list.

3.      That there is regular communication between the parties.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 27th day of August 2007, at Radnor, Pennsylvania.


                                                            /s/
                                                            TARA KAO

GETTY IMAGES, INC.
Service List – August 27, 2007
Page 1 of 1

| **COUNSEL FOR PLAINTIFF** | **COUNSEL FOR DEFENDANTS** |
|---|---|

<table>
<tr>
<td valign="top">

SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
Lee D. Rudy
Nichole Browning
Tara P. Kao
280 King of Prussia Road
Radnor, PA  19087
610/667-7706
610/667-7056 (fax)
ezagar@sbtklaw.com
nbrownging@sbtklaw.com
tkao@sbtklaw.com

LAW OFFICES OF CLIFFORD A.
CANTOR, P.C.
Clifford A Cantor
627 208TH AVE SE
Sammamish, WA 98074-7033
425/868-7813
425/868-7870 (fax)
cacantor@comcast.net

*Counsel for Plaintiff Richard B. Edmonds*

</td>
<td valign="top">

HELLER EHRMAN LLP
George E. Greer
Lori Lynn Phillips
701 5th Avenue, Suite 6100
Seattle, WA 98104-7098
206/447-0900
206/447-0849 (fax)
george.greer@hellerehrman.com
lori.phillips@hellerehrman.com
&
Howard S. Caro
333 Bush Street
San Francisco, CA 94104-2878
415/772-6000
howard.caro@hellerehrman.com

*Counsel for Defendants Mark H. Getty, Jonathan D. Klein, A.D. Albers, James N. Bailey, Jeff Beyle, M. Lewis Blackwell, Richard R. Ellis, Nick Evans-Lombe, John Z. Ferguson, Andrew S. Garb, Jim Gurke, Elizabeth J. Huebner, Scott A. Miskimens, William O'Neill, Christopher H. Sporborg, Sally Von Bargen, and Warwick K. Woodhouse*

SIRIANNI YOUTZ MEIER &
SPOONEMORE
Richard E. Spoonemore
Stephen John Sirianni
719 2ND AVE
1100 MILLENNIUM TOWER
SEATTLE, WA 98104
206/223-0303
206/223-0246 (fax)
rspoonemore@sylaw.com
ssirianni@sylaw.com

*Counsel for Nominal Defendant Getty Images, Inc.*

</td>
</tr>
</table>

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ ) | | |
| In Re SUNRISE SENIOR LIVING, INC. ) | **Civil Action No. 07-00143** | |
| Derivative Litigation ) | | |
| _____) | | |
| ) | | |
| This Document Relates To: ) | | |
| ) | | |
| ) | | |
| ALL ACTIONS ) | | |
| _____) | | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies, under penalty of perjury, that the foregoing

Affidavit of Mark Hanna and exhibits thereto were served electronically via ECF on

counsel for Defendants on July 24, 2008, and that no Defendant needs to be served by

mail.


July 24, 2008                    /s/ Mark Hanna_____