## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re SUNRISE SENIOR LIVING, INC.<br>Derivative Litigation | ) ) ) ) | Civil Action No. 1:07CV00143<br>Judge Reggie B. Walton |
| This Document Relates To:<br><br>ALL ACTIONS | ) ) ) ) ) | |

## REPLY MEMORANDUM IN SUPPORT OF
## THE MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY
## BY NOMINAL DEFENDANT SUNRISE SENIOR LIVING, INC.

George H. Mernick, III (D.C. Bar No. 294256)
HOGAN & HARTSON, LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004

N. Thomas Connally (D.C. Bar No. 448355)
Jon M. Talotta (D.C. Bar No. 473626)
HOGAN & HARTSON, LLP
8300 Greensboro Drive, Suite 1100
McLean, VA 22102

Dated: August 18, 2008

*Attorneys for Nominal Defendant*
*Sunrise Senior Living, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ii

INTRODUCTION ...........................................................................................1

ARGUMENT..................................................................................................2

I.    Plaintiffs' Entire Demand Futility Analysis Is Premised on an Erroneous Application of Delaware Law. .................................................2

    A.    Under Delaware Law, Plaintiffs Must Establish Demand Futility for Each of Their Claims of Misconduct. ...........................2

    B.    The D.C. Circuit Applies the Claim-by-Claim Analysis Required by Delaware Law. ............................................................3

    C.    The Court Must Analyze Whether Demand Was Excused for Each of Plaintiffs' Four Different Claims of Misconduct. ...............3

II.    Plaintiffs' Post Hoc Justifications Cannot Establish Demand Futility for Any of Their Claims. ...........................................................................5

    A.    Plaintiffs Fail to Establish That Demand Was Futile for Their Claims of Stock Options Backdating. ...........................................5

        1.    Plaintiffs Cannot Avoid the Preclusive Effect of Von Guggenberg. ..............................................................5

        2.    Plaintiffs' Allegations Lack Sufficient Factual Basis to Establish a Circumstantial Inference of Backdating..............8

        3.    If Anything, the Conrad and Ryan Decisions Demonstrate That the Amended Complaint Lacks Key Factual Allegations Required to Excuse Demand. .............18

    B.    Plaintiffs Cannot Establish That Demand Was Futile for Their Claims of Ultra Vires Options Grants. ...........................................19

    C.    Plaintiffs Cannot Establish That Demand Was Futile for Their Claims of Knowing Approval of Improper Accounting and False Financial Statements. ...........................................................20

    D.    Plaintiffs Cannot Establish That Demand Was Futile for Their Claims of Insider Trading....................................................21

III.    Plaintiffs Do Not State Any Valid Reason Why This Case Should Not Be Stayed in Favor of the Class Action Pending in This Court. ...................23

CONCLUSION ............................................................................................25

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

Aronson v. Lewis, 473 A.2d 805 (Del. 1984) ................................................................3

Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040 (Del. 2004)...........................................................................................................1, 3, 11

Beam v. Stewart, 833 A.2d 961 (Del. Ch. 2003)......................................................2, 20

Conrad v. Blank, 940 A.2d 28 (Del. Ch. 2007)....................................................4, 17, 19

Desimone v. Barrows, 924 A.2d 908 (Del. Ch. 2007) ...............................................19

Doe I v. State of Israel, 400 F. Supp. 2d 86 (D.D.C. 2005) .........................9, 10, 22, 23

Dozier v. Ford Motor Co., 702 F.2d 1189 (D.C. Cir. 1983).............................................7

Edmonds v. Getty, 524 F. Supp. 2d 1267 (W.D. Wash. 2007) .....................................10

Gaubert v. Federal Home Loan Bank Bd., 863 F.2d 59 (D.C. Cir. 1988).....................11

Grobow v. Perot, 539 A.2d 180 (Del. 1988) .............................................................1, 3

Guttman v. Huang, 823 A.2d 492 (Del. Ch. 2003)................................................21, 23

Heineman v. Datapoint Corp., 611 A.2d 950 (Del. 1992)..............................................3

Henik v. LaBranche, 433 F. Supp. 2d 372 (S.D.N.Y. 2006).........................................6

Henthorn v. Dept. of Navy, 29 F.3d 682 (D.C. Cir. 1984)...........................................13

In re Citadel Equity Fund Ltd. v. Aquila, Inc., 168 F. App'x 474 (S.D.N.Y. 2006)...............15, 16

In re CNET Networks, Inc., 483 F. Supp. 2d 947 (N.D. Cal. 2007) .........................1, 12, 16, 20

In re Coca-Cola Enters., Inc., 478 F. Supp. 2d 1369 (N.D. Ga. 2007)........................22

In re Kaufman Mut. Fund Actions, 479 F.2d 257 (1st Cir. 1973) cert. denied, 414 U.S. 857 (1973) ...................................................................................................6, 11

In re Openwave Systems, Inc., No. 06-03468, 2008 WL 410259 (N.D. Cal. Feb. 12, 2008) ................................................................................................................10

In re PMC-Sierra, Inc. Derivative Litig., No. 06-05330, 2007 WL 2427980 (N.D. Cal. Aug. 22, 2007)..........................................................................................................10

In re PMC-Sierra, Inc. Derivative Litig., No. 06-05330, 2008 WL 2024888 (N.D. Cal. May 8, 2008) .................................................................................................................17

In re Sonus Networks, Inc., S'holder Derivative Litig., 499 F.3d 47 (1st Cir. 2007) .............6, 7, 8

In re Verisign, Inc. Deriv. Litig., 531 F. Supp. 2d 1173 (N.D. Cal. 2007)................................7, 11

In re XM Satellite Radio Holdings Securities Litig., 479 F. Supp. 2d 165 (D.D.C. 2007).....15, 16

Iotex Comm'ns, Inc. v. Defries, No. 15817, 1998 WL 914265 (Del. Ch. Dec. 21, 1998)..........21

Khanna v. McMinn, No. 20545, 2006 WL 1388744 (Del. Ch. May 9, 2006) .............................11

Lewis v. Anderson, 477 A.2d 1040 (Del. 1984)...........................................................................24

Lewis v. Ward, 852 A.2d 896 (Del. 2004) ...................................................................................24

Mills v. Delaware, 732 A.2d 845 (Del. 1999) ...............................................................................3

Nach v. Baldwin, No. 07-00740, 2008 WL 410261 (N.D. Cal. Feb. 12, 2008)...........................10

Needham v. Cruver, Nos. 12428, 12430, 1993 WL 179336 (Del. Ch. May 12, 1993)..................3

Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines, __ F.3d __, No. 07-07108, 2008 WL 3166142 (D.C. Cir. Aug. 8, 2008)............................................................3, 23

Rales v. Blasband, 634 A.2d 927 (Del. 1993) ................................................................................2

Rattner v. Bidzos, No. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003) ........................22, 23

Ryan v. Gifford, 918 A.2d 341 (Del. Ch. 2007).........................................................................4, 18

Sachs v. Sprague, 401 F. Supp. 2d 159 (D. Mass. 2005) .............................................................11

Saito v. McCall, No. 17312, 2004 WL 3029876 (Del. Ch. Dec. 20, 2004) ...................................7

Saunders v. Reynolds, 204 S.E.2d 421 (Va. 1974) ........................................................................6

Semtek Int'l v. Lockheed Martin, 531 U.S. 497 (2001) .................................................................6

Shiflet v. Eller, 319 S.E.2d 750 (Va. 1984)....................................................................................6

Yaw v. Talley, No. 12882, 1994 WL 89019 (Del. Ch. March 2, 1994)..........................................2

Zoran Corp. Derivative Litig., 511 F. Supp. 2d 986 (N.D. Cal. 2007)........................................17

**INTRODUCTION**

Plaintiffs are seeking to displace the Board's authority to manage Sunrise and pursue claims on behalf of the Company based on patently erroneous pronouncements of law. The federal rules and Delaware law impose stringent pleading requirements to ensure that control over claims pursued on behalf of a company stays with the company, unless and until a shareholder plaintiff alleges particularized facts establishing that a majority of the company's current directors are incapable of considering such claims in a disinterested and independent manner. The Amended Complaint is the <u>fourth</u> attempt by this plaintiff group and their counsel to allege such facts. Sunrise's Mem. at 1, 4, 7-8. Having failed to do so yet again, Plaintiffs attempt to tilt the entire playing field in their Opposition by misstating the fundamental principles of demand futility to make their pleading burden appear less onerous than it actually is.

A "key principle" under Delaware law is that "directors are entitled to a presumption that they were faithful to their fiduciary duties." <u>Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart</u>, 845 A.2d 1040, 1048-49 (Del. 2004). The burden is on a derivative plaintiff to overcome that presumption by pleading particularized facts creating a reasonable doubt that those duties were discharged faithfully. <u>Id.</u> These particularized facts must establish that a majority of current directors is "interested" <u>for each</u> of the different claims of wrongdoing alleged, <u>not</u>, as Plaintiffs' contend, based on the complaint "as a whole."

Furthermore, where, as here, a derivative plaintiff relies on circumstantial inferences to support otherwise conclusory assertions of wrongdoing, the court is not obliged to accept the plaintiff's proffered inferences. Rather, the court makes its own determination as to whether the circumstantial facts pled reasonably support the inference of wrongdoing that the plaintiff urges the court to draw. <u>See, e.g.</u>, <u>Grobow v. Perot</u>, 539 A.2d 180, 187 (Del. 1988); <u>In re CNET Networks, Inc.</u>, 483 F. Supp. 2d 947, 954 (N.D. Cal. 2007). Under the correct demand

futility analysis, the Amended Complaint's generalized and conclusory allegations fail to establish that demand was excused for any of Plaintiffs' claims of misconduct.

Moreover, even if the Amended Complaint is not dismissed, the Court should stay this suit in favor of the consolidated securities class action also pending before this Court. Sunrise, the real plaintiff in interest here, will not be prejudiced if this case is stayed. Rather, Sunrise faces substantial harm if it is forced to <u>pursue</u> claims in this derivative suit while at the same time <u>defending</u> claims based on the same underlying conduct in the securities class action.

## <u>ARGUMENT</u>

**I.    Plaintiffs' Entire Demand Futility Analysis Is Premised on an Erroneous Application of Delaware Law.**

The framework Plaintiffs rely on to assert demand futility has no basis in Delaware law. As such, their entire Opposition is premised on a false construct and, like the Amended Complaint, is fatally flawed.

**A.    Under Delaware Law, Plaintiffs Must Establish Demand Futility for Each of Their Claims of Misconduct.**

Plaintiffs acknowledge that "the whole board has not approved the transaction[s] at issue" and, thus, that the demand futility analysis in this case is governed by <u>Rales v. Blasband</u>, 634 A.2d 927, 933-934 (Del. 1993). Pls.' Opp'n at 8. Plaintiffs, however, are patently incorrect in asserting that "[they] need only raise a reasonable doubt regarding the disinterestedness of at least four directors with respect to the Amended Complaint <u>as a whole</u>." <u>Id.</u> at n.8. (emphasis added). Under Delaware law, a derivative plaintiff must establish that demand is futile for each claim purportedly brought on behalf of the corporation. <u>Beam v. Stewart</u>, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) ("Demand futility analysis is conducted on a claim-by-claim basis."); <u>Yaw v. Talley</u>, No. 12882, 1994 WL 89019, at *9 (Del. Ch. March 2, 1994) ("[P]laintiff must...demonstrate that a demand would have been futile as to each...claim."); <u>Needham v.</u>

Cruver, Nos. 12428, 12430, 1993 WL 179336, at *3 (Del. Ch. May 12, 1993) ("[P]re-suit

demand futility analysis must be conducted for each claim in a stockholder derivative

action.") (citing Heineman v. Datapoint Corp., 611 A.2d 950 (Del. 1992)). 1/

**B.    The D.C. Circuit Applies the Claim-by-Claim Analysis Required by Delaware Law.**

The D.C. Circuit applied the required claim-by-claim analysis in Pirelli

Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines, __ F.3d __, No. 07-07108, 2008

WL 3166142 (D.C. Cir. Aug. 8, 2008).  In that case, plaintiffs brought claims derivatively based

on two underlying factual predicates.  One claim of wrongdoing was based on the defendant-

company's allegedly improper accounting, while the other claim was based on allegedly

improper severance packages paid to former employees.  Applying Delaware law, the court did

not conduct its demand analysis based on the complaint "as a whole."  Rather, it analyzed factual

allegations underlying the two distinct claims of misconduct separately, and determined demand

was not excused for either of those claims.  Id. __ F.3d at __, 2008 WL 3166142, at *6-10.

**C.    The Court Must Analyze Whether Demand Was Excused for Each of Plaintiffs' Four Different Claims of Misconduct.**

This same claim-by-claim analysis applies here, where Plaintiffs assert four

distinct claims of misconduct by the Company's officers and directors: stock options backdating

(see Am. Compl. at ¶¶ 64-132), ultra vires options grants (see id. at ¶¶ 133-139), insider sales of

Company stock (see id. at ¶¶ 241-242), and the knowing approval of improper accounting

---

1/    Sunrise has been unable to locate any precise definition of the "reasonable doubt" necessary to excuse demand.  See Grobow, 524 A.2d at 920 ("The Delaware Supreme Court has not defined what degree of particularized factual specificity is required to establish a 'reasonable doubt' sufficient to excuse a demand.").  But it is safe to say that Plaintiffs' proffered definition – taken from a criminal case, Mills v. Delaware, 732 A.2d 845, 851 (Del. 1999) -- provides no guidance.  A criminal defendant, with the benefit of the presumption of innocence, has a much lower burden in demonstrating "reasonable doubt" than a derivative plaintiff, who must overcome the "presumption that [directors] were faithful to their fiduciary duties." Beam, 845 A.2d at 1048-49; see Aronson v. Lewis, 473 A.2d 805, 817-18 (Del. 1984).

practices and false financial statements (see id. at ¶¶ 44-57). Under Plaintiffs' theory of the case, individual defendants are separately liable for each of these different types of misconduct. Thus, to excuse demand for any particular claim of wrongdoing, Plaintiffs must plead particularized facts establishing a reasonable doubt about the independence and disinterestedness of a majority of the Board with respect to that particular alleged misconduct. 2/

Delaware law could not be clearer on this issue: Plaintiffs cannot simply assert a laundry list of alleged misconduct in their Amended Complaint and then lump all those allegations together in order to challenge the Board's ability to consider a demand. To allow Plaintiffs to group all their claims together in order to establish demand futility would eviscerate the protections afforded corporations by Delaware law. Under Plaintiffs' proposed "complaint-as-a-whole" analysis, a plaintiff could manufacture derivative standing simply by pleading enough different claims to implicate a majority of the directors, without alleging that a majority of the board was incapable of considering a demand on any particular claim. 3/ But the law makes clear that demand futility cannot be established by collage – a board's ability to fairly consider a demand must be evaluated with respect to each of a plaintiff's factually distinct claims of wrongdoing. As explained in Sunrise's opening memorandum (see § II), and addressed below, under the required claim-by-claim analysis, demand is not excused for any of Plaintiffs' claims.

