**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In Re SUNRISE SENIOR LIVING, INC. Derivative Litigation | **Civil Action No. 07-00143** |
| This Document Relates To:<br><br>ALL ACTIONS | |

<u>**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT
AND INCORPORATED MEMORANDUM OF LAW**</u>

## TABLE OF CONTENTS

MOTION .......................................................................................................................3

MEMORANDUM OF LAW ..........................................................................................3

I.    INTRODUCTION ...............................................................................................3

II.   FACTUAL AND PROCEDURAL BACKGROUND .......................................5

    A.   The D.C. Action ........................................................................................6

    B.   The Delaware Action .................................................................................8

    C.   Settlement Negotiations ..........................................................................10

III.  TERMS AND BENEFITS OF THE SETTLEMENT ....................................11

    A.   Monetary Relief ......................................................................................11

    B.   Corporate Governance Reforms ..............................................................12

IV.   STANDARD OF REVIEW ...............................................................................13

    A.   The Law Favors Settlement .....................................................................13

    B.   The Court's Role in Approval of a Derivative Settlement ......................14

V.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD
      BE APPROVED BY THE COURT ................................................................16

    A.   Risks of Establishing Liability ................................................................18

    B.   The Range of Possible Recovery, the Risks of Establishing Damages, and
        Defendants' Ability to Withstand Greater Judgment ..............................21

    C.   The Complexity, Expense and Duration of Continued Litigation ..........24

    D.   Reaction to the Settlement Has Been Decidedly Favorable ...................26

    E.   The Stage of the Proceedings at Which the Settlement was Reached .....27

    F.   The Experience and Views of Counsel Favor Approval ..........................28

VI.   THE AGREEMENT FOR THE PAYMENT OF ATTORNEYS' FEES AND
      REIMBURSEMENT OF EXPENSES SHOULD BE APPROVED ................29

    A.   The Parties Negotiated at Arm's-Length and Agreed Upon a Fair and Reasonable
        Fee and Expense Award ...........................................................................29

    B.   Plaintiffs' Counsel Are Entitled to Attorney Fees and Reimbursement of Expenses
        Because Their Efforts Conferred a Substantial Benefit on Sunrise and Its
        Stockholders ............................................................................................32

VII.  CONCLUSION ..................................................................................................35

<u>**MOTION**</u>

Plaintiffs Catherine Molner, Robert Anderson and Janie Morrison ("Plaintiffs")[1] move this Court for an Order, substantially in the form attached as Exhibit D to the Stipulation and Agreement of Settlement ("Stipulation"), providing for final approval of the proposed settlement of this action (the "Settlement") and approval of the negotiated attorney fees and expenses.[2]  For the reasons set forth in the incorporated memorandum of law, in the Stipulation dated May 4, 2009, and in the accompanying Declaration of Lee D. Rudy ("Rudy Dec.") in support of this motion, this Court should find that the Settlement is fair, reasonable and adequate to Sunrise Senior Living, Inc. ("Sunrise" or the "Company") and its stockholders, and should be approved, and should also approve Plaintiffs' Counsel's fees and expenses as agreed to by the parties.

<u>**MEMORANDUM OF LAW**</u>

## I.    <u>INTRODUCTION</u>

Plaintiffs respectfully submit this brief in support of the Settlement of: (1) the above-captioned shareholder derivative action (the "D.C. Action"); and (2) the similar shareholder derivative action captioned *Young, et al. v. Klaassen, et al.*, No. 2770-VCL (Del. Chanc.) (the "Delaware Action") (collectively with the D.C. Action, the "Actions"), under the terms of the Stipulation.[3]

---

[1] Catherine Molner, an original named plaintiff in the Action, died during the pendency of this litigation.  Her son, Robert Molner, agreed to substitute as a plaintiff in this Action.  Plaintiff Robert Anderson is no longer a shareholder of Sunrise.  Plaintiff Janie Morrison is still a Sunrise shareholder and moves the Court to approve the Settlement.

[2] The Stipulation was filed with the Court on May 4, 2009 as an Exhibit to the Unopposed Motion for Preliminary Approval (*See* Dkt. # 96-2).  The Proposed Final Judgment and Order is attached to the Stipulation as Exhibit D (*See* Dkt. # 96-6).

[3] This brief incorporates by reference the entirety of the parties' Stipulation.  Unless otherwise herein defined, all capitalized terms used herein shall have the same meanings as set forth in the Stipulation.

The Settlement was the culmination of over two years' worth of litigation and arm's-length negotiations among experienced counsel who understood and debated the merits of the Actions. Plaintiffs' Counsel conducted an extensive investigation which included, among other things: (i) inspecting, reviewing and analyzing the Company's public filings; (ii) researching corporate governance issues; (iii) participating in numerous telephonic conferences with Defendants' counsel; (iv) researching the applicable law with respect to the claims asserted in the Actions and the potential defenses thereto; and (v) employing a financial expert to conduct an analysis of the Company's accounting, financial reporting and stock option granting practices. Plaintiffs believe that the Settlement is fair, reasonable and adequate to Sunrise and Sunrise stockholders. Accordingly, the Court should approve the Settlement.

As demonstrated below, the efforts of Plaintiffs and their counsel in asserting and prosecuting the Actions was a material factor in Defendants' decisions to: (i) reprice the 700,000 stock options granted to Defendant Paul Klaassen ("Klaassen") in conjunction with his employment agreement executed in September 2000 from $8.50 per share to $13.09 per share, representing an intrinsic value to the Company of $3,213,000 (Defendant Klaassen has also repaid the value of all bonuses he received for fiscal years 2003 through 2005, totaling $601,790, and disclaimed bonuses for fiscal years 2006 and 2007); (ii) implement and/or maintain certain changes to the Company's corporate governance policies; and (iii) convene the Company's overdue 2007 annual meeting on October 16, 2007. These material benefits fully justify this Court's approval of the Settlement as fair and reasonable and, in light of the extensive and successful services rendered by Plaintiffs' Counsel in prosecuting and resolving the Actions, the Fee and Expense Award agreed upon by Defendants.

On May 20, 2009, this Court entered a Preliminary Approval Order (the "Preliminary Order"): (i) directing that a final settlement hearing be held on June 26, 2009 (the "Settlement Hearing") to determine the fairness, reasonableness, and adequacy of the Settlement and the Fee and Expense Award; and (ii) approving the form and content of the Notice of Settlement of Derivative Action (the "Notice") as proposed by Plaintiffs.  Pursuant to the Preliminary Order, the Notice was published in *Investors' Business Daily* by Sunrise on May 27, 2009.  *See* Declaration of N. Thomas Connally filed with the Court on June 4, 2009 ("Connally Dec.") at ¶¶6-7 and Exhibits A and B (Dkt. # No. 98).

The Notice contained detailed descriptions of the history of the Actions and the proposed Settlement, the claims that will be released if the proposed Settlement is approved, and the Fee and Expense Award sought by Plaintiffs' Counsel.  The Notice further disclosed the time and place of the Settlement Hearing and advised Sunrise stockholders of the procedures for objecting to the proposed Settlement and/or Fee and Expense Award.  The time for stockholder objections has passed, and despite the fact that Sunrise has thousands of stockholders who have been notified about this Settlement, Plaintiffs' Counsel are unaware of even a single objection to the proposed Settlement or to the Fee and Expense Award, which is very strong evidence that they are fair, reasonable, and adequate.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

Sunrise shareholders first filed derivative lawsuits concerning the Company's stock option granting practices against certain of the Company's officers and directors in August and September 2006 in the Circuit Court of Fairfax County, Virginia.  Those actions were dismissed, the time for any appeals has expired, and they are no longer pending.  On December 11, 2006, Sunrise's Board of Directors (the "Board") appointed a special committee (the "Special

Committee") of putatively independent directors "to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants."

A.    **The D.C. Action**

On January 19, 2007, the first of three shareholder derivative complaints, each alleging substantially similar allegations on behalf of Sunrise in connection with alleged stock option grant manipulation and other accounting improprieties, was filed in the Federal Court.[4]  The other shareholder derivative complaints were filed in the Federal Court on January 31, 2007 and February 5, 2007, respectively.[5]  On May 9, 2007, upon stipulation of the D.C. Plaintiffs and Defendants, the cases were consolidated into the D.C. Action under the caption *In re Sunrise Senior Living, Inc. Derivative Litigation*, No. 07-00143, and the Court appointed co-lead plaintiffs and co-lead counsel in the D.C. Action.