---

2/     The principal decisions cited by Plaintiffs did not require a separate claim-by-claim analysis because each of those cases arose from just one claim of wrongdoing – the alleged backdating of stock options. See Conrad v. Blank, 940 A.2d 28, 31 (Del. Ch. 2007) ("This derivative action is brought in the right of a...corporation that...issued...stock options that are alleged to have been illegally backdated."); Ryan v. Gifford, 918 A.2d 341, 346 (Del. Ch. 2007) ("Plaintiff...alleges that defendants breached their duties of due care and loyalty by approving or accepting backdated options.").

3/     Even more absurd, under Plaintiffs' erroneous analysis, a derivative plaintiff could plead facts sufficient to excuse demand for one claim of wrongdoing, and then allege numerous other different claims of wrongdoing based on nothing more than speculation, but nevertheless assert that demand is excused for the entire complaint "as a whole."

**II.    Plaintiffs' Post Hoc Justifications Cannot Establish Demand Futility for Any of Their Claims.**

Correctly applying Delaware law, the Amended Complaint's allegations do not establish that demand is excused for any of Plaintiffs' claims of wrongdoing. Plaintiffs' assertion of demand futility for their claims based on options backdating is barred by the final judgment in <u>Von Guggenberg</u>, and, in any event, the Amended Complaint's circumstantial allegations are insufficient to establish any inference of backdating. Nor is there any particularized factual basis to support Plaintiffs' assertion that demand was futile for claims based on allegedly <u>ultra</u> <u>vires</u> options grants. Likewise, Plaintiffs fail to plead facts that would establish demand futility on their claims based on allegedly improper accounting practices and false financial statements. Last, Plaintiffs fail to allege facts that would establish demand futility with respect to their claims based on allegedly improper insider sales of Sunrise stock. The arguments asserted in Plaintiffs' Opposition, based on an erroneous analytical framework, do not repair these patent defects in the Amended Complaint.

**A.    Plaintiffs Fail to Establish That Demand Was Futile for Their Claims of Stock Options Backdating.**

**1.    Plaintiffs Cannot Avoid the Preclusive Effect of <u>Von Guggenberg</u>.**

As Sunrise demonstrated in its opening brief, given the Virginia circuit court's final judgment on the merits in <u>Von Guggenberg</u>, Plaintiffs are precluded from asserting demand futility to the extent their claims are based on allegations of stock options backdating. <u>See</u> Sunrise's Mem. at § II.A. Plaintiffs raise several arguments in an attempt to avoid the preclusive effect of <u>Von Guggenberg</u>, all of which fail.

Plaintiffs assert that Von Guggenberg's complaint was dismissed "without prejudice," and thus they are not precluded from asserting demand futility based on the same options grants challenged in that earlier case. Pls.' Opp'n at 34-35. As Plaintiffs note in their

Opposition, however, the dismissal "without prejudice" applies only to the "<u>underlying claim</u>." Pls.' Opp'n at 35 (quoting <u>Semtek Int'l v. Lockheed Martin</u>, 531 U.S. 497, 505 (2001) (emphasis added)). Thus, in the context of derivative litigation, where a complaint is dismissed for failure to make demand, "dismissal is without prejudice as to the substantive cause of action. The dismissal is with prejudice on the issue of the obligation to make a demand on the directors with respect to that substantive complaint." <u>In re Sonus Networks, Inc., S'holder Derivative Litig.</u>, 499 F.3d 47, 60 (1st Cir. 2007) (citing <u>In re Kaufman Mut. Fund Actions</u>, 479 F.2d 257, 266 (1st Cir. 1973) <u>cert. denied</u>, 414 U.S. 857 (1973)); <u>see also</u> <u>Henik v. LaBranche</u>, 433 F. Supp. 2d 372, 379 (S.D.N.Y. 2006) (state court dismissal of derivative suit for failure to plead demand futility with sufficient particularity "was dismissed with prejudice to the bringing of a new action, absent showing that a pre-suit demand was rejected or not considered").

This is reflected in the Virginia circuit court's order sustaining Sunrise's demurrer and dismissing Von Guggenberg's complaint for failure to make demand. While the complaint was dismissed "without prejudice," leave to amend was denied. <u>See</u> September 15, 2006 Order, Ex. 1 hereto. Von Guggenberg then petitioned the Supreme Court of Virginia for an appeal. Pet. for Appeal, Ex. 2 hereto. Finding no reversible error, the Supreme Court of Virginia rejected the petition. April 27, 2007, Order, Ex. 3 hereto. The decision to refuse the petition was a decision on the merits of the issues raised therein. <u>Saunders v. Reynolds</u>, 204 S.E.2d 421, 424 (Va. 1974). The effect of that refusal was to affirm the decision of the court below. <u>Shiflet v. Eller</u>, 319 S.E.2d 750, 755 n.2 (Va. 1984). Clearly, the Virginia courts ruled on the issue of demand futility.

Contrary to Plaintiffs' assertions, the demurrer in <u>Von Guggenberg</u> was not "based on multiple arguments." Pls.' Opp'n at 37. The only argument advanced by the demurrer – and the only basis for the court's order sustaining the demurrer – was the failure to make a pre-suit demand. Sunrise's other argument for dismissal, based on the statute of

limitations, was raised separately in a plea in bar. In separate orders, the circuit court granted

both the demurrer and the plea in bar. 4/ Sept. 15, 2006 Final Orders, Ex. 1 and Ex. 4 hereto.

Von Guggenberg's unsuccessful petition for appeal sought review of both rulings. Von

Guggenberg Pet. for Appeal, Ex. 2 hereto. Thus, the Virginia circuit court's ruling on the

demurrer is preclusive with respect to the question of whether demand is required on Plaintiffs'

backdating claims. Dozier v. Ford Motor Co., 702 F.2d 1189, 1193-94 (D.C. Cir. 1983) (Scalia,

J.) (as to judgments involving multiple holdings, when both holdings are appealed and affirmed,

"the dismissal on each ground is res judicata in a subsequent suit").

     Citing In Re Sonus Networks, Plaintiffs attempt to evade the preclusive effect of

Von Guggenberg by asserting that the Amended Complaint presents a "significant change in the

demand futility analysis" from Von Guggenberg's complaint. But the reasoning from In re

Sonus Networks supports the opposite conclusion: facts excusing demand that could have been

pled in a prior case cannot be pled in a later case asserting the same claims. 499 F.3d at 62-63.

In both Von Guggenberg and this case, no backdating is alleged to have occurred after August

2002. Thus, nothing new had occurred to support a claim of backdating, or an assertion of

demand futility with respect thereto, between the filing of Von Guggenberg in August 2006 and

the filing of the Amended Complaint in March 2008 (by, among others, the same law firm

representing Von Guggenberg in that earlier suit). Plaintiffs' assertion of demand futility here is

---

4/    The Individual Defendants have asserted that Plaintiffs' claims of options backdating are
time barred. See Ind. Defs.' Mem. at 10-13, 33-36; Rush Reply at 7-8. If so, no Current
Director faces any – much less a substantial risk of – liability for options backdating. See In re
Verisign, Inc. Deriv. Litig., 531 F. Supp. 2d 1173, 1192 (N.D. Cal. 2007) (directors did not face
substantial risk of personal liability where claims were time-barred). None of the Current
Directors would be "interested" in a time-barred claim, and demand would be required. See id.
(dismissing claims for failure to make demand because claims were time barred and thus
directors could not be liable on those claims); Saito v. McCall, No. 17312, 2004 WL 3029876, at
*5 (Del. Ch. Dec. 20, 2004) (dismissing claim on Rule 23.1 motion because underlying claim
barred by ripeness doctrine).

thus based on the same facts that existed at the time Von Guggenberg was filed in 2006. Id. (plaintiff may "plead new events that happened after the first litigation was dismissed," but may not "plead facts that had already occurred and could have been pleaded in the first suit").

The supposed "new" events cited by Plaintiffs are not new and do not prevent the preclusion doctrine from barring their assertion of demand futility with respect to their claim of options backdating. Pls.' Opp'n at 36-37. The naming of additional directors as defendants in this case is not a new event, because those directors could have been named as defendants in Von Guggenberg. Likewise, the assertion of additional legal theories of relief based on the same underlying factual allegations of options backdating does not make the claim "new" for purposes of asserting demand futility. Plaintiffs also point to "new" allegations that Sunrise's former CFO made in a Virginia state court complaint he filed against the Company, but those assertions do not relate to backdating. Plaintiffs also point to the disclosure of the Special Committee's findings concerning options backdating – findings that, on their face, provide no support for Plaintiffs' assertion that demand was futile. 5/

In short, there is no basis to avoid the preclusive effect of Von Guggenberg. Demand is required for claims based on options grants challenged in Von Guggenberg.

## 2. Plaintiffs' Allegations Lack Sufficient Factual Basis to Establish a Circumstantial Inference of Backdating.

Even if not precluded, Plaintiffs' backdating allegations are insufficient to excuse demand. Again, Plaintiffs have pled no admission or other direct evidence of backdating – their

---

5/    Sunrise does not rely on the truth of the Special Committee's findings for purposes of this motion to dismiss. To the extent that the Plaintiffs attempt to argue that those findings somehow support their demand futility allegations, Sunrise simply refers the Court to the plain language of the Company's disclosures relating to those findings, which indicate otherwise. 2006 10-K at 59-60, Ex. 5 hereto. Likewise, Sunrise's other references to Company disclosures relied on by Plaintiffs serve this same limited purpose. As discussed below, Sunrise does not proffer those disclosures for their truth, but merely to demonstrate that the circumstantial inferences urged by Plaintiffs are not reasonable.

allegations are entirely circumstantial. They ask the Court to <u>infer</u> a pattern of backdating from an undisclosed "analysis" of cherry-picked options grants. As addressed below, there is no basis for the Court to do so, and thus no basis for Plaintiffs' assertion of demand futility for their claims of options backdating.

**a.     Plaintiffs' Purported "Statistical Analysis" Cannot Be Credited.**

As explained in Sunrise's opening brief, Plaintiffs' purported "statistical analysis" of Sunrise's stock options grants cannot be credited because Plaintiffs failed to attach a report of this analysis to the Amended Complaint, or to allege sufficient facts to explain the analysis. Sunrise's Mem. at § II.B.1(d). In their 146-page, 365-paragraph, Amended Complaint, Plaintiffs devote just two paragraphs to explaining the methodology of their purported analysis. Am. Compl. at ¶¶ 70-71. As a result, the reader is left to speculate about every aspect of it – from how Plaintiffs analyzed the challenged grants, to what, if anything, the purported results mean.

Apparently recognizing this shortcoming, Plaintiffs attempt to elaborate on their analysis in their Opposition, <u>see</u> Pls.' Opp'n at 11, but this effort fails to cure the underlying defects in the Amended Complaint. First, the Court "is not obligated to accept as true those facts that surface for the first time in opposition papers." <u>Doe I v. State of Israel</u>, 400 F. Supp. 2d 86, 119 (D.D.C. 2005). Second, even with the additional allegations in the Opposition, Plaintiffs still do not explain the most fundamental, outcome determinative aspects of their purported analysis. For example, Plaintiffs do not explain how they "annualized" the 20-day returns, and whether the 20-day return period was based on calendar days or trading days.

Plaintiffs cannot salvage their insufficient pleading by pointing to an undisclosed analysis performed by Merrill Lynch, on another company's options grants, and then asserting that the methodology is "widely known," and that they used the "identical" methodology here. <u>See</u> Am. Compl. at ¶ 71; Pls.' Opp'n at 11-12. Even assuming <u>arguendo</u> that Merrill Lynch's

-9-

methodology were widely known and a reliable indicator of backdating, Plaintiffs do not provide

sufficient facts by which the reader can determine whether Plaintiffs actually "employed that

precise methodology" in their analysis. Nach v. Baldwin, No. 07-00740, 2008 WL 410261, at *7

(N.D. Cal. Feb. 12, 2008) ("The [c]ourt will not rely on a Merrill Lynch-style analysis that

consists entirely of two sentences and lacks any explanation of how plaintiff arrived at his

conclusions").

   Indeed, from their Opposition, it appears that Plaintiffs did not follow Merrill

Lynch's methodology and, thus, their reliance on Edmonds v. Getty, 524 F. Supp. 2d 1267 (W.D.

Wash. 2007), and similar cases, is misplaced. 6/ Because Plantiffs' failed to show their work and,

more fundamentally, failed to consider the "full universe" of options granted during the relevant

period, their purported statistical analysis cannot support an inference of backdating. 7/

---

6/ Plaintiffs state that Sunrise granted options to officers and directors on 21 dates during
the years 1997 through 2001, and that 16 of those grants were "discretionary," and thus subject
to potential backdating. Pls.' Opp'n at 10. But Plaintiffs included only 12 of those dates in their
"analysis." Id. at 11. In their Opposition, Plaintiffs cite, for the first time, some results (but not
the methodology) of a purported "analysis" of all 21 options grants, in an attempt to cure the
Amended Complaint's defects. Id. at 12. But such new factual allegations in an opposition
paper should not be credited. See Doe I, 400 F. Supp. 2d at 119 ("[c]ourt is not obligated to
accept as true those facts that surface for the first time in opposition papers").