On June 29, 2007, the Consolidated Shareholder Derivative Complaint (the "Consolidated Complaint") was filed in the D.C. Action.  The Consolidated Complaint sought relief based on federal claims for violations of Section 10(b), 14(a) and 20(a) and Rules 10b-5 and 14-A-9 of the Securities Exchange Act, and state law claims for accounting, breach of fiduciary duty and/or aiding and abetting, unjust enrichment, rescission, insider selling and misappropriation of information, and violation of Del. Gen. Corp. Law § 211(c).

On July 19, 2007, the D.C. Plaintiffs moved the Federal Court for partial summary judgment on Count X of the Consolidated Complaint related to the Defendants' failure to hold an annual meeting of shareholders in violation of Del. Gen. Corp. Law § 211(c).  While the parties

---

[4] This action was styled *Brockton County Contributory Retirement System v. Klaassen, et al.*, No. 1:07-cv-00143-RBW.  D.C. Plaintiff Morrison subsequently substituted for Brockton County Contributory Retirement System as the named plaintiff in that action.

[5] These actions were styled *Molner v. Klaassen, et al.*, No. 1:07-cv-00227-RBW and *Anderson v. Klaassen, et al.*, No. 1:07-cv-00286-RBW, respectively.

fully briefed this motion, a parallel action in the Delaware Court of Chancery styled *Millenco,*

*LLC v. Sunrise Senior Living, Inc.*, C.A. No. 3095-CC (the "Millenco Action"), which also

sought to force Sunrise to hold an annual meeting of shareholders, was decided and the Delaware

Court of Chancery ordered Sunrise to hold an annual meeting of shareholders on October 16,

2007.  Upon learning of the Delaware Court of Chancery's ruling in the Millenco Action, the

D.C. Plaintiffs notified the Federal Court of the withdrawal of their motion for partial summary

judgment, as it had been effectively mooted.

On August 27, 2007, Defendants moved to dismiss the Consolidated Complaint,

contending, among other things, that the D.C. Plaintiffs had not alleged specific facts to establish

their claims and that the D.C. Plaintiffs had not sufficiently alleged that demand on the Board

would have been futile.  On September 28, 2007, the Company disclosed the factual findings of

the Special Committee's investigation that was predominantly related to the allegations

contained in the Actions.  Therein the Company announced that while the Special Committee

investigation had found no evidence of intentional misconduct, it had found a number of internal

control deficiencies related to stock option accounting and other accounting issues at Sunrise.

On October 26, 2007, the D.C. Plaintiffs filed their Amended Consolidated Shareholder

Derivative Complaint (the "Amended Complaint"), removing the mooted claim concerning

Sunrise's failure to hold an annual meeting and supplementing their allegations with additional

information that had only become available after the filing of the Consolidated Complaint.

Defendants opposed the filing of the Amended Complaint, but after full briefing by the parties,

the Court permitted the D.C. Plaintiffs to file the Amended Complaint by an Order dated March

28, 2008.

On May 16, 2008, the D.C. Plaintiffs moved the Federal Court to partially lift the automatic discovery stay imposed by the Private Securities Litigation Reform Act.  The parties fully briefed this motion, and on October 28, 2008 the Federal Court denied the motion.

On June 16, 2008, nominal defendant Sunrise and the Individual Defendants filed four separate motions to dismiss the Amended Complaint, encompassing over 135 pages.  On July 24, 2008, the D.C. Plaintiffs opposed the four motions to dismiss in two separate forty-plus page submissions.  The Defendants filed their reply briefs on August 18, 2008.  While the motions to dismiss were pending before the Federal Court, the parties to the D.C. Action began to engage in settlement discussions as detailed further below.

On March 27, 2009, the Federal Court denied without prejudice the Defendants' motions to dismiss, following the parties to the D.C. Action representing to the Federal Court that they intended to settle the D.C. Action.

### B.       The Delaware Action

On March 7, 2007, the Delaware Plaintiffs initiated the Delaware Action by filing in the Chancery Court their initial complaint on behalf of Sunrise against certain of the Individual Defendants.  The Delaware Plaintiffs' complaint was substantially similar to the complaint filed by Plaintiff Catherine Molner in the D.C. Action and contained substantially similar allegations against the Individual Defendants named in the Delaware Action, but only sought relief on the basis of state law claims.

On June 29, 2007, the defendants named in the Delaware Action submitted briefs in support of their motions to dismiss or in the alternative stay the Delaware Action.  The Delaware Plaintiffs submitted an amended complaint in response to the Defendants' motions to dismiss on September 18, 2007.  Then on November 2, 2007, the Delaware Action defendants submitted

briefs in support of their motions to dismiss or in the alternative stay the Delaware Action in light of the Delaware Plaintiffs' allegations contained in their amended complaint.  On December 31, 2007, the Delaware Plaintiffs submitted a brief in opposition to the Delaware Action defendants' motions to dismiss.  On February 20, 2008, defendants in the Delaware Action filed reply briefs in further support of their motions to dismiss.

On March 6, 2008, in response to the Delaware Action defendants' reply briefs, the Delaware Plaintiffs moved to strike or in the alternative compel production of documents upon which the Delaware Action defendants relied upon in their reply briefs, asserting that references in the reply briefs were grounded in non-public information that formed the bases for the Special Committee's conclusions that the Individual Defendants did not engage in any misconduct.  On March 12, 2008, the Delaware Action defendants filed briefs in opposition to the Delaware Plaintiffs' motion to strike or in the alternative compel.

On April 25, 2008, the Chancery Court ordered that the Delaware Action defendants produce documents underlying the Special Committee's conclusions cited in defendants' reply briefs on the motions to dismiss.  After receiving these documents, on September 22, 2008, the Delaware Plaintiffs filed a supplemental response to the Delaware Action defendants' motions to dismiss the Delaware Action.  Then on October 21, 2008, the Delaware Action defendants filed supplemental briefs in further support of their motions to dismiss.

On October 30, 2008, the Delaware Plaintiffs filed a letter with the Chancery Court, requesting a 90-day stay of the Delaware Action.  On February 2, 2009 and May 5, 2009, after the 90-day period elapsed, counsel for the parties to the Delaware Action filed letters with the Chancery Court regarding the status of the case.  Nothing substantive has occurred in the

Delaware Action since the Delaware Plaintiffs requested the 90-day stay.  Indeed, the Delaware Action defendants' motions to dismiss are still pending before the Chancery Court.

### C.    Settlement Negotiations

In early December 2008, during the pendency of the motions to dismiss in the D.C. Action, counsel for certain of the Individual Defendants engaged D.C. Plaintiffs' Counsel in preliminary settlement discussions.

On December 9, 2008, D.C. Plaintiffs' Counsel sent a settlement demand letter to Defendants outlining the terms of a proposed settlement of the D.C. Action.  Over the next two and a half months, the Settling Parties engaged in extensive arm's-length negotiations over the terms of a proposed settlement.  D.C. Plaintiffs' Counsel sought and received substantial non-public documents related to Sunrise's Special Committee investigation into the allegations set forth in the D.C. Action.

The Settling Parties' settlement negotiations were further facilitated by an experienced mediator, the Honorable Nicholas H. Politan (ret.), and eventually culminated in the Settling Parties' execution of a binding Memorandum of Understanding on or about February 20, 2009 (the "MOU"), which detailed the terms of the Settlement as set forth in the Stipulation. Following the execution of the MOU, Defendants provided D.C. Plaintiffs' Counsel with additional discovery materials regarding the real estate accounting allegations in the D.C. Action.

After D.C. Plaintiffs' Counsel reviewed these additional discovery materials, on May 4, 2009, Plaintiffs, fully informed of the strengths and weaknesses of the allegations of the Actions, agreed to and executed the Stipulation with the other Settling Parties.  Also on May 4, 2009, the D.C. Plaintiffs filed an Unopposed Motion for Preliminary Approval of Shareholder Derivative Settlement and Incorporated Memorandum, which attached the Stipulation as Exhibit A.  On

May 20, 2009, the Federal Court issued a Preliminary Approval Order preliminarily approving the Settlement and scheduling a final settlement hearing on June 26, 2009.