7/ Numerous courts have held that a plaintiff cannot support an inference of backdating with
a purported "Merrill Lynch-style" analysis that does not include every options grant made to
directors and officers during the relevant period. E.g., In re Openwave Systems, Inc., No. 06-
03468, 2008 WL 410259, at *5 (N.D. Cal. Feb. 12, 2008) ("[P]laintiffs must compare the
average 20-day return on all reported stock option grants during the relevant period to the
average 20-day return on [defendant's] stock during the period") (emphasis in original); In re
PMC-Sierra, Inc. Derivative Litig., No. 06-05330, 2007 WL 2427980, at *4 (N.D. Cal. Aug. 22,
2007) (analysis did not support inference of backdating because it failed to take "into account all
of the options granted during the time period in issue and compar[e] option returns to annualized
market returns"); see also Edmonds, 524 F. Supp. 2d at 1275 (cited in Plaintiffs' Opposition at
13) (distinguishing complaint from those found deficient in other cases where plaintiffs had not
included "full universe" of options in their analyses). Similarly, Plaintiffs cannot rely on the
purported analysis performed by the SEIU, which is mentioned only in passing in the Amended
Complaint. See Pls.' Opp'n at 14; Am. Compl. at ¶ 72. Plaintiffs failed to allege any details
about that analysis, nor have they explained why the SEIU analysis can support an inference of
backdating, or cited even a single case in which a court has relied on that type of analysis.

> **b.**    **The Alleged "Pattern" Based on Cherry-Picked Options Grants Does Not Support an Inference of Backdating.**

Plaintiffs' argument in support of the alleged "pattern" of backdating reveals their own misunderstanding of Rule 23.1 of the Federal Rules of Civil Procedure ("Rule 23.1") and applicable Delaware law.  Rule 23.1 requires more than mere notice pleading, as is otherwise required by Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure.  Gaubert v. Federal Home Loan Bank Bd., 863 F.2d 59, 62 (D.C. Cir. 1988).  On a motion to dismiss, Rule 23.1 requires "a different judicial approach" than the ordinary pleading rules require.  In re Kaufman, 479 F.2d at 263 (Rule 23.1 "is not an ordinary, but an exceptional rule of pleading, serving a special purpose").

In analyzing the Amended Complaint's demand futility allegations under applicable Delaware law, the Court must start with the presumption that directors are disinterested and independent, and therefore capable of considering a pre-suit demand.  See Beam, 845 A.2d at 1048-49; Sachs v. Sprague, 401 F. Supp. 2d 159, 164 (D. Mass. 2005).  The Court also must start with the presumption that the directors were faithful to their fiduciary duties and did not grant or receive any improper stock options (or commit any other allegedly improper acts).  Khanna v. McMinn, No. 20545, 2006 WL 1388744, at *11 (Del. Ch. May 9, 2006).  As a result, Plaintiffs are wrong in arguing that Sunrise was required to provide "evidence" to disprove Plaintiffs' conclusory assertions of backdating, which were supported only by circumstantial allegations.  See Pls.' Opp'n at 28-29.  Rather, it was Plaintiffs' burden to plead particularized facts sufficient to overcome the presumption that no backdating occurred and that presuit demand was required.  E.g., In re Verisign, Inc., 531 F. Supp. 2d at 1192.

> **(i)     There Is No Basis to Infer Backdating for Options Grants Tied to Corporate Events.**

As explained in Sunrise's opening brief, there is no basis to infer that five of the challenged options grants were backdated (September 14, 1998; November 8, 1999; February 25, 2000; March 28, 2000; September 11, 2000), given that those grants coincided with corporate events, which generally negate any inference of backdating.  Sunrise's Mem. at § II.B.1(a). Plaintiffs contend that the Court cannot take judicial notice of corporate events reported in Company disclosures, and thus, Sunrise cannot refer to corporate events to negate Plaintiffs' circumstantial claims of backdating.  Pls.' Opp'n at 29-32.  But Plaintiffs rely on many of the same Company disclosures to support their allegations, and they concede that the Court may take notice of the fact that the Company's disclosures identified the corporate events cited in Sunrise's motion to dismiss.  Id. at 28.  More importantly, however, Sunrise need not "prove" that those events took place at this stage of the proceedings.  Rather, the connection between challenged options grants and corporate events undermines the inference of backdating that the Plaintiffs ask the Court to draw from their circumstantial allegations, including their (undisclosed) statistical analysis.  E.g., In re CNET Networks, Inc., 483 F. Supp. 2d at 960 ("[R]eliance on the numbers is not sufficient when plaintiffs are confronted with a legitimate, judicially-noticeable explanation for the grant date").

> **(a)     November 4, 1997 Options Grants**

Plaintiffs' inherently contradictory allegations that options granted on November 4, 1997, were both springloaded and backdated cannot support an inference of backdating because a stock option cannot possibly be both backdated and springloaded.  See Sunrise's Mem. at 24-25.  Recognizing the absurdity of such a contention, Plaintiffs now argue that "either way," these options grants support an inference of stock option "manipulation."  Pls.' Opp'n at 31.  In other words, Plaintiffs now concede that, contrary to the Amended Complaint,

-12-

their factual allegations do <u>not</u> support an inference that the November 4, 1997, options grants were backdated. Rather, they are now offering a post hoc "either/or" rationalization for their claims based on these grants. Given that Plaintiffs' allegations in the Amended Complaint are at odds with their contentions in the Opposition, both must be rejected. <u>See</u> <u>Henthorn v. Dept. of Navy</u>, 29 F.3d 682, 688 (D.C. Cir. 1984) (court should not consider new factual allegations made in opposition brief, especially when new facts contradict facts alleged in complaint).

### (b)      September 14, 1998 Options Grants

Plaintiffs argue that there is "no evidence" that the re-pricing of stock options occurred on September 14, 1998. Pls.' Opp'n at 29. As explained above, Sunrise was not required to prove this fact. Rather, Plaintiffs were required to allege particularized facts sufficient to overcome the presumption that the options were properly granted. The only allegations offered by Plaintiffs with regard to these options grants are their purported statistical "analysis" and their assertion that the grant date coincided "with one of the lowest prices of Sunrise stock for the fiscal quarter, as well as the fiscal year." Am. Compl. at ¶ 95. As explained above, Plaintiffs' "analysis" cannot be credited. And their favorable timing allegation is far too vague to overcome the presumption that the options were properly granted. <u>See</u> Mem. in Support of Mot. to Dismiss at 25-27 (collecting cases stating that for series of options granted over time, as a matter of course, some will be favorable, some neutral, and some unfavorable).

### (c)      November 8, 1999 Options Grants

As explained in Sunrise's opening brief, there are two reasons why the Court cannot infer that options granted on November 8, 1999, were backdated. First, Plaintiffs' own chart, included in paragraph 111 of their Amended Complaint, does not support any inference of backdating because it shows that Sunrise's stock price declined sharply one month before this grant, and then remained flat for the remainder of the year. <u>See</u> Sunrise's Mem. at 21.

-13-

Second, Plaintiffs fail to allege that the grant date did not coincide with a corporate event at Sunrise: Callen's appointment to the Board. Id. at 20-21. Plaintiffs' argument that "nothing tangible supports Sunrise's proposition that Callen assumed his directorial position on November 8, 1999" (Pls.' Opp'n at 29) misses the point. As discussed above, Sunrise was not required to "prove" that Callen assumed his directorial position on this date. Rather, Plaintiffs were required to allege facts sufficient to overcome the presumption that Sunrise's directors and officers did not intentionally backdate stock options. Indeed, Plaintiffs concede that options granted pursuant to an individual's appointment/election as a director are automatic and cannot be backdated. Am. Compl. at 4 n.2. For this reason, Plaintiffs apparently excluded certain stock options granted to Holladay from their purported analysis. 8/ Pls.' Opp'n at 10-11 n.9, 30; Am. Compl. at ¶ 132. Having relied on the truism that automatic grants cannot be backdated in order to exclude certain options grants from statistical consideration, Plaintiffs cannot ignore the same rule as it applies to options granted on November 8, 1999. Plaintiffs do not – and cannot – allege that these grants did not coincide with Callen's appointment. See Sunrise's Mem. at 20-21. As such, there is no basis to infer that the grants were backdated.

### (d)    February 25, 2000 Options Grants

Similarly, as explained in Sunrise's opening brief, there is no basis to infer that options granted on February 25, 2000, were backdated, given that the Company's disclosures show that the grant date coincided with a corporate event. Sunrise's 2000 Proxy Statement

---

8/      Plaintiffs acknowledge that options granted upon a recipient's commencement of employment are "automatic" and cannot be backdated. Am. Compl. at ¶ 132. Plaintiffs excluded from their backdating analysis options granted to Holladay on May 22, 2000, because these options were "automatically granted pursuant to Defendant Holladay's appointment to the Board...." Am. Compl. at ¶ 132. Likewise, Plaintiffs excluded from their backdating analysis options granted to Adams on May 22, 2000, because that was the day Adams "commence[ed] his employment" with the Company. Id. If options granted to Holladay and Adams on these dates could not have been backdated because they were automatic, there is no basis to dispute that the November 8, 1999, grant was automatic upon Callen's commencement of service as a director.

disclosed that the Board approved the 2000 Stock Option Plan on that date and also approved

senior executive severance plans. Sunrise's Mem. at 21. Plaintiffs concede that they relied on

the Company's proxy statements to support their own allegations. See Pls.' Opp'n at 11 (stating

that Plaintiffs obtained information about grant dates from Sunrise's proxy statements during the

relevant period). Thus, Plaintiffs cannot ask the Court to ignore disclosures undermining

Plaintiffs' suggested inference of backdating that are contained in these same documents. In re

XM Satellite Radio Holdings Securities Litig., 479 F. Supp. 2d 165, 174 n.8 (D.D.C. 2007); In re

Citadel Equity Fund Ltd. v. Aquila, Inc., 168 F. App'x 474, 476 (S.D.N.Y. 2006) (district court

properly took judicial notice of SEC filing referenced "obliquely" in plaintiff's complaint).

### (e)    March 28, 2000 Options Grants

For the same reasons, in the absence of an allegation by Plaintiffs that the

March 28, 2000, options were not granted automatically upon the recipients' employment or

assumption of new positions with the Company, it is not reasonable to infer, simply from

movement in the stock price before and after these grants, that they must have been backdated.

Plaintiffs cannot identify any valid reason why the Court cannot take judicial notice of a

March 28, 2000, press release announcing that Newell, Slavin, Swinton, Tomasso, and Hulse

(the recipients of options granted on this date) all assumed new positions with the Company on

that date. Indeed, it is not possible that these options were backdated to March 28, 2000, unless

the press release itself was backdated, an absurd proposition Plaintiffs do not attempt to suggest.

### (f)    September 11, 2000 Options Grants

Plaintiffs acknowledge that this grant to Paul Klaassen "was allegedly pursuant to

an employment agreement with Sunrise which took effect on September 12, 2000, the day after

the stock options were granted, but was not disclosed until November 13, 2000." Am. Compl. at

¶ 120. As noted in Sunrise's opening brief, Sunrise filed its 10-Q for third quarter 2000 on

-15-

November 13, 2000, which included a copy of Klaassen's employment agreement as an exhibit. Sunrise's Mem. at 22-23. Plaintiffs contend that, while the Court may take notice of Sunrise's SEC filings, including the 10-Q filed on November 13, 2000, "it cannot accept as true that the events actually took place at the time Sunrise reported them." Pls.' Opp'n at 28. This plainly misconstrues how the Court should analyze a motion to dismiss under Rule 23.1. Having relied on the Company's disclosure of Klaassen's employment agreement in their allegations, Plaintiffs cannot ask the Court to disregard other parts of these same disclosures that negate the very inferences they urge the Court to draw. In re XM Satellite Radio, 479 F. Supp. 2d at 174 n.8; In re Citadel Equity, 168 F. App'x at 476.

> **(g)    November 24, 2000 and November 12, 2001 Options Grants**

Plaintiffs' own charts belie their allegations that options granted on November 24, 2000, and November 12, 2001, were backdated. Sunrise's Mem. at 23-24; see Am. Compl. at ¶¶ 124, 128. As explained in Sunrise's opening brief, the charts show nothing but the normal day-to-day fluctuations of the stock market, thus there is no basis to infer that these options grants were backdated. See Sunrise's Mem. at 23-24. 9/

> **(ii)    The Remaining Option Grants Cannot Establish a "Pattern" of Backdating.**

As Sunrise explained in its opening brief, the five remaining challenged options grants (May 2, 1997; August 8, 1997; October 8, 1998; December 10, 1998; and March 5, 1999) cannot support an inference of backdating. See Sunrise's Mem. at 25-27. The cases cited by

---

9/    Plaintiffs reliance on CNET is misplaced. In that case, the court held that options granted at the third-lowest price of the month could support an inference of backdating. 483 F. Supp. 2d at 961. The court did not hold that options granted on one of the highest prices of the month or quarter – as was the case with these grants – could support an inference of backdating.

Plaintiffs for the proposition that "five out of a possible 19 stock options grants" are sufficient to establish a pattern of backdating (Pls.' Opp'n at 32) are easily distinguished.

For example, in <u>Zoran Corp. Derivative Litig.</u>, 511 F. Supp. 2d 986 (N.D. Cal. 2007), the defendant company admitted that the grant dates for at least some stock options were "retroactively" dated – <u>i.e.</u>, backdated. <u>Id.</u> at 998. Moreover, the "pattern" in <u>Zoran</u> was based on an independent expert's analysis of <u>all</u> stock options granted to directors and officers during the relevant period, and the plaintiffs disclosed a detailed report of the analysis and its results. <u>Id.</u> at 1004. The court drew an inference of backdating based on the company's admissions that some options were backdated, the disclosed statistical analysis of all options grants during the relevant time period, and the fact that nine out of 11 discretionary grants (82%) were granted at the lowest or second-lowest price of the month. <u>Id.</u> at 998, 1004-1005. By contrast, in this case, Sunrise has not admitted that any stock options were backdated, and even the minimal description of Plaintiffs' otherwise undisclosed statistical analysis reveals that it was patently flawed. Against this backdrop, the fact that five of 19 options grants (just 26%) produced favorable results for the recipients does not support an inference that any of these options grants were backdated.

Similarly, in <u>Conrad</u>, the plaintiff presented a report of its analysis, which the court found persuasive in reaching its conclusions. 940 A.2d at 40 n.30. By contrast, Plaintiffs have revealed almost no details about their purported analysis, other than the fact that they failed to consider all options grants during the relevant period. <u>See</u> <u>In re PMC-Sierra, Inc. Derivative Litig.</u>, No. 06-05330, 2008 WL 2024888, at *3 (N.D. Cal. May 8, 2008) (plaintiff's analysis not credited because, unlike the analysis in <u>Conrad</u>, it followed the Merrill Lynch methodology only "halfway"). As such, <u>Conrad</u>, provides no support for Plaintiffs' assertion that an inference of backdating can be drawn from the mere fact that five of 19 options grants had favorable results.