## III.   TERMS AND BENEFITS OF THE SETTLEMENT

The Stipulation acknowledges that the terms of the Settlement provide substantial benefits to Sunrise and Sunrise stockholders as a result of the Actions and that Plaintiffs' prosecution of the Actions was a material factor in the Company's decision to agree to adopt and/or maintain the Settlement terms described below (Rudy Dec. at ¶13; Stipulation, ¶5.1.), including the monetary recovery provided for in the Settlement, the Company's decision to comprehensively overhaul the procedures and policies by which stock options are granted, reported, and accounted for at the Company, and the decision to convene Sunrise's 2007 annual meeting of shareholders.

### A.   Monetary Relief

Defendant Paul Klaassen ("Klaassen") and Sunrise agreed that the 700,000 options granted to Klaassen in conjunction with his employment agreement executed in September 2000 shall be repriced from (a) $8.50 per share, the price set on Monday, September 11, 2000 by the Compensation Committee of Sunrise's Board based on the prior business day's closing price; to (b) $13.09 per share, the closing price on the business day prior to November 10, 2000, the date on which Sunrise's full Board approved the terms of Klaassen's employment agreement.  The repricing of Klaassen's stock option grant represents an intrinsic value to the Company of $3,213,000.  Defendant Klaassen has also repaid the value of all bonuses he received for fiscal years 2003 through 2005, totaling $601,790, and disclaimed bonuses for fiscal years 2006 and 2007.

## B.     Corporate Governance Reforms

In addition, Sunrise and Plaintiffs have reached agreement on various corporate governance issues, including certain enhancements to internal controls and procedures at Sunrise.  Upon approval of the Settlement by this Court, provided that all of the events set forth in ¶9.1 of the Stipulation have been met and have occurred, Sunrise shall within thirty (30) days from the Effective Date adopt and/or agree to maintain the Corporate Governance Reforms set forth in the Stipulation.[6]

The Corporate Governance Reforms agreed to by the Settling Parties include, among others, the following: (i) increased director independence, including separation of the positions of Chairman of the Board and Chief Executive Officer, the addition of two new independent directors and the requirement that all directors certify that they are independent and notify the Board immediately of any change in their independent status; (ii) declassification of the Sunrise Board, such that each director will be up for annual re-election; (iii) strengthening of the Company's stock option granting policies, including (a) better documentation, (b) limiting the consideration and approval of broad-based grants to once a year, (c) requiring grants related to personnel events (e.g. hiring, promotion, etc.) to be considered and approved at the next scheduled meeting of the Compensation Committee, (d) extending the vesting period for stock option grants and (e) requiring the exercise price of stock options to be granted at 100% of fair market value on the date of grant; (iv) increased compensation committee oversight, including the development of a long-term incentive plan where members of management submit written bonus objectives to be reviewed by the Compensation Committee; (v) amendment of the Compensation Committee Charter to prohibit the delegation of stock option granting authority;

---

[6] The entire list of corporate governance reforms can be found in Exhibit A to the Stipulation of Settlement.  *See* Dkt. # 96-3.

(vi) increased Audit Committee oversight, including quarterly meetings with the Company's senior officers and external auditors and the review of corporate performance against management's strategic business plans as well as all material changes in Sunrise's accounting policies and principles; (vii) appointment of a Director of Internal Audit who reports directly to the CEO and Audit Committee; (viii) creation of a formal Disclosure Committee responsible for ensuring that information that is or may be required to be disclosed by the Company is collected, recorded, processed, summarized and disclosed accurately and timely; (ix) creation of a Governance and Compliance Committee; (x) implementation of an executive compensation claw-back policy, which permits the Board to recoup incentive bonuses paid to the CEO and CFO irrespective of inappropriate conduct; (xi) adoption of an insider trading policy prohibiting employees and directors from trading in Sunrise securities while in possession of material, non-public information; (xii) director education requirements; (xiii) improvements to the Company's financial training and accounting internal controls; and (xiv) the holding of Sunrise's 2007 annual shareholder meeting.

The numerous corporate governance changes provided for by the Settlement are designed both to address and prevent errors in the Company's stock option granting processes and to strengthen the Company's internal accounting controls and procedures to ensure that the misconduct alleged in the Actions will not happen in the future and provide for a stronger, better governed Company for Sunrise stockholders.

## IV.   STANDARD OF REVIEW

### A.   The Law Favors Settlement

Courts have long favored the voluntary settlement of contested claims.  *See e.g.*, *Williams v. First Nat'l Bank*, 216 U.S. 582 (1910); *American Sec. Vanlines, Inc. v. Gallagher*, 782 F.2d

1056, 1060 (D.C. Cir. 1986) ("Few public policies are as well established as the principle that courts should favor voluntary settlements of litigation by the parties to a dispute.").  In particular, derivative actions readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation. *See Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) (settlements of derivative actions are particularly favored because such litigation is "'notoriously difficult and unpredictable'") (citation omitted).

### B.   The Court's Role in Approval of a Derivative Settlement

Fed. R. Civ. P. 23.1 requires court approval of a shareholder derivative action settlement.[7]  In this regard, federal courts must determine the "fairness, reasonableness and adequacy" of a proposed settlement.  *Osher v. SCA Realty I*, 945 F. Supp. 298, 304 (D.D.C. 1996).  Moreover, it is well-established that courts assume a limited role when reviewing a proposed settlement.  *Id.* at 304.  Where, as here, the parties have thoroughly investigated the factual background of the case, vigorously advanced their respective views of the strengths and weaknesses of the case, negotiated at arm's-length and in good faith to arrive at a settlement recognizing the valuable benefits Plaintiffs helped obtain for Sunrise and Sunrise stockholders, the Settlement should be approved.

The proposed Settlement enjoys a presumption that it is fair and reasonable, because it is the product of extensive, arm's-length negotiations conducted by capable counsel who are well experienced in class and derivative actions.  *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981).  Notably, "[p]ublic policy in this Circuit

---

[7]  Rule 23.1 provides that a shareholder derivative action "shall not be dismissed or compromised without the approval of the court, and notice…shall be given to shareholders or members in such manner as the court directs."  *See* Fed. R. Civ. P. 23.1(c).

favors settlement" of complex litigation and a "presumption of fairness, adequacy, and reasonableness may attach to a" settlement reached after "arms' length negotiations between experienced, capable counsel after meaningful discovery." *Freeport Partners, L.L.C. v. Allbritton*, 2006 U.S. Dist. LEXIS 9710, *26 (D.D.C. Mar. 13, 2006).  In analyzing any settlement which requires court approval, the Court must take into account "the strong judicial policy favoring settlement as well as . . . the realization that compromise is the essence of settlement." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

In determining whether a settlement is fair, adequate and reasonable, courts consider relevant factors, including, among others, the following: (1) adequacy of settlement in light of best possible recovery; (2) adequacy of settlement in light of all risks of litigation; (3) complexity of suit; (4) reaction to the settlement; (5) stage of proceedings; (6) risks of establishing liability; (7) risks of establishing damages; (8) risks of maintaining class status; and (9) ability to withstand greater judgment.  *Osher*, 945 F. Supp. at 304 (articulating the "Nine-factor *Girsh* test" propounded in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).[8]  The standards for approval of class and derivative actions are similar:

> The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest.  The adequacy of the recovery provided the corporation by the settlement must be considered in light of the best possible recovery, of the risks of establishing liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation.

---

[8] Plaintiffs are unaware of any D.C. Circuit authority setting forth settlement factors under Rule 23.1.  Plaintiffs respectfully submit that the factors applied in the class-action settlement context should be applied in the Actions, as other courts have found appropriate in the derivative context.  *See, e.g., Klein v. Broadhead,* Case No. 02-20170-CIV-GOLD, Order and Final Judgment of Dismissal at 7 (S.D. Fla. Nov. 28, 2004) (noting that Rule 23.1 does not provide standards for settlement and applying class action settlement standards similar to the *Girsh* test articulated by the Eleventh Circuit in *Bennett*, 737 F.2d at 986).

*Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978) ("While in *Girsh v. Jepson* we discussed

the necessity of considering such factors in determining the fairness of the settlement of a class

action in order to protect the rights of absent members of the class of plaintiffs, it is clear that the

same factors are relevant in a shareholders' derivative suit.") (citation omitted).[9]

The district court must exercise "sound discretion" in approving a settlement. *Ellis*, 87

F.R.D. at 18; *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). Therefore,

in exercising its discretion,

> the court's intrusion upon what is otherwise a private consensual agreement
> negotiated between the parties to a lawsuit must be limited to the extent
> necessary to reach a reasoned judgment that the agreement is not the product of
> fraud or overreaching by, or collusion between, the negotiating parties, and that
> the settlement, taken as a whole, is fair, reasonable and adequate to all
> concerned.

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). In evaluating

these considerations, the court must not try the case on the merits. *Ass'n for Disabled*

*Americans*, 211 F.R.D. at 467 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).

Rather, the court "must rely upon the judgment of experienced counsel and, absent fraud, 'should

be hesitant to substitute its own judgment for that of counsel.'" *Ass'n for Disabled Americans*,

211 F.R.D. at 467 (citation omitted).

## V.   THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT

The Settlement is an excellent result for Sunrise and Sunrise stockholders as it confers

substantial monetary and corporate therapeutic benefits on the Company and avoids the risks that

---

[9] Notably, the Delaware factors for settlement approval in the stockholder class/derivative action context are substantially the same: (1) the risks of establishing liability; (2) the risks of establishing damages; (3) the complexity, expense, risk and duration of further litigation; (4) the reaction of the affected shareholders to the proposed settlement; and (5) the views of counsel. *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986).

Plaintiffs would have faced going forward with the prosecution of the Actions.  In the context of the alleged wrongdoing, the Settlement creates lasting benefits to Sunrise, which are specifically designed to protect and preserve Sunrise for the benefit of the Company and its stockholders. *See generally*, *In re Caremark Int'l, Inc.,* 698 A.2d 959, 966 (Del. Ch. 1996).

Indeed, a monetary recovery and the establishment of a previously non-required corporate governance procedure or mechanism (as will be accomplished by the Settlement proposed here) provide significant benefits to the nominal defendant in a derivative suit.  *See Citron v. Burns*, C.A. No. 7647, 1985 Del. Ch. LEXIS 382, at *6 (Del. Ch. Feb. 4, 1985).[10] Here, the enhancements enacted will help minimize the probability of future violations of fiduciary duties and damages to the Company.[11]

There can be little doubt that well-governed companies with truly engaged boards of directors tend to outperform those that are not perceived to have these qualities.[12]  Moreover, it is equally clear that well-governed companies with strong boards tend to command a stock market

---

[10]  Federal courts interpreting state law (usually, Delaware law) have reached this same conclusion on numerous occasions.  *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (collecting cases from the Second, Fourth, Fifth, and Sixth Circuits and finding that remedial measures are an adequate basis for settlement of, and judicial approval of, derivative settlements).

[11]  *See In re Infinity Broadcasting Corp.*, 802 A.2d 285 (Del. 2002) (settlement's future impact on the corporation is properly considered in evaluating a proposed settlement and it would be reversible error if a court only considered the immediate tangible results in determining the fairness of a proposed settlement).

[12] A 2003 study by Gompers, Ishii and Metrick of over 1500 large companies in the 1990s concluded that stockholders owning shares in the companies with the "strongest" corporate governance mechanisms produced "abnormal" returns 8.5% higher than less well-governed companies.  Paul A. Gompers, Joy L. Ishii, and Andrew Metrick, *Corporate Governance and Equity Prices*, Quarterly Journal of Economics 118 (2003).  Building on this study, in 2003, Cremers and Nair found that companies with strong corporate governance mechanisms produced annualized returns 10-15% higher than less well-governed companies.  K.J. Martijn Cremers and Vinay B. Nair, *Governance Mechanisms and Equity Prices*, Yale International Center for Finance Working Paper No. 03-15; NYU Center for Law and Business Research Paper No. 03-09 (August 2003).

valuation premium compared to less-well governed companies.[13]  Through the terms of the

Settlement, the Board has positioned Sunrise and Sunrise stockholders to reap the benefits of a

better-governed Company.

As a result of the enactment of the Corporate Governance Reforms, Sunrise will be less

likely to become subject to long and costly litigation in the future.[14]  Sunrise's conformance to

the law, regulations, and high standards of business ethics required by the prophylactic measures

of the Settlement is fully expected to preclude a repetition of the consequences of the violations

alleged.  Accordingly, the Settlement should be approved.

A.     **Risks of Establishing Liability**

The risks inherent in establishing liability are an important factor for the Court to

consider.  *Osher*, 945 F. Supp. at 304.  Complex shareholder litigation is always uncertain, and

the Actions were no different.  To recover derivatively on the Company's claims at trial,

Plaintiffs would have had to, among other things, demonstrate that making a pre-suit demand on

the Board was "futile" and that the Defendants' actions were not the product of valid business

---

[13] The leading international consulting firm McKinsey & Company began a study in 2000
where they interviewed over 2000 institutional investors.  Approximately 75% of the
respondents reported that board performance was at least as important to them as financial
performance.  In addition, nearly 80% of the respondents stated that they would be willing to
pay a premium for shares of a company that was well-governed versus one that was not,
assuming that the past financial performance of the companies was similar.  *Investor Opinion
Survey on Corporate Governance*, McKinsey & Company (June 2000).

[14]  *See, e.g.*, *Cohn v. Nelson*, 375 F. Supp.2d 844, 854-55 (E.D. Mo. 2005), which approved the
settlement of a shareholder's derivative action and found that:

> The Settlement's Corporate Governance reforms specifically designed to
> minimize the probability of violations of fiduciary duties and federal securities
> laws in the future.  As a result of the implementation to the settlement's
> corporate governance changes, [the corporation] is far less likely to become
> subject to long and costly securities litigation in the future, as well as prosecution
> or investigation by regulators and prosecutors.

judgment.  Satisfying both tests would have been a significant challenge for Plaintiffs.  *See* Rudy Dec. at ¶20.

Here, Plaintiffs ***did not*** make a demand on the Board to commence the Actions.  Thus, absent Settlement, there is, at the least, an open question as to whether Plaintiffs would have standing to bring claims on the Company's behalf.  In order to pursue their claims, Plaintiffs would first have to establish that demand on the Board was excused as a matter of law.  *See, e.g., Aronson v. Lewis*, 473 A.2d 805 (Del. 1984).  Establishing demand futility is always an uncertain proposition.  *See, e.g., Beam v. Stewart*, 845 A.2d 1040, 1048-52 (Del. 2004); *Levine v. Smith*, 591 A.2d 194, 197-208 (Del. 1991).  Indeed, as Plaintiffs' Counsel can attest through their own substantial personal experience in this area of the law, the pre-suit demand requirement is no empty procedural test.  *See* Rudy Dec. at ¶20.

Since the spring of 2006, many corporations have announced internal or governmental investigations related to their historical option granting practices, and these investigations, in turn, have produced a flurry of shareholder derivative lawsuits.  *See* Rudy Dec. at ¶21.  Many of these actions have been dismissed on demand futility grounds,[15] including cases where the

---

[15] *See, e.g., In re Linear Technology Corp. Deriv. Litig.,* 2006 WL 3533024 (N.D. Cal. Dec. 7, 2006); *In re Openwave Systems S'holder Deriv. Litig.,* 2007 WL 1456039 (N.D. Cal. May 17, 2007); *In re Computer Sciences Corp. Deriv. Litig.,* 2007 WL 1321715 (C.D. Cal. Mar. 26, 2007); *In re F5 Networks, Inc.,* 2007 WL 2476278 (W.D. Wash. Aug. 6, 2007); *In re PMC-Sierra, Inc. Deriv. Litig.,* 2007 WL 2427980 (N.D. Cal. Aug. 22, 2007); *In re CNET Networks, Inc. S'holder Deriv. Litig.,* 483 F. Supp.2d 947 (N.D. Cal. 2007); *In re Infosonics Corp. Deriv. Litig.,* 2007 WL 2572276 (S.D. Cal. Sept. 4, 2007); *In re Verisign, Inc. Deriv. Litig.,* 531 F. Supp.2d 1173 (N.D. Cal. 2007); *Risberg v. McArdle,* 529 F. Supp.2d 213 (D. Mass. 2008); *In re Finisar Corp. Deriv. Litig.,* 2008 WL 131867 (N.D. Cal. Jan. 11, 2008); *In re Extreme Networks, Inc.,* 2008 WL 3523901 (N.D. Cal. 2008); *In re MIPS Technologies, Inc. Deriv. Litig.*, 542 F.Supp. 2d 968 (N.D. Cal. 2008); *Desimone v. Barrows,* 924 A.2d 908 (Del. Ch. 2007); *Wandel v. Eisenberg,* No. 603665/06, slip. op. (N.Y. Sup. Ct. May 2, 2007).