-17-

Moreover, even assuming _arguendo_ that the Court could reasonably infer from the movement of the stock price alone that these five options grants were backdated, at most, just two Current Directors would be deemed "interested" as a result of their approval or receipt of these options: Aprahamian (May 2, 1997) and Donohue (May 2, 1997, and October 8, 1998). At least five Current Directors (Callen, Holladay, Paul Klaassen, Teresa Klaassen, and Little) would be disinterested and could consider a demand.

In sum, Plaintiffs fail to allege facts from which the Court could reasonably infer that _any_ backdating occurred, and thus, Plaintiffs' assertion of demand futility on their claim of options backdating fails as a matter of law. And even if the Court were to assume that the grants on May 2, 1997, August 8, 1997, October 8, 1998, December 10, 1998, and March 5, 1999, were backdated – simply because those dates proved favorable to the grant recipients – demand would not be futile because a majority of the Board neither approved nor received such grants.

### 3. If Anything, the Conrad and Ryan Decisions Demonstrate That the Amended Complaint Lacks Key Factual Allegations Required to Excuse Demand.

Plaintiffs' attempt to align this case with the Chancery Court decisions on backdating claims in Conrad and Ryan ignores the substantial differences between the allegations in those cases and the conclusory assertions here.

In Ryan, the plaintiffs' backdating allegations were backed by a report disclosed to the court and the defendants. 10/ See Ryan, 918 A.2d at 354. The backdating allegations in the Amended Complaint rest on a purported "statistical analysis" that Plaintiffs fail to disclose.

---

10/    Sunrise does not concede that the production of an analysis like the one in Conrad or Ryan, standing alone, would be sufficient to establish an inference of options backdating. Rather, Plaintiffs' reliance on a statistical analysis they did not disclosed is plainly insufficient.

-18-

No report has been provided, and the few details alleged about Plaintiffs' purported analysis raise more questions than they answer. 11/

The facts alleged in Conrad are even more dissimilar, given that the plaintiff presented its analysis and the nominal defendant apparently admitted that stock options had been backdated. 940 A.2d at 34. Here, Plaintiffs have not presented their analysis, the Company has not admitted that stock options were backdated, and there are no particularized allegations in the Complaint that support the inference that any backdating of stock options took place.

Thus, for all these reasons, Plaintiffs have failed to make allegations sufficient to establish that demand was futile with respect to their claim of options backdating.

**B.** **Plaintiffs Cannot Establish That Demand Was Futile for Their Claims of Ultra Vires Options Grants.**

As explained in Sunrise's opening brief, Plaintiffs fail to plead particularized facts establishing that a majority of the Current Directors were incapable of exercising independent judgment in response to a demand based on Plaintiffs' claim of the ultra vires grant of options. Sunrise's Mem. at § II.D. Indeed, Plaintiffs do not allege that any current director received ultra vires options, and they allege only that Callen and Donohue approved them. Yet Plaintiffs' fail to allege facts sufficient to establish that either Callen or Donohue knew these options were ultra vires, and thus cannot establish that either of them is interested and incapable of considering demand relating to claims based on these grants. See Desimone, 924 A.2d at 941-42 (demand not excused because allegations created no inference that directors "knowingly" issued backdated options; committee approval of misdated options, without more, insufficient to excuse

---

11/   See Desimone v. Barrows, 924 A.2d 908, 941 n.114 (Del. Ch. 2007) (observing that the Ryan court "drew an inference that options had been backdated from a strong statistical showing involving a pattern of options grants over a five year period," and expressing skepticism that a similar inference could be drawn from allegations in which "only two sets of Officer Grants were identified and there [was] no indication…whether these were the only Officer Grants made during the period discussed in the complaint….").

demand with respect to directors on approving committee); see In re CNET Networks, Inc., 483 F. Supp. 2d at 965 (because option-granting errors can occur without director knowledge, mere fact of service on compensation committee fails to establish demand futility). In any event, even accepting Plaintiffs' conclusory allegations, only two directors would be interested, leaving five of the seven Current Directors to consider a demand. 12/

Thus, Plaintiffs have failed to make allegations sufficient to establish that demand was futile with respect to their claims based on allegedly ultra vires grants.

**C.    Plaintiffs Cannot Establish That Demand Was Futile for Their Claims of Knowing Approval of Improper Accounting and False Financial Statements.**

As Sunrise explained in its opening brief, the Amended Complaint fails to allege facts establishing that any current director is interested and thus incapable of considering a demand based on their alleged knowledge and approval of improper accounting practices and false financial statements. Sunrise's Mem. at § II.F. Plaintiffs' arguments in their Opposition consist of nothing more than a regurgitation of the conclusions pled in their Amended Complaint. See Pls.' Opp'n at 15-16, 23-25. Plaintiffs continue to rely solely on the individual defendants' positions with the Company to assert that they "knowingly" approved false financial statements. See id. Yet, Plaintiffs cannot establish a "substantial likelihood of liability" that excuses demand merely by alleging that a director approved improper accounting practices or false financial statements; the law requires more. See Sunrise's Mem. at 28-29, 32-33.

---

12/    Plaintiffs seek to mask this facial insufficiency by combining their demand futility arguments on the ultra vires claims (Counts IX and X) and backdating claims. Pls.' Opp'n at 15, 19. Under Delaware law, however, this Court must consider each claim of wrongdoing separately. Beam, 833 A.2d at 977 n.48. Indeed, the Complaint acknowledges that the allegedly ultra vires grants arise from conduct that is factually distinct from the alleged backdating. Compl. at ¶¶ 130 (admitting that allegedly ultra vires grant on March 3, 1998 was "not necessarily backdated"), 132 (admitting same for allegedly ultra vires grants on May 11, 2001). Moreover, even if Plaintiffs' ulta vires and backdating claims were incorrectly considered together, only three out of the seven Current Directors would arguably be interested (Aprahamian, Donahue and Callen), leaving a majority capable of considering a demand.

Indeed, Plaintiffs were required to plead particularized allegations detailing the precise role that each director played at the Company, the information that would have come to his attention in that role, and some explanation of why he would have perceived the accounting irregularities or errors in financial statements. Id. Contrary to Plaintiffs' assertions, it cannot be reasonably inferred that the various accounting errors alleged in the Amended Complaint were "knowable" to any of the individual defendants. See Pls.' Opp'n at 25. As the case law cited in Plaintiffs' own Opposition makes clear, the Court cannot infer that any of the individual defendants knew about the accounting errors in the absence of "well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it." Pls.' Opp'n at 25 (citing Iotex Commc'ns, Inc. v. Defries, No. 15817, 1998WL 914265, at *4 (Del. Ch. Dec. 21, 1998)). 13/

Thus, Plaintiffs have failed to plead facts sufficient to establish that demand was futile with respect to their claims based on the alleged knowing approval of improper accounting and false financial statements.

**D.      Plaintiffs Cannot Establish That Demand Was Futile for Their Claims of Insider Trading.**

As explained in Sunrise's opening brief, Plaintiffs fail to create a reasonable doubt that the Current Directors could consider a demand on based on the alleged insider trading. Sunrise's Mem. at § II.E. Corporate insiders routinely sell company stock, and as a result, "insider trading claims depend importantly on proof that the selling defendants acted with scienter." Guttman v. Huang, 823 A.2d 492, 505 (Del. Ch. 2003). To establish that a director

---

13/      Indeed, in Iotex, the court refused to infer a breach of fiduciary duty because, even though averments of knowledge may be made generally, "where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something....speculative conclusions unsupported by fact" are not enough. Id. Plaintiffs offer nothing more than similarly speculative conclusions that the Individual Defendants "must have known" of the accounting errors based on their positions.

engaged in insider trading and is incapable of considering demand, plaintiff must show "that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." Rattner v. Bidzos, No. 19700, 2003 WL 22284323, at *11 (Del. Ch. Oct. 7, 2003) (emphasis added). Accordingly, Plaintiffs' were required to allege particularized facts creating an inference that the Current Directors had knowledge of either (1) the alleged stock options backdating; (2) the alleged ultra vires options grants; or (3) the alleged accounting errors and false financial statements. See In re Coca-Cola Enters., Inc., 478 F. Supp. 2d 1369, 1380 (N.D. Ga. 2007) (demand not excused by generalized allegations that defendants had knowledge of adverse, non-public accounting information simply because of their corporate offices and duties). Yet Plaintiffs fail to plead particularized facts supporting an inference that any current director had any such knowledge.

Apparently realizing that their insider trading allegations are utterly lacking, Plaintiffs focus solely on the size and timing of the alleged insider sales. See Pls.' Opp'n 26-27. Although such factors may support an inference of insider trading, Plaintiffs identify only one specific insider sale in the entire Amended Complaint – Callen's sale of 10,000 shares on May 26, 2005, Compl. ¶ 241 – and the timing of that sale is not suspicious since it was made almost one year before Sunrise announced any accounting problems. Am. Compl. at ¶ 221. 14/ All of Plaintiffs' other allegations of insider sales are aggregate sales with totals covering periods as long as nine years. Am. Compl. at ¶ 241. By definition, such generalized allegations cannot establish that any individual sale by an individual director was based on knowledge of material, non-public information. See Rattner, 2003 WL 22284323, at *11.

_____

14/    Plaintiffs attempt to remedy this deficiency by identifying two additional individual sales in their Opposition, but "the Court is not obligated to accept as true those facts that surface for the first time in opposition papers." See Doe I, 400 F. Supp. 2d at 119.

And even if these aggregated sales could be considered, no inference can be drawn absent specific allegations about a director's total holdings of Company stock and past trading practices. Such context is required in order to allege wrongdoing with respect to any particular insider sale. See Rattner, 2003 WL 22284323, at *12 & n.67 (size and timing of sales did not create inference of insider trading absent information about defendants' prior trading activity and total holdings); Guttman, 823 A.2d at 504 (size and timing of sales did not create inference of insider trading without alleging defendants' past trading history, even where two defendants liquidated sizable portion of holdings). The Amended Complaint does not include any factual allegations regarding any current director's total holdings or trading history. 15/

Thus, Plaintiffs have failed to make allegations sufficient to establish that demand was futile with respect to their claims based on allegedly improper sales of Sunrise stock or any of the other claims of wrongdoing alleged in the Amended Complaint. 16/

**III.    Plaintiffs Do Not State Any Valid Reason Why This Case Should Not Be Stayed in Favor of the Class Action Pending in This Court.**

As explained in Sunrise's opening brief, even if the Amended Complaint is not dismissed for failure to allege demand futility, the Court should, at a minimum, stay this case in favor of the consolidated securities class action pending before the Court. Sunrise's Mem. at § III. In their Opposition, Plaintiffs argue that this case should not be stayed because (1) the

---

15/    In their opposition, Plaintiffs improperly attempt to add allegations regarding the past trading history of Callen, Donohue, and the Klaasens, which, as with Plaintiffs' other post hoc explanations, is improper and must be rejected. Doe I, 400 F. Supp. 2d at 119. In any event, the proffered trading history cannot cure Plaintiffs' improper aggregation of the challenged sales. Rattner, 2003 WL 22284323, at *11.

16/    The Opposition does not respond to Sunrise's argument about the insufficiency of Plaintiffs' allegations concerning the independence of the Current Directors. See Sunrise's Mem. at 34-38. "Although not a waiver, the [Opposition's] silence on the subject is a telling indication of this argument's lack of weight under Delaware law." Pirelli, __ F.3d at __, 2008 WL 3166142, at *11.

balance of hardships weighs against a stay, and (2) different claims are asserted in the two cases. Neither argument has any merit.

Plaintiffs assert that the balance of hardships weighs against staying this case because the Company could be sold during the stay, and thus there is a "fair possibility that a stay would damage Plaintiffs, derivatively on behalf of Sunrise" by "leav[ing] Sunrise uncompensated" for damages allegedly caused by the Defendants. Pls.' Opp'n at 38. This argument completely misstates Delaware law. Indeed, this exact argument was refuted by the Delaware Supreme Court in Lewis v. Anderson, 477 A.2d 1040 (Del. 1984), the very same case on which Plaintiffs rely. 17/ If Sunrise were acquired during a stay, the new corporation would be free to pursue the claims putatively brought by Plaintiffs in this action. Plaintiffs, of course, would lose their shareholder status and their ability to assert derivative standing to pursue those claims. Thus, while Plaintiffs (and their attorneys) might suffer hardship if they lost their derivative standing as the result of a merger, Sunrise – the real beneficial plaintiff – would not.

By contrast, as explained in Sunrise's opening memorandum, if this derivative suit is allowed to proceed at the same time as the class action, Sunrise will be prejudiced because the prosecution of the derivative suit will inevitably conflict with Sunrise's ability to defend itself in the class action. Sunrise's Mem. at 41-42. Thus, the balance of hardships weighs in favor of a stay of the derivative suit pending resolution of the class action.

---

17/   Lewis involved a derivative suit filed by a shareholder of "Old Conoco," a Delaware corporation that had been merged into another corporation referred to as "New Conoco." Id. at 1042. The shareholder sought to sue executives of Old Conoco. Id. The Chancery Court dismissed the suit because the shareholder did not own stock in New Conoco and thus lacked standing. Id. at 1043. On appeal, the shareholder argued that unless he was permitted to pursue his claims, the alleged wrong would go unremedied. Id. at 1049. The Delaware Supreme Court rejected this argument, stating that claims against Old Conoco executives were not extinguished by the merger. Rather, title to those claims passed to New Conoco shareholders, who could pursue the claims if they wished. Id. at 1049-51; see Lewis v. Ward, 852 A.2d 896, 903 (Del. 2004) (following a merger, "derivative claims pass...to the surviving corporation, whose board of directors then has the sole right and standing to prosecute the action.").

Plaintiffs second argument regarding the differences in the claims asserted in the two cases misses the point entirely. Similarity of the claims is not the issue. Rather, as explained in Sunrise's opening brief, the underlying factual basis for the claims is what matters. In both cases, the facts alleged are virtually identical. Sunrise's Mem. at 39-41. Factual determinations made in the derivative case, which is purportedly brought on behalf of Sunrise, could preclude Sunrise from effectively defending itself in the class action. Thus, Sunrise could be damaged if the cases proceed simultaneously.