subject corporation **admitted** that it improperly awarded backdated or otherwise manipulated options.[16] *Id.*

Here, Defendants have denied that options were intentionally backdated at Sunrise, even though they have stated, among other things, that there existed a number of internal control deficiencies related to stock option accounting and other accounting issues at Sunrise during the Relevant Period.  Stip. at ¶2.7.  Thus, although Plaintiffs believe that they had strong demand futility allegations in the Actions,[17] Plaintiffs' Counsel are also aware that similar allegations in other shareholder derivative actions have failed.  *See, e.g., In re Openwave Systems, Inc.,* 2007 WL 1456039 (N.D. Cal. 2007); *Risberg,* 529 F. Supp.2d at 213.  Plaintiffs faced a challenge to adequately allege demand futility and believed that there was a real risk that the Actions might never have progressed beyond the pleading stage.  *See* Rudy Dec. at ¶21.

Even assuming Plaintiffs had adequately alleged demand futility, they still would have had to overcome the protections afforded the Board under the so-called "business judgment rule."  Rudy Dec. at ¶20.  The business judgment rule generally affords a strong presumption that, in making a disinterested business decision, the directors of a Delaware corporation acted on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the corporation.  *In re Walt Disney Co., Deriv. Litig.*, 907 A.2d 693, 746-47 (Del. Ch. 2005); *Aronson,* 473 A.2d at 812.  Although Plaintiffs believed they could overcome

---

[16]   Plaintiffs' Counsel are aware of shareholder derivative actions which were dismissed on demand futility grounds despite admissions of "backdating" (*see, e.g.*, *CNET,* 483 F. Supp.2d at 947) or that grants were ***"selected retrospectively…due to price considerations"*** (*see, e.g., Extreme Networks,* 2008 WL 3523901).

[17]   *See, e.g., Weiss v. Swanson*, 2008 WL 623324 (Del. Ch. Mar. 7, 2008).

the business judgment rule protections,[18] the defense would have been hotly litigated, making liability in the Actions uncertain.  *See* Rudy Dec. at ¶20.

Plaintiffs faced other hurdles as well.  Sunrise and the Individual Defendants argued in their respective motions that Plaintiffs had failed to plead their claims with the particularity required by Federal Rule of Civil Procedure 9(b) or establish valid federal and state law claims against certain of the Individual Defendants.  Plaintiffs also faced the potentially persuasive arguments made by Defendants on the basis of jurisdiction and standing.

Based upon the record, applicable law and practical reality, it is therefore clear that there were serious risks in overcoming potential defenses and in establishing both liability and damages.  Indeed, the Ninth Circuit, in affirming the district court's approval of a settlement of a derivative action, noted that "the odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful."  *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).  Even if liability was established, the amount of recoverable damages would still have posed significant issues and would have been subject to further litigation.  Thus, instead of the risk of failure, inherent in continued litigation, to achieve any benefit for Sunrise, the Settlement guarantees an excellent result with the implementation of important corporate governance changes, and immediate financial benefits to Sunrise.  Accordingly, the Settlement should be approved.

**B.     The Range of Possible Recovery, the Risks of Establishing Damages, and Defendants' Ability to Withstand Greater Judgment**

Other relevant factors relate to the adequacy of settlement in light of the range of possible recovery, the risks associated with establishing damages, and the ability of the defendant to

---

[18]  For example, if Plaintiffs could have proved that a director awarded himself options with the benefit of hindsight, then the protections of the business judgment rule would not apply.  *Ryan v. Gifford,* 918 A.2d 341, 357-58 (Del. Ch. 2007).

withstand greater judgment.  *Osher*, 945 F. Supp. at 304.  Plaintiffs may lose at the pleading

stage, at summary judgment or trial if this Court or a jury finds that the Individual Defendants'

actions were protected by statute or the business judgment rule, precluding recovery against

some or all of the Individual Defendants.  Thus, the amount of recovery could easily have been

zero.

Even if Plaintiffs were successful in establishing liability, to establish damages at trial,

they would have had to prove, among other things, that the claims in the Actions actually caused

Sunrise to suffer damages and that the Individual Defendants, as a matter of law, could be held

liable for those damages.  Under traditional applications of Delaware law which apply to this

Delaware corporation, *Kamen v. Kemper Fin. Services, Inc.,* 500 U.S. 90 (1991), Plaintiffs faced

a formidable challenge establishing and collecting monetary damages in the Actions.  *See* Rudy

Dec. at ¶¶22-23.

The issue of damages to Sunrise would have been hotly disputed and clearly would have

been the subject of expert testimony proffered by all parties.[19]  The damages assessments of

experts retained by the parties would surely vary substantially, and the assessment of this crucial

element of Plaintiffs' claims would be reduced at trial to a "battle of the experts."  It is far from

certain how a jury would have evaluated Defendants' experts' opinions.  Indeed, a jury might be

swayed by defense experts seeking to establish that damages were caused by factors other than

the Individual Defendants' alleged wrongdoing, or, alternatively, trying to minimize the amount

of the Company's damages.  *See, e.g.*, *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104,

129 (S.D.N.Y. 1997).  Conceivably, a jury could find that there were no damages or that the

---

[19] *See In re Lloyd's Am. Trust Fund Litig.*, 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *61 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages . . . is a complicated and uncertain process, typically involving conflicting expert opinions.  The reaction of a jury to such complex expert testimony is highly unpredictable.").

damages were a mere fraction of the amount that Plaintiffs contended.  Moreover, even if

Plaintiffs were successful at trial, the Court likely could not have ordered Sunrise to adopt the

comprehensive corporate governance and internal control reforms Plaintiffs achieved in the

Settlement.

Compared to the uncertain outcome of a trial, the Corporate Governance Reforms and the

repricing of Klaassen's stock option grant provide the certainty of a known benefit.  Indeed, the

corporate governance procedures address Plaintiffs' allegations and are designed to prevent

further stock option granting problems, accounting scandals, and financial internal control

deficiencies.  As the U.S. Court of Appeals for the Fifth Circuit cogently observed in *Maher*:

> [W]here, as here, the derivative suit is largely an attack on past corporate
> management practices, as well as on some present officers and directors, the
> dollar amount of a possible judgment, which is essentially the sole goal in the
> class action damage suit, is not the sole, and may well not be the most important,
> matter to be considered, for the effects of the suit on the functioning of the
> corporation may have a substantially greater economic impact on it, both long-
> and short-term, than the dollar amount of any likely judgment in its favor in the
> particular action.

714 F.2d at 461.  "The evaluation of such an economic impact is necessarily judgmental and

imprecise and normally does not lend itself to meaningful quantification."  *Id.*  While the

evaluation of the economic impact of the corporate governance provisions is imprecise, it is

anticipated that the impact of the governance measures will be to increase the value of Sunrise

shares in the future.

While it is clear to Plaintiffs that Sunrise suffered ***losses*** as a result of the conduct

challenged in the Actions, the question of whether it suffered legal, non-exculpated ***damages*** is a

much more complicated question.  Thus, the range of recovery, the complex damages issues

versus the known benefits of Settlement, and the long-term value provided to the Company

through the monetary relief and corporate governance enhancements secured in the Settlement, clearly weigh in favor of its approval.

###  C.    The Complexity, Expense and Duration of Continued Litigation

Another factor militating in favor of the Settlement is the complexity, expense and likely duration of the litigation.  *Officers for Justice*, 688 F.2d at 625; *Girsh*, 521 F.2d at 157.  The Actions involved complex claims and involved myriads of regulations and calculations.  If not for this Settlement, the Action would have continued to be fiercely contested by the parties.  A trial could occupy attorneys on both sides and the Court for weeks.  The expense of such a trial and the use of both judicial resources and the resources of the parties would have been substantial.