For these reasons, if not dismissed, this case should, at a minimum, be stayed.

## CONCLUSION

For these reasons, the Court should dismiss the instant suit in its entirety or, in the alternative, and at a minimum, enter a stay until the class action pending in this Court is resolved.

Respectfully Submitted,

HOGAN & HARTSON LLP

By:  /s/ Jon M. Talotta
George H. Mernick, III (D.C. Bar No. 294256)
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5726
Fax: (202) 637-5910
E-mail: GHMernick@hhlaw.com

N. Thomas Connally (D.C. Bar No. 448355)
Jon M. Talotta (D.C. Bar No. 473626)
8300 Greensboro Drive, Suite 1100
McLean, VA 22102
Telephone: (703) 610-6100
Fax: (703) 610-6200
E-mail: NTConnally@hhlaw.com
E-mail: JMTalotta@hhlaw.com

Dated: August 18, 2008

*Attorneys for Nominal Defendant*
*Sunrise Senior Living, Inc.*

-25-

## CERTIFICATE OF SERVICE

I certify that on August 18, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and mailed via U.S. Mail, postage prepaid, a copy of the foregoing to:

George R. Murphy
Mark Hanna
Joni S. Jacobs
DAVIS, COWELL & BOWE, LLP
1701 K Street NW, Suite 210
Washington, DC 20006

*Liaison Counsel for Plaintiffs*

Eric L. Zagar
Michael C. Wagner
J. Daniel Albert
SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
280 King of Prussia Road
Radnor, PA 19087

Maya Saxena
Joseph White
SAXENA WHITE P.A.
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431

Brian J. Robbins
Felipe J. Arroyo
Ashley R. Palmer
ROBBINS, UMEDA, & FINK LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101

*Co-Lead Counsels for Plaintiffs*

John C. Millian
Matthew R. Estabrook
GIBSON DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

*Attorneys for Defendants Carl Adams, Ronald V. Aprahamian, Craig R. Callen, Thomas J. Donohue, Richard A. Doppelt, David W. Faeder, John F. Gaul, J. Douglas Holladay, Larry E. Hulse, Paul L. Klaassen, Teresa M. Klaassen, Pete A. Klisares, William Little, J. Willard Marriott, Jr., Scott F. Meadow, Darcy Moore, Thomas B. Newell, Robert R. Slager, Christian B.A. Slavin, Timothy S. Smick, Brian C. Swinton, Tiffany L. Tomasso*

John M. Dowd
Jeffrey M. King
Elizabeth C. Peterson
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

*Attorneys for Defendant Bradley R. Rush*

Philip A. Sechler
Vidya Atre Mirmira
Scott K. Dasovich
WILLIAMS & CONNOLLY, LLP
725 12th Street, N.W.
Washington, DC 20005

*Attorneys for Defendant David G. Bradley*

/s/     Jon M. Talotta
Jon M. Talotta (DC Bar 473626)
HOGAN & HARTSON, LLP
8300 Greensboro Drive, Suite 1100
McLean, Virginia 22102
Telephone: (703) 610-6100
Facsimile: (703) 610-6200
E-mail: jmtalotta@hhlaw.com

# EXHIBIT  1



VIRGINIA:

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

NICHOLAS VON GUGGENBERG,          )
                                  )
              Derivative Plaintiff, )
                                  )
         v.                       )          Case No. CL-200610174
                                  )
PAUL J. KLAASSEN, ET AL.,         )
                                  )
              Defendants,         )
                                  )
         and                      )
                                  )
SUNRISE SENIOR LIVING, INC.,      )
                                  )
              Nominal Defendant.  )
                                  )

FINAL      **ORDER**

This matter comes before the Court on Nominal Defendant Sunrise Senior Living, Inc.'s ("Sunrise") Demurrer. Having considered Sunrise's Demurrer and memorandum in support thereof, the opposition thereto, the oral arguments of counsel, and the entire record herein, it is hereby ORDERED, ADJUDGED, and DECREED that:

1.    The Demurrer is SUSTAINED;

2.    The Verified Derivative Complaint of derivative defendant Nicholas Von Guggenberg shall be and hereby is DISMISSED without prejudice. *AND LEAVE TO AMEND IS DENIED.*

Entered this _15_ day of September, 2006.

_____
Circuit Court Judge

WE ASK FOR THIS:

N. Thomas Connally, VSB #36318
Jon M. Talotta, VSB #44590
HOGAN & HARTSON, LLP
8300 Greensboro Drive, Suite 1100
McLean, Virginia 22102
Phone: (703) 610-6100
Fax: (703) 610-6200

Charlie C.H. Lee, VSB #30410
MOORE & LEE LLP
1750 Tysons Boulevard
Suite 1450
McLean, Virginia 22102
Phone: 703-506-2050
Fax: 703-506-2051


OF COUNSEL:
George H. Mernick
HOGAN & HARTSON, LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone: 202-637-5726
Fax: 202-637-5910

Counsel for Nominal Defendant
Sunrise Senior Living, Inc.



SEEN AND OBJECTED TO FOR THE REASONS IN PLAINTIFFS PLEADINGS & IN ORAL ARGUMENT.

John C. Pasierb, VSB #27446
LAW OFFICES OF JOHN C. PASIERB, PLC
2200 Wilson Boulevard
Suite 800

Arlington, Virginia 22201
Phone: 703-875-2260
Fax: 703-528-3692

Eric L. Zagar
Sandra G. Smith
SCHIFFRIN & BARROWAY, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Phone: 610-667-7706
Fax: 610-667-7056

Counsel for Derivative Plaintiff
Nicholas Von Guggenberg

A COPY TESTE:
JOHN T. FREY, CLERK
BY: _____
        Deputy Clerk
Date: _____7-25-06_____
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia

# EXHIBIT  2

VIRGINIA:

IN THE SUPREME COURT OF VIRGINIA AT RICHMOND

| | |
|---|---|
| _____ | |
| NICHOLAS VON GUGGENBERG, ) | Case No. CL200610174 |
| Derivatively on Behalf of Nominal ) | |
| Defendant SUNRISE SENIOR LIVING, ) | |
| INC., ) | |
| ) | |
| Plaintiff/Appellant, ) | |
| ) | |
| v. ) | |
| ) | |
| PAUL J. KLAASSEN, DAVID W. ) | |
| FAEDER, TIMOTHY S. SMICK, ) | |
| THOMAS B. NEWELL, BRIAN C. ) | |
| SWINTON, CHRISTIAN B.A. SLAVIN, ) | |
| LARRY E. HULSE, TIFFANY L. ) | |
| TOMASSO, RONALD V. ) | |
| APRAHAMIAN, CRAIG R.  CALLEN, ) | |
| and THOMAS J. DONAHUE, ) | |
| ) | |
| Defendants/Appellees, ) | |
| On Petition for Appeal from the ) | |
| Circuit Court of the County of Fairfax, ) | |
| Honorable Gaylord L. Finch ) | |
| ) | |
| and ) | |
| ) | |
| SUNRISE SENIOR LIVING, INC., ) | |
| ) | |
| Nominal Defendant. ) | |
| _____ ) | |

## <u>PETITION FOR APPEAL</u>

John Pasierb, Esquire
2200 Wilson Boulevard, Suite 800
Arlington, Virginia 22201
Telephone: 703-875-2260
Fax: 703-528-3692
Virginia State Bar No. 27446

298530.1

## SUBJECT INDEX

I.     ASSIGNMENTS OF ERROR ............................................................. 2

II.    STATEMENT OF THE CASE ............................................................. 2

III.   QUESTIONS PRESENTED ................................................................ 3

IV.    STATEMENT OF FACTS .................................................................. 3

     A.     Defendants' Misconduct ....................................................... 3

     B.     Procedural Posture ............................................................. 4

V.     ARGUMENT ................................................................................ 5

     A.     Defendants' Demurrer Should Have Been Overruled Because Demand On The Board Was Excused ............................................... 5

          1.     Standard of Review ............................................. 5

          2.     Demand Futility Standard ..................................... 6

               a.     Demand Is Excused Under The First Prong Of *Aronson* Because There Is A Reasonable Doubt Regarding The Interestedness Or Independence Of At Least Half The Board ........................................ 7

               b.     Demand Is Excused Under The Second Prong Of *Aronson* Because There Is A Reasonable Doubt That Defendants' Conduct Was The Product Of A Valid Exercise Of Business Judgment ........................ 11

     B.     Defendants' Plea in Bar Should Have Been Overruled Because Plaintiffs' Claims for Breaches of Fiduciary Duty and Unjust Enrichment Were Not Time Barred  12

          1.     Standard of Review ............................................. 12

          2.     Choice of Law .................................................... 12

          3.     The Statute of Limitations Was Tolled ..................... 13

               a.     Plaintiff Could Not Have Discovered Defendants' Wrongdoing Until 2005 .......................................................... 14

               b.     Defendants Fraudulently Concealed Their Wrongdoing ................... 15

               c.     The Running of the Limitations Period Was Equitably Tolled .......... 16

     C.     The Trial Court Abused Its Discretion by Refusing to Allow Plaintiff to Amend His Complaint ................................................. 18

VI.    CONCLUSION.................................................................................................. 19

VII.   CERTIFICATE.................................................................................................. 20

298530.1

# TABLE OF AUTHORITIES

CASES

*Albert v. Alex. Brown Mgmt. Servs.*,
  2005 Del. Ch. LEXIS 100 (June 29, 2005) ..................................................... 13-16

*Alidina v. Internet.com Corp.*,
  2002 Del. Ch. LEXIS 156 (Nov. 8, 2002) ............................................................11

*Allen v. Chesterfield Meadows Shopping Ctr. Assoc., L.P.*,
  53 Va. Cir. 262 (Va. Cir. Ct. 2000) ...................................................................18

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) ........................................................................... Passim

*Beneville v. York*,
  769 A.2d 80 (Del. Ch. 2000) ................................................................................6

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ..............................................................................6, 11

*Glazebrook v. Board of Supervisors of Spotsylvanis County*,
  266 Va. 550, 587 S.E.2d 589 (2003) .............................................................. 5-6

*Grimes v. Donald*,
  673 A.2d 1207 (Del. 1996) ..............................................................................6, 8

*Hubbard v. Dresser, Inc.*,
  271 Va. 117, 624 S.E.2d 1 (2006) ........................................................................5

*In re Walt Disney Co. Derivative, Litig.*,
  825 A.2d 275 (Del. Ch. 2003) ............................................................................11

*Kahn v. Seaboard Corp.*,
  625 A.2d 269 (Del. Ch. 1993) ....................................................................... 16-17

*Kamen v. Kemper Financial Services, Inc.*,
  500 U.S. 90 (1991) ...............................................................................................6

*Kohls v. Duthie*,
  791 A.2d 772 (Del. Ch. 2000) ....................................................................... 9-10

*Kole v. City of Chesapeake*,
  247 Va. 51 (1994) ..............................................................................................19

*Mizel v. Connelly*,
    1999 Del. Ch. LEXIS 157 (Del. Ch. 1999)............................................................8

*Molner v. Klaassen, et al.*,
    Case No. CL 2006 11244.  Plaintiff.......................................................4

*Moore v. Jefferson Hospital, Inc.*,
    208 Va. 438, 158 S.E.2d 124 (1967)....................................................5

*Newman v. Walker*,
    270 Va. 291 (2005) ........................................................................18

*Pogostin v. Rice*,
    480 A.2d 619 (Del. 1984) ....................................................... 7-8, 11

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ...........................................................7

*Rosillo v. Winters*,
    235 Va. 268, 367 S.E.2d 717 (1988)..................................................12

*Sullivan v. Jones*,
    42 Va. App. 794, 595 S.E.2d 36 (2004).............................................12

*Telxon v. Bogomolny*,
    792 A.2d 964 (Del. Ch. 2001).........................................................17

*Tomlin v. McKenzie*,
    251 Va. 478, 468 S.E.2d 882 (1996)................................................12

*Williams v. 5300 Columbia Pike Corp.*,
    891 F. Supp. 1169 (E.D. Va. 1995) ..................................................12

## OTHER AUTHORITIES

Virginia Supreme Court Rule 5:17 .........................................................20

Virginia Supreme Court Rule 1:8 .........................................................18

298530.1

## I.    ASSIGNMENTS OF ERROR

The trial court erred in dismissing Plaintiff's case with prejudice by sustaining Defendants' Demurrer and granting Defendants' Plea in Bar because:

1. Plaintiff has standing to bring this lawsuit because making a demand on the Board of Directors would have been futile.  (Error preserved by objection stated on pages 21-24 of the Transcript.)

2. The statute of limitations does not bar this action.  (Error preserved by objection stated on pages 10-14 of the Transcript.)

3. The trial court abused its discretion when it denied Plaintiff's request to amend the complaint.  (Error preserved by objection stated on page 27 of the Transcript.)

## II.    STATEMENT OF THE CASE

Nicholas Von Guggenberg, Plaintiff/Appellant, instituted a derivative suit in the Circuit Court of Fairfax County seeking redress for Defendants'/Appellees' breaches of fiduciary duties and unjust enrichment.  Defendants subsequently filed a Demurrer and Plea in Bar.

Defendants' motions were heard on September 15, 2006, before the Honorable Gaylord L. Finch.  On that day, the Court sustained Defendants' Demurrer and granted Defendants' Plea in Bar, holding that Plaintiff lacked standing to bring this lawsuit and that this lawsuit was barred by the statute of limitations.

Plaintiff duly noted his exceptions and Notice of Appeal from said decree was timely filed on October 10, 2006.

298530.1

### III.    QUESTIONS PRESENTED

1.  Whether or not Plaintiff has standing to bring this derivative action because making a demand on the Board of Directors would have been futile.