Furthermore, submitting a matter to a jury is always, at best, an uncertain proposition. *See Weiss v. Mercedes-Benz of North America, Inc*, 899 F. Supp. 1297, 1300-1301 (D.N.J. 1995) ("[W]hen parties negotiate a settlement they have far greater control of their destiny than when a matter is submitted to a jury.  Moreover, the time and expense that precedes the taking of such a risk can be staggering.  This is especially true in complex commercial litigation.").  The Settlement provides immediate, certain and substantial benefits to Sunrise and its stockholders and avoids years of delay, added expense and uncertainty.[20]  A prolonged period of pretrial proceedings and a lengthy and uncertain trial would not serve the interest of the Company and its stockholders in light of the benefits provided by the prosecution and settlement of the Actions.

---

[20] The determination of a "reasonable" settlement is not susceptible to a mathematical equation yielding a particularized sum.  Rather, as one court explained, "there is a range of reasonableness with respect to a settlement."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).  In fact, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Justice*, 688 F.2d at 624 (citation omitted).  Given the obstacles and uncertainties inherent here, the Settlement is a very good result and is unquestionably superior to another "possibility" which certainly exists—little or no recovery.

Moreover, any judgment favorable to Plaintiffs would likely be the subject of post-trial motions and appeal, which would prolong the case for years with the ultimate outcome uncertain. It is also clear that even a victory at trial is no guarantee that a judgment would ultimately be sustained on appeal.  Substantial judgments awarded by trial courts have been reversed on appeal.  *See, e.g.*, *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict in favor of plaintiff overturned and j.n.o.v. entered in favor of defendant); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial).

Add to these appellate risks the difficulty and unpredictability of a lengthy and complex trial—where witnesses could suddenly become unavailable or the fact finder could react to the evidence in unforeseen ways—and the benefits of the Settlement become all the more apparent. *See In re Apollo Group, Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) (the court on a motion for judgment as matter of law, overturned a jury verdict of $277 million in favor of shareholders based on insufficient evidence presented at trial to establish loss causation).  Thus, the Settlement, providing immediate benefits, is advantageous to the Company.  *See*, *e.g.*, *In re Warner Communications Sec. Litig.,* 618 F. Supp. 735, 748 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("[a]n appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself.").[21]  Plaintiffs weighed each of these risks against the Settlement's immediate benefits.  *See* Rudy Dec. at ¶25**.**

---

[21]    *See Packard v. Provident Nat'l Bank*, 994 F.2d 1039 (3d Cir. 1993) (reversing judgment requiring bank to reimburse class members in excess of $60 million and dismissing case); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (class won a jury verdict and a motion for judgment N.O.V. was denied, but on appeal the judgment was reversed and the case dismissed); *Trans World Airlines, Inc. v. Hughes*, 312 F. Supp. 478, 485 (S.D.N.Y. 1970), *modified*, 449 F.2d 51 (2d Cir. 1971), *rev'd*, 409 U.S. 363, 366 (1973) ($145 million judgment overturned after years of litigation and appeals).

In light of the complexity, length, and uncertainty of the continued prosecution of the Actions, and the benefits achieved by the Settlement, the conclusion is inescapable—the Settlement is fair and reasonable and should be approved.

### D.      Reaction to the Settlement Has Been Decidedly Favorable

Pursuant to the terms of the Preliminary Order, on May 27, 2009, the Company published the Notice in *Investors' Business Daily* and attached the Notice as an Exhibit to a Form 8-K filed with the SEC.  *See* Connally Dec. at ¶6-7 and Exhs. A and B.  Here, the Notice period was 30 days, a period long enough to easily satisfy federal notions of due process.[22]

Pursuant to the terms of the Preliminary Order, any objections to the Settlement had to be lodged with the Court and served on the parties no later than June 12, 2009.  Here, and despite the fact that Sunrise has more than 50 million shares outstanding held by thousands of stockholders,[23] Plaintiffs are not aware of a single objection to the Settlement or the requested Fee and Expense Award.  "In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor."  *Lipuma v. Am. Express Co.*, 406 F. Supp.2d 1298, 1324 (S.D. Fla. 2005).

Even a small number of objections is convincing evidence of a proposed settlement's fairness and adequacy.  *See, e.g., Perez,* 501 F. Supp.2d. 1360, 1381 (noting that "[a] low percentage of objections demonstrates the reasonableness of a settlement."); *Stoetzner v. U.S.*

---

[22]  *See U.S. v. Alabama*, 271 Fed. Appx. 896, 901 (11th Cir. 2008) (two week notice period was sufficient); *Miller v. Republic Nat'l Life Ins. Co*., 559 F.2d 426, 429-30 (5th Cir. 1977) (four weeks between notice and settlement hearing was sufficient); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975 (19 day notice period sufficient); *Greenspun v. Bogan*, 492 F.2d 375, 378 (1st Cir. 1974)  (24 day notice period sufficient).

[23]  *See* the Yahoo! finance key statistics page for Sunrise at http://finance.yahoo.com/q/ks?s=SRZ.  Notably, nearly 55% of the Company's float is held by institutional investors who have the financial resources to pursue objections in shareholder actions of this nature.

*Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) ("only" 29 objections out of a 281 member

class "strongly favors settlement"); *Rome v. Archer*, 197 A.2d 49, 58 (Del. 1964) (approving

settlement agreement which was ratified by a very large majority of the stockholders); *Chiulli v.*

*Hardwicke Cos., Inc.*, 1985 WL 11532 at *1 (Del. Ch. Feb. 11, 1985) (in the absence of

objection, approval of settlement "would be almost perfunctory").  Plaintiffs submit that the lack

of objection to the Settlement also strongly weighs in favor of its final approval.

        E.        **The Stage of the Proceedings at Which the Settlement was Reached**

        The Actions settled well after the Plaintiffs had analyzed and understood the strengths

and weaknesses of their claims.  Plaintiffs' Counsel carefully and thoroughly investigated the

case before filing.  Rudy Dec. ¶3.  Plaintiffs' Counsel reviewed the stock option grants at issue in

the Actions and did so with the help of a financial expert.  *Id.*  Plaintiffs' Counsel have had

extensive prior experience in stock option backdating cases such as this one (*Id.*, ¶4), and

understood how to evaluate the Board's action in light of applicable Delaware law.  Plaintiffs'

Counsel drafted detailed amended complaints.

        The parties engaged in lengthy settlement negotiations over the course of several months.

(*Id.*, ¶¶5, 11, 18, 19).  After approximately two and a half years of litigation and research into the

strength of Plaintiffs' claims, the parties reached an agreement in principle for the settlement of

the Actions.  (*Id.*, ¶¶3-5, 8-12, 18, 19, 24-26).  Plaintiffs' Counsel evaluated all the information

about the dates, times and amounts of the stock options that allegedly were backdated and

concluded that the settlement reached was in the best interest of Sunrise and its stockholders.

Plaintiffs' Counsel's evaluation was supplemented by substantial informal discovery of more

than a thousand pages of non-public documents provided by Defendants, detailing the Special

Committee's investigation, information concerning the allegedly backdated stock option grants

and information pertaining to the real estate accounting violations alleged by Plaintiffs. Accordingly, Plaintiffs had completed adequate discovery to make an informed decision regarding the fairness, reasonableness and adequacy of the Settlement, which weighs heavily in favor of approval.

F.     **The Experience and Views of Counsel Favor Approval**

In appraising the fairness of the Settlement, the opinion and recommendation of experienced counsel favoring the Settlement is entitled to considerable weight.  As one court stated: "[T]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness.  Attorneys, having intimate familiarity with a lawsuit after litigating the action, are in the best position to evaluate the action, and the court should not without good cause substitute its judgment for theirs."  *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) (citations omitted); *see also In re Nat'l Student Marketing Litig.*, 68 F.R.D. 151, 155 (D.D.C. 1974) (stating that "[t]he opinion and judgment of experienced counsel, whose labors produced the settlement, should also receive due consideration"); *Schleiff v. Chesapeake & Ohio Railway Co.*, 43 F.R.D. 175, 179 (S.D.N.Y. 1967) (noting that "recommendation of the compromise by the experienced counsel for plaintiffs is entitled to great weight").