2.  Whether or not the statute of limitations bars this action.

3.  Whether or not the trial court abused its discretion when it denied Plaintiff's request to amend the Complaint.

### IV.    STATEMENT OF FACTS

#### A.    Defendants' Misconduct

This is a shareholder's derivative action brought for the benefit of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of Directors (the "Board"), and certain of its executive officers (collectively "Defendants") seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment. ¶1.[1]

The Complaint alleges that in gross breach of their fiduciary duties as officers and/or directors of Sunrise, the Defendants colluded with one another to:  (1) improperly backdate dozens of grants of Sunrise stock options to Sunrise executives, in violation of the Company's shareholder-approved stock option plans, (2) improperly record and account for the backdated stock options in violation of Generally Accepted Accounting Principles ("GAAP"); and (3) produce and disseminate to Sunrise shareholders and the market false financial statements and

---

[1]  "¶__" refers to paragraphs in the Verified Derivative Complaint ("Complaint").

3

other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options. ¶2[2].

As a result of the Defendants' egregious misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits. ¶5.

## B.     Procedural Posture

On August 11, 2006, Plaintiff filed his Complaint.  On August 30, 2006, counsel for the parties conferred by telephone regarding Plaintiff's Complaint.  During that conversation, Plaintiff's counsel notified Defendants' counsel that Plaintiff intended to file an amended complaint.  Nevertheless, on September 1, 2006, Defendants filed a Demurrer and Plea in Bar. Defendants' Plea in Bar argued that Plaintiff's action was estopped by the statute of limitations. Defendants' Demurrer argued that Plaintiff lacked standing because he failed to show that pre-suit demand on the Board was futile.  A hearing on Defendants' Plea in Bar and Demurrer was scheduled for September 15, 2006, before the Honorable Gaylord L. Finch.

On September 6, 2006, another shareholder of Sunrise, Catherine Molner, authorized Plaintiff's counsel to file a complaint on her behalf (the "Molner Action").  The Molner Action was styled *Molner v. Klaassen, et al.*, Case No. CL 2006 11244.  Plaintiff subsequently filed a Motion to Consolidate this case with the Molner Action.  In that Motion to Consolidate, Plaintiff requested that the Court consolidate the actions and set a schedule for the filing of a consolidated complaint or designation of an operative complaint.

---

[2] Although in the trial court Defendants characterized Plaintiff's backdating allegations as mere guesswork that lacked a factual foundation, Sunrise's recent announcement that it is being investigated by both the SEC and one of its largest institutional shareholders for options backdating confirms that Plaintiff had a good faith basis for his allegations.

Despite the fact that Plaintiff had an outstanding Motion to Consolidate the Molner Action with the instant one, the Honorable Gaylord L. Finch heard argument on Defendants' Plea in Bar and Demurrer on September 15, 2006.  At that hearing counsel for Plaintiff requested that the Court defer hearing Defendants' motions until the Molner Action was consolidated with the instant case and Plaintiff had an opportunity to file an amended complaint.  *See* Transcript of Hearing ("Transcript") at 12.  (A copy of the Transcript of Hearing is attached hereto as Exhibit A).  The Court, however, refused Plaintiff's request and granted Defendants' Plea in Bar and sustained the Defendants' Demurrer. *Id.* at 26.  The Court also denied Plaintiff's request to replead. *Id.*  On October 16, 2006, Plaintiff timely filed his Notice of Appeal.

## V.    ARGUMENT

### A.    Defendants' Demurrer Should Have Been Overruled Because Demand On The Board Was Excused

#### 1.    Standard of Review

"A demurrer tests the legal sufficiency of facts alleged in pleadings, not the strength of proof."  *Glazebrook v. Board of Supervisors of Spotsylvanis County*, 266 Va. 550, 554, 587 S.E.2d 589, 591 (2003) (citations omitted).  To survive a challenge by demurrer, a pleading must be made with "sufficient definiteness to enable the court to find the existence of a legal basis for its judgment."  *Moore v. Jefferson Hospital, Inc.*, 208 Va. 438, 440, 158 S.E.2d 124, 126 (1967) (internal quotation marks and citations omitted).

In reviewing a trial court's order sustaining a demurrer, the reviewing court is "required to address the same issue that the trial court addressed, namely whether the [bill of complaint] alleged sufficient facts to constitute a foundation in law for the judgment sought."  *Hubbard v. Dresser, Inc.*, 271 Va. 117, 119, 624 S.E.2d 1, 2 (2006).  The reviewing court undertakes this review de novo, accepting "as true all facts properly pleaded in the bill of complaint and all

reasonable and fair inferences that may be drawn from those facts." *Glazebrook*, 266 Va. At 554, 587 S.E.2d at 591 (citations omitted).

### 2.   Demand Futility Standard

Sunrise is incorporated in Delaware, and therefore Delaware law governs the Court's demand futility analysis. *See, e.g., Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991); Va. Code. Ann. 13.1672.3(B). In *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), the Delaware Supreme Court restated Delaware law on demand futility:

> The test of demand futility is a two-fold test under *Aronson* and its progeny.  The first prong of futility rubric is "whether, under the particularized facts alleged a reasonable doubt is created that . . . the directors are disinterested and independent."  The second prong is whether the pleading creates a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment."   These prongs are in the disjunctive.   Therefore, if either prong is satisfied, demand is excused.

*Id.* at 256 (*quoting Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)). [3]   Plaintiff's Complaint satisfies both prongs of *Aronson*.  Indeed, the Complaint establishes that it would have been futile to demand that Sunrise's Board commence this suit because the Complaint creates a reasonable doubt regarding the interestedness or independence of five of the Company's seven Board members.  *See Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000) (Demand is deemed

---

[3]   According to the Delaware Supreme Court in *Grimes v. Donald*, 673 A.2d 1207 (Del. 1996), reasonable doubt is defined as follows:

> "[r]easonable doubt can be said to mean that there is a reason to doubt.  This concept is sufficiently flexible and workable to provide the stockholder with the 'keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms.  Stated obversely, the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence…"

*Id.* at 1217 and n.17.

futile where there is a reasonable doubt that at least half the board is disinterested or independent). Thus, the first prong of *Aronson* is met. Moreover, because Defendants' conduct was not the product of a valid exercise of business judgment, the second prong of *Aronson* is satisfied.

        **a.**      **Demand Is Excused Under The First Prong Of *Aronson* Because There Is A Reasonable Doubt Regarding The Interestedness Or Independence Of At Least Half The Board**

As a matter of law, there is a reasonable doubt regarding a director's disinterestedness if the plaintiff alleges: (i) that the director "either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders," *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), or (ii) facts from which the Court can reasonably infer that the director faces a substantial likelihood of being held liable in the derivative action. *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

At the time this action was commenced, the Board consisted of seven directors: Defendants Paul Klaassen, Teresa Klaassen, Ronald Aprahamian ("Aprahamian"), Craig R. Callen ("Callen") and Thomas J. Donahue ("Donahue"), and non-defendant directors T. Douglas Holladay and William Little. Accordingly, for demand to be excused under the first prong of *Aronson*, Plaintiff need only raise a reasonable doubt regarding the disinterestedness or independence of four directors. *Aronson*, 473 A.2d at 814-815. In the instant case there is a reasonable doubt regarding the disinterestedness or independence of five directors.

First, there is clearly a reasonable doubt regarding Paul Klaassen's disinterestedness. The Complaint alleges that Paul Klaassen received 350,000 backdated options on September 11, 2000. ¶26. Thus, because Paul Klaassen "received … a personal financial benefit from the

challenged transaction which is not equally shared by the stockholders," as a matter of law there is a reasonable doubt as to Paul Klaassen's disinterestedness. *Pogostin*, 480 A.2d at 624.

Likewise, there is clearly a reasonable doubt regarding the independence of Teresa Klaassen, the wife of Paul Klaassen. She is incapable of objectively considering a demand that would be adverse to her husband's personal interest. Accordingly, this relationship creates a reasonable doubt as to Teresa Klaassen's independence. *See Grimes*, 673 A.2d at 1216 (a familial interest may disqualify a director from being considered independent), *Mizel v. Connelly*, 1999 Del. Ch. LEXIS 157, at *10-14 (Del. Ch. 1999) (grandson is not considered an independent director when considering a demand that is adverse to his grandfather's personal interests).

Finally, because Aprahamian, Callen, and Donahue (collectively the "Committee Defendants") each face a substantial likelihood of liability for their direct and prolonged participation in Sunrise's stock option backdating scheme, Plaintiff has raised a reasonable doubt regarding their disinterestedness. Indeed, during the relevant period, the Committee Defendants each served on Sunrise's Stock Option Committee, Compensation Committee, and Audit Committee. ¶¶15-17. As members of the Stock Option Committee and Compensation Committee, the Committee Defendants were directly responsible for approving, and in fact did knowingly approve, the granting of backdated stock options. ¶¶25, 26, 30. As members of the Audit Committee, the Committee Defendants were directly responsible for approving, and in fact did knowingly approve, Sunrise's preparation and dissemination of false financial statements that violated GAAP. ¶¶24, 32. Furthermore, the Committee Defendants actively participated in the cover-up of the backdating scheme by, among other things, disseminating false proxy statements

that falsely reported the dates of stock option grants. ¶33.  In short, the Committee Defendants were each direct, active and integral participants in the backdating scheme and cover-up thereof.

The Committee Defendants' conduct in knowingly granting backdated stock options, approving and disseminating false financial statements, and covering up the scheme was in gross breach of their fiduciary duties of loyalty and good faith and cannot be justified as a legitimate exercise of business judgment. ¶¶36-37.  In light of Plaintiff's detailed allegations regarding the backdating scheme, ¶¶25-33, the Committee Defendants face not just the "mere threat" of being held liable in this derivative action, but rather are substantially likely to be held liable for their misconduct.  Indeed, the Committee Defendants' breaches of fiduciary duties are so blatant and egregious that they essentially have no available defenses.  Accordingly, there is a reasonable doubt regarding the disinterestedness of the Committee Defendants, and therefore demand is excused under the first prong of *Aronson*.

With regard to the Committee Defendants' substantial likelihood of liability, the facts of the instant case are analogous to, yet even more persuasive than, those in *Kohls v. Duthie*, 791 A.2d 772 (Del. Ch. 2000), in which the court held that demand was excused pursuant to the first prong of *Aronson*.  In *Kohls* the plaintiffs alleged, among other things, that the directors of Kenetech Corporation ("Kenetech"), including director Charles Christenson ("Christenson"), breached their fiduciary duties by knowingly allowing Kenetech's Chief Executive Officer to usurp a corporate opportunity to purchase a large number of shares of Kenetech common stock at a steep discount.  *Id*. at 775-76.  The plaintiffs further alleged that there was a reasonable doubt regarding Christenson's disinterestedness because he faced a substantial likelihood of being held liable in the action.  *Id*. at 782-83.  Specifically, the plaintiffs alleged that:

> The CEO consulted with counsel and gave the other directors a
> series of reasons why the company could not buy the shares. The

> complaint alleges (in a conclusory fashion) that these reasons were false on their face and could not have been believed by the others, including Christenson. Moreover, it is alleged that Christenson (and, I infer, the board as a whole) "failed to obtain competent legal, financial or accounting advice." The CEO then convinced the others to let him take the deal alone.

*Id.* at 782. The plaintiffs argued that "Christenson faces a substantial threat of personal liability because his 'inexplicable indifference to the interests of the Company in this matter . . . implicate[s] his duty of loyalty to Kenetech and . . . amounts to bad faith. . .;'" and that "no properly motivated director could have perceived this corporate opportunity and not thoroughly inquired into the company's ability to exploit it." *Id.* at 782-783. The court in *Kohls* held that "the allegations of the complaint, if true, would establish that Christenson faces a 'substantial likelihood' of personal liability for breach of fiduciary duty and aiding and abetting [the CEO's] breach of duty," and therefore concluded that demand was excused. *Id.* at 783.

Like Christenson, the Committee Defendants knowingly acted in bad faith to enrich other Sunrise insiders at the expense of the Company. Hence, like Christenson, the Committee Defendants face a substantial likelihood of being held liable for their misconduct. Indeed, compared to the highly detailed facts alleged in Plaintiff's Complaint, the facts alleged in *Kohls* were far more conclusory and far less particularized, yet they were sufficient for the court in that case to find that Christenson faced a substantial likelihood of liability. Consequently, Plaintiff's detailed allegations regarding the Committee Defendants' participation in the option backdating scheme and cover-up are more than sufficient for this Court to find that they face a substantial likelihood of liability. Accordingly, demand is excused under the first prong of *Aronson*. Thus, Defendants' Demurrer should have been overruled, and this Court should reverse the decision of the trial court.

> **b.**   **Demand Is Excused Under The Second Prong Of**
> ***Aronson* Because There Is A Reasonable Doubt That**
> **Defendants' Conduct Was The Product Of A Valid**
> **Exercise Of Business Judgment**

Since Plaintiff has demonstrated that demand is excused under the first prong of *Aronson*, the Court below could have, and should have, overruled Defendants' Demurrer without evaluating demand futility under the second prong. *Brehm v. Eisner*, 746 A.2d at 256. Nevertheless, demand is also excused under the second prong because there is a reasonable doubt that Defendants' conduct was the product of a good faith exercise of business judgment.

The second prong of the *Aronson* analysis "focuses on the substantive nature of the challenged transaction and the board's approval thereof." *Pogostin*, 480 A.2d at 624; *Aronson*, 473 A.2d at 814. For demand to be excused:

> plaintiffs must allege particularized facts that raise doubt about whether the challenged transaction is entitled to the protection of the business judgment rule. Plaintiffs may rebut the presumption that the board's decision is entitled to deference by raising a reason to doubt whether the board's action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation. Thus, plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision.

*In re Walt Disney Co. Derivative, Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003).

In the instant case, Defendants' conduct in knowingly granting backdated stock options, approving and disseminating false financial statements, and covering up the scheme was not, and could not have possibly been, the product of a good faith exercise of business judgment. Indeed, there can never be a legitimate business purpose for such unlawful conduct. *See, e.g., Alidina v. Internet.com Corp.*, 2002 Del. Ch. LEXIS 156, *13 (Nov. 8, 2002) (*quoting In re J.D. Stevens &*

*Co. Shareholders Litig.*, 542 A.2d 770, 781 n.5 (Del. Ch. 1988) (holding that the business judgment rule does not protect a transaction that is so thoroughly defective that it carries a 'badge of fraud.'").  Accordingly, demand is excused under the second prong of *Aronson,* and therefore Defendants' Demurrer should have been overruled.  Hence, this Court should reverse the decision of the trial court.