Here, Plaintiffs' Counsel have litigated scores of shareholder class and derivative actions and have well-known national reputations of pursuing their cases to a successful resolution, whether by trial or settlement.  *See* Rudy Dec. at ¶19, and Exhs. A, B, and C.  Plaintiffs' Counsel have made a considered judgment based on their knowledge of the facts of the Actions and their extensive experience that the Settlement is in the best interests of Sunrise and Sunrise stockholders and the recovery of substantial value from defendant Klaassen and the enactment of the Company's Corporate Governance Reforms represent an excellent achievement under all the

circumstances.  *See* Rudy Dec. at ¶¶14-17.  Accordingly, the Settlement should be finally

approved.[24]

## VI.   THE AGREEMENT FOR THE PAYMENT OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES SHOULD BE APPROVED

### A.   The Parties Negotiated at Arm's-Length and Agreed Upon a Fair and Reasonable Fee and Expense Award

Plaintiffs' Counsel's efforts in prosecuting and settling the Action conferred substantial

benefits upon Sunrise in the form of both financial and corporate governance therapeutic relief.

In recognition of these substantial benefits, the Company has agreed to pay Plaintiffs' Counsel

$1,000,000 in attorneys' fees and expenses.  This is an appropriate resolution of the issue of fees

and expenses, and the fee is well below the range of agreed-to fees paid in other shareholder

derivative cases settled for similar relief.[25]

The United States Supreme Court has endorsed the consensual resolution of attorneys'

fees in these types of cases as the ideal toward which litigants should strive.  In *Hensley v.

Eckerhart*, 461 U.S. 424, 437 (1983), the Supreme Court stated: "A request for attorney's fees

should not result in a second major litigation.  Ideally, of course, litigants will settle the amount

of a fee."  Where there is no evidence of collusion and no detriment to the parties, the court

should give "substantial weight to a negotiated fee amount."  *Ingram v. Coca-Cola Co.*, 200

F.R.D. 685, 695 (N.D. Ga. 2001).  The weight accorded to a negotiated fee is particularly

---

[24] The last factor of the "*Girsh* test"—the risk of maintaining class status—is inapplicable in the derivative context of the Actions.

[25] *See*, *e.g.*, *In re BP P.L.C. Derivative Litig.*, No. 3AN-06-11929CI, slip op. (3rd Jud. Alaska May 7, 2008) (awarding $9.75 million in fees, plus expenses for corporate governance reforms); *Unite Nat'l Ret. Fund v. Watts*, No. 04-CV-3603 (DMC), 2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005) (awarding $9.2 million in fees and expenses); *In re Schering-Plough Corp.*, No. 01-1412, slip op. (D.N.J. Jan. 15, 2008) (awarding $9.5 million in fees); .

appropriate when, as here, "no objection has been raised to the fee award and the amount of fees is entirely consistent with a reasonable fee award under the circumstances of the case." *Id.*

The fee here was negotiated under market conditions, a process which courts have encouraged. *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568-70 (7th Cir. 1992) (market factors, best known by the negotiating parties themselves, should determine the quantum of attorney fees). The virtue in the negotiation of a fair fee by adversary parties to a settlement (the defendants who must pay the fee versus the lawyers who wish to receive it) is that "[m]arkets know market values better than judges do." *Id.* at 570. Plaintiffs' Counsel wished to maximize the fees to compensate them (as the case law encourages) for their risk, innovation and creativity, while the Company wished to pay the minimum. The amount agreed to reflects the parties' experience as to what is appropriate for the benefits obtained. *See, e.g., In re Nyfix, Inc. Derivative Litig.*, No. FST-CV-06-4009324S (Conn. Super. June 4, 2009) (approving fees and expenses of $1.3 million in a backdating settlement providing monetary relief and corporate governance reforms) Ex. D; *In re K-V Pharm. Co. Derivative Litig.*, No. 07-cv-384-HEA (E.D. Mo. July 26, 2008) ($1.65 million; same) Ex. E; *In re Western Digital Corp. Derivative Litig.*, No. SACV 06-729-AG (C.D. Cal. June 9, 2008) ($1.4 million; same) Ex. F; *In re Barnes & Noble Derivative Litig.*, No. 602389/2006, (N.Y. Sup. Ct. May 5, 2008) ($2.75 million; same) Ex. G; *In re The Cheesecake Factory Inc. Derivative Litig.*, No. CV-06-6234-ABC (N.D. Cal. Apr. 14, 2008) ($2.1 million; same) Ex. H; *In re Family Dollar, Inc. S'holder Deriv. Litig.*, No. 3:06-00510, (W.D.N.C. Aug. 13, 2007) ($3.5 million; same) Ex. I. The result is a fee which was negotiated at arm's-length and set by the market and which is, therefore, reasonable.

Plaintiffs' Counsel negotiated with their adversaries who saw Plaintiffs' Counsel's efforts first hand. Further, Defendants' Counsel have litigated on the defense side for many years and

are aware of fees paid in other actions of a similar nature.  Defendants were represented by

highly skilled lawyers and do not need (and have not sought) protection from the Court for the

result of their own negotiations regarding the amount of the fees and expenses to be paid.  All

counsel were able to consider and utilize as precedent fee decisions from other actions of a

similar nature.  In such circumstances, the end result of those negotiations—which reflects both

Plaintiffs' Counsel's and Defendants' Counsel's substantial experience as to what constitutes an

appropriate fee—is entitled to a great deal of weight in determining whether to approve the fee

request.

For example, in *Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985), the Second Circuit

concluded that courts should be hesitant to interfere in fee arrangements between settling parties

in shareholder actions when defendants have agreed "not to oppose" the payment of fees up to a

certain amount:

> [W]here . . . the amount of fees is important to the party paying them, as well as to
> the attorney recipient, it seems to the author of this opinion that an agreement "not
> to oppose" an application for fees up to a point is essential to completion of the
> settlement, because the defendants want to know their total maximum exposure
> and the plaintiffs do not want to be sandbagged. It is difficult to see how this
> could be left entirely to the court for determination after the settlement.

*Id.* at 905 n.5; s*ee also Court Awarded Attorney's Fees*, 108 F.R.D. at 267; *Johnson v. Georgia*

*Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("in cases of this kind, we encourage

counsel on both sides to utilize their best efforts to understandingly, sympathetically, and

professionally arrive at a settlement as to attorneys' fees.").

Here, Defendants have agreed to pay the Fee and Expense Award.  *See* Rudy Dec. at ¶27.

Accordingly, this Court's role in approving the Fee and Expense Award is very different from a

"statutory fee shifting" case, in which the defendant has not agreed to pay the plaintiff's

counsel's fees and thus reserves the right to challenge every item of work performed that

underlies the requested fee.  Thus, the Court need only approve the overall settlement package—

including the Fee and Expense Award—as fair, reasonable and adequate.  Plaintiffs' Counsel

respectfully submits that the Fee and Expense Award, which was arrived at following arm's-

length bargaining, is a reasonable term of the Settlement and should be approved.

> **B.**     **Plaintiffs' Counsel Are Entitled to Attorney Fees and Reimbursement of Expenses Because Their Efforts Conferred a Substantial Benefit on Sunrise and Its Stockholders**

Under the "substantial benefit" doctrine, counsel who prosecute a shareholders'

derivative case which confers benefits on the corporation are entitled to an award of attorney fees

and costs.  *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *Mills v. Elec. Auto-Lite Co.*, 396

U.S. 375 (1970).  In *Mills*, the United States Supreme Court stated that "an increasing number of

lower courts have acknowledged that a corporation may receive a 'substantial benefit' from a

[stockholders' action], justifying an award of counsel fees, regardless of whether the benefit is

pecuniary in nature," and that "regardless of the relief granted, private stockholders' actions of

this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders by providing

an important means of enforcement of the proxy statute."  *Id.* at 395, 396 (citations omitted).[26]

Commentators provide further support for the proposition that the substantial benefit obtained for

the company need not be monetary:

---

[26] This holds equally true in the context of stock option backdating settlements.  *See, e.g., In re Rambus Inc. Derivative Litig.*, No. 06-cv-3513, (N.D. Cal. Jan. 20, 2009) (approving fees and expenses of $2 million in a backdating settlement providing solely corporate governance reforms) Ex. J; *In re First American Corp. S'holder Derivative Litig.*, No. 06-cv-1230-JVS (C.D. Cal. Jan 8, 2009) ($2.05 million; same) Ex. K; *City of Pontiac Gen. Employees' Ret. Sys. v. Langone*, No. 2006-cv-122302, Findings of Fact in Support of Order and Final Judgment, at 4 (Fulton County, Ga. June 10, 2008) (awarding $14.5 million fee in connection with backdating settlement providing only corporate governance relief) Ex L; *Karstedt v. Isenberg*, No. 4:07-CV-00509 (S.D. Tex. May 14, 2008) (approving attorneys' fees and expenses of $2.85 million where the subject corporation received no direct monetary benefits in the backdating settlement) Ex. M; *Bacas v. Way*, 2008 WL 746825 (S.D. Tex. Apr. 1, 2008) ($3 million; same) Ex. N.