> **B.**     **Defendants' Plea in Bar Should Have Been Overruled Because Plaintiffs' Claims for Breaches of Fiduciary Duty and Unjust Enrichment Were Not Time Barred**

> **1.**     **Standard of Review**

In Virginia, the standard of review for a defensive plea in bar is substantially similar to the standard of review on a demurrer.

> The defensive plea in bar shortens the litigation by reducing it to a distinct issue of fact which, if proven, creates a bar to the plaintiff's right of recovery.  The moving party carries the burden of proof on that issue of fact.  Where no evidence is taken in support of the plea, the trial court, and the appellate court upon review, must rely solely upon the pleadings in resolving the issue presented.  When considering the pleadings, "the facts stated in the plaintiffs' motion for judgment [are] deemed true."

*Tomlin v. McKenzie*, 251 Va. 478, 480, 468 S.E.2d 882, 884 (1996) (citations omitted).  *See also Sullivan v. Jones*, 42 Va. App. 794, 802-03, 595 S.E.2d 36, 40 (2004).  As with a demurrer, a plea in bar admits as true all facts properly pled and inferences properly drawn from the facts alleged.  *Rosillo v. Winters*, 235 Va. 268, 270, 367 S.E.2d 717 (1988).

> **2.**     **Choice of Law**

Under Virginia law "the internal affairs of a corporation are governed by the law of the state of incorporation."  *Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169, 1182 (E.D. Va. 1995).  Sunrise is a Delaware corporation, and Plaintiff's claims undeniably concern the

internal affairs of the Company.  Consequently, the limitations period applicable to Plaintiff's claims is governed by Delaware law.

### 3.    The Statute of Limitations Was Tolled

Under Delaware law, the running of the limitations period is tolled where, *inter alia*, (i) the injury is "inherently unknowable" to the plaintiff; (ii) the defendants have fraudulently concealed their wrongdoing; or (iii) the doctrine of equitable tolling applies, e.g., where the plaintiff has reasonably relied on the good faith of a fiduciary.  *Albert v. Alex. Brown Mgmt. Servs.*, 2005 Del. Ch. LEXIS 100, *61 (June 29, 2005) (citations omitted).

"Under the so-called 'discovery rule,' the statute of limitations is tolled where the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of.  In such a case, the statute will begin to run only upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."  *Id*. at **61-62 (citations omitted).

"The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth.  Fraudulent concealment requires an affirmative act of concealment or some misrepresentation by a defendant that prevents a plaintiff from gaining knowledge of the facts."  *Id*. at **62-63 (citations omitted).

"Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. . . .  This doctrine tolls the

13

limitations period until an investor knew or had reason to know of the facts constituting the wrong." *Id*. at **63-64 (citations omitted).

In the case at bar, the running of the limitations period was tolled for **all three** of the foregoing reasons, and therefore Defendants' Plea in Bar should have been overruled.

### a.    Plaintiff Could Not Have Discovered Defendants' Wrongdoing Until 2005

The essence of Plaintiff's claims, that Defendants improperly backdated stock option grants, is a fact that no reasonably diligent shareholder could have discovered until very recently because there was no reason for any shareholder to suspect that such a practice existed at any company, much less at Sunrise in particular.  The very concept of stock option backdating did not come to light until May 2005, when Professor Erik Lie of the Henry B. Tippie College of Business at the University of Iowa published in the academic journal *Management Science* an article entitled "On the Timing of CEO Stock Option Awards" (the "Lie Article")(Attached hereto as Exhibit B).

In the Lie Article, Professor Lie "propose[d] a **new hypothesis**" to explain the abnormal stock returns following grants of stock options to CEOs that had been identified, but not satisfactorily explained, in earlier academic studies.  *Id*. at 803 (emphasis added).  Professor Lie postulated that "the awards might be timed ex post facto, whereby the grant date is set to be a date in the past on which the stock price was particularly low."  *Id.*  Professor Lie further noted that "[s]uch retroactive timing obviously requires little skill, although outsiders might perceive it to be fraudulent.  **In any event, it is unlikely that outsiders would ever learn of it, because the company does not publicly report the grant date until months thereafter**."  *Id*. (emphasis added).

There are several reasons why a reasonably diligent Sunrise shareholder could not have discovered that Sunrise had engaged in stock option backdating until after the publication of the Lie Article. First, as Professor Lie notes, a reasonably diligent shareholder would not be expected to ferret out the multi-year pattern of favorable option grants to the Defendants because the time that elapsed between the purported grant dates and the public reporting of those dates spanned at least several months, and it would take years for the pattern to become discernable. Second, even if a shareholder had perchance stumbled upon the pattern of favorable option grants, there would be no reason for the shareholder to suspect that the pattern was the result of anything beyond random chance or market forces.[4] Hence, a reasonably diligent shareholder would have no reason to know there was any basis for a cause of action against the Defendants. Finally, even if a shareholder had discovered the pattern and suspected wrongdoing, the shareholder could not have determined that Defendants had backdated the option grants unless the shareholder performed a highly sophisticated statistical analysis to rule out other potential causal factors, which would far exceed the capacity of "a person of ordinary intelligence and prudence." *Albert,* 2005 Del. Ch. LEXIS 100 at *62. Accordingly, the running of limitations period was tolled at least until the May 2005 publication of the Lie Article, which put the investment community on notice of the widespread practice of option backdating. Therefore, Defendants' Plea in Bar should have been overruled.

### b.    Defendants Fraudulently Concealed Their Wrongdoing

Defendants may argue that Plaintiffs' claims must be time-barred because the allegedly backdated options were issued and publicly disclosed long ago, outside the limitations period.

---

[4] Indeed, Professor Lie himself had to conduct a very broad and highly sophisticated statistical study to confirm his hypothesis that the observed pattern of abnormal stock returns was the result of backdating. Id. at 805-12.

This argument not only ignores the fact that Defendants' backdating scheme was unknowable prior to the publication of the Lie Article in May 2005, it also ignores the crux of Plaintiff's claims -- that the publicly reported dates of the option grants were **deliberately false**. Plaintiff specifically alleges that Defendants fraudulently concealed their option backdating scheme by, among other things, deliberately disseminating to shareholders and filing with the SEC annual proxy statements that falsely reported the grant dates in order to conceal the fact that the options were backdated. In fact, Sunrise has never disclosed the true grant dates. Consequently, the running of the limitations period was tolled due to Defendants' fraudulent concealment, and therefore Defendants' Plea in Bar should have been overruled.

> ### c.    The Running of the Limitations Period Was Equitably Tolled

If Defendants had not fraudulently concealed their wrongdoing, the doctrine of equitable tolling would nonetheless apply to toll the running of the limitations period because Plaintiff "reasonably relie[d] on the competence and good faith" of the Individual Defendants, all of whom were fiduciaries who were duty-bound not to engage in bad faith conduct, e.g., a stock option backdating scheme. *Albert*, 2005 Del. Ch. LEXIS 100 at **63-64. See also *Kahn v. Seaboard Corp.*, 625 A.2d 269, 276 (Del. Ch. 1993) ("[I]n the context of an existing fiduciary relationship and a claim of actionable self-dealing, I must express a contrary opinion to that expressed in *Halpern v. Barran*, [313 A.2d 139 (Del. Ch. 1973)], to the effect that without an affirmative act of concealment by defendant, plaintiff's ignorance of the facts constituting the alleged wrong cannot act to toll the running of the statute of limitations. In my opinion, at least in some circumstances, it can. . . . [T]he statute of limitations applies, but is tolled in derivative actions charging actionable self-dealing, until the shareholders knew or had reason to know of the facts constituting the alleged wrong."). Indeed, the pertinent facts of the instant case are

identical to those of *Telxon v. Bogomolny*, 792 A.2d 964 (Del. Ch. 2001), in which the Delaware
Court of Chancery held that the running of the limitations period was equitably tolled.

In *Telxon*, the plaintiff alleged that the members of Telxon's Stock Option Committee,
directors Goodman and Rose, improperly granted to Telxon Chairman Robert F. Meyerson an
option to purchase 10% of Telxon's Aironet subsidiary (the "Aironet Option"). *Id*. at 967-68.
The plaintiff alleged, among other things, "that Goodman and Rose breached their duties of
loyalty and care in awarding the Aironet Option, and that the other directors 'likewise violated
their duty of loyalty to Telxon by permitting Meyerson to reap the benefits of the Aironet Option
when they knew or should have known that the Aironet Option was wrongful and unlawful. . . .'"
*Id*. at 971.  Goodman, Rose, and the other director defendants "moved to dismiss the Amended
Complaint on the grounds that it is barred by the applicable statute of limitations" because the
Aironet Option grant took place in April 1996 and the action was not commenced until
December 1999, more than three years after the grant.  *Id*. at 968.  Even though there was no
allegation that Goodman and Rose received any portion of or benefit from the Aironet Option,
the Court of Chancery nonetheless held that "[t]he original Derivative Complaint charged
actionable self-dealing by corporate fiduciaries and neatly fit the principle [of equitable tolling]
explained in *Kahn v. Seaboard*.  Thus, there is little reason to doubt that the Derivative
Complaint was timely filed."  *Id*. at 973 (emphasis added).

The facts and circumstances of the case at bar are indistinguishable from those in *Telxon*.
Although the Committee Defendants did not receive any backdated options, their backdating of
option grants to Sunrise executives is sufficient to implicate the doctrine of equitable tolling.
Accordingly, as in *Telxon*, Plaintiff's claims are timely because the running of the limitations

period was equitably tolled.  Hence, Defendants' Plea in Bar should have been overruled, and this Court should reverse the decision of the trial court.[5]

> ### C.    The Trial Court Abused Its Discretion by Refusing to Allow Plaintiff to Amend His Complaint

Virginia Supreme Court Rule 1:8 ("Rule 1:8") provides that "leave to amend shall be liberally granted in furtherance of the ends of justice." *See also Allen v. Chesterfield Meadows Shopping Ctr. Assoc., L.P.*, 53 Va. Cir. 262, 264 (Va. Cir. Ct. 2000).   While the granting of leave to amend is within the sound discretion of the trial court, the court must consider the following factors among others:  (1) whether leave to amend has already been granted; (2) whether leave would prejudice the defendant; (3) the length of the case and the timing of the motion in relation thereof; (4) how near is the trial; and (5) the plaintiff's need to amend.  *Id* at 264.  In the instant case, an examination of the relevant factors demonstrates that the trial court abused its discretion in refusing to allow Plaintiff leave to amend his complaint.

*First*, because Plaintiff had not previously amended his complaint, the first factor favors granting leave to amend.

*Second*, leave to amend would not prejudice the Defendants, and in the court below Defendants did not and could not argue otherwise.  For this reason alone, the trial court abused

---

[5] Even if Virginia law governs, the statute of limitations was tolled because of Defendants' fraudulent concealment of their misconduct.  *See Newman v. Walker*, 270 Va. 291, 269 (2005) (citation omitted) (Virginia Supreme Court held that the concealment "must consist of some trick or artifice preventing inquiry or calculated to hinder a discovery of the cause of action by the use of ordinary diligence.").  Here, Plaintiff alleged that Defendants, "for purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC  annual proxy statements that falsely reported the dates of stock option grants to the Officer Defendants."  ¶33.  Moreover, as seen above, Defendants do not and cannot prove that a reasonably diligent shareholder of Sunrise would have discovered that the dates of stock option grants as reported by the Defendants were false.  Thus, even under Virginia law, the statute of limitations was tolled.

its discretion in refusing Plaintiff's request to amend the Complaint.  *See Kole v. City of Chesapeake*, 247 Va. 51, 57 (1994) (a trial court abuses its discretion in refusing to allow an amendment where nothing in the record suggests the amendment will result in prejudice to the opposing party).

*Third*, this case was in its infancy when it was dismissed.  The timing of Plaintiff's request was not unreasonable given the fact that this case was still at the Demurrer and Plea in Bar stage of the proceedings.  This factor favors granting leave to amend.

*Fourth*, the trial had not been scheduled.  Thus, this factor favors granting leave to amend.

*Fifth*, the Plaintiff had great need to amend.  Indeed, in its ruling the trial court found that Plaintiff's allegations regarding demand futility were insufficient.  Likewise, the trial court held that Plaintiff failed to plead sufficient facts from which the court could conclude that the statute of limitations was tolled.  Accordingly, because Plaintiff had great need to amend, this factor favors granting leave to amend.

In light of the foregoing factors, all of which clearly favor granting leave to amend, the trial court abused its discretion in denying Plaintiff leave to amend.  Accordingly, this Court should reverse the decision of the Court below.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order reversing the decision of the trial court in its entirety and overruling Defendants' Plea in Bar and Demurrer, or, in the alternative, granting Plaintiff leave to replead.

298530.1

VII.    **CERTIFICATE**

Pursuant to Rule 5:17 of the Rules of the Supreme Court of Virginia, counsel for the

Plaintiff certifies as follows:

(a)    The Appellant is Nicholas Von Guggenberg and is represented by John Pasierb,

Attorney of Law, 2200 Wilson Boulevard, Suite 800, Arlington, Virginia 22201,

telephone: 703-875-2260, fax: 703-528-3692 and Eric Zagar, Attorney at Law,

280 King of Prussia Road, Radnor, Pennsylvania, 19087, telephone: 610-667-

7706, fax: 610-667-7056.

(b)    The Appellees are Paul J. Klassen, David W. Faeder, Timothy S. Smick, Thomas

B. Newell, Brian C. Sainton, Christian B.A. Slavin, Larry E. Hulse, Tiffany L.

Tomasso, Ronald V. Apprahamian, Craig R. Callen, Thomas J. Donahue, and

Sunrise Senior Living, Inc. and are represented by N. Thomas Connally, Attorney

at Law, 8300 Greensboro Drive, McLean, Virginia, 22102, telephone: 703-610-

6100, fax: 703-610-6200, George H. Mernick, III, 555 Thirteenth Street, N.W.,

Washington, District of Columbia, 20004, telephone: 202-637-6726, fax: 202-

637-5910 and Charlie C.H. Lee, Attorney at Law, 1750 Tysons Boulevard, Suite

1450, McLean, Virginia, 22102, telephone: 703-506-2050, fax: 703-506-2051.

(c)    Counsel for Appellant desires to present oral argument in person in support of this

petition.