> In class action litigation, attorneys' fees are normally premised on the existence of a "common fund" awarded to the class from which the plaintiffs' attorneys' fees may be deducted.  However, in shareholder derivative actions, monetary recovery is not a required predicate to an award of attorneys' fees as long as a "substantial benefit" of some form has been rendered to the corporation as a result of the plaintiff's attorneys' efforts.  The substantial benefit may take the form of remedial corporate action to rectify the alleged wrongdoing . . . .

Ralph C. Ferrara, Kevin T. Abikoff, Laura Leedy Gansler, *Shareholder Derivative Litigation: Besieging the Board* §14.06, at 14-25 to 14-26 (Law Journal Press 2003).  Here, in addition to the substantial monetary recovery described in the Stipulation, Defendants have agreed to implement and/or maintain the corporate governance measures set forth in the Stipulation to reduce the chance of the improprieties alleged by the Plaintiffs occurring in the future.  These changes will continue to benefit Sunrise and its stockholders over the coming years.

The Actions were a material factor in Sunrise's decision to adopt and/or maintain these corporate governance improvements,  Stipulation, ¶5.1, and courts have consistently recognized that the result achieved is a major factor to be considered in approving a fee award.  *See, e.g.*, *Hensley*, 461 U.S. at 436 (the "most critical factor is the degree of success obtained").  The approval of a derivative settlement in an analogous action further confirms the value of the important corporate governance measures to Sunrise and its stockholders.  *See, e.g., Unite Nat'l Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 27, 2005) (approving $9.2 million attorney fee, because of "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement ... [which] will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings."  *Id.* at *18.

Moreover, courts have held that it is in the public interest to have experienced and able counsel enforce securities laws and regulations pertaining to the duties of officers and directors of public companies.  *See, e.g., Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del.

1980); *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1166 (Del. 1989).  Vigorous private enforcement of the federal securities laws and state corporation laws can occur only if private plaintiffs can obtain parity in representation with that available to large corporate interests. Private plaintiffs rarely have the financial resources to pay customary fixed hourly attorney rates for such representation, as such counsel can only feasibly be retained on a contingent basis  To encourage first-rate lawyers to represent plaintiffs in this type of socially important litigation, attorneys' fees awarded should reflect this goal.  *See, e.g., Cohn*, 375 F. Supp. 2d at 865 ("The Supreme Court has emphasized that while private actions provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action,' it is imperative that the filing of contingent class action and derivative lawsuits not be chilled by the failure to award attorneys' fees or by the imposition of fee awards that fail to adequately compensate counsel for the risks of pursuing such litigation, and the benefits that would not otherwise be achieved.") (Citations omitted).

Further, the Supreme Court has long recognized the value of derivative actions.  In *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949), the Supreme Court stated: "This remedy [derivative actions], born of stockholder helplessness, was long the chief regulator of corporate management and has afforded no small incentive to avoid at least grosser forms of betrayal of stockholders' interests.  It is argued, and not without reason, that without it there would be little practical check on such abuses."  If this important public policy is to be carried out, courts need to award fees that will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a shareholder derivative action.  Here, Plaintiffs' Counsel's efforts were performed and the results achieved on a wholly contingent basis, despite significant risk and in the face of determined, resourceful

opposition.  Given the substantial benefits obtained in light of the risks undertaken in the Actions, the agreed-to Fee and Expense Award is fair and reasonable and warrants Court approval.

**VII.**   **CONCLUSION**

The Settlement clearly represents a fair, adequate, and reasonable result in light of the nature and strength of Plaintiffs' claims, the defenses thereto, the procedural posture of the Actions, and all other pertinent facts and circumstances.  Moreover, the negotiated and agreed upon Fee and Expense Award is entirely fair and reasonable in light of the substantial benefits achieved in the Actions.  Accordingly, for all of the foregoing reasons, Plaintiffs respectfully request that the Court approve the Settlement and the Fee and Expense Award.

Date: June 19, 2009                                   Respectfully submitted,

**MURPHY ANDERSON PLLC**

*/s/ Mark Hanna*

George R. Murphy, Esq. (DC Bar 75200)
Mark Hanna, Esq. (DC Bar 471960)
Joni S. Jacobs, Esq. (DC Bar 493846)
1701 K Street NW, Suite 210
Washington, DC 20006
Tel. (202) 223-2620
Fax: (202) 223-8651
mhana@murphypllc.com

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
Lee Rudy, Esq.
Eric L. Zagar, Esq.
Michael Wagner, Esq.
J. Daniel Albert, Esq.
280 King of Prussia Road
Radnor, PA 19087
Tel. (610) 667-7706
Fax: (610) 667-7056

**SAXENA WHITE P.A.**
Maya Saxena, Esq.
Joseph White III, Esq.
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: (561) 394-3399
Fax: (561) 394-3382

**ROBBINS UMEDA LLP**
Brian J. Robbins, Esq.
Felipe J. Arroyo, Esq.
Ashley R. Palmer, Esq.
610 West Ash Street, Suite 1800
San Diego, CA 92101
Tel: (619) 525-3990
Fax: (619) 525-3991

*Attorneys for D.C. Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 19, 2009, I filed the foregoing using the Court's

CM-ECF system, which will send a notice of filing to the following parties:

| | |
|---|---|
| *Attorneys For Nominal Defendant Sunrise Senior Living, Inc.* | **HOGAN & HARTSON, LLP**<br>George H. Mernick, III<br>Columbia Square<br>555 Thirteenth Street, NW<br>Washington, D.C. 20004<br>Tel: (202) 637-5726<br>Fax: (202) 637-5910<br><br>N. Thomas Connally<br>Jon M. Talotta<br>Park Place II<br>7930 Jones Branch Drive<br>McLean, Virginia, 22102<br>Tel: (703) 610-6100<br>Fax: (703) 610-6200 |
| *Attorneys for Defendants Carl Adams, Ronald V. Aprahamian, Craig R. Callen, Thomas J. Donohue, Richard A. Doppelt, David W. Faeder, John F. Gaul, J. Douglas Holladay, Larry E. Hulse, Paul L. Klaasen, Teresa M. Klaasen, Pete A. Klisares, William Little, J. Willard Marriott, Jr. Scott F. Meadow, Darcy Moore, Thomas B. Newell, Robert R. Slager, Christian B.A. Slavin, Timothy S. Smick, Brian C. Swinton, Tiffany L. Tomasso* | **GIBSON DUNN & CRUTCHER, LLP**<br>John C. Millian<br>Jill S. Henderson<br>Matthew R. Estabrook<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036<br>Tel: (202) 955-8500<br>Fax: (202) 467-0539 |
| *Attorneys for Defendant David G. Bradley* | **WILLIAMS & CONNOLY, LLP**<br>Philip A. Sechler<br>Vidya Atre Mirmira<br>725 12th Street, N.W.<br>Washington, D.C. 20005<br>Tel: (202) 434-5000<br>Fax: (202) 434-5029 |

| *Attorneys for Defendant Bradley Rush* | **WILSON SONSINI GOODRICH & ROSATI Professional Corporation**<br>Elizabeth C. Peterson<br>650 Page Mill Road<br>Palo Alto, California 94304<br>Tel: (650) 493-9300<br>Fax: (650) 565-5100 |
|---|---|

*/s/ Mark Hanna*