(d)    A copy of the foregoing petition was mailed, postage pre-paid, by first class mail

to opposing counsel N. Thomas Connally at 8300 Greensboro Drive, McLean,

Virginia, 22102, George H. Mernick, III, 555 Thirteenth Street, N.W.,

20

Washington, District of Columbia, 20004, and Charlie C.H. Lee, 1750 Tysons

Boulevard, Suite 1450, McLean, Virginia, 22102 this _____ day of December,

2006.

_____

John Pasierb
Counsel for Appellant
Virginia State Bar No. 27446

21

# EXHIBIT  3

## VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on* Friday *the* 27th *day of* April, 2007.

Nicholas Von Guggenberg,                                                    Appellant,

  against      Record No. 062587
               Circuit Court No. CL-2006-10174

Paul J. Klaassen, et al.,                                                  Appellees.

From the Circuit Court of Fairfax County

      Upon review of the record in this case and consideration of the argument submitted in support of and in opposition to the granting of an appeal, the Court is of opinion there is no reversible error in the judgment complained of. Accordingly, the Court refuses the petition for appeal.

            A Copy,

            Teste:

                  Patricia L. Harrington, Clerk

            By:

                  Deputy Clerk

# EXHIBIT  4

VIRGINIA:

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

NICHOLAS VON GUGGENBERG,    )
)
    Derivative Plaintiff,    )
)
    v.    )        Case No. CL-200610174
)
PAUL J. KLAASSEN, ET AL.,    )
)
    Defendants,    )
)
    and    )
)
SUNRISE SENIOR LIVING, INC.,    )
)
    Nominal Defendant.    )
)

## _FINAL_ ORDER

    This matter comes before the Court on Nominal Defendant Sunrise Senior Living, Inc.'s ("Sunrise") Special Plea of the Statute of Limitations ("Special Plea"). Having considered Sunrise's Special Plea and memorandum in support thereof, the opposition thereto, the oral arguments of counsel, and the entire record herein, it is hereby ORDERED, ADJUDGED, and DECREED that:

    1.    The Special Plea is GRANTED; and

    2.    The Verified Derivative Complaint of derivative defendant Nicholas Von Guggenberg shall be and hereby is DISMISSED without prejudice. *AND LEAVE TO AMEND IS DENIED.* JCP

    TC

Entered this ___15___ day of September, 2006.

_____
Circuit Court Judge

*1 co to p's d atty F-15 dk*

WE ASK FOR THIS:

N. Thomas Connally, VSB #36318
Jon M. Talotta, VSB #44590
HOGAN & HARTSON, LLP
8300 Greensboro Drive, Suite 1100
McLean, Virginia 22102
Phone: (703) 610-6100
Fax: (703) 610-6200

Charlie C.H. Lee, VSB #30410
MOORE & LEE LLP
1750 Tysons Boulevard
Suite 1450
McLean, Virginia 22102
Phone: 703-506-2050
Fax: 703-506-2051
OF COUNSEL:
George H. Mernick
HOGAN & HARTSON, LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone: 202-637-5726
Fax: 202-637-5910

Counsel for Nominal Defendant
Sunrise Senior Living, Inc.

SEEN: *AND OBJECTED TO FOR THE REASONS IN PLAINTIFF'S PLEADINGS & IN ORAL ARGUMENT.*

John C. Pasierb, VSB #27446
LAW OFFICES OF JOHN C. PASIERB, PLC
2200 Wilson Boulevard
Suite 800
Arlington, Virginia 22201
Phone: 703-875-2260
Fax: 703-528-3692

Eric L. Zagar
Sandra G. Smith
SCHIFFRIN & BARROWAY, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Phone: 610-667-7706
Fax: 610-667-7056

Counsel for Derivative Plaintiff
Nicholas Von Guggenberg

A COPY TESTE:
JOHN T. FREY, CLERK
BY _____
Deputy Clerk
Date: _____12-18-06_____
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia

# EXHIBIT  5



# FORM 10-K

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: March 24, 2008 (period: December 31, 2006)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

10-K - 10-K

## PART I

| | |
|---|---|
| Item 1. | Business 6 |
| Item 6 | to this Form 10-K, Selected Financial Data, shows the impact of the restatement adjustments on income before provision for income taxes for 2005, 2004, 2003 and 2002 and presents the statements of income for 2003 and 2002 as previously reported and |
| Item 7 | to this Form 10-K, Management s Discussion and Analysis of Financial Condition and Results of Operations, includes a discussion of the restated annual information for 2004 and 2005 and restated quarterly information for 2005. |
| Item 1. | Business |
| Item 1A. | Risk Factors |
| Item 1B. | Unresolved Staff Comments |
| Item 2. | Properties |
| Item 3. | Legal Proceedings |
| Item 4. | Submission of Matters to a Vote of Security Holders |

## PART II

| | |
|---|---|
| Item 5. | Market for Registrant s Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities |
| Item 6. | Selected Financial Data |
| Item 7. | Management s Discussion and Analysis of Financial Condition and Results of Operations |
| Item 7A. | Quantitative and Qualitative Disclosure About Market Risk |
| Item 8. | Financial Statements and Supplementary Data |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure |
| Item 9A. | Controls and Procedures |
| Item 9B. | Other Information |

## PART III

| | |
|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance |
| Item 11. | Executive Compensation |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence |
| Item 14. | Principal Accountant Fees and Services |

Part IV

**Item 15.**    Exhibits and Financial Statement Schedules

SIGNATURES

EXHIBIT INDEX

EX-2.8 (EX-2.8)

EX-4.1 (EX-4.1)

EX-10.14 (EX-10.14)

EX-10.20 (EX-10.20)

EX-10.21 (EX-10.21)

EX-10.22 (EX-10.22)

EX-10.23 (EX-10.23)

EX-10.30 (EX-10.30)

EX-10.32 (EX-10.32)

EX-10.33 (EX-10.33)

EX-10.41 (EX-10.41)

EX-10.42 (EX-10.42)

EX-10.43 (EX-10.43)

EX-10.44 (EX-10.44)

EX-10.45 (EX-10.45)

EX-10.46 (EX-10.46)

EX-10.47 (EX-10.47)

EX-10.48 (EX-10.48)

EX-10.49 (EX-10.49)

EX-10.50 (EX-10.50)

EX-10.61 (EX-10.61)

EX-10.62 (EX-10.62)

EX-10.65 (EX-10.65)

EX-21 (EX-21)

EX-31.1 (EX-31.1)

EX-31.2 (EX-31.2)

EX-32 (EX-32)

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2006**

**Commission File Number 1-16499**

**SUNRISE SENIOR LIVING, INC.**
(Exact name of registrant as specified in its charter)

| Delaware | 54-1746596 |
|---|---|
| (State or other jurisdiction incorporation or organization) | (I.R.S. Employer Identification No.) |
| 7902 Westpark Drive McLean, VA | 22102 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (703) 273-7500

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common stock, $.01 par value per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐    No ☑

The aggregate market value of the Registrant's Common Stock held by non-affiliates (based upon the closing price of $27.65 per share on the New York Stock Exchange on June 30, 2006 was $1,235 million. Solely for the purposes of this calculation, all directors and executive officers of the registrant are considered to be affiliates.

The number of shares of Registrant's Common Stock outstanding was 50,486,492 at February 29, 2008.

**DOCUMENTS INCORPORATED BY REFERENCE**

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| **PART I** | | | |
| | Item 1. | Business | 6 |
| | Item 1A. | Risk Factors | 30 |
| | Item 1B. | Unresolved Staff Comments | 47 |
| | Item 2. | Properties | 48 |
| | Item 3. | Legal Proceedings | 48 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | 52 |
| **PART II** | | | |
| | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 53 |
| | Item 6. | Selected Financial Data | 54 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 57 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 106 |
| | Item 8. | Financial Statements and Supplementary Data | 107 |
| | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 175 |
| | Item 9A. | Controls and Procedures | 175 |
| | Item 9B. | Other Information | 187 |
| **PART III** | | | |
| | Item 10. | Directors, Executive Officers and Corporate Governance | 188 |
| | Item 11. | Executive Compensation | 192 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 221 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | 226 |
| | Item 14. | Principal Accountant Fees and Services | 230 |
| **PART IV** | | | |
| | Item 15. | Exhibits and Financial Statement Schedules | 231 |
| SIGNATURES | | | 232 |

2

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

2006, there were 24 communities under construction held in unconsolidated ventures. At December 31, 2007, there were 30 communities under construction held in unconsolidated ventures. See "Liquidity and Capital Resources" for a description of guarantees provided to certain of our development ventures.

We receive fees from our development ventures for services related to site selection, zoning, and design. Services provided prior to transferring the land to a venture or a third party for further development are recognized in "Gain on the sale and development of real estate and equity interests" in our consolidated statements of income. Services provided for construction supervision, employee selection, licensing, training and marketing efforts after the land has been transferred are recognized as operating revenue and are included in "Professional fees from development, marketing and other" in the consolidated statements of income. See "Liquidity and Capital Resources" for a description of development completion guarantees provided to certain of our development ventures.

From time to time we also develop wholly owned senior living communities. At December 31, 2006, we had five wholly owned communities under construction with a resident capacity of over 700 residents. At December 31, 2007, we had eight wholly owned communities under construction with a resident capacity of over 900 residents. We expect most of these communities to be sold to a venture or third party before construction is completed or, in some cases, upon receipt of a certificate of occupancy. We provide funding for the construction, not otherwise financed by construction loans, and capitalize the development costs associated with construction prior to the contribution of the development community to a venture or third-party owner. For communities that remain wholly owned, we often recognize operating losses during the initial one to two years prior to the community achieving stabilization.

### Senior Living Condominium Developments

We began to develop senior living condominium projects in 2004. By the first quarter of 2008, we had discontinued or suspended the development of all but one of our condominium development projects.

## Special Independent Committee Inquiry and Accounting Review

### Special Independent Committee Inquiry

In December 2006, Sunrise's Board of Directors established a Special Independent Committee to review certain allegations made by the SEIU. In March 2007, Sunrise's Board of Directors expanded the scope of the Special Independent Committee's mandate to include the review of facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the restatement, and to develop recommendations regarding any remedial measures, including those pertaining to internal controls and processes over financial reporting, that it may determine to be warranted.

On September 28, 2007, the Company disclosed that the Special Independent Committee had concluded the fact-finding portion of its inquiry with respect to three issues. The first involved the timing of certain stock option grants. The second involved the facts and circumstances with respect to two significant categories of errors in the pending restatement relating to real estate accounting for the effect of preferences provided to the buyer in a partial sale, certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate, and accounting for allocation of profits and losses in those ventures in which Sunrise's partners received a preference on cash flow. The third involved whether directors and executive officers traded in Sunrise common stock when in possession of non-public knowledge of possible accounting errors related to these real estate transactions prior to Sunrise's May 2006 announcement of its accounting review. With respect to these three issues, the Special Independent Committee found:

- no evidence of backdating or other intentional misconduct with respect to the grants on the 38 grant dates examined, including those specifically questioned by the SEIU, or the possible errors identified by the Special Independent Committee in the accounting for stock options;
- no evidence of an intention to reach an inappropriate accounting result with respect to the two categories of real estate accounting errors reviewed, no knowledge that these accounting errors were incorrect at the time they were made, and no evidence that information was concealed from review by the external auditors at the time the accounting judgments were made; and

59

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

- no evidence that any director or officer who traded in the months prior to the announcement of the Accounting Review had material non-public information relating to either of these two categories of real estate accounting errors.

The Special Independent Committee identified a number of accounting issues under GAAP in connection with certain of the option grants reviewed. As a result of the Special Independent Committee's findings, the Company concluded that unintentional errors were made in connection with the accounting for a September 1998 repricing and certain other stock option grants. These errors were corrected as part of the restatement of our historical consolidated financial statements as set forth in Note 2 to our Consolidated Financial Statements. See "Restatement of Consolidated Financial Statements — Accounting for Stock-Based Compensation" for additional information.

On December 20, 2007, the Company announced the completion of the fact-finding portion of the Special Independent Committee inquiry with respect to the last issue being reviewed by it. This portion of the inquiry primarily related to the review of certain judgmental accruals and reserves. The Special Independent Committee found that inappropriate accounting occurred with respect to certain adjustments in these accruals and reserves during the third quarter of 2003 through the fourth quarter of 2005. This inappropriate accounting was corrected as part of the restatement of our historical consolidated financial statements as set forth in Note 2 to our Consolidated Financial Statements.

For information regarding remedial issues recommended by the Special Independent Committee and adopted by the Board of Directors, please refer to Item 9A in this Form 10-K.

During 2007, we have incurred approximately $42 million in professional fees and other costs in connection with the Company's Accounting Review and the Special Independent Committee's inquiry.

### Accounting Review

The financial statements as of and for all periods prior to December 31, 2005 were subject to a comprehensive Accounting Review to correct various accounting errors. The Accounting Review resulted in the following major restatement categories:

- real estate sales;
- costs of real estate projects;
- equity method investments with preferences;
- revenue recognition for Greystone contracts;
- stock-based compensation;
- reimbursed expenses; and
- other adjustments.

Note 2 to the consolidated financial statements provides a reconciliation between amounts previously reported and the restated amounts in the Consolidated Statements of Income for the years ended December 31, 2005 and 2004 and the Consolidated Balance Sheet as of December 31, 2005. As shown in Note 2 to our Consolidated Financial Statements, the impact to 2005 and 2004 pre-tax income was an increase of $15.6 million in 2005 and a reduction of $79.8 million in 2004. The impact to net income was an increase in 2005 of $7.3 million and a reduction in 2004 of $49.6 million. In addition, certain of the adjustments impacted periods prior to 2004 and the net effect of these prior adjustments is a $101.1 million reduction in total stockholders' equity at January 1, 2004. The adjustment for real estate sales and equity method investments with preferences was a $160.6 million reduction to pre-tax income. A large portion of these adjustments result from delayed recognition of sales transactions, which have been recognized in 2006 or may be recognized in subsequent periods as ventures are recapitalized or sold or guarantees expire due to the passage of time. When recognized, these transactions are reflected in "gain on the sale and development of real estate and equity interests" and/or "Sunrise's share of earnings and return on investment in unconsolidated communities" in the consolidated statements of income. In 2006, the gain on the sale and development of real estate included $36.8 million related to recognition of sales for GAAP purposes that had been corrected in the Accounting Review. We anticipate that gain on the sale and development of real estate will

60

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008